STEPHEN H. ROGERS, ESQ.
Nevada Bar No. 5755
MARISSA R. TEMPLE
Nevada Bar No. 9028
ROGERS, MASTRANGELO, CARVALHO & MITCHELL
700 S. Third Street
Las Vegas, Nevada 89101
Phone (702) 383-3400
Fax (702) 384-1460
Email: Mtemple@rmcmlaw.com
Attorneys for Defendant

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| DONALD HUMES, | ) | CASE NO. 2:17-cv-01778-JAD-BNW |
| Plaintiff, | ) | |
| vs. | ) | |
| ACUITY, A MUTUAL INSURANCE COMPANY, a foreign corporation; DOES 1 through 10; and ROE CORPORATIONS 1 through 10, inclusive, | ) | **DEFENDANT'S MOTION TO DISQUALIFY ATTORNEY MARJORIE HAUF, ESQ.** |
| Defendants. | ) | |

Defendant Acuity, A Mutual Insurance Company ("Acuity"), by and through its attorneys, MARISSA R. TEMPLE, ESQ. of the law firm of ROGERS, MASTRANGELO, CARVALHO & MITCHELL, hereby files its Motion to Disqualify Attorney Marjorie Hauf, Esq. from serving as trial counsel in this matter.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1    This motion is made and based upon the pleadings and papers on file herein, the Points

2 and Authorities contained herein and any oral argument that may be adduced at the hearing of this

3 matter.

4    DATED this ___ day of February, 2020.

5                                         ROGERS, MASTRANGELO, CARVALHO &
                                          MITCHELL
6

7

8                                         STEPHEN H. ROGERS, ESQ.
                                          Nevada Bar No. 5755
9                                         MARISSA R. TEMPLE
                                          Nevada Bar No. 9028
10                                        700 S. Third Street
                                          Las Vegas, Nevada 89101
11                                        Attorney for Defendant

12                              **POINTS AND AUTHORITIES**

13                                         **I**

14                        **OVERVIEW AND RELIEF SOUGHT**

15    This case involves an automobile insurance policy entered into in the State of South

16 Dakota.  The Plaintiff/insured, is, and at all times herein was, a resident of the South Dakota, who

17 claims to have sustained injury in a motor vehicle accident occurring in Las Vegas, Nevada.  The

18 3-vehicle accident occurred on Saturday, April 6, 2013 at 6:19 pm on Las Vegas Blvd., just north

19 of Cathedral Way.  A 2003 Chevrolet Camaro, driven by Hussein Sattar, was traveling northbound

20 on Las Vegas Blvd. The Plaintiff, Donald Humes, driving a 2000 Saturn, was traveling behind Mr.

21 Sattar.  Alan Petty, driving a 2003 Nissan Xterra pickup truck, was traveling behind Plaintiff

22 Humes.  Traffic slowed/stopped and Mr. Petty was unable to stop his truck, causing it to strike the

23 rear of Plaintiff's vehicle, pushing it forward into the rear of Mr. Sattar's vehicle.  The Traffic

24 Accident Report reflects that there was "moderate" damage to Mr. Petty's truck  and Plaintiff's

25 vehicle, and "minor" damage to Mr. Sattar's vehicle.  Mr. Sattar and his passenger (his wife) did

26 not report any injury at the scene.  Neither did Mr. Petty or his passenger.

27    Acuity issued Plaintiff Humes (through his company AM Development LLC) Policy No.

28 4885671600 ("the Policy"), effective May 1, 2012.  The policy provides uninsured/underinsured

1  motorist coverage of up to $1,000,000 per person, per occurrence and medical payments coverage

2  of up to $5,000.  Mr. Humes seeks coverage under the subject policy.

3         On or about October 2, 2015, Plaintiff submitted a demand to Acuity for payment of

4  benefits under the Policy.  Plaintiff claims that Acuity "refused, delayed and failed to evaluate

5  Plaintiff's claim, and failed to tender any payments owed to Plaintiff under the insurance contract."

6  (Compl.¶ 21.)  Acuity's position is that, despite multiple requests for records and information on

7  Plaintiff's pre-accident medical care, Mr. Humes (through Mr. Humes' counsel, Marjorie Hauf,

8  Esq.) failed to respond.

9         After receiving the demand, and prior to the commencement of litigation, Acuity, through

10  its adjusters, requested information and documentation from Plaintiff, through his attorney, to

11  substantiate his claim, none of which was immediately forthcoming.  The attorney to which

12  correspondence was both directed and from whom it was received was Marjorie Hauf, Esq. of the

13  law firm of Ganz and Hauf. Specifically, for years before the commencement of litigation, Acuity

14  continued to request information regarding Mr. Humes' pre-accident medical condition.  On

15  October 13, 2015, Acuity adjuster Larry Reub requested an executed authorization for the release

16  of medical records, including records for pre-accident neck and back treatment, and a list of pre-

17  and post-accident medical providers.  In response, an authorization was provided by Marjorie

18  Hauf, Esq., but the dates permitted were from the accident date forward.  On November 12, 2015,

19  Larry Reub again wrote to Plaintiff's counsel Marjorie Hauf, Esq., requesting a properly executed

20  and dated authorization. On January 19, 2016, an authorization was received from MS. Hauf.  Yet

21  again, the authorization contained the wrong date.  The letter also did not include the provider list

22  as requested.  A response was sent from Acuity to counsel on February 2, 2016 requesting a

23  corrected authorization from Ms. Hauf; no response was received.  A follow up letter was sent to

24  Ms. Hauf on March 2, 2016; no response was received.  A follow up letter was sent to Ms. Hauf

25  on May 10, 2016; no response was received.  A follow up letter was sent to Ms. Hauf on July 6,

26  2016; no response was received.  Finally, on July 20, 2016, after almost 6 months, Majorie Hauf,

27  Esq. finally provided the requested authorization and a list of Plaintiff's medical providers.

28  Despite recognizing that there was medical treatment prior to the subject accident, including a

1    significant prior surgery, and requesting records and/or authorizations to allow for review of that

2    treatment, Ms. Hauf refused to provide the list of pre-accident providers and the records for those

3    providers.  (*See Correspondence to/from Acuity*, collectively attached hereto as Exhibit "A").

4         Plaintiff's Complaint against Acuity alleges two causes of action–Breach of Contract and

5    Breach of the Covenant of Good Faith and Fair Dealing. *(See Complaint,* Exhibit "B").  The key

6    question in this lawsuit is whether the evaluation of Plaintiff's injury claim, and ultimate decision

7    regarding payment of the demand amount, constituted a breach of the insurance contract, a breach

8    of the covenant of good faith and fair dealing, or other duties owed under the law.  In defense of its

9    evaluation process, Acuity claims the company reasonably and fairly handled Mr. Humes' claim

10   and that the delay in handling and failure to resolve was due solely to the inaction of Plaintiff,

11   through his attorney, Marjorie Hauf, Esq.

12        Given Marjorie Hauf, Esq.'s active role in the pre-litigation handling of this claim, she was

13   named as a witness by Defendant Acuity.  On July 12, 2018, Defendant served its 4th Supplemental

14   Disclosure of Documents and Witnesses formally identifying Marjorie Hauf, Esq. as a witness in

15   this matter  (*See* Disclosure, attached hereto as Exhibit "C"); no objection was filed and no

16   opposition was raised.  On July 16, 2018, a Notice of Taking Deposition of Marjorie Hauf, Esq.

17   was served (*See* Notice, attached hereto as Exhibit "D"); no objection was filed and no opposition

18   was raised.  On October 2, 2018, the deposition of Marjorie Hauf, Esq. was taken at the office of

19   defense counsel.  Ms. Hauf testified extensively regarding her knowledge of the pre-litigation

20   handling of this claim, including knowledge of the requirements for cooperation under the

21   applicable insurance policy, timeliness of her firm's responses to requests for information,

22   timeliness of Acuity's offers made to resolve, and settlement negotiations–issues that are all at the

23   heart of Plaintiff's breach of contract claim.  (*See* Hauf Deposition Transcript, attached hereto as

24   Exhibit "E")

25        The undersigned counsel for Defendant has raised the issue of disqualification with Ms.

26   Hauf both in writing and by phone.  Based on these interactions, it was counsel's understanding

27   that Ms. Hauf would agree to voluntarily withdraw as lead counsel on this case.  As this has not

28   yet occurred, and in anticipation of this matter going to trial, Defendant now seeks the Court's

Order excluding her as trial counsel for Plaintiff.

<div align="center">

**II**

**<u>ARGUMENT</u>**

</div>

**ATTORNEY MARJORIE HAUF SHOULD BE DISQUALIFIED AS COUNSEL AS SHE IS A NECESSARY WITNESS IN THIS CASE**

Attorneys admitted to practice before this court must "adhere to the standards of conduct prescribed by the Model Rules of Professional Conduct as adopted and amended from time to time by the Supreme Court of Nevada, except as such may be modified by this court." LR IA 10-7(a). Nevada Rule of Professional Conduct 3.7, in relevant part, states:

(a)     A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1)      The testimony relates to an uncontested issue;

(2)     The testimony relates to the nature and value of legal services rendered in the case; or

(3)     Disqualification of the lawyer would work substantial hardship on the client

A lawyer is likely to be a necessary witness when his or her testimony is relevant, material, and unobtainable elsewhere. *World Youth Day, Inc. v. Famous Artists Merchandising Exchange, Inc.*, 866 F.Supp. 1297, 1302 (D. Colo. 1994).

The majority of courts that have considered this issue require the party seeking disqualification to demonstrate that the sought after testimony is "relevant, material and unobtainable elsewhere." See e.g., *Id.* Thus, that party must establish: (1) that the testimony sought is material and relevant to the determination of the issues being litigated and (2) that the evidence cannot be obtained elsewhere. Here, Acuity argues that Ms. Hauf is a necessary witness regarding: (1) the events surrounding the initial policy limits demand, and (2) the evaluation and investigation of the claim following that demand. During her deposition, she answered multiple questions on those issues, never once directing the inquiry to another witness or individual within her firm, suggesting she is the one best suited to address such evidence. Furthermore, the majority of pre-litigation correspondence was directed to and received from Ms. Hauf.

Acuity will argue at trial that the investigation and evaluation of a claim necessarily relies upon the cooperation of the insured (and in this case, his attorney) since much of the necessary and relevant information needed to complete the investigation and evaluation rests solely within the knowledge of the insured/insured's attorney.  To defend against claims of breach of contract and bad faith, Acuity will further argue that it was reasonable for an insurer, when confronted with a demand such as the one from Plaintiff, to request, or be provided with, a medical authorization in order to allow the insurer to obtain relevant information to evaluate the claim.  In this case, Acuity was never provided with sufficient information from Plaintiff and his attorney Marjorie Hauf, Esq. to reasonably and fairly investigate and evaluate his claims for underinsured motorist coverage. Specifically, the company was provided with a deficient medical authorization, made repeated requests for follow up information (including a proper authorization), and requested a provider list, but did not receive a response from Ms. Hauf on behalf of her client.  Acuity's efforts were frustrated several times during the claim process" by Plaintiff and his attorney–all of which will be used in defense of the company's position that Acuity acted in good faith with respect to the claim for underinsured motorist coverage arising out of the subject motor vehicle accident.  Given this position, and Ms. Hauf's extensive involvement in the handling of the pre-litigation claim that forms the basis of Plaintiff's breach of contract claim, Ms. Hauf is a necessary witness. Accordingly, she must be precluded from serving as trial counsel and disqualified from participation in this case.

///
///
///
///
///
///
///
///
///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.

## CONCLUSION

Based on the foregoing, Defendant Acuity respectfully requests that this Honorable Court Order that Marjorie Hauf, Esq. be disqualified as counsel as she will undeniably be a necessary and central trial witness.

DATED this _____ day of February, 2020.

ROGERS, MASTRANGELO, CARVALHO & MITCHELL

STEPHEN H. ROGERS, ESQ.
Nevada Bar No. 5755
MARISSA R. TEMPLE
Nevada Bar No. 9028
700 S. Third Street
Las Vegas, Nevada 89101
Attorney for Defendant

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on the February 13, 2020, I electronically transmitted the attached

3    DEFENDANT'S MOTION TO DISQUALIFY ATTORNEY MARJORIE HAUF, ESQ. to the

4    Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing

5    to the CM/ECF registrant:

6    Marjorie Hauf, Esq.
     Ganz & Hauf
7    8950 West Tropicana Ave., Suite 1
     Las Vegas, Nevada 89147
8    Telephone: (702) 598-4529
     Facsimile: (702) 598-3626
9    *Attorneys for Plaintiff*

10

11

12

13                                          An Employee of
                                            Rogers, Mastrangelo, Carvalho & Mitchell
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

# EXHIBIT "A"



April 10, 2013

*Via Facsimile: (888) 880-9588*

Acuity Insurance Company
2800 South Taylor Drive
Sheboygan, WI 53081-8474

<blockquote>
Re:   My Client   :   **Donald and Barbara Humes**<br>
         Your Insured :   **Donald and Barbara Humes**<br>
         Policy No.   :   4885671600<br>
         Date of Loss :   04 / 06 / 2013
</blockquote>

To Whom It May Concern:

Please be advised that the firm of GANZ & HAUF has been retained to represent the interests of **Donald and Barbara Humes**, who were injured in a motor-vehicle accident, which occurred on or about April 6, 2013 in Las Vegas, Nevada. Please direct all correspondence regarding this claim to the attention of MARJORIE HAUF, ESQ.

I would appreciate your confirming the availability of medical pay and underinsured motorist coverages and the possibility of stacking. At this time, I would like to request a copy of your insureds' Declaration Page, disclosing Mr. and Mrs. Humes' policy limits. Please either mail or fax a copy to my office at your earliest convenience. In the event that Mr. and Mrs. Humes rejected underinsured motorist coverage, please provide a copy of their rejection page.

Additionally, if your insureds' policy requires your written consent as a condition precedent to settlement with the tortfeasor, please advise me of the same. I would request at this time consent to resolve the claim with the tortfeasor for the tortfeasor's liability automobile policy limits.

Thank you in advance for your cooperation in this matter. If you have any questions, please do not hesitate to contact our office.

Very truly yours,

GANZ & HAUF

MARJORIE HAUF, ESQ.

MH/ll
Enclosure



March 20, 2015

*Via Facsimile: (888) 880-9588*

Acuity Insurance Company
2800 South Taylor Drive
Sheboygan, WI 53081-8474

<div>

Re: My Client : Donald Humes and Barbara Grant
   Your Insured : Donald Humes and Barbara Grant
   Policy No. : 4885671600
   Date of Loss : 04 / 06 / 2013

</div>

To Whom It May Concern:

  Please let this letter serve as confirmation that Mr. Humes and Mrs. Grant's Underinsured/Uninsured Motorist claim carries a 6 year statute of limitations that begins from the above mentioned date of loss. If this is not your understanding please contact my office immediately.

       Very truly yours,

       GANZ & HAUF

       IDA YBARRA, ESQ.

IY/ba

8950 West Tropicana, Suite 1 • Las Vegas, NV  89147
Tel: 702.598.4LAW (4529) • www.ganzhauf.com • Fax: 702.598.3626
Con
000005

P 0002

NEO613



October 2, 2015

*Via US Mail and Facsimile (888) 880-9588*

Acuity Insurance Company
2800 South Taylor Drive
Sheboygan, WI  53081-8474

      Re:    **My Client**    :    **Donald Humes**
           **Your Insured** :    **Donald Humes**
           **Policy No.**    :    **4885671600**
           **Date of Loss**  :    **04 / 06 / 2013**

**<u>NOTE: THIS LETTER IS FOR SETTLEMENT PURPOSES AND IS NOT ADMISSIBLE
AS EVIDENCE PURSUANT TO NRS 48.105(1) and NRS 48.025.</u>**

Dear Ms. Farkas:

      As you are aware, my office has been retained to represent **Donald Humes** regarding the
injuries he sustained as a result of a motor vehicle accident which occurred on April 6, 2013.
This was a motor vehicle accident in which Mr. Humes suffered injuries arising from a collision
caused by Alan Petty.

      This was a devastating motor vehicle accident which caused serious injuries to Mr.
Humes. I have enclosed the following exhibits for your review:

1. Las Vegas Metropolitan Police Department Traffic Accident Report
   (Bates #'s 100001-100006)
2. Clark County Fire Department Medical Records
   (Bates #'s 100007-100014)
3. Medic West Ambulance Medical Records and Billing
   (Bates #'s 100015-100070)
4. Sunrise Hospital Medical Records and Billing
   (Bates #'s 100189-100221)
5. Alternative Health Care Medical Records and Billing
   (Bates #'s 100071)
6. Black Hills Surgery Center Medical Records and Billing
   (Bates #'s 100072-100143)
7. Advanced Pain Consultants Medical Records and Billing
   (Bates #'s 100144-100188)
8. The Rehab Doctors Medical Records and Billing
   (Bates #'s 100189-100221)

8950 W. Tropicana Avenue, Suite 1 • Las Vegas, NV  89147
Tel: 702.598.4LAW (4529) • www.ganzhauf.com • Fax: 702.598.3626

Acuity Insurance
October 2, 2015
Page 2 of 4

9.  Box Canyon Surgery Center Medical Records and Billing
    (Bates #'s 100189-100221)
10. Cora Health Services Medical Records and Billing
    (Bates #'s 100189-100221)
11. Chad Novasic Physical Therapy Medical Records and Billing
    (Bates #'s 100189-100221)
12. Well Care Pharmacy Medical Billing
    (Bates #'s 100222)
13. The Physical Therapy Center
    (Bates #'s 100189-100221)
14. Dr. Leon Future Cost Letter
    (Bates #'s 100189-100221)
15. Black Hills NeuroSurgery and Spine
    (Bates #'s 100223-100251)
16. The Physical Therapy Center
    Bates #'s 100252-100235)
17. HIPAA – Compliant Authorization signed by Mr. Humes
    (Bates #'s 100222)

Mr. Humes' providers thus far are, Clark County Fire Department, Medic West Ambulance, Sunrise Hospital, Alternative Health Care, Black Hills Surgery Center, Advanced Pain Consultants, The Rehab Doctors, Cora Health Services, Box Canyon Surgery Center, Chad Novasic Physical Therapy and Rapid City Hospital. I have enclosed also a signed HIPAA compliant authorization as exhibit 17, which will give you the authority to obtain any of Mr. Humes' medical records you believe you need.

**MEDICAL EXPENSES**

| | |
|---|---|
| MedicWest Ambulance | $950.02 |
| Sunrise Hospital | $3,494.00 |
| Alternative Health Care | $1,698.60 |
| Black Hills Surgery Center | $14,768.15 |
| Advanced Pain Consultants | $1,542.12 |
| The Rehab Doctors | $3,097.00 |
| Box Canyon Surgery Center | $11,100.00 |
| Cora Health Services | $3,284.30 |
| Chad Novasic Physical Therapy | $1,365.00 |
| Well Care Pharmacy | $608.94 |
| Black Hills NeuroSurgery and Spine | $556.93 |

Acuity Insurance
October 2, 2015
Page 3 of 4

_____

| The Physical Therapy Center | $1827.00 |
|---|---|
| **TOTAL** | **$44,292.06** |

### FUTURE MEDICAL EXPENSES FOR CERVICAL MEDIAL BRANCH BLOCKS

| Interventionalist's Fee | $8,400.00 |
|---|---|
| Anesthesiologist's Fees | $1,200.00 |
| Facility Fee | $11,100.00 |
| **TOTAL:** | **$20,700.00** |

### FUTURE MEDICAL EXPENSES FOR LUMBAR MEDIAL BRANCH BLOCKS

| Interventionalist's Fee | $4,000.00 |
|---|---|
| Anesthesiologist's Fees | $1,200.00 |
| Facility Fee | $7,400.00 |
| **TOTAL:** | **$12,600.00** |

## CONCLUSION

Based on the foregoing and the attached medical records, an underinsured motorist demand is hereby made for Mr. Don Humes in the amount of $250,000.00. Please find attached a letter from the tortfeasor's liability carrier in the above-referenced case. As you can see, the full $100,000.00 liability policy limit is not enough to fairly compensate my client.

This demand is based upon the fact that Mr. Don Humes has suffered both physically and emotionally, primarily due to the detraction from his quality of life. Don Humes has incurred $44,292.06 in medical expenses and will incur an additional $33,300 in future medical expenses. The information we have provided to you, and the $44,292.06 in current medical bills as well as the $33,000 in future payments, clearly justifies payment of your insured's demand of $250,000.00. However, I have enclosed an authorization, executed by my client, which will allow you to obtain any further information you think you need. .

:
:
:

8950 W. Tropicana Avenue, Suite 1 • Las Vegas, NV  89147
Tel: 702.598.4LAW (4529) • www.ganzhauf.com • Fax: 702.598.3626

Acuity Insurance
October 2, 2015
Page 4 of 4

_____

     Please let me hear from you prior to November 5, 2015. Thank you for your time and consideration.

                    Very truly yours,

                    GANZ & HAUF

                    MARJORIE HAUF, ESQ.

