Marjorie L. Hauf, Esq.
Nevada Bar No.: 8111
Matthew G. Pfau, Esq.
Nevada Bar No.: 11439
Cara Xidis, Esq.
Nevada Bar No.: 11743
H&P LAW
8950 W Tropicana Ave., #1
Las Vegas, NV 89147
702 598 4529 TEL
702 598 3626 FAX
e-file@courtroomproven.com
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DONALD HUMES,

                    Plaintiff,

vs.

ACUITY, A MUTUAL INSURANCE
COMPANY, a foreign corporation; DOES
1 through 10; and ROE CORPORATIONS
1 through 10, inclusive,

                    Defendants.

Case No.: 2:17-cv-01778-JAD-DJA

**Response to Defendant's Motion in Limine to Preclude Evidence of Premium Payments and Claim History**

        Plaintiff Donald Humes, by and through his undersigned counsel at the law firm of H&P Law, hereby files his Response to Defendant's Motion in Limine to Preclude Evidence of Premium Payments and Claim History.

        This Response is made and based upon the pleadings and papers on file herein, the Memorandum of Points and Authorities, the attached exhibits, and any oral argument entertained by this Court.

        DATED this 12th day of May, 2021.                H&P LAW

                                                                        /s/ Marjorie Hauf
                                                                        _____
                                                                        Marjorie Hauf, Esq.
                                                                        Nevada Bar No. 8111
                                                                        Cara Xidis, Esq.
                                                                        Nevada Bar No. 11743

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.

### Factual Background

This case arises from Defendant Acuity's handling of an underinsured motorist made by Mr. Humes as a result of injuries he suffered in an April 6, 2013 motor vehicle collision. At the time of the collision, Mr. Humes was insured by Acuity; the insurance policy included $1,000,000 in underinsured/uninsured (UM/UIM) coverage. Mr. Humes resolved his claim with the tortfeasor, Alan Petty, for his policy limits of $100,000.

## II.

### Legal Standard

The primary purpose of a motion in limine is to prevent prejudice at trial.[1] This Court has authority to issue a preliminary ruling on the admissibility of evidence. The decision to do so is vested to the sound discretion of this Court.[2] Such motions are designed to simply the trial and avoid prejudice that often occurs when a party is forced to object in front of the jury to the introduction of evidence.[3]

As a threshold requirement, all relevant testimony is admissible.[4] Relevant evidence is evidence that makes the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.[5] The Court has the discretion to simplify the issues and to exclude

---

[1] *Brodit v. Cambra, 350* F.3d 985, 1004-1005 (Cal 2003).
[2] *United States v. Kennedy,* 714 F.2d 968, 975 (9th Cir. 1983), cert. denied, 465 U.S. 1034 (1984).
[3] *Fenimore v. Drake Construction Co.,* 549 P.2d 483 (Wash. 1976).
[4] Fed. Rule of Evid. 402.
[5] Fed. Rule of Evid. 401.

RESPONSE TO DEFENDANT'S MOTION IN LIMINE

1  evidence, even if it is relevant, if its probative value is substantially outweighed by
2  the danger that it will confuse the issues or mislead the jury.[6]

3
4                                         III.
5                                   Legal Argument
6

7  **A.   Plaintiff properly disclosed evidence of premium payments and claim**
8  **history.**

9       On May 2, 2018, Plaintiff was deposed by Defendant; he testified that he had
10  been insured with Acuity for over six years and had never been late on his premium
11  payments.[7] Plaintiff also testified that he had not made any other claims with
12  Defendant.[8] Defendant's assertion that this evidence has not been disclosed is
13  unfounded.

14

15  **B.   Plaintiff's premium payments and claim history evidences his compliance**
16  **with the contract and will not mislead a jury.**

17       In the subject insurance policy, Defendant agrees to provide insurance
18  coverage in return for the payment of the premium.[9] In presenting his claims,
19  Plaintiff must be allowed to present evidence that he fulfilled his obligations under
20  the contract - namely that he timely and faithfully paid his premiums.

21       Plaintiff's claim history, or lack thereof, is likewise relevant to his claims as it
22  refutes the suggestion by Defendant that he is presenting a fraudulent claim. There
23  is simply no evidence to support this conclusion and Defendant's arguments to this
24  effect further support Plaintiff's contention Acuity has placed its own interests
25  ahead of his own, in breach of the covenant of good faith and fair dealing.

26  _____

27  [6] Fed. Rule of Evid. 403.
[7] Deposition of Donald Humes at 168:5 - 169:23, attached hereto as Exhibit 1.
28  [8] *Id.*
[9] Insurance Policy, attached hereto as Exhibit 2.

H&P LAW

### IV.

### Conclusion

Based on the foregoing, Plaintiff respectfully requests that Defendant's Motion be denied.

DATED this 12th day of May, 2021.          H&P LAW

*/s/ Marjorie Hauf*

_____
Marjorie Hauf, Esq.
Nevada Bar No. 8111
Cara Xidis, Esq.
Nevada Bar No. 11743



RESPONSE TO DEFENDANT'S MOTION IN LIMINE

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of May, 2021, service of the foregoing **Response to Defendant's Motion in Limine to Preclude Evidence of Premium Payments and Claim History** was made by required Electronic Service to the following individuals:

Stephen Rogers, Esq.
Marissa Temple, Esq.
Rogers Mastrangelo Carvalho & Mitchell
700 South Third Street
Las Vegas, NV 89101
Fax (702) 384-1460
Attorneys for Defendant

_/s/ Priscilla Santos_
An Employee of H&P LAW

RESPONSE TO DEFENDANT'S MOTION IN LIMINE

# EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2                  CLARK COUNTY, NEVADA

3

DONALD HUMES,                    )
4                                )
          Plaintiff,             )
5                                )
          vs.                    )   Case No.:17-cv-01778
6                                )              JAD-PAL
ACUITY, A MUTUAL INSURANCE       )
7 COMPANY, a foreign             )
corporation, DOES 1              )
8 through 10; and ROE            )
CORPORATIONS 1 through 10,       )
9 inclusive,                     )
                                 )
10         Defendants.           )
   _____)
11

12

13

                DEPOSITION OF DONALD CARL HUMES
14

                    Taken at Law Offices of
15        Rogers, Mastrangelo, Carvalho & Mitchell
                    700 South Third Street
16               Las Vegas, Nevada  89101

17               On Wednesday, May 2, 2018
                      At 10:00 a.m.
18

19

20

21

22

23

24 Reported by:  Cheryl Gardner, CCR 230
                 RPR, RMR
25

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3           JEFFREY L. GALLIHER, ESQ.
             Ganz & Hauf
 4           8950 West Tropicana Avenue
             Suite 1
 5           Las Vegas, Nevada  89147
             (702)598-4529
 6           jgalliher@ganzhauf.com

 7   For the Defendants:

 8           MARISSA R. TEMPLE, ESQ.
             Rogers, Mastrangelo, Carvalho & Mitchell
 9           700 South Third Street
             Las Vegas, Nevada  89101
10           (702)383-3400
             mtemple@rmcmlaw.com
11
     Also Present:
12
             CHAD BUTTERFIELD, ESQ.
13           Wilson Elser Moskowitz Edelman & Dicker, LLP
             l300 South Fourth Street
14           11th Floor
             Las Vegas, Nevada  89101
15
             DAVID SCHMIDT, AIC
16           MELISSA GRANDON, AINS
             DARCEL LANG
17           Acuity
             2800 South Taylor Drive
18           Sheboygan, Wisconsin  53081

19

20

21                       * * * * *

22   WITNESS

23      DONALD CARL HUMES                                PAGE

24           Examination by Ms. Temple                     5

25
```

Humes, Donald Carl                May 02, 2018                      Page 3

```
 1                                                        REFERRED
 2   EXHIBITS                                             TO

 3   EXHIBIT A        Plaintiff's Response to               11
 4                    Defendant's Interrogatories,
                      23 pages

 5   EXHIBIT B        Verification, 1 page                  12

 6   EXHIBIT C        Plaintiff's Response to               34
                      Defendant's Request for
 7                    production of Documents,
                      14 pages
 8
     EXHIBIT D        4/10/13 Initial Consultation,         88
 9                    Advanced Pain Consultants,
                      3 pages
10
     EXHIBIT E        Roland Morris acute Low Back          92
11                   Pain Disability Questionnaire,
                     1 page
12
     EXHIBIT F        6/5/14 Initial Evaluation, The       113
13                    Physical Therapy Center, 5 pages

14   EXHIBIT G        6/5/14 Followup, The Rehab           117
                      Doctors, 1 page
15
     EXHIBIT H        8/25/14 Followup, The Rehab          126
16                    Doctors, 1 page

17   EXHIBIT I        Progress Notes, The Rehab            133
                      Doctors, 1 page
18
     EXHIBIT J        10/2/15 Letter from Marjorie         180
19                    Hauf to Acuity, 3 pages

20   EXHIBIT K        10/16/15 Letter from Marjorie        181
                      Hauf to Mr. Reub, 1 page
21
     EXHIBIT L        11/12/15 Letter to Marjorie Hauf     183
22                    from Larry Reub, 2 pages

23   EXHIBIT M        1/19/16 Letter to Larry Reub         189
                      from Ida Ybarra, 2 pages
24
     EXHIBIT N        2/2/16 Letter to Marjorie Hauf       193
25                    from Acuity, 1 page
```

```
 1   EXHIBIT O          3/2/16 Letter to Marjorie Hauf        194
                        from Larry Reub, 1 page
 2
     EXHIBIT P          5/10/16 Letter to Marjorie Hauf       196
 3                      from Larry Reub, 1 page

 4   EXHIBIT Q          7/6/16 Letter to Marjorie Hauf        198
                        from Larry Reub, 1 page
 5
     EXHIBIT R          7/20/16 Letter to Larry Reub          199
 6                      from Ida Ybarra, 1 page

 7   EXHIBIT S          12/7/16 Letter to David Gluth         201
                        from Larry Reub, 2 pages
 8
     EXHIBIT T          12/30/16 Letter to Brittany           203
 9                      Armstrong from Acuity, 1 page

10   EXHIBIT U          10/21/11 record from Alternative      157
                        Health Care Center of the Black
11                      Hills, 1 page

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    DONALD CARL HUMES,

 2          having been first duly sworn to testify

 3          to the truth, the whole truth and nothing

 4          but the truth, was examined and testified

 5          as follows:

 6                        EXAMINATION

 7  BY MS. TEMPLE:

 8       Q.   Can you state your name for me, please.

 9       A.   Donald Carl Humes.

10       Q.   And, Donald, you know that we're here today to

11  discuss a motor vehicle accident in which you were involved

12  on April 6, 2013.

13       A.   Yes.

14       Q.   Okay.  And I introduced myself off the record.

15  I'm introducing myself again on.  My name is Marissa Temple

16  and I am the attorney for Acuity.

17            Have you ever had your deposition taken before?

18       A.   Regarding this matter, no.

19       Q.   How about any matter?  Have you ever at any point

20  in time in your life undergone a similar process of having

21  your testimony taken under oath?

22       A.   Yes.

23       Q.   Okay.  And when was that?

24       A.   When I went through my divorce with my first wife.

25       Q.   Okay.  And was that some time ago?
```

1       A.    Quite some time ago.

2       Q.    Is that the only other time that you've had your

3  deposition taken?

4       A.    That I recall.

5       Q.    Because it's been so long since you've had your

6  deposition taken, I'm going to go over the admonitions or

7  ground rules so you understand what's going to take place

8  today.

9             Okay?

10      A.    Yes.

11      Q.    The first and most important thing is that you've

12  just been sworn in by the court reporter.  That oath that

13  you took is the same oath that you would take in a court of

14  law.  So even though we're here in an informal setting in my

15  office, you have the same requirement to tell the truth and

16  the same penalties of perjury apply as though we were in a

17  courtroom.

18            Do you understand that?

19      A.    Yes.

20      Q.    Okay.  As I mentioned, we have a court reporter

21  here.  She's taking down everything that we say, every

22  question that I ask you, every answer that you provide,

23  every objection that's lodged.  Our goal is to have a clear

24  record of today's transcript.  You live in South Dakota.  We

25  don't want to have you come back to testify again under

1 oath.  We want to make sure we understand everything that

2 was testified to today.

3          Okay?

4     A.    Yes.

5     Q.    So I'm going to ask you to do a few things to help

6 facilitate that.  The first thing I would ask is that you

7 respond audibly to all my questions.  It's easy in a setting

8 like this, informal, to nod your head or shake your head or

9 say uh-huh or huh-uh.  And while we may understand today

10 what you meant, when we go back to look at the transcript in

11 the future, it may be confusing as to exactly what was

12 intended by your response.  So just respond audibly if you

13 can.

14          Is that okay?

15    A.    Yes.

16    Q.    Make sure also that you let me finish my full

17 question before you answer and I'll allow you that same

18 courtesy of finishing your full answer before I ask my next

19 question.  Again, just to make it a perfectly clear

20 transcript.

21          Okay?

22    A.    Yes.

23    Q.    If at any point in time you don't understand a

24 question that I ask, just tell me.  We are all entitled to

25 assume that you understood the question if you answer it and

1  don't indicate to me at the time the question's asked that

2  you don't understand it.

3          Is that okay?

4     A.   Yes.

5     Q.   I know it's been a long time since the accident in

6  2013.  I'm going to ask you some questions about the

7  accident.  I'm going to ask you a lot about your medical

8  treatment, and I know it's dating back many years.  All we

9  ask is that you just give us the best testimony you can,

10  give us the best estimate that you can.  I don't know is

11  always a perfectly acceptable response, but if you have some

12  basis to provide a response and it's not just pure

13  speculation, I would ask that you do so.

14          Attorneys always give the same example when

15  they're trying to differentiate between a guess and an

16  estimate.  If I were to ask you how big this table is, even

17  if you're bad at measurements like I am, you could probably

18  provide us an estimate on the length of the table just based

19  on your experience.  But if I were to ask you how big the

20  table is in my office, having never been in my office, it

21  would just be pure speculation, a guess.

22          Do you understand the difference?

23     A.   Yes.

24     Q.   Okay.  Have you done anything in preparation for

25  your deposition today?  I don't want to know about any

1  conversations you had with your attorney or anyone at your

2  attorney's office, but have you spoken with anyone else, for

3  example in preparation for today?

4          MR. GALLIHER:  Form.  Go ahead and answer.

5          THE WITNESS:  My wife.

6          MS. TEMPLE:  Okay.

7      Q.   And did you talk about the specifics of your

8  deposition testimony today?

9      A.   I didn't really know what to talk about.  I don't

10 know what to expect here so I couldn't discuss it.

11     Q.   Okay.

12     A.   I'm just going to be asked a lot of questions.

13     Q.   Is that Barbara?

14     A.   Yes.

15     Q.   Okay.  Did you speak with anyone else in

16 preparation for your deposition today?

17     A.   No.

18     Q.   Did you review any documents in preparation for

19 your deposition today?

20     A.   No.

21     Q.   Okay.  I'm going to go through a few documents

22 that a lot of times deponents do review in preparation for

23 your deposition just to make sure these aren't things you

24 haven't seen recently.  And the reason I ask is to expedite

25 the process.  If you've seen them, we can move through this

```
 1   a lot faster.
 2          Have you seen a copy of the police report for the
 3   accident?
 4       A.   No.
 5       Q.   Have you seen your responses to interrogatories
 6   which were the questions asked by Acuity of about how the
 7   accident happened, what your damages are, things like that?
 8       A.   Yes.
 9       Q.   Okay.  When was it that you last saw those
10   responses?
11       A.   I have them right here.
12       Q.   Okay.  And you've reviewed those responses?
13       A.   Yes.
14       Q.   When was it that you reviewed them?
15       A.   Last -- about a half an hour ago.
16       Q.   Okay.  And there were some supplemental responses
17   that were provided, a second set that were provided later.
18          Did you have an opportunity to read those as well?
19       A.   No.
20       Q.   The responses that you did review, in the process
21   of reviewing them, was there anything that you noted that
22   was inaccurate or needed to be supplemented, changed in any
23   way?
24       A.   Not that I can think of at this time.
25       Q.   Okay.  And did those responses that you reviewed
```

1   include a signature page with your signature on it?

2        A.   I believe so.  These papers I have in front of me

3   do not have my signature page on it.

4        Q.   Okay.  Do you recall providing responses to those

5   questions?

6        A.   Yes.

7        Q.   Do you recall being asked to sign a verification

8   form that verified that the contents of those responses were

9   true to the best of your knowledge?

10       A.   I don't recall, but it seems reasonable that there

11  would be.

12       Q.   Okay.  I'm going to just show you a copy of your

13  verification page and ask you to confirm for me whether this

14  is your signature.  And I don't know how often I'll be

15  referring to the actual responses, but I'll show you those

16  as well.  The first thing I'm going to do is show you a copy

17  of plaintiff's responses to defendant's interrogatories.

18            I have another copy, Jeff.

19            Do you recognize that as the same document that

20  you reviewed about 30 minutes ago?

21       A.   Yes.

22       Q.   Okay.  And we'll attach that as Exhibit A to the

23  deposition transcript.  If you don't mind since you've got

24  your own copy, we'll hand that to the court reporter and she

25  can mark it later.

 1          I'm going to show you now the verification page
 2   that was provided by your attorney's office to us along with
 3   your responses to those interrogatories.  You see about
 4   halfway down there's a signature line.
 5      A.   Yes.
 6      Q.   Do you recognize that to be your signature?
 7      A.   Yes.
 8      Q.   Okay.  And did you understand that by signing this
 9   document that you were verifying that the content of those
10   responses that you just reviewed were true to the best of
11   your knowledge?
12      A.   Yes.
13      Q.   Okay.  We'll attach the verification as Exhibit B.
14          Along with those interrogatories that we sent, we
15   also sent something called a request for production of
16   documents which requests certain documents be produced that
17   are regarding your claim essentially.
18          Do you recall reviewing those in preparation for
19   today?
20      A.   I don't recall.
21      Q.   Okay.  Did you review any of your medical records
22   in preparation for today?
23      A.   No.
24      Q.   Have you spoken with any of your medical providers
25   specifically in preparation for today's deposition?

1      A.    No.

2      Q.    I understand that you've been in town since

3  Sunday; is that correct?

4      A.    Yes.

5      Q.    Have you met with or seen Dr. Leon since you've

6  been in town?

7      A.    No.

8      Q.    Do you have any plans to see Dr. Leon while you're

9  in town?

10      A.    No.

11      Q.    Do you have any plans to speak with Dr. Leon while

12  you're in town?

13      A.    No.

14      Q.    And just so I'm clear, you haven't spoken with him

15  either since you've been here, correct?

16      A.    Correct.

17      Q.    Have you had any alcohol within the last 24 hours?

18      A.    No.

19      Q.    Have you taken any prescription medication in the

20  last 24 hours?

21      A.    Yes.

22      Q.    What medication have you taken?

23      A.    I take medication for my prostate.

24      Q.    Okay.

25      A.    I take medication for my diabetes, and I take

1  medication for my gout, Allopurinol.

2      Q.   Are any of these medications, do any of these

3  medications affect your ability to testify, affect your

4  memory or recall of certain events?

5      A.   No.

6      Q.   They don't make you drowsy?

7      A.   No.

8      Q.   Okay.  Is there anything that you've done within

9  the last 24 hours that would affect your ability to testify

10 today?

11     A.   No.

12     Q.   Is there any reason why we cannot go forward with

13 your deposition?

14     A.   No.

15     Q.   Now, I know that you were diagnosed with gout

16 prior to this motor vehicle accident; is that correct?

17     A.   Yes.

18     Q.   How about the diabetes, was that a diagnosis that

19 you had prior to this accident?

20     A.   No.

21     Q.   How about the prostate medication that you take,

22 is that something you were taking prior to this accident?

23     A.   No.

24     Q.   Let me get some background information from you if

25 I can.

```
 1            What's your date of birth?
 2      A.    ███████████████.
 3      Q.    What are the last four of your social?
 4      A.    ██████.
 5      Q.    I know you travel by RV and I understand you live
 6   in different locations throughout year; is that correct?
 7      A.    Yes.
 8      Q.    Do you have a main residential address that you
 9   use?
10      A.    Yes.
11      Q.    Where is that?
12      A.    In Box Elder, South Dakota.
13      Q.    What would that full address be if you don't mind?
14      A.    That would be ███████████████████████████
15   ██████████████████████████████████████████████████████
16      Q.    How long have you used that as your residential
17   address or your main address?
18      A.    That specific address about seven years
19   approximately.
20      Q.    Is this your residence?
21      A.    No.
22      Q.    What is it?
23      A.    It is a mail forwarding company.
24      Q.    Is that the mail forwarding company that you own?
25      A.    It is.
```

```
 1        Q.    And what's the name of that company?
 2        A.    Americas Mailbox.
 3        Q.    Do you have a residential address?
 4        A.    No.
 5        Q.    So how does it work, if you get mail, it's sent to
 6   that address?
 7              Are you notified in some way that it's there?
 8        A.    Yes.
 9        Q.    And then what's the next step, is it forwarded to
10   you somewhere?
11        A.    Yes.
12        Q.    How are you notified?
13        A.    In my case, as some of my customers, it would be
14   the individual pieces of mail are scanned, then the image is
15   placed on a secure website, and I'm sent a generic e-mail by
16   the server indicating to me that there is a letter or small
17   package has been scanned and the image is posted.
18              I can log onto that secure web page and view what
19   it is and decide if I want that letter or package forwarded
20   to me or kept in my box on the premises of Americas Mailbox.
21        Q.    And at the time of this accident, that would have
22   been the same process for your ███████████ address?
23        A.    Yes.
24        Q.    Okay.  So if you were to have received mail from
25   Acuity, for example, following the accident, is that the
```

1  process that would have occurred, you would be notified in

2  some way that the mail was received and it would be scanned

3  and sent to you?

4       A.   It is now.  It was not then.

5       Q.   And how was it handled then?

6       A.   As opposed to it would simply be in my box and it

7  would stay in that box awaiting my instructions.

8       Q.   Were you notified that you had mail?

9       A.   No.

10      Q.   And you didn't know, for example, like you do now

11  what items were sitting in your mailbox?  For example, if a

12  letter from Acuity was in your mailbox, you wouldn't have

13  known?

14      A.   Correct.

15      Q.   When did that change?

16      A.   Approximately a year and a half ago.

17      Q.   You travel by RV.

18      A.   Usually.

19      Q.   Okay.  Do you own that RV?

20      A.   No.

21      Q.   Is it leased?

22      A.   I'm paying for it.

23      Q.   Are you the only registered owner of that vehicle?

24           Are you on the registration?

25      A.   No.

1      Q.    Who is on the registration?

2      A.    My dealership.

3      Q.    And you're not on the registration either?

4      A.    No, the license plates are dealer license plates.

5      Q.    In addition to owning the mail forwarding company,

6  do you have any other businesses that you own?

7      A.    Yes.

8      Q.    What are those?

9      A.    Americas Campground and Lodging, Americas RV

10  Service and Sales, Americas Best Insurance, Americas

11  Beverage and Entertainment.

12      Q.    Any others?

13      A.    I have several other LLCs that are just real

14  estate holdings.

15      Q.    Okay.  Do you operate all those businesses

16  yourself?

17      A.    No.

18      Q.    Do you have separate individuals operating each

19  business?

20      A.    I have other individuals that manage them as a

21  total.

22      Q.    Do you yourself manage any of them?

23      A.    No more.

24      Q.    I'm sorry.

25      A.    No more.

 1      Q.   When did that end?

 2      A.   Shortly after the accident.

 3      Q.   Prior to the accident, which of these businesses

 4  were you managing?

 5      A.   All of them.

 6      Q.   Okay.  I'm going to ask you more about that.  I'm

 7  going to first get a little more background information from

 8  you if I can.

 9           Are you currently married?

10      A.   Yes.

11      Q.   Barbara is your wife?

12      A.   Yes.

13      Q.   When were you married to Barbara?

14      A.   October 16, 2016.

15      Q.   You've been together for some time, though.

16      A.   Yes.

17      Q.   When did you first begin dating Barbara?

18      A.   Approximately 32 years ago.

19      Q.   You were previously married.

20      A.   Yes.

21      Q.   When were you married?

22      A.   April of '72.

23      Q.   When were you divorced?

24      A.   Approximately nine and a half years later.

25      Q.   What was your ex-wife's name?

```
 1        A.   Let me correct that.  I was married April of '74.

 2        Q.   What was your ex-wife's name?

 3        A.   Nora.

 4        Q.   Same last name?

 5        A.   When she became my wife, yes.

 6        Q.   Do you know what her maiden name is?

 7        A.   Mabus.

 8        Q.   How do you spell that?

 9        A.   M-A-B-U-S.

10        Q.   Does Nora know that you were involved in this

11   accident?

12        A.   She's dead.

13        Q.   Okay.  Sorry to hear that.  Barbara, I assume,

14   does know that you were involved in this accident.

15        A.   She was with me.

16        Q.   She was sitting in the front passenger seat?

17        A.   Yes.

18        Q.   Any other marriages?

19        A.   No.

20        Q.   Do you have any children?

21        A.   Yes.

22        Q.   How many children?

23        A.   By wife or total in my lifetime?

24        Q.   Sure.  However you want to break it down.  I don't

25   know.
```

```
 1        A.    Well, I just found out I have two daughters.
 2        Q.    Oh, wow.  Okay.  And are they older?  I mean
 3   they're not newborns, right?
 4        A.    No.
 5        Q.    So how did you find out you had daughters, two
 6   daughters?
 7        A.    I knew of their existence.  I knew they had been
 8   adopted.  They found me.
 9        Q.    How old are they?
10        A.    About 34 years old.
11        Q.    Did they know that you've been involved in this
12   accident?
13        A.    I don't think so.
14        Q.    Any other children?
15        A.    Yes.
16        Q.    Tell me about your other children that you have.
17        A.    I have a son, Charles Humes.
18        Q.    How old is Charles?
19        A.    36 I believe, 37.
20        Q.    Is Nora his mother?
21        A.    Yes.
22        Q.    And any other children?
23        A.    I have a daughter, Linda Burback (phonetic).
24        Q.    How old is Linda?
25        A.    38.
```

1        Q.    Any other children?

2        A.    Yes.

3        Q.    Who else?

4        A.    A daughter that I know very little about.  Her

5   name is Stephanie.

6        Q.    Do you know her last name?

7        A.    No.

8        Q.    Do you know how old she is?

9        A.    Approximately 37.

10       Q.    Any other children?

11       A.    No.

12       Q.    Do Stephanie, Charles, or Linda know about this

13  accident you've been involved in?

14       A.    Stephanie does not, Linda and Charles do.

15       Q.    Have they ever assisted you in any way following

16  this accident due to the injuries that you sustained, had to

17  help you to doctors' appointments, assist you with your

18  businesses, anything like that?

19       A.    Linda no.  Charles is my operations manager.

20       Q.    For which business?

21       A.    All of them.

22       Q.    Was he your operations manager at the time of this

23  accident?

24       A.    Yes.

25       Q.    How long has he served as your businesses

1  operation manager?

2      A.   Approximately six years.

3      Q.   What is his role as operations manager of the

4  businesses?

5      A.   An operations manager is responsible for all

6  things fiscal.

7      Q.   Can you be a little more specific with respect to

8  your business what that entails?

9      A.   He handles all the fiscal aspects.

10     Q.   So is he on location?

11     A.   Yes.

12     Q.   Are these all located in South Dakota?

13     A.   Yes.

14     Q.   Are they all located out of the same as a single

15 location?

16     A.   Yes.

17     Q.   Is that the ███████████ address?

18     A.   Yes.  The dealership is the same building.  It has

19 its own specific address, ███████████ per state law in

20 South Dakota.

21     Q.   And that's the RV Service and Sales?

22     A.   Yes.

23     Q.   Is that where you purchased your RV?

24     A.   That's my dealership.

25     Q.   Right.  And is that where the RV was purchased?

1            MR. GALLIHER:  Foundation.

2            THE WITNESS:  The vehicle has not been purchased.

3            MS. TEMPLE:

4       Q.   Is that the registered owner of the vehicle, your

5   dealership?

6       A.   At this time no.

7       Q.   Which -- you mentioned it was a dealership that's

8   the registered owner, correct?

9       A.   No, I did not say that.

10      Q.   Okay.  Who is the registered owner of the vehicle?

11      A.   The owner of the vehicle is a gentleman.  His name

12  is Chuck Gilson.

13      Q.   And what is Chuck's relation to you?

14      A.   Friend.

15      Q.   At the time of the accident who was the registered

16  owner of the vehicle?

17           MR. GALLIHER:  Foundation.

18           THE WITNESS:  Chuck Gilson.  I did not have that

19  vehicle at that time --

20           MS. TEMPLE:  Okay.

21           THE WITNESS:  -- of the accident.

22           MS. TEMPLE:

23      Q.   Were you still traveling by RV at that time?

24      A.   Yes.

25      Q.   Were you still residing in certain parts of the

```
 1   country, in several parts of the country throughout each
 2   year as of April 6, 2013?
 3        A.   Yes.
 4        Q.   What's your highest level of education?
 5        A.   Some college.
 6        Q.   Where did you attend college?
 7        A.   Lake County, Illinois, and Chicago.
 8        Q.   Which college?
 9        A.   Lake County, Illinois, and Chicago City College.
10        Q.   Did you attain a degree?
11        A.   No.
12        Q.   Did you graduate high school?
13        A.   Yes.
14        Q.   Where did you graduate high school?
15        A.   Prosser Vocational.
16        Q.   Where is that located?
17        A.   Chicago.
18        Q.   Have you had any additional schooling beyond the
19   county college and the city college?
20        A.   I underwent a couple classes in computers.
21        Q.   Anything else?
22        A.   No.
23        Q.   Do you have any special technical degrees or
24   licenses?
25        A.   No.
```

```
 1        Q.    So you have these five businesses that you own,
 2   correct?
 3        A.    Yes.
 4        Q.    What is your role within those businesses?
 5              Do you have a role independent of just being the
 6   owner?
 7              MR. GALLIHER:  Objection, vague as to time.
 8              MS. TEMPLE:  I'm talking about right now.
 9              THE WITNESS:  Restate the question.
10              MS. TEMPLE:  Sure.
11        Q.    Beyond just being the owner of that business, do
12   you have another role?
13              Are you CFO, CEO, anything else besides just what
14   you term as the owner?
15        A.    No.
16        Q.    As the owner of those businesses currently, what
17   do your duties entail?
18        A.    My main responsibility is marketing the companies.
19        Q.    How do you do that?
20        A.    Advertising in various publications, internet,
21   social, social media, website.
22        Q.    Beyond advertising and marketing, is there any
23   other specific duties that you have with your company?
24        A.    I'm consulted about the various problems as they
25   occur if necessary.
```

1    Q.    Are you making a claim for wage loss or lost

2    income as a result of this accident?

3    A.    Yes.

4    Q.    What's the basis of that claim?

5    A.    Since the accident since I'm no longer able to put

6    in the time that's required to run my businesses, I can't

7    put in the effort that's necessary, I've had to hire a

8    gentleman to be my general manager.

9    Q.    Is that Kevin Larson?

10    A.    Yes.

11    Q.    How long was Kevin Larson served as your general

12    manager?

13    A.    Approximately four years, three years, four years,

14    somewhere through there.

15    Q.    How does his role differ from your son's role as

16    operations manager?

17    A.    He is responsible for all things.

18    Q.    Does he oversee your son?

19    A.    Yes.

20    Q.    And is it your testimony that you had to hire

21    Kevin because of the injuries that you sustained as a result

22    of this accident?

23    A.    Absolutely.

24    Q.    Who handled the duties that Kevin handles now

25    prior to the accident?

```
 1        A.    Me.
 2        Q.    At the time that this accident occurred, how many
 3   employees did you have for your businesses?
 4        A.    I would say, and this is going back a long time, I
 5   would say maybe 12.
 6        Q.    How many employees do you have now?
 7        A.    On site approximately 30.
 8        Q.    Do you pay yourself a salary?
 9        A.    As an owner I'm not allowed to take a salary.
10        Q.    How do you get paid?
11        A.    When I take something out, it's owner equity.
12        Q.    Have your business profits decreased or increased
13   since April 2013?
14        A.    Increased.
15        Q.    Do you know how much that increase is?
16        A.    Not off the top of my head.
17        Q.    So you weren't paying yourself by the hour at any
18   point in time?
19        A.    No.
20        Q.    Were you keeping track at all of how many hours
21   you were working around the time of this accident?
22        A.    No.
23        Q.    Has the owner equity that you've taken from the
24   company changed between now and 2013?
25              MR. GALLIHER:  Object to the form.
```

1          THE WITNESS:  Restate your question, please.

2          MS. TEMPLE:  Sure.

3     Q.   Has your owner's equity changed, the amount that

4  you've taken from the company as owner's equity changed

5  between now and the time of the accident?

6          MR. GALLIHER:  Same objection, lacks foundation.

7  If you don't understand the question, you need to let her

8  know that.

9          THE WITNESS:  My question is if you make an

10  objection --

11          MR. GALLIHER:  You still need to answer the

12  question, yeah.

13          MS. TEMPLE:  I should have instructed you on that.

14     Q.   From time to time your attorney is going to object

15  to questions I ask.  Unless he instructs you not to answer

16  the question, you can still answer the question if you

17  understand.

18          MR. GALLIHER:  I'll make it very clear if I don't

19  want you to not answer the question.

20          THE WITNESS:  I'm not an attorney.  I don't

21  understand nuances.

22          MS. TEMPLE:  No.  I understand.

23          THE WITNESS:  When the attorney makes an

24  objection, do I continue or do I stop?

25          MS. TEMPLE:  I always tell too -- I always say in

1  the beginning and explain that and I didn't do that.  I

2  apologize.

3          THE WITNESS:  Repeat your question.

4          MS. TEMPLE:  Sure.

5      Q.   The owner's equity -- you testified earlier, if I

6  understand correctly, that your pay or the amount of money

7  that you receive from the company is drawn as owner's

8  equity, and I'm wondering if that amount that you take from

9  the company has increased or decreased or changed in any way

10 between 2013 and now.

11         MR. GALLIHER:  Foundation, go ahead.

12         THE WITNESS:  That's hard to answer because the

13 only funds I remove from the company are to pay my personal

14 bills.  The profit that I make with the company generally

15 stays within the company to help the company continue to

16 grow.

17         MS. TEMPLE:

18     Q.   Have the profits for the company increased since

19 2013?

20     A.   Yes.

21     Q.   You file taxes for these companies.

22     A.   Of course.

23     Q.   You keep records of profits, losses, things like

24 that just in the course of business.

25     A.   My accountant does.

1      Q.    Who is your accountant?

2      A.    Carol Hintz.

3      Q.    How do you spell Hintz?

4      A.    H-I-N-T-Z I believe.

5      Q.    Did any of your medical providers ever tell you

6    that you can't put as much effort into work, not as much

7    time?

8            MR. GALLIHER:  Foundation.

9            THE WITNESS:  No.

10           MS. TEMPLE:

11     Q.    Did any of your medical providers ever restrict

12   the type of work you do, make any modifications to the type

13   of work you do?

14     A.    They didn't have to.

15     Q.    Why is that?

16     A.    Because I know what hurts and where it hurts.  I

17   know my limitations.

18     Q.    Did you ever convey to any of your medical

19   providers how you were self-limiting?

20     A.    Yes.

21     Q.    Which providers?

22     A.    All of them.

23     Q.    Dr. Anderson?

24     A.    Yes.

25     Q.    Dr. Leon?

1      A.    Yes.

2      Q.    Did any of them ever tell you that wasn't

3 necessary?

4      A.    No.

5      Q.    I don't want to be disrespectful, but I want to

6 ask you a question about the limitations that you say you

7 experienced.

8            Do you attribute any of those to just the aging

9 process?

10     A.    No.

11     Q.    I know some of your doctors have referred to your

12 condition as degeneration but you don't think that just age

13 and aging in general resulted in the need to slow down?

14           MR. GALLIHER:  Foundation, speculation, it calls

15 for a medical opinion.  You can answer.

16           THE WITNESS:  In my opinion -- please restate the

17 question.

18           MS. TEMPLE:  Sure.

19     Q.    Do you believe that your -- that aging or

20 degeneration led to the need to slow down at all?

21           Do you blame it at all on aging?

22     A.    Not on aging.

23     Q.    A hundred percent on the accident?

24     A.    Yes, absolutely.

25     Q.    Are there any co-owners of your business?

```
 1        A.    No.
 2        Q.    Is Barbara involved in any way?
 3        A.    Yes.
 4        Q.    And what's her role?
 5        A.    She assists me greatly.
 6        Q.    Okay.  Does she have a formal role within the
 7   company?
 8        A.    She is an employee of the company.
 9        Q.    And what is her job title?
10        A.    To help out wherever is necessary.
11        Q.    Does she have an official job title?
12        A.    Wife.
13        Q.    I know as the wife of a business owner how that
14   goes.  I don't know if formally within the company she has
15   some type of, is she CFO or anything like that?
16        A.    Wife.
17        Q.    Okay.  Does she do any of the accounting for you?
18        A.    No.
19        Q.    Has Carol Hintz handled your accounting since the
20   time of the accident?
21        A.    Yes.
22        Q.    How about immediately prior to the accident like a
23   year or two prior to the accident, was Carol Hintz at that
24   time your accountant as well?
25        A.    Yes.
```

1      Q.    Have you always filed taxes for the business?

2      A.    My accountant has on my behalf.

3      Q.    Do you review those prior to filing?

4      A.    She sends me forms, I sign them, I send the IRS

5   money.

6      Q.    You don't have any reason to think that they're

7   inaccurate?

8            MR. GALLIHER:  Foundation, speculation.

9            THE WITNESS:  No, I do not.

10           MS. TEMPLE:

11     Q.    We referenced earlier your responses to request

12  for production where our office and Acuity requested certain

13  documents from you.  I'm going to show you a copy of that

14  and ask you to look at a few things for me.  I'm not going

15  to ask you much specific.  I just want to know first of all

16  if you've seen that document before.

17     A.    I've seen so many documents over this I -- frankly

18  I don't recall.

19     Q.    Okay.  Well, let me draw your attention to request

20  No. 6 if you will -- it's on page 3 -- and just have you

21  read that to yourself if you don't mind.  You don't have to

22  read it out loud.

23           Were you aware that Acuity had requested a release

24  for your employment records and your tax forms?

25     A.    Again, I've seen so many documents I don't recall.

1      Q.    Okay.  And specifically I'm asking do you have a

2   recollection of having been asked for that information from

3   Acuity?

4      A.    No, I don't recall.

5      Q.    Okay.  Your responses right below that, response

6   to request No. 6 and there's some legal jargon in the

7   beginning and then the response follows if you'll read that

8   to yourself for me.

9           Have you had a chance to review that?

10     A.    Yes.

11     Q.    Okay.  And like here, there's an objection lodged

12  and then a response that follows despite the objection where

13  it says that you are willing to provide the authorization;

14  is that correct?

15          MR. GALLIHER:  I'll object.  That's not exactly

16  what it says.

17          MS. TEMPLE:

18     Q.    Okay.  Appropriate authorizations will be provided

19  to defendant once received by the plaintiff.

20          Am I reading that correctly?

21     A.    Yes.

22     Q.    Do you have any objection, considering that you're

23  making a claim for wage loss, to producing an authorization

24  that would allow Acuity to get your employment records and

25  your tax records?

1      MR. GALLIHER:  I'll object to the form.  It lacks

2  foundation.

3      THE WITNESS:  No.

4      MS. TEMPLE:  Okay.

5    Q.   I have those authorizations here and they're the

6  same authorizations that were provided with the request for

7  production.  You don't have to sign them right now but when

8  we take a break, I'll have you sign those so we can obtain

9  that information for the purpose of reviewing the

10  information relative to your wage loss claim.

11      Okay?

12      MR. GALLIHER:  I'll review those and I may or may

13  not allow him to sign them.

14      MS. TEMPLE:  Okay.

15    Q.   But you have no objection for allowing Acuity to

16  obtain information relating to your employment and your

17  taxes; is that correct?

18      MR. GALLIHER:  Foundation.

19      THE WITNESS:  That would be up to my attorney.

20      MS. TEMPLE:

21    Q.   I want to know about your personal opinion on

22  providing the information.  You would agree with me that if

23  you're making a claim for wage loss, that that's the type of

24  information that would be important to Acuity, correct?

25      MR. GALLIHER:  Asked and answered and

1  argumentative.  Go ahead.

2          MS. TEMPLE:

3      Q.   Is that correct?

4      A.   No, I do not have any objection.

5      Q.   You understand that Acuity would want to review

6  that information for a wage loss claim.

7          MR. GALLIHER:  Speculation.

8          THE WITNESS:  Yes.

9          MS. TEMPLE:  Okay.  We'll mark this as Exhibit C.

10     Q.   How many hours a week would you estimate that you

11 were working in 2013 around the time of the accident?

12     A.   Before the accident 70, maybe 80.

13     Q.   How many hours would you estimate that you work

14 now per week?

15     A.   25.

16     Q.   Do you attribute the decline in the amount of

17 hours that you work to the injuries sustained in this

18 accident?

19     A.   Yes.

20     Q.   100 percent?

21     A.   I would think so, yes.

22     Q.   How old are you?

23     A.   66.

24     Q.   Were you intending to work 70 to 80 hours at the

25 age of 66 had this accident never occurred?

```
 1            MR. GALLIHER:  Foundation, speculation.
 2            THE WITNESS:  Most certainly because I still own
 3   the businesses and I would have continued working those
 4   hours until I sell the businesses.
 5            MS. TEMPLE:
 6       Q.   Did you have anyone in a management position for
 7   your business prior to Kevin?
 8       A.   As a general manager, no.
 9       Q.   How about just a management position in general
10   for any of your businesses aside from Kevin Larson?
11       A.   Charles.
12       Q.   Anyone else?
13       A.   In more minor roles, yes.
14       Q.   Okay.  Can you give me the names of those
15   individuals?
16       A.   That would have been Dawn Lydick.
17       Q.   How do you spell Lydick?
18       A.   L-Y-D-I-C-K.
19       Q.   Does Dawn still work for you in any capacity?
20       A.   Yes.
21       Q.   And what is her role?
22       A.   Vehicle registrations.
23       Q.   Anyone else?
24       A.   No.
25       Q.   Any former employees who worked for you in a
```

1  management capacity?

2      A.   No.

3      Q.   Do you keep records of all of the employees that

4  your company's employed at any given time?

5      A.   Yes.

6      Q.   In 2013 would that have been a case that you would

7  have some type of record that would reflect who your

8  employees were for your various companies?

9      A.   That would be payroll records and such.

10     Q.   Did you have employees that worked for you in 2013

11 at the time of the accident that no longer work for you?

12     A.   Yes.

13     Q.   Any of those individuals in a management role?

14     A.   No.

15     Q.   Would you describe your job at the time of the

16 accident as physically demanding?

17     A.   It can be.

18     Q.   How so?

19     A.   Americas Mailbox is a mail forwarding company.  We

20 handle tubs and tubs of mail and packages the same as any

21 post office would.

22     Q.   Were you personally responsible for handling those

23 tubs and tubs of mail?

24     A.   I would certainly help out when and where

25 necessary and asked.

1      Q.    Following the accident did you assist with the

2  tubs and tubs of mail?

3      A.    No longer able to.

4      Q.    From the day of the accident forward?

5      A.    From the day of the accident I was still down here

6  in Las Vegas.

7      Q.    I'm just looking for a time frame.  So beginning

8  as of April 2013 you have never handled the physical labor

9  tasks for your business.

10      A.    Correct.

11      Q.    You travel throughout the year, correct?

12      A.    No.

13      Q.    You don't travel from one location to another

14  meaning some parts of the year you live in South Dakota,

15  some parts of the year live in Florida?

16      A.    That would be the correct answer.  There are some

17  times I travel, some parts of the year yes, that I do not.

18      Q.    Is it certain months you're always in one location

19  versus another?

20      A.    Generally I'm in South Dakota during the summer

21  months.  In the winter months I go somewhere south as a

22  snowbird.

23      Q.    At the time of the accident was that southern

24  location Florida?

25      A.    No.

1     Q.    Where was it?

2     A.    Here in Las Vegas.

3     Q.    When would you come to Las Vegas?

4           MR. GALLIHER:  Form.

5           THE WITNESS:  I would have been in Las Vegas

6    approximately one, maybe two weeks prior to the accident.

7           MS. TEMPLE:

8     Q.    So starting in March?

9     A.    Approximately.

10    Q.    How long would you be in Las Vegas?

11          MR. GALLIHER:  Form.

12          THE WITNESS:  As I stated, approximately one or

13   two weeks prior to the accident.

14          MS. TEMPLE:

15    Q.    And then would you stay in -- did you stay in Las

16   Vegas following the accident?

17    A.    Yes.

18    Q.    For how long?

19    A.    Approximately a week or two at the most.

20    Q.    Earlier you testified that or just a moment ago

21   you testified that you would go south for the winter.  I'm

22   wondering in the year 2013 where south was.

23    A.    I could have been in Arizona for a time.

24    Q.    Do you specifically recall where you went the

25   winter of 2013?

 1     A.   Other than Vegas, Las Vegas and then up to South
 2  Dakota, no.
 3     Q.   How many months would you generally spend in South
 4  Dakota in 2013?
 5     A.   Five, six, somewhere through there.
 6     Q.   The remaining months were spent in Vegas and
 7  Arizona?
 8     A.   For that year.
 9     Q.   What about 2014?
10     A.   Possibly Florida.
11     Q.   Do you specifically recall?
12     A.   No.
13     Q.   You don't have a home in any of those locations?
14     A.   No.
15     Q.   Would you have kept records of where you were
16  residing at which point in time?
17     A.   No.
18     Q.   Do you stay at an RV park?
19     A.   Occasionally.
20     Q.   When you're not staying at an RV park, where do
21  you stay?
22     A.   It could be anywhere.
23     Q.   Do you recall in 2015 what your travel pattern
24  was?
25     A.   Probably Florida.

1      Q.    For the winter months?

2      A.    Yes.

3      Q.    What do you consider the winter months?

4      A.    Cold and snow.

5      Q.    Can you give me an idea of what time frame we're

6  looking at?

7      A.    It varies.  It could be as early as

8  September-October until March-April.

9      Q.    And then you stay in South Dakota for a period of

10  time before leaving once it turned cold and snow?

11     A.    I have been.

12     Q.    For 2016 what was your travel pattern?

13     A.    Probably Florida.

14     Q.    That was last year.  Do you remember --

15           MR. GALLIHER:  Two years.

16           MS. TEMPLE:  You're right, two years ago.

17           THE WITNESS:  Florida, no.

18           MS. TEMPLE:

19     Q.    Do you remember which month?

20     A.    No.

21     Q.    Do you have family in Florida?

22     A.    Yes.

23     Q.    Which family members are in Florida?

24     A.    Currently my sister, of course her husband and her

25  son.

```
 1        Q.    What's your sister's name?
 2        A.    Cheryl.
 3        Q.    Last name?
 4        A.    Lesko.
 5        Q.    How do you spell that?
 6        A.    L-E-S-K-O.
 7        Q.    Does Cheryl know that you were involved in this
 8   accident?
 9        A.    Yes.
10        Q.    Do you have any family in Arizona?
11        A.    Yes.
12        Q.    Who is your family in Arizona?
13        A.    Currently in Arizona, she's moved several times,
14   that would be my daughter Linda.
15        Q.    What about Las Vegas, do you have any family here?
16        A.    No.
17        Q.    When was the last time you spent an extended
18   period of time in Las Vegas?
19              MR. GALLIHER:  Form.
20              THE WITNESS:  Now, right now.
21              MS. TEMPLE:
22        Q.    Before now.
23        A.    As related to this case?
24        Q.    I'm just asking when the last time was when you
25   spent, say, more than two weeks in Las Vegas?
```

```
1        A.    The accident, the time frame of the accident.
2        Q.    You've been back to Las Vegas since then.
3        A.    In regard to this accident.
4        Q.    What do you mean by that?
5        A.    I came down to visit with attorneys.  I came down
6   to visit Dr. Ramone.
7        Q.    Dr. Leon?
8        A.    Leon.  Thank you.
9        Q.    And that was the only purpose for your visit?
10       A.    Yes.
11       Q.    Why treat in Las Vegas?
12       A.    Because --
13             MR. GALLIHER:  Foundation.
14             THE WITNESS:  Because that's where my initial
15   doctor was.
16             MS. TEMPLE:  Go ahead.
17             THE WITNESS:  That was the doctor I went to.
18             MS. TEMPLE:
19       Q.    Right after the accident you mean?
20       A.    Soon thereafter, yes.
21       Q.    You've since treated with doctors in South Dakota
22   and Florida, correct?
23       A.    Yes.
24       Q.    Is there a reason why you continue to see a doctor
25   in Las Vegas despite having these other medical providers in
```

```
 1   Florida and South Dakota?
 2        A.   When I would come down to visit the attorneys, I
 3   would visit the doctor as well.
 4        Q.   Do you have an idea as to how much, like have you
 5   quantified how much you've lost financially as far as your
 6   wage loss is concerned?
 7             MR. GALLIHER:  Foundation, speculation.
 8             THE WITNESS:  No, I have not been able to.  I
 9   would guess it would be substantial.
10             MS. TEMPLE:  Okay.
11        Q.   What would you base it on?
12        A.   The growth of my company.
13        Q.   If I understand your testimony correctly, your
14   company has grown since the accident.
15        A.   Yes, but it would have grown considerably more.
16        Q.   Have you spoken with an accountant or a financial
17   adviser that has suggested that that's the case?
18        A.   Didn't need to.
19        Q.   So how do you know that the company would have
20   grown more?
21        A.   Because one of the aspects of my marketing is able
22   to attend RV shows and RV rallies and other types of shows
23   where I would set up a booth and market my company by
24   talking to people about my company.  Since the accident I've
25   still done several but nowhere near the number as I was able
```

```
 1  to do before.
 2      Q.    Okay.  How many marketing or RV shows did you
 3  attend in the year 2012?
 4      A.    I don't recall.
 5      Q.    Is that something that your accountant would have
 6  a record of?
 7      A.    Possibly.
 8      Q.    Those trips are business expenses.  Is that fair?
 9      A.    Yes.
10      Q.    In the year 2013 how many RV shows did you attend?
11      A.    The same answer.  I don't recall.  I'd have to
12  pull out my diaries and such.
13      Q.    What do you mean by your diaries?
14      A.    My logs.  I'd have to put together a list.  I
15  don't keep a diary per se.  I would have to look at the
16  shows that I signed up for.
17      Q.    What type of log do you keep that you could
18  reference?
19      A.    As I said, it's not really diaries or logs.  It's
20  more of a mental I think.  I have to sit down and look and
21  go back and say, oh, I attended this show and so on.
22      Q.    Is there one particular company that puts on these
23  RV shows?
24      A.    No.
25      Q.    Does anyone accompany you to these RV shows?
```

1      A.    Yes.

2      Q.    Barbara?

3      A.    Yes.

4      Q.    Anyone else?

5      A.    Generally no.

6      Q.    Has Charles ever accompanied you to an RV show?

7      A.    No.

8      Q.    Do you have any records at all in your possession

9  that would support your claim that your business would have

10 grown more had you not been involved in this accident?

11          MR. GALLIHER:  Foundation, speculation.

12          THE WITNESS:  Not that I can think of.

13          MS. TEMPLE:

14     Q.    How have you been financially impacted?

15     A.    In what way?

16     Q.    Sure.  I mean you said that the business growth

17 was affected but are you still living the same lifestyle?

18     A.    The same lifestyle, yes.  To the same extent, no.

19     Q.    Have you ever had to file for bankruptcy?

20     A.    No.

21     Q.    And I don't just mean since this accident.  I mean

22 ever.

23     A.    No.

24     Q.    Have you ever had a home foreclosed on?

25     A.    Yes.

1      Q.    When was that, prior to this accident?

2      A.    Yes.

3      Q.    What year?

4      A.    Approximately 1982.

5      Q.    Have you ever had a car repossessed?

6      A.    No.

7      Q.    Have you ever had a short sale?

8      A.    What's a short sale?

9      Q.    Similar to a foreclosure where you essentially

10 sell your home back.

11     A.    No.

12     Q.    Prior to this accident had you ever been involved

13 in any other motor vehicle accidents?

14     A.    35 years ago before the accident.

15     Q.    35 years before the accident?

16     A.    Approximately.

17     Q.    Were you injured in that accident?

18     A.    Minorly.

19     Q.    What injuries did you sustain?

20     A.    Abrasions.

21     Q.    How about a neck injury?

22     A.    No.

23     Q.    Back injury?

24     A.    No.

25     Q.    Have you had any other motor vehicle accidents

1  aside from the motor vehicle accidents 35 years ago and the

2  one that you were involved in in this case?

3       A.   Little minor fender benders 35, 45 years ago.

4       Q.   How about since this motor vehicle accident?

5       A.   No.

6       Q.   And just so I'm clear, I'm not just looking for

7  motor vehicle accident that may have been caused by someone

8  else.  I'm looking also for motor vehicle accident that you

9  may have caused.

10      A.   Is there a question in there?

11      Q.   Yes.  Have you ever been involved in any motor

12  vehicle accidents that you caused?

13      A.   No.

14      Q.   Have you ever been injured on the job?

15      A.   Yes.

16      Q.   When?

17      A.   Approximately 30 years ago.

18      Q.   What type of injury did you sustain?

19      A.   I was climbing out of a semi and I fell down.  The

20  step that I was stepping down on, my foot came off that step

21  and my, and the step went between my legs and caught me in

22  the testicular area.

23      Q.   Did you hurt your back in that incident?

24      A.   No.

25      Q.   Your neck?

```
 1        A.    No.
 2        Q.    Any other work related injuries?
 3        A.    No.
 4        Q.    How about any slips and falls, sports related
 5   injuries?
 6        A.    No.
 7        Q.    Have you ever been involved in any other lawsuits
 8   aside from this one?
 9        A.    No.
10        Q.    And, again, I'm looking for lawsuits that may have
11   been initiated by you or initiated against you.  Have you
12   ever had any other lawsuits?
13        A.    When I lost my house in my divorce.  That's one of
14   the things that my ex-wife did as part of the divorce
15   proceedings.  That was many years ago.  Other than that, no.
16        Q.    You testified earlier that you have diabetes and
17   gout, correct?
18        A.    Correct.
19        Q.    And that you take a prostate medication.
20        A.    Yes.
21        Q.    Are there any other medical conditions that you
22   currently have?
23        A.    No.
24        Q.    How about prior to the accident, did you have any
25   medical conditions that you were diagnosed with prior to the
```

```
 1  accident?
 2       A.   No.
 3       Q.   Did you have a family doctor that you would see
 4  regularly prior to the accident?
 5       A.   No.
 6       Q.   Who prescribed you your medication for gout prior
 7  to the accident?
 8       A.   A doctor.  I don't recall who it was I travel so
 9  much.
10       Q.   Would it have been in South Dakota, Florida?
11       A.   It could have been Florida.
12       Q.   But you have no recollection as to who the doctor
13  was who would have prescribed you your medication?
14       A.   I don't recall.  I have a mental image of the
15  doctor but I don't recall his name.
16       Q.   Do you have a mental image of the location?
17       A.   Yes.
18       Q.   Where is that?
19       A.   Wesley Chapel, Florida.
20       Q.   Is that doctor someone that you've treated with
21  since this accident as well?
22       A.   Yes.
23       Q.   Do you still treat with that medical provider?
24       A.   When I'm in that area.
25       Q.   Have you ever treated with that doctor in Wesley
```

1  Chapel, Florida, for injuries related to this accident?

2      A.   Yes.

3      Q.   But you have no recollection of his name?

4      A.   Sorry.  I don't mean to sound bad or anything.

5  It's one of those Indian names and I don't know how to spell

6  it or pronounce it.

7      Q.   Do you know the name of his practice?

8      A.   No.

9      Q.   Aside from the doctor that was prescribing you the

10 medication for gout prior to this accident, were there any

11 other doctors whom you had seen, say, a year before this

12 accident?

13     A.   Right around that time I underwent a full medical

14 health inspection.

15     Q.   Prior to this accident?

16     A.   Yes, I believe it was.

17     Q.   Okay.

18     A.   In fact, I'm sure it was.

19     Q.   Where?

20     A.   In Rapid City, South Dakota.

21     Q.   And what was the name of the doctor?

22     A.   It was a doctor designated by the insurance

23 company.

24     Q.   Which insurance company?

25     A.   Met Life.

1      Q.    Was there a reason you underwent that examination?

2      A.    Yes.

3      Q.    Why?

4      A.    My son was purchasing a $1 million life insurance

5   policy on me, and Met Life ordered me to undergo a full

6   medical examination.

7      Q.    Do you recall when that was in relation to this

8   accident?

9      A.    Before the accident.

10     Q.    Time frame?

11     A.    A year or two.

12     Q.    Did you have to go to that prior to -- did that

13  provider come to you?

14     A.    I went to that provider.

15     Q.    You don't recall the name of the provider or the

16  practice?

17     A.    No.

18     Q.    Do you recall what the result was of the

19  examination, what they told you as far as your health?

20     A.    I passed.  There was no problems.  I was granted

21  the million dollar policy.

22     Q.    Did they review any of your medical records in the

23  process of determining whether you could qualify?

24           MR. GALLIHER:  Foundation, speculation.

25           THE WITNESS:  I wouldn't know how to answer that.

```
 1  Maybe they did, maybe they didn't, I don't know.

 2          MS. TEMPLE:

 3      Q.   Do you know specifically whether they did?

 4      A.   No, I don't know.

 5      Q.   Were you ever asked to provide any medical records

 6  to the doctor that examined you?

 7      A.   I had to fill out the prerequisite forms that most

 8  of the doctors have their patients fill out when they go in.

 9      Q.   Beyond that?

10      A.   No.  I only saw the doctor one time.

11      Q.   Do you have a family physician now?

12      A.   Yes.

13      Q.   Who is that?

14      A.   In Rapid City, that would be Dr. Plooster.

15      Q.   How do you spell that?

16      A.   P-L-O-O-S-T-E-R.

17      Q.   And is he just a family practitioner?

18      A.   He's a DO.

19      Q.   How long have you seen Dr. Plooster?

20      A.   A year, year and a half.

21      Q.   And does Dr. Plooster prescribe all your

22  medication for you, your prostate medication, your diabetes

23  medication and your gout medication?

24      A.   It's between him and the doctor down to Wesley

25  Chapel, Florida.
```

1      Q.    Prior to Dr. Plooster, did you have a family

2  doctor that you would see?

3      A.    The closest I would call a family doctor would be

4  Dr. Trevor Anderson who is the doctor that is working on my

5  back.

6      Q.    Did you ever treat with Dr. Anderson before this

7  accident?

8      A.    No, I didn't know him at all.

9      Q.    How did you come to know of him?

10     A.    Just contacted him and went to him.  He's in pain

11  management.  The name of his practice is Rehab Doctors.

12              MR. GALLIHER:  Can we take a break.

13              MS. TEMPLE:  Sure.

14                  (Whereupon a recess was taken

15                   from 11:05 a.m. until 11:17 a.m.

16                   after which the following proceedings

17                   took place:)

18                  (Whereupon, Exhibits A, B, and C were

19                   marked for identification by the court

20                   reporter and are attached to the original

21                   transcript of this deposition.)

22              MS. TEMPLE:  All right.

23     Q.    Mr. Humes, we're back on the record.  I know

24  you've had a chance now to take a break.  Is there anything

25  that you thought of during that break perhaps that changes

1   any of your prior responses that you'd want to elaborate on
2   any of your responses?
3       A.   Not at this time.
4       Q.   Okay.  A few questions that I actually thought of
5   when I was looking back through my notes.  Did you mention
6   that you were a truck driver before you owned these
7   businesses?
8       A.   Yes.
9       Q.   When would that have been?
10      A.   A very long time ago, I haven't exercised driving
11  semis for many many years.
12      Q.   Do you have a CDL?
13      A.   No more.
14      Q.   And I know you testified that you worked at the
15  time of the accident about 70 to 80 hours a week.  I assume
16  during the time that you were outside of South Dakota and
17  away from the businesses that that would change?
18      A.   No.
19      Q.   So you maintained the 70- to 80-hour work week
20  when you were south for the winter?
21      A.   Absolutely.
22      Q.   What types of tasks did you do remotely?
23      A.   Well, I would have the various shows that I
24  mentioned and a lot of phone calls.
25      Q.   Who would handle the physical labor when you were

1  down south?

2          MR. GALLIHER:  Form, foundation.

3          THE WITNESS:  The people I paid, my staff.

4          MS. TEMPLE:  Okay.

5      Q.   Mr. Larson?

6      A.   Mr. Larson is the general manager.

7      Q.   Your son.

8      A.   He's the operations manager.

9      Q.   Well, as in your role you testified earlier that
10  at the time of the accident or just prior to the accident
11  that would be something that would have been your
12  responsibility, correct?

13     A.   For the most part, yes.

14     Q.   Okay.  So just after the accident when you were no
15  longer able to do that type of physical activity, who would
16  be responsible for the physical part of the position, the
17  tubs and tubs of mail?

18     A.   Well, the ultimate responsibility would fall upon
19  the general manager as, you know, as job description.  He
20  would, you know, he knows that work needs to be done and he
21  will delegate.

22     Q.   Do you know a particular employee that that type
23  of work would be delegated to at that time?

24     A.   Not a particular employee.  It would be whatever
25  employee had that job with, that job description.

1      Q.   And what job would that be?

2      A.   It could be anything from grounds maintenance to

3  handling the mail, sorting the mail, the pre-sort, anything.

4      Q.   And are those the same individuals that would

5  handle those tasks when you were down south?

6      A.   They would do that, yes.  I couldn't do it all by

7  myself.  When I was there prior to the accident, I would be

8  able to help them out as necessary.  I would, you know, I

9  would be best described as a hands on boss.  There was no

10 responsibility, no task that I did not do or willing to do

11 myself.  If I expect my employees to do something, I need to

12 know how to do it too.

13     Q.   And that hands-on aspect of your job changed after

14 the accident?

15     A.   Yes.  Now, you know, I do pretty much just the

16 phone calls and various marketing and things that don't

17 require physical.

18     Q.   When were you diagnosed with gout?

19     A.   I would guess 20 years ago.

20     Q.   That condition causes you pain.

21     A.   Not as long as I take my medication.

22     Q.   If you don't take your medication, what are the

23 effects of gout?

24          MR. GALLIHER:  Calls for a medical opinion.  Go

25 ahead.

1    THE WITNESS:  Usually the one or two toes on my

2 left foot will become inflamed.

3    MS. TEMPLE:

4    Q.   Is there anything else that you experience from

5 the gout pain wise when you would not take your medication?

6    A.   No.

7    Q.   How did you find out that you had gout?

8    A.   I got out of bed one day, put my foot on the

9 floor, and there was immense pain in my left foot.  I call

10 up a friend of mine that happened to be a foot doctor.  I

11 said, "What's going on here?"  He said, "You've got gout."

12 I never even heard of it before.

13    Q.   Did it ever cause pain in your back?

14    A.   No.

15    Q.   How about your neck?

16    A.   No, the gout affected physically my left foot, a

17 couple toes.

18    Q.   I've always understood gout is a joint issue so I

19 didn't know if there was other joints that you feel an

20 effect.

21    A.   It doesn't do that with me.  It's my left toes.

22    Q.   At the time of this accident did you have health

23 insurance?

24    A.   No.

25    MR. GALLIHER:  Collateral source, go ahead.

1             MS. TEMPLE:

2     Q.    Did you say no?

3     A.    Correct.  No, I did not.

4     Q.    If you had to go to the doctor for your gout

5  medication, for example, was that something that you'd just

6  have to pay out of pocket?

7     A.    Yes.

8     Q.    Do you know if you owe any money for any of the

9  medical treatment that you've undergone as a result of this

10  accident?

11            MR. GALLIHER:  Form, foundation.

12            THE WITNESS:  I'm sure I do.

13            MS. TEMPLE:

14     Q.    Do you know what that amount is?

15     A.    No.

16     Q.    Have you been contacted by collections for any of

17  the bills related to the medical treatment that you've

18  undergone?

19     A.    I have been.

20     Q.    Which particular medical provider contacted you

21  about collections?

22     A.    If I recall, it could have been Black Hills

23  Surgical.

24     Q.    Do you recall when that was?

25     A.    Several years ago.

1      Q.    Do you know if you paid that bill?

2      A.    We're on a payment plan.

3      Q.    And that's for treatment related to this accident?

4      A.    Yes.

5      Q.    Is Black Hills Surgical Center where Dr. Anderson

6   would perform your surgery?

7      A.    Yes.

8      Q.    Did you also have a payment plan with

9   Dr. Anderson?

10     A.    I don't think so.  We went on a lien.

11     Q.    Okay.  But to your knowledge Black Hills Surgical

12  is not on a lien?

13     A.    They started out that way and then they had a

14  change of policy.

15     Q.    Do you know how much you paid towards Black Hills

16  Surgical?

17     A.    No.

18     Q.    But you do know that payments have been made?

19     A.    Yes.

20     Q.    Do you know when those payments were made?

21     A.    Monthly.

22     Q.    Starting when?

23     A.    I don't know.

24     Q.    All right.  Let's talk about the motor vehicle

25  accident.  You were in Las Vegas at the time, correct?

1      A.    Yes.

2      Q.    Were you here on business?

3      A.    No.

4      Q.    Who was with you?

5      A.    My wife.

6      Q.    What was the purpose of your trip?

7      A.    Pleasure.

8      Q.    How long were you intending to stay?

9      A.    Approximately three weeks.

10     Q.    When had you arrived here?

11     A.    Approximately a week or so before.

12     Q.    What type of vehicle were you driving?

13     A.    That would have been a motor coach.

14     Q.    At the time of the accident?

15     A.    Oh, I'm sorry.  At the time of the accident it was

16   a 2000 Saturn.

17     Q.    Was that vehicle owned by you?

18     A.    Yes.

19     Q.    Had you driven that vehicle before?

20     A.    Yes.

21     Q.    You have to excuse my ignorance.  I think I know

22   how RVs work.  When you travel with a vehicle like that, do

23   you just attach it to the RV?

24     A.     In that case, yes.

25     Q.    And that's what you did for that trip to Las

```
 1  Vegas.
 2       A.   Yes.
 3       Q.   Did you stay at an RV park?
 4       A.   Yes.
 5       Q.   Which one?
 6       A.   Thousand Trails.
 7       Q.   And then you just used the Saturn to navigate
 8  around town during your trip?
 9       A.   Yes.
10       Q.   Where did the accident occur?
11       A.   On what's referred to as the Strip.
12       Q.   Do you know the exact intersection?
13       A.   No.
14       Q.   What time of day?
15       A.   Late afternoon, early evening.
16       Q.   Was it still light out?
17       A.   Yes.
18       Q.   How was the weather, clear?
19       A.   Clear and dry.
20       Q.   It sounds like a typical day in Las Vegas.  Where
21  were you going?
22       A.   My wife and I were going to go see a magician at
23  one of the casinos.
24       Q.   Do you recall which casino?
25       A.   No.
```

1        Q.    You said your wife was in the passenger seat,

2   correct?

3        A.    Yes.

4        Q.    Were you wearing your seatbelt?

5        A.    Yes.

6        Q.    Was it a lap belt and a shoulder harness?

7        A.    Yes.

8        Q.    Did you have a particular time that you had to be

9   there?

10       A.    Well, the show started at a particular time and we

11  were at the corner coming at the stoplight there, and we

12  were getting ready to make a right turn into by where the

13  casino was or is.  I don't know if it's still there anymore.

14  I don't know.

15       Q.    Were you running late?

16       A.    No.

17       Q.    So you were in the process of turning when the

18  accident happened?

19       A.    Well, we were going to be turning.  We were in the

20  right lane.  The light was red.  There was a car in front of

21  me.  He stopped.  I stopped, the young man behind me did

22  not.

23       Q.    Did you have any warning that the impact was going

24  to happen?

25       A.    None.

```
 1        Q.    No tires screeching, horns honking?
 2        A.    It was like an explosion.
 3        Q.    How fast were you traveling or were you at a
 4   complete stop?
 5        A.    I was at a full and complete stop.
 6        Q.    How long had you been at a full and complete stop?
 7        A.    20 seconds.
 8        Q.    Following the accident, were you able to get out
 9   of your vehicle?
10        A.    No.
11        Q.    Why is that?
12        A.    Because the way the car was crumpled.
13        Q.    Did you try to open your door?
14        A.    No.  I was unconscious.
15        Q.    Did you hit your head on anything?
16              MR. GALLIHER:  Objection.
17              THE WITNESS:  I don't think so.  I don't know.  I
18   may have.  The airbags did not deploy but the, you know, I
19   had headaches.  Of course there was neck and back and so on.
20              MR. GALLIHER:  The question was did you hit your
21   head if you know.
22              THE WITNESS:  I don't recall.
23              MS. TEMPLE:
24        Q.    The impact from the vehicle behind you pushed your
25   vehicle into the vehicle in front of you?
```

1       A.    Very hard.

2       Q.    Okay.  And neither your front airbags deployed or

3  any side airbags?

4       A.    That car I don't believe had side airbags but no,

5  the front airbags did not, no, did not deploy.

6       Q.    Did you have any cuts on your face, abrasions,

7  bruising?

8       A.    I don't remember.

9       Q.    How about your head, do you recall having any

10  cuts, abrasions, or bruising on your head?

11       A.    Again, I'm sorry.  I don't remember.

12       Q.    Did the seatbelt leave any type of cuts or

13  bruising or abrasions if you can recall?

14       A.    Bruising on both Barbara and myself, yes.

15       Q.    Did you take any photos of the bruising?

16       A.    No.

17       Q.    And you said that Barbara also had bruising from

18  the seatbelt.

19       A.    Yes.

20       Q.    Do you know if she had any other cuts, bruising,

21  or abrasions on any other part of her body?

22            MR. GALLIHER:  Foundation, speculation.

23            THE WITNESS:  I don't recall.

24            MS. TEMPLE:

25       Q.    Did the windshield glass break?

1       A.   There may have been cracks.  Was it shattered?
2  No.  I don't fully recall.
3       Q.   When did you actually get out of the vehicle?
4       A.   When the paramedics took us out on backboards.
5       Q.   Do you know how long that was after the accident?
6       A.   No.
7       Q.   Do you know how long you were unconscious?
8       A.   No.
9       Q.   Do you know if Barbara was unconscious?
10      A.   She told me she was.  I remember the explosion
11  happening and the next thing I recall is there were people,
12  pedestrians trying to talk to us to see if we were okay.
13  Somebody called the police.  Somebody called an ambulance.
14  I don't know who.  I was in and out of consciousness several
15  times.
16      Q.   When the ambulance or the paramedics came to put
17  you on the backboard, do you know if they had to use any
18  devices to open your vehicle to extricate him?
19      A.   I don't know, both the front and the car were, you
20  know, very heavily damaged.
21      Q.   Do you have any --
22      A.   So they might have.  I don't know.
23      Q.   Do you have any photographs of the damage to the
24  vehicle?
25      A.   There were photographs taken.

1        Q.    Who took those photographs if you know?

2        A.    The man's name was Bob Berry.

3        Q.    How do you spell the last name?

4        A.    B-E-R-R-Y.

5        Q.    And who was Bob?

6        A.    Bob was a person I knew down here in Las Vegas.

7        Q.    And what gives you the impression that he would

8    have taken pictures?

9        A.    Because he and I went to the, where the car was

10   towed after the accident.  He took many pictures at that

11   site.

12       Q.    So away from the scene of the accident?

13       A.    Yes.

14       Q.    Do you know if there were any photographs taken at

15   the scene of the accident?

16       A.    I don't know.

17       Q.    Have you ever seen the photographs from Bob?

18       A.    No.

19       Q.    Was the vehicle repaired?

20       A.    It was totaled on both ends.

21       Q.    Did you receive payment for that vehicle?

22       A.    Yes.

23       Q.    From the other driver's insurance company?

24       A.    I presume that's where it came from.

25       Q.    Did you ever have to deal with any estimating of

```
 1  the damage or anything like that or was it just deemed
 2  totaled?
 3       A.   It was totaled.  There wasn't much left of it.
 4       Q.   Did an officer come to the scene of the accident?
 5       A.   I was told there was.
 6       Q.   I understand a report was prepared.  Have you ever
 7  seen that report?
 8       A.   No.
 9       Q.   You never spoke with any officers?
10       A.   No.
11       Q.   Who told you that officers came to the scene?  How
12  did you come to find that out?
13       A.   The paramedic told me.
14       Q.   Did you have to provide the paramedic with a
15  description of how the accident occurred?
16       A.   I don't recall that.
17       Q.   And you were transported to the hospital.
18       A.   Yes.
19       Q.   Was Barbara also transported?
20       A.   Yes.
21       Q.   Were you transported in the same vehicle?
22       A.   Yes.
23       Q.   Which hospital?
24       A.   Sunrise.
25       Q.   Were there any witnesses to the accident?  I think
```

```
 1   you said some individuals came up to the vehicle.
 2             MR. GALLIHER:  Speculation.
 3             THE WITNESS:  Pedestrians walking along the Strip.
 4   I have no idea who any of them were, how many there were.
 5             MS. TEMPLE:
 6        Q.   You never got the names of any witnesses?
 7        A.   No.
 8        Q.   Did you ever speak to either of the other drivers?
 9        A.   No.
10        Q.   Did you ever speak to any of the occupants of
11   either vehicle?
12        A.   No.
13        Q.   Do you know if Barbara spoke with anyone in either
14   vehicle?
15        A.   No.  Yes, I do know.  No, she did not.
16        Q.   Okay.  How long were you at the scene of the
17   accident if you know?
18        A.   I don't know.  Part of the time Barbara and I were
19   each drifting in and out of consciousness.
20        Q.   Was that still the case after you were removed
21   from the vehicle?
22        A.   Yes.
23        Q.   Do you know how many times you drifted out of
24   consciousness?
25        A.   No.
```

1      Q.    And when you say you drifted out of consciousness,
2    you were completely out?
3      A.    I'm sorry.  Is there any other way?
4      Q.    I'm just wondering, sometimes you get fuzzy after
5    an accident.  I want to know if you were actually
6    unconscious to where you were out.
7      A.    It was a combination of both, mostly in and out.
8    There were occasional times -- well, the entire time fuzzy
9    but there were times just completely out.
10     Q.    Were you experiencing physical pain anywhere?
11     A.    Oh, yes.
12     Q.    Where?
13     A.    Head, neck, shoulders, across my chest, my hands,
14   my knees.  I'm speculating my knees hit the dashboard
15   because, again, I had my seatbelt on.
16     Q.    Did you have any bruising or cuts or abrasions on
17   your knees?
18     A.    I don't think so.  Perhaps -- well, perhaps
19   bruising but cuts I don't think so.
20     Q.    How about back pain, were you experiencing back
21   pain at the scene of the accident?
22     A.    Yes.
23     Q.    Lower back pain?
24     A.    Yes.
25     Q.    Okay.  Did you convey all of this to the

 1 | paramedics?

 2 |     A.   There wasn't a lot of talking going on.  I told

 3 | them I was hurting.  He asked me where.  I told him where.

 4 | He took me -- they took me to the hospital.

 5 |     Q.   Prior to this motor vehicle accident, had you ever

 6 | injured your head before?

 7 |     A.   No.

 8 |     Q.   Prior to this accident had you ever injured your

 9 | shoulders before?

10 |     A.   No.

11 |     Q.   Prior to this accident, had you ever injured your

12 | chest?

13 |     A.   No.

14 |     Q.   Prior to this accident, had you ever injured your

15 | hands?

16 |     A.   No.

17 |     Q.   Prior to this accident, had you ever injured your

18 | lower back?

19 |     A.   No.  I had a surgery procedure maybe 20 years

20 | earlier.

21 |     Q.   Was that for your lower back?

22 |     A.   Probably upper.  It was -- I don't know what the

23 | procedure's called, they took a piece of my hip bone and

24 | inserted it in my vertebra.

25 |     Q.   A fusion?

1      A.    Yes.

2      Q.    And my understanding is that was your upper neck.

3      A.    Yeah, I don't know exactly which vertebrae.

4      Q.    Your lower back, had you ever injured your lower

5  back prior to this?

6      A.    No.

7      Q.    Had you ever undergone medical treatment aside

8  from your neck to any of the body parts you injured in this

9  accident prior to the accident?

10     A.    No.

11     Q.    Never underwent treatment for lower back pain

12  prior to this accident?

13     A.    No.

14     Q.    Did you ever have an opportunity to see the

15  property damage to either the vehicle behind yours or the

16  vehicle in front of yours?

17     A.    I don't even know what kind of vehicle it was.

18     Q.    And you haven't come to learn that information

19  since the accident?

20          MR. GALLIHER:  If you learned it from me or

21  somebody from my office, I instruct you not to answer.

22          THE WITNESS:  Say again, please.

23          MR. GALLIHER:  If you learned that information

24  from me or somebody from my office, I'm going to instruct

25  you not to answer.

1           MS. TEMPLE:  I'm not asking for conversation.

2      Q.   I'm asking if you know since the accident what

3  type of property damage was sustained to either vehicle, the

4  one in front of yours or the one behind yours?

5      A.   The only thing I recall because I didn't see the

6  vehicle behind me, the only thing I recall was the vehicle

7  in front of me.  He sustained damage as well.  As to the

8  extent or who was driving it, I don't know.

9      Q.   Are you aware of any photographs that were taken

10  of either the vehicle in front of yours or the vehicle

11  behind yours?

12      A.   No.

13      Q.   The injuries that you just described, is that a

14  complete list of the injuries that you attribute to this car

15  accident?

16           MR. GALLIHER:  It calls for a medical opinion.  Go

17  ahead.

18           THE WITNESS:  No.

19           MS. TEMPLE:

20      Q.   What other injuries did you attribute to this car

21  accident?

22      A.   My hands are still tingly.  I now have to use a

23  CPAP machine because my sleep was disrupted.

24      Q.   Did you have any issues with sleep disruption

25  prior to this accident?

```
 1        A.    No.
 2        Q.    Had you ever seen a medical provider for any sleep
 3   related issues at all prior to this accident?
 4        A.    No.
 5        Q.    When did you start using the CPAP machine?
 6        A.    About a year and a half ago.
 7        Q.    Who prescribed that?
 8        A.    One of the doctors in Rapid City, South Dakota.
 9        Q.    Which doctor?
10        A.    I'm thinking it was -- I'm thinking it was
11   Dr. Plooster.
12        Q.    Did Dr. Plooster tell you that the need for the
13   CPAP machine was directly related to injuries sustained in
14   this accident?
15        A.    I told him that since the accident I've been
16   having problems sleeping.  I'm just saying I believe it was
17   Dr. Plooster.  I'm trying to think of any other doctor that
18   may have said that but it was -- a sleep study was arranged
19   and I went to the facility there in Rapid City, and it was
20   demonstrated that I know you have these problems that I
21   never had before and I've been using the CPAP ever since.
22        Q.    Did any of your medical providers tell you that
23   the need for that CPAP machine was related to injuries
24   sustained in this accident?
25        A.    They did not relate that to me.
```

1      Q.    Where did you undergo the sleep study?

2      A.    As I just said, in Rapid City, South Dakota.

3      Q.    I'm sorry.  I was trying to be more specific.  Was

4   there a specific facility that you can recall where you

5   underwent that procedure?

6      A.    I don't know the name of it.

7      Q.    Can you give me a cross street?

8      A.    There's probably only one in Rapid City anyway.

9   Rapid City is not a big town.

10     Q.    Most of the records related to your medical

11  treatments for treatment that you underwent subsequent to

12  this accident, have been provided.  We haven't been provided

13  anything related to a sleep study.  That's why I asked.

14     A.    Okay.

15     Q.    How about the CPAP, is that something that you

16  rent or you own?

17     A.    I now own it.

18     Q.    Had you ever seen a chiropractor prior to this

19  motor vehicle accident?

20     A.    No.

21     Q.    Had you ever had physical therapy prior to this

22  motor vehicle accident?

23     A.    Yes.

24     Q.    Was it related to your cervical fusion?

25     A.    Yes.  Well, what I had -- yes, the insert.  I had

 1  a stroke, a TIA stroke, temporary stroke many years ago, and
 2  there would have been physical therapy with that.
 3      Q.   Do you recall an approximate time frame when you
 4  had the stroke?
 5      A.   That's got to be approximately 30 years ago.
 6      Q.   And what issues did you have as a result of the
 7  stroke?
 8      A.   I learned that I now stutter a little bit if I
 9  start speaking too fast.
10      Q.   Do you blame that stutter on this accident?
11      A.   No.
12      Q.   Any other issues that arose following the stroke?
13      A.   No.  It was a TIA I believe it's called.  It was a
14  minor stroke.
15      Q.   What was the purpose for the PT, the physical
16  therapy?
17      A.   It was just something they do with people that
18  have strokes.
19      Q.   Did you have any physical deficiencies that
20  necessitated physical therapy?
21      A.   I didn't think so.
22      Q.   Was it speech therapy or body therapy?
23      A.   It would have been speech.  As I said, if I start
24  speaking too fast, I begin to stutter a little bit.  That's
25  something I've never done before.

1      Q.    Did the stroke cause any memory issues?

2      A.    No.

3      Q.    Memory loss.  Is that a no?

4      A.    Correct, that would be a no.

5      Q.    And you don't know what in particular physical

6  therapy was directed at helping?

7      A.    They wanted to make sure that I was okay to go

8  back to work.

9      Q.    What in particular were they treating?

10     A.    It was just more of make sure I could walk and

11 talk and functioning.

12     Q.    Did you have functional limitations aside from the

13 stuttering issue that you mentioned that resulted from the

14 stroke?

15     A.    Not really.

16     Q.    Who was your physical therapist?

17     A.    Oh, I don't recall that at all.  I mean this was

18 30 or so years ago.

19     Q.    Prior to this motor vehicle accident, had you ever

20 had any pain injections, injections directed at either

21 diagnosing or therapeutic?

22     A.    No.

23     Q.    How did you come to injure your neck?

24     A.    Which time?

25     Q.    When you needed the surgery.

```
 1              MR. GALLIHER:  Foundation.
 2              THE WITNESS:  I went to bed one night and I woke
 3  up in the morning.
 4              MS. TEMPLE:
 5       Q.   And what were you experiencing when you woke up?
 6       A.   It hurt.
 7       Q.   Did you have the tingling in your hand that you
 8  described earlier?
 9       A.   No.  Because it was compressing against the nerve,
10  it was causing my left arm to hurt and I had no idea what
11  that was.
12       Q.   And what about your hand, did you have like
13  tingling, radiating pain, numbness?
14       A.   Not really.  Now it's not.
15       Q.   I mean before the surgery.  When you woke up that
16  day and you realized that you were in pain, you mentioned
17  the arm issue.
18       A.   That was up in the middle of my arm kind of thing.
19  Like I said, as was explained to me, the nerve was being
20  compressed.  There was nothing wrong with my arm.  It was
21  compressing the nerve and making my, making me feel pain in
22  my arm.
23       Q.   Did you have any issues with your other arm?
24       A.   No.
25       Q.   How immediate was the surgery after you woke up
```

```
 1   that day?
 2           Did you have surgery right away?
 3       A.  No.
 4       Q.  When was the surgery in relation to that?
 5       A.  About a month and a half later.
 6       Q.  Did you try anything in the meantime?
 7       A.  There was nothing to try.
 8       Q.  Just lived with the pain?
 9       A.  Pretty much.
10       Q.  Was there anything that they think, that your
11   medical providers thought may have caused that injury?
12           MR. GALLIHER:  Speculation, foundation.
13           THE WITNESS:  I went to bed that night.  It just
14   happens.
15           MS. TEMPLE:
16       Q.  No fall or twisting funny?
17       A.  No, nothing like that.
18       Q.  Following that surgery, did you undergo physical
19   therapy?
20       A.  No, no need to.  The doctor fixed the problem.
21       Q.  Who performed that surgery?
22       A.  I don't recall the name.  He's long passed.
23       Q.  Did you have to go for followups following that
24   surgery?
25       A.  Yes.
```

1     Q.    With that medical provider, the surgeon?

2     A.    Yes.

3     Q.    Did you have any other post surgical care?

4     A.    No.

5     Q.    How long did you follow up with that doctor?

6     A.    I might have visited him once, maybe twice.  He

7  wanted to make sure there was no problems with the

8  incisions.  He took a little piece of my hip bone and

9  inserted it between my vertebrae.  He wanted to make sure

10 everything was okay.

11    Q.    I know it's been a long time.  Did the doctor tell

12 you if you can recall whether you need another similar

13 surgery down the road?

14    A.    No.  He just took care of that and we shook hands

15 and parted company.

16    Q.    No indication that you might need another level in

17 the future?

18    A.    Not that I recall.

19    Q.    In the five years prior to this motor vehicle

20 accident did you undergo any medical treatment for your

21 neck?

22    A.    No.

23    Q.    Had you ever been to Alternative Health Care

24 Center prior to this motor vehicle accident?

25    A.    No.

1      Q.   For any injuries or pain even unrelated to the
2   injuries that you experienced in this accident?
3      A.   No.  See, before the accident I was very healthy.
4   I worked out.  I'm the guy you'd see on TV.  I was 60 years
5   old.  I could still do jumping jacks and that kind of thing.
6   I was I wouldn't say athletic but I was much more healthier
7   than other people my age, and since the accident now I feel
8   like an old man with the hurts and pains.
9      Q.   Did you have a gym membership before this
10  accident?
11     A.   I did.
12     Q.   Where was your gym membership?
13     A.   Bally.  That was back when I still lived in
14  Chicago.  And then I became a snowbird and my Bally
15  membership didn't work very well anymore but I still
16  continued to walk a great deal, do various different
17  athletic things.
18     Q.   I should have asked you this earlier.  When did
19  you start becoming a snowbird as you describe it where you'd
20  go south for the winter and then back to South Dakota?
21     A.   About 16 years.
22     Q.   16 years ago from now?
23     A.   About that, yes.
24     Q.   Did you have -- have you had a gym membership at
25  all since your Bally fitness membership?

```
 1        A.    No.
 2        Q.    There is a note in the file in one of your medical
 3   records that you were requesting a note from the medical
 4   provider for a gym membership.  Do you have a recollection
 5   of that?
 6        A.    I do.
 7        Q.    Which gym would it have been that you were seeking
 8   membership?
 9        A.    There's one location in Rapid City that I was
10   considering called Planet Hollywood.  No.
11        Q.    Planet Fitness?
12        A.    Planet Fitness.
13        Q.    Did you ever go through with getting a membership?
14        A.    No.
15        Q.    Were you given that note?
16        A.    Yes.
17        Q.    Do you recall the medical provider telling you
18   whether they thought it was -- what they thought about the
19   idea of you getting a gym membership?
20        A.    Not really.  They said if you think it will help,
21   fine.  If not -- the thing that made me decide ultimately
22   decide against it is because the amount of time that I spend
23   in Rapid City, South Dakota, that I'd had been paying for a
24   membership and I'm not there.
25        Q.    I'm surprised they don't let you do some type of
```

1  hold or something.  I'm sure a lot of people do what you do

2  and leave for the winter.  That wasn't something you

3  explored?

4       A.   I didn't get into that.

5       Q.   Have you ever had a gym membership anywhere since

6  this motor vehicle accident?

7       A.   Yes.

8       Q.   Where was that?

9       A.   Well, as I said, Bally.

10            MR. GALLIHER:  She said since the accident.

11            THE WITNESS:  Since the accident.  I'm sorry.  No.

12            MS. TEMPLE:  Okay.

13       Q.   All right.  So you go to the emergency room and

14  Sunrise Hospital, correct?

15       A.   Correct.

16       Q.   Were you honest with your medical providers

17  throughout the course of your medical treatment?

18       A.   Absolutely.

19       Q.   When you were feeling pain, you told them you were

20  feeling pain?

21       A.   Yes.

22       Q.   When you felt like you were improving, you told

23  them you were feeling improvement?

24       A.   Yes.

25       Q.   You never exaggerated your symptoms at any point

```
 1  in time?
 2       A.   I find it ridiculous to ever lie to your medical
 3  professionals.
 4       Q.   Did any of your medical professionals ever tell
 5  you they thought you were exaggerating?
 6       A.   No.
 7       Q.   Were you experiencing back pain at the emergency
 8  room?
 9       A.   Yes.
10       Q.   Did you tell the emergency room providers that you
11  were experiencing back pain?
12       A.   Yes.
13       Q.   Did you tell Dr. Leon when you saw him a few days
14  later that you were experiencing back pain?
15       A.   That was the point of the visit.
16       Q.   Back?
17       A.   Well, back and everything.
18       Q.   I want to distinguish between the two and I can be
19  more specific.  Lower back pain.  Were you experiencing
20  lower back pain when you presented to the emergency room?
21       A.   Yes.
22       Q.   Did you tell your medical providers in the
23  emergency room that you were experiencing back pain?
24       A.   I told them my back hurts.  I don't remember
25  specifically lower or middle or upper.  I said my back
```

1  hurts, my back, neck and so on.

2       Q.    And you treated with Dr. Leon on April 10, 2013,

3  so a few days after the accident.  Is that your

4  recollection?

5       A.    Yes.

6       Q.    Did you see a lawyer before you saw Dr. Leon?

7       A.    Yes.

8       Q.    What did the emergency room tell you what to took

9  for followup care?

10       A.    Go see a doctor.

11       Q.    They didn't refer you to a particular doctor?

12       A.    I don't think so.

13       Q.    Did they refer you to a lawyer?

14       A.    No.

15             (Remarks off the record.)

16             MS. TEMPLE:

17       Q.    So you go to Dr. Leon and the purpose of the visit

18  was to address your back pain; is that correct?

19       A.    Yes.

20       Q.    What did -- what type of doctor did you understand

21  Dr. Leon to be?

22       A.    A person that worked with people that are in pain.

23       Q.    Had you ever seen a medical doctor in Las Vegas

24  prior to being treated at Sunrise Hospital?

25       A.    No.

1        Q.   There was a typed out sheet contained in your
2   medical record with Dr. Leon that went through your symptoms
3   and your, the accident.
4             Do you recall preparing that for Dr. Leon?
5        A.   I don't recall it, no.
6        Q.   Did you ever tell Dr. Leon that you had had that
7   prior neck surgery?
8        A.   Absolutely.
9        Q.   Did you tell Dr. Leon that you had gout?
10       A.   I don't recall.  I probably did because, again,
11  you know, most times when you see a doctor, they hand you a
12  form and they ask you to fill out lots of questions.
13       Q.   I'm going to show you -- I know you've never seen
14  these medical records so I'll give you a chance to take a
15  look.  I'm going to show you the initial consultation from
16  Dr. Leon that was produced by your attorney.  We'll mark
17  this as Exhibit D.
18            You've never seen this record before, correct?
19       A.   No.
20            MR. GALLIHER:  Have you seen this record before?
21            THE WITNESS:  I'm sorry.
22            MR. GALLIHER:  Had you ever seen the record
23  before?
24            THE WITNESS:  I don't think so.
25            MR. GALLIHER:  Because you asked had you ever seen

1 the record before and I just wanted to make sure the record
2 was clear.
3          MS. TEMPLE:
4     Q.   About halfway down, well, towards the bottom of
5 the first paragraph.  The first paragraph describes how it
6 was that the accident occurred.
7          Do you recall telling Dr. Leon how the accident
8 occurred?
9     A.   I'm sure that's one of the questions he would have
10 asked me, and I would have told him.
11    Q.   Okay.  Toward the bottom it says that your car was
12 rear-ended at what you were told was about 30 miles per
13 hour.
14          Do you see that in the first paragraph?
15    A.   The first paragraph.  Okay.
16    Q.   Do you recall telling Dr. Leon that the vehicle
17 that struck yours was traveling 30 miles per hour?
18          MR. GALLIHER:  Wait.  I'm going to object because
19 that misstates this document.  Go ahead.  Do you remember
20 what you told Dr. Leon?
21          THE WITNESS:  I don't recall the conversation what
22 exactly was said.
23          MS. TEMPLE:
24    Q.   Do you have an estimate as to exactly how fast the
25 vehicle behind you was traveling?

1           MR. GALLIHER:  Objection, speculation.

2           THE WITNESS:  I have no idea.

3           MS. TEMPLE:

4       Q.    Did anyone ever tell you or provide you

5   information regarding how fast that vehicle was traveling?

6           MR. GALLIHER:  Anybody other than a lawyer or

7   somebody from my office.  Okay?

8           THE WITNESS:  Yes.

9           MS. TEMPLE:

10      Q.    Who told you?

11      A.    The paramedic.

12      Q.    And do you know how the paramedic came to learn

13  that information?

14          MR. GALLIHER:  Foundation, speculation.

15          THE WITNESS:  He told me that the police officer

16  told him.

17          MS. TEMPLE:

18      Q.    You never spoke with the police officer directly?

19      A.    No.

20      Q.    And then eventually you returned to South Dakota;

21  is that correct?

22      A.    Yes.

23      Q.    And in relation to the accident, I think you said

24  you were here in Las Vegas another week.

25      A.    Approximately.

```
 1      Q.    So you saw Dr. Leon on April 10, 2013.  Did you
 2  see any other doctors while you were here in Las Vegas aside
 3  from the ER doctors and Dr. Leon?
 4      A.    I don't think so.
 5      Q.    The next visit we have for you is not until
 6  April 24, 2013, at Alternative Health Care Center.  Is that
 7  your recollection as well?
 8      A.    Could be, yes.
 9      Q.    Do you recall seeing any medical providers between
10  your visit with Dr. Leon in Las Vegas and Alternative Health
11  Care Center?
12      A.    No, I do not.
13      Q.    So your recollection is from April 10, 2013, until
14  the first date of treatment at Alternative Health Care
15  Center which we have as April 24, 2013, there was no medical
16  care.
17      A.    Correct.
18      Q.    Were you prescribed any pain medication by
19  Dr. Leon?
20      A.    Yes.
21      Q.    What were you prescribed if you can recall?
22      A.    I do not recall.
23      Q.    Did you have that prescription filled here in Las
24  Vegas?
25      A.    Yes.
```

1        Q.    Do you recall the name of the pharmacy?

2        A.    No.

3        Q.    Does Well Care Pharmacy sound familiar?

4        A.    I don't recall.

5        Q.    Had you ever had any prescriptions filled at a

6    pharmacy in Las Vegas prior to your involvement in this

7    accident?

8        A.    No.

9        Q.    And then you began treating at Alternative Health

10   Care Center and it's your testimony you had never been there

11   prior to this accident, correct?

12       A.    Correct.

13       Q.    Do you recall being asked to fill out a pain

14   diagram to show where you were experiencing pain at

15   Alternative Health Care Center?

16       A.    I'd been asked to fill that form out.  I don't

17   recall exactly where.

18       Q.    I'm going to show you a pain diagram that was

19   produced by your attorneys for your April 24, 2013, visit

20   with Alternative Health Care and have you take a look at

21   that, and we'll mark it as Exhibit E.

22             Is that your handwriting at the top of that page?

23       A.    Yes.

24       Q.    And you see here where there's certain areas that

25   are marked indicating the type of pain and the location of

1  pain.

2      A.   Yes.

3      Q.   Do you know or do you recall whether that's

4  something that you prepared?

5      A.   That's my handwriting.

6      Q.   Okay.  And I mean the diagram part too.

7      A.   Again, that's my handwriting.

8      Q.   Okay.  You did not mark your back, your lower back

9  in this picture; is that correct?

10      A.   It's not marked here, correct.

11      Q.   But it's your testimony that you were experiencing

12  lower back pain at that time.

13      A.   I grew into it.

14      Q.   Well, I want to know if you recall.  Did you

15  experience lower back pain at the time of your first visit

16  with Alternative Health Care Center?

17           MR. GALLIHER:  Foundation.

18           THE WITNESS:  Nothing comes to mind.  I don't

19  recall.

20           MS. TEMPLE:

21      Q.   And you've treated based on your record from

22  April 24, 2013, to June 18, 2013, and this was the

23  chiropractic treatment with Alternative Health Care Center.

24           Is that your recollection that there was

25  approximately two months of chiropractic care?

1      A.    Yes.

2      Q.    Were you treating with any other medical provider

3  during that two-month period aside from Alternative Health

4  Care Center?

5      A.    I don't recall.

6      Q.    There's been a two-month -- well, just over a

7  month gap in medical treatment from June to July 2013.  Do

8  you know what you would have been doing in June of 2013 to

9  July of 2013 that would have prevented any medical care?

10     A.    I might have been just waiting for the doctors'

11 appointments.  Sometimes you have to make appointments and

12 you have to wait a while.

13     Q.    Were you experiencing pain during that month?

14     A.    Yes.

15     Q.    Were you taking any prescription pain medication

16 during that time?

17     A.    Probably.

18     Q.    Do you have an independent recollection of taking

19 prescription pain medication during that time?

20     A.    No.

21     Q.    When Dr. Leon prescribed you pain medication, do

22 you know how long that prescription was to last?

23     A.    No.

24     Q.    Do you have a pharmacy that you use in South

25 Dakota?

1        A.    Wherever I'm at.  I use different pharmacies.

2        Q.    Which pharmacy at the time of this accident were

3   you using in South Dakota?

4        A.    It would have either been Walgreen's or Walmart.

5        Q.    Have you used both?

6        A.    I have.

7        Q.    Both in South Dakota?

8        A.    Yes.

9        Q.    When you're in Florida, which location or which

10   facility do you fill your prescription?

11        A.    Either at Walmart or with Humana pharmacy where

12   they send me the medication.

13        Q.    Is that an online --

14        A.    It's Humana pharmacy.  They know what medications

15   I take and they send them to me through the mail.

16        Q.    And then you return to Dr. Leon in July 2013.  Do

17   you recall having an actual visit with Dr. Leon in

18   July 2013?

19        A.    Yes.

20        Q.    So you returned to Vegas for that visit?

21        A.    Yes.

22        Q.    And that was the only reason that you returned to

23   Las Vegas?

24        A.    No.

25        Q.    Was it also to see your attorney?

1      A.    Yes.

2      Q.    Had Dr. Leon told you at that first visit that he

3  wanted to follow up with you sooner than July?

4      A.    Whenever Dr. Leon asked me to come down, I was

5  there.

6      Q.    Did you -- the records that we have suggest that

7  Dr. Leon told you to contact him by phone in four weeks.  Do

8  you recall having a telephone conference with Dr. Leon four

9  weeks after your first visit?

10      A.    There were phone conferences I recall, but mostly

11  he just told me to make sure I continue medical care where

12  I'm at in South Dakota.

13      Q.    How long were those phone conferences that you had

14  with Dr. Leon?

15      A.    I don't recall.

16      Q.    How many times did you have a phone conference

17  with Dr. Leon?

18      A.    I do not recall.

19      Q.    When was the last time that you spoke with

20  Dr. Leon by phone?

21      A.    I don't recall.  It's been some time.

22      Q.    How long were you in Las Vegas for that trip?

23      A.    Which trip?

24      Q.    July 2013.

25      A.    A short time, long enough to visit my attorney and

1  the doctor.

2       Q.   And you returned where, South Dakota?

3       A.   Yes.

4       Q.   And at that time you had already been released

5  from care from Alternative Health Care Center.  Is that your

6  recollection?

7       A.   Alternative Health Care was merely one step.  It

8  wasn't so much a release from care.  It was just one of the

9  steps that I had to undergo before going to the next level.

10       Q.   I'll be more specific.  With respect to that

11  facility, you were released from care in June 2013 based on

12  the records we have.

13            Is that your understanding?

14       A.   Yes.

15       Q.   Okay.  And then one month goes by, you see

16  Dr. Leon.  No treatment in the meantime; is that correct?

17       A.   Not that I recall.

18       Q.   You don't recall having treatment in the meantime?

19       A.   Again, there are time periods you have to wait

20  before you can get in to go see a doctor and for Dr. Leon

21  there's also the added complexity of making the air fare and

22  hotel.

23       Q.   Did you fly to Las Vegas on that trip?

24       A.   Yes.

25       Q.   Then you returned to South Dakota, and the records

1  we have suggest no medical treatment for the rest of July.

2          Is that your recollection?

3      A.   I don't recall.

4      Q.   Who referred you to Dr. Trevor Anderson?

5      A.   Well, the clinic he works with is Rehab Doctors.

6  I don't know if I was referred to that or I just called the

7  clinic on my own.  I probably just contacted him on my own.

8      Q.   Do you specifically recall one way or another?

9      A.   No.

10     Q.   And he recommended that you undergo physical

11  therapy and epidural steroid injections?

12     A.   There were several recommendations and yes, that

13  was a part of it.

14     Q.   Okay.  Did you have an understanding as to yes

15  recommended epidural steroid injections?

16          MR. GALLIHER:  Objection, speculation, medical

17  opinion.

18          THE WITNESS:  I wouldn't know that.

19          MS. TEMPLE:

20     Q.   Were you still experiencing all of the same pain

21  that you experienced just after the motor vehicle accident

22  or had anything resolved?

23     A.   Nothing had resolved.

24     Q.   Was the full therapy that you underwent for two

25  months beneficial at all?

1      A.    I don't believe so.  I don't believe so.

2      Q.    Do you think you would have benefited from more

3   frequent visits than the amount you went to?

4            MR. GALLIHER:  Objection, foundation.

5            THE WITNESS:  I don't believe so.

6            MS. TEMPLE:

7      Q.    Why do you think it wasn't beneficial or why did

8   you say it wasn't beneficial?

9      A.    Because the hurt and pain was still there.

10  Immediately after the physical therapy, you know, it felt

11  better for a couple of hours, you know, if that long, maybe

12  a few minutes, but it would always return.

13     Q.    If it didn't help, why did you return to physical

14  therapy from August to September 2013?

15     A.    Because I follow the instructions of my doctors.

16     Q.    Did you tell the doctors that it wasn't benefiting

17  you?

18     A.    When I went back in to go see the doctor, I

19  mentioned that I don't feel it's helping that much.

20     Q.    But you still underwent it a second time.

21     A.    Again, I follow the order of my doctors.

22     Q.    There was a one-month period of time when you

23  treated in Burlington, Wisconsin.  Do you recall that?

24     A.    Yes.

25     Q.    Who referred you to a physical therapy facility in

```
 1   Burlington?
 2        A.    I was instructed to wherever I go to undergo
 3   physical therapy.  When I visited Burlington, Wisconsin,
 4   that's where my mother at that time was at, and she told me
 5   about the physical therapy location in Burlington and I made
 6   arrangements to go there to continue it.
 7        Q.    And you were there for about a month?
 8        A.    About that.
 9        Q.    And you went six times according to the record
10   that we have.  Does that sound right?
11        A.    Yes.
12        Q.    Do you have family in South Dakota?
13        A.    My son.
14        Q.    Any other family besides -- is that Charles?
15        A.    Yes.
16        Q.    Any other family --
17        A.    No.
18        Q.    -- at the time --
19        A.    My wife but other than that no.
20        Q.    -- of this accident.
21              Aside from your wife and Charles did you have any
22   other family in South Dakota?
23        A.    No.
24        Q.    So you do ultimately undergo the injections that
25   Dr. Anderson recommended.
```

1      A.    Yes.

2      Q.    Were they helpful at relieving pain?

3      A.    For a short time.

4      Q.    How short?

5      A.    Typically a couple months.

6      Q.    And I want to distinguish between the rhizotomies

7  that you had or the radio frequency ablation which is the

8  nerve burning procedure and the first set of injections that

9  you had with Dr. Anderson.  Okay?

10           Do you have a specific recollection as to how long

11  the pain was relieved following the epidural steroid

12  injections?

13     A.    The injections didn't work that well and that's

14  yes went up the next level of the burning.  If the

15  injections worked as well as he had hoped, as well as I had

16  hoped, then there would be no need to continue.

17     Q.    When you -- when Dr. Anderson performed the

18  injections, were you asleep or awake?

19     A.    Awake.

20     Q.    Was it a twilight?  Do you understand what I mean

21  by that?

22     A.    No.  I was very much aware.

23     Q.    Did he --

24     A.    That was not a very pleasant experience.

25     Q.    I've heard.  Did he ask you before the injection

1  to rate your pain for him on a scale of one to ten?

2       A.   I don't recall.

3       Q.   Do you -- I know you said that you felt that the

4  injection benefited you for several days following the

5  accident.  How much of a benefit did you feel?

6            MR. GALLIHER:  Did you mean following the

7  treatment?

8            MS. TEMPLE:  I'm sorry.  I meant following the

9  treatment.  Thank you.

10           THE WITNESS:  Not very much because if I benefited

11 again, we wouldn't have gone to the next level.

12           MS. TEMPLE:

13      Q.   Did you feel more than 50 percent relief?

14      A.   No.

15      Q.   More than 30 percent?

16      A.   I'd say no.

17      Q.   Immediately following those injections, is it your

18 testimony that you did not experience even 30 percent relief

19 from those injections?

20      A.   I would say the pain was always there.  It was a

21 slightly lesser degree.  As to percentage I wouldn't guess,

22 but it never went away.

23      Q.   But just so I'm clear, it was definitely less in

24 your estimation than 30 percent improved?

25      A.   I would say so and, again, that would come back.

1      Q.    Within days?

2      A.    I would say a short time.  I would say a short

3  time.

4      Q.    Not as much as a month?

5      A.    No.

6      Q.    A week?

7      A.    It could be.

8      Q.    Then did Dr. Anderson then perform a second set of

9  injections about a month later?

10     A.    I don't have in my mind all the time frames.

11     Q.    Okay.  Let me ask you this.  Did any of the

12  injections that he did, and I'm not talking about the nerve

13  burning, I'm talking about the injections, did any of them

14  relieve your pain more than 50 percent?

15     A.    No.

16     Q.    Even temporarily?

17     A.    No.

18     Q.    So you have the injection and then right away you

19  did not experience more than 50 percent pain relief?

20     A.    Again, there was always pain there.  I would say

21  no less than 50 percent.

22     Q.    All right.  How about less than --

23     A.    Well, the pain relief was less than 50 percent.

24     Q.    Was the pain relief less than 30 percent?

25     A.    I would say no, not for the injections.  The

1  injections really didn't do very much good.  The most thing
2  I got out of that is going through the experience of laying
3  on my face and having the procedure done that I did not want
4  to be there for.
5       Q.   So you didn't feel like they were beneficial?
6       A.   No.
7       Q.   How many sets of injections did you have?
8       A.   Several.
9       Q.   Did you also have some with Dr. Leon?
10      A.   I believe I did.
11      Q.   Did Dr. Leon put you to sleep?
12      A.   There was a procedure that I was not conscious of
13  what was going on but you're able to maintain a conversation
14  which is odd.  He said the anesthesia that he uses you can
15  maintain conversation but, he said, you're not going to
16  remember any of it.
17      Q.   Does that feel different than the feeling you had
18  with Dr. Anderson?
19      A.   Oh, no, the one with Dr. Anderson I was fully
20  conscious all the time.  I was very aware of what was going
21  on around me and the feelings and so on.
22      Q.   Okay.  I've met Dr. Leon many many times and I've
23  heard him describe that as twilight where you're kind of in,
24  you're kind of out.  Is that how you describe it?
25      A.   There was no in and out about it.  I literally

1  have no recollection of the procedure but he told me I had
2  quite a conversation with him.  I don't know what kind of
3  anesthesia would do that?
4       Q.   And, again, Dr. Leon's injections any more than
5  30 percent benefit?
6       A.   I don't think because if it was, I wouldn't have
7  gone any further.
8       Q.   Do you have an independent recollection of having
9  the, of the conversation with Dr. Leon regarding what the
10 pain benefit percentage was following the injections?
11      A.   No, I do not recall.
12      Q.   Do you have a recommendation of Dr. Leon asking
13 you prior to the injections what your pain level was?
14      A.   This was a number of years ago.  No, I do not
15 recall.
16      Q.   Is there a reason why you returned to Las Vegas to
17 get injections with Dr. Leon as opposed to just staying in
18 South Dakota or returning to South Dakota and having the
19 injections to Dr. Anderson?
20      A.   Because he suggested I come down and get them and
21 I follow instructions from my doctors.
22      Q.   Did he ever give you any indication as to why you
23 couldn't have those same injections with Dr. Anderson with
24 whom you were treating in South Dakota?
25      A.   No.

1      Q.    Did you ever ask?

2      A.    No.

3      Q.    You didn't find it odd that you had to travel all

4  the way to Nevada to have injections as opposed to just

5  going back to South Dakota?

6      A.    I had to come down to talk to my attorneys anyway.

7  That was the only two reasons why I came to Las Vegas on

8  that trip was to talk to the attorneys and to see Dr. Leon.

9      Q.    Was Haynes, Florida, the location where you would

10  or thereabouts where you would locate when you would go

11  south?

12      A.    It could be.

13      Q.    Do you recall treating at Cora Health Services for

14  physical therapy?

15      A.    Cora Health Services is in several locations.

16  Haynes, Florida, would have been one of the locations that I

17  visited.

18      Q.    And, again, that was because your goal was to get

19  physical therapy where you went?

20      A.    I was under doctor's orders to do so.

21      Q.    Was that Dr. Anderson?

22      A.    Probably, yes.

23      Q.    So that brings us up through 2014.  I'm going to

24  give you the time line.  I believe you said it's been a long

25  time and it's hard for you to remember the chronology.  This

1  is based on the records that have been provided to us.  And

2  based on the record we've been provided, there was four

3  months of no medical treatment between January 2014 -- well,

4  about three months -- and the end of March 2013.  I'm sorry.

5  Let me look at this again.  Actually it was a four-month gap

6  between January 2014 and April 23, 2014.

7          Do you know where you were living in early 2014?

8      A.   What months?

9      Q.   January through April.

10     A.   That probably would have been Florida.

11     Q.   Is there a reason why you did not undergo any

12  medical care for four months in the beginning of 2014?

13          MR. GALLIHER:  Foundation.

14          THE WITNESS:  When I would have come down to

15  Florida, it takes a long time to get to go see a doctor and

16  then have the exam by the doctor and then once the exam is

17  through, then it takes even more time to go see -- make the

18  reservations and appointment to go see the specialist.

19          MS. TEMPLE:

20     Q.   Four months?

21     A.   It could be a while.  We're talking Florida in

22  January.

23     Q.   But the records that we have show that you didn't

24  ever see any doctor in Florida during that time.

25     A.   Again, get down there, you make the phone call,

1  make the appointment, get in to see him or see the doctor,

2  and then go through the exams.  Oh, you need more help.

3  Either recommend this doctor.  It's January in Florida.

4  It's tough to go see a doctor.

5      Q.  And then no other visits that we have until

6  April 23, 2014, when you were back in Vegas to see Dr. Leon.

7  Is there a reason why aside from seeing your attorney and

8  Dr. Leon that you were in Las Vegas in April 2014?

9      A.  I don't think so.  Ever since the accident the

10  only reason then I come to Vegas would have been in reel to

11  this accident.

12      Q.  And Dr. Leon at that point talked to you about

13  rhizotomy, a radio frequency ablation, the nerve burning.

14  Do you recall talking to Dr. Leon about that procedure prior

15  to undergoing it?

16      A.  I remember speaking with Dr. Leon on several

17  occasions.  I do not recall him recommending a certain type

18  of treatment.

19      Q.  Do you know why it is that you were recommended to

20  undergo that nerve burning procedure?

21          MR. GALLIHER:  Speculation, foundation, medical

22  opinion.

23          THE WITNESS:  I would think it would be because

24  the injections did not work properly or work fully.

25  / / /

1          MS. TEMPLE:

2     Q.    Were you ever told by any of your medical

3  providers why it is that you would undergo the radio

4  frequency or rhizotomy nerve burning procedure at any time

5  during the course of your care?

6          MR. GALLIHER:  Object to the form.

7          THE WITNESS:  Again, the same answer.  Because

8  apparently the injections did not work as well as we had

9  hoped.

10         MS. TEMPLE:  Okay.

11    Q.    And I guess my question is that's what I

12 understand your understanding to be.  Were you told that

13 specifically by a medical provider and if so, whom?

14    A.    No, I do not recall.

15    Q.    And you returned to South Dakota and you go back

16 to treating with Dr. Anderson.  Do you recall that?

17    A.    I would have, yes.

18    Q.    May 2014 is when we have as the date that you

19 underwent those rhizotomies.  Do you recall having that

20 procedure?

21    A.    I've had that procedure done several times.  I

22 don't recall specific dates.

23    Q.    And I'm trying to get your recommendation on the

24 first time that you had the procedure.  Does May 2014 sound

25 correct to you?

1     A.   It could be.  I do not recall the exact date going
2  back that far.
3     Q.   Do you recall Dr. Anderson as having been the
4  doctor that would have performed that procedure the first
5  time you had it done?
6     A.   In Rapid City, yes.
7     Q.   Well, did you have it done in Las Vegas before
8  that?
9     A.   I'm running through my mind the difference between
10 the injections and the -- no, that would have been -- the
11 first time would have been up in Rapid City, South Dakota.
12    Q.   Okay.  And did you benefit from that nerve burning
13 procedure?
14    A.   Yes.  Not fully but yes, there was much more
15 benefit in the injections.
16    Q.   Okay.  Can you give me a percentage.
17         MR. GALLIHER:  Form.  You're talking about the
18 percentage of relief or percent --
19         MS. TEMPLE:  Right.  That's a good question.
20    Q.   Can you give me a percentage of how much relief
21 you experienced following the rhizotomy.  Just so the
22 record is clear, there's a bunch of different names for
23 rhizotomy; RFA, radio frequency ablation, rhozotomy
24 (phonetic), nerve burning, it's all the same thing.  I'm
25 going to call it a rhizotomy if that's okay with you.

1      A.   Yes.

2      Q.   Can you quantify for me what percentage of relief

3  you would have experienced following that first rhizotomy

4  with Dr. Anderson?

5      A.   I would say 50 to 75.

6      Q.   It definitely improved though, that's your

7  testimony?

8      A.   It was improving.

9      Q.   Okay.  And then you returned for physical therapy

10  at Physical Therapy Center.  Do you recall returning for

11  physical therapy?

12      A.   I was there several times.

13      Q.   Okay.  Do you know who referred you back to

14  physical therapy?

15      A.   That probably would have been Dr. Anderson.

16      Q.   Okay.  All right.  I'm going to show you a record.

17           MR. GALLIHER:  Counsel it's 12:30.

18           MS. TEMPLE:  How do you want to do this?

19           MR. GALLIHER:  Let's go off the record.

20                (Whereupon a recess was taken

21                from 12:26 p.m. until 1:35 p.m. after

22                which the following proceedings took place:)

23           MS. TEMPLE:

24      Q.   So, Mr. Humes, before we broke for lunch, we were

25  discussing your first rhizotomy that you underwent and you

1  testified that you did feel some relief from that rhizotomy,

2  correct?

3      A.   Yes.

4      Q.   And I think you said it was about 50 to

5  75 percent?

6      A.   For a short time.

7      Q.   For how long?

8      A.   A month and a half, two months, and then it would

9  return.

10     Q.   Did it return to worse than it had been prior to

11  the rhizotomy?

12     A.   Probably not.  It would go back to what it always

13  has been.

14     Q.   Do you specifically recall whether that pain

15  following the rhizotomy and once a month and a half had

16  passed, whether that pain was worse than it had been before

17  you had the rhizotomy?

18          MR. GALLIHER:  Asked and answered.

19          THE WITNESS:  Not really.  I don't recall.  It

20  just comes back.

21          MS. TEMPLE:  Okay.

22     Q.   All right.  I'm going to show you the next record

23  for medical care that we have which is June 5, 2014, about

24  three weeks after the rhizotomy with Physical Therapy

25  Center.  Take a look at that if you will, and we'll go ahead

1  and mark this as the next exhibit in line which is

2  Exhibit F.

3          I'll have you look at that first paragraph for me

4  under subjective.  Do you recall receiving treatment at the

5  Physical Therapy Center, correct?

6      A.   Yes.

7      Q.   Okay.  And under that first line after note, it

8  says that you were previously seen in this clinic following

9  an MVA and then two lines after that it says since I last

10  saw him last fall, he states that, quote, I am worse than I

11  was the last time you saw me, end quote.

12          Do you recall telling the physical therapist that

13  you were worse than you were the last time you saw him?

14      A.   I don't recall it, but if this statement is in

15  here, I would say that's what I would have said.

16      Q.   You don't have any reason to dispute the content

17  of these medical records from The Physical Therapy Center?

18      A.   No.

19      Q.   And then two lines after that or three lines after

20  that it states in addition he underwent, quote, a procedure

21  to burn the nerves, end quote, in his lower neck at the end

22  of April which he states has actually made his pain worse so

23  far.

24          Do you have an independent recollection of telling

25  the doctor that the procedure to burn your nerves had made

1    your pain worse?

2              MR GALLIHER:  Form.

3              THE WITNESS:  Again, I don't recall it but I would

4    defer to this statement here.

5              MS. TEMPLE:  Okay.

6       Q.    And then that very same day you returned to

7    Dr. Anderson as well.  Do you recall ever telling

8    Dr. Anderson that the rhizotomies that he performed actually

9    made you feel worse?

10      A.    No, I do not recall.

11      Q.    Do you recall telling Dr. Anderson that the

12   rhizotomies didn't help?

13      A.    Again, I do not recall.

14      Q.    Did you think that the rhizotomy was effective at

15   relieving your pain?

16      A.    Immediately following the procedure, yes, but as I

17   stated earlier, the pain returns.

18      Q.    Were you ever told by Dr. Anderson or Dr. Leon how

19   long the pain relief was supposed to last following

20   rhizotomy?

21      A.    It would vary between, if I recall, 45 days to six

22   months.

23      Q.    And I'm asking just so I'm clear what the expected

24   benefit for rhizotomies is, not just as it pertains to you.

25   Is that something that was ever conveyed to you by Dr. Leon

1  or Dr. Anderson prior to undergoing a rhizotomy?

2       A.   The statement was made in June.  It wasn't made

3  specifically in my case.

4       Q.   And it was your understanding that that procedure

5  was supposed to relieve pain for how long?

6       A.   I believe it was 45 to 180 days.

7       Q.   And what was your understanding, what happens

8  next?

9       A.   You have to repeat the procedure.

10      Q.   And were you told that that repeat procedure would

11  occur as often as 45 days after the prior one?

12      A.   When the pain would come back, I would notify

13  Mr. Anderson and we would schedule another procedure.

14      Q.   And when you told Mr. Anderson or Dr. Anderson

15  that the pain relief lasted you a month and a half, is it

16  your recollection that he said let's do it again?

17      A.   It would be because we went and did it again.  He

18  would do different parts of my back.

19      Q.   Did he ever do your lower back?

20      A.   Yes.

21      Q.   All the way down by your tailbone?

22      A.   He just did that.

23      Q.   When did he do that?

24      A.   Just a week or two ago.

25      Q.   All right.  The CPAP machine that you now own,

1  when did you purchase that?

2       A.   It was first rented, paid for by -- well, it

3  doesn't matter who paid for it.  I understand the way it

4  works is that it's rented for a year or 13 months and then

5  it goes over to where I now own it and I'm told I now own

6  it.

7       Q.   Was there a period of time when you borrowed your

8  son's CPAP machine?

9       A.   I tested my -- I wanted to use a CPAP machine to

10 see what effect it would have so, yes, I did borrow my son's

11 for two nights.

12      Q.   Does your son have difficulty with sleep?

13      A.   Yes.

14      Q.   And he utilizes that CPAP machine for those

15 difficulties?

16      A.   Yes.

17      Q.   Has he ever been involved in a car accident?

18           MR. GALLIHER:  Foundation, speculation.

19           THE WITNESS:  Not that I'm aware of.  My son and I

20 didn't really grow up together because me and my wife got

21 divorced and she got possession.

22           MS. TEMPLE:

23      Q.   Did any of your other relatives have sleep

24 difficulties?

25           MR. GALLIHER:  Same objection.

```
 1              THE WITNESS:  Unknown.
 2              MS. TEMPLE:
 3     Q.    How long did you use your son's CPAP machine?
 4              MR. GALLIHER:  Asked and answered.
 5              THE WITNESS:  As I said, two nights.
 6              MS. TEMPLE:  I'm sorry.  You answered that
 7   already.
 8     Q.    What was your answer?
 9     A.    Two nights.
10     Q.    Did you eventually begin to experience -- let me
11   show you the medical record.  The next date of treatment
12   June 5, 2014, for Dr. Anderson.  I'm going to ask you to
13   take a look and we'll mark it as the next exhibit in line,
14   Exhibit G.
15              (Whereupon, Exhibits D, E, and F were marked
16              for identification by the court reporter
17              and are attached to the original transcript
18              of this deposition.)
19              MS. TEMPLE:
20     Q.    Under the followup section you reference the
21   concern about your speech.  Do you see that?
22     A.    Yes, I do.
23     Q.    Concern about short-term memory, mood, speech
24   pattern.  Do you recall reporting that to Dr. Anderson?
25     A.    Yes.
```

1    Q.    And when did those develop?

2    A.    After the accident.

3    Q.    Okay.  You did have, testify earlier that you had

4  issues with speech prior to the accident as a result of the

5  stroke that you suffered.

6    A.    I mentioned that I discovered I start to stutter

7  if I start speaking too quickly.  This does not address that

8  at all.  They're completely separate issues.

9    Q.    What types of issues were you dealing with with

10  respect to speech after this accident?

11    A.    I didn't -- I was told by people around me that

12  they would be -- by several different people, that I'd be

13  involved in a conversation with them and -- and this is

14  something I've never done before.  This is all new to me.

15        I didn't even know that I was doing this, that

16  they would tell me I'd been talking to them and all of a

17  sudden I would stop speaking for a second or two and then I

18  would come back and sometimes repeat what I just said, and

19  this caused concern to me 'cause I'm trying to run companies

20  on doing the best I can and a lot of my responsibilities in

21  marketing is talking with people so they told me that they

22  would become concerned about this one of which was my son.

23        My son is a retired combat trauma medic in the

24  Army so he's used to seeing, you know, brain damages and

25  things like this that and he got me on the side and said,

1  you know, dad, this is what I'm noticing.  He said, you need

2  to go get it checked out, and I did.

3          Not only he told me that but, you know, it was

4  about one or two other people that told me the same thing.

5  That's when I made the appointment to go to a counseling

6  service to been evaluated.

7      Q.   And that was not until June 2014?

8      A.   About that, yes.

9      Q.   So over a year after the accident.

10     A.   I didn't even realize I had this issue.  My son

11  and other people told me.  It was like I would just stop in

12  the middle of a sentence, I'd be looking at somebody, be in

13  the conversation and then a second or two or so later I

14  would just sometimes resume the conversation at that point

15  or I'd, you know, repeat the last sentence or so.

16     Q.   Did any of your medical providers ears attribute

17  this condition or these issues to age?

18     A.   No.  This has nothing to do with age.

19     Q.   Did any of your medical providers believe that

20  this or convey to you that this condition was the result of

21  the motor vehicle accident?

22     A.   The counseling service that I went to after tested

23  me.  Their opinion was that yes.

24     Q.   Which service is that?

25     A.   I don't recall the name.  I'm sure you have the

1   records.

2       Q.   Did you have an MRI of the brain?

3       A.   I've had so many MRIs.  I would think I have.

4       Q.   Do you know if you were -- do you recall if you

5   were asked to bring to the counseling service your ambulance

6   records or paramedic record from the day of the accident?

7       A.   No, I don't recall, and if I did, what has one got

8   to do with other?  You know, you're asking ambulance

9   records.  What does that have to do with how my brain is

10  malfunctioning?

11      Q.   Do you recall them doing any tests on you at the

12  scene of the accident after you reported that you lost

13  consciousness?

14      A.   Well, after I lost consciousness, I wouldn't

15  recall anything.

16      Q.   After you came to, do you recall them performing

17  any tests to tell if you were back conscious, or if there

18  were any issues ongoing at the scene of the accident?

19          MR. GALLIHER:  Foundation, speculation, medical

20  opinion.

21          THE WITNESS:  The paramedics, my law enforcement

22  background would typically tell me they would shine a

23  flashlight in my eyes kind of thing, how many fingers am I

24  holding up kind of thing, I don't recall that but that's

25  just the training that they go through.

```
 1            MS. TEMPLE:
 2       Q.    But you don't recall having those types of tests?
 3       A.    No.
 4       Q.    And no records from the paramedics were provided
 5  by you to this counseling service.
 6       A.    I have no record like that.
 7       Q.    And what about the emergency room records.  Do you
 8  know whether those were ever provided to the counseling
 9  service for review?
10       A.    Not that I'm aware of.  They may have requested
11  it, but I'm not aware of it.
12       Q.    Did you just have one visit with the counseling
13  service?
14       A.    No.  There were multiple.
15       Q.    And on which visit did they tell you that the
16  issues that you were experiencing with memory, speech, were
17  related to the motor vehicle accident?
18       A.    Well, they didn't tell me in the middle of the
19  testing.  They gave me the report at the end of the
20  treatment, of the investigation, the report that they would
21  have filed.
22       Q.    Did you ever see a copy of that report?
23       A.    I don't -- I honestly don't recall.  I know there
24  was a verbal.  He probably gave me a copy.  I would think he
25  would have but I don't remember it.
```

1      Q.    And what was the verbal as you recall it?

2      A.    The -- in my opinion the doctor was telling me

3  that he felt the same way, that it was the result of, that

4  the trauma, the experience of being thrown about the car

5  like I was and such.

6      Q.    Did he ever tell you that he would have

7  anticipated you having these symptoms closer to the accident

8  if related to the accident?

9      A.    No.  There might have been.  I don't know.  As I

10  said, I don't -- you have the records there, you know,

11  people were telling me shortly after the accident upon my

12  return back to South Dakota that, you know, that they

13  noticed this.

14         It took a little bit of time for them to notice it

15  and to tell me.  With the exception of my son, you know,

16  most people don't want to go to their employer, hey, you're

17  acting kind of strange, you know, you have mental issues.

18  That's not usually a good thing to tell the boss.  My son on

19  the other hand had no problem with it.

20      Q.    Did you have a seizure problem?

21      A.    No, I don't have seizures.

22      Q.    None of your doctors ever diagnosed you with

23  having a seizure problem or a seizure disorder?

24         MR. GALLIHER:  Foundation, speculation.

25         THE WITNESS:  Again, I don't believe I have

1    seizures.  I'm not an epileptic or anything like that.

2           MS. TEMPLE:

3       Q.    Did the doctor, the counseling service, tell you

4    that you had diminished reasoning?

5       A.    Yes.

6       Q.    And is it your understanding that that diminished

7    reasoning was determined to be a result of this accident?

8       A.    Yes.  There were types of concentration, it became

9    harder to concentrate on things and, again, this was all

10   brand new to me.  I've never been like this.  As I stated

11   earlier, I have a background in law enforcement, you know,

12   which required fast thinking as you can imagine at times and

13   I've run businesses most of my adult life, some of them had

14   a great deal of responsibility.

15      Q.    Have you ever been diagnosed with Alzheimer's?

16      A.    No, not at all.

17      Q.    Have you ever been tested?

18      A.    No need to.

19      Q.    And then there's -- following that June treatment

20   related to the counseling, there's another two-month break

21   in the medical care from June to August of 2014.  Where was

22   it that you underwent the counseling services?

23      A.    In Rapid City, South Dakota.

24      Q.    Okay.  Why is it that you had a two-month break in

25   your medical treatment in 2014 if you can recall?

1          MR. GALLIHER:  Speculation, foundation.

2          THE WITNESS:  I don't recall.

3          MS. TEMPLE:

4     Q.    You didn't leave South Dakota during that time,

5 did you?

6     A.    I may have.  I don't know.

7     Q.    Do you keep a record of your travel when you're at

8 one place versus another?

9     A.    Sometimes.

10    Q.    Is that something you'd be able to produce to us?

11          Okay.  And how do you keep those records?

12    A.    Different ways.  As I said, I would do RV shows

13 and I would know what shows I go to because I have to pay

14 money for that.

15    Q.    And we talked about that would be something that

16 would likely be in the possession of your accountant.

17    A.    Either the accountant or a couple things myself.

18    Q.    To you keep a log or diary of your travels?

19    A.    Not as well as I should.

20    Q.    Do you keep anything, even if it's scratched out

21 like written on a piece of paper?  Do you keep anything like

22 that?

23    A.    Again, I would have a piece of paper saying I paid

24 to be in a certain show.  These shows are not inexpensive.

25 If you're going to pay for it, you're going to go there and

1  there's going to be different types of receipts and things

2  like that.

3      Q.   You weren't just traveling to the show though,

4  right?

5      A.   Oh, yes.

6      Q.   That's the only reason?

7      A.   Sometimes, yes.  Sometimes it would be in

8  conjunction with my travels.  For example, you know, there's

9  a show in Hershey, Pennsylvania, I will go to Hershey,

10 Pennsylvania, and continue on my way to Florida.

11     Q.   And your plan of going south for the winter, that

12 remained regardless of whether you were going to a show or

13 not, your intention was to travel south?

14     A.   Well, it's one of my intentions.  My intention is

15 to market my companies as best of my abilities.

16     Q.   I guess my question is whether or not you attended

17 a show or not during those winter months, you were planning

18 to go south.

19     A.   Yes.

20     Q.   And when you returned to Dr. Anderson on

21 August 25, 2014, do you recall him asking how the rhizotomy

22 was, how you were doing at that time as a result of the

23 rhizotomy?  That's about two months after the rhizotomy.

24     A.   That would seem like a logical question, but I

25 don't recall that situation.

 1      Q.   Okay.  I'm going to show you the record from that
 2  visit August 25, 2014.  I'm going to mark this one as the
 3  next exhibit in line which is H.
 4               (Whereupon, Exhibits G and H were marked
 5               for identification by the court reporter
 6               and are attached to the original transcript
 7               of this deposition.)
 8          MS. TEMPLE:  All right.
 9      Q.   Now, if you go down to just under the middle, it
10  starts with "he continues" in that first paragraph.
11          Do you see that?
12      A.   What are you exactly referring to?
13      Q.   The followup section, he continues.  It's about,
14  just over halfway through the paragraph.
15      A.   Okay.
16      Q.   Do you see that?
17      A.   I see the paragraph.  Which sentence are you
18  referring to?
19      Q.   He continues.
20      A.   Oh, okay.
21      Q.   And it states he continues to be frustrated by the
22  range of motion he has in his cervical spine that has not
23  been helped by anything that has been done so far.
24          Would you agree with that statement?
25      A.   Yes.

1    Q.   You would agree that nothing that you had done up

2  until that point of August 25, 2014, had helped.

3    A.   For that issue I would agree nothing has helped

4  that.

5    Q.   What do you mean for that issue?

6    A.   Well, I still have problems.  The issue with, you

7  know, the back and so on.  I believe the range of motion

8  being able to turn my head for example.  My range is

9  limited.  You know, I can't turn my head without it starting

10 to hurt anywhere from this position.  I don't know how to

11 put that into words, from here to about here.  Beyond there

12 it starts hurting, you know, so, again, from here to about

13 here.  That's it.

14   Q.   And it states, the next sentence, he has only had

15 minor improvements with PT and RFA which is the rhizotomies

16 that we talked about earlier.

17        Would you agree with that statement?

18   A.   As I said, I don't feel the physical therapy was

19 much good at all.

20   Q.   And the rhizotomy, the same?

21   A.   Limited.

22   Q.   And then you go back for more physical therapy at

23 Promotion Physical Therapy.  Again, if the physical therapy

24 wasn't benefiting you, why did you go back for another

25 round?

1        A.    At the instructions of my doctor.

2        Q.    Go ahead.

3              MR. GALLIHER:  No.  There's no question.

4              THE WITNESS:  That's it.

5              MS. TEMPLE:  Okay.

6        Q.    Did you ever think to tell your doctor, ask your

7    doctor why would I continue with care that's not helping me?

8              MR. GALLIHER:  Asked and answered.

9              THE WITNESS:  I'm confused.  You just said asked

10   and answered.  Do I answer it again?

11             MR. GALLIHER:  Yes.

12             THE WITNESS:  Go ahead.  Restate the question.

13             MS. TEMPLE:  Sure.

14       Q.    Did you ever think to tell your doctor that you

15   weren't interested in getting the medical treatment because

16   it wasn't benefiting you?

17             MR. GALLIHER:  Same objection.

18             THE WITNESS:  Again, I would follow the

19   instructions of my medical professionals.  As professionals

20   they're going to have more knowledge about something than I

21   would have and I'm sure there are occasions and instances

22   where you may have to go for a treatment 20 times, you know,

23   whereas ten times didn't been help so, you know, if my

24   doctor tells me take this medication or go to this

25   treatment, I'm going to take that medication and go to that

```
 1  treatment.
 2          MS. TEMPLE:
 3      Q.    You're now a month and a half or a year and a half
 4  post accident.  You've gone to four different physical
 5  therapists.  Did you find it odd that you're still being
 6  referred to physical therapy --
 7      A.    Not at all.
 8      Q.    Despite not having any benefit from it?
 9      A.    Not at all.  Again, this is what the medical
10  professionals said to do.  I went to do it.
11      Q.    And then you returned to Dr. Anderson one more
12  time before what the records say is a trip down south for
13  you.  That would have been October 6, 2014, with
14  Dr. Anderson.  You followed up before heading down south.
15  In the record you asked for him to set up a meeting between
16  Dr. Anderson and your attorney.
17          Do you recall having that conversation with him?
18      A.    I would have.  Common sense tells me that I would
19  have, that there needs to be some conversation, you know,
20  between because my attorneys are -- I trust my attorneys,
21  and they need to know the information what's going on in my
22  life.
23      Q.    Why does your doctor need to contact your
24  attorney?
25          MR. GALLIHER:  Objection, asked and answered.
```

1          THE WITNESS:  Because I felt that's part and

2    parcel.  The attorneys need to know what's going on in my

3    life as well.

4          MS. TEMPLE:

5     Q.   And you felt it important that Dr. Anderson set

6    up a meeting to handle that?

7     A.   Who better to talk to than the person who knows

8    what they're talking about.

9     Q.   How many times did you ask your doctor to call

10   your attorney?

11    A.   I do not recall that.

12    Q.   Can you give me an estimate?

13    A.   No.

14    Q.   More than once?

15    A.   Probably.

16    Q.   More than twice?

17    A.   I don't recall.

18    Q.   Do you know if that conversation ever took place

19   between your doctor and your attorney?

20    A.   No.

21         MR. GALLIHER:  Speculation, foundation.

22         THE WITNESS:  No, I do not know that.

23         MS. TEMPLE:

24    Q.   Do you know if your doctor had to clear your

25   treatment with your attorneys before he would give you

1   treatment?

2          MR. GALLIHER:  Speculation, foundation.

3          THE WITNESS:  No.  I do not know that.

4          MS. TEMPLE:

5   Q.   Were you ever prevented from getting any of the

6   medical treatment that you wanted to get from anyone?

7   A.   I don't believe I was.

8   Q.   And let me make sure I made that question clear.

9   Did anyone prevent you from getting the medical treatment

10  that you wanted to undergo?

11  A.   It's not treatment --

12         MR. GALLIHER:  Hold on.  Object to the form of the

13  question.  Go ahead.

14         THE WITNESS:  It's not treatment that I want to go

15  through.  This is not treatment I ever wanted to go through.

16  Again, I will follow the instructions of my doctors.

17         MS. TEMPLE:

18  Q.   And is the goal to improve your physical

19  condition?

20  A.   That would be the goal, yes.

21  Q.   That requested meeting with the attorney and that

22  occasion that you were going to go down south for the winter

23  occurred on October 6, 2014, according to the record that we

24  have.  From October 6, 2014, to May 5, 2016, so about a year

25  and a half, we have no records of any medical treatment

1  undergoing whatsoever.

2          Is that your recollection that no medical

3  treatment was undergone between October 2014 until May 2016?

4      A.   Well, I don't have exact dates.  I would suspect

5  that your records are incomplete.

6      Q.   Okay.  Is it your recollection that you never went

7  a year and a half without undergoing any medical care?

8      A.   I do not recall that at all.  This has been an

9  ongoing and constant thing.

10     Q.   October 2014 when you went down south, do you

11 recall where it was that you went?

12     A.   For the last several years I would say probably

13 Florida up until the time that my mother passed away.

14     Q.   And you had medical providers that you could see

15 in Florida if you so desired?

16     A.   I did set things up with medical providers down

17 there.

18     Q.   So the fact that you were in Florida as opposed to

19 South Dakota or Las Vegas, that wasn't something that

20 prevented you from receiving medical care.

21     A.   No.

22     Q.   All right.  I'm going to show you some file notes

23 from Dr. Anderson.  That we'll mark as the next exhibit in

24 line.

25          (Whereupon, Exhibit I was marked

1                    for identification by the court

2                    reporter and is attached to the

3                    original transcript of this deposition.)

4          MS. TEMPLE:

5      Q.   That's not your writing on that page anywhere, is

6  it?

7      A.   No, it is not.

8      Q.   These are -- I'll represent to you that this is a

9  page that was produced within the record of Dr. Anderson.

10  It looks to be file notes.  You can see that there's dates

11  on the side.

12          Do you see that?

13      A.   I do.

14      Q.   If you look down to 4/15/16, the first entry, do

15  you see that?

16      A.   I do.

17      Q.   It states PT or patient is requesting another

18  BC4-5 C5-6 rhizotomy.  Last rhizo or rhizotomy was May 19,

19  2014.  PT or patient said was a mutual agreement that he has

20  a rhizo every couple years.

21          Do you see where it says that?

22      A.   I do.

23      Q.   Do you recall making that request of Dr. Anderson?

24          MR. GALLIHER:  Foundation.

25          THE WITNESS:  I do not.

```
 1            MR. TEMPLE:  Okay.
 2      Q.   Do you know what is meant by a mutual agreement
 3 that you have a rhizotomy every few years?
 4            MR. GALLIHER:  Speculation, foundation.
 5            THE WITNESS:  No, I can't speculate as what the
 6 doctor is saying.
 7            MS. TEMPLE:
 8      Q.   Did you ever have a mutual agreement with anyone
 9 that you would have a rhizotomy every few years?
10            MR. GALLIHER:  Form, foundation.
11            THE WITNESS:  I had a conversation with
12 Dr. Anderson when he described to me how long these things
13 typically can last and which I would have said okay, but
14 they don't in my case.
15            MS. TEMPLE:
16      Q.   What do you mean they don't, they don't last?
17      A.   They don't last two years.
18      Q.   Well, this is 2016 and by then you'd had a
19 rhizotomy that only lasted a month and a half, right?
20            MR. GALLIHER:  Foundation.
21            MS. TEMPLE:
22      Q.   Is that correct?
23      A.   I would guess so.
24      Q.   You never with anyone with any medical providers
25 had an agreement that you were to have these every couple
```

1  years?

2       A.   Again, I do not recall.

3       Q.   Was it your understanding that these rhizotomies

4  were going to be performed as a matter of course every

5  couple of years?

6       A.   It's my understanding that the procedure would

7  happen as needed.  In some people the procedure lasts longer

8  than others and I perhaps was on the short side of that

9  scale.

10      Q.   Were you ever told by any of your medical

11  providers that one and a half months of benefit from a

12  rhizotomy was an effective rhizotomy or the sign of an

13  effective rhizotomy?

14      A.   I wouldn't know that.

15      Q.   Did any of your providers know that, that it

16  worked even though it only lasted a month and a half?

17      A.   I don't recall having conversation like that.

18      Q.   Did you ever have a conversation with Dr. Leon

19  about having rhizotomies every couple of years?

20      A.   I don't believe I have.

21      Q.   Did you want to have -- and I don't say want

22  because I know you testified you didn't want any of this

23  treatment, but for your benefit to relieve your pain was it

24  your desire to have rhizotomies every few years?

25      A.   It's my desire to make the hurt go away regardless

1  of time, the difference, the time span between this

2  situation.  As I said earlier, this is not a pleasant

3  procedure.  I don't wake up in the morning jumping out of

4  bed wanting to go through this.

5       Q.   Your records earlier are that -- you agreed with

6  me that you would defer to the medical records.  You don't

7  dispute them where it says that you told your doctor you saw

8  no benefit from the rhizotomy and that you were worse as a

9  result of the rhizotomy.

10           MR. GALLIHER:  Object to the form.

11           MS. TEMPLE:

12      Q.   Why would you undergo a procedure that made you

13  feel worse?

14      A.   I would guess because sometimes it works better

15  than others.  You know, the pain comes and goes.  There are

16  times it's worse.  There are times that it's better.  When

17  asked that question, I would try to speak in generalities.

18  Is the pain the same every day?  No.  It does, you know,

19  change.  Some days are worse than others.  Some days it's a

20  lot worse than others.  Some days it's different parts of my

21  back.

22      Q.   Did any of your medical doctors ever tell you that

23  it would improve your recovery in your personal injury case

24  if you had more rhizotomies?

25      A.   We never really discussed the lawsuit side of it.

1 | The medical doctors are more concerned about what they do,
2 | and that is taking care of the medical situation.
3 |     Q.   Well, you did have your attorney call your
4 | doctors.
5 |          MR. GALLIHER:  Objection, lacks foundation and
6 | that also misstates the testimony.
7 |          THE WITNESS:  I don't know who called who.  I
8 | asked, I mentioned that there needs to be a conversation.
9 | The attorneys need to know what's going on.
10 |          MS. TEMPLE:
11 |     Q.   Did any of your medical providers comment on how
12 | their performance of rhizotomies would benefit any recovery?
13 |     A.   No.  I never had that conversation nor would I.
14 |     Q.   I know that you said you recall getting treatment
15 | and not having a year and a half gap between 2014 and 2016.
16 | As you sit here today, do you have any recollection as to
17 | what treatment you underwent during that time?
18 |     A.   Just as needed as necessary.
19 |     Q.   But you're certain that you had some type of
20 | medical treatment between October 6, 2014, and May 5, 2016.
21 |     A.   I would think so.  I'm giving you the best answer
22 | I can, counselor.
23 |     Q.   That's fine.  I don't want to have to call you
24 | back to Las Vegas to take your deposition.  We don't have
25 | any records so any information you have --

1       A.   I don't want to come back to do anything like

2    that.  I'm not a gambler so Las Vegas has no appeal to me.

3       Q.   The records around the end of 2016 indicate that

4    you were not on any prescribed pain medication.  You were

5    just taking over-the-counter ibuprofen.  Do you recall when

6    it was that you stopped taking prescribed pain medication?

7       A.   As soon as possible.  I try to avoid any

8    medication.  I'm not against it.  I'm not against medicinal

9    drugs but, you know, I try to avoid it whenever I can.

10      Q.   Can you recall when in the course of your

11   treatment that would have been that you discontinued that

12   use of prescribed pain medication?

13      A.   No.

14      Q.   Can you even give me an estimation?

15      A.    It would have been as short a time as I could.

16   Again, I try not to take any form of drugs at all.  I don't

17   do recreational at all whatsoever but I try to avoid any

18   medicinal drugs.  Given the current situation with opioids

19   it's easy to understand why.

20      Q.   Did you manage your pain then aside from the

21   treatment that you were provided with Dr. Anderson and

22   physical therapy with over-the-counter medication?

23      A.   Once in a while I take Aleve.

24      Q.   Otherwise no medication?

25      A.   No.

1      Q.    And were you also given home exercises to perform?

2      A.    As part of the physical therapy.

3      Q.    Did you perform those home exercises?

4      A.    Yes, I did.

5      Q.    How frequently did you perform those?

6      A.    Every day.

7      Q.    Twice a day, once a day?

8      A.    Depending on what it was.  Sometimes -- again,

9  depending on what it was.  Sometimes once a day, others were

10  twice a day.

11      Q.    What kind of things were they having you do for

12  home exercises?

13      A.    Mostly motion, range of motion.

14      Q.    Neck, back?

15      A.    Yes.

16      Q.    Both?

17      A.    Yes.

18      Q.    How long did those home exercises take on average?

19            MR. GALLIHER:  Form.

20            THE WITNESS:  Average on a daily basis?

21            MS. TEMPLE:

22      Q.    Yes.

23      A.    10, 15 minutes maybe a couple times a day.

24      Q.    Did you ever need Barbara's assistance with any of

25  those exercises?

1      A.    No.

2      Q.    Did you ever need anyone's assistance?

3      A.    No.  They were simple things.  It was like leaning

4  up against the wall, pulling rubberized, I would call them

5  rubberized plastic strips, things like that, nothing

6  complicated.

7      Q.    Did they have you bend over, touch your toes,

8  things like that?

9      A.    Uh-huh.

10     Q.    Is that a yes?

11     A.    I'm sorry.  Yes.

12     Q.    That's okay.  Did you notice if the pain in your

13  back, for example, was more significant when you would bend

14  or flex or was there a specific provoking maneuver that

15  would increase the pain?

16     A.    Yes.

17     Q.    What was that?

18     A.    To this day I still have that.

19     Q.    What in particular?

20     A.    Back, neck.

21     Q.    But what causes an increase in that pain?  I'm

22  asking if there was a particular movement that they would

23  have you do that would cause the pain to increase in your

24  lower back.

25     A.    Mostly the bending over part, leaning up against

```
 1   the wall didn't really do much of anything.
 2        Q.    Do you still experience back pain?
 3        A.    Yes.
 4        Q.    Do you still experience neck pain?
 5        A.    Yes.
 6        Q.    Did your back pain ever decrease throughout the
 7   course of your care?
 8        A.    No.
 9        Q.    Has it increased?
10        A.    At times.
11        Q.    The pain that you're experiencing now, and I don't
12   mean right this minute but within the last week, is that
13   greater or less than the pain that you experienced just
14   following the accident specific to your lower back?
15        A.    It's about the same.
16        Q.    What about your neck?
17        A.    The same.
18        Q.    So no improvement from right now how you feel or
19   within this past week to the time immediately following the
20   accident for either your neck or back pain?
21        A.    I would say overall it's been constantly
22   consistent.  Now, as I also stated earlier I did have that
23   treatment with -- Dr. Anderson did the burning of my nerves
24   in my lower neck about a week or so ago.
25        Q.    So you've had several sets of rhizotomies for your
```

1  neck, the nerve burning for your neck, correct?

2      A.   Yes.

3      Q.   The second set you had in May 2016 and again you

4  reported that they did not help.

5      A.   I can't recall physical.

6      Q.   Have the rhizotomies in your neck ever relieved

7  your pain for more than a minimal period of time?

8      A.   The pain always comes back.

9      Q.   What's the longest you've gone following rhizotomy

10 in your neck with pain relief?

11     A.   Maybe a couple months.

12     Q.   Two months, three months?

13     A.   About that.

14     Q.   You've never experienced greater than three months

15 of pain relief following a rhizotomy in your neck.

16     A.   I don't believe so.

17     Q.   How many rhizotomies have you had in your neck

18 total?

19     A.   I have no idea, more than one.

20     Q.   I'm just wondering if that's one of those

21 procedures you may have undergone during that year and a

22 half we don't have any medical records but if you don't

23 remember --

24     A.   I don't remember.

25     Q.   When you went down to Florida for the winter, you

```
 1  had a rhizotomy done there as well, correct?

 2       A.   I did.

 3       Q.   And that's with Dr. Bhalani?

 4       A.   Yes.

 5       Q.   That's Tampa Minimally Invasive Surgery?

 6       A.   Okay.

 7       Q.   Do you recall treating with Bhalani?

 8       A.   Yes.

 9       Q.   And you recall getting the rhizotomies with him?

10       A.   Yes.

11       Q.   And like the others, that rhizotomy lasted three

12  months at the most?

13       A.   At the most.

14       Q.   What's the least the rhizotomy relieved your pain?

15       A.   I'd say a month, month and a half.

16       Q.   Did you feel like the treatment when you first

17  began receiving medical care was more towards your neck than

18  your back?

19       A.   I would say equally.

20       Q.   The injections in your back, and I mean the lower

21  back, took place after the injections in your neck, correct?

22       A.   I wouldn't recall that.  I don't know what came

23  first, what came prior.

24       Q.   If the medical records suggest that you didn't

25  have injections in your lower back until 2017, does that
```

```
 1  sound correct to you?
 2       A.   It could be because Dr. Anderson told me there's
 3  only so much you can do so he would start off at one part
 4  then after a certain amount of time go to the next part.  He
 5  couldn't do it all at one time.
 6       Q.   Did Dr. Anderson ever tell you that he didn't
 7  think that your back pain was the result of the motor
 8  vehicle accident?
 9       A.   No.  He never told me that at all.
10       Q.   Did he ever tell you it was the result of the
11  motor vehicle accident?
12       A.   That's not his position I would think.  His
13  position is to make the hurt go away.
14       Q.   Did any of your medical providers ever discuss
15  with you the cause of why your injuries, what they related
16  was the cause of your injuries?
17       A.   Well, I believe the medical professionals felt the
18  same as I did.  I never asked them specifically but that was
19  the reason I was there.
20       Q.   Did they ever tell you specifically that that was
21  the cause?
22       A.   I don't believe so.
23       Q.   Are you still undergoing care with -- you
24  testified you are still undergoing care with Dr. Anderson.
25       A.   As I stated, I had a procedure done about one or
```

1  two weeks ago.

2        Q.    And that was for the lower back?

3        A.    Yes.

4        Q.    And that was a rhizotomy?

5        A.    Yes.

6        Q.    How do you feel as a result of that rhizotomy?  Do

7  you feel that you benefited from it?

8        A.    At this point, yes.

9        Q.    Have you had --

10       A.    It's still there but there's some relief.

11       Q.    Is that the first rhizotomy you've had in your

12 lower back?

13       A.    No.

14       Q.    Do you recall when your last rhizotomy was for

15 your lower back?

16       A.    No.

17       Q.    A year?  Can you give me some kind of estimate?

18 We have no record.

19       A.    No.

20       Q.    Was it with Dr. Anderson or Dr. Leon or Tampa

21 Minimally Invasive Surgery?

22       A.    The only people that gave me rhizotomy that I

23 recall was Dr. Leon, Dr. Anderson, and Dr. Bhalani or

24 whatever his name was.

25       Q.    And you didn't recall, you can't provide me any

 1 | kind of estimate -- how many have you undergone?  Let me ask
 2 | you that, for your lower back, do you know?
 3 |      A.   I wouldn't be able to guess and I'm not being
 4 | evasive, I truly don't remember because it's been a constant
 5 | thing.
 6 |      Q.   And this lower back rhizotomy that you had
 7 | recently with Dr. Anderson, did that result in 100 percent
 8 | relief of your lower back pain?
 9 |      A.   No.
10 |      Q.   What percentage relief do you believe you have as
11 | a result of that rhizotomy?
12 |      A.   I would guess it to be about 75 percent.  Again,
13 | that was only a week or two ago.
14 |      Q.   Do you anticipate that the pain is going to
15 | return?
16 |      A.   It has in the past.
17 |           MR. GALLIHER:  Speculation.
18 |           THE WITNESS:  So I would say yes.
19 |           MS. TEMPLE:
20 |      Q.   And we only talked earlier about your lumbar spine
21 | and that's when you told me -- I'm sorry.  We talked about
22 | your cervical spine, your neck, and that's when you told me
23 | that the greatest benefit you ever saw from a rhizotomy was
24 | three months.
25 |           For your lower back, your lumbar spine what's the

1  longest benefit you have had from a rhizotomy?

2      A.    I would say probably about the same.

3      Q.    What's the shortest?

4      A.    I don't know.  I couldn't begin to guess.  It

5  comes back and it's time for another treatment.

6      Q.    You mentioned earlier that at least one of your

7  medical providers told you that 45 days could be the benefit

8  that you receive as a result of a rhizotomy, as little as

9  45 days.

10         Do you recall which provider it was that told you

11  that?

12     A.    No.

13     Q.    Have all three of your pain management doctors

14  been consistent on what the range of timing for pain

15  resolution is following a rhizotomy?

16     A.    I think very little conversation was how long it

17  would last.  You know, conversations revolved about, you

18  know, this is what's going on in my life.  I'd like, I'm

19  going to need another treatment so we didn't really get into

20  details like that.

21     Q.    You weren't concerned with long-term effects

22  whether it would courier pain six months, 8 months?  That

23  part didn't matter.

24     A.    I have complete confidence in my doctors.  I'm

25  sure they're doing the very best they can.

1    Q.   Did they tell you, if you can recall, what that
2   anticipated benefit would be?
3            MR. GALLIHER:  Asked and answered.
4            THE WITNESS:  No.
5            MS. TEMPLE:
6    Q.   No?
7    A.   No.
8    Q.   Have any of your doctors ever mentioned surgery?
9    A.   No.
10    Q.   And just so I'm clear, I'm referring to surgery
11   for the neck, surgery for the lower back.  Have any
12   providers indicated or spoken to you at all about the need
13   for surgery?
14    A.   Am I to presume when you say surgery, you're
15   talking about an actual scalpel opening me up and things
16   like that?
17    Q.   As opposed to burning your nerves, correct.
18    A.   There hasn't been any of that conversation.
19    Q.   Have you treated with a surgeon?
20            MR. GALLIHER:  You mean since this crash.
21            MS. TEMPLE:  Correct.
22    Q.   Since this motor vehicle accident, have you
23   undergone any medical care with a surgeon?
24    A.   No.
25    Q.   Do you intend to keep undergoing the rhizotomy

1   procedures if recommended?

2            MR. GALLIHER:  Speculation.

3            THE WITNESS:  As needed.

4            MS. TEMPLE:

5       Q.   If given the option of undergoing future rhizotomy

6   procedures, are you more likely to get those procedures with

7   Dr. Anderson or Dr. Leon?

8            MR. GALLIHER:  Speculation.

9            THE WITNESS:  It depends where I'm at.

10           MS. TEMPLE:

11      Q.   You only come to Las Vegas, if I understand

12  correctly, to treat with Dr. Leon.

13      A.   No.

14      Q.   And to see your attorney.

15      A.   Yes.

16      Q.   You live in South Dakota for part of the year.

17      A.   That's my home address.  I don't have a home as

18  you would think of as a home.

19      Q.   You own businesses in South Dakota and reside

20  there during the summer months.  Is that fair?

21      A.   I own businesses there.  I may or may not be in

22  South Dakota.

23      Q.   You're in South Dakota more often than you're in

24  Las Vegas.  Is that fair?

25      A.   Yes.  That would be a fair statement.

1      Q.   If you had to pick between Dr. Leon and

2   Dr. Anderson to get future injections, which would you

3   choose if you had to pick?

4      A.   I consider them both equally competent.

5      Q.   Do you plan to come back here to see Dr. Leon as

6   opposed to getting treatment with Dr. Anderson?

7      A.   I have no plans.

8      Q.   Did you plan to treat with Dr. Anderson?

9      A.   As I am in South Dakota, yes.

10      Q.   If both Dr. Anderson and Dr. Leon recommended

11   future treatment and those treatments were different, how

12   would you handle that situation?

13          MR. GALLIHER:   Speculation, foundation, incomplete

14   hypothetical, assumes facts not in evidence.   Go ahead.

15          THE WITNESS:   I wouldn't know.   I haven't thought

16   of that.

17          MS. TEMPLE:

18      Q.   If both Dr. Anderson and Dr. Leon recommended the

19   same future care and told you you need to undergo X, Y, and

20   Z, how would you handle that situation?

21          MR. GALLIHER:   Same objection.

22          THE WITNESS:   I would follow the advice of my

23   doctors.

24          MS. TEMPLE:

25      Q.   And which doctor would you have perform that

1  treatment?

2          MR. GALLIHER:  Same objection.

3          THE WITNESS:  It depends where I'm at.

4          MS. TEMPLE:

5      Q.   I guess I'm confused and I'm not trying to be

6  difficult, but why come to Las Vegas to undergo the

7  treatment that Dr. Anderson is also recommending?  Why not

8  get it with Dr. Anderson since you're there?

9      A.   That wasn't the question you asked me, counselor.

10  You asked me if I was here or there which one would I do,

11  and frankly, as I said, both those doctors I feel are very

12  competent in what they do.

13     Q.   Why would you come to Las Vegas to get treatment

14  with Dr. Leon if that very same treatment was recommended by

15  Dr. Anderson?

16         MR. GALLIHER:  Counsel, are you assuming that he's

17  in South Dakota when this decision is being made?

18         MS. TEMPLE:  No, I'm not.

19         MR. GALLIHER:  I think that's the confusion.

20         MS. TEMPLE:  No.

21     Q.   It doesn't matter where you are.  If Dr. Anderson

22  makes a recommendation for future care and Dr. Leon makes a

23  recommendation for that same future care, why wouldn't you

24  get it in South Dakota knowing that you're going to be there

25  part of the year anyway?

```
 1          MR. GALLIHER:  Ill object to the form of the
 2   question.  It lacks foundation and it's an incomplete
 3   hypothetical, and it assumes facts not in evidence.
 4          THE WITNESS:  I don't know how else I can answer
 5   it.  You know, it depends on where I'm at.  I feel that they
 6   both are very competent.  They both know what they're doing
 7   there.  If I'm in South Dakota, I'll have it done there.  If
 8   I'm in Florida, I'll have Dr. Bhalali do it.  If I'm in
 9   Vegas, I'll have it done here.
10          MS. TEMPLE:
11     Q.   How often are you in the Las Vegas area?
12     A.   I only come here for reasons like this.  The last
13   time I was here for pleasure was at the time of the
14   accident.
15     Q.   What other states besides Nevada do you travel to
16   in the southwest regularly?
17     A.   As I said earlier, up until the time my mother
18   passed it was pretty much Florida.
19          MR. GALLIHER:  She's asking about the southwest.
20          THE WITNESS:  I'm sorry.  I don't have any
21   particular states that I go to.  It may be Arizona.  It may
22   be New Mexico.  It may be here in Nevada.  My lifestyle is
23   one that I can follow the weather.  Las Vegas is a nice
24   town, but you folks have snow here occasionally.  It gets
25   chilly once in a while.  I try to avoid snow and cold.
```

1          I'm not particularly worried about where I'm going

2  to go.  I've been down to Texas.  I've been to a number of

3  states.  People often ask me where do I go in the winter.

4  My answer is very truthfully south.  I don't have a

5  particular state I care for one over the other.

6          MS. TEMPLE:

7      Q.   Let me ask you this.  If Dr. Leon and Dr. Anderson

8  recommend the same future medical care, but Dr. Anderson

9  costs considerably less, would that factor into your

10  decision of which doctor to see?

11     A.   I don't know.

12          MR. GALLIHER:  Same objection.

13          MS. TEMPLE:

14     Q.   Cost doesn't matter to you if it's the same exact

15  treatment?

16          MR. GALLIHER:  Argumentative, misstates his

17  testimony.  Go ahead.

18          THE WITNESS:  There again, it just depends on the

19  two doctors.  I feel they're both competent.

20          MS. TEMPLE:

21     Q.   So both doctors are equally competent.  Both

22  doctors you trust, one located in South Dakota where you

23  spend a considerable amount of time and that doctor is

24  considerably cheaper.  Would you then choose Dr. Anderson

25  over Dr. Leon?

1           MR. GALLIHER:   Same objection.

2           THE WITNESS:   There are variables involved.   You

3   know, cost of the travel, the cost of time.   You know, what

4   is the cost, the other factors besides just the procedure.

5   Coming down here obviously I have hotel and air fare and

6   time away from things to be considered.   I try to consider

7   all the different variables.

8           MS. TEMPLE:

9     Q.   What would make you choose Dr. Leon over

10  Dr. Anderson if Dr. Anderson is considerably cheaper for the

11  exact same care?

12          MR. GALLIHER:   Same objection.

13          MS. TEMPLE:

14    Q.   What factors?

15    A.   I don't know how I can answer that.   You know,

16  again, I don't have a lifestyle that most people have.   It

17  depends on where I'm at in the country.   If I'm in Florida

18  and Dr. Anderson is in South Dakota and Leon's down here,

19  then I would, you know, use a doctor there in Tampa,

20  Dr. Bhalani.

21          I have to take all variables into consideration.

22  Cost.   What's cost to one cost to another?   Are we talking

23  $10 or are we talking $50,000?   So, you know, if it's $10,

24  it doesn't really matter.   $50,000 then of course it's going

25  to require more.   I would put the same exact consideration

1  into that decision as I'm sure anybody sitting at this table

2  would.

3      Q.   Your care that you had over the course from the

4  time of the accident until now has often had to be

5  interrupted because of location.  Do you think that

6  discontinuing treatment to relocate slowed your progress?

7           MR. GALLIHER:  Foundation, speculation.

8           THE WITNESS:  I wouldn't really think so because,

9  again, I follow the advice of my doctors.

10          MS. TEMPLE:

11     Q.   You don't think moving from one place to the other

12 had any impact at all.

13          MR. GALLIHER:  Objection.

14          THE WITNESS:  As a rule no, because it still takes

15 time to make the appointments.  I can't just walk in Black

16 Hills Surgical Center and walk into a procedure and lay down

17 and have the procedure done.  Those things have to be done

18 in advance.  It often takes a couple weeks to set it up.  I

19 use that you know, during time frame to get to where I'm

20 going if necessary if I'm not already there.

21          MS. TEMPLE:

22     Q.   Who is Dr. Nawwaz, N-A-W-W-A-Z?

23     A.   That would be the doctor in Florida that has an

24 Indian name, his first name I don't know what that is but

25 that would be that doctor.

1      Q.    Then he's listed as a general PCP in your medical

2   records that you treated with.  So that's the doctor that

3   you were referencing earlier?

4      A.    Yes.

5      Q.    All right.  I'm going to show you -- let me ask

6   you this.  Have any of your doctors told you that you're

7   going to need future medical care?

8      A.    That would seem to be indicated by, you know,

9   letting me know next time I need to come in.

10     Q.    If the rhizotomies last forever and you never have

11  any additional pain, you wouldn't anticipate needing to go

12  back to the doctor.  Is that fair?

13     A.    Why would I go through that procedure ever again

14  unnecessarily?  It is not pleasant.

15     Q.    Have the doctors told you that if you don't

16  experience further pain, meaning the rhizotomy resolved all

17  issues, that you don't need to return?

18     A.    They have never told me that, but I would not go

19  through it.

20     Q.    Do you have any appointments with any medical

21  providers as you sit here today?

22     A.    I don't think so, but I would need to check my

23  calendar.

24     Q.    Do you keep a calendar of all your medical

25  appointments?

```
 1       A.    For the most part.
 2       Q.    So that dates back how far?
 3             How long have you kept a calendar of all your
 4  medical appointments?
 5       A.    A couple years we started keeping it.
 6       Q.    2014, 2015 did you keep a calendar of all your
 7  medical appointments?
 8       A.    Probably.
 9       Q.    Is it handwritten?
10       A.    Electronic.
11       Q.    On a phone?
12       A.    Yes.
13       Q.    And that's something that you maintain yourself?
14       A.    Frankly mostly my wife maintains it for me.  She's
15  my social secretary.
16       Q.    All right.  I'm going to show you a medical record
17  from Alternative Health Care Center and have you take a look
18  at it.
19             Do you recognize the handwriting on that page?
20       A.    I do.
21       Q.    Is that your handwriting?
22       A.    It is.
23       Q.    It looks to be some type of an intake form for
24  Alternative Health Care Center.  Do you see that?
25       A.    I do.
```

1    Q.   If you look at today's date, all the way to the
2  right it's dated 10/21/2011.  Do you see that?
3    A.   I do.
4    Q.   And this would have been about two years before
5  the motor vehicle accident, correct?
6    A.   Yes.
7    Q.   Does this refresh your recollection as to whether
8  you underwent medical treatment at Alternative Health Care
9  Center prior to the motor vehicle accident?
10    A.   It does for a completely unrelated issue.
11    Q.   When you look down where it says present medical
12  complaint, do you see that?
13    A.   I do.
14    Q.   Lower back issues, do you see that?
15    A.   Yes.
16    Q.   You would agree that lower back issues is one of
17  the complaints caused by this motor vehicle accident?
18    A.   Again, there was a completely separate issue.
19    Q.   I think I asked you if you had ever treated at
20  Alternative Health Care Center prior to the motor vehicle
21  accident and you indicated THAT you had not.
22    A.   In reference to the discussion that we're
23  discussing.
24    Q.   I just want to make it clear that when I'm asking
25  for any medical treatment in any of these facilities prior

1  to the motor vehicle accident, I'm not limiting it to the

2  injuries that you sustained in this accident or similar

3  injuries.  I'm asking for any medical treatment whatsoever.

4           So is there anything you want to add to what you

5  previously testified to regarding additional medical

6  treatment that you underwent prior to this motor vehicle

7  accident?

8       A.   I had this situation here.

9       Q.   Okay.  Anything else?

10      A.   The.  Not that I recall at all.

11      Q.   Okay.  What was the reason for this medical visit?

12      A.   Honestly I lifted my foot up on my bed to pull my

13 sock on and my back went out.  It hurt and for the first

14 time in my life I went to a chiropractor.

15      Q.   Okay.  And how long did you treat with that

16 chiropractor?

17      A.   Just a couple of times.

18      Q.   How -- over the course of what period of time?

19      A.   I would guess a month, a short time, maybe month

20 and a half.

21      Q.   So when you testified earlier that you had never

22 had any lower back pain prior to this motor vehicle

23 accident, that would be inaccurate?

24           MR. GALLIHER:  Argumentative.

25           THE WITNESS:  I had forgotten about this and it

1  was outside of the scope of the accident.

2          MS. TEMPLE:  Okay.

3      Q.   And, again, I just want to make it clear.  I'm not

4  just looking for any medical treatment that you had prior to

5  the motor vehicle accident related to -- I'm looking for any

6  medical treatment you had for your neck or your back prior

7  to the accident.

8      A.   Sure.  I had simply forgotten about this.

9      Q.   Okay.  Did you forget about any of the neck

10 treatment you may have had prior to the accident?

11         MR. GALLIHER:  Aside from the fusion.

12         MS. TEMPLE:  Right.

13         THE WITNESS:  You asked me if I forgot something.

14 Wouldn't that mean I don't remember?

15         MS. TEMPLE:

16     Q.   Now that you've had a chance to reflect on it and

17 you understand the distinction I'm making between accident

18 related injuries and injuries that may not have been caused

19 by an accident, does that refresh your recollection at all

20 of prior medical treatment you may have gotten?

21     A.    Not any more than we discussed.  I had forgotten

22 about this but, as I said, this is a completely unrelated

23 issue.

24     Q.   Did you have any additional medical care for this

25 lower back issue aside from the chiropractic care?

1      A.    No.

2      Q.    Did they send you for an MRI or X-ray?

3      A.    No MRI.  I don't recall about X-rays.

4      Q.    Do you know if this facility has an in-house X-ray

5   machine?

6      A.    I don't believe they do.

7      Q.    Did you have to be referred to Alternative Health

8   Care Center?

9      A.    No.

10      Q.    You can just go in.  You don't have to have a

11   primary care doctor send you there?

12      A.    Well, what it is the gentleman that worked on me,

13   and I didn't believe in chiropractic at all, but he's in the

14   Masonic organization there as I am, and I was told by some

15   of my friends that he did very good work, and I tried it out

16   and much to my surprise it worked.

17      Q.    And who is that?

18      A.    Bruce Crisman.

19      Q.    Bruce Crisman is the same doctor that you saw

20   after this accident or the same chiropractor, correct?

21      A.    Yes.  He does a great job.  I went to go see him

22   the first time and he for the most part cured the problem

23   the very first time.

24      Q.    And you're personal friends with Dr. Crisman or

25   Chiropractor Crisman?

1       A.    We're both in the same Masonic lodge.

2       Q.    Do you hang out socially?

3       A.    No.  I had a piece of pie and a cup of coffee with

4   him once.  That's about it.  Him and 20 other guys.

5       Q.    Did you ever ask Mr. Crisman to withhold

6   production of any medical records related to your care in

7   2011?

8       A.    No.

9       Q.    And have we talked about the full extent of the

10  medical care that you underwent prior to the accident of

11  2013?

12          MR. GALLIHER:  Form and foundation.

13          THE WITNESS:  I thought we had until you showed me

14  this and reminded me.

15          MS. TEMPLE:

16      Q.    Anything else that you haven't forgotten or that

17  you can think of?

18      A.    Again, counselor, if I forgot it --

19      Q.    Anything else that you can think of while we're on

20  the subject?

21      A.    No.

22      Q.    All right.  In your interrogatory responses that

23  are still in front of you I think you were asked to list

24  limitations that you experienced as a result of the

25  accident.  Before reviewing those -- I don't even need you

1   to review those.  I just want to talk about those

2   limitations and lifestyle changes as a result of the

3   injuries that you sustained.

4          Can you tell me about those.

5      A.   You're going to need to be more specific than

6   that.

7      Q.   Sure.  What limitations with respect to your

8   activities of daily living have you experienced as a result

9   of the injuries you sustained in this accident?

10     A.   As I mentioned earlier, counselor, I was quite

11  athletic.  I'm the guy that would be able to sit on a chair

12  and just get up and go run a mile.  I would be able to do

13  things like tai chi, racquetball.  I was in different forms

14  of athletic activity.

15     Q.   Organized sports?

16     A.   I was able to go for long walks.  I was able to do

17  things like snorkeling.  I no longer can do those things.

18  Now I just feel like an old man with lots of hurt.

19     Q.   You haven't gone snorkeling since this accident?

20     A.   No.

21     Q.   You haven't gone on any long walks since this

22  accident?

23     A.   No.

24     Q.   What's the longest you can walk before you start

25  to experience pain?

1      A.    Before the accident I would go out in the Badlands

2   and walk all day long.

3      Q.    What about now?

4      A.    Not very much.

5      Q.    Tai chi, were you -- did you ever participate with

6   a facility or did you just do it on your own?

7      A.    Yes.

8      Q.    Yes, I participated with a facility?

9      A.    Both.

10     Q.    Which facility?

11     A.    There was no formal facility.  It would be a group

12  of people that would meet in one of the city parks at Rapid

13  City on the weekends.

14     Q.    Did you have to pay for that?

15     A.    No.

16     Q.    Racquetball, were you ever in an organized league?

17     A.    No.

18     Q.    Where did you play racquetball?

19     A.    At different health clubs, Bally.

20     Q.    You testified earlier that you discontinued your

21  Bally membership well before this accident.

22     A.    I did, but I could, you know, at the Thousand

23  trailer parks, they would offer me tennis courts and I would

24  be playing tennis.

25     Q.    Who did you you usually play tennis with?

1    A.   I wouldn't, you know, begin to know who they were.

2   They were as transient as I am.  There were no organized

3   things.  It would just be whoever happened to be around that

4   had a racket.

5    Q.   Any other physical limitations?

6    A.   Well, I don't do swimming much anymore.  I don't

7   do walking much anymore.  I don't do physical exercise much

8   anymore.  What else is there?  I've never jumped out of a

9   perfectly good aircraft.  I'm not saying this to be

10  facetious.  I try very hard not to do stupid things, and

11  jumping out of a perfectly good aircraft would be one of

12  those things.

13   Q.   You've been ATV riding; is that right?

14   A.   I don't think so.

15   Q.   If your medical records indicate that you went ATV

16  riding in August 2013 and did not experience pain --

17   A.   Okay.  I remember this.  I went riding with my son

18  and it lasted for a very short time and I told him I needed

19  to go back.

20   Q.   Your records indicate you did not experience pain

21  as a result of the ATV ride.  Is that not your recollection?

22   A.   When I did that I'm very cautious how I carry

23  myself.  I have to lock my head in place.  I can't turn my

24  head.  I just -- I don't know how I can describe it.  I just

25  kind of duck my head.  I limit my motion very carefully and

1  going on the ATV ride it was the once, maybe twice I did

2  that it was not too hilly or, you know, rugged terrain.  It

3  was on trails and very smooth.  I can't do hard trails.

4       Q.   Was it with an organized group?

5       A.   No.

6       Q.   Does he own ATVs?

7       A.   My son has one.

8       Q.   Is that what you used?

9       A.   I would rent one.

10       Q.   Okay.  And where did you rent it?

11       A.   There are several places in the Black Hills that

12  rent them.  I would buy a coupon.  Up in Rapid City they

13  have a thing called Clip Big Deals dot com where they have a

14  lot of resort or someplace, any -- anybody with a business

15  will offer their product typically if it was setoff so I

16  would rent an ATV, you know, for those couple hours and

17  frankly I would -- I'm thinking maybe twice and both times I

18  brought it back early.

19       Q.   Even though you weren't experiencing pain?

20       A.   I got tired of locking my head in place.  It's --

21  when you go on an ATV, you know, you're on some trails.

22  It's very rugged.  I couldn't go on those trails and I

23  didn't.

24       Q.   Do you recall the name of any of the facilities in

25  the Black Hills where you rented your ATVs?

1    A.    No.  I did this like as I said he had maybe twice
2  from two different places just resorts up in the Black Hills
3  somewhere.
4    Q.    And the one time that's reflected in your record
5  is August 2013 so about five months after the motor vehicle
6  accident.  Was the second time that you recall ATV-ing
7  before or after that August 2014 --
8    A.    Oh, quite a ways after that.
9    Q.    Years?
10   A.    Maybe a couple years afterward to try it to see if
11 it was still as bad as it was before if there was any
12 improvement, and there wasn't.  So I mean I returned the ATV
13 before the time it was due back and said keep the money.
14 I'm done.
15   Q.    Does Charles live all year in South Dakota?
16   A.    Yes.
17   Q.    All right.  Let's talk about the lawsuit that you
18 filed and you understand that you filed a lawsuit in this
19 case against Acuity Insurance.
20        Do you understand that?
21   A.    Yes.
22   Q.    According to your lawsuit you claim that Acuity
23 did not pay the full value of your claim or what the claim
24 is worth.  Is that a fair summary of at least one of your
25 claims with respect to this lawsuit?

1      A.    I believe it is.

2      Q.    Okay.  What other reasons are you suing Acuity in

3 this case?

4            MR. GALLIHER:  Form.

5            THE WITNESS:  Over the years I have paid Acuity a

6 lot of money.  This most recent time which I've had Acuity

7 insurance for give or take, you know, six or seven years,

8 something like that, and they cover my companies and I pay

9 them, as I said, a lot of money.  My payments have never

10 been late.  They have never been postponed or anything like

11 that, never had a problem.

12            I had over the years several occasions where I

13 could have filed a claim but I did not because I feel that

14 insurance is for catastrophic purposes, not for little

15 thousand dollar claims here and there.  So I pay my own

16 situations.

17            This last payment that I paid Acuity my wife told

18 me over lunch was approximately $20,000.  That's a lot of

19 money to pay for insurance.  Again, going back to the

20 conversation she said when we first started, it was about 15

21 or 16,000.  She couldn't recall which.

22            You can pull it up on the records.  I have a

23 feeling that Acuity was very willing to take my money.  I

24 don't abuse the insurance business.  As I said, I pay my own

25 what could have been claims.

 1          I feel like this is -- and I'm not saying this

 2   against anybody at this table, not at all.  I feel that

 3   Acuity is putting me into an adversarial position.  This is

 4   an insurance company that I pay to protect me and I've given

 5   a lot of money to do so.  Now when it comes time to do

 6   something, again, I feel I'm being put in an adversarial

 7   position.

 8          I understand.  I own businesses.  I understand the

 9   concept of protect the company, protect the stockholders and

10   so on but again, this is my own company.  And I don't feel

11   that even though I've always paid my bills, never without

12   question, never late.

13          Why am I being treated in this manner?  Clearly

14   this is a claim and I did not initiate this claim.  I made

15   the, you know, the judgment call to come to a full and

16   complete stop at a stoplight as I suspect most people in

17   this room have done previously themselves.

18          I did not contribute to this accident.  I happened

19   to be sitting in the car.  That's all I did.  I was not

20   performing any illegal action.  I was hit from behind by at

21   that time a person or persons unknown and I feel that I'm

22   involved in a time when Acuity should step up and protect me

23   for which I paid them a lot of money for.

24          Here we are today and, again, I get the concept

25   protect the stockholders and so on.  You know, I understand

1  that, but there needs to be, you know, a little bit of
2  judgment call.  Hey, this guy is our own customer.  You
3  know, there's got to be some benefit of the doubt.
4          Now, being involved in an accident, counselor, was
5  a life changing event for me in every aspect.  As I said, I
6  was not a couch potato.  You don't do the things that I did
7  and be a couch potato.  I'm very hands on in my businesses.
8  I'm very active.  You know, I'm not saying I'm some sort of
9  super jock or anything like that but I did work out then and
10 I did exercise and I was in pretty good condition.
11         I didn't have any health issues, no medical
12 issues, no real limitations, that kind of a thing and the
13 one time in my life 'cause I had not filed any claims like
14 this in my life before.  I am not a person to go out and do
15 things like that.  History will bear that out.  It's all
16 public record.
17         You won't find a single time where I've ever filed
18 a suit of any sort on anything or related to anything at all
19 like this.  I don't do that.  If I slip and fall, it's my
20 fault.  I should have been more careful, but to be treated
21 like this and to be what I would consider as ignored and
22 dragged this case on and force me to come down to Vegas, I
23 had no plans to come down here.
24         I mean Vegas is a nice town, but as I stated
25 earlier, I'm not a gambler and frankly I think they

1  overcharge too much for the shows here.  I mean $200 for a
2  ticket for an hour and a half of entertainment, come on.
3  That's crazy.
4           MS. TEMPLE:
5      Q.    It's pretty spectacular stuff.
6      A.    No doubt.  Cirque de Soleil puts on a fantastic
7  show the one that I've seen no doubt, but for my wife and I
8  $250 for an hour and a half, maybe two hours I don't see it.
9  So Las Vegas is a nice town but in the sense I enjoy going
10 to the casinos.  I enjoy walking around and looking at the
11 casinos themselves because quite frankly they are quite
12 spectacular.  Bellagio, for example, and the water fountains
13 and the art shows they have inside I recognize and
14 appreciate beauty of all forms.  So for that I would come to
15 Vegas and coming from Chicago as I have, Chicago is a
16 restaurant town as well as a culture town and Vegas is
17 certainly that as well.  It wasn't always that way but it is
18 now.
19           This is a nice community.  The people I've met
20 here have been very nice, but I would not come to Vegas for
21 any other reason.  I did not wake up that fateful morning
22 and say, honey, we haven't used our insurance policy for a
23 while, let's go out and get into an accident.
24           Again, I was sitting there minding my own
25 business.  Now, part of what made the problem so bad as I

1  was told is my wife was sitting there next to me.

2           MR. GALLIHER:  Wait, wait.  Who were you told this

3  by 'cause if it was by one of your attorneys, I'm going to

4  instruct you to not talk about it.

5           THE WITNESS:  Okay.  I was leaning forward and

6  twisted slightly to the right as I was talking to my wife as

7  perhaps you yourself have done talking to your spouse when

8  you're in a car and that's what -- what I feel exasperated

9  [sic] the situation.

10          It wasn't just a simple matter of being hit from

11  behind and slammed forward with such force that, you know,

12  everything hurt.  My wife didn't sustain the same damages

13  that I did because she was sitting in my opinion with her

14  back flat up against the seat.  I was twisted slightly

15  talking to my wife, something I've done many many times.

16          So, again, for me to be treated like a, like I'm

17  the bad guy here, I'm not the bad guy.  I'm a victim here

18  and I'm being treated like the bad guy and I resent that

19  greatly.  There has been significant loss of income.  Yes,

20  my companies are successful and that's partially because of

21  my staff.  I have absolutely no doubt my companies would be

22  a lot more successful if I were able to continue doing the

23  things that I was doing with the same frequency.  I still do

24  some of those same things but I'm much more not as often or

25  not anywhere near strenuous.

1          MS. TEMPLE:  Let me ask you this.

2      Q.   Are you aware that none of the information, no

3  documentation related to any type of wage loss claim has

4  ever been produced to Acuity?  Are you aware of that?

5      A.   That would be -- I'm not aware of the particulars.

6  That would be something to discuss with my attorney sitting

7  next to me.

8      Q.   Through our discussions today I think you've come

9  to understand that Acuity is also not in possession of all

10  of your medical records.

11      A.   Up until you mentioned that, you know, that

12  section of time, I was under the impression you had

13  everything.

14      Q.   Do you agree with me that Acuity should have the

15  right to investigate and evaluate your claim under your

16  insurance policy being provided all the information relative

17  to your claim?

18          MR. GALLIHER:  Form, foundation and, you know, I'm

19  going to object to the premise of the question because

20  Acuity has been provided with authorizations to get all of

21  his medical records.  You haven't?  You haven't gotten

22  authorizations to get his medical records.

23          MS. TEMPLE:  No, we haven't.  I have

24  authorizations here for you to sign.  We only have the

25  primary care doctor.  I think there's three or four more.

```
 1  I've got them written down but in any event I'll go back to
 2  my question if I can.  You can still answer the question or
 3  be instructed not to.
 4       Q.    My question is do you agree with me that Acuity
 5  has the right to investigate or evaluate your claim and be
 6  given all the information relative to that claim?
 7            MR. GALLIHER:  I'll object, calls for a legal
 8  conclusion.
 9            MS. TEMPLE:
10       Q.    You can answer.
11       A.    I would defer that question to my attorney.
12       Q.    You understand the basis of your lawsuit or some
13  of the allegations in your lawsuit are that Acuity failed to
14  investigate and evaluate your claim.  Are you aware that
15  that's at least one of the allegations contained in your
16  Complaint that you filed?
17       A.    Again, I would defer that to my attorney.
18       Q.    Do you have any information at all as to how long
19  it took Acuity to respond to the initial demand sent by your
20  attorney?
21            MR. GALLIHER:  Foundation and speculation.  Answer
22  if you know the answer.
23            THE WITNESS:  I wouldn't know that.
24            MS. TEMPLE:  Okay.
25       Q.    So in your Complaint when you allege that Acuity
```

1  failed to investigate your claim, what information do you

2  have to suggest that he failed to investigate the claim?

3      A.   I would suggest that this issue should have been

4  resolved a long time before now.

5      Q.   And I'll go back to a similar question to what I

6  asked earlier.  Do you think that Acuity is entitled to get

7  all the information related to your claim in order to

8  evaluate that claim including your wage loss information,

9  your medical records?

10          MR. GALLIHER:  Foundation, speculation.

11          MS. TEMPLE:

12     Q.   Do you think it's fair for them to want to look at

13  that information as part of their information?

14          MR. GALLIHER:  Same objection.

15          THE WITNESS:  I'm sure if Acuity has that

16  information from my legal counselor, they would have

17  responded appropriately.  You're asking questions I cannot

18  answer.

19          MS. TEMPLE:

20     Q.   And irrespective of what was done or wasn't done,

21  I'm just asking a general question.  Is that a fair position

22  for Acuity, your insurance company to take?  We need all of

23  the information related to your claim so that we can

24  properly evaluate and investigate your claim.

25          MR. GALLIHER:  Foundation, speculation.

1           MS. TEMPLE:

2      Q.    Is that a fair position for the insurance company

3  to take, that position alone?

4      A.    I would take the position that whatever my

5  attorney recommends for me to do, then I would be willing to

6  do so as I follow the instructions from my doctors, I follow

7  instructions from my legal staff.

8      Q.    You understand that these are your allegations

9  that you've made in your Complaint, that Acuity unreasonably

10  delayed, that Acuity failed to investigate, that Acuity

11  didn't evaluate.  These are your allegations and today one

12  of the reasons we're all here is to figure out what

13  information you're basing those allegations upon?

14           MR. GALLIHER:  Argumentative.

15           MS. TEMPLE:

16      Q.    Do you understand that?

17      A.    I understand the question and my answer would

18  remain the same.  I would feel reasonably secure that if the

19  questions were asked of my attorney and my attorney feels

20  it's proper to answer and perform a task that he would have

21  said or done so.

22      Q.    And you don't think that type of information being

23  requested of your attorneys is necessarily unreasonable?

24      A.    It doesn't matter what I think in this case.

25      Q.    It's your Complaint.  That's why we're here.

1  That's what you're going to tell the jury if we have to go
2  to trial is what your beliefs are.
3              MR. GALLIHER:  Wait a minute.  Is this a question?
4              MS. TEMPLE:  You bet it is.  I'm entitled to know
5  and we all want to know for the benefit of evaluating the
6  claim what your allegations are.  These are your allegations
7  contained in your Complaint.
8       Q.   So I'm asking you if you think there's anything
9  unreasonable about asking for all of your medical records
10 and your employment records?  Is there anything unreasonable
11 about asking for that information?
12             MR. GALLIHER:  Foundation.
13             THE WITNESS:  I would say my own -- no, I don't
14 think it's unreasonable.  Acuity should be I would think
15 putting myself in a position of Acuity.
16             MR. GALLIHER:  Okay.  We're not going to do that
17 today.  Answer the question.
18             THE WITNESS:  Then I'll let my answer stand.
19             MS. TEMPLE:  Okay.
20      Q.   With respect to the timeline of how Acuity
21 responded to your claim, do you have an understanding of
22 that timeline?
23             MR. GALLIHER:  Foundation.
24             MS. TEMPLE:
25      Q.   How long it took them to respond to, say, the

1  initial demand that was sent, how long it took them to

2  respond to any followup correspondence from your attorney.

3          MR. GALLIHER:  Speculation.

4          THE WITNESS:  I believe there has been an

5  unnecessary delay.

6          MS. TEMPLE:

7      Q.   Do you have a specific timeline?

8      A.   I'm not quite sure I understand the question.

9      Q.   Do you know how many days for example it took

10 Acuity to respond to the demand that you submitted?

11         MR. GALLIHER:  Objection, speculation.

12         MS. TEMPLE:

13     Q.   What are you basing your -- so we're clear, I'm

14 talking about prior to the filing of a lawsuit because it's

15 your lawsuit that alleges that Acuity unreasonably delayed.

16 What are you basing that allegation on?

17         What conduct of Acuity prior to the filing of the

18 lawsuit leads you to believe that they unreasonably delayed?

19     A.   Well, there are several things but one of which

20 there just seemed to be a lot of confusion as to where the

21 case was going to be handled at.

22         Was this going to be a South Dakota issue?  Was

23 this going to be a Nevada issue?  And there seemed to be a

24 significant amount of delay just trying to figure out

25 something as basic as that.

1    Q.    I think that was after the filing of the
2  Complaint.  Is that why your understanding as well?
3    A.    I don't have any understanding at all of that.
4    Q.    Aside from the venue issue of the location of the
5  case, is there anything prior to the filing of the lawsuit
6  that causes you to believe that Acuity unreasonably delayed,
7  any evidence that you have, any information that you have to
8  support that claim?
9    A.    That I have?
10    Q.    Yeah.
11    A.    I do not have specified information like that.
12    Q.    Okay.
13    A.    That would be again up to my counsel here.
14    Q.    Did you ever have any personal communications with
15  Acuity about your claim?
16    A.    No.
17    Q.    Did you ever reach out to them to discuss your
18  claim directly?
19    A.    No.
20    Q.    All of your communications with respect to this
21  claim have been through an attorney?
22    A.    Correct.
23    Q.    You retained an attorney very soon after the
24  accident, correct?
25    A.    Yes.

1      Q.   Do you know the name of the adjuster that was

2  handling your claim?

3      A.   No.

4      Q.   Have you ever seen any of the letters that went

5  back and forth between Acuity representatives and your

6  attorney?

7      A.   I don't believe so.

8      Q.   I'm going to hand you what we'll mark as the next

9  exhibit in line which is Exhibit J, and this is from

10  October 2, 2015.  I'll just have you take a look at that if

11  you will.

12          Are you aware that this is the first time that any

13  medical records related to your treatment were provided to

14  Acuity?

15      A.   I would not be aware of that.

16      Q.   To about almost two years after the accident over

17  a year and a half after the accident, you were not aware of

18  that?

19      A.   As I just answered.

20      Q.   And if you'll flip to the next page, you'll see

21  the very last line of that paragraph said I have enclosed

22  also a signed HIPAA compliant authorization as Exhibit 17

23  which will give you the authority to obtain any of

24  Mr. Humes' medical records you believe you need.

25          Do you see that?

```
 1        A.    I do.
 2        Q.    So your attorney said here's an authorization.
 3   You can go get the medical records.  Do you think it would
 4   be unreasonable for Acuity to do so?
 5        A.    My personal opinion would be no.
 6        Q.    All right.  I'm going to have you hand that letter
 7   over to the court reporter so she can mark it.
 8               (Whereupon, Exhibit J was marked
 9                for identification by the court
10                reporter and is attached to the
11                original transcript of this deposition.)
12               MS. TEMPLE:
13        Q.    I'm going to show you the next letter to your
14   attorney that was sent to Acuity dated October 16, 2015.  Do
15   you see that's dated October 16, 2015, correct?
16        A.    Yes.
17        Q.    The first line indicates that your attorney
18   received an e-mail from Acuity on October 13, 2015.  Do you
19   see that?
20        A.    Yes.
21        Q.    October 13, 2015, is 11 days after the letter was
22   sent by your attorney with 200 pages of medical records and
23   an authorization that you agree is reasonable for Acuity to
24   use to get your medical records.
25               Do you think 11 days later is a reasonable amount
```

1  of time in which to respond to a 200-page letter related to

2  your claim?

3          MR. GALLIHER:  Wait.  I'm going to object to the

4  form and the foundation.  Go ahead.

5          THE WITNESS:  I wouldn't know what would be

6  considered reasonable in this situation.

7          MS. TEMPLE:

8      Q.   So you don't have an opinion as to the

9  unreasonableness or the reasonableness of the timing of this

10 correspondence?

11         MR. GALLIHER:  Form and foundation.  Go ahead.

12         THE WITNESS:  I would think I'm certain that my

13 law firm would have handled everything in a timely and

14 appropriate manner.

15         MS. TEMPLE:  Okay.

16     Q.   And you don't have an opinion as far as Acuity's

17 actions in responding 11 days later to that letter as to

18 whether that was an unreasonable time frame?

19     A.   I would not begin to presume what is reasonable or

20 unreasonable in this situation.  This is not something I do

21 every day, counsel.

22     Q.   I know, but the allegations are in your Complaint

23 so we've got to explore them and so you allege unreasonable

24 delay so I'm asking if 11 days is unreasonable in your

25 opinion to respond to a question?

1       A.    I don't know what is reasonable or unreasonable.

2       Q.    I'm going to show you the next letter from Acuity.

3  This is an actual letter as opposed to an e-mail.

4              (Whereupon, Exhibit K was marked

5              for identification by the court

6              reporter and is attached to the original

7              transcript of this deposition.)

8              MS. TEMPLE:  This is November 12, 2015.

9              MR. GALLIHER:  So the October 16th letter, did we

10  mark that as K?

11             MS. TEMPLE:  Yes.  This will be L.

12      Q.    All right.  Do you see this is dated

13  November 12th, correct?

14      A.    Yes.

15      Q.    Okay.  The second paragraph in our correspondence

16  of October 13, 2015, do you see that paragraph that starts

17  with that?

18      A.    Yes.

19      Q.    It says we have attached an authorization for your

20  client to complete for each medical provider your client had

21  treated with prior to and as a result of the accident, and

22  then if I go down, skip that perhaps and go to the next one.

23  The authorization appears to have expired before it was

24  provided to us.

25              Do you see that?

1       A.   Yes.

2       Q.   Do you think it's unreasonable for Acuity to

3   request an authorization that hadn't expired already?

4       A.   I would think that would be reasonable.

5       Q.   Were you aware that the authorization that was

6   produced on your behalf was already expired at the time it

7   was produced?

8       A.   No, I was not aware.

9       Q.   Were you aware that Acuity was asking for records

10  for treatment that you had had just prior to this motor

11  vehicle accident, if any?  Were you made aware of that?

12      A.   I am only aware that my attorneys were handling

13  all that.

14      Q.   Okay.  Do you think it's unreasonable for Acuity

15  to want to get an idea of what your condition was just prior

16  to the motor vehicle accident, what type of condition you

17  were in health-wise?

18      A.   I'm aware that if my attorneys felt that was

19  important, then they would disclose that.

20      Q.   And because these are your allegations that

21  Acuity's conduct was unreasonable, I want to ask you because

22  you would be the one that would be testifying at trial so I

23  want to know based on -- and I know you're smart.  You own a

24  lot of businesses.  We may have different definitions of

25  what's reasonable.  I want to know what your definition of

1  reasonable is.

2        Do you think that it's reasonable for Acuity to

3  want to get an idea of what your medical condition was just

4  prior to the motor vehicle accident?

5        MR. GALLIHER:  Form, foundation.

6        THE WITNESS:  I would say it would be reasonable

7  just prior.  Going back 20 and 30 years is not reasonable.

8        MS. TEMPLE:

9    Q.   And particularly for someone in your case.  I know

10 your surgery had been many years prior but for someone who

11 had a history of the same type of injury that you claim you

12 sustained in this accident, would it be fair for the company

13 to say, hey, have you had any recent treatment, if so, let

14 us know.

15        MR. GALLIHER:  Form and foundation, incomplete

16 hypothetical.

17        THE WITNESS:  It wasn't the same type of injury.

18        MS. TEMPLE:

19    Q.   Is that a fair question for them to ask in

20 general?

21    A.   A lot of questions would be fair to ask in general

22 but again what you're referring to was not the same type of

23 injury.  It's different issues, different circumstances and

24 it was a very long time ago and it was resolved with very

25 successful results.

1      Q.    Did you tell Acuity that ever?

2      A.    As I stated earlier, counselor, I have not had any

3   conversation with Acuity regarding this case whatsoever.

4   All my conversations have been with my law firm.

5      Q.    Do you know if Acuity knew that you were feeling

6   all better from the prior neck fusion that you had?

7            MR. GALLIHER:  Objection, speculation.

8            THE WITNESS:  I would not know that.

9            MS. TEMPLE:

10     Q.    Do you think that would be important for them to

11  know what they were trying to determine what injuries you

12  sustained in a motor vehicle accident if you felt all better

13  from your prior cervical fusion?

14     A.    That would be a decision made by my attorney.

15     Q.    What about you, what's your opinion on whether

16  that's a reasonable expectation for Acuity for them to want

17  to know that information that you were all better from that

18  prior fusion in order for them to evaluate your claims?

19            (Admonishment by the Certified Court Reporter

20            reminding everyone to speak one at a time.)

21            MS. TEMPLE:  Same objection.  Go ahead.

22            THE WITNESS:  I'm going to hate to say this.  Can

23  you repeat the question.

24            MS. TEMPLE:  All right.

25     Q.    Do you think it would be important to know what

1  you just told me, would it have been important for Acuity to

2  know that you were all better from that prior fusion before

3  your involvement in this motor vehicle accident?

4          MR. GALLIHER:  Objection, foundation, speculation,

5  asked and answered.

6          THE WITNESS:  The best way I can answer that is

7  what I've tried to get across earlier and that is that my

8  opinion here in this matter really doesn't matter.  I

9  provided my attorneys with every answer that I could

10  reasonably, you know, answer as I have with this panel

11  today.

12          I've been extremely truthful in every way but,

13  again, my pain doesn't matter.  We're talking about issues

14  of law and that's where I back out because I am not an

15  attorney.

16          MS. TEMPLE:

17      Q.   And that's why I'm purposely trying to ask you for

18  your opinion as a reasonable prudent person.  I want you to

19  understand at trial your attorneys aren't going to be

20  testifying.  All of the allegations that are complained in

21  your Complaint are going to be your allegations so I want to

22  know what you think is reasonable because your Complaint

23  specifically alleges that the conduct of Acuity was

24  unreasonable and you'll be the one testifying to that at

25  trial so we're entitled to explore that today.

1        So I'll ask you again do you think that it's
2   unreasonable on the part of Acuity or do you think that it's
3   important for them to know that you were fine just before
4   this motor vehicle accident?
5            MR. GALLIHER:  Same objection.
6            MS. TEMPLE:
7       Q.   That you weren't still getting treatment for your
8   neck, that you felt all better.
9       A.   I would think Acuity would have need for that
10  knowledge.
11      Q.   Also in this same letter Acuity asks for a list of
12  your medical providers that you may have been treating with
13  just prior to the motor vehicle accident.
14           Were you ever made aware that Acuity was seeking
15  that information?
16      A.   Yes, because I provided that to my legal counsel
17  who in turn provided it to Acuity.
18      Q.   Have you ever seen any communication -- I think
19  you said you hadn't seen any communication between your
20  attorney and Acuity.
21      A.   I don't recall ever seeing anything like that.
22      Q.   So how do you know that that information was
23  provided to Acuity?  Have you ever seen anything suggesting
24  that?
25      A.   Because they asked me who were the doctors and

1  such, what was the medical treatment.

2      Q.    Okay.

3      A.    I wouldn't know who was asking that, was it Acuity

4  or was it Ganz & Hauf.

5      Q.    So this last letter that we just talked about was

6  November 12, 2015, where they said we've got an expired

7  authorization, please give us one that's not expired and

8  please give us a list of providers that you treated with

9  prior to the accident.

10     A.    Is there a question?

11     Q.    No.  I'm going to now move on.

12             (Whereupon, Exhibit L was marked

13             for identification by the court

14             reporter and is attached to the

15             original transcript of this deposition.)

16           MS. TEMPLE:

17     Q.    The next letter that I have is January 19, 2016,

18  from Ganz and Hauf.  Do you see that?

19     A.    I do.

20     Q.    We'll mark this as the next exhibit in line.  This

21  response was sent January 19, 2016, two months after the

22  letter from Acuity asking for the authorization.

23           Do you think that that that's a reasonable

24  response time?

25           MR. GALLIHER:  Same objection.

1          THE WITNESS:  I wouldn't know what's reasonable I

2     mean reasonable is a week, a month, a year, I wouldn't know.

3          MS. TEMPLE:

4     Q.   Well, do you have a specific -- do you believe --

5     let me ask you this -- that this was unreasonable?  Do you

6     have any basis to say that two months to respond to

7     correspondence during the handling of a claim is

8     unreasonable?

9          MR. GALLIHER:  Lacks foundation, calls for

10    speculation.

11         THE WITNESS:  I believe two months is quite a bit

12    of time.

13         MS. TEMPLE:  Okay.

14    Q.   So when your attorneys responded to Acuity two

15    months later, do you see that second sentence where they

16    provided an enclosed HIPAA-compliant authorization that you

17    signed?

18    A.   Yes.

19    Q.   Actually this was attached to that letter.  It's

20    the second page with the authorization.

21         Is that your signature?

22    A.   Yes.

23    Q.   Can you tell me where in that letter there's a

24    list of the pre-accident medical providers that Acuity had

25    requested?

1      A.    I wouldn't know.

2      Q.    Well, I'm letting you see the letter.  I think

3  you've got the letter.  That's the letter sent from your

4  attorney to Acuity.  Do you see anywhere in that letter

5  where Acuity was provided with the pre-accident medical

6  providers?

7      A.    Counsel, for all I know there's more pages to

8  this.  Maybe it was sent out and it's not here right now.

9      Q.    I'll represent to you that is the letter received

10 on January 19, 2016, by Acuity two pages long one of which

11 is your authorization for the release of records.

12         Based on my representation and your ability to

13 read what your attorney wrote, do you see anything in that

14 letter where, anywhere in that letter where your attorney

15 provided a list of pre-accident medical providers?

16     A.    I don't see anything with this letter --

17     Q.    Okay.

18     A.    -- like what you mentioned.

19     Q.    Okay.  And, again, I don't have to flip back to

20 it, the November 19, 2015, letter that we referenced if your

21 attorney wants to show you the prior letter which was the

22 prior exhibit --

23         MR. GALLIHER:  The November 12th letter.

24         MS. TEMPLE:  Yeah.  That second paragraph

25 specifically says we have attached an authorization for your

1  client to complete for each medical provider that your

2  client had treated with prior to and as a result of this

3  accident.

4       Q.   Do you see that?

5       A.   I do.

6       Q.   How many authorizations did your attorney attach

7  to this correspondence based on what has been presented to

8  you today?

9       A.   Based on what I see here today, which there may be

10 more pages, I'm not aware of that.  I don't see that.

11      Q.   Okay.  You see one authorization.

12      A.   On this letter.

13           MR. GALLIHER:  She's talking about this letter.

14           THE WITNESS:  It's the authorization that I

15 signed.  Is that what you're asking?

16           MS. TEMPLE:

17      Q.   Yeah, just one authorization though, right?

18      A.   It doesn't state an authorization.  It says it has

19 my signature saying I authorize you to release the requested

20 information.

21      Q.   Okay.  Does it have -- does this letter include an

22 authorization made out to each medical provider with whom

23 you received medical care both before and after the

24 accident?

25           MR. GALLIHER:  I'm going to object to the

1  foundation.

2          THE WITNESS:  Are you asking does it show the

3  names of the providers?

4          MS. TEMPLE:

5     Q.   Yes.

6     A.   No, it does not.

7     Q.   Is this letter responsive to the request from

8  Acuity?

9          MR. GALLIHER:  Form, foundation.

10         THE WITNESS:  This letter, if this is it in its

11 entirely, does not have all of the names of the providers.

12 For all I know there may be a followup letter or followup

13 e-mail.  I don't know.

14         MS. TEMPLE:  All right.

15    Q.   This is the next letter from Acuity to your

16 attorney and this is dated February 2, 2016, and we'll mark

17 this as the next exhibit in line which is Exhibit N.

18         Do you see that second paragraph there?

19    A.   I do.

20    Q.   The first line actually says we are in receipt of

21 your correspondence dated January 19, 2016.

22         Do you see that?

23    A.   I do.

24    Q.   And this letter is about just under two weeks

25 after that.  Do you have a complaint with the timeliness of

1  this letter, two weeks to respond to the authorization in

2  the prior letter provided by your attorney?

3          MR. GALLIHER:  Foundation.

4          THE WITNESS:  Do I have a complaint about that?

5          MS. TEMPLE:  Sure.

6     Q.   Do you think it's unreasonable?

7     A.   No.

8     Q.   That second paragraph states we again ask that you

9  provide a list of and authorization for each medical

10 provider that your client has treated with for at east five

11 years prior to this accident.  We will need to review

12 pre-accident records in order to properly evaluate this

13 claim.

14          Do you see that?

15    A.   Yes.

16              (Whereupon, Exhibits M and N were

17              marked for identification by the

18              court reporter and are attached to

19              the original transcript of this deposition.)

20          MR. GALLIHER:  I'd object to that exhibit as being

21 incomplete.

22          MS. TEMPLE:  That's fine.  All right.

23    Q.   Next letter is dated March 2, 2016, and we'll mark

24 it as Exhibit O.  This letter is dated March 2, 2016, and

25 this is a letter from Acuity to your attorney.

1           Do you see that?

2      A.   I do.

3      Q.   The first sentence we would like to inquire as to

4  the status of our communication to you dated February 2,

5  2016.

6           Do you see that?

7      A.   Yes, I do.

8      Q.   Is it reasonable for 30 days to go by with no

9  response from your attorney?

10          MR. GALLIHER:  Foundation.

11          THE WITNESS:  I do not pretend to know what

12 reasonable is in this case.  Again, I'm not being facetious.

13 What is reasonable?  Is reasonable a week, a day, a month?

14 I don't know.

15          MS. TEMPLE:

16     Q.   Would you have expected your attorney to respond

17 on your behalf within 30 days with a response to Acuity?

18          MR. GALLIHER:  Same objection.

19          THE WITNESS:  I would expect my attorney to

20 respond in a timely manner.

21          MS. TEMPLE:

22     Q.   What's timely, one month, two months, five months?

23          MR. GALLIHER:  Asked and answered.

24          THE WITNESS:  Subjective.  I don't know.

25 / / /

1            MS. TEMPLE:

2      Q.    And you're the one alleging the unreasonable delay

3  so let me ask you if you can't say 30 days what would be

4  reasonable, how long?  Is 90 days too long to wait to hear a

5  responsible?

6            MR. GALLIHER:  Argumentative.

7            THE WITNESS:  I would hope that reasonable would

8  mean as quickly as reasonably possible.

9            MS. TEMPLE:

10     Q.    Do you think it would be reasonably possible to

11 respond to Acuity's response earlier than, say, 60 days?

12           MR. GALLIHER:  Foundation and speculation.

13           THE WITNESS:  Yes.

14           MS. TEMPLE:  All right.  If you'll pass that to

15 the court reporter for me.

16               (Whereupon, Exhibits O and P were

17               marked for identification by the

18               court reporter and are attached to

19               the original transcript of this deposition.)

20           MS. TEMPLE:

21     Q.    The next letter sent from Acuity to your attorney

22 is dated May 10, 2016, three months after the letter

23 requesting the list of providers.  We again would like to

24 inquire as to the status of our communications to you dated

25 February 6, 2016, and March 2, 2016.

1          Do you see that?

2     A.    I do.

3     Q.    The next sentence asks could you confirm receipt

4  of the correspondence of 2/2/16 in which we asked you to

5  provide a list of and/or confirm the list of medical

6  providers we enclosed.

7          Do you see that?

8     A.    Yes.

9     Q.    Were you aware that your attorneys had not

10 responded to Acuity and their request for your medical

11 information?

12          MR. GALLIHER:  Form, foundation.

13          THE WITNESS:  No, I would not be aware of that.

14          MS. TEMPLE:

15    Q.    And you've already testified that three months

16 would be, you would expect your attorney to have responded

17 earlier than three months after that correspondence?

18          MR. GALLIHER:  Asked and answered.

19          THE WITNESS:  I would expected my attorneys or any

20 professional to behave, not behave, I'm sorry.  Wrong choice

21 of words, would be to perform their responses in a timely

22 manner.

23          MS. TEMPLE:

24    Q.    Earlier than three months?

25          MR. GALLIHER:  Argumentative.

1          THE WITNESS:  I know there are, you know, parts of
2     different laws different states that says attorneys have X
3     numbers of days to respond to X request.  I don't know what
4     that is in Nevada.  It may be six months.  It may be
5     30 days.  I don't know.  And, again, I'm not being vague.  I
6     don't know the laws and regulations that attorneys have to
7     follow here in Nevada.
8          MS. TEMPLE:
9     Q.    Irrespective of the laws in the State of Nevada,
10    you allege unreasonable delay and if I understand your
11    testimony, you would have expected a response earlier than
12    two months after a letter was sent requesting information.
13    A.    I would hope so.
14         MS. TEMPLE:  This is the next exhibit in line.
15    We'll mark it as Exhibit Q.
16              (Whereupon, Exhibit Q was marked
17              for identification by the court
18              reporter and is attached to the
19              original transcript of this deposition.)
20         MS. TEMPLE:
21    Q.    So I just handed you what's been marked as
22    Exhibit Q dated July 6, 2016.  Do you see that?
23    A.    Yes.
24    Q.    And now that's five months after the first letter
25    February 2, 2016.  The first line says we would again like

1  to inquire as to the status of our communications to you

2  dated February 2, 2016, March 2, 2016, and May 10, 2016.

3  Copies of these communications are enclosed for your

4  convenience.

5           Do you see that?

6      A.   I do.

7      Q.   Were you aware that no response had been received

8  by Acuity to the request for a list of your medical

9  providers?

10     A.   As stated earlier, I would not be aware of

11  anything like that.

12     Q.   Five months is an unreasonable amount of time to

13  respond to a correspondence requesting that information.

14          Do you agree with that?

15          MR. GALLIHER:  Foundation, form, argumentative.

16          THE WITNESS:  Possibly.  I would think so.

17          MS. TEMPLE:  All right.

18              (Whereupon, Exhibit R was marked for

19              identification by the court reporter

20              and is attached to the original

21              transcript of this deposition.)

22          MS. TEMPLE:

23     Q.   So this is Exhibit R dated July 20, 2016.

24          Do you see that?

25     A.   Yes.

```
 1        Q.    Okay.  And this is correspondence now from your
 2  attorney back to Acuity.  Do you see that as well?
 3        A.    Yes.
 4        Q.    And in that middle paragraph it lists your
 5  provider.  Do you see that?
 6        A.    Yes.
 7        Q.    Okay.  Do you see your general practitioner with
 8  whom you were treating prior to this accident?
 9        A.    Are you referring to the, what, the 10, 20 years
10  earlier?  What are you referring to?
11        Q.    No.  I'm referring to the medical provider that
12  was providing you medication for gout for example.
13        A.    No.
14        Q.    Do you see any of your pre-accident medical
15  providers in that paragraph?
16        A.    I don't believe so.
17        Q.    Do you see any explanation in this letter or any
18  of the prior letters that we've reviewed stating that you
19  were no longer experiencing any neck pain prior to this
20  motor vehicle accident?
21        A.    It doesn't have that in there.
22        Q.    Do you see anything within this letter or have you
23  seen anything within any other letters that suggest that you
24  were in what you describe as great health prior to this
25  motor vehicle accident?
```

1        A.    No.

2                    (Whereupon, Exhibit S was marked

3                    for identification by the court

4                    reporter and is attached to the

5                    original transcript of this deposition.)

6        MS. TEMPLE:

7        Q.    I'm now going to show you what has been marked

8   Exhibit S dated December 7, 2016.  Do you see that?

9        A.    Yes.

10       Q.    And this letter is to your attorney from Acuity.

11  Do you see that?

12       A.    Yes.

13       Q.    Okay.  Third paragraph do you see where it starts

14  we and it says we have made multiple requests for medical

15  authorization and information that will allow us to access

16  medical records for any treatment prior to this date of

17  loss.

18               Do you see that?

19       A.    Yes.

20       Q.    And would you agree with me based on what we've

21  reviewed so far that information has not been provided by

22  your attorney up until this point in time?

23       A.    I cannot --

24               MR. GALLIHER:  Object to form, foundation.  Go

25  ahead.

```
 1           THE WITNESS:  I cannot attest what my attorney
 2  provided or not provided.
 3           MS. TEMPLE:
 4      Q.   Based on what you've provided so far, do you see
 5  any information in what you've reviewed that that
 6  information was provided?
 7      A.   No.
 8      Q.   If you can continue on this paragraph, it says in
 9  our last communication with your office in October 2016, we
10  spoke with Ms. Brittany Armstrong.  We informed her that our
11  medical evaluation has indicated medical treatment prior to
12  the accident of April 7, 2013.  This includes but is not
13  limited to a pre-loss fusion of C6-7.  We had again asked
14  for medical providers, dates of service, and medical
15  authorizations to obtain those records.  Ms. Armstrong had
16  advised us that she would contact Mr. Humes and obtain the
17  information we required.
18           Do you see where it says that?
19      A.   Yes.
20      Q.   Were you aware that Acuity had again asked for
21  this information on December 7, 2016?
22      A.   No, I would not have been aware.
23               (Whereupon, Exhibit T was marked for
24                identification by the court reporter
25                and is attached to the original
```

1              transcript of this deposition.)4.

2         MS. TEMPLE:

3    Q.   December 30, 2016, is a letter from Acuity to your

4  attorneys.  Do you see that?

5    A.   Yes.

6    Q.   Do you see that the first sentence says this will

7  followup our letter of December 7, 2016?

8    A.   Yes.

9    Q.   And do you see where it says it will also followup

10  our conversation, telephone conversation of December 19,

11  2016?

12    A.   I do.

13    Q.   In our telephone conversation you had indicated

14  that you would contact your client regarding any medical

15  treatment prior to April 7, 2013, date of loss.

16         Do you have any indication that prior to

17  December 30, 2016, that information that was requested had

18  been provided?

19    A.   I would not have that.

20    Q.   Were you aware of this letter on December 30,

21  2016, again requesting that information that had been

22  requested since February 2016?

23    A.   No.

24    Q.   Does all of this information that you've been

25  provided today to review change your opinion with regard to

1  any delay on the part of Acuity in evaluating your claim?

2          MR. GALLIHER:  Form, foundation, speculation.

3          THE WITNESS:  I would suspect my own personal

4  opinion that there were delays on both sides.

5          MS. TEMPLE:

6     Q.    What information do you have, if any, to suggest

7  that there was any delay on the part of Acuity?

8          MR. GALLIHER:  Form and foundation.

9          THE WITNESS:  As I said, suspect.

10         MS. TEMPLE:  Okay.

11    Q.    Do you have any evidence or information as you sit

12 here today to suggest that Acuity delayed any evaluation of

13 your claim?

14    A.    No.

15         MR. GALLIHER:  Same objection.

16         MS. TEMPLE:

17    Q.    Do you have any evidence as you sit here today

18 that on the other hand your attorneys delayed in providing

19 the information requested?

20         MR. GALLIHER:  Same objection.

21         THE WITNESS:  I wouldn't know how to answer that.

22         MS. TEMPLE:

23    Q.    So based on what we've reviewed in the past half

24 hour, you don't have an opinion as to whether there was a

25 delay on the part of your attorney's office in providing the

```
 1  information requested by Acuity?
 2          MR. GALLIHER:  Asked and answered.
 3          THE WITNESS:  You have given me one side of the
 4  story.  I have not heard the other side.
 5          MS. TEMPLE:
 6      Q.   Based on what you've seen, do you have an opinion
 7  one way or the other?
 8          MR. GALLIHER:  Same objection.
 9          THE WITNESS:  I don't form an opinion until I know
10  all the facts available to me and again, not being vague,
11  but common sense.
12          MS. TEMPLE:  That's okay.
13      Q.   Did you have any of this information when you
14  filed your lawsuit against Acuity?
15      A.   No.
16      Q.   You didn't have their version.
17      A.   I wasn't aware of any delays.
18      Q.   Your Complaint also alleges that you had medical
19  payments coverage.  Were you aware of that medical payment
20  coverage under your policy?
21      A.   I probably did have.  I mean $20,000 a year I
22  probably did have.
23      Q.   Okay.  Do you have an understanding as to what
24  that coverage provides?
25      A.   I would presume medical coverage payments.
```

1      Q.   Do you have -- your Complaint alleges that you

2   have $5,000 in coverage but you don't know one way or the

3   other what your coverage was as you sit here today?

4      A.   Not to the full extent, no.

5      Q.   Your Complaint also alleges that that medical

6   coverage was never paid by Acuity.  Did you have independent

7   knowledge as to whether Acuity ever paid that $5,000 in

8   medical payment coverage?

9      A.   No, I do not have independent knowledge of that.

10      Q.   Have you ever seen a copy of the medical payment

11   coverage ledger showing any payments that may have been

12   made?

13      A.   No, I have not.

14      Q.   Have you ever requested that from Acuity?

15      A.   No, I have not.  I have had no communication with

16   Acuity whatsoever at any time.

17      Q.   If Acuity were to tell you that they had paid

18   Black Hills Surgical Hospital and Alternative Health Care a

19   combined $5,000 which you allege is the limit of your

20   coverage, would you have any reason to dispute that the

21   balance of your medical payment coverage was paid?

22      A.   Knowing that you, counselor, are an officer of the

23   court I would not doubt that you are telling me the truth.

24      Q.   And you don't have any evidence to dispute that

25   information?

1        A.    No.

2        Q.    Part of the claims that you're making against

3    Acuity include a claim that you're entitled to damages for

4    pain and suffering.

5              Do you understand that?

6        A.    Yes.

7        Q.    Would you agree with me that a person's pain and

8    suffering is subjective?

9              MR. GALLIHER:  Form, foundation, calls for a

10   medical opinion.

11             THE WITNESS:  Well, since nobody knows the pain

12   that I suffer internally, then yes, it would have to be

13   subjective.

14             MS. TEMPLE:

15       Q.    What's painful to you may not be painful to

16   someone else and vice versa.

17       A.    Is there a question there?

18       Q.    Is that a true statement?

19       A.    I would say yes.

20             MR. GALLIHER:  Foundation, speculation.

21             MS. TEMPLE:

22       Q.    And what you'd value your pain and suffering

23   another reasonably-minded person could put a totally

24   different value on that pain and suffering.

25             Is that a fair statement?

1     A.    I know there are people in this world that don't
2  know what pain is.  I am not one of them.
3     Q.    You understand that Acuity's role in evaluating
4  your claim is to determine what pain and suffering,
5  essentially put a dollar amount on that pain and suffering.
6          Do understand that?
7          MR. GALLIHER:  Object to the form, foundation,
8  calls for a legal opinion.
9          THE WITNESS:  Yes.
10         MS. TEMPLE:   Okay.
11    Q.    And, again, an amount that you would value your
12 pain and suffering at could be a totally different amount
13 than what a reasonable person at Acuity might value your
14 pain and suffering at.
15         Is that a fair statement?
16         MR. GALLIHER:  Can I have that back.
17             (Question read.)
18         MR. GALLIHER:  Form and foundation, speculation.
19         THE WITNESS:  I wouldn't know how to answer that
20 because a reasonable man concept can vary from reasonable
21 man to reasonable man.  I don't know.  You know, if you
22 would compare me to somebody that is a super athlete, that
23 would be different.
24         If you would compare my wages that I've lost
25 compared to somebody that works at a Coca-Cola plant

1  standing bottles up that have fallen down, that would be

2  different.  A lot of factors come into play here.

3            MS. TEMPLE:

4      Q.   Just because two different people have two

5  different opinions on what pain and suffering is valued at

6  that doesn't make one person reasonable and one person

7  unreasonable?

8            MR. GALLIHER:  Form and foundation.

9            THE WITNESS:  Trying to establish what is a

10 reasonable -- pain and suffering.  I wouldn't know how to

11 answer that.  I can only answer for myself personally.

12           MS. TEMPLE:

13     Q.   Well, let me ask you what monetary amount would

14 you put on your pain and suffering that you incurred as a

15 result of this accident because you understand that a jury

16 would ask you to do that.

17     A.   That would be dependent on many different

18 variables which I can't answer.  That would be something

19 that would be figured out by pre-prescribed formulas such as

20 when 9/11 happened.  You know, different people received

21 different payouts based upon their professions and their age

22 limitations, how much pain was involved, what medical

23 treatment they received.  There's a lot of different

24 variables here and that would be the point of going through

25 all this is what exactly was involved, how long, how much.

1        Q.    You've been paid a hundred thousand dollars by the

2   other driver; is that correct?

3              MR. GALLIHER:  Form, foundation.

4              THE WITNESS:  I don't know how much I've been paid

5   to be honest with you because some of those fees went to go

6   pay doctors and such.  I myself I don't recall getting

7   hardly anything.  All that went to pay the bills.

8              MS. TEMPLE:

9        Q.    The other driver had a hundred thousand dollars in

10  insurance.

11             MR. GALLIHER:  Foundation.

12             MS. TEMPLE:

13       Q.    Is that your understanding?

14       A.    Okay.

15       Q.    I'm asking.  Do you have an understanding?

16       A.    I don't know how much he had.

17       Q.    You understand that your claim is made under your

18  coverage for underinsured motorists.

19       A.    Yes.

20       Q.    But you don't know what the other motorist's

21  insurance was?

22             MR. GALLIHER:  Foundation.

23             THE WITNESS:  There's no reason for me to know

24  that.  I have no knowledge of even the vehicle that he was

25  driving.  I don't know.  Up until recently I didn't even

```
 1  know his full name or he had his girlfriend with him.
 2          MS. TEMPLE:
 3      Q.   But despite that you can say that that driver was
 4  underinsured?
 5      A.   If he had a hundred thousand as you said and my
 6  bills and such are going to exceed that, then yes, I would
 7  call that underinsured.
 8      Q.   Do you know how much you've incurred in medical
 9  bills so far?
10      A.   No.
11      Q.   Have you put a monetary amount on your pain and
12  suffering?
13      A.   I have not.
14      Q.   Are you aware that your attorney demanded $250,000
15  as settlement from Acuity on your behalf?
16      A.   I am not.
17      Q.   Are you aware that that demand as of a month ago
18  was $950,000?
19      A.   I am not.
20      Q.   So you would have no knowledge as to the reason
21  why your demand increased from 250,000 to 950,000?
22      A.   I am not.
23      Q.   Have you ever been convicted of a felony?  That's
24  a question we ask all deponents.
25      A.   Never.
```

1      Q.    Have you ever been convicted of a misdemeanor?
2  Specifically I'm looking for a crime of dishonesty, fraud,
3  something along those lines.
4      A.    Never.
5      Q.    Do you have a Facebook page?
6      A.    I do.
7      Q.    Personal or business?  I know you testified to
8  business earlier.
9      A.    Yes.
10     Q.    Both?
11     A.    Yes.
12     Q.    And what is your personal page under, your full
13  name?
14     A.    Yes.
15     Q.    Do you post on that page regularly?
16     A.    No.
17     Q.    What about your business page, as a function of
18  the marketing are you updating that page regularly?
19     A.    It is a function of marketing.  I do not do that.
20     Q.    Does somebody else do that?
21     A.    Yes.
22     Q.    What's the name of your page?
23     A.    Americas Mailbox.
24     Q.    It was my understanding you did have a role in
25  that.  Is that inaccurate?

```
 1        A.    I have a person that handles all my social media.
 2   I give them pictures of the rallies that I attend on
 3   occasion.
 4        Q.    Do you have an Instagram account?
 5        A.    I believe he has one set up.
 6        Q.    How about you for personal use?
 7        A.    No.
 8        Q.    Have you ever posted anything on Facebook about
 9   this accident?
10        A.    No.
11        Q.    Have you ever posted anything on Facebook about
12   the injuries that you sustained in this accident?
13        A.    No.  I rarely go on Facebook as it is.  I consider
14   it a huge waste of time.
15             MS. TEMPE:  All right.  I don't think I have
16   anymore questions but if you'll just let me have like five
17   seconds just to step out real quick and make sure that
18   there's nothing else.
19             You don't have any questions, right?
20             MR. GALLIHER:  Right.
21                 (Pause in proceedings.)
22                 (Whereupon, Exhibit U was marked for
23                 identification by the court reporter
24                 and is attached to the original
25                 transcript of this deposition.)
```

```
 1            MS. TEMPLE:  So we're back on the record.  I want
 2  to just clarify that one of the documents that we
 3  referenced, the Alternative Health Care Center treatment
 4  record dated 10/21/11, was not marked as an exhibit because
 5  I didn't identify it as an exhibit.  It's now marked as
 6  Exhibit U and I don't have anymore questions.  Thank you for
 7  your time.
 8            MR. GALLIHER:  No questions.
 9                (Whereupon the proceedings
10                concluded at 3:59 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    REPORTER'S CERTIFICATE

 2

 3   STATE OF NEVADA     )
                         ) ss
 4   COUNTY OF CLARK     )

 5          I, CHERYL GARDNER, CCR 230, RPR, RMR, do hereby
     certify:
 6
            That I reported the taking of the deposition of the
 7   witness DONALD CARL HUMES commencing on May 2, 2018 at the
     hour of 10:00 a.m.
 8
            That prior to being examined, the witness was by me
 9   duly sworn to testify to the truth, the whole truth, and
     nothing but the truth:
10
            That I thereafter transcribed my said shorthand
11   notes into typewriting, and that the typewritten transcript
     of said deposition is a complete, true, and accurate
12   transcription of my said shorthand notes taken down at said
     time:
13
            I further certify that I am not a relative or
14   employee of an attorney or counsel of any of the parties,
     nor a relative or employee of any attorney or counsel
15   involved in said action, nor a person financially interested
     in the action; that a request has NOT been made to review
16   the transcript.

17          IN WITNESS WHEREOF, I have hereunto set my hand and
     affixed my official seal of office in the County of Clark,
18   State of Nevada, this 10th day of May, 2018.

19

20                        _____
                          Cheryl Gardner, CCR 230
21

22

23

24

25
```

# EXHIBIT 2

# AFFIDAVIT

## True Copy of Policy

STATE OF WISCONSIN   )
                               )

SHEBOYGAN COUNTY   )

<u>Dennis R Rickard</u>, <u>Manager - Commercial Underwriting</u> of Acuity, A Mutual Insurance Company, being familiar with the forms used by the company in its regular course of business and being its custodian of underwriting records and files, certifies that <u>he</u> has checked the records for policy number <u>X42163</u> issued to <u>AM Development LLC</u> and covering <u>Commercial Auto and Commercial Excess Liability</u> during the policy term from <u>05/01/2012</u> to <u>05/01/2013</u>.

THAT said policy according to the records was subject to the Coverages and Limits, Insuring Agreements, Conditions, Exclusions, and applicable Endorsements as attached.

_Dennis R Rickard_
_____
Dennis R Rickard

Subscribed and sworn to before me
this ____13th____ day of __March__ , __2018__

_Debra A. Chvarak_
_____

Notary Public, State of Wisconsin
My Commission: _Expires 1·30·2021_



UC-179(12-06)

F 0001



**ACUITY.**
A Mutual Insurance Company

**COMMERCIAL AUTO
COVERAGE PART**

### Business Auto Declarations

**Item One**
First Named Insured and Address:

AM DEVELOPMENT LLC
C/O DONALD HUMES

Agency Name and Number:

BANKWEST INSURANCE
7937-AB

Policy Number:   X42163

Policy Period:   Effective Date:      05-01-12

Expiration Date:    05-01-13

In return for the payment of the premium and subject to all the terms of the policy, we agree to provide the insurance coverage as stated in the same.

12:01 A.M. standard time at your mailing address shown in the declarations

**Item Two**
**SCHEDULE OF COVERAGES AND COVERED AUTOS**

Each of these coverages apply only to those *autos* shown as covered *autos* by the entry of one or more of the symbols from the Covered Autos section of the Business Auto Coverage Form next to the name of the coverage.

| Coverages | Covered Auto Symbols | Limit of Insurance | | Premium |
|---|---|---|---|---|
| Liability | 2 | $  1,000,000  each *accident* | | $      402.00 |
| Auto Medical Payments | 2 | 5,000  each person | | 36.00 |
| Uninsured Motorists Bodily Injury | 2 | 1,000,000  each person | 1,000,000  each *accident* | 86.00 |
| Underinsured Motorists | 2 | 1,000,000  each person | 1,000,000  each *accident* | |

**Estimated Schedule Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**$      524.00**

**PREMIUM SUMMARY**

Estimated Schedule Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$      524.00

Estimated Endorsement Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      100.00

**Estimated Advance Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**$      624.00**

**COVERAGE FORMS AND ENDORSEMENTS APPLICABLE TO BUSINESS AUTO COVERAGE**

| Form Number | Form Title | Premium |
|---|---|---|
| IL-0017F (11-98) | Common Policy Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | |
| IL-0021F (11-11) | Nuclear Energy Liability Exclusion - Broad Form . . . . . . . . . . . . . . . . . . . . | |
| IL-7012 (11-11) | Asbestos Exclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CA-0001F (12-11) | Business Auto Coverage Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CA-2384F (01-06) | Exclusion of Terrorism . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| CA-7073 (10-09) | South Dakota Uninsured and Underinsured Motorists Coverage . . . . . . . . | |

Page 2

Policy Number:  X42163
Effective Date:  05-01-12

| Form Number | Form Title | Premium |
|---|---|---|
| CA-7074 (10-11) | South Dakota Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  |
| CA-7247 (09-09) | ACUITY Enhancements - Business Auto . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.00 |
| CA-9903F (03-06) | Auto Medical Payments Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |  |
| IL-7024 (05-02) | South Dakota Changes - Cancellation and Nonrenewal . . . . . . . . . . . . . |  |

**Estimated Endorsement Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**$    100.00**

Item Three
**SCHEDULE OF COVERAGES**

| Unit No. | Model Year | Vehicle Description | Vehicle ID Number | PGS Comp | PGS Coll | Terr | Class Code |
|---|---|---|---|---|---|---|---|
| 001 | 00 | SATURN LS | 1G8JS52F0Y0000000 | 006 | 006 | 510 | A10800 |

| Unit No. | Liability Limit | Liability BI Premium | Liability PD Premium | PD Deductible | Medical Payments Limit | Premium |
|---|---|---|---|---|---|---|
| 001 | 1,000,000 | 402.00 | Included | | 5,000 | 36.00 |

| Unit No. | Uninsured Motorists Limit [3] | Premium | UMPD Deductible | Underinsured Motorists Limit [3] | Premium |
|---|---|---|---|---|---|
| 001 | 1,000/1,000/0 | 86.00 | | 1,000/1,000 | |

| Unit No. | Comprehensive Stated Amount | Deductible Amount | Premium Amount | Specified Causes of Loss Stated Amount | Deductible Amount | Premium Amount | Full Glass |
|---|---|---|---|---|---|---|---|
| 001 | | | | | | | |

| Unit No. | Collision Stated Amount | Deductible Amount | Premium Amount | Towing Limit | Premium | APC Discount | Safety Discount |
|---|---|---|---|---|---|---|---|
| 001 | | | | | | | |

| Unit No. | Fleet No. | Premium Per Unit Number |
|---|---|---|
| 001 | | 524.00 |

**Estimated Schedule Premium**  . . . . . . . . . . . . . . . . $    **524.00**

[3] First number is thousands of bodily injury coverage each person; second number is thousands of bodily injury coverage each *accident;* third number (if any) is thousands of property damage coverage each *accident.*

**ADDITIONAL NAMED INSUREDS**

WHO IS AN INSURED includes the following Additional Named Insureds:

AMERICA'S MAILBOX LLC

CA-7000(2-09)

SO 01 06/18/12   F  0003

AMERICA'S CAMPING & LODGING

**FIRST NAMED INSURED IS:**

LIMITED LIABILITY COMPANY

## BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declara-

tions. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in italics have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERED AUTOS

Item Two of the Declarations shows the *autos* that are covered *autos* for each of your coverages. The following numerical symbols describe the *autos* that may be covered *autos*. The symbols entered next to a coverage on the Declarations designate the only *autos* that are covered *autos*.

### A. DESCRIPTION OF COVERED AUTO DESIGNATION SYMBOLS

SYMBOL   DESCRIPTION

**1 =**   ANY *AUTO*.

**2 =**   OWNED *AUTOS* ONLY. Only those *autos* you own (and for Liability Coverage any *trailers* you do not own while attached to power units you own). This includes those *autos* you acquire ownership of after the policy begins.

**3 =**   OWNED PRIVATE PASSENGER *AUTOS* ONLY. Only the private passenger *autos* you own. This includes those private passenger *autos* you acquire ownership of after the policy begins.

**4 =**   OWNED *AUTOS* OTHER THAN PRIVATE PASSENGER *AUTOS* ONLY. Only those *autos* you own that are not of the private passenger type (and for Liability Coverage any *trailers* you do not own while attached to power units you own). This includes those *autos* not of the private passenger type you acquire ownership of after the policy begins.

**5 =**   OWNED *AUTOS* SUBJECT TO NO-FAULT. Only those *autos* you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those *autos* you acquire ownership of after the policy begins provided they are required to have no-fault benefits in the state where they are licensed or principally garaged.

**6 =**   OWNED *AUTOS* SUBJECT TO A COMPULSORY UNINSURED MOTORISTS LAW. Only those *autos* you own that because of the law in the state where they are licensed or principally garaged, are required to have and can-

not reject Uninsured Motorists Coverage. This includes those *autos* you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement.

**7 =**   SPECIFICALLY DESCRIBED *AUTOS*. Only those *autos* described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any *trailers* you do not own while attached to any power unit described in Item Three).

**8 =**   HIRED *AUTOS* ONLY. Only those *autos* you lease, hire, rent or borrow. This does not include any *auto* you lease, hire, rent or borrow from any of your *employees* or partners or members of their households.

**9 =**   NONOWNED *AUTOS* ONLY. Only those *autos* you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes *autos* owned by your *employees,* partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs.

**19 =**   MOBILE EQUIPMENT SUBJECT TO COMPULSORY OR FINANCIAL RESPONSIBILITY OR OTHER MOTOR VEHICLE INSURANCE LAW ONLY. Only those *autos* that are land vehicles and that would qualify under the definition of *mobile equipment* under this policy if they were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where they are licensed or principally garaged.

### B. OWNED AUTOS YOU ACQUIRE AFTER THE POLICY BEGINS

**1.** If symbols 1, 2, 3, 4, 5, 6 or 19 are entered next to a coverage in Item Two of the Declarations, then you have coverage for *autos* that you acquire of the type described for the remainder of the policy period.

**2.** But, if symbol 7 is entered next to a cov-

erage in Item Two of the Declarations, an *auto* you acquire will be a covered *auto* for that coverage only if:

**a.** We already cover all *autos* that you own for that coverage or it replaces an *auto* you previously owned that had that coverage; and

**b.** You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

**C. CERTAIN TRAILERS, MOBILE EQUIPMENT AND TEMPORARY SUBSTITUTE AUTOS**

If Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered *autos* for Liability Coverage:

**1.** *Trailers* with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

**2.** *Mobile equipment* while being carried or towed by a covered *auto.*

**3.** Any *auto* you do not own while used with the permission of its owner as a temporary substitute for a covered *auto* you own that is out of service because of its:

**a.** Breakdown;

**b.** Repair;

**c.** Servicing;

**d.** *Loss;* or

**e.** Destruction.

## SECTION II - LIABILITY COVERAGE

**A. COVERAGE**

We will pay all sums an *insured* legally must pay as damages because of *bodily injury* or *property damage* to which this insurance applies, caused by an *accident* and resulting from the ownership, maintenance or use of a covered *auto.*

We will also pay all sums an *insured* legally must pay as a *covered pollution cost or expense* to which this insurance applies, caused by an *accident* and resulting from the ownership, maintenance or use of covered *autos.* However, we will only pay for the *covered pollution cost or expense* if there is either *bodily injury* or *property damage* to which this insurance applies that is caused by the same *accident.*

We have the right and duty to defend any *insured* against a *suit* asking for such damages or a *covered pollution cost or expense.* However, we have no duty to defend any *insured* against a *suit* seeking damages for *bodily injury* or *property damage* or a *covered pollution cost or expense* to which this insurance does not apply. We may investigate and settle any claim or *suit* as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

**1. Who Is an Insured**

The following are *insureds:*

**a.** You for any covered *auto.*

**b.** Anyone else while using with your permission a covered *auto* you own, hire or borrow except:

(1) The owner or anyone else from whom you hire or borrow a covered *auto.* This exception does not apply if the covered *auto* is a *trailer* connected to a covered *auto* you own.

(2) Your *employee* if the covered *auto* is owned by that *employee* or a member of his or her household.

(3) Someone using a covered *auto* while he or she is working in a business of selling, servicing, repairing, parking or storing *autos* unless that business is yours.

(4) Anyone other than your *employees,* partners (if you are a partnership), members (if you are a limited liability company) or a lessee or borrower or any of their *employees,* while moving property to or from a covered *auto.*

(5) A partner (if you are a partnership) or a member (if you are a limited liability company) for a covered *auto* owned by him or her or a member of his or her household.

**c.** Anyone liable for the conduct of an *insured* described above but only to the extent of that liability.

**2. Coverage Extensions**

**a. Supplementary Payments**

We will pay for the *insured:*

(1) All expenses we incur.

(2) Up to $2,000 for cost of bail bonds (including bonds for related traffic law violations) required because of an *accident* we cover. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments in any *suit* against the *insured* we defend, but only for bond amounts within our Limit of Insurance.

(4) All reasonable expenses incurred by the *insured* at our request, in-

cluding actual loss of earnings up to $250 a day because of time off from work.

(5) All costs taxed against the *insured* in any *suit* against the *insured* we defend.

(6) All interest on the full amount of any judgment that accrues after entry of the judgment in any *suit* against the *insured* we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**b. Out of State Coverage Extensions**

While a covered *auto* is away from the state where it is licensed we will:

(1) Increase the Limit of Insurance for Liability Coverage to meet the limit or limits specified by a compulsory or financial responsibility law in the jurisdiction where the covered *auto* is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

(2) Provide the minimum amounts and types of other coverages, such as no-fault, required of out of state vehicles by the jurisdiction where the covered *auto* is being used.

We will not pay anyone more than once for the same elements of *loss* because of these extensions.

**B. EXCLUSIONS**

This insurance does not apply to any of the following:

**1. Expected or Intended Injury**

*Bodily injury* or *property damage* expected or intended from the standpoint of the *insured*.

**2. Contractual**

Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages:

**a.** Assumed in a contract or agreement that is an *insured contract* provided the *bodily injury* or *property damage* occurs subsequent to the execution of the contract or agreement; or

**b.** That the *insured* would have in the absence of the contract or agreement.

**3. Workers' Compensation**

Any obligation for which the *insured* or the *insured's* insurer may be held liable under any workers' compensation law, disability benefits law or unemployment compensation law or any similar law.

**4. Employee Indemnification and Employer's Liability**

*Bodily injury* to:

**a.** An *employee* of the *insured* arising out of and in the course of:

(1) Employment by the *insured;* or

(2) Performing duties related to the conduct of the *insured's* business; or

**b.** The spouse, child, parent, brother or sister of that *employee* as a consequence of paragraph a. above.

This exclusion applies:

**a.** Whether the *insured* may be liable as an employer or in any other capacity; and

**b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to *bodily injury* to domestic *employees* not entitled to workers' compensation benefits or to liability assumed by the *insured* under an *insured contract*. For the purposes of the Coverage Form, a domestic *employee* is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5. Fellow Employee**

*Bodily injury* to any fellow *employee* of the *insured* arising out of and in the course of the fellow *employee's* employment or while performing duties related to the conduct of your business.

**6. Care, Custody or Control**

*Property damage* to or *covered pollution cost or expense* involving property owned or transported by the *insured* or in the *insured's* care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

**7. Handling of Property**

*Bodily injury* or *property damage* resulting from the handling of property:

**a.** Before it is moved from the place where it is accepted by the *insured* for movement into or onto the covered *auto;* or

**b.** After it is moved from the covered *auto* to the place where it is finally delivered by the *insured*.

**8. Movement of Property by Mechanical Device**

*Bodily injury* or *property damage* resulting from the movement of property by a me-

F 0007

chanical device (other than a hand truck) unless the device is attached to the covered *auto*.

### 9. Operations

*Bodily injury* or *property damage* arising out of the operation of:

**a.** Any equipment listed in paragraphs 6b and 6c of the definition of *mobile equipment*; or

**b.** Machinery or equipment that is on, attached to, or part of, a land vehicle that would qualify under the definition of *mobile equipment* if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

### 10. Completed Operations

*Bodily injury* or *property damage* arising out of your work after that work has been completed or abandoned.

In this exclusion, your work means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in paragraphs a or b above.

Your work will be deemed completed at the earliest of the following times:

**a.** When all of the work called for in your contract has been completed.

**b.** When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

**c.** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

### 11. Pollution

*Bodily injury* or *property damage* arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of *pollutants:*

**a.** That are, or that are contained in any property that is:

(1) Being transported or towed by, han-

dled, or handled for movement into, onto or from, the covered *auto;*

(2) Otherwise in the course of transit by or on behalf of the *insured;* or

(3) Being stored, disposed of, treated or processed in or upon the covered *auto.*

**b.** Before the *pollutants* or any property in which the *pollutants* are contained are moved from the place where they are accepted by the *insured* for movement into or onto the covered *auto;* or

**c.** After the *pollutants* or any property in which the *pollutants* are contained are moved from the covered *auto* to the place where they are finally delivered, disposed of or abandoned by the *insured.*

Paragraph a above does not apply to fuels, lubricants, fluids, exhaust gases or other similar *pollutants* that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered *auto* or its parts, if:

(1) The *pollutants* escape, seep, migrate, or are discharged, dispersed or released directly from an *auto* part designed by its manufacturer to hold, store, receive or dispose of such *pollutants;* and

(2) The *bodily injury, property damage* or *covered pollution cost or expense* does not arise out of the operation of any equipment listed in paragraphs 6b and 6c of the definition of *mobile equipment.*

Paragraphs b and c above of this exclusion do not apply to *accidents* that occur away from premises owned by or rented to an *insured* with respect to *pollutants* not in or upon a covered *auto* if:

(1) The *pollutants* or any property in which the *pollutants* are contained are upset, overturned or damaged as a result of the maintenance or use of a covered *auto;* and

(2) The discharge, dispersal, seepage, migration, release or escape of the *pollutants* is caused directly by such upset, overturn or damage.

### 12. War

*Bodily injury* or *property damage* arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other au-

F 0008

thority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**13. Racing**

Covered *autos* while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered *auto* is being prepared for such a contest or activity.

**C. LIMIT OF INSURANCE**

Regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for the total of all damages and *covered pollution cost or expense* combined, resulting from any one *accident* is the Limit of Insurance for Liability Coverage shown in the Declarations.

All *bodily injury, property damage* and *covered pollution cost or expense* resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one *accident.*

No one will be entitled to receive duplicate payments for the same elements of *loss* under this Coverage Form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

## SECTION III - PHYSICAL DAMAGE COVERAGE

**A. COVERAGE**

**1.** We will pay for *loss* to a covered *auto* or its equipment under:

**a. Comprehensive Coverage**

From any cause except:

(1) The covered *auto's* collision with another object; or

(2) The covered *auto's* overturn.

**b. Specified Causes of Loss Coverage**

Caused by:

(1) Fire, lightning or explosion;

(2) Theft;

(3) Windstorm, hail or earthquake;

(4) Flood;

(5) Mischief or vandalism; or

(6) The sinking, burning, collision or derailment of any conveyance transporting the covered *auto.*

**c. Collision Coverage**

Caused by:

(1) The covered *auto's* collision with another object; or

(2) The covered *auto's* overturn.

**2. Towing**

We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered *auto* of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

**3. Glass Breakage - Hitting a Bird or Animal - Falling Objects or Missiles**

If you carry Comprehensive Coverage for the damaged covered *auto,* we will pay for the following under Comprehensive Coverage:

**a.** Glass breakage;

**b.** *Loss* caused by hitting a bird or animal; and

**c.** *Loss* caused by falling objects or missiles.

However, you have the option of having glass breakage caused by a covered *auto's* collision or overturn considered a *loss* under Collision Coverage.

**4. Coverage Extensions**

**a. Transportation Expenses**

We will also pay up to $20 per day to a maximum of $600 for temporary transportation expense incurred by you because of the total theft of a covered *auto* of the private passenger type. We will pay only for those covered *autos* for which you carry either Comprehensive or Specified Causes of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered *auto* is returned to use or we pay for its *loss.*

**b. Loss of Use Expenses**

For Hired Auto Physical Damage, we will pay expenses for which an *insured* becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver, under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

(1) Other than collision only if the Declarations indicate that Comprehen-

F 0009

sive Coverage is provided for any covered *auto;*

(2) Specified Causes of Loss only if the Declarations indicate that Specified Causes of Loss Coverage is provided for any covered *auto;* or

(3) Collision only if the Declarations indicate that Collision Coverage is provided for any covered *auto.*

However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

## B. EXCLUSIONS

1. We will not pay for *loss* caused by or resulting from any of the following. Such *loss* is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the *loss.*

   **a. Nuclear Hazard**

   (1) The explosion of any weapon employing atomic fission or fusion; or

   (2) Nuclear reaction or radiation, or radioactive contamination, however caused.

   **b. War or Military Action**

   (1) War, including undeclared or civil war;

   (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2. We will not pay for *loss* to any covered *auto* while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for *loss* to any covered *auto* while that covered *auto* is being prepared for such a contest or activity.

3. We will not pay for *loss* caused by or resulting from any of the following unless caused by other *loss* that is covered by this insurance:

   **a.** Wear and tear, freezing, mechanical or electrical breakdown.

   **b.** Blowouts, punctures or other road damage to tires.

4. We will not pay for *loss* to any of the following:

   **a.** Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

   **b.** Any device designed or used to detect speed measuring equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed measurement equipment.

   **c.** Any electronic equipment, without regard to whether this equipment is permanently installed, that receives or transmits audio, visual or data signals and that is not designed solely for the reproduction of sound.

   **d.** Any accessories used with the electronic equipment described in paragraph c above.

   Exclusions 4c and 4d do not apply to:

   **a.** Equipment designed solely for the reproduction of sound and accessories used with such equipment, provided such equipment is permanently installed in the covered *auto* at the time of the *loss* or such equipment is removable from a housing unit which is permanently installed in the covered *auto* at the time of the *loss,* and such equipment is designed to be solely operated by use of the power from the *auto's* electrical system, in or upon the covered *auto;* or

   **b.** Any other electronic equipment that is:

   (1) Necessary for the normal operation of the covered *auto* or the monitoring of the covered *auto's* operating system; or

   (2) An integral part of the same unit housing any sound reproducing equipment described in a above and permanently installed in the opening of the dash or console of the covered *auto* normally used by the manufacturer for installation of a radio.

5. We will not pay for *loss* to a covered *auto* due to *diminution of value.*

## C. LIMIT OF INSURANCE

1. The most we will pay for *loss* in any one *accident* is the lesser of:

   **a.** The actual cash value of the damaged or stolen property as of the time of the *loss;* or

   **b.** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

2. An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total *loss.*

3. If a repair or replacement results in better than like kind or quality, we will not pay for

the amount of the betterment.

### D. DEDUCTIBLE

For each covered *auto,* our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable de-ductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to *loss* caused by fire or lightning.

## SECTION IV - BUSINESS AUTO CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

### A. LOSS CONDITIONS

**1. Appraisal for Physical Damage Loss**

If you and we disagree on the amount of *loss,* either may demand an appraisal of the *loss.* In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of *loss.* If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the apprais-al and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**2. Duties in the Event of Accident, Claim, Suit or Loss**

We have no duty to provide coverage under this policy unless there has been full com-pliance with the following duties:

**a.** In the event of *accident,* claim, *suit* or *loss,* you must give us or our autho-rized representative prompt notice of the *accident* or *loss.* Include:

(1) How, when and where the *accident* or *loss* occurred;

(2) The *insured's* name and address; and

(3) To the extent possible, the names and addresses of any injured per-sons and witnesses.

**b.** Additionally, you and any other involved *insured* must:

(1) Assume no obligation, make no payment or incur no expense with-out our consent, except at the *in-sured's* own cost.

(2) Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or *suit.*

(3) Cooperate with us in the investiga-tion or settlement of the claim or

defense against the *suit.*

(4) Authorize us to obtain medical re-cords or other pertinent information.

(5) Submit to examination, at our ex-pense, by physicians of our choice, as often as we reasonably require.

**c.** If there is *loss* to a covered *auto* or its equipment you must also do the following:

(1) Promptly notify the police if the covered *auto* or any of its equip-ment is stolen.

(2) Take all reasonable steps to pro-tect the covered *auto* from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

(3) Permit us to inspect the covered *auto* and records proving the *loss* before its repair or disposition.

(4) Agree to examinations under oath at our request and give us a signed statement of your answers.

**3. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

**a.** There has been full compliance with all the terms of this Coverage Form; and

**b.** Under Liability Coverage, we agree in writing that the *insured* has an obliga-tion to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the *insured's* li-ability.

**4. Loss Payment - Physical Damage Cov-erages**

At our option we may:

**a.** Pay for, repair or replace damaged or stolen property;

**b.** Return the stolen property at our ex-pense. We will pay for any damage that results to the *auto* from the theft; or

**c.** Take all or any part of the damaged or stolen property at an agreed or ap-praised value.

If we pay for the *loss,* our payment will

include the applicable sales tax for the damaged or stolen property.

**5. Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after *accident* or *loss* to impair them.

**B. GENERAL CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the *insured* or the *insured's* estate will not relieve us of any obligations under this Coverage Form.

**2. Concealment, Misrepresentation or Fraud**

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other *insured,* at any time, intentionally conceal or misrepresent a material fact concerning:

**a.** This Coverage Form;

**b.** The covered *auto;*

**c.** Your interest in the covered *auto;* or

**d.** A claim under this Coverage Form.

**3. Liberalization**

If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

**4. No Benefit to Bailee - Physical Damage Coverages**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

**5. Other Insurance**

**a.** For any covered *auto* you own, this Coverage Form provides primary insurance. For any covered *auto* you do not own, the insurance provided by this Coverage Form is excess over any other collectible insurance. However, while a covered *auto* which is a *trailer* is connected to another vehicle, the Liability Coverage this Coverage Form provides for the *trailer* is:

(1) Excess while it is connected to a motor vehicle you do not own.

(2) Primary while it is connected to a covered *auto* you own.

**b.** For Hired Auto Physical Damage Coverage, any covered *auto* you lease, hire, rent or borrow is deemed to be a covered *auto* you own. However, any *auto* that is leased, hired, rented or borrowed with a driver is not a covered *auto.*

**c.** Regardless of the provisions of paragraph a above, this Coverage Form's Liability Coverage is primary for any liability assumed under an *insured contract.*

**d.** When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**6. Premium Audit**

**a.** The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the First Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the First Named Insured will get a refund.

**b.** If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7. Policy Period, Coverage Territory**

**a.** Under this Coverage Form, we cover *accidents* and *losses* occurring:

(1) During the policy period shown in the Declarations; and

(2) Within the coverage territory.

**b.** The coverage territory is:

(1) The United States of America;

(2) The territories and possessions of the United States of America;

(3) Puerto Rico;

(4) Canada; and

(5) Anywhere in the world if:

(a) A covered *auto* of the private passenger type is leased,

hired, rented or borrowed without a driver for a period of 30 days or less; and

(b) The *insured's* responsibility to pay damages is determined in a *suit* on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico, or Canada or in a settlement we agree to.

c. We also cover *loss* to, or *accidents* involving, a covered *auto* while being transported between any of these places.

**8. Two or More Coverage Forms or Policies Issued by Us**

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same *accident,* the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

## SECTION V - DEFINITIONS

A. *"Accident"* includes continuous or repeated exposure to the same conditions resulting in *bodily injury* or *property damage.*

B. *"Auto"* means:

1. A land motor vehicle, *trailer* or semitrailer designed for travel on public roads; or

2. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, *auto* does not include *mobile equipment.*

C. *"Bodily injury"* means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

D. *"Covered pollution cost or expense"* means any cost or expense arising out of:

1. Any request, demand, order or statutory or regulatory requirement that any *insured* or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of *pollutants*; or

2. Any claim or *suit* by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of *pollutants.*

*Covered pollution cost or expense* does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of *pollutants:*

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, handled, or handled for movement into, onto or from the covered *auto;*

(2) Otherwise in the course of transit by or on behalf of the *insured;*

(3) Being stored, disposed of, treated or processed in or upon the covered *auto;*

b. Before the *pollutants* or any property in which the *pollutants* are contained are moved from the place where they are accepted by the *insured* for movement into or onto the covered *auto;* or

c. After the *pollutants* or any property in which the *pollutants* are contained are moved from the covered *auto* to the place where they finally are delivered, disposed of or abandoned by the *insured.*

Paragraph a above does not apply to fuels, lubricants, fluids, exhaust gases or other similar *pollutants* that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered *auto* or its parts, if:

(1) The *pollutants* escape, seep, migrate, or are discharged, dispersed or released directly from an *auto* part designed by its manufacturer to hold, store, receive or dispose of such *pollutants;* and

(2) The *bodily injury, property damage* or *covered pollution cost or expense* does not arise out of the operation of any equipment listed in paragraphs 6b or 6c of the definition of *mobile equipment.*

Paragraphs b and c above do not apply to *accidents* that occur away from premises owned by or rented to an *insured* with respect to *pollutants* not in or upon a covered *auto* if:

(1) The *pollutants* or any property in which the *pollutants* are contained

F 0013

are upset, overturned or damaged as a result of the maintenance or use of a covered *auto;* and

(2) The discharge, dispersal, seepage, migration, release or escape of the *pollutants* is caused directly by such upset, overturn or damage.

**E.** *"Diminution in value"* means the actual or perceived loss in market value or resale value which results from a direct or accidental *loss.*

**F.** *"Employee"* includes a *leased worker. Employee* does not include a *temporary worker.*

**G.** *"Insured"* means any person or organization qualifying as an *insured* in the Who Is an Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each *insured* who is seeking coverage or against whom a claim or *suit* is brought.

**H.** *"Insured contract"* means:

**1.** A lease of premises;

**2.** A sidetrack agreement;

**3.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**4.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**5.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for *bodily injury* or *property damage* to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

**6.** That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your *employees,* of any *auto.* However, such contract or agreement shall not be considered an *insured contract* to the extent that it obligates you or any of your *employees* to pay for *property damage* to any *auto* rented or leased by you or any of your *employees.*

An *insured contract* does not include that part of any contract or agreement:

**1.** That indemnifies a railroad for *bodily injury* or *property damage* arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing; or

**2.** That pertains to the loan, lease or rental of

an *auto* to you or any of your *employees,* if the *auto* is loaned, leased or rented with a driver; or

**3.** That holds a person or organization engaged in the business of transporting property by *auto* for hire harmless for your use of a covered *auto* over a route or territory that person or organization is authorized to serve by public authority.

**I.** *"Leased worker"* means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. *Leased worker* does not include a *temporary worker.*

**J.** *"Loss"* means direct and accidental loss or damage.

**K.** *"Mobile equipment"* means any of the following types of land vehicles, including any attached machinery or equipment:

**1.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**2.** Vehicles maintained for use solely on or next to premises you own or rent;

**3.** Vehicles that travel on crawler-treads;

**4.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **a.** Power cranes, shovels, loaders, diggers or drills; or

   **b.** Road construction or resurfacing equipment such as graders, scrapers or rollers.

**5.** Vehicles not described in paragraph 1, 2, 3 or 4 above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   **b.** Cherry pickers and similar devices used to raise or lower workers.

**6.** Vehicles not described in paragraph 1, 2, 3 or 4 above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not *mobile equipment* but will be considered *autos:*

   **a.** Equipment designed primarily for:

      (1) Snow removal;

      (2) Road maintenance, but not construction or resurfacing; or

(3) Street cleaning.

**b.** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**c.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

However, *mobile equipment* does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered *autos*.

**L.** *"Pollutants"* means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**M.** *"Property damage"* means damage to or loss of use of tangible property.

**N.** *"Suit"* means a civil proceeding in which:

**1.** Damages because of *bodily injury* or *property damage;* or

**2.** A *covered pollution cost or expense,*

to which this insurance applies are alleged.

Suit includes:

**1.** An arbitration proceeding in which such damages or *covered pollution costs or expenses* are claimed and to which the *insured* must submit or does submit with our consent; or

**2.** Any other alternative dispute resolution proceeding in which such damages or *covered pollution costs or expenses* are claimed and to which the *insured* submits with our consent.

**O.** *"Temporary worker"* means a person who is furnished to you to substitute for a permanent *employee* on leave or to meet seasonal or short-term workload conditions.

**P.** *"Trailer"* includes semitrailer.

F  0015

**ACUITY ENHANCEMENTS - BUSINESS AUTO**  CA-7247(9-09)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

**A. Temporary Substitute Vehicle Physical Damage**

The following is added to item C Certain Trailers, Mobile Equipment and Temporary Substitute Autos under Section I - Covered Autos:

If Physical Damage Coverage is provided by this Coverage Form, any *auto* you do not own while used with permission of its owner as a temporary substitute for a covered *auto* you own that is out of service because of its breakdown, repair, servicing, *loss* or destruction is a covered *auto* for Physical Damage Coverage.

**B. Who Is an Insured**

The following are added to Who Is an Insured under Section II - Liability Coverage:

**1. Newly Acquired Organizations**

Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** This coverage does not apply to *bodily injury* or *property damage* that occurred before you acquired or formed the organization;

**c.** No person or organization is an *insured* with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**2. Employees as Insureds**

Any *employee* of yours is an *insured* while using a covered *auto* you do not own, hire or borrow in your business or your personal affairs.

**C. Increased Supplementary Payments**

**1.** The limit shown in paragraph A2a(2) of Section II - Liability Coverage is increased to $3,000.

**2.** The limit shown in paragraph A2a(4) of Section II - Liability Coverage is increased to $300.

**D. Fellow Employee Coverage**

The Fellow Employee Exclusion contained in Section II - Liability Coverage does not apply.

**E. Transportation Expenses**

The Transportation Expenses Coverage Extension is replaced by the following:

We will also pay up to $50 per day to a maximum of $1,500 for temporary transportation expense incurred by you because of the total theft of a covered *auto* of the private passenger or *light truck* type. We will pay only for those covered *autos* for which you carry either Comprehensive or Specified Causes of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered *auto* is returned to use or we pay for its *loss*.

**F.** The following are added to Coverage Extensions under Section III - Physical Damage Coverage:

**1. Accidental Airbag Discharge**

We will pay to replace an airbag that deploys without the car being involved in an accident. This coverage applies only to a covered *auto* which you own.

**2. Loan/Lease Gap Coverage**

In the event of a total *loss* to a covered *auto* of the private passenger or *light truck* type, we will pay any unpaid amount due on the lease or loan, less:

**a.** The amount paid under the Physical Damage Coverage Section of the policy; and

**b.** Any:

(1) Overdue lease/loan payments at the time of the *loss;*

(2) Financial penalties imposed under a lease for excessive use, abnormal wear and tear or high mileage;

(3) Security deposits not returned by the lessor;

(4) Costs for extended warranties, Credit Life Insurance, Health, Accident or Disability Insurance purchased with the loan or lease; and

(5) Carry-over balances from previous loans or leases.

**3. Hired Auto Physical Damage Coverage**

If hired *autos* are covered *autos* for Liability Coverage, then the Physical Damage Coverages provided under this Coverage Form for any *auto* you own are extended to *autos*

(continued next page)

of the private passenger or *light truck* type which you lease, hire, rent or borrow for a period of 30 days or less, subject to the following limit.

The most we will pay under this extension is the lesser of the actual cash value, the cost of repair or $35,000, minus a deductible. The deductible will be equal to the largest deductible applicable to any owned *auto* of the private passenger or *light truck* type for that coverage. Subject to the above limit, deductible and excess provisions, we will provide coverage equal to the broadest coverage applicable to any covered *auto* you own of the private passenger or *light truck* type.

4. **Rental Reimbursement Coverage for Private Passenger Vehicles or Light Trucks**

   a. This coverage applies only to a covered *auto* of the private passenger or *light truck* type.

   b. We will pay for rental reimbursement expenses incurred by you for the rental of an *auto* because of a covered *loss* to an *auto* to which this extension applies. Payment applies in addition to the otherwise applicable amount of each coverage you have on a covered *auto*. No deductibles apply to this coverage.

   c. We will pay only for those expenses incurred during the policy period beginning 24 hours after the *loss* and ending, regardless of the policy's expiration, with the lesser of the following number of days:

      (1) The number of days reasonably required to repair or replace the covered *auto*. If *loss* is caused by theft, this number of days is added to the number of days it takes to locate the covered *auto* and return it to you.

      (2) 30 days.

   d. Our payment is limited to the lesser of the following amounts:

      (1) Necessary and actual expenses incurred.

      (2) $50 per day to a maximum of $1,500.

   e. This coverage does not apply while there are spare or reserve *autos* available to you for your operations.

   f. If *loss* results from the total theft of a covered *auto* to which this extension applies, we will pay under this coverage only that amount of your rental reimbursement expenses which is not al-

ready provided for under the Physical Damage Coverage Extensions.

   g. The Rental Reimbursement Coverage described above does not apply to a covered *auto* that is described or designated as a covered *auto* on Rental Reimbursement Coverage Form CA-9923F.

5. **Fire Department Service Charge**

   When the fire department is called to save or protect a covered *auto*, its equipment, its contents, or occupants from a covered *loss*, we will pay up to $1,000 for your liability for fire department service charges:

   a. Assumed by contract or agreement prior to loss; or

   b. Required by local ordinance.

   No deductible applies to this additional coverage.

6. **Fire Extinguisher Recharge**

   We will pay the actual cost of recharging or replacing, whichever is less, fire extinguishers kept in your covered *auto* that are intentionally discharged in an attempt to extinguish a fire.

7. **Audio, Visual and Data Electronic Equipment Coverage**

   **Coverage**

   a. We will pay with respect to a covered *auto* for *loss* to any electronic equipment that receives or transmits audio, visual or data signals and that is not designed solely for the reproduction of sound. This coverage applies only if the equipment is permanently installed in the covered *auto* at the time of the *loss* or the equipment is removable from a housing unit which is permanently installed in the covered *auto* at the time of the *loss*, and such equipment is designed to be solely operated by use of the power from the *auto's* electrical system, in or upon the covered *auto*.

   b. We will pay with respect to a covered *auto* for *loss* to any accessories used with the electronic equipment described in paragraph a above. However, this does not include tapes, records or discs.

   **Exclusions**

   The exclusions that apply to Physical Damage Coverage, except for the exclusion relating to Audio, Visual and Data Electronic Equipment, also apply to coverage provided by this coverage. In addition, the following exclusions apply:

(continued next page)

F 0017

We will not pay, under this coverage, for either any electronic equipment or accessories used with such electronic equipment that is:

**a.** Necessary for the normal operation of the covered *auto* or the monitoring of the covered *auto's* operating system; or

**b.** Both:

(1) An integral part of the same unit housing any sound reproducing equipment designed solely for the reproduction of sound if the sound reproducing equipment is permanently installed in the covered *auto;* and

(2) Permanently installed in the opening of the dash or console normally used by the manufacturer for the installation of a radio.

**Limit of Insurance**

With respect to coverage under this coverage, the Limit of Insurance provision of Physical Damage Coverage is replaced by the following:

**a.** The most we will pay for all *loss* to audio, visual or data electronic equipment and any accessories used with this equipment as a result of any one *accident* is the lesser of:

(1) The actual cash value of the damaged or stolen property as of the time of the *loss;*

(2) The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality; or

(3) $1,000.

**b.** An adjustment for depreciation and physical condition will be made in determining actual cash value at the time of the *loss.*

**c.** If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.

**Deductible**

**a.** If *loss* to the audio, visual or data electronic equipment or accessories used with this equipment is the result of a *loss* to the covered *auto* under this Coverage Form's Comprehensive or Collision Coverage, then for each covered *auto* our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declara-

tions does not apply to *loss* to audio, visual or data electronic equipment caused by fire or lightning.

**b.** If *loss* to the audio, visual or data electronic equipment or accessories used with this equipment is the result of a *loss* to the covered *auto* under this Coverage Form's Specified Causes of Loss Coverage, then for each covered *auto* our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by a $100 deductible.

**c.** If *loss* occurs solely to the audio, visual or data electronic equipment or accessories used with this equipment, then for each covered *auto* our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by a $100 deductible.

**d.** In the event that there is more than one applicable deductible, only the highest deductible will apply. In no event will more than one deductible apply.

**8. Original Equipment Manufacturer Electronic Equipment Coverage**

In addition to the coverage provided above, we will also pay, with respect to a covered *loss*, the actual loss sustained to electronic equipment permanently installed in the location provided for such equipment by the original manufacturer of the *auto* but only with respect to a covered *auto*.

**Deductible**

A deductible applies to this coverage. Refer to paragraph L Deductible Applicable to Original Equipment Manufacturer Electronic Equipment, Fuel in Vehicle and Miscellaneous Equipment Used With Covered Vehicle Coverages.

**9. Rental Reimbursement, Business Income and Extra Expense Coverage**

**Limits**

The most we will pay for all *loss* for each covered *auto* involved in any one *accident* for Rental Reimbursement, Business Income and Extra Expense combined is $10,000.

**Coverage**

**a.** Rental Reimbursement Coverage

(1) We will pay for expenses incurred by you during the *period of restoration* for the rental of an *auto* made necessary because of a covered *loss* to a covered *auto* used in your business. The *loss* must be caused by a cause of loss covered under

*(continued next page)*

item A1 of Physical Damage Coverage in this Coverage Part.

(2) This Rental Reimbursement Coverage does not apply to a covered *auto* of the private passenger or *light truck* type because coverage for these vehicles is provided in item 4 of this endorsement.

**b.** Business Income and Extra Expense Coverage

(1) Business Income Coverage

(a) Actual Loss Sustained Coverage - We will pay the actual loss of *business income* sustained by you as the result of the necessary suspension of your business during the *period of restoration* due to a *loss* to a covered *auto* used in your business. The *loss* must be caused by a cause of loss covered under item A1 of Physical Damage Coverage in this Coverage Part.

(b) Specified Amount per Day Coverage - At your option, we will pay up to $250 per day for a maximum of seven days during the *period of restoration* for income loss. The *loss* must be caused by a cause of loss covered under item A1 of Physical Damage Coverage in this Coverage Part.

(2) Extra Expense Coverage

We will pay the necessary and resonable *extra expenses* that you incur during the *period of restoration* that you would not have incurred had there been no *loss* to a covered *auto* used in your business. The *loss* must be caused by a cause of loss covered under item A1 of Physical Damage Coverage in this Coverage Part.

**Conditions**

**a.** Any payment for Business Income made under Specified Amount per Day Coverage reduces the payment we make under any other coverages listed in extension 9.

**b.** No other deductible applies to these coverages.

**c.** We will not pay under these coverages if you do not repair or replace the covered *auto*.

**d.** You must resume all or part of your business as quickly as possible.

**e.** If you have other *autos* you can use to reduce the amount of loss payable under these coverages, you are required to use them.

**f.** We will not pay for loss or expenses caused by suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the suspension of your business, we will cover such loss that affects your *business income.*

**g.** We will pay for expenses you incur to reduce the amount that would otherwise have been payable under this coverage. We will not pay more than the amount by which you actually reduce the *business income* loss or *extra expense* incurred.

**10. Fuel in Vehicle Coverage**

We will also pay, with respect to a covered *loss*, the actual loss sustained for the *loss* to the fuel used to operate your vehicle but only with respect to a covered *auto*. You must provide documentation supporting your claim for damages.

**Deductible**

A deductible applies to this coverage. Refer to paragraph L Deductible Applicable to Original Equipment Manufacturer Electronic Equipment, Fuel in Vehicle and Miscellaneous Equipment Used With Covered Vehicle Coverages.

**11. Miscellaneous Equipment Used With Covered Vehicle Coverage**

We will also pay, with respect to a covered *loss*, the actual cash value, repair cost or replacement cost, whichever is less, for *loss* to your *miscellaneous equipment* but only with respect to a covered *auto*.

**Exclusions**

We will not pay for *loss* caused by:

**a.** Theft, unless there are visible signs or marks of forcible entry into the covered *auto* and the theft is reported to law enforcement authorities; or

**b.** Mysterious disappearance.

**Deductible**

A deductible applies to this coverage. Refer to paragraph L Deductible Applicable to Original Equipment Manufacturer Electronic Equipment, Fuel in Vehicle and Miscellaneous Equipment Used With Covered Vehicle Coverages.

**G. Deductible Provision**

(continued next page)

Section III - Physical Damage Coverage paragraph D Deductible is replaced by the following:

1. For each covered *auto,* our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to *loss* caused by fire or lightning.

2. For combinations of tractor, truck, semi-trailer or trailers when attached together by coupling devices at the time of *loss,* one deductible will apply.

   a. If more than one *auto* of the combination is damaged or stolen, the largest applicable deductible shown in the Declarations will apply.

   b. If only one *auto* of the combination is damaged or stolen, the deductible shown in the Declarations for that *auto* will apply.

3. The deductibles will not apply to *loss* caused by a collision of a covered *auto* with any other auto insured by us.

4. If the insured chooses to have a damaged windshield or other glass repaired instead of replaced, no deductible will apply to the loss.

**H. Knowledge of Claim or Suit**

The following is added to the Duties in the Event of Accident, Claim, Suit or Loss Condition:

Knowledge of an *accident,* claim, *suit* or *loss* by an agent or *employee* of any insured shall not in itself constitute knowledge of the insured unless your partners, executive officers, directors, managers, members or a person who has been designated by them to receive reports of *accidents,* claims, *suits* or *loss* shall have received such notice from the agent or *employee.*

**I. Waiver of Subrogation for Written Contracts**

The following is added to the Transfer of Rights of Recovery Against Others to Us Condition:

We waive any right of recovery we may have against a person or organization because of payments we make for *bodily injury* or *property damage* arising out of your use of a covered *auto* which occurs while under a contract with that person or organization. The waiver applies only to a person or organization with whom you have a written contract or agreement requiring you to waive the right of recovery under this policy. The written contract or agreement must have been executed prior to the *accident* causing *bodily injury* or *property damage.*

**J. Worldwide Coverage Territory for Hired**

**Autos**

The following is added to paragraph B7 of Section IV - Business Auto Conditions:

With respect to *autos* hired for 30 days or less, the coverage territory is extended to include all parts of the world if the insured's responsibility to pay damages is determined in a suit in the United States of America (including its territories and possessions), Puerto Rico or Canada or in a settlement we agree to.

**K. Mental Anguish Coverage**

The Definition of *bodily injury* is amended to include mental anguish.

**L. Deductible Applicable to Original Equipment Manufacturer Electronic Equipment, Fuel in Vehicle and Miscellaneous Equipment Used With Covered Vehicle Coverages**

1. If *loss* to property covered by these extensions is the result of a *loss* to the covered *auto* under this Coverage Form's Comprehensive or Collision Coverage, then for each covered *auto* our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to *loss* to property covered by an extension caused by fire or lightning.

2. If *loss* to property covered by these extensions is the result of a *loss* to the covered *auto* under this Coverage Form's Specified Causes of Loss Coverage, then for each covered *auto* our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by a $100 deductible.

3. In the event that there is more than one applicable deductible, only the highest deductible will apply. In no event will more than one deductible apply.

**M. Coverage Extensions Definitions**

1. "*Business income*" means the:

   a. Net income (Net profit or loss before income taxes) that would have been earned or incurred if no *loss* would have occurred; and

   b. Continuing normal operating expenses incurred, including payroll.

2. "*Extra expense*" means those expenses you incur to avoid or minimize the suspension of business and to continue your business operations.

3. "*Light truck*" means a truck with a gross vehicle weight of 10,000 pounds or less.

4. "*Miscellaneous equipment*" means hand

(continued next page)

F 0020

trucks, dollies, pallets, pads, covers, binders, tarps, tie-downs, chains and other similar equipment used in the handling of property being transported.

**5.** "*Period of restoration*" means the period of time that:

  **a.** Begins:

    (1) Twenty-four hours after the time of *loss* for Rental Reimbursement Coverage or Business Income Coverage; or

    (2) Immediately after the time of *loss* for Extra Expense Coverage; and

  **b.** Ends at the earliest of:

(1) The time required to resume your normal business operations; or

(2) The time that is reasonably necessary to repair or replace the covered *auto*.

*Period of restoration* does not include any increased period required due to the enforcement of any ordinance or law that requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of pollutants.

The expiration date of this policy will not cut short the *period of restoration*.

## ASBESTOS EXCLUSION

IL-7012(11-11)

This endorsement modifies insurance provided under the following:

BIS-PAK BUSINESS LIABILITY AND MEDICAL EXPENSE COVERAGE FORM
BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS' ERRORS AND OMISSIONS COVERAGE PART
DIRECTORS' AND OFFICERS' LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM

POLLUTION LIABILITY COVERAGE FORM
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

The following exclusion is added:

**Asbestos**

This insurance does not apply to any *bodily injury* or *property damage* arising out of activities related to, but not limited to, manufacture, mining, storage, distribution, installation, sale, use, exposure to, service, testing for, repair, containment or removal of asbestos, asbestos fibers, asbestos dust, or products containing asbestos.

**SOUTH DAKOTA UNINSURED AND UNDERINSURED MOTORISTS COVERAGE**

CA-7073(10-09)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM

GARAGE COVERAGE FORM

MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

For a covered *auto* licensed or principally garaged in, or *garage operations* conducted in, South Dakota:

1. **COVERAGE**

   a. **Uninsured Motorists Coverage**

   We will pay all sums the *insured* is legally entitled to recover as compensatory damages from the owner or driver of an *uninsured motor vehicle*. The damages must result from *bodily injury* sustained by the *insured* caused by an *accident*. The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the *uninsured motor vehicle*.

   No judgment for damages arising out of a *suit* brought against the owner or driver of an *uninsured motor vehicle* is binding on us unless we:

   (1) Received reasonable notice of the pendency of the *suit* resulting in the judgment; and

   (2) Had a reasonable opportunity to protect our interests in the *suit*.

   b. **Uninsured Motorists Property Damage Coverage**

   We will pay all sums in excess of any deductible shown in the Declarations that the *insured* is legally entitled to recover from the owner or operator of an *uninsured motor vehicle*. The damages must result from *property damage* to an *auto* specifically described in Item Three of the Declarations for which a limit is shown for Uninsured Motorists Property Damage Coverage. The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the *uninsured motor vehicle*.

   Any judgment for damages arising out of a *suit* brought without our written consent is not binding on us.

   c. **Underinsured Motorists Coverage**

   We will pay all sums the *insured* is legally entitled to recover as compensatory damages from the owner or driver of an *underinsured motor vehicle*. The damages must result from *bodily injury* sustained by the *insured* caused by an *accident*. The

owner's or driver's liability for these damages must result from the ownership, maintenance or use of the *underinsured motor vehicle*.

We will pay only after all liability bonds or policies have been exhausted by payment of judgments or settlements.

No judgment for damages arising out of a *suit* brought against the owner or driver of an *underinsured motor vehicle* is binding on us unless we:

(1) Received reasonable notice of the pendency of the *suit* resulting in the judgment; and

(2) Had a reasonable opportunity to protect our interests in the *suit*.

2. **WHO IS AN INSURED**

   If the Named Insured is designated in the Declarations as:

   a. An individual, then the following are *insureds*:

   (1) The Named Insured and any *family members*.

   (2) Anyone else *occupying* a covered *auto* or a temporary substitute for a covered *auto*. The covered *auto* must be out of service because of its breakdown, repair, servicing, *loss* or destruction.

   (3) Anyone for damages he or she is entitled to recover because of *bodily injury* sustained by another *insured*.

   b. A partnership, limited liability company, corporation or any other form of organization, then the following are *insureds*:

   (1) Anyone *occupying* a covered *auto* or a temporary substitute for a covered *auto*. The covered *auto* must be out of service because of its breakdown, repair, servicing, *loss* or destruction.

   (2) Anyone for damages he or she is entitled to recover because of *bodily injury* sustained by another *insured*.

3. **EXCLUSIONS**

   This insurance does not apply to any of the following:

   a. The direct or indirect benefit of any insurer or self-insurer under any workers' compensation law, disability benefits law or similar law.

   b. *Bodily injury* sustained by:

   (1) An individual Named Insured while *occupying* any vehicle owned by that

(continued next page)

F  0022

Named Insured that is not a covered *auto* for Uninsured Motorists Coverage under this Coverage Form;

(2) Any *family member* while *occupying* any vehicle owned by that *family member* that is not a covered *auto* for Uninsured Motorists Coverage under this Coverage Form; or

(3) Any *family member* while *occupying* any vehicle owned by the Named Insured that is insured for Uninsured Motorists Coverage on a primary basis under any other Coverage Form or policy.

**c.** *Bodily injury* sustained by:

(1) An individual Named Insured while *occupying* any vehicle owned by that Named Insured that is not a covered *auto* for Underinsured Motorists Coverage under this Coverage Form;

(2) Any *family member* while *occupying* any vehicle owned by that *family member* that is not a covered *auto* for Underinsured Motorists Coverage under this Coverage Form; or

(3) Any *family member* while *occupying* any vehicle owned by the Named Insured that is insured for Underinsured Motorists Coverage on a primary basis under any other Coverage Form or policy.

**d.** Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

**e.** Punitive or exemplary damages.

**f.** *Property damage* for which the *insured* has been or is entitled to be compensated by other property or physical damage insurance.

**g.** The direct or indirect benefit of any insurer of property.

**h.** *Property damage* caused by a vehicle for which the owner and/or operator cannot be identified.

**i.** *Bodily injury* or *property damage* arising directly or indirectly out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**4. LIMIT OF INSURANCE**

**a. Uninsured Motorists Coverage**

The Uninsured Motorists Coverage Limit of Insurance shown in the Declarations applies regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident.*

(1) The "each person" Limit of Insurance is the most we will pay for all damages resulting from *bodily injury* to any one person caused by any one *accident,* including all damages claimed by any person or organization for care, loss of services or death resulting from the *bodily injury.*

(2) Subject to the "each person" Limit of Insurance, the "each accident" Limit of Insurance is the most we will pay for all damages resulting from *bodily injury* caused by any one *accident.*

**b. Uninsured Motorists Property Damage Coverage**

The Uninsured Motorists Property Damage Coverage Limit of Insurance shown in the Declarations applies regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident.*

The "each accident" Limit of Insurance is the most we will pay for all damages resulting from *property damage* caused by any one *accident.*

The amount of damages will be reduced by any deductible applying to Uninsured Motorists Property Damage Coverage.

**c. Underinsured Motorists Coverage**

The Underinsured Motorists Coverage Limit of Insurance shown in the Declarations applies regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident.*

(1) The "each person" Limit of Insurance is the most we will pay for all damages resulting from *bodily injury* to any one person caused by any one *accident,* including all damages claimed by any person or organization for care, loss of services or death resulting from the *bodily injury.*

(2) Subject to the "each person" Limit of Insurance, the "each accident" Limit of Insurance is the most we will pay for all damages resulting from *bodily injury* caused by any one *accident.*

**d.** No one will be entitled to receive duplicate payments for the same elements of *loss.*

We will not make a duplicate payment un-

(continued next page)

F 0023

der this Coverage for any element of *loss* for which payment has been made by or for anyone who is legally responsible, including all sums paid under this Coverage Form's Liability Coverage.

We will not pay for any element of *loss* if a person is entitled to receive payment for the same element of *loss* under any workers' compensation, disability benefits or similar law.

**e.** With respect to damages resulting from an *accident* with an *underinsured motor vehicle,* the limit of liability shall be reduced by all sums paid by or for anyone who is legally responsible, including all sums paid under this Coverage Form's Liability Coverage.

**f.** Any amount paid under this coverage will reduce any amount an *insured* may be paid under this Coverage Form's Liability Coverage.

## 5. CHANGES IN CONDITIONS

The Conditions are changed for Uninsured Motorists Coverage and Underinsured Motorists Coverage as follows:

**a.** Other Insurance in the Business Auto and Garage Coverage Forms and Other Insurance - Primary and Excess Insurance Provisions in the Truckers Endorsement and Motor Carrier Coverage Form is replaced by the following:

If there is other applicable insurance available under one or more policies or provisions of coverage:

(1) Any insurance we provide with respect to a vehicle the Named Insured does not own shall be excess over any other collectible uninsured or underinsured motorists insurance providing coverage on a primary basis.

(2) If the coverage under this Coverage Form is provided:

   (a) On a primary basis, we will pay only our share of the loss that must be paid under insurance providing coverage on a primary basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on a primary basis.

   (b) On an excess basis, we will pay only our share of the loss that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on an excess basis.

**b.** Duties in the Event of Accident, Claim, Suit or Loss is changed by adding the following:

(1) Promptly notify the police if a hit-and-run driver is involved; and

(2) Promptly send us copies of the legal papers if a *suit* is brought.

**c.** Transfer of Rights of Recovery Against Others to Us is changed by adding the following:

If we make any payment and the *insured* recovers from another party, the *insured* shall hold the proceeds in trust for us and pay us back the amount we have paid.

**d.** The following Condition is added:

   **Arbitration**

   If we and an *insured* disagree whether the *insured* is legally entitled to recover damages from the owner or driver of an *uninsured motor vehicle* or *underinsured motor vehicle* or do not agree as to the amount of damages that are recoverable by that *insured,* both we and that *insured* may agree to arbitration. However, disputes concerning coverage under this endorsement may not be arbitrated. If both parties agree to arbitrate, each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. Each party will pay the expenses of the third arbitrator equally.

   Unless both parties agree otherwise, arbitration will take place in the county in which the *insured* lives. Local rules of law as to arbitration procedures and evidence will apply. Results of an arbitration proceeding are not binding.

## 6. ADDITIONAL DEFINITIONS

As used in this endorsement:

**a.** *"Family member"* means a person related to an individual Named Insured by blood, marriage or adoption who is a resident of such Named Insured's household, including a ward or foster child.

**b.** *"Occupying"* means in, upon or getting in, on, out or off.

**c.** *"Uninsured motor vehicle"* means a land motor vehicle or *trailer:*

(1) For which no liability bond or policy at the time of an *accident* provides at least the amounts required by the applicable law where a covered *auto* is principally garaged;

(2) For which an insuring or bonding company denies coverage or is or becomes

(continued next page)

F 0024

insolvent; or

   (3) Which is a hit-and-run vehicle and neither the driver nor owner can be identified or which causes an *accident* without hitting an *insured,* a covered *auto* or a vehicle an *insured* is *occupying*.

However, *uninsured motor vehicle* does not include any vehicle:

   (1) Owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer who is or becomes insolvent and cannot provide the amounts required by that motor vehicle law;

   (2) Owned by a governmental unit or agency; or

   (3) Designed for use mainly off public roads while not on public roads.

**d.** *"Underinsured motor vehicle"* means a land motor vehicle or *trailer* to which a liability bond or policy applies at the time of an *accident,* but the amount paid for *bodily injury* to an *insured* under that bond or policy is not enough to pay the full amount the *insured* is legally entitled to recover as damages.

However, *underinsured motor vehicle* does not include any vehicle:

   (1) Which is an *uninsured motor vehicle;*

   (2) Owned or operated by a self-insurer under any applicable motor vehicle law;

   (3) Owned by a governmental unit or agency;

   (4) Designed for use mainly off public roads while not on public roads; or

   (5) For which an insuring or bonding company denies coverage or is or becomes insolvent.

EXCLUSION OF TERRORISM

CA-2384F(1-06)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury, damage, loss or expense, are shown in italics:

  **1.** *"Terrorism"* means activities against persons, organizations or property of any nature:

    **a.** That involve the following or preparation for the following:

      (1) Use or threat of force or violence; or

      (2) Commission or threat of a dangerous act; or

      (3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

    **b.** When one or both of the following applies:

      (1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      (2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

  **2.** *"Any injury, damage, loss or expense"* means any injury, damage, loss or expense covered under any Coverage Form or Policy to which this endorsement is applicable, and includes but is not limited to *bodily injury, property damage, personal injury, personal and advertising injury, loss,* loss of use, rental reimbursement after *loss* or *covered pollution cost or expense,* as may be defined under this Coverage Form, Policy or any applicable endorsement.

**B.** Except with respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage or Garagekeepers Coverage - Customers' Sound Receiving Equipment, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for *any injury, damage, loss or expense* caused directly or indirectly by *terrorism,* including action in hindering or defending against an actual or expected incident of *terrorism. Any injury, damage, loss or expense* is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury, damage, loss or expense. **But this exclusion applies only when one or more of the following are attributed to an incident of** *terrorism***:**

**1.** The *terrorism* is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the *terrorism* was to release such material; or

**3.** The *terrorism* is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the *terrorism* was to release such materials; or

**5.** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the *terrorism* and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

**6.** Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

  **a.** Physical injury that involves a substantial risk of death; or

  **b.** Protracted and obvious physical disfigurement; or

  **c.** Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of *terrorism* which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one

(continued next page)

incident, for the purpose of determining whether the thresholds in Paragraphs B5 and B6 are exceeded.

With respect to this Exclusion, Paragraphs B5 and B6 describe the thresholds used to measure the magnitude of an incident of *terrorism* and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of *terrorism,* there is no coverage under this Coverage Form, Policy or any applicable endorsement.

**C.** With respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage or Garagekeepers Coverage - Customers' Sound Receiving Equipment, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for any *loss,* loss of use or rental reimbursement after *loss* caused directly or indirectly by *terrorism,* including action in hindering or defending against an actual or expected incident of *terrorism.* **But this exclusion applies only when one or more of the following are attributed to an incident of *terrorism*:**

**1.** The *terrorism* is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the *terrorism* was to release such material; or

**3.** The *terrorism* is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the *terrorism* was to release such materials; or

**5.** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the *terrorism* and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions.

Multiple incidents of *terrorism* which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the threshold in Paragraph C5 is exceeded.

With respect to this Exclusion, Paragraph C5 describes the threshold used to measure the magnitude of an incident of *terrorism* and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of *terrorism,* there is no coverage under this Coverage Form, Policy or any applicable endorsement.

**D.** In the event of any incident of *terrorism* that is not subject to the Exclusion in Paragraphs B or C, coverage does not apply to any *injury, damage, loss or expense* that is otherwise excluded under this Coverage Form, Policy or any applicable endorsement.

F 0027

**NUCLEAR ENERGY LIABILITY EXCLUSION - BROAD FORM**

IL-0021F(11-11)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS' ERRORS AND OMISSIONS COVERAGE PART
DIRECTORS' AND OFFICERS' LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
POLLUTION LIABILITY COVERAGE FORM
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

1. The insurance does not apply:

   a. Under any Liability Coverage to *bodily injury* or *property damage:*

      (1) With respect to which an *insured* under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the *hazardous properties* of *nuclear material* and with respect to which:

         (a) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954 or any law amendatory thereof; or

         (b) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   b. Under any Medical Payments coverage, to expenses incurred with respect to *bodily injury* resulting from the *hazardous properties* of *nuclear material* and arising out of the operation of a *nuclear facility* by any person or organization.

   c. Under any Liability Coverage, to *bodily injury* or *property damage* resulting from the *hazardous properties* of *nuclear material,* if:

      (1) The *nuclear material:*

         (a) Is at any *nuclear facility* owned by, or operated by or on behalf of, an insured; or

         (b) Has been discharged or dispersed therefrom.

      (2) The *nuclear material* is contained in *spent fuel* or *waste* at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an *insured;* or

      (3) The *bodily injury* or *property damage* arises out of the furnishing by an *insured* of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any *nuclear facility,* but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to *property damage* to such *nuclear facility* and any property thereat.

2. As used in this endorsement:

   a. *"Hazardous properties"* include radioactive, toxic or explosive properties.

   b. *"Nuclear material"* means *source material, special nuclear material* or *byproduct material.*

   c. *"Source material," "special nuclear material"* and *"byproduct material"* have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   d. *"Spent fuel"* means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a *nuclear reactor.*

   e. *"Waste"* means any waste material:

      (1) Containing *byproducts material* other than the tailings or *wastes* produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its *source material* content; and

      (2) Resulting from the operation by any person or organization of any *nuclear facility* included under the first two paragraphs of the definition of *nuclear facility.*

   f. *"Nuclear facility"* means:

      (1) Any *nuclear reactor;*

      (2) Any equipment or device designed or used for:

         (a) Separating the isotopes of uranium or plutonium;

(continued next page)

(b) Processing or utilizing *spent fuel;* or

(c) Handling, processing or packaging *waste.*

(3) Any equipment or device used for the processing, fabricating or alloying of *special nuclear material* if at any time the total amount of such material in the custody of the *insured* at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

(4) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of *waste;*

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

g. *"Nuclear reactor"* means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

h. *"Property damage"* includes all forms of radioactive contamination of property.

F 0029

## AUTO MEDICAL PAYMENTS COVERAGE

CA-9903F(3-06)

This endorsement modifies insurance provided under the following:
BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

### 1. COVERAGE

We will pay reasonable expenses incurred for necessary medical and funeral services to or for an *insured* who sustains *bodily injury* caused by an *accident*. We will pay only those expenses incurred within three years from the date of the *accident*.

### 2. WHO IS AN INSURED

**a.** You while *occupying* or, while a pedestrian, when struck by any *auto.*

**b.** If you are an individual, any *family member* while *occupying* any *auto* or, while a pedestrian, when struck by any *auto.*

**c.** Anyone else *occupying* a covered *auto* or a temporary substitute for a covered *auto.* The covered *auto* must be out of service because of its breakdown, repair, servicing, loss or destruction.

### 3. EXCLUSIONS

This insurance does not apply to any of the following:

**a.** *Bodily injury* sustained by an *insured* while *occupying* a vehicle located for use as a premises.

**b.** *Bodily injury* sustained by you or any *family member* while *occupying* or struck by any vehicle (other than a covered *auto*) owned by you or furnished or available for your regular use.

**c.** *Bodily injury* sustained by any *family member* while *occupying* or struck by any vehicle (other than a covered *auto*) owned by or furnished or available for the regular use of any *family member.*

**d.** *Bodily injury* to your *employee* arising out of and in the course of employment by you. However we will cover *bodily injury* to your domestic *employees* if not entitled to workers' compensation benefits. For the purposes of this endorsement, a domestic *employee* is a person engaged in household or domestic work performed principally in connection with a residence premises.

**e.** *Bodily injury* to an *insured* while working in a business of selling, servicing, repairing or parking *autos* unless that business is yours.

**f.** *Bodily injury* arising directly or indirectly out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g.** *Bodily injury* to anyone using a vehicle without a reasonable belief that the person is entitled to do so.

**h.** *Bodily injury* sustained by an *insured* while *occupying* any covered *auto* while used in any professional racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply to any *bodily injury* sustained by an *insured* while the *auto* is being prepared for such a contest or activity.

### 4. LIMIT OF INSURANCE

Regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for *bodily injury* for each *insured* injured in any one *accident* is the Limit of Insurance for Auto Medical Payments Coverage shown in the Declarations.

No one will be entitled to receive duplicate payments for the same elements of *loss* under this coverage and any Liability Coverage Form, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

### 5. CHANGES IN CONDITIONS

The Conditions are changed for Auto Medical Payments Coverage as follows:

**a.** The Transfer of Rights of Recovery Against Others to Us Condition does not apply.

**b.** The reference in Other Insurance in the Business Auto and Garage Coverage Forms and Other Insurance - Primary and Excess Insurance Provisions in the Truckers and Motor Carrier Coverage Forms to "other collectible insurance" applies only to other collectible auto medical payments insurance.

### 6. ADDITIONAL DEFINITIONS

As used in this endorsement:

(continued next page)

F 0030

a. *"Family member"* means a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child.

b. *"Occupying"* means in, upon, getting in, on, out or off.

## SOUTH DAKOTA CHANGES

CA-7074(10-11)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

For a covered *auto* licensed in, or *garage operations* conducted in, South Dakota:

1. The following exclusion is added to Section II - Liability Coverage:

   This insurance does not apply to punitive or exemplary damages.

2. Under Physical Damage Coverage:

   The Limit of Insurance provision with respect to repair or replacement resulting in better than like kind or quality is replaced by the following, and supersedes any provision to the contrary:

   We may deduct for betterment from the amount we pay for the *loss* only if the repair or replacement results in an increase in the fair market value of the vehicle.

   Betterment as used in this provision means the difference between:

   a. The fair market value of the vehicle before the *loss;* and

   b. The fair market value of the vehicle after repair or replacement.

3. The *Diminution of Value* exclusion is replaced by the following:

   We will not pay for *loss* to a covered *auto* due to *diminution of value.* This exclusion applies unless the covered *auto* is not substantively physically repaired to its pre-*loss* condition.

4. The following is added to the Deductible section under Physical Damage Coverage:

   With respect to damage to a windshield, you may choose to have the windshield repaired or replaced. If you choose to have it repaired, we will waive any Physical Damage Coverage deductible applying to the *loss.*

5. The Appraisal for Physical Damage Loss Loss Condition is replaced by the following:

   If you and we disagree on the amount of *loss,* an appraisal of the *loss* may take place if both you and we agree to the appraisal procedure. In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of *loss.* If they fail to agree, they will submit their differences to the umpire. Each party will:

   a. Pay its chosen appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

   If we submit to an appraisal, we will still retain our right to deny the claim.

   Appraisals are not binding. Any decision may be appealed to a court of competent jurisdiction.

6. The Legal Action Against Us Loss Condition is replaced by the following:

   No one has the right under this policy to bring us into an action to determine the *insured's* liability.

7. The Other Insurance General Condition in the Business Auto and Garage Coverage Forms and the Other Insurance - Primary and Excess Insurance Provisions General Condition in the Truckers and Motor Carrier Coverage Forms is replaced by the following:

   When two coverage forms providing liability coverage apply to an *auto* and:

   a. One provides coverage to a named insured engaged in the business of selling, repairing, servicing, storing or parking *autos;*

   b. The other provides coverage to a person not engaged in that business; and

   c. At the time of an *accident* a person described in b is operating an *auto* owned by the business described in a;

   then that person's liability coverage is primary and the coverage form issued to a business described in a is excess over any coverage available to that person.

F 0031

**COMMON POLICY CONDITIONS**

IL-0017F(11-98)

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

**1.** The First Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the First Named Insured written notice of cancellation at least:

**a.** Ten days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** Thirty days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the First Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the First Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the First Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The First Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

**1.** We have the right to:

**a.** Make inspections and surveys at any time;

**b.** Give you reports on the conditions we find; and

**c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**a.** Are safe or healthful; or

**b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs 1 and 2 of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph 2 of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. PREMIUMS

The First Named Insured shown in the Declarations:

**1.** Is responsible for the payment of all premiums; and

**2.** Will be the payee for any return premiums we pay.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**SOUTH DAKOTA CHANGES - CANCELLATION AND NONRENEWAL**            IL-7024(5-02)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS ERRORS AND OMISSIONS COVERAGE PART
DIRECTORS AND OFFICERS LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM
POLLUTION LIABILITY COVERAGE FORM
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM

1. Paragraph 2 of the Cancellation Common Policy Condition is replaced by the following:

   We may cancel this policy by mailing or delivering to the First Named Insured written notice of cancellation at least 20 days before the date cancellation takes effect.

   **a.** When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason.

   **b.** When this policy has been in effect for 60 days or more or if it is a renewal with us, we may not cancel unless it is based upon at least one of the following reasons:

   (1) Nonpayment of premium;

   (2) Discovery of fraud or material misrepresentation made by or with the knowledge of the Named Insured in obtaining the policy, continuing the policy or in presenting a claim under the policy;

   (3) Discovery of acts or omissions on the part of the Named Insured which increase any hazard insured against;

   (4) The occurrence of a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued;

   (5) A violation of any local fire, health, safety, building or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

   (6) A determination by the Director of Insurance that the continuation of the policy would jeopardize our solvency or would place us in violation of the insurance laws of this state;

   (7) A violation or breach of any policy terms or conditions by the insured; or

   (8) Such other reasons as are approved by the director of insurance.

2. Paragraph 5 of the Cancellation Common Policy Condition is replaced by the following:

   If this policy is cancelled, we will send the First Named Insured any premium refund due. If we cancel, the refund will be computed pro rata. If the First Named Insured cancels, the refund will be computed at 90% of pro rata. The cancellation will be effective even if we have not made or offered a refund.

3. The following Condition is added and supersedes any provision to the contrary:

   **NONRENEWAL**

   If we decide not to renew this policy, we will mail or deliver to the First Named Insured written notice of nonrenewal not less than 60 days before:

   **a.** The expiration date; or

   **b.** The anniversary date if this is a continuous policy.

   Any notice of nonrenewal will be mailed or delivered to the First Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

F  0033



**COMMERCIAL AUTO
CHANGES**

First Named Insured and Address:

AM DEVELOPMENT LLC
C/O DONALD HUMES

Agency Name and Number:

BANKWEST INSURANCE
7937-AB

Policy Number:   X42163

Change Effective Date:   09-01-12

**PREMIUM SUMMARY**

No Additional or Return Premium
Direct Billed

**CHANGES:**

IL-7007 (6-01)                                   Policyholder - Original                                   SO 01 10/18/12

F  0034



**COMMERCIAL EXCESS LIABILITY
COVERAGE PART**

## Declarations

First Named Insured and Address:

AM DEVELOPMENT LLC
C/O DONALD HUMES
███████████████

Agency Name and Number:

BANKWEST INSURANCE
7937-AB

Policy Number:  X42163

Policy Period:    Effective Date:      05-01-12

Expiration Date:    05-01-13

In return for the payment of the premium and subject to all the terms of the policy, we agree to provide the insurance coverage as stated in the same.

12:01 A.M. standard time at your mailing address shown in the declarations

### COVERAGE FORMS AND ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART

| Form Number | Form Title | Premium |
|---|---|---|
| CU-7008 (11-05) | Asbestos Exclusion | $ |
| CU-7010 (03-03) | Nuclear Energy Liability Exclusion Endorsement | |
| CU-7019 (03-03) | South Dakota Amendatory Endorsement | |
| CU-7037 (05-05) | Commercial Excess Liability Coverage Form | |
| CU-7054 (03-03) | Fungi or Bacteria Exclusion | |
| CU-7067 (03-03) | War Liability Exclusion | |
| CU-7086 (01-08) | Exclusion of Certified Acts of Terrorism | |

**Advance Endorsement Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**$**

### PREMIUM SUMMARY

Advance Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$      500.00

Advance Endorsement Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Total Advance Premium** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**$      500.00**

### ADDITIONAL NAMED INSUREDS

WHO IS AN INSURED includes the following Additional Named Insureds:

AMERICA'S MAILBOX LLC
AMERICA'S CAMPING & LODGING

Page 2

Policy Number:   X42163

Effective Date:   05-01-12

## LIMITS OF INSURANCE

General Aggregate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 1,000,000

Products-Completed Operations Aggregate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,000,000

Each Occurrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,000,000

## PREMIUM COMPUTATION

Not Subject to Audit

Estimated Advance Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 500.00

## SCHEDULE OF UNDERLYING INSURANCE - GENERAL LIABILITY

Policy Number:   CG-X42163
Name of Insurer:  ACUITY, A Mutual Insurance Company
Policy Period:    05-01-12 To 05-01-13

Occurrence Coverage

**Limits or Amounts of Insurance**

General Aggregate Limit (Other Than Products-Completed Operations) . . . . . . . . . . . . . $ 2,000,000

Products-Completed Operations Aggregate Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,000,000

Personal and Advertising Injury Limit (Any One Person or Organization) . . . . . . . . . . . . . 1,000,000

Each Occurrence Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,000,000

## SCHEDULE OF UNDERLYING INSURANCE - AUTOMOBILE LIABILITY

Policy Number:   CA-X42163
Name of Insurer:  ACUITY, A Mutual Insurance Company
Policy Period:    05-01-12 To 05-01-13

**Limits or Amounts of Insurance**

Bodily Injury and Property Damage Combined Single Limit (Each Accident) . . . . . . . . . . $ 1,000,000

## SCHEDULE OF UNDERLYING INSURANCE - EMPLOYERS' LIABILITY

Policy Number:   CWC-X42163
Name of Insurer:  ACUITY, A Mutual Insurance Company
Policy Period:    05-01-12 To 05-01-13

**Limits or Amounts of Insurance**

Bodily Injury by Accident (Each Accident) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 100,000

Bodily Injury by Disease (Policy Limit) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 500,000

Bodily Injury by Disease (Each Employee) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100,000

## COMMERCIAL EXCESS LIABILITY COVERAGE FORM

This policy contains both a Products-Completed Operations Aggregate Limit and a General Aggregate Limit of Insurance. These are described in Section II - Limit of Insurance.

Other provisions in this policy restrict coverage. Read the entire policy and any *underlying insurance* carefully to determine rights, duties and what is covered and not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under any *underlying insur-*

*ance.* The words "we," "us" and "our" refer to the Company providing this insurance.

The words "this insurance" mean the liability insurance provided under this policy.

The word "insured" means any person or organization qualifying as such under any *underlying insurance.*

Other words and phrases that appear in italics have special meaning. Refer to Section IV - Definitions of this policy.

## SECTION I - COVERAGES

1. **Insuring Agreement**

   a. We will pay those sums, in excess of the amount payable under the terms of any *underlying insurance,* that the insured becomes legally obligated to pay as damages because of *injury* or damage to which this insurance applies, provided that the *underlying insurance* also applies, or would apply but for the exhaustion of its applicable Limits of Insurance.

   We will also pay those sums that the insured becomes legally obligated to pay as damages because of *injury* or damage to which the insurance provided under the Coverage Extension applies as set forth in paragraph 4 below.

   b. We have the right to participate in the investigation or settlement of claims or the defense of the insured against suits seeking damages because of *injury* or damage to which this insurance may apply. We have a duty to investigate or settle such claims or to defend the insured against such suits when the applicable Limit of Insurance of the *underlying insurance* has been used up by payment of judgments, settlements and any cost or expense subject to such limit.

   We will have the right and duty to participate in the investigation and settlement of claims or the defense of the insured against suits seeking damages because of *injury* or damage to which the insurance provided under the Coverage Extension may apply.

   This right or duty to defend is limited as set forth in paragraph 3 below.

   However, we will have no duty to defend the insured against any suit seeking damages for *injury* or damage to which this insurance does not apply.

   c. The amount we will pay for damages is limited as described in Section II - Limit of Insurance.

   d. This insurance is subject to the same terms, conditions, agreements, exclusions and definitions as the *underlying insurance,* except:

      (1) We have no obligation under this insurance with respect to any claim or suit that is settled without our consent; and

      (2) With respect to any provisions to the contrary contained in this insurance.

2. **Exclusions**

   The exclusions that apply to the *underlying insurance* apply to this insurance. Also, this insurance does not apply to damages because of:

   a. *Injury* or damage to premises rented to you or temporarily occupied by you with permission of the owner.

   b. Any duty to pay expenses under any medical payments coverage.

   c. Any duty to reimburse an insurer as provided by the terms of the Endorsement For Motor Carrier Policies of Insurance For Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980 or under the terms of any similar endorsement required by Federal or state statute.

   d. Any duty payable only because of the attachment of the Endorsement For Motor Carrier Policies of Insurance For Public Liability or any similar endorsement required by Federal or state statute.

   e. Any duty imposed by law under any automobile no-fault, uninsured motorist, underinsured motorist, workers' compensation, disability benefits or unemployment compensation law or any similar law.

   f. Any duty imposed by law under the following:

      (1) Section 130, Civil Liability, of Title I (Truth in Lending Act) of the Consumer Credit Protection Act (Public Law

F 0038

90-321; 82 Stat. 146 et. seq.);

(2) Title IV (Odometer Requirements) of the Motor Vehicle Information and Cost Savings Act (Public Law 92-513; 86 Stat. 961); or

(3) Employee's Retirement Income Security Act (E.R.I.S.A.) of 1974 as now or hereafter amended.

**g.** *Injury* or damage to personal property in the care, custody or control of the insured.

This exclusion does not apply to liability assumed under a sidetrack agreement.

**h.** *Injury* or damage sustained by an employee, former employee, prospective employee or their beneficiaries or legal representatives and caused by any negligent act, error or omission of the insured, or any other person for whose acts the insured is legally liable, in the administration of any employee benefit program. Administration includes giving counsel to employees, interpreting, handling of employee records, and effecting enrollment, termination or cancellation of employees.

**i.** Any obligation to pay any claim or claims made against you or any of your officers, directors or trustees, individually or collectively, by reason of a wrongful act in their respective capacities as officers, directors or trustees.

As used in this exclusion, "wrongful act" means any actual or alleged error, misstatement or misleading statement, act or omission, or neglect or breach of duty made or committed by your directors, officers or trustees.

**j.** Any obligation arising out of an act, error or omission of an insured:

(1) While performing the duties of an insurance agent in your garage operations; or

(2) In your garage operations as a result of title paper preparation.

As used in this exclusion:

(1) "Insurance agent" means a person or organization who is duly licensed as an insurance agent by the regulatory authority of the state in which the insured's principal place of business is located.

(2) "Garage operations" means the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. Garage operations includes the ownership, maintenance or use of the autos indicated in Section I of the Garage Coverage Form as covered autos. Garage operations also includes all operations necessary or incidental to a garage business.

(3) "Title paper preparation" means the preparation of official title papers for registering an auto sold by you. This includes the designation of a lienholder who holds a financial interest in the auto.

(4) "Auto" means a land motor vehicle, trailer or semitrailer.

**k.** Any obligation imposed due to the application of any statute permitting a customer to return an auto sold by an insured, if the auto fails to perform satisfactorily.

As used in this exclusion, "auto" means a land motor vehicle, trailer or semitrailer.

**l.** *Injury* or damage your customer becomes legally obligated to pay which arise out of the use of your covered auto. This exclusion applies only if your business is shown in the Declarations of the *underlying insurance* as an auto dealership.

However, if your customer becomes legally obligated to pay for *injury* or damage which arise out of their use of your covered auto and if there is:

(1) No other valid and collectible insurance (whether primary, excess or contingent) available to your customer, we will pay up to the compulsory or financial responsibility law limits where the covered auto is principally garaged.

(2) Other valid and collectible insurance (whether primary, excess or contingent) available to the customer but it is less than the compulsory or financial responsibility law limits where the covered auto is principally garaged, we will pay only for the amount by which the compulsory or financial responsibility law limits exceed the limits of the other insurance.

**3. Investigation or Settlement of Claims or Defense of Insured Against Suits**

**a.** When we have the duty to defend, we will pay for all *defense expense* once our duty to defend begins. We may investigate any claim or suit.

If we exercise our right to defend when there is no duty, we will pay only that *defense expense* we incur.

If we provide a defense, we may investigate any claim or suit at our discretion. We may settle such claim or suit within the Limit of Insurance available at the time of the settlement.

**b.** Our right or duty to defend ends when we

have used up the Limits of Insurance available in the payment of any judgments or settlements as provided under Section II - Limit of Insurance. This applies both to claims and suits pending at the time and those filed thereafter.

**c.** When we control the investigation or settlement of a claim or the defense of the insured against a suit, we will pay for the *defense expense.* If by mutual agreement or court order the insured assumes control before the applicable Limit of Insurance available is used up, we will reimburse the insured for reasonable *defense expense.*

**d.** As soon as the Limit of Insurance available is used up, you will then arrange to assume control of the investigation or settlement of all such claims or the defense of you or any other insured against such suits when our right or duty to investigate, settle or defend them ends.

**e.** We will assist the insured in the transfer of control of the investigation or settlement of claims or the defense of the insured against suits under c or d above. Until such transfer is completed, we will take on behalf of any insured those steps that we think proper:

    (1) To avoid a default in any claim or suit; or

    (2) To the continued investigation or settle-

ment of a claim or defense of the insured against a suit.

You agree that if we take such steps:

    (1) We do not waive or give up any of our rights under this insurance; and

    (2) You will reimburse us for any *defense expense* that arises out of such steps if the applicable Limit of Insurance available has been used up.

**f.** Any payment for *defense expense* will not reduce the Limits of Insurance.

**4. Coverage Extension**

**a.** The terms of this policy are extended as follows:

If *underlying insurance* provides coverage for the use of watercraft you do not own, in addition to watercraft ashore on premises you own or rent, the coverage provided by this policy is extended to cover any watercraft you do not own that is:

    (1) Less than 75 feet long; and

    (2) Not being used to carry persons or property for a charge;

even if these nonowned watercraft are not insured in the *underlying insurance.*

**b.** We will only pay for damages up to the limits of insurance.

## SECTION II - LIMIT OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below define the most we will pay under the terms of this insurance regardless of the number of:

**a.** Insureds;

**b.** Claims made or suits brought;

**c.** Persons or organizations making claims or bringing suits.

**2.** The General Aggregate Limit is the most we will pay for all damages under Section I - Coverages, other than damages arising out of:

**a.** The *products-completed operations hazard;* or

**b.** The ownership, operation, maintenance, use, loading or unloading, or entrustment to others, of an auto.

The General Aggregate Limit applies separately to:

**a.** Each location owned by or rented to you. A location is a premises involving the same or connecting lots, or a premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad; and

**b.** Each of your projects away from a location owned by or rented to you.

Each payment we make for such damages reduces by the amount of the payment, the General Aggregate Limit. This reduced limit will then be the Limit of Insurance available for further damages of these kinds.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Section I - Coverages because of damages arising out of the *products-completed operations hazard.* Each payment we make for such damages reduces, by the amount of the payment, the Products-Completed Operations Aggregate Limit. This reduced limit will then be the Limit of Insurance available for further damages of these kinds.

**4.** Subject to 2 and 3 above, or with respect to *injury* or damage arising out of the ownership, operation, maintenance, use, loading or unloading, or entrustment to others of an auto, the Each Occurrence Limit is the most we will pay for the sum of damages under Section I - Coverages because of all *injury* and damage arising out of any one *occurrence.*

**5.** The limits of this policy apply separately to

F 0040

each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limit of Insurance.

## SECTION III - CONDITIONS

We have no duty to provide coverage under this policy unless you and any other involved insured have fully complied with the Conditions contained in this policy and those contained in any *underlying insurance.*

If any of the following conditions are contrary to Conditions contained in the *underlying insurance,* the provisions contained in this policy apply.

1. **Appeals**

   In the event the *underlying insurer* elects not to appeal a judgment in excess of the limits of the *underlying insurance,* we may elect to make such appeal. If we so elect, we shall be liable, in addition to the applicable Limit of Insurance for all *defense expenses* we incur.

2. **Bankruptcy of Underlying Insurer**

   In the event of bankruptcy or insolvency of any *underlying insurer,* this policy shall not replace such *underlying insurance.* This policy applies as if the *underlying insurance* was valid and collectible.

3. **Duties in the Event of Occurrence, Claim or Suit**

   a. You must see to it that we are notified as soon as practicable of an *occurrence* or offense which may result in a claim. To the extent possible notice should include:

      (1) How, when and where the *occurrence* or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any *injury* or damage arising out of the *occurrence* or offense.

   b. If a claim or suit is received by any insured you must:

      (1) Immediately record the specifics of the claim or suit and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or a suit;

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or the defense of the insured against the suit;

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of *injury* or damage to which this insurance may also apply; and

      (5) Notify us immediately of any judgment or settlement of any claim or suit brought against any insured.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

4. **Maintenance of Underlying Insurance**

   a. You agree to maintain the *underlying insurance* in full force and effect during the term of this policy. You agree to inform us within 10 days of any replacement of that *underlying insurance* by the same or another company. If there is any change in the replacement *underlying policy* in hazard, policy limits or coverage, including any terms, conditions and endorsements, we will only be liable under this insurance to the same extent as if there had been no change in, or replacement of, *underlying insurance.*

   b. In the event that any *underlying insurance* is cancelled or not renewed and not replaced, you must notify us within 10 days. We will not be liable under this insurance for more than we would have been liable if that *underlying insurance* had not terminated if you do not request cancellation of this policy effective the same date that the *underlying insurance* was cancelled.

   c. Reduction or exhaustion of the *aggregate limit* of any *underlying insurance* by payments for judgments or settlements will not be a failure to maintain *underlying insurance* in full force and effect.

   d. No statement contained in this Condition limits our right to cancel or not renew this policy.

5. **Other Insurance**

   This insurance is excess over any other valid and collectible insurance whether primary, ex-

F 0041

cess, contingent or any other basis, except other insurance written specifically to be excess over this insurance.

**6. Policy Period**

This insurance will respond to *injury* or damage that occurs, or arises from an offense committed, during the policy period of this insurance shown in the Declarations.

## SECTION IV - DEFINITIONS

1. *"Aggregate limit"* means the maximum amount stated in the policy for which the insurer will be liable, regardless of the number of covered claims.

2. *"Defense expense"* means payments allocated to the investigation or settlement of a specific claim or the defense of the insured against a specific suit, including:

   **a.** Attorney fees and all other litigation expenses.

   **b.** The cost of bonds to appeal a judgment or award in our defense of the insured against any suit.

   **c.** Up to $250 for the cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which bodily injury liability coverage provided by *underlying insurance* applies.

   **d.** The cost of bonds to release attachments. This is only for bond amounts within the Limit of Insurance available.

   **e.** Reasonable expenses incurred by the insured at our request to assist us in the investigation or settlement of the claim or the defense of the insured against the suit. This includes actual loss of earnings up to $100 a day because of time off from work.

   **f.** Cost taxed against the insured in the suit.

   **g.** Interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the amount available for the judgment under the provisions of Section II - Limits of Insurance.

   *Defense expense* does not include:

   **a.** Salaries and expenses of our employees or the insured's employees, other than:

   (1) That portion of our employed attorneys' fees, salaries and expenses allocated to a specific claim or suit; and

   (2) The expenses described in e above.

   **b.** Fees and expenses of independent adjusters we hire.

3. *"Injury"* means bodily injury, property damage, personal injury or advertising injury as defined in the *underlying insurance.*

4. *"Occurrence"* means:

   **a.** With respect to bodily injury to persons other than your employees and property damage, an accident, including continuous or repeated exposure to substantially the same general harmful conditions;

   **b.** With respect to bodily injury to your employees arising out of and in the course of their employment by you, the accident or disease which causes the bodily injury; and

   **c.** With respect to offenses committed by the insured resulting in personal injury or advertising injury, all such injury sustained by any one person or organization.

5. *"Occurrence limit"* means any specific limit, other than an *aggregate limit,* applicable to any *underlying insurance,* regardless of whether such limit is subject to an *aggregate limit* in the *underlying policy.*

6. *"Products-completed operations hazard":*

   **a.** Includes all *injury* occurring away from premises you own or rent and arising out of *your product* or *your work* except:

   (1) Personal injury or advertising injury as defined in the *underlying insurance;*

   (2) Products that are still in your physical possession; or

   (3) Work that has not yet been completed or abandoned. However, *your work* will be deemed completed at the earliest of the following times:

   (a) When all of the work called for in your contract has been completed;

   (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

   (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   **b.** Does not include *injury* arising out of:

   (1) The transportation of property, unless

F 0042

the *injury* or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the loading or unloading of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment, or abandoned or unused materials; or

(3) Products or operations for which the classification in the General Liability *underlying policy* or in our General Liability manual or rules includes products or completed operations.

7. *"Underlying insurance"* means the liability insurance coverage provided under policies shown in the Schedule of Underlying Insurance in the Declarations, for the limits and periods indicated. It includes any policies issued to replace those policies during the term of this insurance, provided that you have notified us within 10 days of the replacement, and the replacement policies provide:

  **a.** At least the same policy limits;

  **b.** The same hazards insured against, except as modified by general program revisions; and

  **c.** The same coverage, including all terms, conditions and endorsements.

8. *"Underlying insurer"* means any insurer who issues a policy of *underlying insurance.*

9. *"Underlying policy"* means a policy providing *underlying insurance.*

10. *"Your product"* means:

  **a.** Any goods or products other than real property, manufactured, sold, handled, distributed or disposed of by:

    (1) You;

    (2) Others trading under your name; or

    (3) A person or organization whose business or assets you have acquired; and

  **b.** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

*Your product* includes:

  **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of *your product;* and

  **b.** The providing of or failure to provide warnings or instructions.

*Your product* does not include vending machines or other property rented to or located for the use of others but not sold.

11. *"Your work"* means:

  **a.** Work or operations performed by you or on your behalf; and

  **b.** Materials, parts or equipment furnished in connection with such work or operations.

*Your work* includes:

  **a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of *your work;* and

  **b.** The providing of or failure to provide warnings or instructions.

F 0043

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT** CU-7010(3-03)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

1. This insurance does not apply to:

   a. Any claim or accident:

      (1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the *hazardous properties* of *nuclear material* and with respect to which:

         (a) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954 or any law amendatory thereof; or

         (b) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

   b. Any claim or accident resulting from the *hazardous properties* of *nuclear material,* if:

      (1) The *nuclear material:*

         (a) Is at any *nuclear facility* owned by, or operated by or on behalf of, an insured; or

         (b) Has been discharged or dispersed therefrom;

      (2) The *nuclear material* is contained in *spent fuel* or *waste* at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

      (3) The claim or accident arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any *nuclear facility,* but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to *property damage* to such *nuclear facility* and any property thereat.

2. As used in this endorsement:

   a. *"Hazardous properties"* include radioactive, toxic or explosive properties.

   b. *"Nuclear material"* means *source material, special nuclear material* or *by-product material.*

   c. *"Source material," "special nuclear material"* and *"by-product material"* have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   d. *"Spent fuel"* means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a *nuclear reactor.*

   e. *"Waste"* means any waste material:

      (1) Containing *by-products material* other than the tailings or *wastes* produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its *source material* content; and

      (2) Resulting from the operation by any person or organization of any *nuclear facility* included under the first two paragraphs of the definition of *nuclear facility.*

   f. *"Nuclear facility"* means:

      (1) Any *nuclear reactor;*

      (2) Any equipment or device designed or used for:

         (a) Separating the isotopes of uranium or plutonium;

         (b) Processing or utilizing *spent fuel;* or

         (c) Handling, processing or packaging *waste;*

      (3) Any equipment or device used for the processing, fabricating or alloying of *special nuclear material* if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

      (4) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of *waste;*

   and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

(continued next page)

g. *"Nuclear reactor"* means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

h. *"Property damage"* includes all forms of radioactive contamination of property.

## SOUTH DAKOTA AMENDATORY ENDORSEMENT

CU-7019(3-03)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

1. The following exclusion is added to item 2, Exclusions of Section I - Coverages:

   This insurance does not apply to punitive or exemplary damages.

2. The following is added to Section IV - Conditions:

   **Cancellation**

   a. The First Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   b. We may cancel this policy by mailing or delivering to the First Named Insured written notice of cancellation at least 20 days before the date cancellation takes effect.

   (1) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason.

   (2) When this policy has been in effect for 60 days or more or if it is a renewal with us, we may not cancel unless it is based upon at least one of the following reasons:

   (a) Nonpayment of premium;

   (b) Discovery of fraud or material misrepresentation made by or with the knowledge of the Named Insured in obtaining the policy, continuing the policy or in presenting a claim under the policy;

   (c) Discovery of acts or omissions on the part of the Named Insured which increase any hazard insured against;

   (d) The occurrence of a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued;

   (e) A violation of any local fire, health,

safety, building or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

   (f) A determination by the Director of Insurance that the continuation of the policy would jeopardize our solvency or would place us in violation of the insurance laws of this state; or

   (g) A violation or breach of any policy terms or conditions by the insured.

   c. We will mail or deliver our notice to the First Named Insured's last mailing address known to us.

   d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

   e. If this policy is cancelled, we will send the First Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the First Named Insured cancels, the refund will be computed at 90% of pro rata. The cancellation will be effective even if we have not made or offered a refund.

   f. If notice is mailed, proof of mailing will be sufficient proof of notice.

   **Nonrenewal**

   If we decide not to renew this policy, we will mail or deliver to the First Named Insured written notice of nonrenewal not less than 60 days before:

   a. The expiration date; or

   b. The anniversary date if this is a continuous policy.

   Any notice of nonrenewal will be mailed or delivered to the First Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

F  0045

**EXCLUSION OF CERTIFIED ACTS OF TERRORISM**

CU-7086(1-08)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

*Any injury or damage* arising, directly or indirectly, out of a *certfied act of terrorism.*

**B.** The following definitions are added:

**1.** For the purposes of this endorsement, *"any injury or damage"* means any injury or damage covered under any Coverage Part, Coverage Form, or underlying insurance to which this endorsement is applicable, and includes but is not limited to *bodily injury, property damage, personal and advertising injury, injury* or *environmental damage* as may be defined in any applicable Coverage Part, Coverage Form, or underlying insurance.

**2.** *"Certified act of terrorism"* means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a *certified act of terrorism* include the following:

**a.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**FUNGI OR BACTERIA EXCLUSION**

CU-7054(3-03)

The endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

**1.** The following exclusion is added to Paragraph 2, Exclusions of Section I - Coverages:

**a.** *Injury* or damage which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any *fungi* or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of

the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, *fungi* or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any *fungi* or bacteria that are, are on, or are contained in, a good or product intended for consumption.

**2.** The following definition is added to the Definitions Section:

*"Fungi"* means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

**ASBESTOS EXCLUSION**

CU-7008(11-05)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

The following exclusion is added:

**Asbestos**

**1.** This insurance does not apply to *injury,* including but not limited to, physical or mental injury, mental anguish or shock, sickness, disease, occupational disease, disability or death, or damage to property arising out of activities re-

lated to, but not limited to, manufacture, mining, storage, distribution, installation, sale, use, exposure to,  service, testing for, repair, containment or removal of asbestos, asbestos fibers, asbestos dust, or products containing asbestos.

**2.** The following definition applies:

*"Injury"* means bodily injury or property damage as defined in the *underlying insurance.*

**WAR LIABILITY EXCLUSION**

CU-7067(3-03)

This endorsement modifies insurance provided under the following:

COMMERCIAL EXCESS LIABILITY COVERAGE FORM

The following exclusion is added:

This insurance does not apply to:

*Injury* or damage, however caused, arising, directly or indirectly, out of:

  **1.** War, including undeclared or civil war; or

  **2.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

  **3.** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.