2:17-cv-01778-JAD-DJA - May 21, 2021

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEVADA

3   DONALD HUMES,                    )
                                     ) Case No. 2:17-cv-01778-JAD-DJA
4            Plaintiff,              )
                                     ) Las Vegas, Nevada
5   vs.                             ) May 21, 2021
                                     ) 1:35 p.m. - 2:17 p.m.
6   ACUITY, A MUTUAL INSURANCE       ) Courtroom 6B
    COMPANY, a foreign               ) PRETRIAL HEARING
7   corporation; DOES 1 through      )
    10; and ROE CORPORATIONS 1       )
8   through 10, inclusive,           )
                                     )
9            Defendant.              )
    _____)   *CERTIFIED COPY*

10

11         REPORTER'S TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE JENNIFER A. DORSEY
12          UNITED STATES DISTRICT COURT JUDGE

13

14  APPEARANCES:

15  For the Plaintiff:   CARA M. XIDIS, ESQ.
                         JUSTIN W. WILSON, ESQ.
16                       H&P LAW
                         8950 West Tropicana Avenue, Suite 1
17                       Las Vegas, Nevada 89147
                         (702) 598-4529
18

19  (Appearances continued on page 2.)

20

21  Court Reporter:      Amber M. McClane, RPR, CRR, CCR #914
                         United States District Court
22                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                       (702) 384-0429 or AM@nvd.uscourts.gov

24  Proceedings reported by machine shorthand.  Transcript
    produced by computer-aided transcription.
25

```
 1    APPEARANCES CONTINUED:

 2    For the Defendant:

 3         MARISSA R. TEMPLE, ESQ.
           STEPHEN H. ROGERS, ESQ.
 4         ROGERS, MASTRANGELO, CARVALHO & MITCHELL
           700 South Third Street
 5         Las Vegas, Nevada 89101
           (702) 383-3400

 6

 7    Also Present:

 8         Summer Rivera, Jury Services Coordinator

 9

10                          * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2:17-cv-01778-JAD-DJA - May 21, 2021

```
 1           LAS VEGAS, NEVADA; FRIDAY, MAY 21, 2021; 1:35 P.M.

 2                              --o0o--

 3                    P R O C E E D I N G S

 4           COURTROOM ADMINISTRATOR:  Now's the time set for a

 5   jury questionnaire hearing in Case Number

 6   2:17-cv-1778-JAD-DJA, Donald Humes versus Acuity, a Mutual

 7   Insurance Company.

 8           Counsel, please state your appearances.

 9           MS. XIDIS:  Good morning, Your Honor.  Cara Xidis for

10   the plaintiff.

11           MR. WILSON:  And Justin Wilson for the plaintiff as

12   well.

13           MS. TEMPLE:  And Marissa Temple for the defendant.

14           MR. ROGERS:  And Steve Rogers also.

15           THE COURT:  All right.  Are the four of you

16   intending -- you're going to be the four lawyers at trial; is

17   that right?

18           MS. XIDIS:  Yes, Your Honor.

19           MR. ROGERS:  Yes, Your Honor.

20           THE COURT:  Okay.  Thanks.  All right.  In just a

21   minute we will get to the jury questionnaires, but before I do

22   that, just a couple issues.

