2:17-cv-01778-JAD-DJA - May 28, 2021

1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEVADA

3    DONALD HUMES,                )
                                  ) Case No. 2:17-cv-01778-JAD-DJA
4              Plaintiff,         )
                                  ) Las Vegas, Nevada
5    vs.                          ) May 28, 2021
                                  ) 9:52 a.m. - 11:00 a.m.
6    ACUITY, A MUTUAL INSURANCE   ) Courtroom 6B
     COMPANY, a foreign           ) JURY TRIAL, DAY 4
7    corporation; DOES 1 through  ) CLOSING ARGUMENTS
     10; and ROE CORPORATIONS 1   )
8    through 10, inclusive,       )
                                  )
9              Defendant.         )
     _____) *CERTIFIED COPY*

10

11       REPORTER'S **PARTIAL** TRANSCRIPT OF JURY TRIAL, DAY 4
               BEFORE THE HONORABLE JENNIFER A. DORSEY
12              UNITED STATES DISTRICT COURT JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:   *CARA M. XIDIS, ESQ.*
                          *JUSTIN W. WILSON, ESQ.*
16                        *H&P LAW*
                          *8950 West Tropicana Avenue, Suite 1*
17                        *Las Vegas, Nevada 89147*
                          *(702) 598-4529*

18

19   (Appearances continued on page 2.)

20

21   Court Reporter:      Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25

```
 1   APPEARANCES CONTINUED:

 2   For the Defendant:

 3       MARISSA R. TEMPLE, ESQ.
         STEPHEN H. ROGERS, ESQ.
 4       ROGERS, MASTRANGELO, CARVALHO & MITCHELL
         700 South Third Street
 5       Las Vegas, Nevada 89101
         (702) 383-3400
 6

 7   Also Present:

 8       Donald Humes, Plaintiff

 9       Larry Reub, Acuity Client Representative

10       Brian Clark, Trial Technician

11       Luis Gutierrez, Trial Technician

12

13                          * * * * *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              LAS VEGAS, NEVADA; FRIDAY, MAY 28, 2021; 9:52 A.M.

2                               --o0o--

3                     P R O C E E D I N G S

4                  PLAINTIFF'S CLOSING ARGUMENTS

5         MS. XIDIS:  The term pacta sunt servanda is Latin,

6  which means promises should be kept.  Those were the first

7  words I read in law school when I opened my contracts book,

8  and they've -- they've stuck with me.  Whether it's drivers on

9  the roadway with a license who promise to drive carefully,

10 whether it's a doctor who promises to do no harm, or an

11 insurance company that we pay money to for the promise to

12 protect us, to help us when we need it, but we don't know --

13 but we don't need to go to law school to learn that promises

14 should be kept.  Generally that's something we know by the

15 time we leave kindergarten.

16         Now, you have sat through hours and hours of

17 testimony about the crash, Don's injuries, and the

18 nitty-gritty of the medicine involved, but it's important to

19 take a step back and remember why we are here, what this case

20 is ultimately about.

21         Don entered into a contract with Acuity for

22 automobile coverage.  In addition to the basic liability

23 coverage, he purchased extra coverage in the form of

24 underinsured motorist coverage with the express purpose of

25 protecting himself and his family.  Don faithfully paid his
```

 1    premiums, and Acuity happily took those payments.  But when

 2    Don was injured and called on Acuity to fulfill its promise

 3    and protect him, it turned its back on Don telling him he

 4    couldn't possibly be as injured as he claims and Mr. Petty had

 5    sufficient insurance to compensate him.

 6          We are here because Acuity has not paid Don a cent of

 7    his underinsured motorist benefits.  We are here because, as

 8    you have heard over and over, Acuity doesn't believe Don

 9    should have treated with the doctors he did.  We are here

10    because Acuity doesn't think Don's doctors had good enough

11    reasons for recommending the treatment.  We are here because

12    Acuity doesn't think Don got enough benefit from the medical

13    procedures to justify them paying for any of it.  This is your

14    opportunity as a jury, as the voice of our community, to send

15    a message to Acuity that, when it makes the promise of

16    protection to Don, it must honor that promise.

17          At the beginning of this trial, I presented you with

18    a checklist that, if followed, would have prevented Acuity's

19    breach of contract.

20          The first step was to confirm coverage.  And as I

21    told you, that happened.  And as the judge has just instructed

22    you, everyone agrees that the policy was in effect at the time

23    of the crash, and everyone agrees Don's underinsured motorist

24    coverage applies.  But let's a take minute and look at the

25    coverage itself, at the contract itself.

1          Sorry, my mouse stopped working.  There we go.

2          Acuity promises we will pay all sums the insured is

3     legally entitled to recover as compensatory damages for the

4     owner or driver of an underinsured motor vehicle.

5          And let's break this down a bit.  So we have:  We

6     will pay -- Acuity promises to pay -- all sums -- not just

7     some of it or, in this case, none of it -- the insured -- that

8     is Don Humes -- legally entitled to recover as compensatory

9     damages -- means the damages the at-fault driver -- in this

10    case, that was Mr. Petty -- the damages he caused Don,

11    including the specific things set forth in the jury

12    instructions the judge just read to you.  Mr. Humes' past and

13    future medical expenses.  His past and future disability and

14    impairment.  His past and future pain and suffering, mental

15    anguish, and loss of capacity to enjoy life.

16         The contract does have a couple of conditions,

17    however.  For example, the policy states:  We will pay only

18    after liability bonds or policies have been exhausted by

19    payment of judgments or settlements.  In other words, Acuity

20    won't pay until after Mr. Petty's insurance does, and

21    Mr. Petty's insurance paid in January of 2015, more than six

22    years ago.  Don took that money and paid what bills he could.

23    And as of January 30th, 2015, all of the conditions necessary

24    to obtain payment of Don's underinsured motorist benefits were

25    satisfied.

 1          Which brings us to the next step:  Gather records and
 2    bills.  Now, this is admittedly a little broader than records
 3    and bills.  This encompasses the gathering of the information
 4    needed to evaluate the claim to determine what you owe.  And
 5    you heard from Don that he provided Acuity with everything
 6    they needed to evaluate his claims.  You heard from Acuity's
 7    hired doctor during this trial that he had all of Don's
 8    medical records and bills, thousands of pages provided to him
 9    by Acuity.  And you did not hear from a single person from
10    Acuity, not even Mr. Reub sitting right here during the entire
11    trial, that Acuity was missing any information it needed.

12          Further, the policy requires that Don do certain
13    things that Acuity asks.  For example, Acuity could have asked
14    Don to submit to a medical examination with a physician of its
15    choice, like Dr. Schifini, but it did not.  Acuity simply
16    gathered and reviewed documents.  Until Don filed this lawsuit
17    for breach of contract seeking your help to get Acuity to
18    honor the contract and pay what it owes, then and only then
19    did Acuity hire Dr. Schifini and ask Don questions under oath
20    in an effort to rationalize its denial after the fact.

21          The final step in the checklist is to pay what you
22    owe.  Here, Acuity decided that Don had been fully compensated
23    by Mr. Petty's insurance policy, a policy that did not even
24    cover his medical expenses, and refused to pay him any of the
25    protection he had in the event he was in a crash with an

1    underinsured motorist, like he was on April 6th, 2013.