MH/rw
Enclosures
cc: Donald Humes

From:        Marjorie Hauf
To:          Ida Ybarra; Brittany Armstrong; Tina Manley
Subject:     FW: NE0613 Acuity Claim Your Client / Our Insured: Donald Humes / AM Development Inc.
Date:        Tuesday, October 13, 2015 3:06:11 PM
Attachments: NE0613 medical authorization.pdf

From: David Schmidt [mailto:David.Schmidt@acuity.com]
Sent: Tuesday, October 13, 2015 2:18 PM
To: Marjorie Hauf <Mhauf@GanzHauf.com>
Cc: Larry Reub <Larry.Reub@acuity.com>
Subject: NE0613 Acuity Claim Your Client / Our Insured: Donald Humes / AM Development Inc.

Dear Marjorie,

We have received your demand of $250,000 for settlement of Donald's Underinsured Motorist Claim dated October 2, 2015. Please note that the Claims Representative that is handling this matter is Larry Reub, not Mr. Farkas, as noted in your letter. I am assisting Mr. Reub with this file as Larry has just recently return from "storm duty".

In order for us to complete our evaluation we will need to gather Donald's prior medical records and history. You had included a medical authorization, but the authorization was for Hartford, not Acuity Insurance. I have attached an authorization for your client to complete for each medical provider your client has treated with prior to this accident, or any other provider your client has treated with since this accident that you had not supplied to us with your letter of October 2, 2015. If you have forwarded us all of the records (prior to and since this accident) for the providers included in your demand package, we do not need an authorization for those providers.

I noted in your demand package a letter from Hartford offering their policy limits of $100,000. Would you please advise if our insured has settled this claim and if so, would you please provide us a copy of the Hartford declarations page along with a copy of the release form.

Once we have gathered and reviewed all of Donald's medical records we will respond to your demand. If you have any questions on this request, please feel free to contact me. I look forward to working with you to bring this matter to a fair resolution.

Thanking you in advance for your cooperation and assistance in this matter.

David Schmidt, AIC
Field Claims Manager - North Dakota, South Dakota and Nebraska
Acuity Insurance
PO Box 58
Sheboygan, WI 53082
phone: (605) 371 0235
fax: (920) 208 7387

This e-mail is confidential. If you are not the intended recipient, you must not disclose or use the information contained in it. If you have received this e-mail in error, please tell us immediately by return e-mail and delete the document.



NE0613

October 16, 2015

*Via US Mail and Facsimile (888) 880-9588*

Larry Reub
Acuity Insurance Company
2800 South Taylor Drive
Sheboygan, WI  53081-8474

Re:  My Client        :    **Donald Humes**
     Your Insured  :    **Donald Humes**
     Policy No.      :    4885671600
     Date of Loss  :    04 / 06 / 2013

Dear Mr. Reub:

I am in receipt of your email on October 13, 2015, wherein you request a copy of Hartford's exhaustion of their $100,000.00 policy limits. Although it is not necessary to exhaust the underlying policy before the under insured motorist carrier evaluates the claim, under NV law. Please find the attached release signed by our client / your insured.

Again, Mr. Humes' demand is based upon the fact that he has suffered both physically and emotionally, primarily due to the detraction from his quality of life. Mr. Humes has incurred $44,292.06 in medical expenses along with $33,000 in future medical expenses. The information we have provided to you, and the $44,292.06 in current medical bills, alone, clearly justifies payment of his Underinsured Motorist's $250,000 demand.

Please let me hear from you prior to November 18, 2015. Thank you in advance for your cooperation in this matter.  If you have any questions, please do not hesitate to contact our office

Very truly yours,

GANZ & HAUF

MARJORIE HAUF, ESQ.

MH/rw
Enclosures
cc: Donald Humes

8950 W. Tropicana Avenue, Suite 1 • Las Vegas, NV  89147
Tel: 702.598.4LAW (4529) • www.ganzhauf.com • Fax: 702.598.3626





November 12, 2015

MS. MARJORIE HAUF
GANZ & HAUF

VIA EMAIL

RE:   Claim Number: NE0613
      Date of Loss: 04/07/2013
      Insured Name: AM DEVELOPMENT
      LLC
      Your Client/Our Insured: Donald
      Humes

Dear Ms. Hauf,

As you are aware, we have been in recent communication with you regarding obtaining Donald's medical records regarding this claim. We received your recent communication including the copy of the release from Hartford Insurance for their policy limits of $100,000. We thank you for providing this information.

In our correspondence of October 13, 2015, we had attached an authorization for your client to complete for each medical provider your client had treated with prior to, and as a result of this accident.

In response, you have provided us with an authorization for release of information included with your correspondence of October 16, 2015. This authorization specifies dates of service from April 6, 2013 to present, and is signed and dated July 11, 2013, with 90-day expiration from that date.

The authorization appears to have expired before it was provided to us, and limits authorization of medical information to post accident information.

We will again, attach an authorization for your client to complete for each medical provider your client has treated with for at least five years prior to this accident, and/or any other provider your client has treated with since the accident
We thank you for your cooperation and assistance. As soon as we have been able to review the medical records for your client, we will respond to your demand.

2800 South Taylor Drive · Sheboygan, WI 53081
920.458.9131   920.458.1618 FAX
www.acuity.com

K-651(2-14)

2

Again, thank you for your cooperation and assistance in this matter.

Sincerely,
/s/ Larry Reub

Larry W Reub
Claim Representative
Larry.Reub@acuity.com

cc:

K-651(2-14)

Jan. 19. 2016  3:54PM                                                                    No. 7324   P. 1



<div align="center">January 19, 2016</div>

*Via US Mail and Facsimile (888) 880-9588*

Larry Reub
Acuity Insurance Company
2800 South Taylor Drive
Sheboygan, WI  53081-8474

|      | Re:              |     |                |
|------|------------------|-----|----------------|
|      | My Client        | :   | Donald Humes   |
|      | Your Insured     | :   | Donald Humes   |
|      | Policy No.       | :   | 4885671600     |
|      | Date of Loss     | :   | 04 / 06 / 2013 |

Dear Mr. Reub:

I am in receipt of your letter dated November 12, 2015, wherein you request a medical authorization.  Please find enclosed a HIPAA-compliant authorization, executed by Mr. Humes.

Please let me hear from you prior to February 19, 2016 with an answer to our demand which was sent on October 16, 2015. Thank you in advance for your cooperation in this matter. If you have any questions, please do not hesitate to contact our office

<div align="center">Very truly yours,

GANZ & HAUF

*Ida Ybarra*

IDA YBARRA, ESQ.</div>

IY/ba
Enclosures

<div align="center">8950 W. Tropicana Avenue, Suite 1 • Las Vegas, NV  89147
Tel: 702.598.4LAW (4529) • www.ganzhauf.com • Fax: 702.598.3626</div>

 

February 2, 2016

MS. MARJORIE HAUF
GANZ & HAUF
8950 TROPICANA AVE, SUITE 1
LAS VEGAS  NV  89147

VIA US MAIL AND EMAIL BARMSTRONG@GANZHAUF.COM

RE:  Claim Number: NE0613
Date of Loss: 04/07/2013
Insured Name: AM DEVELOPMENT
LLC
Your Client / our Insured: Donald
Humes

Dear Ms. Hauf,

We are in receipt of your correspondence dated January 19, 2016 and thank you for the same. In that recent correspondence, you enclosed a HIPAA – compliant authorization, executed by Mr. Humes. That authorization provides for disclosure by the recipient for personal injury records arising from the accident of 4/6/13.

We again ask that you provide a list of, and authorization for each medical provider that your client has treated with for at least five years prior to this accident.  We will need to review any pre-accident records in order to properly evaluate this claim.

Enclosed also find a list of medical providers that we have identified from information you have provided, and from payment of medical payment coverage. Will you please review this list and confirm if the list is complete, and identify any additional providers that may not be identified.

You have asked us to respond to your demand by February 19, 2016. We will need the requested information prior to being able to evaluate and respond to the demand.  We will respond as soon as we are able to receive and evaluate the required information.

Again we thank you for your cooperation and assistance in this matter.

2800 South Taylor Drive · Sheboygan, WI 53081
920.458.9131 · 920.458.1618 FAX
www.acuity.com

P 0011
P 0013

 

March 2, 2016

MS. MARJORIE HAUF
GANZ & HAUF
8950 TROPICANA AVE, SUITE 1
LAS VEGAS  NV  89147

RE:  Claim Number: NE0613
Date of Loss: 04/07/2013
Insured Name: AM DEVELOPMENT
LLC
Your Client / Our Insured: Donald
Humes

Dear Ms. Hauf,

We would like to inquire as to the status of our communication to you, dated February 2, 2016.  Copy enclosed for your convenience.

Could you please confirm receipt of the correspondence of 2/2/2016 and advise us regarding the status of our requests.

Thank you for your consideration and cooperation.

Sincerely,

s/s Larry Reub

Larry W Reub
Claim Representative
Larry.Reub@acuity.com

cc:

2600 South Taylor Drive · Sheboygan, WI 53081
920.458.9131 · 920.453.1618 FAX
www.acuity.com

K-651(2-14)

I  0012
P  0014

 

May 10, 2016

MS. MARJORIE HAUF
GANZ & HAUF
8950 TROPICANA AVE. SUITE 1
LAS VEGAS NV 89147

RE:  Claim Number: NE0613
Date of Loss: 04/07/2013
Insured Name: AM DEVELOPMENT LLC
Your Client / Our Insured: Donald Humes

Dear Ms. Hauf,

We again would like to inquire as to the status of our communications to you dated February 2, 2016 and March 2, 2016.

Could you please confirm receipt of the correspondence of 2/2/16 in which we ask you to provide a list of, and or confirm the list of medical providers we enclosed .We also ask that you provide a Medical Authorization, or complete the Medical Authorization form we had provided, that would allow us to obtain medical records for 5 years pre accident.

We would sincerely appreciate your cooperation so that we might evaluate and respond to your requests for settlement.

Sincerely,

s/s *Larry Reub*

Larry W Reub
Claim Representative
Larry.Reub@acuity.com

cc:

2800 South Taylor Drive · Sheboygan, WI 53081
605.393.6014 · 920.208.7382 FAX
www.acuity.com

K-651(2-14)

 

July 6, 2016

MS. MARJORIE HAUF
GANZ & HAUF
8950 TROPICANA AVE SUITE 1
LAS VEGAS NV  89147

                  RE:  Claim Number: NE0613
                      Date of Loss: 04/07/2013
                      Insured Name: AM DEVELOPMENT LLC
                      Your Client /Our Insured: Donald Humes

Certified Return Receipt Requested

Dear Ms. Hauf,

We would again like to inquire as to the status of our communications to you dated February 2, 2016; March 2, 2016; and May 10, 2016. Copies of these communications are enclosed for your convenience.

We would appreciate it if you could confirm receipt of our correspondence dated February 2, 2016. In that correspondence we provided a list of medical providers and asked that you would either confirm that list, or provide a complete list of all medical providers. We also included a medical authorization form and asked that you complete that form, or provide a medical authorization that would allow us to obtain medical records for Mr. Humes five years prior to the accident of April 7, 2013. We feel it is important that we have complete medical records in order to properly evaluate this claim.

We would sincerely appreciate your cooperation in obtaining this information.

Sincerely,

Larry W Reub
Claim Representative
Larry.Reub@acuity.com

2800 South Taylor Drive · Sheboygan, WI 53081
605.393.6014 · 920.208.7382 FAX
www.acuity.com

K-651(2-14)

I  0014
P  0016



# GANZ & HAUF

July 20, 2016

*Via US Mail and Facsimile (888) 880-9588*

Larry Reub
Acuity Insurance Company
2800 South Taylor Drive
Sheboygan, WI 53081-8474

Re:   My Client      :   Donald Humes
Your Insured :   Donald Humes
Policy No.    :   4885671600
Date of Loss :   04 / 06 / 2013

Dear Mr. Reub:

I am in receipt of your letter dated July 6, 2016, wherein you request a medical authorization preceding five years from the date of the above mentioned crash. Please find enclosed a HIPAA-compliant authorization, executed by Mr. Humes.

Mr. Humes' providers are, Clark County Fire Department, Medic West Ambulance, Sunrise Hospital, Alternative Health Care, Black Hills Surgery Center, Advanced Pain Consultants, The Rehab Doctors, Cora Health Services, Box Canyon Surgery Center, Chad Novasic Physical Therapy, Rapid City Hospital and MetLife.

Please let me hear from you prior to August 22, 2016 with a response to our original demand sent to you on October 2, 2015. Thank you for your time and consideration.

Very truly yours,

GANZ & HAUF

IDA YBARRA, ESQ.

IY/ba
Enclosures

8950 W. Tropicana Avenue, Suite 1 • Las Vegas, NV 89147
Tel: 702.598.4LAW (4529) • www.ganzhauf.com • Fax: 702.598.3626

# EXHIBIT "B"

EXHIBIT "B"

Electronically Filed
05/05/2017 03:03:47 PM

CLERK OF THE COURT

RECEIVED
MAY 2 6 2017
(LV)
DIVISION OF INSURANCE
STATE OF NEVADA

RECEIVED
JUN - 1 2017
(CC)
DIVISION OF INSURANCE
STATE OF NEVADA

1   **COMP**
    MARJORIE HAUF, ESQ.
2   Nevada Bar No. 8111
    DAVID T. GLUTH, II, ESQ.
3   Nevada Bar No. 10596
    DANE M. WATSON, ESQ.
4   Nevada Bar No. 13982
5   GANZ & HAUF
    8950 W. Tropicana Ave, Suite 1
6   Las Vegas, Nevada 89147
    Tel: (702) 598-4529
7   Fax: (702) 598-3626
8
    Attorneys for Plaintiff
9

10                                -o0o-

11                        **DISTRICT COURT**

12                   **CLARK COUNTY, NEVADA**

13  DONALD HUMES,

14                  Plaintiff,                    CASE NO.:    A-17-755094-C
                                                  DEPT NO.:       XV
15  vs.

16
    ACUITY, A MUTUAL INSURANCE
17  COMPANY, a foreign corporation;
    DOES 1 through 10; and ROE CORPORATIONS 1    **COMPLAINT**
18  through 10, inclusive,

19                  Defendants.

20

21      Plaintiff, DONALD HUMES, by and through his undersigned counsel, MARJORIE

22  HAUF, ESQ., of the law firm GANZ & HAUF, and hereby complain and allege as follows:

23              **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

24
        1.      At all times mentioned herein, Plaintiff, DONALD HUMES ("Plaintiff"), was and is
25
    a resident of the State of South Dakota.
26
        2.      At the time of the subject crash, Plaintiff was driving a vehicle on the public roads in
27
    the State of Nevada, County of Clark.
28

GANZ&HAUF
8950 W. Tropicana Ave., #1
Las Vegas, NV 89147
Phone: (702) 598-4529
Fax: (702) 598-3626

3.    That Plaintiff is informed and believes, and thereon alleges, that Defendant, ACUITY, A MUTUAL INSURANCE COMPANY ("ACUITY" or "Defendant"), at all times herein mentioned, is a Wisconsin corporation doing business in the States of South Dakota and Nevada.

4.    That Plaintiff is informed and believes, and thereon alleges, that Defendant, ACUITY, at all times herein mentioned, was licensed as property and casualty insurer by the State of Nevada.

5.    That Plaintiff is informed and believes, and thereon alleges, that Defendant, ACUITY, at all times herein mentioned, wrote insurance policies in Nevada and collected insurance premiums in Nevada.

6.    The true names of DOES 1 through 10 and ROE CORPORATIONS 1 through 10, their citizenship and capacities, whether individual, corporate, associate, partnership or otherwise, are unknown to Plaintiff who therefore sue these Defendants by such fictitious names.  Plaintiff is informed and believes, and therefore alleges, that each of the Defendants, designated as DOES 1 through 10 and ROE CORPORATIONS 1 through 10, are or may be, legally responsible for the events referred to in this action, and caused damages to the Plaintiff, as herein alleged, and Plaintiff will ask leave of this Court to amend the Complaint to insert the true names and capacities of such Defendants, when the same have been ascertained, and to join them in this action, together with the proper charges and allegations.

7.    ROES 1 through 5 are insurance companies, casualty companies, corporations, or other business entities who wrote or participated in writing ACUITY policy number 4885671600 or who participated in the claims processing and/or handling of Plaintiff's claim as herein alleged.

8.    DOES 1 through 5 are employers of Defendants who may be liable for Defendant's negligence pursuant to NRS 41.130, which states:

Except as otherwise provided in NRS 41.745, whenever any person shall

GANZ & HAUF
8960 W. Tropicana Ave., #1
Las Vegas, NV 89147
Phone: (702) 598-4529
Fax: (702) 598-3626

suffer personal injury by wrongful act, neglect or default of another, the person causing the injury is liable to the person injured for damages; and where the person causing the injury is employed by another person or corporation responsible for his conduct, that person or corporation so responsible is liable to the person injured for damages.

9.    On April 6, 2013, Plaintiff, DONALD HUMES, was a driving a vehicle that was traveling northbound on Las Vegas Boulevard in Las Vegas, Nevada. At or about the same time, nonparty, Alan Petty, driving a vehicle owned by Paul Petty, crashed into the rear of the vehicle DONALD HUMES was in.

10.    As a result of the crash, Plaintiff suffered serious bodily injuries to his cervical and lumbar spine.

11.    That Plaintiff is treating for his injuries arising from the accident of April 6, 2013 and is in need of multiple spine injections as a result of the accident.

12.    As a result of the crash, Plaintiff incurred in excess of $54,000 in medical expenses and was recommended for in excess of $33,000 in future medical procedures.

13. Alan Petty and Paul Petty resolved their claims with Plaintiff for their liability insurance policy limits of $100,000.

14. That prior to April 6, 2013, Plaintiff and AM Development, LLC purchased a policy of automobile insurance from Defendant ACUITY, policy number 4885671600, which included uninsured/underinsured motorist coverage applicable to the subject motor vehicle accident, with policy limits of $1,000,000.

15. That prior to April 6, 2013, Plaintiff and AM Development, LLC purchased a policy of automobile insurance from Defendant ACUITY, policy number 4885671600, which included medical payments coverage applicable to the subject motor vehicle accident, with policy limits of $5,000.

16. That Plaintiff was and is an insured under the underinsured motorist policy.

17. That on or about October 2, 2015, counsel for the Plaintiff made a time limit demand

GANZ&HAUF

8860 W. Tropicana Ave., #1
Las Vegas, NV 89147
Phone: (702) 598-4529
Fax: (702) 598-3626

on Defendant, ACUITY, in the amount of $250,000, well within the policy limits.

18. Plaintiff provided to ACUITY all his medical records, bills, and treatment related to the subject crash.

19. Plaintiff provided ACUITY executed authorizations for release of information with the names of his treaters both prior to and after the crash for it to obtain any records it deemed necessary.

20. Plaintiff also submitted his medical bills to ACUITY for payment under his medical payments coverage.

21. Defendant, ACUITY has refused, delayed, and failed to evaluate Plaintiff's claim, and failed to tender any payments owed to Plaintiff under the insurance contract.

### FIRST CLAIM FOR RELIEF

### BREACH OF CONTRACT

22. Plaintiff repeats and realleges each and every statement set forth in the above Paragraphs as though each were set forth herein verbatim.

23. Plaintiff made claims for his underinsured motorist coverage benefits to Defendant ACUITY and DOE/ROE Defendants as a result of the subject collision.

24. Defendant and/or DOE/ROE Defendants failed to reasonably investigate and evaluate Plaintiff's claims, as has failed to tender reasonable payment under Plaintiff's underinsured motorist insurance coverage of the insurance contract.

25. Plaintiff made a claim for his medical payments coverage benefits to Defendant ACUITY and DOE/ROE Defendants as a result of the subject collision.

26. Defendant and/or DOE/ROE Defendants failed to pay Plaintiff's medical bills under the medical payments coverage of the insurance contract.

27. Defendant and/or DOE/ROE Defendants' refusal to reasonably evaluate Plaintiff's claim and refusal to make reasonable payment under Plaintiff's underinsured motorist coverage

GANZ&HAUF
8950 W. Tropicana Ave., #1
Las Vegas, NV 89147
Phone: (702) 598-4529
Fax: (702) 598-3626

1   and medical payments coverage was a material breach of the insurance contract.

2       28. That, as a result of Defendant and/or DOE/ROE Defendants' breach of contract,

3   Plaintiff has incurred compensatory or expectation damages in an amount in excess of $15,000.

4       29. That, as a result of Defendant and/or DOE/ROE Defendants' breach of contract,

5   Plaintiff has incurred foreseeable consequential and incidental damages in an amount in excess of

6   $15,000.

7

8

9                               **SECOND CLAIM FOR RELIEF**

10   **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

11       30. Plaintiff repeats and realleges each and every statement set forth in the above

12   Paragraphs as though each were set forth herein verbatim

13

14       31. That Nevada law recognizes in every contract a covenant of good faith and fair dealing,

15   which is a promise that neither party will do anything which will injure the right of the other to

16   receive the benefits of the agreement.

17       32. That Defendant and/or DOE/ROE Defendants' breached this covenant of good faith

18   and fair dealing by its refusal to evaluate Plaintiff's claim or reasonably pay Plaintiff Plaintiff's

19   claim, or respond to him in a timely manner, arising from the automobile accident of April 6, 2013,

20   as required under the policy of insurance.