23           One, I have your briefing on the motions to strike

24   and an order on those motions is forthcoming.  I just -- I

25   just finished a jury trial last night, so -- and you just
```

1     filed the responses at noon today.  So those -- I expect that

2     that will get out today.

3            I want to talk now about jury instructions.  As I

4     flagged for you I think it was Monday, there are concerns I

5     have with the jury instructions because they are based on

6     Nevada law, not South Dakota law, which there's an order in

7     this case that says this case is governed by South Dakota law.

8            So no one has given me South Dakota law jury

9     instructions, and so you have two options right now.  One, you

10    can either stipulate that Nevada law applies, or you need to

11    submit to me jury instructions that are based on South Dakota

12    law.  Those are the two choices that we have here.  I need you

13    guys to talk, figure out which way this is going to go.  And

14    if the answer is that it's going to be South Dakota law as it

15    currently stands, then you need to -- you need to provide me

16    with a new set of jury instructions.  And I also don't know

17    which ones you agree on and which ones you dispute at this

18    point.

19           So I need two things, and I'm going to give you till

20    Sunday at 5:00 p.m. to get this taken care of.  So you can

21    either file a stipulation that Nevada law applies, and then

22    you don't have to submit additional jury instructions based --

23    I'm sorry, did I say Nevada?  Yes.  Then you don't have to

24    submit additional jury instructions that are based on South

25    Dakota law.  Or you can find the case law or the law or the

1    jury instructions that apply South Dakota law and provide

2    those.  Either way, I also need a joint set of agreed upon

3    jury instructions and then the instructions that you disagree

4    on.  So you need to get together on these issues.

5            Does that make sense?

6            So I need to know -- I need to be able to say, okay,

7    they all agree on these -- you know, most of them are

8    really -- should be agreed on.  They're form instructions.

9    They should be agreed on.  Ninth Circuit model civil jury

10   instructions.  They should -- so many basic ones that are not

11   case specific.  You should be able to at a minimum agree on

12   that, but you should also be able to agree on -- this is a

13   breach of contract case.  This should not be complicated.  It

14   should be quite simple about which jury instructions apply.

15   So agree on the ones you can, and then provide to me the ones

16   you cannot agree on and let me know that those are the ones

17   that you dispute.  I need all of that done, filed by 5:00 p.m.

18   on Sunday.

19           During voir dire, I am going to explain to the

20   parties -- not to the parties -- to the jury -- jurors what

21   this case is about, and this is what I propose to tell them:

22   This is a civil lawsuit between Donald Humes and Acuity, a

23   Mutual Insurance Company, about Acuity's alleged failure to

24   cover Mr. Humes' medical expenses after a 2013 car accident.

25   Mr. Humes and Acuity agree that Mr. Humes purchased an

1   insurance policy from Acuity and that his policy provides him

2   underinsured motorist coverage, but they dispute whether the

3   accident caused his injuries, whether the medical care he

4   received was necessary to treat his injuries, and the

5   reasonable charges for any necessary treatments.

6           Any objections?  I'll ask the plaintiff first.

7       **MS. XIDIS:**  Yes, Your Honor.  Most of it sounds fine.

8   My only concern is that you've limited it to medical

9   expenses -- perhaps unintentionally -- which leaves out the

10  general damages.

11      **THE COURT:**  All right.  Damages instead of medical

12  expenses?

13      **MS. XIDIS:**  I would be comfortable with that.

14      **THE COURT:**  So alleged failure to cover Mr. Humes'

15  damages after -- excuse me -- after a 2013 car accident, but

16  then the rest of it where they dispute whether the accident

17  caused his injuries, when the medical care he received was

18  necessary to treat his injuries, and the reasonable charges

19  for any necessary treatments, do you have a proposed change to

20  any of that?

21      **MS. XIDIS:**  No, Your Honor.

22      **THE COURT:**  Okay.

23      **MS. TEMPLE:**  No changes, Your Honor.

24      **THE COURT:**  Okay.  So I'm going to replace "medical

25  expenses" with "damages," and that will be the summary that I

1    read.

2            Just looking -- just in prepping for this case, I

3    know we had talked last at calendar call that we're going to

4    seat eight jurors.  We only need six to decide the case.  So

5    essentially there's two alternates but they aren't treated as

6    alternates.  They're just part of the people who will be

7    deciding, part of the jury.  So we could lose up to two and

8    still go to verdict with this case.  So even if we lose one

9    and have seven, that doesn't -- that's fine under both the

10   rule and the statute.

11           The parties get a total of six peremptory challenges;

12   three each.  So that means that we really have to focus on 14

13   people in the box in order to start our questioning process,

14   and then as we lose someone from the 14, we excuse someone,

15   we'll pull somebody from the rest of the jury -- rest of the

16   venire to replace them.  So I think -- and I see Summer, our

17   Jury Services representative, here today.  I think we'll

18   probably just do 14 in the box so that we're clear, and then