2           Now, during its opening statement on Monday, Acuity,

3    for the very first time, acknowledged Don had not been fully

4    compensated by Mr. Petty's insurance and was owed money under

5    the policy.  For the very first time in eight years.  Ladies

6    and gentlemen, they admitted they should have paid him at

7    least some of his underinsured motorist benefits.  They

8    admitted they breached the contract.

9           **MS. TEMPLE:**  Objection, Your Honor.  That's complete

10   fabrication, and that's not -- can we approach?

11          **MS. XIDIS:**  I'm happy to go back and look at the

12   transcript.

13          **THE COURT:**  Okay.  So here's what we're going to do.

14   We're just going to disregard that last statement.  We're

15   going to stick to the evidence, not the arguments.

16          **MS. XIDIS:**  Sure.  I'm happy to do that.

17          Now, ladies and gentlemen, this case is quite simple.

18   Don was injured in a crash with an underinsured motorist,

19   Mr. Petty.  Those injuries cause him pain.  His medical

20   providers recommended treatment.  He followed those

21   recommendations and got the treatment.  Eventually they found

22   treatment that provided relief, albeit temporary and certainly

23   not a cure.  This treatment the pain always comes back.  The

24   question is:  How much relief does it give him and for how

25   long?

1          All of the doctors who have met with Don, examined

2     him, and treated him, who have seen him in person and had

3     their hands on him agree that his injuries were caused by the

4     crash and are going to be with him for the rest of his life.

5     His options are limited.  He can suck it up and live with it

6     or undergo painful procedures for some temporary relief.

7     They're not great options, but it's what he has.

8          Even the hired expert, Dr. Schifini, acknowledged

9     during his testimony that Don has chronic pain.  He agreed

10    that the crash could cause injuries and acknowledged that Don

11    was injured in the crash.  He agreed that it was reasonable

12    for Don to follow the advice of his doctors, and he agreed

13    that Don's doctors were reasonable in their examinations and

14    were simply trying to help Don address his pain.

15         That said, you sat through this trial, and you heard

16    the defense dive into the nitty-gritty of the medicine.  While

17    unnecessary, we're happy to dive in and discuss the details of

18    his care as well.  But let's start with all of the red

19    herrings we've encountered this week.

20         Now, the expression "red herring" comes from farmers

21    in Britain that would rub these smoked and salted, really

22    stinky fish around their property to ward off foxes and

23    protect their animals.  And the purpose of this was to throw

24    the foxes off the scent, throw them off the trail, distract

25    them.  And this trial has been full of red herring, and it's a

 1    good thing we have our masks.  Let's go through them.

 2          First we have Don's prior medical history:  Gout,

 3    stroke, diabetes.  They went through this with so many

 4    different people asking about the effects of these things on

 5    Don.  One thing you never heard was that any of these things

 6    have anything to do with neck or back pain or any of the

 7    injuries that Don claimed.  Why are we wasting our time?

 8    Distractions.

 9          The CPAP.  You heard from Don that he's not asking

10    Acuity to cover that.  Why spend so much time talking about

11    something that's unrelated?  Don acknowledges that he thought

12    maybe it was related.  He'd never had it before, but he

13    deferred to his doctors.  He's not asking Acuity to pay for

14    that.

15          Age.  You heard from every single medical provider

16    about degenerative changes, and -- and each of them

17    acknowledged that every -- every adult practically, at least

18    those over 30, 40 years old, have degenerative changes in

19    their spine.  And every single one of them acknowledged that

20    just because you have degenerative changes doesn't mean you

21    have pain, that there is not a correlation between the two.

22          There's no evidence that Don was in pain in the year

23    before the crash.  He hadn't had any neck pain in over -- in

24    decades.  And his low back pain, he had one incident that

25    lasted two weeks -- yes, two weeks, not months -- and it

1   resolved completely.  When Dr. Leon and Dr. Anderson were

2   asked about that treatment, they said it wouldn't have changed

3   their course of treatment at all.  They weren't even concerned

4   about it at the point that it had resolved and never come

5   back, it wasn't -- it was a non-issue for them.

6          And think about Dr. Schifini's testimony on that as

7   well.  He never once said that that 2011 treatment for low

8   back pain had anything to do with what Don's going through

9   now.  Distractions.

10          There's the travel and the gaps in treatment, and I

11   anticipate that you're going to hear a lot about this soon.

12   Don is a businessman.  He is a -- was a full-time RVer.  He

13   traveled around the country.  He spent his winters in warmer

14   climes, whether that was Florida, sometimes Texas, Arizona.

15   That was part of his life, and he treated where he was.

16   Sometimes he was able to get appointments quickly; sometimes

17   he wasn't.  Sometimes he was here in Nevada on other business,

18   visiting his lawyers about this case.  While he was here, he

19   got treatment.

20          No doctor will tell you that any delays between

21   appointments made his injuries worse.  The only consequence of

22   not seeing doctors more often is that he was in pain, and

23   that's a choice that Don had to make based on the priorities

24   in his life at the time.  Sometimes life events just get in

25   the way, and despite your best efforts, you don't make that

1    doctor appointment or it gets rescheduled or you call and the

2    next appointment that's available you're not going to be

3    around.  The travel and the gaps in treatment have nothing to

4    do with his injuries.

5          The crash speed.  You heard about this with

6    Dr. Schifini, about how sometimes it was reported at 20 to

7    25 miles an hour, sometimes 30.  Everyone agrees this was a

8    big crash.  You saw the pictures.  There's no question.  And

9    if it was a 20-mile an hour crash, can it cause injury?  Yeah,

10   Dr. Schifini said it absolutely could.  If it's higher than

11   that, can it cause injury?  Yes, Dr. Schifini said it

12   absolutely could.  It doesn't matter.  Distractions.

13         Loss of consciousness is the same thing.  Don

14   testified yesterday that -- that he -- he believed he lost

15   consciousness, he was in and out.  The records reflect that he

16   says he lost consciousness, and other times he said he's not

17   sure.  The fact of the matter is it doesn't go to any of his

18   neck or back problems that he's currently experiencing, the

19   treatment that he's asking Acuity to pay for.

20         Now, he did see a neuropsychologist, Dr. Gardiner,

21   and Dr. Gardiner evaluated his cognizant deficits that his

22   friends had -- had notified him about.  But Dr. Gardiner did

23   relate that to an acute brain injury that loss of

24   consciousness would be related to.  He related that to the

25   chronic pain that Don was in, and I invite you to look at

1    those records from Scovel.

2          You heard about how Dr. Leon and Dr. Anderson both

3    were treating Don on a lien, and a lien is a way that a doctor

4    can provide patient -- provide treatment to patients who a lot

5    of times, when they're involved in personal injury cases, the

6    resolution of that claim is -- is years out and -- but they

7    want to make sure that those patients have treatment, as

8    Dr. Leon testified.  But the fact of the matter is both of

9    those doctors were paid back in 2015 when Don received the --

10   the settlement money from Mr. Petty.  Neither of them are

11   waiting for payment.  Neither of them feel like their payment

12   is contingent on your decision here.  Defendant's suggestion

13   that they might be biased, it's unfounded.