21

22       33. That Defendant and/or DOE/ROE Defendants' refusal to evaluate and/or pay Plaintiff's

23   claim was done so in the absence of a reasonable basis for denying such benefits under the policy,

24   and was done with Defendant's knowledge and/or reckless disregard of the lack of a reasonable

25   basis for denying the claim.

26       34. That, as a result of Defendant and/or DOE/ROE Defendants' breach of the covenant of

27   good faith and fair dealing, Plaintiff has incurred compensatory and expectation damages in

28   amount in excess of $15,000.

GANZ&HAUR
8850 W. Tropicana Ave., #1
Las Vegas, NV 89147
Phone: (702) 688-4629
Fax: (702) 639-3626

35. That Defendant's willful, wanton, malicious, reckless, oppressive, and/or fraudulent breach of the covenant of good faith and fair dealing entitle Plaintiff to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pray for relief and judgment against Defendants, and each of them, as follows:

1.  Compensatory or expectation damages for denied policy benefits;

2.  Consequential damages, including emotional distress and attorney's fees, in excess of $15,000;

3.  Punitive damages in excess of $15,000;

4.  Costs of suit; and,

5.  Such other and further relief as this Court deems appropriate.

Dated this _____ day of May, 2017.

GANZ & HAUF

MARJORIE HAUF, ESQ.
Nevada Bar No. 8111
DAVID T. GLUTH, II, ESQ.
Nevada Bar No. 10596
DANE M. WATSON, ESQ.
Nevada Bar No. 13982
8950 W. Tropicana Ave, Suite 1
Las Vegas, Nevada 89147
*Attorneys for Plaintiff*

GANZ & HAUF
8950 W. Tropicana Ave., #1
Las Vegas, NV 89147
Phone: (702) 598-4529
Fax: (702) 598-3026

Page 6

# EXHIBIT "C"

# EXHIBIT "C"



**ECC**
STEPHEN H. ROGERS, ESQ.
Nevada Bar No. 5755
MARISSA R. TEMPLE
Nevada Bar No. 9028
ROGERS, MASTRANGELO, CARVALHO & MITCHELL
700 South Third Street
Las Vegas, Nevada 89101
Phone (702) 383-3400
Fax (702) 384-1460
Email: Mtemple@rmcmlaw.com
Attorneys for Defendant

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DONALD HUMES, | CASE NO. 2:17-cv-01778-JAD-PAL |
| Plaintiff, | |
| vs. | |
| ACUITY, A MUTUAL INSURANCE COMPANY, a foreign corporation; DOES 1 through 10; and ROE CORPORATIONS 1 through 10, inclusive, | |
| Defendants. | |

**DEFENDANT'S FOURTH SUPPLEMENTAL FRCP 26 DISCLOSURE**

Pursuant to Rules 26(1) and 26(e) of the Federal Rules of Civil Procedure, Defendant ACUITY, A MUTUAL INSURANCE COMPANY ("Defendant"), by and through their attorneys of record, STEPHEN H. ROGERS, ESQ. and MARISSA R. TEMPLE, disclose their Fed. R. Civ. P. 26(a)(1) Supplemental Disclosure as follows (**supplements are delineated in bold**):

**I.**

**WITNESSES - FRCP 26(a)(1)(A) - PERSONS MOST LIKELY TO HAVE DISCOVERABLE INFORMATION THAT THE DEFENDANT MAY USE TO SUPPORT ITS CLAIM:**

1.   DONALD HUMES, Plaintiff
     c/o Marjorie Hauf, Esq.
     David T. Gluth, II, Esq.
     Dane M. Watson, Esq.
     GANZ & HAUF
     8950 West Tropicana Ave., Suite 1

1

Las Vegas, Nevada 89147
Telephone: (702) 598-4529

2

3

Plaintiff's testimony will include, but not be limited to, his knowledge of the facts and

circumstances surrounding the subject incident.

4

    2.      PERSON MOST KNOWLEDGEABLE FOR

5

ACUITY, A MUTUAL INSURANCE COMPANY
c/o STEPHEN H. ROGERS, ESQ.

6

MARISSA R. TEMPLE.
ROGERS, MASTRANGELO, CARVALHO & MITCHELL

7

700 South Third Street
Las Vegas, Nevada 89101

8

(702) 383-3400

9

Defendant's testimony will include, but not be limited to, their knowledge of the facts and

10

circumstances surrounding the subject incident.

11

    3.      OFFICER J. PRIBYL, ID # 14016
LAS VEGAS METROPOLITAN POLICE DEPARTMENT

12

400 S. Martin L. King Boulevard
Las Vegas, Nevada 89106

13

(702) 828-3111

14

Officer J. Pribyl's testimony will include, but not limited to, his investigation of events and

15

happenings surrounding the subject incident.

16

    4.      ALAN MICHAEL PETTY
957 Via Stellato Street

17

Henderson, NV 891011
Phone number unknown

18

Mr. Petty's testimony will include, but not be limited to, his knowledge of the facts and

19

circumstances surrounding the subject incident.

20

    5.      KEIRY NAVA

21

1603 Justin Court
Logandale, Nevada 89021

22

Phone number unknown

23

Ms. Nava's testimony will include, but not be limited to, her knowledge of the facts and

24

circumstances surrounding the subject incident.

25

    6.      BARBARA HUMES
514 Americas Way

26

PMB 1000
Box Elder, SD 57719

27

Phone number unknown

28

Ms. Humes' testimony will include, but not be limited to, her knowledge of the facts and

circumstances surrounding the subject incident.

7.    HUSSAN ARIF SATTAR
17704 LA Rosa Lane
Fountain Valley, California 92708
Phone number unknown

Mr. Sattar's testimony will include, but not limited to, his knowledge of the facts and circumstances surrounding the subject incident.

8.    MAHRUKH SATTAR
17704 LA Rosa Lane
Fountain Valley, California 92708
Phone number unknown

Ms. Sattar's testimony will include, but not limited to, her knowledge of the facts and circumstances surrounding the subject incident.

9.    PAUL BIEWEN, M.D. Expert
Woodlake Medical Management
10400 Yellow Circle Drive, Suite 502
Minnetonka, MN 55353
(952) 253-6600

Dr. Biewen is an expert witness in the field Physical Medicine and Rehabilitation. Dr. Biewen's testimony will include, but not limited to, the opinions expressed in his reports and supplements thereto.

10.    CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
Alternative Health Care
343 Quincy Street, Suite 100
Rapid City, SD 57701

The Person Most Knowledgeable/Custodian of Records, will testify with respect to his/her treatment of Plaintiff after the subject incident and necessity of all Plaintiff's medical records and billings in the past, present and future, and all further matters related to the subject litigation.

11.    CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
Black Hills Surgical Hospital;
216 Anamaria Drive
Rapid City, SD 57701

The Person Most Knowledgeable/Custodian of Records, will testify with respect to his/her treatment of Plaintiff after the subject incident and necessity of all Plaintiff's medical records and billings in the past, present and future, and all further matters related to the subject litigation.

///

12.    CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
American Medical Response/Medicwest
50 S. Main Street, Suite 401
Akron, OH 44308

The Person Most Knowledgeable/Custodian of Records, will testify with respect to his/her treatment of Plaintiff after the subject incident and necessity of all Plaintiff's medical records and billings in the past, present and future, and all further matters related to the subject litigation.

13.    CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
Presence Resurrection Medical Center
7435 W Talcott Avenue
Chicago, IL 60631

The person Most Knowledgeable/Custodian of Records, will testify with respect to the information contained in the Affidavit of No Records.

14.    CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
ProMotion Physical Therapy
4141 Fifth Street
Rapid City, SD 57701

The Person Most Knowledgeable/Custodian of Records, will testify with respect to his/her treatment of Plaintiff after the subject incident and necessity of all Plaintiff's medical records and billings in the past, present and future, and all further matters related to the subject litigation.

15.    CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
Sunrise Hospital
3186 South Maryland Parkway
Las Vegas, Nevada 89109

The Person Most Knowledgeable/Custodian of Records, will testify with respect to his/her treatment of Plaintiff after the subject incident and necessity of all Plaintiff's medical records and billings in the past, present and future, and all further matters related to the subject litigation.

16.    CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
Tampa Minimally Invasive Spine Surgery Center
5329 Primrose Lake Circle
Tampa Florida, 33647

The Person Most Knowledgeable/Custodian of Records, will testify with respect to his/her treatment of Plaintiff after the subject incident and necessity of all Plaintiff's medical records and billings in the past, present and future, and all further matters related to the subject litigation.

///

17.     CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
        The Rehab Doctors
        1136 Jackson Boulevard, Suite 3
        Rapid City, SD 57702

The Person Most Knowledgeable/Custodian of Records, will testify with respect to his/her treatment of Plaintiff after the subject incident and necessity of all Plaintiff's medical records and billings in the past, present and future, and all further matters related to the subject litigation.

18.     CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
        The Physical Therapy Center, Inc.
        1110 West Omaha Street, Suite 3
        Rapid City, SD 57701

The Person Most Knowledgeable/Custodian of Records, will testify with respect to his/her treatment of Plaintiff after the subject incident and necessity of all Plaintiff's medical records and billings in the past, present and future, and all further matters related to the subject litigation.

19.     CUSTODIAN OF RECORDS/PERSON MOST KNOWLEDGEABLE
        Well Care Pharmacy
        3300 W Charleston Blvd., A
        Las Vegas, NV 89102

The person Most Knowledgeable/Custodian of Records, will testify with respect to the information contained in the Affidavit of No Records.

20.     **MARJORIE HAUF, ESQ.**
        **GANZ & HAUF**
        **8950 West Tropicana Ave., Suite 1**
        **Las Vegas, Nevada 89147**
        **Telephone: (702) 598-4529**

**This witness is expected to testify regarding the pre-litigation handling of Mr. Humes' claim, including but not limited to: requests to Acuity made on behalf of Mr. Humes, responses to Acuity's requests for additional information, communications with adjuster and Acuity employees in the presentation of Mr. Humes' claim, and correspondence drafted and sent to Acuity on behalf of Mr. Humes.**

Defendant also names as witnesses all of the parties health care providers after the subject accident, and, as relevant, prior to same.

Defendant further names all witnesses identified by all other parties herein and reserves the right to add to its list of witnesses as discovery proceeds and as the parties testimony at trial may make necessary.

**II.**
**LIST OF DOCUMENTS - FRCP 26(a)(1)(ii)**

1.    Defendant's Answer to Plaintiff's Complaint, Bates No. A 001 - A 0006;

2.    Traffic Accident Report No. LVMPD 130406-3202, Bates No. B 0001 - B 0004;

3.    Acuity Business Auto Declarations from Donald Humes, re: Policy No. X42163, Bates No. C 0001 - C 0004;

4     Medical Records Review of Plaintiff Donald Humes, authored by Paul Biewen, M.D., Bates No. D 0001 - D 0018;

5.    Medical Records Obtained by RMCM, re: Plaintiff:

    a.    Alternative Health Care Center, Bates No. E 0001 - E 0031;

    b.    Black Hills Surgical Hospital, Bates No. E 0032 - E 0366;

    c.    Medicwest Ambulance, Bates No. E 0367 - E 0378;

    d.    Affidavit of No Records from Presence Resurrection Medical Center, Bates No. E 0379 - E 0380;

    e.    ProMotion Physical Therapy, Bates No. E 0381 - E 0425;

    f.    Sunrise Hospital, Bates No. E 0426 - E 0448;

    g.    Tampa Minimally Invasive Spine Surgery Center, Bates No. E 0449 - E 0478;

    h.    The Rehab Doctors, Bates No. E 0479 - E 0545;

    i.    The Physical Therapy Center, Bates No. E 0546 - E 0626;

    j.    Affidavit of No Records from Well Care Pharmacy, Bates No. E 0627;

    **k.    Sunrise Hospital Bills, Bates No. E 0628 - E 0631;**

6.    AM Development LLC's Policy (No. X42163), Bates No. F 0001 - F 0047;

7.    Acuity's Claims Activity Log (with redactions), Bates No. G 0001 - G 0015;

8.    Acuity's Claims Representative Workflow. Bates No. H 0001 - H 0308;

9.    All incoming and outgoing pre-litigation correspondences from Acuity and Ganz and Hauf, Bates No. I 0001 - I 0031;

10.   Acuity's Payment Ledger, Bates No. J 0001;

11.   Diagnostic Films Obtained by RMCM, re: Plaintiff:

    a.    Black Hills Surgical Hospital, Bates No. K 0001;

1      b.   Sunrise Hospital, Bates No. K 0002 ;

2    12.   Correspondence to and from Counsel/Acuity with Dr. Biewen, Bates No. L 0001 - L

3      0017;

4    13.   Correspondence to and from Counsel with Dr. Schifini, Bates No. M 0001 - M 0013I;

5      and

6    14.   Correspondence to and from Counsel with Mr. Silvestri, Bates No. N 0001 - N 0028.

7      (*Exhibits 1-10, 12-14 will be provided on CD*)

8      (*Diagnostic films will be available upon requestor's expense*)

9     Defendant specifically reserves the right to designate as an exhibit any document designates

10 by any party, and to supplement this list as any document becomes known through the course and

11 scope of discovery.

12     In addition, neither inclusion of any documents within this disclosure made pursuant to Fed.

13 R. Civ. P. 26, nor acceptance of documents provided by any other party hereto in a disclosure made

14 pursuant to Fed. R. Civ. P. 26, shall be deemed as a waiver by Defendant of any evidentiary rights

15 they may have with respect to those documents, including, but not limited to, objections related to

16 authenticity, materiality, foundation, hearsay, or any other right as may be permitted pursuant to the

17 Federal Rules of Evidence.

18

19              **III.**

20    **COMPUTATION OF EACH CATEGORY OF DAMAGES CLAIMED BY THE**

21       **DISCLOSING PARTY - FRCP 26(a)(1)(iii)**

22    No disclosures at this time.

23    Defendant reserves the right to supplement this list as the discovery process continues.

24              **IV.**

25   **FOR INSPECTION AND COPYING AS UNDER RULE 34 ANY INSURANCE**

26   **AGREEMENT UNDER WHICH ANY PERSON CARRYING ON AN INSURANCE**

27   **BUSINESS MAY BE RELIABLE TO SATISFY PART OR ALL OF A JUDGMENT**

28   **WHICH MAY BE ENTERED IN THE ACTION OR INDEMNIFY REIMBURSE FOR**

    **PAYMENT MADE TO SATISFY JUDGEMENT - RULE 26(a)(1)(iv)**

1    See Exhibits 3 and 6, above.

2    DATED this 12th day of July _____, 2018.

3

4                  ROGERS, MASTRANGELO, CARVALHO &
                    MITCHELL

5

6                  STEPHEN H. ROGERS, ESQ.
7                  Nevada Bar No. 5755
                  MARISSA R. TEMPLE
8                  Nevada Bar No. 9028
                  700 South Third Street
9                  Las Vegas, Nevada 89101
                  *Attorney for Defendant*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Pursuant to Rule 5(b) of the Federal Rules of Civil Procedure, I hereby certify under penalty of perjury that I am an employee of Rogers, Mastrangelo, Carvalho & Mitchell, and on the 12 day of July, 2018, a true and correct copy of the **DEFENDANT'S FOURTH SUPPLEMENTAL FRCP 26 DISCLOSURE** was served by placing an original or true copy thereof in a sealed envelope, and depositing in the U.S. Mail, postage prepaid, and via email to the following:

jgalliher@GanzHauf.com
Ccrawford@GanzHauf.com

Marjorie Hauf, Esq.
David T. Gluth, II, Esq.
Dane M. Watson, Esq.
Ganz & Hauf
8950 West Tropicana Ave., Suite 1
Las Vegas, Nevada 89147
Telephone: (702) 598-4529
Facsimile: (702) 598-3626
Attorneys for Plaintiff

_____
An Employee of Rogers, Mastrangelo, Carvalho & Mitchell

# EXHIBIT "D"

# EXHIBIT "D"

1  **NOTC**
   STEPHEN H. ROGERS, ESQ.
2  Nevada Bar No. 5755
   MARISSA R. TEMPLE
3  Nevada Bar No. 9028
   ROGERS, MASTRANGELO, CARVALHO & MITCHELL
4  700 S. Third Street
   Las Vegas, Nevada 89101
5  Phone (702) 383-3400
   Fax (702) 384-1460
6  Email: Mtemple@rmcmlaw.com
   Attorneys for Defendant
7
                    **UNITED STATES DISTRICT COURT**
8
                        **DISTRICT OF NEVADA**
9

10  DONALD HUMES,                          )     CASE NO. 2:17-cv-01778-JAD-PAL
                                           )
11            Plaintiff,                    )
                                           )
12  vs.                                     )
                                           )
13  ACUITY, A MUTUAL INSURANCE             )
    COMPANY, a foreign corporation; DOES 1 )
14  through 10; and ROE CORPORATIONS 1 through )
    10, inclusive,                          )
15                                          )
              Defendants.                   )
16  _____ )

17          <u>**NOTICE OF TAKING DEPOSITION OF MARJORIE HAUF, ESQ.**</u>

18          PLEASE TAKE NOTICE that on **August 2, 2018 at 1:30 p.m.,** at the law offices of

19  ROGERS, MASTRANGELO, CARVALHO & MITCHELL, located at 700 South Third Street, Las

20  Vegas, Nevada 89101, Defendant ACUITY, A MUTUAL INSURANCE COMPANY, will take the

21  deposition of MARJORIE HAUF, ESQ. , upon oral and/or video examination, pursuant to F.R.C.P.

22  Rule 26, before a Notary Public, or some other officer authorized by law to administer oaths.

23          PLEASE TAKE FURTHER NOTICE that pursuant to Rule 30(b)(2) of the Federal Rules

24  of Civil Procedure, Defendant may record the testimony at the deposition by sound, sound-and-

25  visual, or stenographic means.  Oral examination will continue from day to day until completed.

26  / / /

27  / / /

28

1   **Please advise if the deponent requires an interpreter.**

2        You are invited to attend and cross-examine.

3        DATED this 16th day of July, 2018.

4                            ROGERS, MASTRANGELO, CARVALHO &
                           MITCHELL

5

6

7                            STEPHEN H. ROGERS, ESQ.
                           Nevada Bar No. 5755

8                            MARISSA R. TEMPLE
                           Nevada Bar No. 9028

9                            700 S. Third Street
                           Las Vegas, Nevada 89101

10                            Attorney for Defendant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF MAILING**

2      Pursuant to Rule 5(b) of the Federal Rules of Civil Procedure, I hereby certify under penalty

3  of perjury that I am an employee of Rogers, Mastrangelo, Carvalho & Mitchell, and on the _16_ day

4  of July, 2018, a true and correct copy of the foregoing **NOTICE OF TAKING DEPOSITION OF**

5  **MARJORIE HAUF, ESQ.** was served by placing an original or true copy thereof in a sealed

6  envelope, and depositing in the U.S. Mail, postage prepaid to the following:

7

8
   Marjorie Hauf, Esq.
9  David T. Gluth, II, Esq.
   Dane M. Watson, Esq.
10 Ganz & Hauf
   8950 West Tropicana Ave., Suite 1
11 Las Vegas, Nevada 89147
   Telephone: (702) 598-4529
12 Facsimile: (702) 598-3626
   *Attorneys for Plaintiff*

13

14      _____
        An Employee of Rogers, Mastrangelo, Carvalho &
15      Mitchell

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 3 of 3

# EXHIBIT "E"

EXHIBIT "E"

# In the Matter Of:

2:17-cv-01778-JAD-PAL

DONALD HUMES

vs

ACUITY

---

## Deposition Of:

*MARJORIE HAUF, ESQ.*

*October 02, 2018*

---



702-805-4800
scheduling@envision.legal

1                   UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3
   DONALD HUMES,                          )
4                                         )
                      Plaintiff,          )
5                                         )
                      vs.            .    )    Case No.
6                                         )    2:17-cv-01778-JAD-PAL
   ACUITY, A MUTUAL INSURANCE             )
7  COMPANY, a foreign                     )
   corporation; DOES 1 through            )
8  10; and ROE CORPORATIONS 1             )
   through 10, inclusive,                 )
9                                         )
                      Defendants.         )
10 _____)

11

12

13

14

15                DEPOSITION OF MARJORIE HAUF, ESQ.

16
        Taken at Rogers, Mastrangelo, Carvalho & Mitchell
17                      700 South Third Street
                       Las Vegas, Nevada 89101
18
                     On Tuesday, October 2, 2018
19                        At 1:36 p.m.