19   spread out whatever's left.

20           What do you think, Summer?

21           **MS. RIVERA:**  I think that's fine because we can fit

22   32 total with the 14 and the 18.  Because three, six, nine,

23   18.  So we don't need to use an overflow courtroom.

24           **THE COURT:**  Oh great.  That makes sense.  Okay.

25           Well, wait.  Hold on.  So we're going to just do 32

1  but...

2          **COURTROOM ADMINISTRATOR:**  We pre-seat 14 per side.

3          **THE COURT:**  I know.  We pre-seat 14, and then we can

4  sit everybody else.  But do we have more than 32 that are

5  coming, Summer?

6          **MS. RIVERA:**  So on the list that I sent you, there

7  was more than -- we're shooting for 30.  But depending on how

8  many we get rid of, we're just going to bring in the first 30

9  so it gave the attorneys flexibility to excuse up to --

10          **THE COURT:**  Got it.  Are you going to keep any

11  overflows down in Jury Services?

12          **MS. RIVERA:**  I was not planning on it.  I was just

13  only calling in 30, and they will all come up here.

14          **THE COURT:**  Okay.  So I think you provided us the

15  jury questionnaires 1 through 99ish?

16          **MS. RIVERA:**  Yes, that's correct.

17          **THE COURT:**  And is that just 30 people?

18          **MS. RIVERA:**  No.  I think that was 44 people.

19          **THE COURT:**  Okay.  So how many people will show up

20  here?

21          **MS. RIVERA:**  So I'm planning -- I'm going to call in

22  more than 30 because we usually have about three to five that

23  don't show up.  So I plan on calling 32 hoping to get as close

24  to 30 as possible.

25          **THE COURT:**  Can we do 35?

2:17-cv-01778-JAD-DJA - May 21, 2021

1          **MS. RIVERA:**  Yes.

2          **THE COURT:**  All right.  Let's call in 35.  So our

3    first 35 of the questionnaires are who we will be calling in;

4    right?

5          **MS. RIVERA:**  That's correct.

6          **THE COURT:**  Okay.

7          **MS. RIVERA:**  And then if we do have more than 35 or

8    if all 35 show up, then I can keep the three that won't fit

9    into the courtroom downstairs in the jury room.

10          **THE COURT:**  Perfect.  Thank you.  You've answered my

11    questions.

12          All right.  So why don't we go ahead then -- I'll ask

13    the lawyers, let's go ahead and turn to the jury

14    questionnaires, which I find extremely helpful during jury

15    selection.  It really shaves down the time.  I don't re-ask

16    the questions in the questionnaires.

17          So the reason they're in the questionnaires is

18    because these are standardish questions.  Granted, some of

19    them are just criminal directed, but some of them are civil

20    directed.

21          So let's -- my intention of this hearing this morning

22    is -- this morning? -- this afternoon is to just go through

23    any people that you think we should not bring to the

24    courthouse for -- for one reason or another that you think

25    that they will be -- they should be excluded for cause right

1    now.

2            And I will tell you, I don't think that's very many.

3    I think it's just a couple based on what I've looked at, and

4    typically it's a significant scheduling situation where they

5    can't be here.

6            You should also know that we -- so Jury Services has

7    the discretion under a -- the Court's general orders and also

8    under our jury plan, when someone from the jury pool has

9    contacted Jury Services and said I need to postpone, this date

10   doesn't work for me, or I have no childcare or I don't have

11   transportation or there's some specific reason that they ask

12   to be excused, Jury Services has the ability to do that.  And

13   so there have been people in the jury pool that was called for

14   this case who have been excused for those reasons that the

15   general order and the jury plan allow.

16           These jury questionnaires that you have don't include

17   any of the people who have already been excused for those

18   reasons.  So these are the ones we need to sort through and

19   finish up today.

20           So I'm going to just talk about the handful that I've

21   found, and then I'll go to each side and see if there's any

22   that you propose to be excused for cause before they even show

23   up here on Monday.

24           My first one is Number 3.  So it's pool sequence

25   Number 3, and then there's that long participant number.  But

2:17-cv-01778-JAD-DJA - May 21, 2021

1    I'm just using the pool sequence number.

2            This person says -- has answered question Number 7

3    affirmatively and explained they have a mother that recently

4    had surgery who is in need of assistance since she's confined

5    to a wheelchair, and this person takes care of the mother from

6    3:00 p.m. to 8:00 p.m. once the caregiver leaves.

7            Trial will go till 5:00.  So somebody who has to be

8    taking care of someone at 3:00 p.m. is not going to work out

9    for us.  So any objection to me excusing Juror Number 3 for

10   cause?

11           **MS. XIDIS:**  No, Your Honor.

12           **MS. TEMPLE:**  No.

13           **THE COURT:**  Okay.  My next one is Juror Number 9.

14   Same question, Number 7.  Answer:  Between my job and running

15   a business, I also have to help my wife all the time to take

16   care of her and the kids.  She suffers from debilitating

17   migraine due to her brain aneurysm surgery.

18           It sounds like it's possibly a temporary situation so

19   maybe we could postpone this person, but I'm not certain of