14         There was also a lot of discussion about attorneys

15   and relationships in the case, the fact that Don knew

16   Dr. Crisman, that they were Masons together.  So what?  You

17   really think more likely than not that Dr. Crisman changed the

18   way he treated a patient because he knew him?  No.  You heard

19   about one phone call between Dr. Anderson and my office.

20   Dr. Anderson testified that it's normal for him to talk to

21   attorneys.  He provides updates on the -- on the treatment of

22   the patient.  Does he allow the attorney to dictate that

23   treatment?  Of course not.

24         The neck surgery.  This happened more than 20 years

25   ago.  He woke up one day, had arm pain, had surgery,

1    completely went away.  Dr. Leon told you that that's

2    suggestive of a disk injury, not something we're dealing with

3    as a result of this crash.  No doctor, not Dr. Leon, not

4    Dr. Anderson, and certainly not Dr. Schifini, has made any

5    indication that Don's current problems are in any way related

6    to that neck surgery.  It's simply part of his past, something

7    he had and recovered from.  Why are we spending so much time

8    on it?  Distractions.

9            And then we already talked about the 2011

10   chiropractic treatment.

11           Now, the judge has instructed you on the burden of

12   proof in this case:  The preponderance of the evidence.  What

13   that means is simply this:  Don has the burden of proving that

14   he was injured as a result of the crash.  And imagine a scale,

15   and it's perfectly balanced.  And you put a feather on one

16   side.  That's the preponderance of the evidence.  It's just a

17   question of what is more likely than not, even by just a

18   little bit.

19           You can apply this analysis to all of the questions

20   in this case.  What is more likely, that Don was injured and

21   has been trying to resolve his pain or that he unnecessarily

22   subjects himself to procedures involving needles heated to

23   80 degrees Celsius -- that's 176 degrees Fahrenheit -- just so

24   he can get policy benefits that he already paid a premium for?

25   What's more likely than not?

1        So what is left?  Acuity's argument that Don didn't

2   have any improvement from any of these procedures?  That's

3   simply not supported by the medical records.  Acuity showed

4   you a whopping two medical records reporting a lack of

5   benefit.  Each one was discussed by Dr. Leon and Dr. Anderson.

6   The first, a physical therapy record from September 19th,

7   2013.  And as the doctors both explained, this reporting was

8   to be expected.  The injection was a mere six days earlier,

9   and the anti-inflammatory effect of the medication hadn't even

10  kicked in yet.  It was way too early to expect improvement.

11  Now, this record in no way suggests that the injection was not

12  successful.

13        The second is a physical therapy record from

14  June 5th, 2014.  Now, when defense counsel put this record in

15  front of Dr. Anderson which shows Don said he had more pain

16  three weeks after the ablation, the nerve burning,

17  Dr. Anderson pointed out the difference between an injection

18  and an ablation.  He testified that it is very common for that

19  procedure to result in increased pain before it provides

20  actual pain relief.  It gets worse before it gets better.  In

21  fact, Dr. Anderson told us that it can take up to eight weeks

22  for that to kick in.  He specifically said that he had

23  recently changed when he asked for that pain reporting about

24  improvement because, when he asked most of his patients at six

25  weeks, past this date, they did not report very much relief at

1   all.  But when he waited until eight weeks, many of them

2   reported much, much higher levels of improvement.  Again, this

3   record in no way suggests that the ablation, the nerve

4   burning, was not successful.

5           The only other thing that Acuity's doctor has relied

6   on to establish a lack of improvement is Don's deposition

7   testimony taken on May 2nd, 2018, five years after the crash.

8   He ignores all of the medical records reflecting the

9   improvement that Don obtained following the procedures;

10  records that he was provided by Acuity and testified that he

11  has reviewed; records that reflect Don's reporting close in

12  time to the procedures they reference; and he ignores the fact

13  that Don did report relief in his deposition.  He just didn't

14  report as much relief as Acuity wanted.

15          Which is more likely to be the most accurate, the

16  reports Don gave his doctors contemporaneously with the

17  procedures, or his recollection five years later?  Everyone

18  agrees -- except Dr. Schifini, of course -- that the nerve

19  burning procedures are incredibly painful.  Dr. Anderson said

20  he hates to perform them because he doesn't like to put his

21  patients through that.  No reasonable person would willingly

22  subject themselves to those procedures unless they are

23  obtaining benefit.

24          This is really a simple concept.  It is cost-benefit

25  analysis.  If the benefit was not greater than the cost, no

2:17-cv-01778-JAD-DJA - May 28, 2021

1   one would ever do it.  And this is something that Don will

2   need for the rest of his life.

3          In order to obtain that medical treatment, Don needs

4   your help enforcing his contract with Acuity.  They promised

5   to protect him by compensating him for the damages he

6   sustained when injured by the negligence of an underinsured

7   motorist.  That's exactly why he bought this coverage, to

8   protect himself and his family in the event that someone else

9   didn't have enough insurance to protect him.  But when he made

10  a claim, they abandoned him, telling him that his injuries

11  weren't severe, that he chose the wrong doctors, that he

12  treated in the wrong states, that he has already been

13  compensated.  What right does Acuity have to direct his care?

14         Don's a traveler.  He's here in Nevada sometimes.

15  He's here in -- he's in Florida sometimes.  He's in South

16  Dakota sometimes.  The majority of his treatment was in

17  South Dakota.  If he moves to California, does he have to go

18  back to South Dakota for treatment?  If he moves to New York,

19  does he have to go back to South Dakota for treatment?  No.

20         Acuity could have written a provision into the policy

21  limiting, saying I will only pay for treatment in

22  South Dakota.  They didn't do that.  There is no such

23  provision in the contract, yet Acuity wants to limit Don.

24  They tell you that him going and treating with Dr. Leon while

25  he's in Las Vegas already is unreasonable.  Don's not asking

1    Acuity to pay for the airfare.  He's already here.  He made an

2    appointment.

3            So let's talk about what Acuity promised to pay Don.

4    Let's talk about the numbers.  I showed you this jury

5    instruction earlier.  It tells you what Don is entitled to

6    recover, and it is reflected on the verdict form.  These are

7    his past medical expenses totaling $160,000 -- $160,397.03.

8    And you'll have this back when you're doing your deliberations

9    as well.  It's Exhibit 31.

10           This is a copy of the verdict form that you'll

11   receive.  You will work together to come to a fair and just

12   verdict, a verdict that fully compensates Don for the damages

13   he suffered as a result of the crash from April 6th, 2013, to

14   the present and continuing into the future.

15           Now, you've heard that Mr. Petty's insurance carrier

16   paid out its policy limit to Don as a result of the crash.

17   Your job, as the jury, is to determine the total value of

18   Don's -- of the damages Don suffered as a result of the crash.

19   As the Court has instructed, you must not consider Don's

20   settlement with Mr. Petty.  And based on the evidence you were

21   presented, the medical records and bills, the testimony of his

22   friends and family, the testimony of the doctors who treated

23   him, I would suggest the following as a starting point for

24   your discussions.