20

21

22

23

24

25  Reported by:  Mickey Chan, CCR No. 928, RPR

Hauf, Esq., Marjorie                October 02, 2018                Pages 2..5

---

Page 2

```
 1   APPEARANCES:
 2     For the Plaintiff:
 3                JOLENE MANKE, ESQ.
 4                GANZ & HAUF
                  8950 West Tropicana Avenue
 5                Suite 1
                  Las Vegas, Nevada 89147
 6                (702)598-4529
                  jmanke@ganzhauf.com
 7
 8     For the Defendant:
 9                MARISSA R. TEMPLE, ESQ.
10                ROGERS, MASTRANGELO, CARVALHO & MITCHELL
                  700 South Third Street
11                Las Vegas, Nevada 89101
                  (702)383-3400
12                mtemple@rmcmlaw.com
13
14
       Also Present:    DARCEL LANG, Claims Adjuster for Acuity
15
16
17                         *****
18
19
20
21
22
23
24
25
```

---

Page 4

```
 1   EXHIBIT R      Letter Dated December 30, 2016      78
 2   EXHIBIT S      Letter Dated February 6, 2017       82
 3   EXHIBIT T      Letter Dated February 8, 2017       83
 4   EXHIBIT U      Letter Dated February 14, 2017      84
 5   EXHIBIT V      Letter Dated March 9, 2017          87
 6   EXHIBIT W      Letter Dated March 29, 2017         88
 7   EXHIBIT X      Letter Dated April 26, 2017         90
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1                    I N D E X
 2
       WITNESS                                     PAGE
 3
       MARJORIE HAUF, ESQ.
 4
 5     Examination by MS. TEMPLE                      5
 6
 7
 8     EXHIBITS                                    MARKED
```
```
 9     EXHIBIT A    Letter Dated April 10, 2013       25
10     EXHIBIT B    Letter Dated March 20, 2015       28
11     EXHIBIT C    Letter Dated January 15, 2015     31
12     EXHIBIT D    Letter Dated October 2, 2015      37
13     EXHIBIT E    E-mail Dated October 13, 2015     41
14     EXHIBIT F    Letter Dated October 16, 2015     43
15     EXHIBIT G    Letter Dated November 12, 2015    44
16     EXHIBIT H    Letter Dated January 19, 2016     47
17     EXHIBIT I    Letter Dated February 2, 2016     49
18     EXHIBIT J    Letter Dated March 2, 2016        51
19     EXHIBIT K    Letter Dated May 10, 2016         53
20     EXHIBIT L    Letter Dated July 6, 2016         54
21     EXHIBIT M    Letter Dated July 20, 2016        58
22     EXHIBIT N    Letter Dated September 7, 2016    64
23     EXHIBIT O    Letter Dated September 19, 2016   67
24     EXHIBIT P    Letter Dated December 2, 2016     72
25     EXHIBIT Q    Letter Dated December 7, 2016     73
```

---

Page 5

```
 1        LAS VEGAS, NEVADA; TUESDAY, OCTOBER 2, 2018
                         1:36 P.M.
 2                        *****
 3   Whereupon,
 4              (In an off-the-record discussion
 5              held prior to the commencement of
 6              the proceedings, counsel agreed to
 7              waive the court reporter's
 8              requirements under Nevada Rules of
 9              Civil Procedure, Rule 30(b)(4), or
10              Federal Rules of Civil Procedure,
11              Rule 30(b)(5), as applicable.)
12   Whereupon,
13                   MARJORIE HAUF, ESQ.,
14   having been sworn to testify to the truth, the whole truth,
15   and nothing but the truth, was examined and testified under
16   oath as follows:
17                      EXAMINATION
18   BY MS. TEMPLE:
19        Q.   Please state your name for me, please.
20        A.   Marjorie Hauf.
21        Q.   Is it okay if I call you Marjorie?
22        A.   Yes.
23        Q.   Okay.  And, Marjorie, your professional address is
24   what?
25        A.   8950 West Tropicana, Suite 1.
```

---

Hauf, Esq., Marjorie                October 02, 2018                Pages 6..9

**Page 6**

1    Q.   And that's Las Vegas?
2    A.   Yes.
3    Q.   89...
4    A.   147.
5    Q.   Okay.  Have you had your deposition taken before?
6    A.   Yes.
7    Q.   Okay.  Approximately how many times?
8    A.   One.
9    Q.   Was it in relation to a first-party case?
10   A.   No.
11   Q.   Okay.  I know you've taken many depositions,
12   correct?
13   A.   Yes.
14   Q.   Are you sufficiently familiar with the admonitions
15   of a deposition that you'd waive my reviewing them with you?
16   A.   Yes.
17   Q.   I assumed so.
18        All right.  Have you brought anything with you for
19   your deposition?
20   A.   I brought the copies of -- I have a bunch of stuff
21   that I'm dealing with later, but I did bring copies of the
22   correspondence.
23   Q.   Okay.  So when you say you brought copies of the
24   correspondence, does that correspondence include all
25   pre-litigation and post-litigation correspondence?

**Page 7**

1    A.   No.
2    Q.   What does it include?
3    A.   It was just what we had produced as pre-litigation
4    correspondence, and I also have a copy of the claims file,
5    it looks like, here.
6    Q.   And I have that as well.  We can --
7    A.   Not the claims file.  Sorry.  Just the claim log
8    notes.
9    Q.   Okay.
10   A.   Not the whole file.  The whole file is hundreds
11   and hundreds of pages.
12   Q.   Okay.  Did you review all of that documentation
13   prior to your deposition today?
14   A.   I reviewed what I have here, yes.
15   Q.   When was the last time that you worked on this
16   file yourself?
17   A.   I spoke to the client yesterday.
18   Q.   Okay.  So are you still actively involved in the
19   handling of this claim?
20   A.   I'm actively involved in -- somewhat actively
21   involved in every file in my office, so...
22   Q.   Do you consider yourself the handling attorney of
23   this file?
24   A.   Again, I handle, to some degree, every file in my
25   office.  I'm the managing partner of the firm.

**Page 8**

1    Q.   Okay.  So you are still involved, at least on some
2    level, in the handling of this case?
3    A.   Yes.
4    Q.   Okay.  Do you -- how does it work at your firm?
5    Do you have a lead attorney and then someone who oversees
6    it?
7    A.   I am the managing partner of the firm.  I oversee
8    the entire staff and all the files, litigation, and
9    pre-litigation.  Each litigation file is assigned to an
10   associate and a paralegal, and then there's also a team of
11   other support professionals that help us with -- that also
12   work on every file.
13   Q.   And is Adam Ganz your only partner?
14   A.   Yes.
15   Q.   What is Adam's role in the handling of this file,
16   if any?
17   A.   I couldn't tell you specifically what he's done or
18   hasn't done on the file.
19   Q.   Does he have a similar role to you in that he
20   oversees all files?
21   A.   Yes.
22   Q.   And you called yourself the managing attorney.
23   Does he also consider himself the managing attorney of your
24   firm?
25   A.   Yes.

**Page 9**

1    Q.   How many associates do you have?
2    A.   Four.
3    Q.   Ida Ybarra worked on this case at one point.  Is
4    she still employed at your firm?
5    A.   No.
6    Q.   David Gluth worked on this file at one point in
7    time.  Is he still employed at your firm?
8    A.   No.
9    Q.   And I know Ms. Manke is here with you and she's
10   worked on this file, and I assume she's still employed at
11   your firm?
12   A.   Yes.
13   Q.   Aside from the documents you referenced, the
14   correspondence and the claim notes, is there anything else
15   that you reviewed in anticipation of the deposition?
16   A.   No.
17   Q.   Aside from speaking with your client, did you
18   speak with anyone in preparation for your deposition?
19   A.   I didn't speak with the client in preparation for
20   the deposition.  I spoke with him because I speak with
21   clients, but, no.
22   Q.   Did you do anything else, aside from reviewing
23   those documents, in preparation for today?
24   A.   I did go through the claims file, these documents,
25   and that was it.

Hauf, Esq., Marjorie                    October 02, 2018                    Pages 10..13

Page 10

1    Q.   Have you reviewed any of the deposition
2  transcripts?
3    A.   I did read my client's deposition transcript, yes.
4  Thank you.
5    Q.   How about any of the doctors?
6    A.   I did not read any of the doctors' depos.
7    Q.   Have you ever read any of the doctors' depos?
8    A.   Probably.
9    Q.   But you don't have a specific recollection of
10 having done so?
11   A.   No.
12   Q.   Is that something you typically do for the cases
13 in your firm?
14   A.   At some point.
15   Q.   How about at this point in litigation when it's
16 still in the discovery stage?  If a deposition transcript
17 were to come in on a file that you're simply managing, would
18 you read that deposition transcript?
19   A.   I do not read every deposition transcript that
20 comes into the firm.  I'll read them if I need to read them
21 for some purpose.
22   Q.   Who is the main handling attorney of this case?
23   A.   Right now, the day to day is being handled by
24 Jolene.
25   Q.   Do you know how long that's been the case?

Page 11

1    A.   Probably as long as she's been with us, which has
2  been a couple of months now.
3    Q.   Do you know who was handling it before Jolene, as
4  the day-to-day handling attorney?
5    A.   Jeff Galliher.
6    Q.   And how long was Jeff Galliher with your firm?
7    A.   Maybe a year.
8    Q.   How about prior to Mr. Galliher, do you know who
9  the day-to-day handling attorney was?
10   A.   It was David, and then Ida before that.
11   Q.   David Gluth?
12   A.   Yes.
13   Q.   And Ida Ybarra.  Okay.
14        From your handling of the file, are you familiar
15 with the facts and circumstances surrounding the accident
16 itself?
17   A.   Yes.
18   Q.   Okay.  And the accident occurred on April 6, 2013.
19 Is that your understanding as well?
20   A.   Yes.
21   Q.   Are you familiar with the injuries involved?
22   A.   Yes.
23   Q.   Are you familiar with the medical treatment that
24 was undergone?
25   A.   Generally, yes.

Page 12

1    Q.   Okay.  Let me get some background information from
2  you, if I can.  Are you licensed in any other states besides
3  Nevada?
4    A.   Yes.
5    Q.   Where else?
6    A.   Arizona.
7    Q.   How long have you been licensed in Arizona?
8    A.   Since 2003.
9    Q.   How long have you been licensed in Nevada?
10   A.   Since 2002.
11   Q.   Have you ever had any action taken against your
12 license?
13   A.   No.
14   Q.   Any suspensions?
15   A.   No.  That's not true.  Arizona did get suspended
16 because they didn't receive my dues check on time, and they
17 had -- they sent a certified mailing to indicate that you
18 hadn't paid your dues and gave you a chance to pay them.
19 That certified mailing never went out, so I didn't get it,
20 so I didn't know my dues check hadn't arrived.  Anyway,
21 we've got it fixed.  So that actually was suspended for a
22 short period of time for that reason.
23   Q.   Nothing related to your practice of law or your
24 ability to practice law, like --
25   A.   No.

Page 13

1    Q.   And never any suspension in Nevada?
2    A.   No.
3    Q.   Okay.  I want to make sure I understand how the
4  firm is set up, as far as the day-to-day handling goes.  So
5  you have one attorney that is primarily assigned to each
6  file?
7    A.   Yes.
8    Q.   And in this case, it would have been no different.
9  You would have had one attorney who was the day-to-day
10 handler?
11   A.   Yes.
12   Q.   And then you managed the files within your firm?
13   A.   Yes.
14   Q.   You oversee the work of that attorney; is that
15 fair?
16   A.   Yes.
17   Q.   If they want to send out a letter, for example,
18 just a basic letter, does that have to go through you first?
19   A.   It's a case by case basis.  Some attorneys yes,
20 some attorneys no, some situations yes, some situations no,
21 some cases yes, some cases no.
22   Q.   I understand that.
23        Does it vary between first party and third party?
24   A.   No.
25   Q.   In this case, would Ida Ybarra in, say, 2013, have

Page 14

```
 1  had to get your permission before sending out a letter?
 2      A.   I mean, globally, no.  But, again, it would depend
 3  on what the letter was about, what the case was about, what
 4  the, you know...
 5      Q.   How about specific to this case, would the
 6  handling attorney -- the day-to-day handling attorney have
 7  had to have your approval before sending out a letter?
 8      A.   It would depend on what the letter was about.
 9      Q.   Do you recall, during the course of this case,
10  ever requiring an attorney to provide a letter to you prior
11  to it going out?
12      A.   Again, it depends on what the situation is.  I
13  mean, it's not -- have I ever looked at an attorney and
14  said, You have a directive that you must run every letter
15  that goes out in this case by me?  No.  That's never
16  happened on any case with any attorney.  But if they need
17  advice on something, they need something proofread, there's
18  a lot of reasons why I would read letters before they go
19  out.
20      Q.   And I guess I want to know if you have an
21  independent recollection of specifically doing that in this
22  case.  For pre-litigation letters that went out, do you
23  recall reviewing the ones that were not drafted or signed by
24  you?
25      A.   I mean, I've reviewed them now.  Whether I
```

Page 15

```
 1  reviewed them at the time, I don't know.
 2      Q.   And back in 2013, was your practice structured the
 3  same way?  You'd have a day-to-day handling attorney, and
 4  then you'd manage the files and the firm?
 5      A.   Yeah.
 6      Q.   And Adam Ganz' role was the same as it is today?
 7      A.   Yes.
 8      Q.   Have you ever had any other -- since you've been
 9  Ganz & Hauf, have you had any other partners besides you and
10  Adam?
11      A.   No.
12      Q.   How long has Ganz --
13      A.   That's not true.  We did have a partner.  We
14  had -- Randy Creighton was there for a while.  He did
15  bankruptcy and some other things.  He didn't do any...
16      Q.   Was that during -- since 2013?
17      A.   I don't remember when he was there.
18      Q.   When did Ganz & Hauf -- when was Ganz & Hauf
19  created?
20      A.   2006.
21      Q.   Where did you work prior to Ganz & Hauf?
22      A.   Vannah Costello Vannah & Ganz.
23      Q.   And that was the same for Mr. Ganz, correct?
24      A.   Yes.
25      Q.   How long did you work there?
```

Page 16

```
 1      A.   Four years.
 2      Q.   Did you work anywhere else after becoming licensed
 3  in Nevada?
 4      A.   No.
 5      Q.   Your practice, what types of cases do you handle?
 6      A.   All types of cases that protect injured people.
 7      Q.   Do you know the division of your firm, as far as
 8  what percentage is first party versus third party?
 9      A.   No.
10      Q.   I assume that your practice includes first-party
11  handling, because this is a first-party case?
12      A.   Yes.
13      Q.   Is it more third party than first party?
14      A.   Yes.
15      Q.   Have you been handling --
16      A.   Say that again.
17      Q.   Sure.  Do you handle more third party cases than
18  first party?
19      A.   Yes.
20      Q.   Was your practice area the same when you were with
21  Vannah and Costello?
22      A.   Yes.
23      Q.   Since becoming licensed in Nevada, have you
24  handled first party cases?
25      A.   Yes.
```

Page 17

```
 1      Q.   And you've always worked for the injured party?
 2      A.   Yes.
 3      Q.   Have you ever defended an insurance company before
 4  in your practice?
 5      A.   I don't think so.
 6      Q.   Do you know if anyone at your firm has ever
 7  represented an insurance company?  And when I say "your
 8  firm," I mean Ganz & Hauf.
 9      A.   Yes.  I have attorneys that have worked on the
10  defense side, yes.
11      Q.   That was a poorly worded question.  I mean while
12  at your firm, has anyone at your firm ever represented an
13  insurance company while employed with Ganz & Hauf?
14      A.   I don't think so.
15      Q.   All right.  Let's talk about this case
16  specifically.  Do you know when Mr. Humes retained you to
17  represent him?
18      A.   No.
19      Q.   An approximate time frame?
20      A.   Well, our letters of representation went out on
21  April 10th of 2013, so he would have retained us by then.
22      Q.   Mr. Humes testified that he was referred to
23  Dr. Leon by you.  Is that your recollection as well?
24      A.   I don't have any recollection of referring him or
25  not referring him.
```

Hauf, Esq., Marjorie                October 02, 2018                Pages 18..21

Page 18

1    Q.   Is that something that would be contained in the
2  file, whether or not there was a referral to Dr. Leon?
3    A.   No.
4    Q.   Have you referred clients to Dr. Leon before?
5    A.   Yes.
6    Q.   Do you have a system for maintaining notes for
7  case files, Needles or something like that?
8    A.   Yes.
9    Q.   What system does your firm use?
10   A.   We use a SharePoint system we created.
11   Q.   Is that the same back in 2013?
12   A.   I'm not sure.
13   Q.   But you had some type of computerized file
14  maintenance program?
15   A.   Yes.
16   Q.   What types of information is kept within that
17  program?
18   A.   Case status, client contact information.
19   Q.   What about, like, case notes?  For example, if a
20  demand goes out, is that something that's noted within the
21  system, generally?
22   A.   Sometimes yes, sometimes no.  In an ideal world,
23  it would all be logged to keep time, but that's not always
24  as it should be in a case where we don't have to bill.
25   Q.   The expectation, though, as far as you're

Page 19

1  concerned, if an associate makes a phone call on a case
2  regarding value, for example, or settlement, is that
3  something that you expect to be maintained within that
4  SharePoint system?
5    A.   Yes.
6    Q.   And was that still the case back in 2013?
7    A.   Yeah.  There would be some version of a telephone
8  log system, yes.
9    Q.   And is that telephone log system separate and
10  apart from the case status section?
11   A.   Yes.
12   Q.   So you've got one section where there's a case
13  status area and then one where there's logged phone calls?
14   A.   Yes.
15   Q.   What about letters that are sent out?  Assuming
16  that they're notated in that SharePoint system, is that
17  within either the case status section or a different
18  section?
19   A.   It should be in one of those other -- one of those
20  two places.  It's more reliably just in the file.
21   Q.   Who is Britney Armstrong?
22   A.   A paralegal.
23   Q.   It's my understanding that she was a paralegal
24  with your firm back in 2013 as well, correct?
25   A.   Yes.

Page 20

1    Q.   Do you know how long she's worked with your firm?
2    A.   Seven or eight years.  She's been with us a while.
3    Q.   Do you know how long she's been a paralegal?
4    A.   Probably five years, maybe six.
5    Q.   In 2013, would she have been a paralegal?
6    A.   Yes.
7    Q.   Has she been consistently with your firm for that
8  entire seven to eight years?
9    A.   Yes.
10   Q.   No periods of time when she was gone?
11   A.   No.
12   Q.   Do you know if there were any other paralegals
13  that worked on this file?
14   A.   I'm sure there were other paralegals that worked
15  on the file.
16   Q.   Would that be something noted within that
17  SharePoint or case management system?
18   A.   Possibly.
19   Q.   If an individual puts in a note or logs a
20  telephone call, does it identify the person making that
21  note?
22   A.   Yes.
23   Q.   Is that automatic or do they have to input their
24  name within the system?
25   A.   They input it.

Page 21

1    Q.   So if I'm in the SharePoint system and I go to
2  input a note, I would have to actively indicate that it's
3  being inputted by me?
4    A.   Yes.
5    Q.   Or do I have my own SharePoint access that
6  automatically notices that it's me?
7    A.   There's a field where you put your name.
8    Q.   Have you reviewed your firm's SharePoint system or
9  management system in preparation for this deposition,
10  specific to Mr. Humes' claim?
11   A.   Not in preparation for the deposition
12  specifically, no.
13   Q.   Do you know when the last time would have been
14  that you reviewed this?
15   A.   I would have looked at it yesterday when I talked
16  to the client.
17   Q.   And when you talked to the client, would you have
18  gone through the whole background or just whatever was
19  needed for that particular call?
20   A.   No.  Just whatever was needed for that particular
21  call.
22   Q.   Who maintains settlement authority on a particular
23  file?
24   A.   There's no structure in place for that.
25   Q.   So, say, Jolene were to have settlement

Page 22

```
1   discussions on a case.  Assuming the client approved of the
2   amounts, would you have to rubber stamp the settlement?
3       A.   No.
4       Q.   Would anyone have to approve of the settlement?
5       A.   No.
6       Q.   So Jolene would have the authority to make that
7   call, assuming the client was okay with it?
8       A.   Yes.
9       Q.   Do you run all of your settlement offers by the
10  client?
11      A.   Yes.
12      Q.   And everyone in your firm has that -- there's that
13  same expectation for them?
14      A.   Yes.
15      Q.   What about demands?  When you make demands on
16  behalf of the client, are those amounts reviewed with the
17  client or addressed with the client prior to them being
18  made?
19      A.   Yes.
20      Q.   In every instance?
21      A.   Yes.
22      Q.   And the attorneys or associates are aware that
23  that's the expectation?
24      A.   Yes.
25      Q.   When you get an offer on a case and that's relayed
```

Page 23

```
1   to the client, what's the practice with your firm?  Is that
2   generally done in writing, over the phone, in person?
3       A.   It's -- any offer that comes in is automatically
4   sent to the client by the paralegal on the case, either by
5   mail or e-mail, whatever their preferred method of
6   communication, and then they're also set up for a phone
7   call to talk about it or an in-person meeting, whatever they
8   prefer.
9       Q.   What about with the demand?  When you send out a
10  demand or your firm sends out a demand on behalf of a
11  client, is that relayed to the client in writing, by phone,
12  in person?
13      A.   Both.  We'll talk to the client before we -- for
14  authority, for the demand, and then we will send them a copy
15  when it goes out.
16      Q.   And that's regardless of the format that it goes
17  out, whether it's informally in a letter, policy limits,
18  time little demand, an e-mail?  Regardless, they get a copy
19  of the demand that's made?
20      A.   Well, I'm only talking about the -- the demand
21  letter that will actually go out.  I mean, we don't
22  necessarily send every copy of every negotiation
23  communicating back and forth with clients.  Offers that come
24  in, yes.  Ours that go out, sometimes we do, sometimes we
25  don't.
```

Page 24

```
1       Q.   Have you had any interactions or involvement with
2   Mr. Humes prior to his retention of your firm on or around
3   April 10th, 2013?
4       A.   I don't believe so.
5       Q.   No prior cases that you would have handled for
6   him?
7       A.   I don't think so.
8       Q.   Do you know how he came to find your firm?
9       A.   I think he was referred by a prior client.
10      Q.   And you had never met him before his retention?
11      A.   Not that I remember.
12      Q.   Did Ms. Ybarra leave your firm on good terms?
13      A.   Yes.
14      Q.   What about Mr. Gluth?
15      A.   Yes.
16      Q.   Neither one was fired?
17      A.   No.
18      Q.   All right.  The first -- I have some
19  correspondence, and I know you have it as well.  I'm still
20  going to provide you with the copy that I have, just to make
21  sure we're on the same page.  The first letter that I have
22  that I want to show you, we'll mark as Exhibit A, which is a
23  copy of an April 10th, 2013 letter to Acuity.
24           MS. TEMPLE:  You know what?  Let me mark this one.
25  I'm sorry.  I'm going to just mark these.  We'll mark this
```

Page 25

```
1   one.
2            (Deposition Exhibit A was marked
3            for identification.)
4   BY MS. TEMPLE:
5       Q.   Do you recognize that letter?
6       A.   Yes.
7       Q.   Is that your standard representation letter?  Or
8   at least at the time of April 10, 2013, was that your firm's
9   standard representation letter?
10      A.   I mean, it's a representation -- it's what I would
11  refer to as a letter of representation.
12      Q.   Do you have a form that you use for this letter or
13  is it generated differently for each case?
14      A.   I thinks there's a form we start with, yeah, but
15  then it's specified, each case.
16      Q.   Is your firm's practice -- in a case where an
17  individual has underinsured motorist coverage, is the
18  practice to send a letter to both the UIM carrier and the
19  tortfeasor's carrier?
20      A.   Yes.
21      Q.   Does that go out, generally, around the same time?
22      A.   Yes.
23      Q.   So, presumably, you would have sent this letter to
24  the tortfeasor's carrier, as well, acknowledging your
25  retention and advising of your representation?
```

Hauf, Esq., Marjorie                    October 02, 2018                    Pages 26..29

Page 26

1     A.   Not this letter.  We would have sent a letter.
2     Q.   And is it your understanding that Hartford
3  Insurance was the tortfeasor's carrier in this case?
4     A.   Yes.
5     Q.   In this case, you asked Acuity to provide you with
6  the medical payments and underinsured motorist coverages.
7  Were you provided that information?
8     A.   We were eventually provided with it.
9     Q.   Do you have when you would have been provided with
10  that information?
11     A.   I don't know that Acuity provided me with that
12  information, no.  I don't know that Acuity provided me with
13  that information outside of litigation.  I don't think they
14  did.
15     Q.   Did you review -- I'm sorry if I asked you this
16  already.  Did you review your phone log in preparation for
17  today?
18     A.   No.  But even if they would have provided it
19  orally, we would have asked for it in writing.
20     Q.   And you don't have any indication that you
21  received that in writing?
22     A.   No, not pre-litigation.  I mean, I obviously know
23  it now as I sit here today.
24     Q.   Do you know if your file that you're reviewing
25  right now contains e-mails that would have been received?