20   that.  Does anyone have an objection to me excusing this

21   person for cause?

22           **MS. XIDIS:**  No, Your Honor.

23           **MS. TEMPLE:**  No, Your Honor.

24           **THE COURT:**  Okay.  Those are my only two.  I'm going

25   to move to the plaintiff.  Do you have any additional ones

2:17-cv-01778-JAD-DJA - May 21, 2021

1  that you think should be excused for cause at this point

2  before we even bring them in?

3          **MS. XIDIS:**  I believe that Number 46 have indicated

4  that he was concerned about spreading COVID back to his

5  parents who are high risk.  I would propose excusing him or

6  her.

7          **THE COURT:**  Yeah.  So this one said both parents have

8  recovered from major surgery within the past six months, but

9  then answered to 10(a), "If yes, will you be able to serve as

10  a juror?"  And the answer was yes.  So just concerned about

11  going to a public area and bringing anything back to my

12  parents.

13          What we can't tell is whether this person lives with

14  the parents, and I had a handful of these in my trial this

15  week.  And, really, most of these people were comfortable once

16  they saw we have Plexiglas, we have mask requirements, and we

17  have social distancing.  So I would be disinclined -- as long

18  they answered that, yes, they would be able to serve as a

19  juror, I'm disinclined to excuse them right now.  So I'm going

20  to deny that one.  Thank you.

21          **MS. XIDIS:**  Okay.

22          **THE COURT:**  Next one?

23          **MS. XIDIS:**  Let me -- some of them are on the same

24  basis, so give me just a minute so I'm not --

25          **THE COURT:**  Absolutely.  Take your time.  Just tell

1    me when you're ready.

2        **MS. XIDIS:**  Number 50 indicates that she is a

3    caregiver of a disabled -- and this is in response to Question

4    7(a) -- of a disabled elderly lady with MS living in the home

5    who relies on her to assist with activities of daily living

6    and meal prep.  I would suggest excusing her as well.

7        **THE COURT:**  The answer to Number 8 is problematic,

8    too.

9        **MS. XIDIS:**  Correct.

10       **THE COURT:**  A medical disability that would make it

11   difficult to serve as a juror:  Chronic lower back pain,

12   taking prescription medication, have been out of work

13   recently, going back full time this week, has no vacation

14   time, going to jury duty will be a financial hardship, already

15   behind on rent.

16       Any objection to me excusing this one for cause?

17       **MS. XIDIS:**  No, Your Honor.

18       **MS. TEMPLE:**  No, Your Honor.

19       **THE COURT:**  All right.  We'll excuse Number 50 for

20   cause also.

21       Next one?

22       **MS. XIDIS:**  Number 64 with respect to Questions 8 and

23   10 indicated that his or her diabetes could affect her -- his

24   or her ability to sit on a jury.

25       **MS. TEMPLE:**  I'm sorry, did you say 64?

1      **MS. XIDIS:**  Yes, Number 64.

2      **THE COURT:**  Yeah.  I think this one I'm going to need

3  more follow up on just because I can't -- I don't -- diabetes

4  alone I don't think gets us there.  Maybe complications from

5  would, but we'll -- we'll have to follow up on that and see if

6  this is someone who has some situation that makes it so they

7  can't sit still or need to keep running to the bathroom or

8  something like that.  So we'll follow up on this one.  Thank

9  you.  I'll just make a note.  We'll follow up on this one at

10  jury selection.

11      Next one?

12      **MS. XIDIS:**  No, Your Honor.  I think the other ones

13  are ones we can deal with through follow up.

14      **THE COURT:**  Okay.  Great.

15      Any others from the defense?

16      **MR. ROGERS:**  Yes, Your Honor.  Just one moment.

17  We're discussing this.

18      Okay.  Your Honor, I'm second-chairing this.  I'm

19  Steve Rogers, but Ms. Temple has asked me to talk to you about

20  this.

21      Okay.  Number 20 raised some issues in response to

22  those questions we're focusing on, beginning with Number 8.

23      **THE COURT:**  Number 20.  Okay.

24      **MR. ROGERS:**  And I understand that we're focused

25  primarily on scheduling hardship, disability, and

1    COVID-related issues.  There were some additional

2    philosophical concerns.  They do seem to relate more to the

3    criminal justice system.

4              **THE COURT:**  Um-hum.

5         **MR. ROGERS:**  But still it appeared that there was

6    enough here to raise some concern for cause.

7              **THE COURT:**  Okay.  Yeah.  This person says they're a

8    crime reporter and has apparently a lot of concerns about the

9    criminal justice system that are raised and has PTSD from

10   covering the October 1st shooting.

11             I think that this is somebody who we definitely need

12   to follow up on, but I don't see cause at this point.

13             **MR. ROGERS:**  Okay.  Okay.  Next was Number 43.

14             **THE COURT:**  Okay.

15             **MR. ROGERS:**  It was someone with a hearing deficit.

16             **THE COURT:**  All right.  So this person says they have

17   a hearing loss and they wear a hearing aid.  This is one we'll

18   follow up on, too.  We also have special hearing devices that

19   are right there next to Danielle.  You can see those little

20   headphone sets.  So if someone does have a hearing deficit, we

21   can -- we have ways to assist them so that they can

22   participate in this process.

23             **MR. ROGERS:**  Got it.  Okay.

24             Number 56 expressed concerns about COVID but did seem

25   to back off those concerns.  That may fall within the