25           Don has past medical expenses of $160,397.03, as I

1    showed you.  That number should go here (indicating) on that

2    top line, the value of past necessary medical care, treatment,

3    and services rendered.  In other words, past medical expenses.

4         Now, Acuity has complained that some of the bills are

5    higher than they would expect.  The fact of the matter is that

6    Don owes them regardless.  And as Dr. Leon testified, while on

7    the higher end of charges, they are still within the range of

8    reasonable and customary charges.  Don's injuries have not

9    resolved, and his doctors have testified that he will live

10   with pain for the rest of his life.

11        Now, this treatment is estimated to cost $27,200.58 a

12   year, and this covers the treatment that he's receiving

13   routinely to his neck, mid back, and low back; the nerve

14   burning in his neck and injections in his mid back and low

15   back.

16        Dr. Leon -- now, in my opening I stated that Don had

17   a life expectancy of 16 years.  Dr. Leon testified, based on

18   his analysis, that Don's life expectancy was actually 21

19   years, and I would defer to his expertise.  But because I told

20   you 16 years, I'm going to tell you what that number is as

21   well.  I'm going to give you a range.  I would suggest that

22   the value of Don's future medical expenses is between

23   $435,209.28 and $571,212.18.

24        **THE COURT:**  Ms. Xidis, this is the 25-minute alert

25   that you've requested.

1      **MS. XIDIS:**  Thank you, Your Honor.

2          You've heard from Don.  You've heard from his

3      doctors.  You know a little about his medical history.  You

4      can decide whether you want to consider that 16 years that

5      he's expected to live or the 21 that Dr. Leon believes he's

6      expected to live based on his expertise and analysis.

7          Now, Don is not just entitled to medical bills,

8      whether past or future.  Mr. Petty is legally responsible to

9      Don for all the damages that he owes.  And Acuity, in

10     providing underinsured motorist coverage, agrees to pay

11     anything above that that Mr. Petty didn't cover, that his

12     policy didn't cover.  That includes pain and suffering, mental

13     anguish, loss of capacity to enjoy life, disability, and

14     impairment.  And you've heard a lot about how Don was

15     affected; a little bit from Don but mostly through his friends

16     and family, the people he works with, who see him regularly

17     and have -- have a glimpse into his life.  You've also heard

18     from his medical doctors.

19         Based on that testimony and what you've heard, I

20     would suggest that, while it's difficult to place a value on

21     things like that -- you don't have a bill saying this is how

22     much your pain and suffering was -- you have to consider the

23     impact on his life.  But I would suggest as a value at least

24     the cost of his medical bills.  For past pain and suffering, I

25     would suggest $160,397.03.  And for future pain and suffering,

1   mental anguish, loss of capacity to enjoy life, disability,

2   and impairment I would also suggest the amount of the medical

3   bills, the future -- the anticipated future medical expenses,

4   the $435,209.28.

5          Now, again, there is no need to consider the

6   settlement with Mr. Petty.  In fact, you have instructed --

7   been instructed that you must not consider it.  You do not

8   need to make any reductions.  Your job is to determine the

9   full value, 100 percent of Don's damages.  This is important.

10  Don is only asking for the benefit of his bargain, the

11  protection he paid for.  Thank you.

12         May I ask how much time I used?

13         **THE COURT:**  You used 28.

14         **MS. XIDIS:**  Thank you.

15         **MS. TEMPLE:**  Ready for me?

16         **THE COURT:**  I'm ready.

17         **MS. TEMPLE:**  Thank you, Your Honor.

18              **DEFENSE'S CLOSING ARGUMENTS**

19         **MS. TEMPLE:**  We are here to pay what we owe,

20  everything that Mr. Humes is entitled to under the policy that

21  he purchased with Acuity Insurance, and that's why we're here.

22         What's interesting is the policy of insurance and the

23  law, they're very similar; almost the same.  It's not like a

24  life insurance policy.  With a life insurance policy, you

25  purchase a policy, and when you pass away, the beneficiaries

1    of that policy get that entire amount.  With a car insurance

2    policy, you have to prove that the damages that you're

3    claiming and the money that you're seeking is what's actually

4    owed, just like you have to prove under the law.  And what

5    does that mean?  That means that you have to prove that the

6    injuries that you sustain, that you sustained them from the

7    accident.  You have to prove that all of this treatment that

8    you had was necessary because of that accident.  And then you

9    have to prove that all those medical bills for the treatment

10   that you had were reasonable.

11           You're going to be guided to your -- in your

12   evaluation of this claim.  You've heard Dr. Schifini testify,

13   and Dr. Schifini told you how he evaluates a claim.  He said

14   sometimes I get the opportunity to see a patient or a claimant

15   and I get to examine them, and sometimes I get the opportunity

16   to review all of their medical records and bills.  And you

17   heard in this case that he was the only expert that had the

18   opportunity to review everything.  He reviewed all of the

19   medical records.  He reviewed the deposition transcripts, the

20   testimony under oath in this case of Mr. Humes, of his

21   doctors, Bruce Crisman, Trevor Anderson, and Dr. Leon, and he

22   also was the only one with the benefit of knowing what

23   treatment Mr. Humes had before this accident, what complaints

24   of pain he had before this accident.

25           As a juror, you're going to get that same opportunity

1    that Dr. Schifini did in this case.  You're going to get an

2    instruction that shows you how to evaluate the claim, and

3    that's Instruction Number 6.  It will walk you through all of

4    the elements that you have to show.

5           And Ms. Xidis talked about this.  In order to reach

6    damages and determine that there's damages, you have to

7    determine that there's a disability or impairment, that

8    there's pain and suffering, that there's reasonable, necessary

9    medical care, and that all of that was the result of injuries

10   sustained in this accident.

11          You'll be guided further by Jury Instruction

12   Number 3.  You heard the judge read it to you.  We've talked

13   about it.  We talked about it at the outset of the litigation,

14   and we're talking about it again now.  It's the burden of

15   proof, and the plaintiff has to prove it.  The defense doesn't

16   have to disprove it.  After plaintiff rested his case,

17   recognizing that he didn't meet his burden, we could have

18   rested ours without presenting one bit of evidence, but we

19   presented Dr. Schifini to further show you the evidence

20   through the defense.

21          It's important to know here that the law recognizes

22   that quantity does not equal quality.  Overemphasis -- and

23   there were a number of people that came in from Mr. Humes'

24   family to talk about these claims of injury.  Overemphasis on

25   the personal to the exclusion of the medical evidence really

1   reflects an acknowledgment that the medicine just doesn't

2   support the claims here.

3        And if you're left, like I told you during the

4   opening statement, with more questions than answers, then

5   you're in the same position Acuity's in and the same position

6   they've been in for years, and it's proof that the burden has

7   not been met.

8        Sorry.

9        And that's the burden of proof instruction:  A party

10   has the burden of proving any claim or defense by a

11   preponderance of the evidence.  It means that you must be

12   persuaded by the evidence that the claim or defense is more

13   probably true than not true.  You have to base it on all the

14   evidence, regardless of which party presented it.