Page 27

1     A.   It does.
2     Q.   Okay.  But you don't know when, in relation to
3  today, you received that information from Acuity?
4     A.   I don't think I got it pre-litigation.
5     Q.   Do you know when, in relation to litigation, you
6  received it?
7     A.   No.
8     Q.   And your assumption that you did not receive it
9  pre-litigation is because you don't see a letter or e-mail
10  correspondence from them?
11     A.   Yeah, and I have no recollection of it.  And I
12  didn't see anything in the claim log notes about it either.
13     Q.   You mean the claim log from Acuity?
14     A.   Right.  That they produced in litigation.
15     Q.   You didn't review your claim log notes in
16  preparation for today back from 2013?
17     A.   No.
18     Q.   Would that have be something that you would have
19  noted within your claim log at your firm, if that
20  information had been provided?
21     A.   Maybe or maybe not, because we always want it in
22  writing.  My expectation would be yes.
23        MS. TEMPLE:  Okay.  The next letter I want to mark
24  is -- we'll mark it as Exhibit B.  It's dated March 20th,
25  2015.

Page 28

1             (Deposition Exhibit B was marked
2             for identification.)
3  BY MS. TEMPLE:
4     Q.   Do you have a copy of that letter?
5     A.   Yes.
6     Q.   Okay.  Is that the next letter that your firm sent
7  to Acuity in relation to this claim?
8     A.   I think so.
9     Q.   Okay.  So this is two years after the accident; is
10  that correct?
11     A.   Yes.  That's the next letter that was either sent
12  or received from Acuity.
13     Q.   Do you have any indication in your file that there
14  was any contact with Acuity adjusters between April 2013 and
15  March 2015?
16     A.   If they had communicated with us or responded to
17  us, we would either have a letter in the file or a phone
18  note in the log or I'm assuming it would be in their claim
19  log note as well, so let me see.
20        No.  It doesn't look like there was any contact to
21  us from Acuity between 2013 and 2015.
22     Q.   How about you to Acuity, any information provided
23  to them, any contact with them during that time, roughly two
24  years?
25     A.   I believe the med pay was paid on the -- on

Page 29

1  Barbara's claim during this time, and maybe on Donald's as
2  well.
3     Q.   But did your firm have any contact with Acuity
4  regarding the status of this claim during those two years?
5     A.   Something would have transpired in order for us to
6  receive the med pay.
7     Q.   What is the standard with that?  Is it typically
8  paid to you and the client or paid directly to the medical
9  provider?
10     A.   It depends.  Case by case.
11     Q.   How do you know that there would have been contact
12  with your firm regarding medical payments coverage during
13  those two years?
14     A.   I'm looking at the Acuity claim log notes that
15  indicates that they paid med pay in June 2013, and I believe
16  that Ms. Grant's med pay was paid to us.
17     Q.   So you received a medical payments check during
18  those two years is your belief?
19     A.   I think so.
20     Q.   Beyond receipt of that check, did you or your
21  firm, anyone on behalf of Mr. Humes, contact Acuity during
22  those two years regarding the status of this claim?
23     A.   I don't think.  There's not a letter.
24     Q.   Okay.  Did you ever provide Acuity with any of
25  Mr. Humes' medical records during that two year time frame?

Page 30

1    A.   I don't know.  If we got -- if we received med pay
2  on him, we would have had to in order to collect the med
3  pay.
4    Q.   Well, let me distinguish bills versus records.  If
5  med pay was paid, presumably, you could have just provided
6  the bills and not the records; is that fair?
7    A.   I have not seen an insurance company pay a bill
8  without a record, but I suppose it's theoretically possible.
9    Q.   Beyond the medical payments coverage and the
10 aspects of that, was any additional information provided to
11 Acuity during that two-year period regarding the status of
12 this claim?
13   A.   We would have provided them whatever they asked
14 for.
15   Q.   Okay.  Did you ever tell them that the claim with
16 the tortfeasor resolved?
17   A.   Yes.
18   Q.   When did you tell them that?
19   A.   Well, let me rephrase that.  I don't know if I
20 personally told them that.  There's -- it was certainly
21 included in the request for evaluation in 2015.
22   Q.   When in 2015?
23   A.   October of 2015, we sent a letter requesting they
24 evaluate the claim, and in that letter, it indicates that
25 the tortfeasor had settled, at least what the limits were.

Page 31

1    Q.   Do you know when the tortfeasor claim settled?
2    A.   I don't remember.
3    Q.   I'm going to show you what we'll mark as
4  Exhibit C.
5         (Deposition Exhibit C was marked
6          for identification.)
7  BY MS. TEMPLE:
8    Q.   Have you seen that letter before?
9    A.   Probably.
10   Q.   And according to this letter, the claim with the
11 tortfeasor -- against the tortfeasor resolved on or around
12 January 15th, 2015; is that accurate?
13   A.   That looks right.
14   Q.   And so you have no reason to believe, based on
15 your review of the file, that around January 15th, 2015,
16 Acuity was notified of this resolution; is that fair?
17   A.   Well, I didn't review the file.  I only reviewed
18 the correspondence, and there's not a letter.
19   Q.   What about -- and as you sit here today, you don't
20 have any knowledge as to whether that was done sooner than
21 October 2015; is that fair?
22   A.   No, I don't know.
23   Q.   Okay.  What's your firm's practice if a
24 third-party claim resolves and you've notified a first-party
25 claim of a potential UIM claim -- or I'm sorry --

Page 32

1  first-party carrier of a potential UIM claim, do you notify
2  them when the third-party claim resolves?
3    A.   There's -- I mean, there's no policy or practice
4  for that.  It depends on the case.
5    Q.   So the first time you notified Acuity that you
6  were presenting a claim on Mr. Humes' behalf for
7  underinsured motorist coverage was October 2nd, 2015?
8    A.   No.  The first time I notified them I was
9  presenting a claim on Mr. Humes behalf was April 10th, 2013.
10   Q.   Where does it say in that letter that you're
11 presenting a claim for underinsured motorist coverage for
12 Acuity to evaluate and investigate?
13   A.   Well, I didn't ask them to evaluate it at that
14 point.  It was four days post-crash.  There would have been
15 no way for them to reasonably evaluate it.  But that is the
16 letter that notifies them that a claim is to be opened, and
17 they are to evaluate.  That's their obligation to evaluate
18 it, not my obligation to tell them to.
19   Q.   You do this in every case, though, right?  Every
20 time an insured or a client has underinsured motorist
21 coverage, you send this letter, it's automatic?
22   A.   Yes.
23   Q.   Regardless of whether your own evaluation suggests
24 that the tortfeasors' policy will be insufficient to cover
25 the damages?

Page 33

1    A.   The first party -- because the first-party
2  coverage always has a duty to evaluate and protect its
3  insured, yes, we put them on notice every time to give them
4  to opportunity to do that.
5    Q.   But you understand my question?  Even if you see,
6  as the handling attorney, no potential for underinsured
7  motorist exposure because the tortfeasor's limits are high
8  enough, you'd still send this letter?
9    A.   No.  I wouldn't send it if I didn't think there
10 was any exposure.
11   Q.   So it's not automatic in every case where a person
12 has underinsured motorist coverage?
13   A.   I think it's the exception rather than the rule.
14 I think in most cases, you can presume that the underinsured
15 motorist coverage would want the information that there's a
16 claim being opened so that they have the opportunity to do
17 their job and investigate it.  That's why we send it.
18 That's why we send it with an authorization, and let them
19 go -- you know, let them start their investigation.
20        If there is a claim, for example, a commercial
21 carrier or something like that with somebody who doesn't
22 have a substantial injury, then, no, I probably wouldn't put
23 them, because there would be no exposure.  But if there is a
24 potential of exposure, we'll put them on notice, yes.
25   Q.   Was an authorization sent with this letter?

1    A.   Yes.
2    Q.   Are you certain of that?
3    A.   Yes.
4    Q.   Was it expired?
5    A.   No.
6    Q.   Was it made out to Hartford Insurance?
7    A.   No.
8    Q.   Do you have a copy of that authorization with you?
9    A.   Yes.
10   Q.   Did you provide a list of Mr. Humes' medical
11   providers at that time?
12   A.   Not in this letter, no.
13   Q.   Did you provide the third party tortfeasor's
14   policy limits at that time?
15   A.   I doubt I had them.
16   Q.   Did you say anything in this letter indicating
17   that you were -- Mr. Humes was making a claim under his
18   underinsured motorist coverage?
19   A.   I think this letter would put -- should put an
20   insurance company on notice that they're making a claim
21   under their underinsured motorist coverage.
22   Q.   Does it say that in the letter?
23   A.   Well, the letter speaks for itself.  You can read
24   it.
25   Q.   I'm asking --

1    A.   That's -- you can interpret it the way you want.
2    I'm interpreting the way I want to.  I think this puts them
3    on notice of a claim, yes.
4    Q.   Not asking if it puts them on notice of a claim.
5    I'm asking if you're telling them that Mr. Humes intends to
6    make a claim, that he is making a claim for underinsured
7    motorist?
8    A.   I'm sorry.  I don't understand the semantic
9    difference there.
10   Q.   I guess my question is -- follow-up question would
11   be:  Do you intend to make a UIM claim in every single case
12   where this letter is sent, considering that it's sent as
13   the -- it's not sent as to the exception to the rule?
14   A.   The intent of the letter is to put the
15   underinsured motorist carrier on notice of a claim so that
16   they can do their job.  They can't do their job if they
17   don't know that there's been an incident.  So it's to put
18   them on notice of the incident and let them do their job in
19   their claim.  In this case, Acuity, then, didn't do anything
20   for two years.
21   Q.   And no action was taken on your firm's part during
22   those two years either, as far as the underinsured motorist
23   claim is concerned; is that fair?
24   A.   No.  I don't think that that's fair.
25   Q.   What action did your firm take during those two

1    years with respect to the underinsured motorist claim?
2    A.   I'm not sure how to answer that question without
3    breaching attorney-client and work product privilege.
4         As far as did we send them a letter?  We didn't.
5    We provided them everything they would have asked for, you
6    know, so that they could do their job and evaluate their
7    claim.  They didn't ask for anything.
8    Q.   Do you make it a practice of providing lists of
9    medical providers to the insurance company?
10   A.   That's -- that's too broad for me to answer.
11   Q.   With respect to underinsured motorist claims, when
12   you send this initial letter, which you state alerts the
13   insurance company that there's a claim being presented, do
14   you also provide a list of medical providers with whom your
15   client would have undergone medical care?
16   A.   Sometimes we do, sometimes we don't.
17   Q.   How do you decide in which cases it's done and
18   which cases it's not?
19   A.   I don't know that I can answer that with any
20   certainty.  It's a case-by-case basis.
21   Q.   Is there a reason why Acuity wasn't provided with
22   the medical providers with whom Mr. Humes had undergone any
23   medical care, considering he had already treated at that
24   point?
25   A.   They didn't ask.

1    Q.   If I understand your testimony in other cases,
2    regardless of whether the insurance company asks for it.
3    When this initial letter goes out, you've sent a list of
4    providers before?
5    A.   I'm sure there's been occasions where that's
6    happened or there's been a request and we provided it at
7    that point.
8    Q.   So the next letter is what we've marked, I think,
9    as Exhibit B, which is the March 20th, 2015 correspondence.
10   A.   Yes.
11   Q.   And that's -- you agree with my record keeping
12   that that letter is the next letter that would have been
13   sent by your firm?
14   A.   That's the next one I have, yes.
15        MS. TEMPLE:  And then we have what we'll mark as
16   Exhibit D.
17             (Deposition Exhibit D was marked
18             for identification.)
19   BY MS. TEMPLE:
20   Q.   And that's dated October 2nd, 2015.  Do you see
21   that?
22   A.   Yes.
23   Q.   Do you recognize this letter?
24   A.   Yes.
25   Q.   What do you recognize this letter to be?

Page 38

1    A.   This is our request that Acuity evaluate the
2  claim.
3    Q.   Is this time limited?
4    A.   Yes.
5    Q.   What's the time limit provided?
6    A.   We ask that they respond to us by November 5th.
7    Q.   This was dated October 2nd.  Do you know when it
8  was sent?
9    A.   It would have been sent that dad or the next day.
10   Q.   How do you know?
11   A.   Because we would sign a letter and put it in the
12 mail.  If the mail was picked up, then it would go that --
13 the next day.  If it was not picked up, it would go that
14 day.
15   Q.   Do you have a fax confirmation sheet?
16   A.   No.
17   Q.   Do you generally maintain fax confirmation sheets
18 in your files?
19   A.   Sometimes we do, sometimes we don't.  We always
20 send everything two ways, so that's why we do that, because
21 sometimes the fax confirmations don't make it to the file.
22   Q.   Okay.  And what is the demand at this time, as far
23 as the monetary amount requested?
24   A.   $250,000.
25   Q.   Presumably, that was approved of by the client?

Page 39

1    A.   Yes.
2    Q.   Is this a form letter that your firm used at the
3  time?
4    A.   No.
5    Q.   So you don't have a standard demand form letter
6  that your firm would have utilized at the time?
7    A.   No.  Every case is different.  There's no way to
8  have a form demand letter.
9    Q.   And what I mean by form is you've got the section
10 with the medical expenses, you've got the section with the
11 facts and circumstances surrounding the accident, you have
12 the conclusion section.  Obviously the contents would be
13 different, case by case, but is the letter format generally
14 the same?
15   A.   Yes.
16   Q.   And that would have been the case back in 2015?
17   A.   Yeah.  Yeah.
18   Q.   And was an authorization attached to this letter?
19   A.   Yes.  As Exhibit 17.
20   Q.   I'm sorry?
21   A.   Yes.  As Exhibit 17.
22   Q.   Do you have a copy of that with you?
23   A.   No.  I didn't bring the exhibits to the request
24 for an evaluation with me.
25   Q.   Are you aware that that authorization was

Page 40

1  addressed to Acuity?
2    A.   I would assume it would be addressed to Acuity.
3    Q.   I'm sorry.  I'm sorry about that.
4         Are you aware that that authorization was directed
5  to Hartford, not Acuity?
6    A.   No.  I do think that there was a mistake with
7  that, and I'm only looking at this e-mail that was sent to
8  us on the 13th, and I think this -- hold on.  Let me read
9  it.  Yeah, the authorization.  There was a wrong
10 authorization for the Hartford.
11   Q.   Have you had that issue arise before, where the
12 wrong authorization was sent to the adjuster?
13   A.   I'm sure it happens, yes.
14   Q.   Did you include any medical records with this
15 demand?
16   A.   Yes.
17   Q.   Did you include any prior preexisting records for
18 treatment that would have taken place before the accident?
19   A.   We would have included whatever we had.
20   Q.   Do you know, as you sit here today, whether
21 records for prior medical care were produced to Acuity at
22 that time?
23   A.   I don't know which of these providers that are on
24 this list were prior providers versus providers from the
25 crash.  I don't know.

Page 41

1    Q.   Do you know if this batch of records that was sent
2  to Acuity included the recommendation for future medical
3  care?
4    A.   Yes.
5    Q.   And is the answer yes, it did?
6    A.   It did.
7    Q.   So if I understand your testimony, you would have
8  included all the records you had in your office at that
9  time, but it's possible that that did not include all of the
10 treatment records for treatment undergone?
11   A.   Yes.
12   Q.   All right.  Let's look at that e-mail that you
13 were referencing before, which we'll mark as the next
14 exhibit in line.
15        MS. TEMPLE:  Is it E?
16        THE COURT REPORTER:  (Nods head.)
17        (Deposition Exhibit E was marked
18             for identification.)
19 BY MS. TEMPLE:
20   Q.   And this e-mail, you have in your file as well,
21 correct?
22   A.   Yes.
23   Q.   Dated October 13th, 2015?
24   A.   Yes.
25   Q.   Okay.  In this letter, it tells you that the

Hauf, Esq., Marjorie                    October 02, 2018                    Pages 42..45

Page 42

1   letter was addressed to the wrong adjuster. Do you see
2   that?
3       A.   Yes.
4       Q.   And this letter was sent October 13th, 2015?
5       A.   This letter -- yeah. This letter was sent to the
6   only adjuster we had ever heard from, and, apparently, they
7   had switched adjusters.                              .
8       Q.   But the e-mail that was sent back to you was sent
9   on October 13th; is that correct?
10      A.   Yes.
11      Q.   Okay. Is that an unreasonable period of time for
12  Acuity to have responded to the demand letter that was sent
13  out on October 2nd?
14      A.   I don't know the -- I don't have an answer to that
15  question. This isn't a response to the demand letter. It's
16  not an unreasonable period of time for them to receive the
17  demand letter.
18      Q.   They indicated that they did not have a medical
19  authorization that was properly addressed; is that fair?
20      A.   Well, they did have one from 2013, but that --
21  which they never used, and that had probably expired.
22  Usually we -- usually they're good for 90 days. So this
23  second authorization, yes, would have been -- it looks like,
24  according to this e-mail anyway, that it had the wrong
25  insurance company on it.

Page 43

1           MS. TEMPLE: All right. So we will look at the
2   next letter in line, which we'll mark as Exhibit F.
3           (Deposition Exhibit F was marked
4               for identification.)
5   BY MS. TEMPLE:
6       Q.   And this letter is in response to Acuity's request
7   regarding whether or not the tortfeasor's claim had settled;
8   is that fair?
9       A.   This letter is in response to the October 13th
10  e-mail.
11      Q.   Regarding whether the tortfeasor's claim was
12  resolved?
13      A.   That was one of their questions, Acuity's
14  questions in the October 13th e-mail, yes.
15      Q.   Did you provide an updated authorization at that
16  time?
17      A.   Yes.
18      Q.   Did you provide the declaration page from Hartford
19  at that time?
20      A.   No. We provided a copy of the release with
21  Hartford.
22      Q.   Were you aware that your firm -- it was requested
23  that your firm provide a copy of the declarations page?
24      A.   We would have provided them with what we had. I
25  have no means to get somebody else's declaration page.