1    follow-up category.

2            **THE COURT:**  Yes.  So this person said that they have

3    stage IV kidney failure, diabetic, hypertensive, but has been

4    vaccinated and has said that they can serve as a juror.  So we

5    will -- we can ask them about that and make sure that they're

6    comfortable, but it looks like they don't have -- in fact the

7    next one says no concerns.  So we'll bring them in.

8            **MR. ROGERS:**  Okay.  And finally, 73 had some COVID

9    concerns for their parents.  That may fall within the umbrella

10   we've already discussed.

11           **THE COURT:**  Right.  So, if yes, will you be able to

12   serve as a juror?  Yes.  And so we'll follow up with this one

13   as well because they have said that they could serve.  So we

14   will bring them in.

15           **MR. ROGERS:**  Okay.  That's all on my list.

16           **THE COURT:**  Wonderful.

17           All right.  So that means 3, 9, and 50 are the three

18   that I'm showing.  Danielle, do you have the same list?

19           **COURTROOM ADMINISTRATOR:**  Yes, Your Honor.

20           **THE COURT:**  All right.  Did you get it, Summer?

21           **MS. RIVERA:**  I got it.

22           **THE COURT:**  All right.  So we will excuse for cause

23   3, 9, and 50, and they will not be part of the group that we

24   will see here on Monday.

25           **MS. RIVERA:**  All right.  Your Honor, and so it looks

1    like we will cut it off close to Number 64.

2         **THE COURT:**  Oh.  Great.

3         **MS. RIVERA:**  So I'm going to go double-check that

4    downstairs, but pretty much I think everyone after 64 will be

5    excused.

6         **THE COURT:**  Okay.  Thanks, Summer.

7         **MS. RIVERA:**  Thank you.

8         **THE COURT:**  Have a good weekend.

9         **MS. RIVERA:**  You, too.

10        *(Summer Rivera exits the proceedings.)*

11        **THE COURT:**  All right.  Is there anything else I need

12   to address then while we're all here?

13        **MS. TEMPLE:**  We do have one other issue, Your Honor,

14   and it is kind of impacting our ability to complete the jury

15   instructions.  We tried to reach a stipulation, and then we

16   thought collectively it might be better to check with

17   Your Honor.  I know you've handle this issue before because I

18   was peripherally involved with a case that you heard the

19   issue.

20        We've got a stipulation in place.  There's no dispute

21   on the -- that the contract was in force.  I think you can

22   tell that from the pleadings.  There's no dispute that the --

23   of the contract amount.  There's no dispute that Mr. Humes was

24   an insured under the contract.  There's no coverage defenses

25   raised.  There's no dispute on the offset amount.  We've

1    agreed on what the setoff would be.

2            The -- so the question becomes -- I think, you know,

3    overwhelmingly the case law says the contract amount doesn't

4    come in.  The -- the amount of the insurance contract doesn't

5    come in where that's not in dispute.  But the issue that we

6    have is whether you want to tell the jury -- you want us to

7    tell the jury about the offset amount and have them apply the

8    offset, meaning they come to a full-value determination after

9    the offset is applied, or if Your Honor would prefer, that the

10   jury listens to all the evidence, reaches a conclusion on the

11   value, and then after that Your Honor applies the offset that

12   we've stipulated to.  And we wanted to put -- we have the

13   stipulation in place but for the language on the offset

14   because we didn't want to get that -- we didn't want to do

15   it -- and I know in the past, the cases I have experience

16   with, you've had the offset applied by Your Honor and you

17   don't -- you know, they don't hear the contract amount or the

18   setoff amount.  They just make a value determination.

19           **THE COURT:**  Right.  Because that's really what this

20   case comes down to entirely, is a value determination;

21   correct?

22           **MS. TEMPLE:**  Yes.  And that would eliminate a lot of

23   the jury instructions that we would need.  Because we're not

24   really talking about -- at the heart of it we're not really

25   talking about a breach of the contract from a -- from

1    Mr. Humes' perspective for sure, but we're more talking -- it

2    would be very similar to a negligence case as far as the

3    instructions, the value, the damages, the -- and, you know,

4    I -- I think we kind of e-mailed back and forth a little bit,

5    but -- and I don't want to speak for counsel, but I think

6    we're both kind of okay with either way for the offset.

7    Personally, I think it would be easier to let the jury make

8    the full-value determination and not hear the amount of the

9    offset and, you know, of course not hear the amount of the

10   insurance contract and just say this is what we think it's

11   worth and here's the award, and then Your Honor after can

12   apply what we've stipulated to as the offset.

13            **THE COURT:**  Any objections to that?

14            **MS. XIDIS:**  Well, I think that it's a matter of how

15   it's going to -- to come down so that we don't end up causing

16   jury confusion.

17            My first concern is that I don't know that the -- the

18   amount of the policy of the coverage should be excluded.  I

19   mean, it's part of the contract.  This is a breach of contract

20   case.  I mean, obviously I'm not going to be getting up there

21   pounding my chest about a million dollars in coverage, but it