15        You've heard from Dr. Schifini, and he told you there

16   is no traumatic spine injury in this case.  How do we know

17   that?  How does he know that?  Well, he showed you the medical

18   x-rays and the MRIs in this case.  He painstakingly went

19   through every one.  He was the only expert that did that, and

20   he told you there's just no evidence of a traumatic injury.

21   And he showed you where you would see one, how you could see

22   one, and why you don't.  Interestingly, Dr. Leon never

23   reviewed those x-rays when he came to the conclusion that all

24   of the injuries that were sustained in this accident were the

25   result of this accident, all the injuries that were being

1    complained of.

2          Then there were injections.  And he told you those

3    were non-diagnostic, and I'll tell you more during the closing

4    how we know that they were non-diagnostic.  The treatment was

5    inconsistent with large gaps, and that wasn't just that

6    19-month gap we're talking about.  I'll show you in a minute

7    there were gaps from the outset, large gaps in the medical

8    treatment.

9          And then there's the conduct, and Dr. Schifini talked

10   about this.  We questioned plaintiff and his experts about

11   this.  The conduct is inconsistent.  When you can take these

12   long breaks in treatment, when you have all of this travel

13   that you're taking but you're not receiving medical care or

14   taking any pain medication.  If you have a traumatic spinal

15   injury, if you're in debilitating pain, if you're rendered

16   severely disabled, it's inconsistent that you would be able to

17   travel the way he did, not treat the way Mr. Humes did.

18         And this is the calendar, and I really think that

19   this helps kind of put it into perspective.  And what this

20   shows is all of the treatment that Mr. Humes had up until that

21   October 2014 gap.  You will notice that in the first month,

22   after this injury that he claims was severely debilitating, he

23   had five treatments.  Even despite his physical therapist

24   saying you need treatment several times a week, he didn't have

25   that treatment.

1          July 2013, several months after the accident, just

2     one time he saw a doctor while not taking any pain medication.

3     October and November of 2013, just one visit to the doctor in

4     those two months.

5          January through May of 2014, a total of five visits

6     during that time, one time a month he saw a doctor.  And then

7     we know after October 6th, 2014, for 19 months there was no

8     medical care.

9          And I know you've heard a lot about this 19-month

10    gap.  It's really important in this case.  But I want to put

11    it more into perspective as far as timing.  Nineteen months is

12    82 weeks.  That's 577 days.  If we go back from now, 19

13    months, that's October 2019.  Nineteen months ago none of us

14    had ever heard about COVID.  That's how long Mr. Humes went

15    without any medical treatment before coming back to Acuity and

16    saying, all of this treatment I'm going to have for the rest

17    of my life starting now after that year and seven months of

18    nothing is related to that accident, and you need to pay for

19    it.

20          We talk about explanations during the course of this

21    trial for that 19-month gap, and here's the truth behind that.

22    This is the honesty behind it.  Mr. Humes knew, when he came

23    to court, he had to explain that 19-month gap.  We knew that.

24    Because if you are to believe that this treatment that he

25    needs for the rest of his life is because of that accident in

1    2013, you have to have some kind of explanation as to why for

2    almost two years he could go without medical care, and the

3    first explanation was a denial.  That's a denial that I got

4    when I took his deposition in September 2018.

5         "Q   The requested meeting with the attorney and that

6         occasion that you were going to go down south for the

7         winter occurred on October 6th, 2014, according to the

8         record we have.  From October 6th, 2014, to May 5th,

9         2016 -- so about a year and a half -- we have no records

10        of any medical treatment.  Is that your recollection, that

11        no medical treatment was undergone between October 2014

12        until May 2016?

13        "A   Well, I don't have exact dates.  I would suspect that

14        your records are incomplete.

15        "Q   Okay.  Is it your recollection that you never went a

16        year and a half without undergoing any medical care?

17        "A   I do not recall that at all.  This has been an

18        ongoing and constant thing."

19             Later on in the deposition...

20        "Q   I know that you said you recall getting treatment and

21        not having a year and a half gap between 2014 and 2016.

22        As you sit here today, do you have any recollection as to

23        what treatment you underwent during that time?

24        "A   Just as needed, as necessary."

25             That deposition lasted several hours.  That was

 1    Mr. Humes' opportunity to tell me everything about his claim,

 2    anything that stood in the way of getting treatment.  Never,

 3    during that several-hour deposition, was anything mentioned

 4    about the information he provided in court, about these

 5    life-altering events that prohibited him and prevented him

 6    from receiving medical care.

 7         Next we had the testimony of Ms. Humes during trial.

 8    Ms. Humes testified from her Mexico trip.  She told you that

 9    the day before her testimony she had been contacted by the

10    attorney and asked to figure out what happened during that

11    gap, why was there a gap.  And she testified for the first

12    time listing off all of the reasons.  And this was the first

13    time, after conducting all these years of discovery, that we'd

14    ever heard any of them, and I am certain that you could sense

15    my frustration during that cross-examination.

16         We have rules in Nevada, the discovery rules.  It

17    requires production of information, production of documents,

18    disclosure of information.  We don't have trial where you show

19    up -- you get all that information during what's called

20    discovery.  That's where you learn about the claims.  That's

21    where you learn about the information.  So it was -- it's hard

22    to express how disorienting it is to come and hear brand-new

23    information for the first time eight years after the accident

24    and many years after that gap in treatment.

25         And Donald Humes testified as well, and you heard his

1   testimony.  He was -- he was very emotional about that

2   two-year period in his life when he claims he couldn't have

3   medical treatment because of these issues that arose.  And he

4   described those 18 months in great detail.  He described them

5   as the most unforgettable of his life.  But he had forgotten

6   to tell me about them ever, and he had forgotten to tell any

7   of his doctors.  That was the first time in eight years he'd

8   ever mentioned it.

9           And interestingly, we took the statement of -- or we

10  heard the testimony of Charles Humes, his son, and you'll

11  recall that one of the reasons that Mr. Humes and his wife

12  gave as hurdles to him getting medical treatment during that

13  two years is that he had a -- he had cancer.  But you heard

14  Charles testify, when I asked about how that cancer affected

15  him and his work and his life and he said, it was just this

16  dot on his ear and he got it removed and he was back at work

17  the next day.

18          And then we have Dr. Leon's version.  Dr. Leon said

19  all that treatment that I recommended, that really expensive

20  medical treatment, it worked.  It worked and that's why for 19

21  months Mr. Humes didn't have to have any medical treatment.

22  He was better.  But that's not the testimony in this case from

23  Mr. Humes.  He says he's continued to suffer pain.  And you

24  heard Dr. Schifini testify that he reviewed the records and

25  saw over and over in the medical records the notations that

1    these injections weren't working.

2            And you heard Dr. Schifini say that he read the

3    deposition of Mr. Humes where Mr. Humes said none of these

4    work.  At best they gave me 30 percent relief, and for the

5    longest period of time it was maybe a month.  So Dr. Leon's

6    suggestion that this 19-month period where there was no

7    treatment is because of pain relief, it's just not supported

8    by the record.  It's not even supported by Mr. Humes' own

9    testimony.