Page 44

1       Q.   Do you typically request a third party
2   tortfeasor's declaration page before you resolve their
3   claim?
4       A.   No.
5       Q.   So you just trust that the amount of insurance
6   that they're representing to you is accurate?
7       A.   Often we do. Sometimes we get an affidavit that
8   they have no other insurance.
9       Q.   Did you do that in this case?
10      A.   I don't remember.
11          MS. TEMPLE: All right. We'll look at the next
12  exhibit in line, which we'll mark as Exhibit G.
13          (Deposition Exhibit G was marked
14              for identification.)
15          THE WITNESS: I think I just -- let me just
16  clarify what I just said there. I think we normally request
17  the declarations page. We don't normally get the
18  declarations page, and there's no means by which to compel a
19  third-party insured to give us the declarations page, so we
20  ask for some proof of their limits.
21  BY MS. TEMPLE:
22      Q.   And what do you typically accept as proof of
23  limits?
24      A.   A letter, an affidavit, or the dec page, if
25  they'll send it.

Page 45

1       Q.   And when you say a letter, you're suggesting a
2   letter from that insurance company?
3       A.   Yes.
4       Q.   All right. So let's look at this next exhibit,
5   Exhibit G. Do you recall receiving this letter from Acuity?
6       A.   No.
7       Q.   Okay. You want an opportunity to review it?
8       A.   No. I've reviewed it. It's in my file, but I
9   don't recall getting it, no.
10      Q.   And you see here where Acuity is saying that the
11  authorization that you provided was expired?
12      A.   Yes.
13      Q.   The letter also requests that you provide a list
14  of all medical treat -- providers with whom your client
15  treated in the five years prior to the accident. Do you see
16  that?
17      A.   Yes.
18      Q.   When asked for that information by your client's
19  insurance company, is that something that you'll generally
20  provide on their behalf?
21      A.   If we have it, yes.
22      Q.   Do you reach out to your client and see if they've
23  treated in the past five years?
24      A.   That would be privileged, obviously.
25      Q.   I'm not asking if you did that in this case. I'm

Page 46

```
 1   saying, generally, is that something that you do?
 2       A.   Again, that would be privileged, both
 3   attorney-client and work product privilege as far as --
 4       Q.   I'm not asking for the contents of a privileged
 5   communication.  I'm asking, in your practice, do you
 6   generally check with your clients to find out if they had
 7   prior medical care?
 8       A.   Again, that's going to be work product privilege
 9   because that's going to be my mental impressions and
10   opinions about whether or not that's information that we
11   need to obtain.
12       Q.   All right.  We'll bring it up, if we have to, with
13   the discovery commissioner.  Are you refusing to answer?
14       A.   Yes.
15       Q.   Okay.  They also ask for -- you said they did ask
16   for a list of medical providers with whom your client
17   treated with within the five years prior.  Did you have any
18   objection to providing that information to Acuity?
19       A.   No.
20       Q.   All right.  We'll mark as next in line -- and just
21   for reference, that's November 12th, 2015.  You agree with
22   me on that?
23       A.   That's the date on the letter, yes.
24       Q.   Okay.  And as you sit here today, you have no
25   reason to dispute that that letter would have been received
```

Page 47

```
 1   around that time?
 2       A.   I have no reason to believe or disbelieve it.
 3       Q.   Would that be something that would be noted in
 4   your claims management system, when that letter would have
 5   been received?
 6       A.   No.
 7       Q.   Do you have some type of time stamping system
 8   within your firm where letters are stamped on the day that
 9   they're received?
10       A.   No.
11            MS. TEMPLE:  We'll mark as next in line Exhibit H.
12            (Deposition Exhibit H was marked
13             for identification.)
14   BY MS. TEMPLE:
15       Q.   And this was January 19th, 2016, that you
16   responded to this November 2015 letter; is that correct?
17       A.   Yes.
18       Q.   Why did it take two months to provide the
19   authorization requested?
20       A.   There's no way I can answer that without breaching
21   privilege.
22       Q.   Is it your practice to provide the information
23   that an insurance company requests of your client when
24   asked, assuming it's something reasonable like an
25   authorization for the release of records?
```

Page 48

```
 1       A.   Can you say that one more time?
 2       Q.   Sure.  Is it your firm's practice to provide
 3   something, like the authorization for the release of
 4   records, when asked by the insurance company?
 5       A.   That's too overbroad for me to answer.
 6       Q.   Okay.  Well, in this particular case, was there
 7   any reason why you wouldn't provide a prompter response to
 8   this request for an authorization?
 9       A.   There's no way I can answer that without breaching
10   privilege.
11       Q.   I'm not asking, in these questions, for you to
12   answer with conversations that you would have had with your
13   client.  None of these questions are directed at obtaining
14   information regarding specifics of conversations that you
15   had, but I'm entitled to know the steps that you took to
16   present this claim to Acuity.  That's what this entire claim
17   is about -- entire case is about.  And so I'm going to ask
18   you again:  Is there a reason why it took two months to
19   provide a signed authorization to Acuity?
20       A.   And, again, there --
21            MS. MANKE:  I'll make the objection for Ms. Hauf.
22   We'll just say it's the same objection.
23            MS. TEMPLE:  All right.  So you're refusing to
24   answer?
25            MS. MANKE:  Yes.
```

Page 49

```
 1   BY MS. TEMPLE:
 2       Q.   You're not disputing that it took two months to
 3   provide that authorization?
 4       A.   No.
 5       Q.   Did that letter of January 2016 include a list of
 6   the prior medical providers with whom your client treated
 7   before this accident?
 8       A.   No.
 9       Q.   Did your letter address that request at all?
10       A.   No.
11            MS. TEMPLE:  Okay.  We'll mark as the next exhibit
12   in line Exhibit I, a letter dated February 2nd, 2016.
13            (Deposition Exhibit I was marked
14             for identification.)
15   BY MS. TEMPLE:
16       Q.   Is this a letter that's contained within your
17   file?
18       A.   Yes.
19       Q.   Okay.  And this is a letter from Acuity to you?
20       A.   This is the first page of it, yes.
21       Q.   Am I missing a page?  Oh, the signature page.
22   Okay.  Well, I only have -- do you have two pages of the
23   letter?
24       A.   Yeah.  But it doesn't have any content on the
25   other one anyway.
```

Hauf, Esq., Marjorie                    October 02, 2018                    Pages 50..53

Page 50

1    Q.   Just the signature page?
2    A.   Just the signature.
3    Q.   Okay.  So let's take a look at this letter, if we
4  can, which is Exhibit I.
5    A.   Well, actually, that's not true.  There's three
6  pages, and the third page -- the second page has a signature
7  page and the third page has a list of providers --
8    Q.   Okay.
9    A.   -- that Acuity had.
10   Q.   Okay.  And in this letter, Acuity thanks you for
11 enclosing the authorization, fair?
12   A.   Yes.
13   Q.   And it reiterates a request for those providers
14 with whom Mr. Humes would have undergone care five years
15 prior to the accident.  Do you see that?
16   A.   Yes.
17   Q.   And at this point, I'll ask you the same question
18 that I asked you with respect to the November letter.  Were
19 you refusing to provide that information on Mr. Humes'
20 behalf?
21   A.   No.
22   Q.   And as you indicated, the letter also includes a
23 list of medical providers that were identified as having
24 provided medical care to Mr. Humes following the accident;
25 is that correct?

Page 51

1    A.   Yes.
2    Q.   And Acuity requests that you confirm that this
3  list is complete, and if not, identify any additional
4  providers that may not be on that list; is that fair?
5    A.   Yes.
6    Q.   Okay.  Is there anything unreasonable about either
7  of those requests?
8    A.   No.
9    Q.   Is it fair for Acuity to request that information
10 in the course of its evaluation of your client's claim?
11   A.   Yes.
12   Q.   And according to the Acuity adjuster, he needs
13 that information so that he can complete his evaluation.  Do
14 you see that?
15   A.   Yes.
16   Q.   And there's nothing unreasonable about that?
17   A.   No.
18        MS. TEMPLE:  We'll mark as next in line Exhibit J,
19 which is dated March 2nd, 2016.
20        (Deposition Exhibit J was marked
21         for identification.)
22 BY MS. TEMPLE:
23   Q.   Is that a letter that was contained in the file
24 that you reviewed prior to your deposition today?
25   A.   Yes.

Page 52

1    Q.   And that letter is also addressed to you; is that
2  correct?
3    A.   Yes.
4    Q.   And that letter is fairly brief.  It confirms that
5  you received that letter dated one month prior.  Is that an
6  accurate representation?
7    A.   Yes.
8    Q.   Do you have any indication that you or anyone from
9  your firm would have responded to Acuity's request within
10 that 30 day period?
11   A.   I'm sorry.  What was your question?  Do I have any
12 information that...
13   Q.   Suggests that your firm or you responded to Acuity
14 within that 30 day period?
15   A.   Yes.
16   Q.   And when was that?
17   A.   3/25/15.  According to Acuity's claim log notes,
18 there was a conversation.
19   Q.   3/25/15?
20   A.   Yeah.  Aren't we in 2015?  Oh, we're in 2016.
21 Hold on.  No.
22   Q.   Okay.  As you sit here today, do you know why no
23 response was sent by your office?
24   A.   Again, there's no way I can answer that without
25 breaching privilege.

Page 53

1    Q.   So you do know; you just can't tell me because
2  it's privileged.  Is that your testimony?
3    A.   I'm not answering that question.
4    Q.   So you're refusing to answer?
5    A.   Yes.
6        MS. TEMPLE:  Okay.  We will mark as next in line
7  Exhibit K.
8        (Deposition Exhibit K was marked
9         for identification.)
10 BY MS. TEMPLE:
11   Q.   And this letter is dated May 10th, 2016; is that
12 correct?
13   A.   Yes.
14   Q.   Is that the next letter in line in your file
15 chronologically?
16   A.   Yes.
17   Q.   And this is, again, a letter from Acuity to you;
18 is that accurate?
19   A.   Yes.
20   Q.   And this letter, again, is brief.  Inquires as to
21 whether you received the letters dated February 2nd and
22 March 2nd; is that correct?
23   A.   Yes.
24   Q.   And also confirms their request, which is that
25 they need medical providers from five years pre-accident and

Page 54

1  a list of the medical providers with whom your client
2  received medical care, or at least confirmation of the list
3  that they already have; is that fair?
4      A.   Yes.
5      Q.   So since January 2016, Acuity didn't hear from
6  your office in response to their request; is that fair?
7      A.   There's no letters.
8      Q.   Do you have any indication that they were
9  otherwise contacted by your firm?
10      A.   No.
11      Q.   As you sit here today, do you know why no response
12  was sent to Acuity from January 2016 until -- at least or up
13  till May 2016?
14      A.   Again, there's no way I can answer that without
15  breaching privilege.
16      Q.   So you're refusing to answer that question?
17      A.   Yes.
18           MS. TEMPLE:  Let's mark as the next exhibit in
19  line a letter dated July 6, 2016.  We'll mark it as
20  Exhibit L.
21               (Deposition Exhibit L was marked
22               for identification.)
23  BY MS. TEMPLE:
24      Q.   And this letter is sent certified mail, at least
25  according to the letter; is that correct?

Page 55

1      A.   It says certified mail on it, yes.  I don't know
2  if it was sent certified mail, obviously.
3      Q.   Do you notate that within the file, generally, or
4  does someone from your office notate that, how it's
5  received?
6      A.   We keep a copy of the signed receipt, yeah.
7      Q.   Do you have that within your file?
8      A.   No.
9      Q.   It's possible that it's -- it was received
10  certified mail but you just don't have an indication of that
11  as you sit here right now?
12      A.   Anything's possible.
13      Q.   Is that a full copy of all -- everything with
14  respect to the correspondence that was sent pre-litigation
15  and received?
16      A.   With the exception of the exhibits to the request
17  to evaluate, because those were voluminous.
18      Q.   So this letter is dated July 6, 2016.  In the
19  first paragraph, it inquires as to the status of the
20  correspondence from February 2nd, March 2nd, and May 10th;
21  is that accurate?
22      A.   Yes.
23      Q.   And, again, it's asking that you provide a list of
24  medical providers with whom Mr. Humes underwent treatment in
25  the five years prior to the accident and to confirm that

Page 56

1  their list of medical providers is a complete one; is that
2  fair?
3      A.   Yes.
4      Q.   Were you aware that Mr. Humes had undergone a
5  cervical fusion prior to this accident?
6      A.   Again, I don't know how I can answer that without
7  breaching privilege.  That's directly a conversation I would
8  have with my client.
9      Q.   Well, did you see that anywhere in the medical
10  records?
11      A.   Yes.  It was in the medical records.
12      Q.   So is it fair to say that you were aware that your
13  client had undergone a cervical fusion before this accident?
14      A.   The medical records indicated that he had had a
15  cervical fusion I believe it was 15 to 20 years before this
16  crash.
17      Q.   In which record did you see an actual date noted?
18      A.   I believe the initial chiropractor had it in
19  there.
20      Q.   Okay.  Is that Alternative Health Care, Dr. Bruce
21  Crisman?
22      A.   I don't have his medical treatment memorized, so I
23  don't know.
24      Q.   That's okay.
25           Do you know whether the full records from that

Page 57

1  chiropractor were produced in this case?
2      A.   If I had it, Acuity had it.  So if I know about
3  it, they would have known about it.
4      Q.   You're certain of that?
5      A.   I'm certain that we would have sent them
6  everything we had.
7      Q.   When did you become aware, from the medical
8  records, that Mr. Humes' cervical fusion was 15 to 20 years
9  before this accident?
10      A.   I don't know.
11      Q.   Is it possible that that's something that you
12  learned after litigation commenced --
13      A.   I don't know.
14      Q.   -- as far as the date itself?
15      A.   I don't know.  I doubt it.
16      Q.   Why do you doubt it?
17      A.   Because it was in the medical records.
18      Q.   But you don't know, as you sit here today, when
19  you became aware of the date of his cervical fusion surgery?
20      A.   I don't think anybody knows the date of his
21  cervical fusion surgery, but I know that there's a medical
22  record that says it was -- at least one medical record.
23  There may be more.  There's just one I specifically recall
24  that said it was 15 to 17 or 15 to 20 years prior.
25      Q.   But you don't know when you would have seen that

Page 58

1  medical record for the first time?  As you sit here today,
2  you don't know when you saw that record?  Before litigation?
3  After litigation?
4      A.   I don't know when I saw it, no.
5           MS. TEMPLE:  All right.  Let's go to the next
6  exhibit in line, which we'll mark as Exhibit M.
7           (Deposition Exhibit M was marked
8                for identification.)
9  BY MS. TEMPLE:
10     Q.   Is that the next letter in line in your file as
11  well, chronologically?
12     A.   Yes.
13     Q.   Okay.  And that's dated July 20, 2016?
14     A.   Yes.
15     Q.   From your office to Acuity?
16     A.   Yes.
17     Q.   Signed by Ida Ybarra?
18     A.   Yes.
19     Q.   Do you have an independent recollection of having
20  reviewed this letter before it went out?
21     A.   No.
22     Q.   This letter provides a HIPAA-compliant
23  authorization for medical records from five years before the
24  date of the accident; is that fair?
25     A.   Yes.

Page 59

1      Q.   Is that the first time that the authorization that
2  was provided by your firm included five years prior to the
3  accident as an allowable time frame?
4      A.   According to these documents, yes.
5      Q.   It then lists the medical providers with whom
6  Mr. Humes underwent medical care; is that correct?
7      A.   Yes.
8      Q.   Does it provide a list of the providers with whom
9  Mr. Humes underwent medical care in the five years prior to
10  the accident?
11     A.   I don't know the answer to that.  It just says the
12  providers -- it says it gives them a five year list --
13  or five year authorization, and then it gives a list of
14  providers.  Which of these providers are pre-accident and
15  which are post, I couldn't tell you as I sit here right now.
16     Q.   And the letter certainly doesn't say.  It just
17  lists the providers?
18     A.   Yes.
19     Q.   It doesn't distinguish, These are the ones you saw
20  five years before, these are the ones you saw after the
21  accident?
22     A.   No.
23     Q.   You're aware that he treated in four different
24  states, correct?
25     A.   We've provided medical records from Florida, South

Page 60

1  Dakota, Nevada.  I don't recall other states other than
2  those three.
3      Q.   Well, let's just say three then.  He's treated in
4  three separate states, at least three separate states?
5      A.   For this crash?
6      Q.   Correct.
7      A.   According to the records, yes.
8      Q.   Did you provide any contact information for any of
9  the providers aside from just the name of the medical
10  provider?
11     A.   In this letter, no.
12     Q.   Are you aware that the adjuster spoke with Britney
13  Armstrong on multiple occasions regarding the pre-litigation
14  handling of this claim?
15     A.   I'm not really sure how to answer that.  I mean,
16  am I -- I guess I'm aware, yes, that he spoke to Britney,
17  yes.
18     Q.   You reviewed the claim log --
19     A.   Yes.
20     Q.   -- from Acuity?
21     A.   Yes.
22     Q.   There, you see numerous times where Larry says
23  that he contacted Britney or was contacted by Britney; is
24  that fair?
25     A.   There were log entries that indicated that he

Page 61

1  spoke with Britney, yes.  Called her or she called him, yes.
2      Q.   Assuming your file maintenance system was used as
3  intended, those calls would also be noted within your
4  system?
5      A.   Yes.
6      Q.   All right.  So we'll go to the next exhibit in
7  line.  And let me go back to -- actually, we'll just go to
8  the next exhibit in line.  That's fine.
9           Since you have a copy of the claim log, I'm going
10  to ask you about a particular call and if you're aware of
11  it.  The next letter that we have, and I'm going to mark as
12  the next exhibit in line as Exhibit N, is a letter dated
13  September 7, 2016.  Do you have that as your next exhibit in
14  line?
15     A.   Yes.
16     Q.   Okay.  Prior to that, it appears, at least based
17  on the log from Larry Reub, that Ida Ybarra had been
18  contacted, and this is a note from August 31st, 2016.  Do
19  you see that?
20     A.   No.
21     Q.   Okay.  Is your log page -- are there page numbers
22  at the bottom?
23     A.   Yes.
24     Q.   Page 7, third entry.
25     A.   This one -- are you referring to where it says,

Hauf, Esq., Marjorie                    October 02, 2018                    Pages 62..65

1  "We attempted to contact Attorney Ida Ybarra, who represents
2  Donald Humes, and had difficult [sic] reaching her. We did
3  talk to the paralegal, Britney, and advised her we had
4  received the authorizations and the provider list. We
5  advised the provider list that they provided contained two
6  providers we were unaware of and no information on where
7  they were located, and needed that info for medical
8  records." Is that what you're talking about?
9       Q.   Yes.
10      A.   Yes. I see that right here.
11      Q.   And in that request, they're seeking additional
12  information regarding two of the providers that you
13  provided, as they couldn't locate them. Is that an
14  unreasonable request?
15      A.   Well, it is, because I don't know which two. I
16  mean, there's no way I can answer that because I don't know
17  which two.
18      Q.   Why would that matter?
19      A.   Because if it's -- I mean, if it's something they
20  could have Googled and found, then, yes, it would be
21  unreasonable. If it's something that has a very common name
22  that they couldn't determine what the location would be,
23  then maybe not. There's no way for me to know what was in
24  their mind, but I don't know what providers they are.
25      Q.   Well, two lines down, Box Canyon Surgery and

1  Novasic Physical Therapy. Do you see that?
2       A.   It says, Britney did provide the addresses and
3  contact for Box Canyon Surgery Center and Novasic Physical
4  Therapy, so if those were the two they were asking for, she
5  provided it.
6       Q.   Was that an unreasonable request on the part of
7  Acuity to need the contact information for Mr. Humes'
8  providers in order to obtain the records from those
9  providers? Is that unreasonable?
10      A.   Yes. I think that those are novel enough names
11  that they probably could have Googled them and found them
12  before a month.
13      Q.   Is it unreasonable for them to ask for assistance
14  if they're having difficulty locating providers?
15      A.   No. They asked for it and they were given it.
16      Q.   So you don't think, on its face, that's an
17  unreasonable request?
18      A.   I don't know how to answer that other than I
19  already did. I think those are novel enough names that they
20  could have found them.
21      Q.   But your office didn't refuse to provide the
22  information; you provided it?
23      A.   Yes.
24      MS. TEMPLE: Okay. So now we'll go to the next
25  exhibit in line, Exhibit N.