22   is a background fact that -- that there's no reason to

23   exclude.

24            With respect to the offsets, the hard part there, I

25   don't have a problem with the --

1          **THE COURT:**  Wait.  Hold on one second.  It's a

2     million-dollar policy?

3          **MS. XIDIS:**  A million dollars of UIM coverage.

4          **THE COURT:**  Okay.  Go ahead.

5          **MS. XIDIS:**  With respect to the offsets, I think it

6     would be easiest if the Court did the deductions after the

7     fact.  My -- my problem and how -- what I'm having trouble

8     resolving -- and so any input is -- is more than welcome -- is

9     while it would be easy to -- to address the MedPay by just not

10    talking about it, the fact that in order to establish an

11    underinsured event, even if it's stipulated to, which it's

12    not, you have to talk about the tortfeasor's policy limits of

13    $100,000.  So that number's in the jury's mind saying, well,

14    he already got paid this much.

15         So we have to address what they're going to do with

16    that in a clear way that avoids a double deduction.  And

17    whether that's through a jury instruction or a verdict form or

18    a combination of the two that gives that clear instruction,

19    that's my concern, is that even if the Court's doing that

20    deduction, the jury needs to -- to have a clear instruction

21    that that's already handled.  Either that or we let the jury

22    do the deduction.

23         **THE COURT:**  And I -- I think that in a prior case

24    that I had essentially what happened was the parties sort of

25    agreed to affixion, and that's almost how it has to operate,

1   is that there's affixion and that it's not so much UM/UIM

2   coverage.  It's just sort of, hey, the only question we need

3   you people to decide here is the value of these injuries.

4           So if you -- if you agree that that's where we're at,

5   then the language of the policy doesn't matter.  Then however

6   much he got from somebody else doesn't matter.  What we call

7   this coverage doesn't matter.  So you have to kind of do it in

8   a more generic way, but you have to sort of stipulate that

9   that's how you're going to do it and you're going to -- so I

10  think it was presented as a valuation issue and that the jury

11  is only being asked to determine what the value of this --

12  this -- these injuries are.  And then the parties essentially

13  stipulate that what that means is, if it's over X amount, it's

14  a plaintiff's verdict and, if it's below X amount, it's a

15  defense verdict.

16          So you -- you can put questions to the jury that are

17  that narrow, and that really streamlines things.  But -- and

18  it stops them from having to come up with, you know,

19  understanding UM/UIM coverage or offsets.  But if you can't

20  come up with a -- sort of a targeted, narrow issue for the

21  jury to decide and then stipulate what that means if they

22  decide one way or the other, then unfortunately we do have to

23  do it the much more complicated way and present all of these

24  pieces.

25          **MS. XIDIS:**  Okay.

1          **MS. TEMPLE:**  Can I address one issue?

2          **THE COURT:**  Sure.

3          **MS. TEMPLE:**  I -- I would have briefed this.  This

4    stipulation has been circulated.  I provided this stipulation

5    well in advance.  This is my first time hearing that counsel

6    was wanting to bring up the contract amount.  That part, I

7    don't know of any case law in any jurisdiction in the country

8    that says that, if the contract amount isn't in dispute in a

9    first-party case, in a breach of contract case, that the

10   contract amount comes in.  And I see why they want it in.

11   They want to say a million dollars, a million dollars, a

12   million dollars, but that pre-suggests an amount to the jury

13   and that's why the overwhelming case law says, unless the

14   terms of the contract are in dispute, that amount doesn't come

15   in.

16          So regardless of what we do with the offset, I'm a

17   little taken aback by the suggestion that that would even come

18   into evidence because, I mean, I didn't know that that was

19   even a consideration.

20          **THE COURT:**  Okay.  Well, I'll let you both continue

21   to have conversations about that.  I would see that just -- I

22   mean, I don't want to prejudge an issue, but it would be a

23   relevancy issue.  And so it would be subject to 401, 402, and

24   403.  And for a 403, bringing in an issue like that would have

25   to be substantially -- would have to be -- have a substantial

1   risk of prejudice over probative.  So that's what you're

2   looking at probably.  That's how I would frame the issue.

3   It's not a case law situation; it's a relevancy issue.  So

4   it's an evidentiary issue.

5        **MS. TEMPLE:**  And I guess my issue with it would be,

6   if the contract amount isn't -- if we've stipulated a contract

7   amount that -- why would it be relevant here?  Why would the

8   jury need to hear the amount?

9        **THE COURT:**  Right.  And I'm not going to prejudge

10  that right now.  Hopefully you guys can work through that over

11  the weekend.  And if not and you need to move to exclude the

12  policy value, then you can raise that and we'll -- we'll deal

13  with it.

14       **MS. TEMPLE:**  Okay.  Thank you.

15       **THE COURT:**  I'll make a ruling on that.  But, I mean,

16  I don't know which way that would go at this point.

17       **MS. TEMPLE:**  Okay.  Thank you, Your Honor.

18       **THE COURT:**  Sure.

19       So, anyway, it looks like you have a lot of work cut