10           And the unreliability -- let me say this first.

11   Before I go into the other unreliable issues in this case, I

12   want to talk about what happened during that gap, that 2014 to

13   2016 period, because I think -- I think it's important.  I

14   don't think it's a red herring.  It's important for you to

15   understand that he continued to travel thousands and thousands

16   and thousands of miles back and forth from Florida, that he

17   didn't have any pain medication, but right at the time that

18   that gap began, that 19-month gap, he received the settlement

19   from the other driver.  And once he received the settlement

20   from the other driver, he stopped treating for 19 months.

21           You've heard the doctors and the witnesses talk about

22   it.  Dr. Schifini said, look, there's no medical or

23   commonsense explanation for this.  If somebody is

24   traumatically injured in an accident, they cannot possibly go

25   19 months without medical care.  Dr. Anderson didn't have an

1   explanation either.  And when Mr. Humes was asked, he never

2   disclosed a reason.

3          The unreliability doesn't end there.  We talked about

4   the past medical history, and here's why it's important.

5   Regardless if it was two weeks or a month and a half, like

6   Mr. Humes testified, the way that we found out about that

7   medical care was not through disclosure by Mr. Humes.  He was

8   asked five or six times during his deposition whether he had

9   prior medical treatment, and the question started out

10  generally:  Did you have any back pain?  Did you have any neck

11  pain?  And they got more specific:  Did you have any treatment

12  at Alternative Health Care with Dr. Crisman?  Did you have any

13  chiropractic care within five years of this accident?  And he

14  responded that he didn't.  But there was an errant entry in

15  one of the medical records, and that entry said 2011.  There

16  was no context to it whatsoever.  In fact, I wasn't even

17  100 percent sure I was reading it correctly.

18         And so just like you heard Mr. Humes testify on the

19  stand when Ms. Xidis tried to refresh his recollection about

20  seeing this document at his deposition, the document said 2011

21  and I said, Mr. Humes, I've got this one page that says 2011.

22  You're telling me that you didn't have any issues before this

23  accident, you were in perfect health, never had any neck or

24  back pain besides that fusion many years prior?  And he said,

25  oh, you're right, you're right, I did, I forgot.  I had

1    treatment with Dr. Crisman in 2011.  And he said, but it's not

2    for the same thing.  I said, well, Mr. Humes, can you direct

3    your attention down to the bottom, where it says low back

4    issues, would you agree with me that that's what you're

5    claiming in this case?  And he said, well, it's different.

6           So I hopped on a plane and I flew to South Dakota,

7    and I talked to Dr. Crisman myself.  And that's where a lot of

8    the information that you heard me questioning him about and

9    that you heard Dr. Schifini talk about came from.  Those

10   records are very scarce.  They're handwritten, hard to read.

11   But Mr. Crisman was open with that testimony, and you heard us

12   talking about it.  There was acupuncture recommendations.

13   There were special orthotic fittings.  There were x-rays.

14   There were manipulations.  This treatment was not just, hey,

15   how you doing, I'm all better.  And he denied it, and I had to

16   go to South Dakota to find it.

17          There's also inconsistencies throughout the medical

18   records.  Your role in this case is the same role as Acuity

19   has.  Okay?  You-all are evaluating this the same way we have

20   had to for the past several years.  You've heard for years

21   throughout the course of this litigation, it's been brought up

22   through trial, that we've had to fight for this information

23   during the course of discovery.  Pre-accident medical records,

24   I had to fly to South Dakota to get them.  They weren't

25   provided to me.  Employment records for these claims that all

1    of this -- these employment issues changed after the accident,

2    that new people had to be hired, I said, please give the

3    records to me.  Here's an authorization.  I'll get them

4    myself --

5         **MS. XIDIS:**  Your Honor, Counsel's testifying.  She

6    could have put someone from Acuity on the stand to talk about

7    what Acuity had or did not have.  What Counsel did and what

8    she asked for, it's irrelevant.

9         **THE COURT:**  Ms. Temple.

10        **MS. TEMPLE:**  This came up -- this came up during his

11   examination about the authorization.

12        **THE COURT:**  It's beyond the scope of the testimony

13   that was provided.

14        **MS. TEMPLE:**  Okay.

15        **THE COURT:**  I'm going to just direct the jury to

16   please rely on your own recollection of the testimony from the

17   witnesses.

18        **MS. TEMPLE:**  Okay.  Did you notice that plaintiff

19   seemingly didn't want you to see those medical records and

20   bills?  Before they rested their case, they introduced into

21   evidence the photographs and the insurance contract.

22   Plaintiff's case, plaintiff's burden, plaintiff's medical

23   records and bills, and they rested without giving you any of

24   them.  We had to get those in through our expert.  Why is

25   that?  Why didn't they want you to have those bills and

1    records?

2            Our every effort to get information through discovery

3    is -- our every effort to get information out to you during

4    the trial is reflective of Acuity's every effort over the past

5    several years in the course of litigation to get information

6    to us.  I implore you to read those records if you find them

7    necessary.  If we hadn't given them to you, you wouldn't have

8    the opportunity.  And you'll see how infrequently Mr. Humes

9    treated.  You'll see the inconsistencies between the pain he's

10   reporting and the activities he was doing, like ATV riding.

11   You'll see that he was traveling all across the country while

12   not getting medical treatment.  You'll see admissions that

13   there was no loss of consciousness, like he testified here

14   today.  You'll hear that he was claiming the CPAP issue as

15   part of this litigation, and for the first time in court we

16   heard that that's no longer being claimed.

17           And then, after that period of time, that 19 months,

18   after he'd received the settlement from the other driver,

19   after all that time went by, he goes back for treatment, and

20   it's over $100,000 in treatment.  And you've heard no medical

21   or commonsense explanation as to why that is.

22           And now they want you -- they want Acuity to not only

23   pay all of those medical expenses after that long period of

24   time when he had stopped treating, but they also want us to

25   pay -- Mr. Humes wants Acuity to pay all the future medical

1   expenses for any back or neck treatment he has for the rest of

2   his life, $27,000 a year, half a million dollars, Acuity has

3   to pay it.

4          I want to talk about that $160,000, and I want to

5   direct your attention to the amounts that are highlighted.

6   $117,069 goes to Dr. Leon and Dr. Anderson.  For the first

7   time in court -- we've -- we've provided you with a copy of

8   the lien.  It's within the medical records.  We heard that

9   Dr. Leon had been paid.  I don't recall Dr. Leon testifying

10  that he had received payment yet.  I don't see any evidence of

11  payment to either of them.  In any event, it's worth noting

12  that 75 percent of the medical treatment, over two-thirds of

13  the medical treatment, goes to the two experts who testified

14  in this trial that all of the treatment is related to this

15  accident, that all of the injuries were sustained in this

16  accident, and that everything he needs for the rest of his

17  life to the tune of half a million dollars, it's all because

18  of this accident.