1            (Deposition Exhibit N was marked
2            for identification.)
3  BY MS. TEMPLE:
4       Q.   And this letter is dated September 7th, 2016, from
5  Acuity to your firm; is that fair?
6       A.   Yes.
7       Q.   Okay. And in that letter, Larry Reub is
8  confirming the conversation, presumably with Britney, based
9  on the note that we just reviewed where -- and it's also
10  written to Britney, confirming receipt of the missing
11  information on medical providers. Does that sum up that
12  first sentence fairly?
13      A.   The sentence says, "This will confirm our
14  conversation of early last week and thank you for providing
15  the missing information regarding medical providers we had
16  inquired about."
17      Q.   So is that a yes?
18      A.   It says what it says.
19      Q.   And they are working to obtain the last of the
20  medical records. Do you see that?
21      A.   It says, "As per that conversation, we are in the
22  process of obtaining the last of the needed medical records
23  and are now evaluating the medical records we have
24  obtained."
25      Q.   You don't fault Acuity for attempting to get all

1  of the medical records, with respect to Mr. Humes'
2  treatment, to complete its evaluation of the claim?
3       A.   I'm very -- I hadn't noticed this before, but it
4  just says they just started evaluating them in 2016, so that
5  does surprise me in -- that does surprise me, yes.
6       Q.   You have a copy of the claims log, though,
7  correct?
8       A.   Yes.
9       Q.   Okay.
10      A.   And there's nothing in the claims log that
11  indicates they evaluated the claim before 2016.
12      Q.   Okay. Well, you know, I don't want to go back and
13  forth on this, but do you want to turn to Page 3?
14      A.   Yes.
15      Q.   A note dated October 13, 2015.
16      A.   Yes.
17      Q.   Two pages long.
18      A.   Yes.
19      Q.   Seems to be a summary of the medical records that
20  your office provided in its demand, which would have been
21  received right around that time; is that fair?
22      A.   It's a summary of records, but it's not an
23  evaluation.
24      Q.   What's your definition of an evaluation?
25      A.   Maybe we could look it up in the dictionary. My

1  definition of an evaluation would be that they would make an
2  evaluation, not just reiterate medical records.
3        Q.   And do you think that it's fair in the course of
4  Acuity's evaluation and reasonable in the course of Acuity's
5  evaluation to review all of the records?
6        A.   Do I think that -- are you asking me if I think
7  they should review all the records?
8        Q.   Sure.
9        A.   Yes.  I think they should review everything
10 they're provided, yes.
11       Q.   Up until this point --
12       A.   And I think they should review -- I think they
13 should obtain whatever else they think they need and review
14 it as well.
15       Q.   Up until this point in time, do you know whether
16 you had provided a list of the medical providers with whom
17 Mr. Humes underwent medical treatment in the five years
18 prior to the accident?
19       A.   Other than what I've already answered about that,
20 I don't.
21       Q.   And I'm talking about up through September 19th,
22 2016.
23       A.   What I said before is we did provide multiple
24 lists of providers.  I don't know whether those are past
25 providers or pre-crash providers or post-crash providers.

1        Q.   Okay.  Let's look at the next letter in line,
2  dated September 19th, 2016.  Is that the next letter that
3  you have in line as well?
4        A.   Yes.
5             THE COURT REPORTER:  This is O.
6             (Deposition Exhibit O was marked
7              for identification.)
8  BY MS. TEMPLE:
9        Q.   September 19th, 2016, Acuity sends you a letter
10 indicating that they are evaluating the records that they
11 were able to obtain, based on the information that your firm
12 provided, and that they will have a response to you.  Is
13 that a fair summary?
14       A.   It says, "We advised you -- we had advised you in
15 our correspondence of September 7, 2016, that we would
16 provide you with an offer or status update by this date.
17             We have been advised by our medical records
18 analyst that they are in the process of evaluating the
19 medical records provided and will provide us with an
20 evaluation by October 5th, 2016.
21             As soon as we receive the medical records
22 evaluation, we will forward an offer for resolution of this
23 claim.  If we receive the evaluation prior to the promise
24 date, we will present our offer at that time.  Thank you for
25 your patience and understanding."

1             As I sit here today, I still haven't received an
2  offer, so...
3        Q.   I want to go back to the August 31st, 2016.  Were
4  you aware that around August 31st, 2016, Britney Armstrong
5  was contacted and asked for the date of your client's prior
6  cervical fusion and the information regarding that injury?
7        A.   No.
8        Q.   Okay.  Did you see anywhere in your review of the
9  claims log notes where Mr. Reub, the adjuster, asked for
10 information regarding the prior cervical fusion?
11       A.   Yes.
12       Q.   Including the date of that fusion?
13       A.   Yes.
14       Q.   Did your firm ever provide Mr. Reub with the date
15 of your client's cervical fusion prior to the commencement
16 of litigation?
17       A.   Yes.
18       Q.   When did you provide that information to him?
19       A.   It would have been in the medical records that
20 indicated it was 15 to 17 or 20 or something like that years
21 prior.
22       Q.   When asked --
23       A.   In fact, I'm looking at it right here.  On
24 10/13/15 -- 10/13/15, there's a claim log note on Page 3
25 where it says, Records from Alternative Health Care Center,

1  chiro, starting on 4/25 -- 4/24/13 to 6/18/13, approximately
2  18 visits.  Complaints of headaches, neck, back, and
3  shoulder pain, and knee pain.  Notes C3 fusion, 15 to 17
4  years ago.  Complaints of tingling in finger.  MRI from
5  Black Hills Surgical on 5/22/13, note prior to fusion.  So
6  they would have known it at least on 10 -- according to
7  their own note, on 10/13/15.
8        Q.   Assuming that that record's accurate, correct?
9        A.   Yes.
10       Q.   And do you know whether that was an intake sheet
11 or a doctor's medical record that indicated when the fusion
12 took place?
13       A.   I don't remember.
14       Q.   Is it fair for Acuity to ask for confirmation on
15 when his surgery was?  Is that a fair request?
16       A.   No.  I don't think it's a fair request to require
17 information that you already have.
18       Q.   Assuming that information is correct.  That's your
19 assumption, right?
20       A.   No.  That's what our record says.
21       Q.   You don't even know which record.
22       A.   Well, it says right -- I know what it says here,
23 and I don't have -- I have not memorized his medical
24 records.  And, again, I'm trying to be careful here because
25 I'm trying to answer questions and be cooperative, but we're

Hauf, Esq., Marjorie                October 02, 2018                Pages 70..73

Page 70

1  getting -- we keep getting dangerously close to work product
2  privilege.  So what I think is fair and what I don't think
3  is fair isn't important.  What's going to be important is
4  what a jury thinks is fair and what a jury doesn't think is
5  fair.
6        So I'm happy to give you the facts as I know them,
7  and, no, I didn't memorize the medical records.  If you have
8  the medical records and you want me to look at it, I'd be
9  happy to read it for you.  But as far as what my opinions
10  are, I'm not here as an expert, so my opinions don't matter.
11        Q.   October 7th, 2016, October 10th, 2016,
12  December 19th, 2016, December 30th, 2016, Larry asks your
13  firm to provide information regarding when that cervical
14  fusion took place, confirmation on when that fusion took
15  place.  Do you disagree with that?
16        A.   Yes.
17        Q.   And why do you disagree that those conversations
18  took place on those dates?
19        A.   Because I'm not sure what you're looking at.  You
20  tell me those conversations took place, but he already had
21  the information.
22        Q.   That's not what I'm asking.
23        A.   So I -- I guess I don't know -- no, I don't know
24  that those conversations took place.  They were not with me.
25        Q.   Do you dispute that those conversations took

Page 71

1  place?  Do you have a reason to dispute that?
2        A.   There's no way to answer that question.  I have no
3  reason to confirm it or dispute it.  They weren't with me.
4        Q.   If you wanted to know or if Acuity was asking for
5  the date that the surgery took place, is that something that
6  your firm could have obtained and provided to him?
7        A.   We did obtain and provide it to him, and they
8  documented it in their claim file.
9        Q.   Confirmation that that's exactly when it occurred?
10        A.   No.  There's absolutely no way I could provide a
11  confirmation of a surgery 15 to 17 years earlier.  They
12  don't keep records that long.
13        Q.   How about just asking your client?
14        A.   Again, I can't share with you what I discussed
15  with my client.
16        Q.   I'm not asking you to share with me what you
17  discussed with your client.  I'm asking is that a potential
18  way to obtain information regarding the date of a surgery?
19        A.   Yes.
20        Q.   Are you aware that Ms. Armstrong advised Mr. Reub
21  that she would obtain that information and provide it to
22  him?
23        A.   He already had the information, so that's where
24  I'm getting confused in your question.  Do I know the
25  conversation between my paralegal and the adjuster?  I

Page 72

1  don't.  I wasn't present for it and they weren't with me.
2        Q.   Have you seen anything within the file to
3  suggest -- your file, within your maintenance program, to
4  suggest that Ms. Armstrong told Mr. Reub that she would
5  provide him confirmation of when that surgery took place?
6        A.   No.
7        Q.   Do you need a break?
8        A.   No.
9        Q.   Okay.  Let's move on to the correspondence of
10  December 2nd, 2016.
11             (Deposition Exhibit P was marked
12             for identification.)
13  BY MS. TEMPLE:
14        Q.   This is a letter from your firm to Mr. Reub,
15  correct?
16        A.   Yes.
17        Q.   And in this letter, you provide another
18  authorization for Tampa Minimally Invasive Spine Surgery
19  Center.
20        A.   Well, we would have provided another blanket
21  authorization, and it advises of that particular treater.
22        Q.   A new provider with whom Mr. Humes is undergoing
23  care?
24        A.   I don't know if it was new or not.
25        Q.   Or at least someone that he was currently treating

Page 73

1  with at the time?
2        A.   It says, "Mr. Humes is currently treating with
3  Tampa Minimally Invasive Spine Surgery Center.  I have
4  enclosed an updated HIPAA authorization for you to collect
5  these records."
6        Q.   With the understanding that that authorization
7  would permit Acuity to obtain those records if they desired
8  to do so?
9        A.   Yes.
10             MS. TEMPLE:  Okay.  The next letter in line is
11  dated December 7th, 2016, which we'll mark as Exhibit Q.
12             (Deposition Exhibit Q was marked
13             for identification.)
14  BY MS. TEMPLE:
15        Q.   Do you have this letter as your next letter in
16  line, chronologically?
17        A.   Yes.
18        Q.   And this letter requests information regarding the
19  pre-loss fusion, among other things; is that correct?
20        A.   It says, "We have made multiple requests for
21  medical authorization and information that will allow us to
22  access medical records for any treatment prior to this date
23  of loss.  In our last communication with your office in
24  October 2016, we spoke with Ms. Brittany Armstrong.  We
25  informed her that our medical evaluation has indicated

Hauf, Esq., Marjorie                    October 02, 2018                    Pages 74..77

1  medical treatment prior to the accident of April 7th, 2013.
2          This includes, but is not limited to, a pre-loss
3  fusion at C6-7.  We had again asked for medical providers,
4  dates of services, and medical authorization to obtain those
5  records.  Ms. Armstrong advised us -- Ms. Armstrong had
6  advised us that she would contact Mr. Humes and obtain the
7  information we require regarding the pre-loss date medical
8  treatments.
9          Ms. Armstrong had also indicated that Mr. Humes
10 would be going to Florida for the winter and would see a
11 doctor there for additional treatment.  Please confirm that
12 Tampa Minimally Invasive Spine Surgery Center is the
13 facility -- is this facility in Florida.  Please contact us
14 to -- and please provide a contact address.  We will use
15 your provided medical authorization to obtain the treatment
16 records."
17     Q.   Okay.  So in this letter, Acuity requested
18 information regarding that C6-7 pre-loss fusion, correct?
19     A.   It says what it -- what I read.
20     Q.   Is that correct --
21     A.   It says --
22     Q.   -- that they requested that information from your
23 firm?
24     A.   It says, "This includes, but is not limited to, a
25 pre-loss fusion of C6" -- I mean, it says what it says.  I

1  just read it to you.
2      Q.   Is there a reason why that information was not
3  provided?
4      A.   The information was provided.
5      Q.   Who were the providers with whom Mr. Humes
6  underwent the fusion and the fusion-related medical care?
7      A.   I don't specifically remember other than that it
8  was a hospital in Chicago that had closed and a doctor that
9  had died.
10     Q.   And when was Acuity told that?
11     A.   I don't know.
12     Q.   Do you know if it was pre-litigation?
13     A.   I believe it was.
14     Q.   When?
15     A.   I don't know.
16     Q.   What leads you to believe that they were told that
17 prior to the commencement of litigation?
18     A.   It is either in one of these letters or in the
19 claim log note that I reviewed.
20     Q.   And if your firm's position was that Acuity did
21 not need to be told the date of the pre-loss fusion because
22 they already had that information, why would Ms. Armstrong
23 agree to provide it?
24     A.   Because she's the paralegal and she would not have
25 read the medical records, nor would she have been the person

1  to make those decisions, because she's the paralegal, not an
2  attorney.
3      Q.   She signed the -- or the letter was addressed to
4  her, correct, requesting that information?
5      A.   No.  It was addressed to Mr. Gluth.
6      Q.   That's the December 7th, 2016 letter.  Prior and
7  subsequent letters regarding the handling of this claim were
8  addressed to Mrs. Armstrong; for example, the September 7th,
9  2016 letter and the December 30th, 2016 letter.
10     A.   Acuity might have addressed them to her.  That
11 doesn't change her scope of knowledge or scope of
12 responsibility just because they wrote her a letter.
13     Q.   Would she be authorized to make that type of
14 decision on your firm's behalf, that such information would
15 be provided to Acuity upon request?
16     A.   I don't know how to answer that.
17     Q.   Okay.  Do you dispute that Ms. Armstrong told
18 Acuity that she would provide that information to them?
19     A.   I have no way to know what Ms. Armstrong said or
20 didn't say.
21     Q.   So that's a no?
22     A.   I have no way to know what Ms. Armstrong said or
23 didn't say.  I wasn't there.
24     Q.   Were you refusing, as a firm, to provide that
25 information to Acuity?

1      A.   No.
2      Q.   Have you seen mistakes in medical records before?
3      A.   Yes.
4      Q.   Have you seen patient accounts that are
5  inaccurate?
6      A.   Yes.
7      Q.   Mr. Humes had a claim that this accident injured
8  his neck; is that fair?
9      A.   Yes.
10     Q.   Would it be fair and reasonable for an insurance
11 company, in your experience, to request information for
12 prior neck-related medical care?
13     A.   Again, I'm not going to answer any more questions
14 about my opinions.  That's not why I'm here.  I'm trying
15 very hard to cooperate, but we're a couple hours into this
16 now, and, again, my opinions don't matter.
17     Q.   You know, Mr. Humes, since you read his deposition
18 testimony, you probably know that he deferred a lot of these
19 same questions to you, as his attorney.
20     A.   Deferred a lot of what questions?
21     Q.   About the reasonableness and the hand in the
22 claim, any delay on the part of Acuity, he said you could
23 address that better than he could.
24     A.   Well, our experts have addressed it, so that would
25 be the people that we would have to address it to the jury.

Page 78

1    Q.   All right.  Now next in line is December 30th.
2  And we're almost to the end.  I appreciate your patience.
3  If you want to take a break, let me know, okay?
4    A.   I'm fine.
5         MS. TEMPLE:  All right.  So this is December 30th,
6  2016.  Next in line is Exhibit R.
7              (Deposition Exhibit R was marked
8              for identification.)
9  BY MS. TEMPLE:
10   Q.   So the last letter is December 7th, 2016, and the
11 next letter is February 6, 2017.  Is that your chronological
12 order as well?
13   A.   Yes.
14   Q.   Do you know whether there was any correspondence
15 sent by your firm to Acuity within that two month time
16 frame?
17   A.   December 7th to December 30th is only three weeks.
18   Q.   I'm sorry.  December -- I'm on the wrong one.  I'm
19 sorry.  I'm looking at Exhibit -- the next one in line,
20 February 6.  So December 30th, 2016.  My apologies.  Did we
21 mark the right one?
22   A.   Yes.
23   Q.   Okay.  So Exhibit R.  Now, here is another letter
24 directed to Britney Armstrong, again, asking for the
25 pre-loss records needed to evaluate the claim.  Do you know,

Page 79

1  by that time, whether your firm had distinguished whether
2  any of the medical providers that had been provided to
3  Acuity were pre-accident medical providers?
4    A.   I'm sorry.  I don't understand that question.
5    Q.   Sure.  Had your firm, at any point in time, told
6  Acuity, These are the pre-accident medical providers with
7  whom Mr. Humes underwent care?
8    A.   No.
9    Q.   Were you refusing to provide that information to
10 Acuity?
11   A.   No.  And we may have.  Like I said, I don't know
12 which of those providers were pre or post.
13   Q.   In response to a request from Acuity regarding
14 whether Mr. Humes had any pre-loss medical treatment, and if
15 so, which providers would have offered that treatment to
16 him, what could your firm have done?
17        MS. MANKE:  Objection.  Calls for speculation.
18        THE WITNESS:  I'm sorry.  I don't understand that
19 question.
20 BY MS. TEMPLE:
21   Q.   Sure.  In response to Acuity's request for
22 pre-loss medical treatment information, including the names
23 of those providers, is there something that your firm could
24 have done in response to that request?
25   A.   We could provide them what information we had,

Page 80

1  sure.
2    Q.   And that would include distinguishing which
3  treating providers offer treatment after the accident and
4  which ones would have offered it before, if any?
5    A.   Well, we could have done it and they could have
6  done it, and all they'd have to do is look at the records or
7  obtain them and look at them.
8    Q.   And assuming that they collected all the medical
9  records from the providers that you named, and none of them
10 were pre-accident providers, is it fair for Acuity to say,
11 Did Mr. Humes have any pre-accident medical care, and in
12 turn, ask you to provide that information?
13   A.   What they say in the letter is, "To reiterate, we
14 will need all pre-loss medical treatment information,
15 including providers' names, addresses, and an applicable
16 medical authorization for each pre-loss date medical
17 provider."
18   Q.   Right.  Is that a reasonable request?
19   A.   Again, what I think is reasonable and don't think
20 is reasonable is not the purpose of this deposition.
21   Q.   Acuity's position --
22   A.   That would be a question for the -- that would be
23 a question for our expert.
24   Q.   Acuity's defense in this case is that the company
25 acted reasonably, and that your firm delayed in presenting

Page 81

1  necessary information for the evaluation of this claim.
2    A.   Okay.
3    Q.   Is there a reason your firm did not provide this
4  information that Acuity deemed as necessary to the
5  evaluation of the claim?
6    A.   If you're asking is there a reason why we didn't
7  provide medical records for treatment that occurred 15 years
8  in the past, the answer to that would be yes, and the reason
9  why nobody could provide that is because medical records
10 don't exist for that period of time, typically.  And in this
11 particular case, we know that where Mr. Humes obtained the
12 fusion didn't exist anymore, so there's a reason why we
13 couldn't do it.  There's a reason probably why Acuity
14 couldn't do it, too, because it doesn't exist anymore.
15   Q.   They have been asking, throughout his
16 pre-litigation process, for five years prior to the
17 accident.
18   A.   Yes.  They've been asking for five years prior to
19 the accident.  They did receive a list.  They did receive an
20 authorization to get those records.  They never did ask for
21 a recorded statement of Mr. Humes to attempt to get any of
22 this information that they thought they were -- they needed.
23 That would have been something they could have done to try
24 to get what they needed if they felt like they weren't
25 getting it from my firm.  I'm sure the policy allows for

Hauf, Esq., Marjorie                    October 02, 2018                    Pages 82..85

Page 82

1   that.
2        Q.   Is there a reason why your firm did not provide
3   them with the medical providers and treatment with whom he
4   treated for five years and distinguish that that was the
5   pre-accident care?
6        A.   Again, that would be -- I can't answer that
7   without breaching privilege.  I can't answer why my firm did
8   what it did or didn't do without breaching privilege.  It's
9   impossible.
10       Q.   So you're refusing to answer that question?
11       A.   Yes.
12            MS. TEMPLE:  All right.  Next letter in line is
13  February 6, 2017, which we'll mark as Exhibit S.
14            (Deposition Exhibit S was marked
15            for identification.)
16  BY MS. TEMPLE:
17       Q.   And this is sent certified mail, from Acuity to
18  Ms. Armstrong, dated February 6, 2017, and following up on
19  December 30th, 2016.  Do you have any indication in your
20  file that Acuity was contacted with a response to their
21  request between December 30th, 2016 and February 6th, 2017?
22       A.   No.
23       Q.   And as part of this letter, Acuity is requesting
24  pre-accident medical treatment information.  Do you have any
25  reason to believe that up until this point in time, your

Page 83

1   firm has responded to Acuity with a specific list of which
2   providers treated Mr. Humes before this accident?
3        A.   In an attempt to answer that question, we had
4   provided a list of the providers we knew of.  If you're
5   asking did we say, This is prior and this is after, no.
6            MS. TEMPLE:  The next letter in line is dated
7   February 8th, 2017, and we'll mark it as Exhibit T.
8            (Deposition Exhibit T was marked
9            for identification.)
10  BY MS. TEMPLE:
11       Q.   Is this the next letter in line, chronologically,
12  for you?
13       A.   Yes.  And this answers the question you were
14  asking earlier about if they knew, pre-litigation, where the
15  fusion took place, and this is the letter that tells them.
16       Q.   Okay.  Where does it say that?
17       A.   It says, "Mr. Humes treated with Resurrection
18  Hospital of Chicago, now called Presence Resurrection
19  Hospital and Dr. Louis V. Pupillo.  I have enclosed a HIPAA
20  authorization for you to get these records."
21       Q.   And is this the doctor and the facility that did
22  the fusion?
23       A.   I can tell you that that is my understanding,
24  based upon this letter, that that was who did the fusion.
25  And I know, from Mr. Humes' deposition, that this hospital

Page 84

1   doesn't exist anymore -- it says that here -- and that this
2   doctor had died.
3        Q.   Okay.  But that's something -- the deposition took
4   place after litigation.
5        A.   Correct.
6        Q.   Does it say in this letter that that's where the
7   fusion took place?
8        A.   No.
9        Q.   Does it say in this letter that that's Mr. Humes'
10  only pre-accident medical care provider?
11       A.   No.
12            MS. TEMPLE:  All right.  We'll mark as Exhibit U
13  the next letter in line, which is dated February 14th, 2017.
14            (Deposition Exhibit U was marked
15            for identification.)
16  BY MS. TEMPLE:
17       Q.   While we're marking that, had you advised Mr. --
18  or Acuity that this facility no longer exists by that time?
19       A.   Well, it says, "Mr. Humes treated with
20  Resurrection Hospital of Chicago, now called Presence
21  Resurrection Hospital."
22       Q.   Had you told Acuity specifically -- you or someone
23  from your firm told Acuity, specifically, the answer to
24  their question as to confirmation on when the fusion took
25  place?