20  out for you for the weekend, and this stipulation seems to be

21  a big chunk of it, narrowing the issues.  And I am completely

22  comfortable presenting to the jury kind of a single issue, and

23  that's fine with me as long as you-all stipulate to what it

24  means when the jury comes back that way.  That -- in a civil

25  case, that verdict form can look like a lot of different

1    things.  And so if the verdict form just says, you know, we

2    find that he has damages in the amount of whatever, I think we

3    can -- I suspect that you-all agree he had some damages, and

4    so it wouldn't be prejudicial to say how much are his damages,

5    which presumes there are some damages, but then that number

6    controls who wins and why.  But you need to then -- the

7    stipulation needs to explain sort of that flowchart about what

8    happens if it's a number X over X.  So -- and just for my --

9    to gauge my understanding here, was it -- was it 100 that he

10   got from the tortfeasor?

11           **MS. XIDIS:**  Yes.

12           **THE COURT:**  And then the five on med?

13           **MS. XIDIS:**  Yes.

14           **THE COURT:**  From this policy?

15           **MS. TEMPLE:**  Yes, Your Honor.

16           **THE COURT:**  All right.  Got it.  All right.  So, you

17   know, however you come out on this is fine with me.  Obviously

18   it's easier for the jury if it's very streamlined and easy.

19   The more jury instructions you have, the harder -- the more

20   chance of confusion.  So the narrow -- more narrow the issues,

21   the easier this case becomes for a jury to decide.

22           **MR. ROGERS:**  Agreed.

23           **THE COURT:**  How many witnesses do we have?

24           **MS. XIDIS:**  Plaintiff has likely -- likely nine.

25           **THE COURT:**  Um-hum.  And defense?

1        **MS. TEMPLE:**  Three, Your Honor.

2        **THE COURT:**  Great.  All right.  Do we think we're

3    going to be able to get this -- so knowing that I'm not going

4    to be there on Tuesday and so it's just Monday -- and by the

5    way, Monday, with just needing to get eight people in the

6    seats, I think we could be possibly -- we should plan that we

7    may be starting openings before lunch.  So just know that that

8    might happen.

9        And then we'll need to make sure that we have

10   witnesses ready to go on Monday because we'll get on as many

11   as we possibly can on Monday.

12       And so, knowing all of that, are we going to finish

13   this case within those four court days next week?

14       **MS. XIDIS:**  Yes.  Even -- even with the nine

15   witnesses, I'm planning on finishing early, shortly after

16   lunch on Wednesday.

17       **THE COURT:**  Great.

18       **MS. TEMPLE:**  Unfortunately, Your Honor, I'm not as

19   optimistic.  With seven before-and-after witnesses, two

20   medical experts, and the plaintiff, I just -- I can't imagine

21   being done that soon with --

22       **THE COURT:**  Okay.

23       **MS. TEMPLE:**  -- all of that cross-examination.

24       **THE COURT:**  All right.  How much extra time do you

25   think your three witnesses will be?

1       **MS. TEMPLE:**  My three witnesses?  I mean, very, very

2   short for two and then our medical expert.  Our medical expert

3   is the main one.  So probably, what, a half day?

4       **MR. ROGERS:**  Oh, at most.  Yeah.  We'll be done in a

5   half day or less with the direct.  And maybe the cross as

6   well.

7       **THE COURT:**  Okay.  We're going to finish this trial

8   next week.  It is going to happen in four days.  We are going

9   to make sure of it, and I am not shy to move things along.  So

10  we're going to get through this, and we're going to do it

11  quickly.  And so I will -- I'm pretty comfortable letting the

12  jury -- I will tell the jury that there's the potential that

13  they would have to come back the following Tuesday.  I just

14  want to make sure we don't have any severe scheduling

15  situations.  I think the following Monday is Memorial Day, so

16  that's why it would be the Tuesday.

17      I'd like to screen out any significant scheduling

18  problems in case something crazy happens, like the fact that

19  they test the fire alarms in this building every night at

20  6:00.  So that means I really can't keep a jury deliberating

21  past 6:00.  So insanity like that happens.

22      And I'm just going to let everyone know, so we just

23  finished a trial last night in here, and the computer systems,

24  the monitors only work a portion of the time.  So we ended up

25  going to paper exhibits on the ELMO, and we have a drop-down

1   screen that the jury can see.  So just know that we can go old

2   school and we can manage it that way -- and I understand we

3   did get binders.  So I know that we've got your exhibits.

4          But just know that it may not go smoothly with the

5   technology, and we now expect in this room anything that can

6   go wrong from an electronic perspective will.  So just be

7   prepared that that may be the case.  Microphones go out.  The

8   screens in the jury box only worked part of the time.  And so

9   sometimes we couldn't even do the connections between the,

10  like, laptops to be able to broadcast things.  So, anyway,

11  just expect that may be the case.

12         We're trying real hard to get it fixed because we

13  should have it fixed, but in the event that it isn't, just

14  know that we may have to go to plan B, which would be paper.

15         **MR. ROGERS:**  Got it.

16         **MS. TEMPLE:**  Um-hum.

17         **THE COURT:**  Okay.  Anything else, Danielle, while

18  we're here?

19         **COURTROOM ADMINISTRATOR:**  No, Your Honor.