19         Your role -- we talked about it at the outset of

20  litigation.  I'm going to bring it up again -- you evaluate

21  the evidence.  The evidence that's submitted, the testimony of

22  the parties and the experts, and then you decide if plaintiff

23  has proved his claims.  We talked about those scales of

24  justice at the beginning; the insurance company, as a

25  defendant; and you committed to the judge that you would treat

1    the defendant, Acuity, just as you would a plaintiff.  During

2    jury selection we told you, look, this is -- we recognize the

3    risk here.  We're a defendant insurance company coming into a

4    courtroom to defend ourselves.  And we expressed those

5    concerns to you during jury selection, and you assured us that

6    you would be fair to both sides equally.  And you're here

7    because we believe that from you.  It's Jury Instruction

8    Number 5, and it states:  All parties are equal before the

9    law, and an insurance company is entitled to the same fair and

10   conscientious consideration by you as any party.

11            Also along those same lines we talk about sympathy,

12   and it's just natural to have sympathy.  It's natural to have

13   sympathy for someone who's traveled all the way from South

14   Dakota to testify.  It's natural to have sympathy for someone

15   who claims injury.  But sympathy is not allowed in that jury

16   room.  It can't be part of your deliberation.  And that's for

17   both sides.  If you feel sympathetic for Mr. Humes for the

18   reasons I just talked about, that cannot even come into the

19   deliberation.  It plays no role.  And just the same way for

20   Acuity.  If you feel sympathy over the years and years that

21   information has been requested and not produced, you can't

22   have sympathy for them either.  It goes both ways.  No

23   sympathy can be considered as part of the deliberation

24   process.

25            As you go back into that deliberation room, I want

1    you to think about something, and I think it will help you

2    arrive at a verdict.  And I think it will have you -- help you

3    arrive at the verdict that Acuity is seeking in this case.  If

4    there wasn't an insurance policy for Mr. Humes to collect

5    from, from which he could make a claim, would he have flown

6    back to Las Vegas multiple times for treatment at a huge

7    premium, four to five times what it costs in South Dakota,

8    with no connection here aside from his attorney and his

9    doctor?  Would he be demanding meetings with doctors and

10   lawyers and demanding certain medical procedures irrespective

11   of pain or recommendation?  And I would submit to you -- I

12   would ask that you review those records.  There were multiple

13   calls and letters, and you'll see them throughout the file,

14   throughout the records.

15         Would Mr. Humes have gone back to treatment after a

16   year and seven months after settling with the other driver and

17   told Acuity that it's because of this accident and that they

18   need to pay?  And if you believe that Mr. Humes is still in

19   pain, do you think he would be blaming all of this treatment

20   that he's having right now on this accident, or would he be

21   blaming it on his pre-accident health?  The fusion, the fact

22   that he had treatment before for the exact same issues.  His

23   wife testified to you that she had back surgery.  She wasn't

24   in an accident.  She was in this accident, but she didn't have

25   back surgery as a result of this accident.  Once you answer

2:17-cv-01778-JAD-DJA - May 28, 2021

1    those questions, I think you've arrived at the verdict.

2           And I want to talk about the amounts here, the

3    monetary amounts.  You heard Dr. Schifini testify that there's

4    no traumatic injury in this case.  All you have is a

5    sprain/strain.  You would need three to four months of medical

6    care before you reach what he called maximum medical

7    improvement, and he kind of defined maximum medical

8    improvement.  It's when medicine has done all it can, and then

9    at that point he -- if you're still in pain, we've done what

10   we can, medicine has done what it can, and he called that

11   maximum medical improvement.  He calculated that to be

12   $7,646.49.  That's through the first three months of medical

13   treatment.  And that, if you follow the law, that's the

14   conclusion that you would reach, that that's the amount that's

15   related.

16          Now, I want to talk to you about something else.  My

17   client, Acuity, has offered not to stop there.  Despite the

18   medical evidence, despite the law, they are willing to do

19   something -- and they have conveyed this as a courtesy to

20   Mr. Humes.  And myself and Mr. Rogers, we would never counsel

21   a client away from a courtesy that they want to provide to

22   their insured.  They have been willing, despite the medical

23   evidence, to consider all the way up until that 19-month gap.

24   There is no evidence that almost two years of medical

25   treatment later it's still related to the accident.  So up

 1    until that 19-month period, the total medical bills were

 2    $56,003.96.  And that, of course, doesn't include the pain and

 3    suffering, which I'll talk about in a minute.  But that's the

 4    amount that Acuity said, you know what, even though our expert

 5    is relying on the evidence and the law and we believe in him

 6    and trust him, we're going to give Mr. Humes all the way up a

 7    year and -- it's -- essentially is 19 months of treatment,

 8    until that 19-month gap.

 9            So we have two verdict forms that I'm going to show

10    you.  The first is the one that would be calculated if you

11    want to rely on Dr. Schifini and the law and the evidence only

12    and not take into consideration the courtesy.  And that's

13    $7,649 -- I'm sorry, $7,646.49 and $8,000 in pain and

14    suffering.  And I'm not going to do the math because I went to

15    law school because I'm not good at math, but I'll let you-all

16    do the math and come out with a number if that's the jury

17    verdict form you want to reach.

18            I want to show you the other verdict form, and this

19    is the one that Acuity is saying we're willing to pay this

20    amount.  Irrespective of what's been received, this is how we

21    value the claim.  This amount right here is how we value the

22    claim, and that is $116,003.96.  I did the math on this one.

23    That's $56,003.96.  That's the amount up until that almost

24    two-year gap when the settlement was reached with the other

25    driver and Mr. Humes stopped treating.  $60,000 in pain and

2:17-cv-01778-JAD-DJA - May 28, 2021

1    suffering for a total of $116,003.96.  And I told you it was

2    going to be a significant amount.  That's the value.

3          As far as future necessary medical treatment, I am

4    sure that you, right along with me, heard that number for the

5    first time.  I didn't hear any experts testify that the amount

6    of future treatment would behalf a million dollars.  And I

7    certainly don't think that I heard any evidence, particularly

8    from Dr. Schifini, that all of the -- would be related to this

9    accident.  This treatment that he needs all the way until he's

10   deceased essentially for the rest of his life is attributable

11   to that 2013 accident.

12         And as far as future pain and suffering, if you don't

13   award future damages, then -- and you don't believe that he's

14   going to continue to treat in the future, you don't think he's

15   still treating for accident-related injuries, you don't award

16   anything there either.  And what I want to add, you heard

17   during the course of the trial, Mr. Humes has not received any

18   medical care for a year.  That amount that I just told you,

19   $116,003.96, Acuity is ready to willing to extend that to

20   Mr. Humes, and now we leave it to you and we entrust you to

21   decide.

22         **THE COURT:**  Ms. Xidis.

23         **MS. XIDIS:**  Yes.  Court's indulgence while I get the

24   PowerPoint set up.

25         **PLAINTIFF'S REBUTTAL CLOSING ARGUMENTS**

2:17-cv-01778-JAD-DJA - May 28, 2021

1          **MS. XIDIS:**  Okay.  So I'm not going to cover

2     everything that Ms. Temple addressed in her closing.  I really

3     don't think there's -- there's much of a need to, but I do

4     want to touch on some of them.