Page 85

1        A.   I've already answered that three times.  They had
2   it in their file.
3        Q.   By February 14, 2017, I want to know if that was
4   something that was verbally confirmed or confirmed in
5   writing by your office to Acuity?
6        A.   I -- I don't have a letter that spells that out
7   for them nor did I have that conversation with somebody from
8   Acuity.  There's no way I can know what other conversations
9   took place because I wasn't there.
10       Q.   Except your log system, assuming that was
11  maintained?
12       A.   Well, the log system is not a verbatim transaction
13  of what happens in a call, so there's no way for me to know
14  that.
15       Q.   All right.  So let's look at the letter from
16  February 14th, 2017.  The middle paragraph addresses a few
17  questions, including what I just asked you, which is
18  confirmation that that was the provider that performed
19  Mr. Humes' cervical fusion.  Do you see that in that letter?
20       A.   It says, "In your correspondence of February 8th,
21  2017, you advised Mr. Humes treated with Presence
22  Resurrection Hospital and Dr. Louis V. Pupillo, of Chicago.
23  Please confirm that this is Presence Resurrection Medical
24  Center," it gives an address.  "Is this the provider that
25  treated Mr. Humes for his cervical fusion?"

Hauf, Esq., Marjorie                October 02, 2018                Pages 86..89

Page 86

1    Q.   So that was one question that was asked of your
2  firm on February 14th, 2017, via correspondence from Acuity,
3  correct?
4    A.   It says, "Is this the provider that treated
5  Mr. Humes for his cervical fusion?"
6    Q.   Okay.  Is that a correct statement, that was asked
7  of your firm by Acuity on February 14th, 2017?
8    A.   The letter says, "Is this the provider that
9  treated Mr. Humes for his cervical fusion?"
10   Q.   Next, they ask for the proximate dates of that
11 treatment at the facility.
12   A.   Next, it says, "Can you provide us with an
13 approximate date or dates of the treatment received at this
14 facility?"
15   Q.   And that was asked of you, your firm, by Acuity,
16 on February 14th, 2017.  Provide us confirmation that this
17 is the provider who performed the surgery and the date of
18 the cervical fusion, correct?
19   A.   Yes.
20   Q.   And, once again, it asks to confirm whether there
21 were any other pre-loss treatment providers aside from this
22 single facility that you identified.
23   A.   It says, "Your February 8th, 2017 correspondence
24 lists one additional pre-loss provider.  Please confirm with
25 your client that there are no other pre-loss treatment

Page 87

1  providers, and that this is the only facility that has
2  treated him for any pre-loss medical care."
3        MS. TEMPLE:  Let's look at the next letter in
4  line, which is marked Exhibit V.  Well, we'll mark it as
5  Exhibit V.
6             (Deposition Exhibit V was marked
7              for identification.)
8  BY MS. TEMPLE:
9    Q.   Here you say -- or Mr. Gluth says to Reub, in
10 writing, that the client doesn't know when he had the
11 fusion; is that fair?
12   A.   Well, I can read to you exactly what it says.  It
13 says, "I am in receipt of your letter dated February 8,
14 2017, wherein you asked if Mr. Humes had a cervical fusion
15 at Resurrection Hospital of Chicago, now called Presence
16 Resurrection Hospital and with Dr. Louis V. Pupillo.  It is
17 my understanding that he did.  Unfortunately, the client
18 does not recall the year in which he had the fusion.
19 However, I previously sent you a HIPAA authorization dating
20 back ten years for your use."
21   Q.   Does your letter confirm that cervical -- that
22 Resurrection Hospital was the only pre-accident medical
23 provider for Mr. Humes?
24   A.   No.
25   Q.   Okay.  Does it identify any other pre-accident

Page 88

1  medical providers with whom Mr. Humes underwent care?
2    A.   No.
3    Q.   So this March 9th, 2017 letter does not respond to
4  all of the questions asked by Acuity on February 14th, 2017?
5    A.   The letter says what the letter says.
6    Q.   Is it fair that this letter does not respond to
7  all the questions posed by Acuity in their February 2017
8  correspondence?
9    A.   Yes.
10        MS. TEMPLE:  All right.  We'll mark as the next
11 exhibit in line, Exhibit W.
12             (Deposition Exhibit W was marked
13              for identification.)
14 BY MS. TEMPLE:
15   Q.   What's the date on that one?
16   A.   March 29th, 2017.
17   Q.   Thanks.
18        Okay.  Correspondence sent by Acuity to your firm
19 in response to your March 9th, 2017 letter, and it was dated
20 March 29th, 2017.  Is that chronologically the next letter
21 that you have in line?
22   A.   Yes.
23   Q.   And this letter -- and I'm trying to paraphrase
24 here so we can move forward quickly -- asks if you can
25 confirm that this was his only provider for pre-loss

Page 89

1  treatment?
2    A.   It says, "This will confirm receipt of your
3  correspondence dated March 9, 2017.  In that correspondence,
4  you confirmed that Mr. Humes had his cervical fusion at
5  Presence Resurrection Hospital in Chicago, Illinois,
6  although you are unsure of the year the fusion took place.
7  In our last two correspondences, we had asked that you
8  confirm that this was the only provider for pre-loss
9  treatment for Mr. Humes.  We have yet to receive
10 confirmation or additional information regarding any
11 possible pre-date of loss medical treatment."
12   Q.   Okay.  So this letter reiterates the request made
13 several times for Mr. Humes' pre-accident medical treatment,
14 correct?
15   A.   The letter says what the letter says.
16   Q.   Did your firm ever respond to this March 29th,
17 2017 letter prior to initiating litigation?
18   A.   I do not have another letter from our office.
19   Q.   How about by phone?  Do you have any indication
20 that your firm contacted Acuity with the requested
21 information that's now been requested for almost two years
22 regarding pre-accident medical care?
23   A.   The only thing I would have with me today would be
24 the claim log notes, so if it's in there, then that's where
25 it would be.  I wasn't asked to bring our file, so I

Hauf, Esq., Marjorie                 October 02, 2018                 Pages 90..93

1  don't -- I can't answer that other than what I have in front
2  of me.  I don't have a letter.  And if it is in these claim
3  log notes, then that would be an indication.
4         MS. TEMPLE:  And then the last in line, the last
5  correspondence that I have that was sent pre-litigation,
6  we'll mark as Exhibit X.
7         (Deposition Exhibit X was marked
8         for identification.)
9  BY MS. TEMPLE:
10     Q.  Okay.  This is to Mr. Gluth, from Larry Reub,
11 dated April 26, 2017.
12     A.  Yes.
13     Q.  Do you have any indication whether a response to
14 this letter was ever sent by your office prior to the
15 commencement of litigation?
16     A.  My answer would be the same as before.  I don't
17 have another letter from our office in my file, and I
18 would -- and I don't have our phone log notes with me,
19 because I wasn't asked to bring those, but if it's in
20 Acuity's call log notes, that's where it would be -- then it
21 would be in there, as far as what I have with me today.
22     Q.  Okay.  Did you ever tell Acuity, on behalf of
23 Mr. Humes, that Mr. Humes underwent treatment for lower back
24 pain within a year before this accident?
25     A.  Did I?

1      Q.  You or anyone from your firm?
2      A.  I don't know.
3      Q.  Were you aware that Mr. Humes underwent treatment
4  for his lower back within approximately a year before this
5  motor vehicle accident?
6      A.  I can't answer that without breaching privilege.
7      Q.  And you've reviewed the medical records in this
8  case.  I asked you that at the outset; is that correct?
9      A.  I didn't review them in preparation for this
10 deposition, but I have looked at -- have looked at medical
11 records in this case.
12     Q.  And I asked you at the outset of the deposition if
13 you were familiar with the injuries that he had sustained in
14 this case; is that fair?
15     A.  Yes.
16     Q.  Do you know, from your review of the medical
17 records or your discussions with his medical providers, that
18 Mr. Humes underwent treatment for lower back pain within
19 approximately a year of this accident?
20     A.  Can you state that again?  I'm sorry.  I'm not --
21 I'm trying to answer the question without breaching
22 privilege, but I think you're asking work product privilege,
23 so if you don't mind asking again in a way that I could
24 potentially answer.
25     Q.  Sure.  Did you know, based on the medical records

1  in this case, that Mr. Humes underwent treatment for lower
2  back pain within a year before this accident?
3      A.  Are you asking me if I -- at what point in time?
4      Q.  Are you --
5      A.  I don't know.  I don't know the answer to that.  I
6  didn't review his medical records in preparation for this
7  deposition.
8      Q.  Is Acuity entitled to know that Mr. Humes
9  underwent treatment for his lower back within a year before
10 this accident?
11     A.  Is Acuity entitled to know if he did?
12     Q.  Sure.  Is that the information that they're
13 entitled to, particularly when they ask?
14     A.  Yeah.  They're entitled to whatever information
15 they feel that they need.
16     Q.  Did you ever refuse to provide records regarding
17 treatment for Mr. Humes' lower back that predated this
18 accident?
19     A.  I didn't refuse to provide anything.
20     Q.  Have you had a chance to review Dr. Crisman's
21 deposition transcript?
22     A.  No.
23     Q.  Did you ever contact Dr. Crisman and tell him to
24 withhold production of pre-accident records?
25     A.  No.

1      Q.  Did Mr. Humes, to your knowledge, withhold
2  production of pre-accident medical records?
3      A.  No.
4      Q.  Did Mr. Humes, to your knowledge, ever tell his
5  medical providers to withhold production of pre-accident
6  medical records?
7      A.  No.
8      Q.  Are you aware that Mr. Crisman -- Dr. Crisman, the
9  medical provider with whom Mr. Humes underwent medical
10 treatment prior to this accident, within a year of this
11 accident, is friends with Mr. Humes?
12     A.  I just told you I didn't look at his depo, so I
13 don't know where that's coming from.  I can't answer that
14 question.
15     Q.  If you can't answer the question, you can't answer
16 the question.  I'm asking as you sit here today, were you
17 aware that the two of them considered themselves friends?
18     A.  Again, I can't -- I just told you I didn't review
19 the deposition, so I don't know what he said in his
20 deposition, and anything else I know would be privileged.
21     Q.  The subpoenaed records from Dr. Crisman's office
22 that were subpoenaed by Acuity and the records that you
23 produced in this case, they differ from one another.  There
24 are records that that provider, Dr. Crisman, produced to
25 Acuity that he didn't produce to you.  Do you have any idea

Hauf, Esq., Marjorie                    October 02, 2018                    Pages 94..97

Page 94

1  why that would be, that those two disclosures would differ?
2      A.   I don't know that they do, because I didn't review
3  them, and if they do, I don't know why they would.  That
4  would have to be a question for him.
5      Q.   There's been some question in this case about the
6  rhizotomies that were performed on Mr. Humes and whether
7  your firm or Mr. Humes, himself, dictated how often those
8  were to take place.  Did you ever dictate to any of
9  Mr. Humes' medical providers how often he was to have a
10 rhizotomy?
11     A.   No.  I have never dictated medical treatment to
12 any client's provider.
13     Q.   Did you ever contact plaintiff's medical provider,
14 specifically Dr. Anderson, who performed the rhizotomies,
15 and tell him that he needed to perform more injections or
16 rhizotomies in this case?
17     A.   No.  I talked to Mr. Anderson at one -- or
18 Dr. Anderson -- I did have a conversation with Dr. Anderson
19 regarding the status of the client's treatment before we
20 sent the request for evaluation to find out what his future
21 recommendations would be so that we could provide that
22 information, but that was the only time I've ever talked to
23 him.
24     Q.   Did Mr. -- strike that.
25          Do you have a medical degree?

Page 95

1      A.   No.
2      Q.   Do you have any medical background?
3      A.   No.
4      Q.   I'll ask you the same questions I asked Mr. Humes.
5  Do you see any explanation, in any of the letters that we've
6  reviewed, stating that Mr. Humes was no longer experiencing
7  neck or back pain prior to this motor vehicle accident, that
8  he was asymptomatic?
9      A.   The letters speak for themselves.
10     Q.   I'm asking you, did you see anything within those
11 letters that we just reviewed stating that he was
12 asymptomatic at the time of the accident?
13     A.   Well, we can go back through them.
14     Q.   We've already reviewed them.  I think that was
15 your testimony.  Did you see anything, during our review of
16 those letters, that suggested that?
17     A.   I do not have the letters memorized, so if you
18 would like me to go back and read them all, I would be happy
19 to do that, but I think the letters speak for themselves as
20 far as saying what they say.  I don't remember that question
21 being asked.
22     Q.   Is that information that you'll provide to an
23 insurance company?
24     A.   That's too overbroad for me to answer.
25     Q.   Have you told an insurance company in the past

Page 96

1  that your client was asymptomatic at the time of the
2  accident?
3      A.   I'm sure I've said a lot of things to a lot of
4  people in my life, and I can't tell you if that -- if I've
5  ever said to an insurance company that the client was
6  asymptomatic.  I'm sure I have.
7      Q.   Are you aware that Mr. Humes testified in this
8  case that Acuity's response time in this case was
9  reasonable?
10     A.   I don't remember him saying that.
11     Q.   Are you aware that, conversely, Mr. Humes
12 testified that your firm's response time, he would have
13 expected you to respond to Acuity's inquiries faster?
14     A.   I don't remember reading that part of his depo
15 either.
16     Q.   Are you aware that during his deposition,
17 Mr. Humes was asked, and I quote, Do you have any evidence
18 or information, as you sit here today, to suggest that
19 Acuity delayed any evaluation of your claim?  His response,
20 and I quote, No.  Do you recall reading that in his
21 deposition transcript?
22     A.   No.  But I would be happy to look for it if you
23 would like to show it to me.
24     Q.   How many times did you say that you spoke with
25 plaintiff's medical providers?

Page 97

1      A.   I didn't.  You asked specifically about
2  Dr. Anderson, and I recall one conversation with
3  Dr. Anderson.
4      Q.   Did Mr. Humes set up that meeting with
5  Dr. Anderson?
6      A.   I don't know if my office did or if I asked the
7  client to.
8      Q.   Why did you say that meeting took place?
9      A.   My recollection of the conversation with
10 Dr. Anderson was the status of Mr. Humes' treatment and what
11 his future recommendations were for him.
12     Q.   And you don't recall who set that call up?
13     A.   No.
14     Q.   Do you think that you, acting on behalf of
15 Mr. Humes, met your obligation under the policy of insurance
16 here?
17     A.   Again, that goes directly to my work product, so I
18 can't answer that.
19     Q.   Do you think your firm acted without delay?
20     A.   The same answer.
21     Q.   Do you think you've acted in good faith?
22     A.   Same answer.
23     Q.   In reviewing your handling of this file, do you
24 think there's anything that you could have done differently
25 to assist Acuity in its evaluation of this file?

Envision Legal Solutions          702-805-4800          scheduling@envision.legal

Hauf, Esq., Marjorie                    October 02, 2018                    Pages 98..101

Page 98

1      A.   Same answer.
2      Q.   You're refusing to answer a question regarding
3  what your firm could have done to assist Acuity in
4  evaluating this claim, if anything?
5      A.   Correct.  Because that is directly work product
6  privileged information.  The only way I could answer those
7  questions is based upon my own mental impressions and
8  opinions.
9      Q.   Does the handling of this claim exemplify your
10 highest level of work that your firm produces?
11     A.   Same answer.
12     Q.   Do you know who drafted the complaint?
13     A.   I don't.
14     Q.   Do you review the complaints before they're served
15 and filed?
16     A.   Sometimes.
17     Q.   Do you know if you reviewed this complaint before
18 it was filed?
19     A.   I don't know.
20     Q.   Would you agree with me that a person's pain and
21 suffering is subjective?
22     A.   Again, that goes directly to my mental impressions
23 and opinions.
24     Q.   It's just a general question.  Do you think pain
25 and suffering of a person, in general, is subjective?

Page 99

1      A.   I'm not a doctor, and that would go directly to
2  my -- to my mental impressions and opinions, which would be
3  my work product.
4      Q.   So you're refusing to answer?
5      A.   Yes.
6      Q.   The complaint alleges that Acuity refused,
7  delayed, and failed to evaluate plaintiff's claim and failed
8  to tender medical payments coverage.  Is that still your
9  understanding, as you sit here today, that the medical
10 payments coverage was never paid?
11     A.   I think the medical payments coverage was paid.
12     Q.   Prior to the commencement of litigation?
13     A.   I don't know when it was paid.
14     Q.   Are you aware that Acuity requested to mediate
15 this matter in order to have the matter reviewed by and
16 discussed with a third party, uninvolved, unbiased
17 individual who could provide feedback?
18     A.   That's an extremely compound question.  Am I -- if
19 you're asking am I aware that Acuity asked for a mediation,
20 I'm not.
21     Q.   In writing, several times, and by phone, you're
22 not aware of that?
23     A.   No.
24     Q.   Are you, on behalf of Mr. Humes, refusing to
25 mediate this case?

Page 100

1      A.   I would -- and I don't mind telling you this
2  because it would come in a letter if you -- if you requested
3  mediation, my response would be, as it always is, that we
4  would be willing to mediate within reasonable parameters,
5  and we would send a letter outlining those parameters.
6      Q.   What are the parameters that you generally agree
7  to?  I'm not asking you to stick to anything right now, but,
8  I mean, generally, what do you require of an insurance
9  company that wants to mediate a first-party claim?
10     A.   And, again, I don't mind telling you this because
11 you've probably got ten letters from this firm that say --
12 that tell you what the parameters are.  Usually it is that
13 the insurance company pay for the mediation, that they
14 provide a reasonable opening offer in advance of the
15 mediation, that they permit us to do an opening presentation
16 at the mediation, without objection, that they bring
17 somebody with full authority to resolve the claim for the
18 full value of -- that changes from time to time, the policy
19 limits, value of the case, whatever.  That's going to
20 change, depending on the situation of a particular case, and
21 that they promptly respond to offers so that we're not
22 sitting there for hours on end waiting for them to respond.
23 There's usually a time limit on that.
24     Q.   Do you require certain mediators?
25     A.   Not typically, no.

Page 101

1      Q.   Do you know why that response or correspondence
2  that's generally sent in response to mediation request
3  wasn't sent in this case?
4      A.   I don't know that there was a mediation request
5  and I don't know that that wasn't sent, so I can't answer
6  that.
7      Q.   But there's no reason that you know of why you
8  wouldn't agree to a mediation in this case --
9      A.   Again, I would --
10     Q.   -- assuming the parameters were met?
11     A.   I would agree to mediate a case, under certain
12 parameters, in almost every case.  This is a Federal Court
13 case, so we're going to have a mandatory settlement
14 conference anyway.
15          MS. TEMPLE:  Give me one second, if I can.  We
16 will go off record.
17          (A brief recess was taken.)
18          MS. TEMPLE:  Okay.  So we're done.
19          THE WITNESS:  Hold on.  There was one thing I
20 wanted to clarify as soon as you walked out.  Let me think
21 about what it was, if I can remember.
22          MS. TEMPLE:  Okay.
23          THE WITNESS:  I can't remember what it was.  I
24 should have wrote it down.  As soon as you walked out, I
25 thought there's something that I need to clarify, and now I

can't remember what it was.

MS. LANG: I hate when I do that.

THE WITNESS: I don't remember what it was. Sorry.

MS. TEMPLE: Okay. We can wait a minute and go off the record for a little bit.

THE WITNESS: Yeah. Let me think about it.

(Discussion off the record.)

THE COURT REPORTER: Do you need a copy of the transcript?

THE WITNESS: Well, I want to review and sign.

(Whereupon, the deposition concluded at 3:56 p.m.)

CERTIFICATE OF DEPONENT

PAGE LINE CHANGE REASON

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

______________________________________

* * * * *

I, MARJORIE HAUF, ESQ., deponent herein, do hereby certify and declare the within and foregoing transcription to be my deposition in said action; that I have read, corrected, and do hereby affix my signature to said deposition under penalty of perjury.

______________________________

MARJORIE HAUF, ESQ., Deponent

CERTIFICATE OF REPORTER

STATE OF NEVADA ) SS:

COUNTY OF CLARK )

I, Mickey Chan, a duly commissioned and licensed court reporter, Clark County, State of Nevada, do hereby certify: That I reported the taking of the deposition of the witness, MARJORIE HAUF, ESQ., commencing on Tuesday, October 2, 2018, at 1:36 P.M.

That prior to being examined, the witness was, by me, duly sworn to testify to the truth. That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes.

I further certify that I am not a relative or employee of an attorney or counsel or any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor a person financially interested in the action; that a request [X] has [ ] has not been made to review the transcript.

IN WITNESS THEREOF, I have hereunto set my hand in my office in the County of Clark, State of Nevada, this 5th day of October, 2018.

______________________________

Mickey Chan, CCR No. 928, RPR