20         **THE COURT:**  Max, anything you can think of?

21         **MR. ALDERMAN:**  No, Judge.

22         **THE COURT:**  Okay.  Amber, anything I'm missing?  No?

23  Okay.

24         All right.  Well, we will see everyone.  Please get

25  here about 8:45 and be ready to go at 8:45 on Monday.  What

1    happens when we get the jury -- the people that show up, a

2    couple things sometimes happen.  Sometimes we'll get a

3    questionnaire and a person who hasn't responded yet but they

4    finally respond on the day they're supposed to show up and we

5    get their questionnaire that day, and so you'll have their

6    questionnaire to take a look at first thing.

7         When the people show up with Summer and she gets the

8    full list of everybody who's here, she then randomizes that

9    list.  So this list we have right now in 1 through 60-whatever

10   order is going to get shuffled.  So we'll have new numbers for

11   these people, and what we'll want to do is just reorganize

12   based on the new list.  So it will be the same, for the most

13   part, questionnaires, but we're going to have to put them in a

14   different order.  So expect that you'll need a little bit of

15   time to do that.  I think it just took me about 10 to 15

16   minutes the other day to do that for about 70 people.  So it

17   shouldn't take too long, but it is something you'll need to do

18   before we start with jury selection.

19        At jury selection, I ask the -- I ask the questions.

20   I'll allow you some very limited follow up but only follow up.

21   And so once I've gone through all my questions -- and, again,

22   I'm not going to go back over what is asked in the

23   questionnaires unless I, too, need to follow up on something

24   in the questionnaires.  And I will.  I have a lot of yellow

25   tabs that I'm going to be following up on.  Some of them were

1    the ones that you both raised today.  So we'll -- we'll talk

2    through all of those, but I'll also allow you to do about ten

3    minutes of follow up when I'm done.

4          Any other questions?  You were on your feet.

5          MS. TEMPLE:  I just have these, too, to go with the

6    exhibits.  They're the original transcripts, so I would assume

7    the Court needs those, too?

8          THE COURT:  Yes.  Those -- those stay with Danielle.

9          MS. TEMPLE:  Perfect.  Thank you, Your Honor.

10         THE COURT:  Yes.  All right.  Anything else?

11         MR. WILSON:  Briefly, Your Honor.  With respect to

12   the organization of the new -- newly shuffled jury

13   questionnaires, if we show up let's say at 8:30, is it

14   possible we could get those, we could organize them so as not

15   to waste the time once we open at 8:45?

16         THE COURT:  Yeah.  It sort of depends on when Summer

17   gets those to us.  And so we can't be entirely sure exactly

18   what time she's going to be up here, but it's usually between

19   8:30 and 8:45, so...

20         MR. WILSON:  I was just gonna say, I'll plan on

21   showing up just a smidge early so we could take care of that

22   so we don't have an overlap whenever the Court wants to get

23   going.

24         THE COURT:  Perfect.

25         MS. TEMPLE:  And, Your Honor, it sounds like I might

1    have to file an emergency motion if we can't work it out.  So

2    would we be able to have that handled that morning, or would

3    we do it before -- I just want to make sure my opening doesn't

4    include anything that --

5             THE COURT:  Yes.

6             MS. TEMPLE:  -- Your Honor rules on.

7             THE COURT:  We'll deal with it in the morning.

8             MS. TEMPLE:  Perfect.  Thank you, Your Honor.

9             THE COURT:  All right.  All right, everyone.  I will

10   see you on first thing Monday morning.  And before that,

11   though, 5:00 p.m. Sunday is the deadline for the jury

12   instructions, please, or a stipulation and jury instructions.

13   So even if you stipulate that it's going to be Nevada law

14   for -- for these -- for this claim, not South Dakota law, so

15   that it makes it easier for you to put together the jury

16   instructions, I still need to know what do you agree on and

17   what don't you agree on.  So having a package of we absolutely

18   agree on these things so nobody has to really worry about

19   these would be great, and then the other pieces would be the

20   and plaintiff proposes and then defendant proposes and we

21   can't agree on.

22             Danielle?

23             COURTROOM ADMINISTRATOR:  Do you want them e-mailed

24   to me in Word format?

25             THE COURT:  Oh yes.  And if you could please also

 1    e-mail those to Danielle in Word so that, if I need to edit

 2    them, I can do that.

 3            **MR. ROGERS:**  Can do.

 4            **MS. TEMPLE:**  All right.  Thank you.

 5            **THE COURT:**  Okay.  And if this case resolves over the

 6    weekend, please let Danielle know.

 7            **MR. ROGERS:**  Great.  Will do.

 8            **THE COURT:**  Thanks, everybody.

 9        *(Proceedings adjourned at 2:17 p.m.)*

10                        --o0o--

11                COURT REPORTER'S CERTIFICATE

12

13       I, AMBER M. McCLANE, Official Court Reporter, United

14    States District Court, District of Nevada, Las Vegas, Nevada,

15    do hereby certify that pursuant to 28 U.S.C. § 753 the

16    foregoing is a true, complete, and correct transcript of the

17    proceedings had in connection with the above-entitled matter.

18

19    DATED:  6/3/2021

20

21    /s/_____*Amber M. McClane*_____

22            AMBER McCLANE, RPR, CRR, CCR #914

23

24

25