5          First, this is exactly why we're here.  Don has a

6     policy of insurance with Acuity.  He was in a crash.  The

7     person who cause that crash didn't have enough insurance.  For

8     eight years Acuity looked at him and said you're not injured

9     enough.  I don't believe you.  The treatment that you're

10    getting, we don't like.  You're going to Nevada.  You're going

11    to Florida.  You should stay home in San Diego [sic] where

12    it's cheap.  You shouldn't get this treatment; it doesn't help

13    you enough.  And now today, for the very first time, they tell

14    Don that they think he's entitled to something.  This is why

15    we are here.  Eight years.

16         They accuse him of trying to withhold records, the

17    bills and records.  Did you hear anyone other than Ms. Temple

18    testify to that?  Did they put Larry Reub on the stand to tell

19    you what Acuity wanted and what they didn't get?  No.  Because

20    Don gave them everything they needed.  He gave them

21    authorizations to obtain the records.  He told them who his

22    medical providers were.  You have thousands of pages of

23    records.  Dr. Schifini testified that he reviewed all of Don's

24    medical treatment, all of Don's medical records and bills.

25    What's missing?  Nothing.  You would have heard about it from

1    a witness on the stand under oath.  Ms. Temple's testimony,

2    her comments, aren't evidence.

3            Let's talk about these treatment gaps, these months

4    here and there.  What difference does it make really?  He's in

5    pain for longer.  No doctor has said it's making him worse.

6    It's a consequence of -- of Don's choice not to take the time

7    out to go to a medical doctor.  He's in Florida in the winter.

8    Sometimes it takes a long time to make those appointments.

9    He's back in South Dakota.  He's -- he's a busy man.  That

10   doesn't mean that his pain's not real.  It doesn't mean he's

11   not dealing with it every single day.  It means that he's

12   facing the consequences of those decisions not to get

13   treatment at that time.  His medical bills are less as a

14   result.  His pain and suffering's higher.  Acuity should be

15   grateful.

16           The 19-month gap, I'm really surprised that I'm

17   talking to you about this right now.  Does Acuity really think

18   that Don and Barbara and Cheryl are making up the fact that

19   his mom died during that period of time?  That Barbara had

20   open-heart surgery as well as other heart surgeries?  That

21   both he and Barbara suffered cancer?  Not a scare.  They both

22   had it.  They fought it.  Look at his right ear.  Is he making

23   that up?  I'm not going to spend any more time on that gap.

24           Let's talk about Dr. Schifini.  She said that he's

25   the only doctor, the only medical provider you heard from who

1    had reviewed everything, and listed off medical records and

2    depositions.  Depositions, he's the only one who would need to

3    review the depositions because he hasn't talked to Don.  He

4    doesn't know about Dr. Anderson's treatment.  He hasn't talked

5    to Dr. Leon.  He still doesn't know anything about

6    Dr. Bhalani.  He wasn't deposed in this case.  Of course he

7    reviewed the depositions.  Dr. Leon and Dr. Anderson have Don

8    right here.  They don't need to do that.  That doesn't mean

9    anything.  They had the medical records and bills.

10          And Dr. Schifini concluded that Don was at maximum

11   medical improvement, there was nothing more that could be done

12   for him.  He must not have looked at those medical records

13   very hard.  Because, let me tell you, there's a lot in there.

14   First, for example, this is a medical record reflecting 80 to

15   90 percent pain relief from injections and an ablation in his

16   cervical spine in December of 2016.  80 to 90 percent pain

17   relief.  Let me show you where in the records it also reflects

18   improvement.

19          August 12th, 2013; August 22nd, 2013; August 27th,

20   2013; September 10th, 2013; January 8th, 2014, improvement;

21   January 9th, 2014, complete resolution of pain; May 5th, 2014,

22   improvement; June 16th, 2014, felt a little better; June 18th,

23   2014, improvement; August 25th, 2014, improvement;

24   October 6th, 2014, improvement; November 7th, 2016,

25   improvement.  The pain is relieved by the nerve block, last

1    done six months ago.  His relief is lasting longer than a

2    month and a half.  He said that in his deposition five years

3    later.  What's more likely?

4            November 7th, 2016, 60 percent relief.  30 percent

5    from the deposition.  December 14th, 2016, relieved by a nerve

6    block last done seven months ago.  December 14th, 2016,

7    60 percent relief.  August 23rd, 2017, the injections helped.

8    October 5th, 2017, they helped.  May 16th, 2018, it has helped

9    with his lower back pain.  July 11th, 2018, they helped

10   initially for about ten days.  Then a couple of weeks ago he

11   started to feel better again.  July 23rd, 2018, they helped

12   eventually.  Just like Dr. Anderson and Dr. Leon explained, it

13   takes time for these to kick in.  You can't pick a physical

14   therapy record from six days later and put it up in front of

15   you in a vacuum and say, look, it didn't help.  But that's

16   what they did.  That's what they've been doing for eight

17   years.

18           August 29th, 2019, they're helping.  September 18th,

19   2019, helping.  70 percent that said.  October 29th, 2019,

20   much better.  December 6th, 2019, helped, helped, helped

21   70 percent, helped eventually but more pain for weeks.

22           The records are full of references to his

23   improvement.  He is going through these treatments, and

24   they're helping.  Do they get rid of his pain?  Absolutely

25   not.  That's why he needs them for the rest of his life.  Even

1    Dr. Schifini said that when you have chronic pain, when you're

2    at that six-month mark, more likely than not that's not going

3    away.  This isn't something he can have a surgery for and fix.

4    He wishes it was that simple.  His neck was that simple.  His

5    low back in 2011 was six days of chiropractic therapy.  Six

6    days.  The idea that Dr. Leon and Dr. Anderson are

7    recommending these treatments because they -- but they aren't

8    diagnostic, there's no support for that.  Look at the records.

9    They are replete with improvement.  Acuity has no place, there

10   is no provision in that contract that allows them to dictate

11   what medical treatment he gets, where he gets it, how much

12   those medical providers pay.  If he goes to Texas and the

13   providers charge that much, that's reasonable and customary in

14   Texas, Acuity pays for it under the policy.  That's what they

15   promised.  If he goes to Hawaii and treatment's even more

16   expensive, if he goes to Wyoming and it's cheaper, he gets to

17   pick where he treats, who he treats with.  They don't get to

18   make those decisions for him.  That is not their place.  Show

19   me in the policy, look -- search that policy, find a place

20   where they get to do that.

21         Don paid them for protection.  They haven't given it.

22   They get up here in this trial and they call him a liar, and

23   then after eight years they say, yeah, we should have paid you

24   something.

25         Look at that verdict form.  Tell Acuity that how they

```
 1   treated Don is not okay.

 2       (Excerpt concluded at 11:00 a.m.)

 3                        --o0o--

 4              COURT REPORTER'S CERTIFICATE

 5

 6       I, AMBER M. McCLANE, Official Court Reporter, United

 7   States District Court, District of Nevada, Las Vegas, Nevada,

 8   do hereby certify that pursuant to 28 U.S.C. § 753 the

 9   foregoing is a true, complete, and correct transcript of the

10   proceedings had in connection with the above-entitled matter.

11

12   DATED:  7/6/2021

13

14                        /s/_____Amber M. McClane_____

15                        AMBER McCLANE, RPR, CRR, CCR #914

16

17

18

19

20

21

22

23

24

25
```