2:17-cv-01778-JAD-DJA - May 26, 2021

1            IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF NEVADA

3    DONALD HUMES,                  )
                                    ) Case No. 2:17-cv-01778-JAD-DJA
4              Plaintiff,           )
                                    ) Las Vegas, Nevada
5    vs.                            ) May 26, 2021
                                    ) 8:05 a.m. - 5:09 p.m.
6    ACUITY, A MUTUAL INSURANCE     ) Courtroom 6B
     COMPANY, a foreign             ) JURY TRIAL, DAY 2
7    corporation; DOES 1 through    )
     10; and ROE CORPORATIONS 1     )
8    through 10, inclusive,         )
                                    )
9              Defendant.           )
     _____)   *CERTIFIED COPY*

10

11          REPORTER'S TRANSCRIPT OF JURY TRIAL, DAY 2
            BEFORE THE HONORABLE JENNIFER A. DORSEY
12              UNITED STATES DISTRICT COURT JUDGE

13

14   APPEARANCES:

15   For the Plaintiff:   *CARA M. XIDIS, ESQ.*
                          *JUSTIN W. WILSON, ESQ.*
16                        *H&P LAW*
                          *8950 West Tropicana Avenue, Suite 1*
17                        *Las Vegas, Nevada 89147*
                          *(702) 598-4529*

18

19   (Appearances continued on page 2.)

20

21   Court Reporter:     Amber M. McClane, RPR, CRR, CCR #914
                         United States District Court
22                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                       (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25

```
 1    APPEARANCES CONTINUED:

 2    For the Defendant:

 3         MARISSA R. TEMPLE, ESQ.
           STEPHEN H. ROGERS, ESQ.
 4         ROGERS, MASTRANGELO, CARVALHO & MITCHELL
           700 South Third Street
 5         Las Vegas, Nevada 89101
           (702) 383-3400

 6

 7    Also Present:

 8         Donald Humes, Plaintiff

 9         Larry Reub, Acuity Client Representative

10         Brian Clark, Trial Technician

11         Luis Gutierrez, Trial Technician

12                        * * * * *

13                      I N D E X

14    Plaintiff's Witnesses:                        Page

15    RAIMUNDO LEON, M.D.

16         Direct Examination by Mr. Wilson           22

17         Cross-Examination by Mr. Rogers           150

18         Redirect Examination by Mr. Wilson        212

19    TREVOR ANDERSON, M.D.

20         Direct Examination by Mr. Wilson          220

21         Cross-Examination by Mr. Rogers           254

22         Redirect Examination by Mr. Wilson        272

23         Recross-Examination by Mr. Rogers         274

24

25                        * * * * *
```

2:17-cv-01778-JAD-DJA - May 26, 2021

1      *I N D E X   C O N T.*

2        *E X H I B I T S*

3    EXHIBIT NO.:        OFFERED        RECEIVED    WITHDRAWN

4    31                    135            136

5

6                      *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914         *Page 3*

2:17-cv-01778-JAD-DJA - May 26, 2021

```
 1        LAS VEGAS, NEVADA; WEDNESDAY, MAY 25, 2021; 8:05 A.M.

 2                            --o0o--

 3                    P R O C E E D I N G S

 4        THE COURT:  Okay.  What do we have?

 5        MS. TEMPLE:  Your Honor, we have a stipulation that

 6   we entered into on the offset issue, the contract issues that

 7   we talked about last week.  If I can approach, we both signed

 8   it.  I'll just submit it to, Your Honor.

 9        THE COURT:  Sure.  You can approach.

10        Okay.  This is your stipulation as well?

11        MS. XIDIS:  Yes, Your Honor.

12        THE COURT:  Thank you.

13        Okay.  What else do we have.

14        MS. TEMPLE:  Just, Your Honor, a point of

15   clarification for discussion that we had on when was it

16   Monday.

17        THE COURT:  It feels like it's already been a whole

18   week.

19        MS. TEMPLE:  It's just -- so, Your Honor, I just

20   wanted to clarify if I -- if it came across that I was

21   suggesting non-cooperation by Mr. Humes or any contractual

22   defenses, pre-litigation conduct, admissions pre-litigation,

23   that's not my intention.  I do feel, however, that everything

24   that's happened since litigation just like a third party case

25   we should be able to comment on.  If we've served discovery
```

2:17-cv-01778-JAD-DJA - May 26, 2021

1   requests, if we've requested information, if we've asked
2   things in deposition, if we've asked is things in
3   interrogatories and they're not responded to or we're told
4   something completely contrary to what we were being told for
5   the first time in trial, that's something I want to be able to
6   raise and I'm not raising that as a contractual defense.  I'm
7   not raising it to suggest non-cooperation, I will not present
8   a noon cooperation argument to the jury at closing.  My
9   suggestion by introducing that information is that there's
10  years and years of discovery that has went on where
11  information has not been disclosed it's being disclosed for
12  the first time in court so I want to make that clarification
13  and one more thing that I want to clarify with respect to the
14  wage loss issue.  And perhaps counsel can correct me if I'm
15  wrong I've been involved in this case from the onset I know is
16  that there's never been a withdrawal of the wage loss claim.
17  There was a suggestion that that claim has been withdrawn and
18  I defer to counsel but in deposition Mr. Humes testified he
19  had a wage loss claims unequivocally in interrogatory
20  responses there's the suggestion that there's a wage loss
21  claim I briefed it in my trial brief because there's been
22  produced to support that.  But we had somebody come in and
23  testify all about wage loss.  So I am intending to bring that
24  up at some point.  The lack of evidence, but the testimony
25  suggesting that there is a claim.  There's no computation so I

1   don't think he can go to a jury but I think I should be able

2   to discuss it.

3           **THE COURT:**  What do you mean you should be able to

4   discuss it?

5           **MS. TEMPLE:**  I should be able to address the

6   testimony of mister -- or Charles, Mr. Humes through the

7   plaintiff.  I've should be able to address the statements in

8   his interrogatory responses that he has a wage loss claim.

9   The authorization that was requested to provide all

10  information supportive of that claim, the -- he testified for

11  pages and pages about how his work life has been affected by

12  this, these injuries, and I want to address that on cross.

13          **THE COURT:**  Let me hear the response, Ms. Xidis.

14          You can move the far -- whatever.  That one because I

15  don't think that Mr. Humes needs one.  So --

16          **MS. XIDIS:**  I'll move this one over before the jury

17  returns.  Or that works.

18          **THE COURT:**  Easier one to move.

19          **MS. XIDIS:**  I think you are probably right.  So with

20  respect to the wage loss, I have no problem if defense counsel

21  wants to cross my client and say you are making a wage loss

22  claim before you're not now.  That's fine.  They can cross him

23  about his work life and how it's been affected that's fine.

24  We are not -- we are formally withdrawing our wage loss claim

25  if that had not been clear before.  We are not asking for a

```
1   line item on the jury form on the verdict form.  We are not
2   going to be asking the jury to award a specific amount for
3   past or future wage loss.
4           The affect on his work life goes to the general
5   damages and that's why it's been discussed so far but that's
6   the only reason.  But, no, I have no problem if she wants to
7   point out the fact that he had a wage loss claim and decided
8   nope I don't need that anymore.
9           MS. TEMPLE:  I mean, I'm not even going to go that
10  far to be honest, Your Honor.  I just want to cross on the
11  insistent sees that go to the general damages so I think we're
12  on the same page.
13          THE COURT:  It sounds like it.  My only warning would
14  be to the extent that you intend to -- I mean, I don't think
15  that requires too many questions.
16          MS. TEMPLE:  Right.
17          THE COURT:  They've withdrawn it.  So the -- you
18  know, that's fine, the change of that can be pointed out.  But
19  it can't be repeatedly pointed out.  So I will definitely
20  limit the number of questions you can ask about that if you
21  start to ask too many.
22          MS. TEMPLE:  Okay.  Thank you, Your Honor.
23          THE COURT:  All right.  It sounds like we're sort of
24  on the same page then.
25          MS. XIDIS:  Yes.  With respect to the -- the
```

1    questioning regarding what's been produced, what hasn't, I

2    think that there's -- there's a fine line which is what I was

3    getting at on Monday -- between pointing out whether

4    information was responded to in deposition or written

5    discovery and suggesting that like the questions why didn't

6    you ever tell Acuity or why wasn't Acuity informed of that.

7    And so I think that if -- I have no problem if there was an

8    interrogatory that they feel wasn't responded to properly that

9    they can cross Mr. Humes on that but they need to do it in

10   terms of --

11          **THE COURT:**  And it goes to the breach of contract

12   claim.

13          **MS. XIDIS:**  Yes.  Yes.  Thank you.

14          But I think it does need to be in terms of now we

15   asked you in this interrogatory and you responded this isn't

16   it true that whatever, they can go on from there, but I don't

17   think the questions about why didn't you tell Acuity or when

18   Acuity asked you for this before -- phrasing in that form I

19   think edges too close into the bad faith claim.

20          **MS. TEMPLE:**  I agree.  It's a fine line because

21   Acuity's the defendant and we're the ones that are collecting

22   this information through discovery.  So when I'm referencing

23   Acuity as the defendant, you never told the defendant this and

24   I can -- I can do my best to use the word defendant and say,

25   you know -- and I'm only going to point out interrogatories,

1  request for production, you know, the things that we use in

2  litigation to obtain this information during the course of

3  discovery.  I have no intention of talking about anything that

4  happened before litigation commenced period.  So I will make

5  sure to keep my phrasing to the things that occurred post

6  litigation.

7       **THE COURT:**  The problem with some of those questions

8  is that they also have that ten den see to cast aspersions on

9  counsel.  Counsel's not going to get up there and testify.

10  Counsel's not going to become a witness.  Counsel's not on the

11  witness list.  So you're going to have to -- it's going to be

12  have to be very targeted at this plaintiff, and what

13  information he provided with respect to these damages or

14  issues.  So it needs to be very much and did you give that

15  information over to Acuity, kind of thing.  Because -- and at

16  some point that -- that too becomes to the extent that it

17  bleeds into your lawyer wasn't being forthright with us, that

18  starts to become a problem here.

19       **MS. TEMPLE:**  Right.  And that will not be -- frankly,

20  you know, I don't want to -- I don't want to make a statement

21  like this at this point in the trial unequivocally that I

22  won't do it but I think the only time I'm really going to

23  introduce that is with respect to the wage loss as far as what

24  wasn't produced to substantiate some of the stuff that's been

25  testified to I don't want to go too far into it but I can't

1    see it being an issue for a lot of the other things.

2         **THE COURT:**  And with the wage loss claim being

3    withdrawn, again, that is going to be a narrow inquiry that is

4    even necessary -- I'm sorry that is relevant.  Because it's

5    not probative of much, and I think that would be the issue for

6    me.  It becomes how is that probative of anything that this

7    jury is going to have to decide if the wage loss claim has

8    been withdrawn except to the extent that you're right, Charles

9    Humes testified that his father's life at work has been

10   significantly impacted.  So you're going to need to hew

11   towards that instead of dollars impassed on the company and so

12   because I think we kind of stopped some of that when that was

13   happening.

14        So to -- I think a single question or so on the

15   comment of that makes some sense but then beyond that it

16   really is the general damages life at work situation and not

17   dollars in wage loss.

18        **MS. TEMPLE:**  Right.  And I will not talk dollars in

19   wage loss.

20        **THE COURT:**  But I think --

21        **MS. TEMPLE:**  I probably would have objected to him

22   testifying at all if I knew that the wage loss claim had been

23   withdrawn.  I don't think it's relevant whatsoever.  Anyway

24   we're past that point.

25        **THE COURT:**  Got it.

1      **MS. TEMPLE:**  So I appreciate you allowing me to

2  clarify, Your Honor.

3      **THE COURT:**  Thank you.

4      And I would entertain a -- potentially entertain a

5  very narrow limiting instruction on that type of testimony,

6  but, again, it's going to -- but has -- depending on how much

7  you go into it.  If you start going into it, then that kind of

8  negate these need for a limiting instruction.  But I would --

9  I would consider a limiting instruction about what the jury

10  can consider that testimony for.

11      **MS. TEMPLE:**  Okay.  Thank you, Your Honor.

12      **THE COURT:**  Anything else before we bring the jury

13  back in?

14      **MR. WILSON:**  Yes, Your Honor.  There was some

15  discussion about future damages I believe before we got

16  started on Monday.  And the lack of an economist that the

17  plaintiff has disclosed in this case.  It's our position and

18  the position of the Restatement Second of Torts § 913 A (b)

19  that future damages when they don't account for inflation

20  don't need to be reduced for present value which is the case

21  here.  Our future of damages did not account for inflation so

22  they do not need to be reduced.  And even if they did need to

23  be reduced that's something that can be addressed in

24  post-trial motions because the jury doesn't need the -- the

25  inflation amounts or the futures reduced to consider them in

2:17-cv-01778-JAD-DJA - May 26, 2021

1    this case.  So that's our position before we even get into it

2    with Dr. Leon who is, you know, our medical expert who's going

3    to talk about the future care, that we handle that before we

4    get up there.

5            **THE COURT:**  So who do we have on this morning?

6            **MR. WILSON:**  Dr. Leon is first, Your Honor.

7            **THE COURT:**  Then who?

8            **MR. WILSON:**  Dr. Anderson.

9            **THE COURT:**  Okay.  Response?

10           **MR. ROGERS:**  Yes.

11           I'll respond to this one.  So yesterday -- or pardon

12   me, Monday we had a discussion about the problems with this

13   futures claim.  One is that they didn't provide a proper

14   computation for the number that they announced before the jury

15   was brought in on Monday.  If I remember right, it was about

16   $560,000.  And they said that it's okay just to put the

17   defense to doing the math, and that's -- we -- this hasn't

18   been briefed --

19           **THE COURT:**  No, but it hasn't been briefed by your

20   side either.  So we've got a witness who's about to come in

21   here.  I don't have a motion in limine on future damages.  So

22   where does that leave us right now.

23           **MR. ROGERS:**  Yeah.  Maybe what we could do is voir

24   dire the witness on this?

25           **THE COURT:**  To what?

1      **MR. ROGERS:**  On the futures claim.  Because there are

2   a couple hitches about this.  The medical history is that the

3   plaintiff lives in South Dakota.  He came out here for one

4   injection with Dr. Leon, which was something called a medial

5   branch block.  And the futures claim is an entirely different

6   injection called rhizotomies Dr. Leon hasn't performed a

7   single rhizotomy.  The plaintiff hasn't come to Las Vegas for

8   a single rhizotomy.  The cost difference between a rhizotomy

9   in South Dakota, where the plaintiff is getting all of them,

10  is enormous.  It's a difference of a factor of seven.

11  Dr. Leon charges roughly $21,000 for them.  Dr. Anderson,

12  who's been doing them, charges roughly 2- to $3,000.  And to

13  allow Dr. Leon, without this computation that quantifies the

14  futures that they're going to be claiming to come in and say

15  that this fiction of the plaintiff ever traveling to Vegas for

16  one of these procedures at a charge of 700 percent more than

17  what he's ever incurred is something that I want to explore

18  outside the presence of the jury.  I don't think that's

19  admissible.  Because it's never been an actually incurred

20  cost.

21      **MR. WILSON:**  First, I believe that that would be

22  something that should be presented in cross-examination and

23  it's not appropriate for what we're doing right now.

24      Second, I would submit to the Court that there are

25  some issues with respect to the billing that have been

1    discovered through our analysis of the bills and Dr. Leon is

2    prepared to testify on that to discuss the differences in the

3    bills.  And I think that just bolsters my point that this is

4    something that could be addressed in cross-examination, I

5    mean, if opposing counsel feels so confident that it's

6    700 percent different it would seem to me that that would be

7    something that would be very destructive to his testimony.  So

8    why would we want to --

9        **MR. ROGERS:**  Because it's a -- it's a number with

10   foundational issues.  If we're addressing a foundational

11   problem we don't flush that out in front of the fact finder.

12       And if Dr. Leon has new opinions that haven't been

13   reported and it sounds like the suggestion is that he does, I

14   would move to exclude any of that.  I don't know what they

15   intend to add.

16       **MR. WILSON:**  It's not a matter of a new opinion,

17   Your Honor.  It's a matter of the expert looked at the bills

18   and he can explain the billing from the various locations.

19   He's an expert and unless you're suggesting he's not qualified

20   to offer testimony with respect to medical billing in the area

21   of pain management.

22       **MR. ROGERS:**  In the area of South Dakota.  To be an

23   expert, Your Honor, on the reasonableness of charges, that's

24   regional.  Medicine is national.  But charges are regional.

25   And that, I suppose, is what Dr. Leon's excuse will be for the

1    cost difference between his office and Dr. Anderson's.

2          But if he doesn't establish the foundation needed to

3    have an informed opinion about the reasonableness of charges

4    in a state he's never practiced in, his opinion on that issue

5    is inadmissible.

6          **THE COURT:**  Okay.

7          **MR. WILSON:**  Briefly?  It's actually not a new

8    opinion, Your Honor.  It's -- he was provided all the billing

9    in this case and he would just be defending his prior

10   opinions.  Additionally, if there's an issue of Dr. Leon not

11   being qualified to discuss the bills in South Dakota, then

12   that would apply equally to Dr. Schifini.  And don't believe

13   that -- that is how the situation should be handle in this

14   case, Your Honor.

15         **THE COURT:**  Okay.

16         **MR. ROGERS:**  Yes.

17         **THE COURT:**  I have not received a motion in limine on

18   this issue.  This is something that if there were

19   documentation problems, if there were foundational problems,

20   this should have all been raise before trial.  Here we are

21   with Dr. Leon about to walk in here at 9:08 on Wednesday

22   morning, day 2 of trial, and what I'm hearing right now is

23   some fabulous cross-examination questions.  And this -- I

24   don't see this as a foundational problem.  I see this as

25   impeachment of his opinions, and this goes directly to the --

1    his credibility.  So those -- this is going to be something

2    that needs to be explored through vigorous cross-examination,

3    not by deeming him excluded for one of the purposes that has

4    now been raised.  They -- this is a witness who has been

5    deposed; correct?

6            **MR. ROGERS:**  Correct.

7            **THE COURT:**  And his opinions are out there.  And so

8    at this point he's going to be able to testify.  You're going

9    to have to qualify him for whatever he's qualified in as one

10   does when presenting an expert so that has to happen.

11           **MR. WILSON:**  Yes, Your Honor.

12           **THE COURT:**  You need to establish that.  But I -- my

13   understanding is that the qualification dispute at this point

14   may be whether he's qualified to testify to the reasonableness

15   of bills in South Dakota, which he may not be, but mister --

16   but Dr. Schifini may not be too if he doesn't practice there

17   either.  So I don't know what you all want to do about that,

18   but it sounds like a lot to get into on cross-examination.  It

19   is, in fact, exactly what the fact finder has to decide.  This

20   is not an issue for me at this point.  This is credibility.

21   It is tested through vigorous cross-examination, and that

22   is -- that's going to be an issue for the jury.

23           So obviously under *Daubert* and *Kumho Tires* and those

24   standards, the witnesses -- experts who are put up as expert

25   witness -- witnesses who are put up as experts need to be

1  qualified in whatever the area is that they're intended to be

2  qualified in. And I -- I know I addressed some expert issues

3  in the last few days by written order, but those were

4  disclosure issues. Those were not qualification issues.

5       So I expect that both sides, when they put their

6  experts up -- I mean, these people are doctors. So I don't

7  expect there will be significant dispute, but whether they are

8  familiar with the bill -- billing systems in -- or

9  reasonableness of bills in other states is going to have to be

10 established or it won't be established. I mean, that's really

11 where both of these sides come down.

12      But with respect to whether the -- the plaintiff is

13 somebody whose going to fly to Vegas to treat, well, that's

14 also something that you had all get to explore, the

15 reasonableness of that and whether the jury is going to

16 believe that that is reasonable and how this should be going

17 when you have a car accident in Las Vegas when you live in

18 South Dakota. Those are issues that they're going to have to

19 figure out of whether they're reasonableness whether that

20 treatment -- whether the cost of that treatment makes sense or

21 whether he should be treating someplace elsewhere it costs a

22 lot less. So probably a strategy question in a lot of ways

23 whether or not you want to bring out, you know, how much of

24 this -- or conflict between the charges in different states is

25 relevant and can be testified to.

1          So I trust that you-all will do what you need to do

2     with respect to foundational issues and qualifying this --

3     this expert.  Hang on one second.  And then also the scope of

4     cross-examination.  So anything else before we bring the jury

5     back in.

6          **MR. WILSON:**  You had asked about demonstratives on

7     Monday I believe and we --

8          **MR. ROGERS:**  Before we move on to that if I could,

9     Your Honor, just ask for leave to submit an objection now

10    because I don't want to be disruptive of plaintiff counsel's

11    questioning, but we will have a running objection if you'll

12    permit it, under *Daubert* for foundational reasons for

13    Dr. Leon's opinions regarding the charges in South Dakota in

14    other states --

15         **THE COURT:**  I'm not giving you -- I'm not going to

16    give you a running objection yet because I haven't heard him

17    establish that foundation or not yet.  So.

18         **MR. ROGERS:**  Okay.

19         **THE COURT:**  So we'll see what happens and then you

20    raise the objection.  And if it gets to the point where I say

21    I'm going to allow it, then I will let you have a standing

22    objection so that you don't have to keep objecting.  But we're

23    not there yet.

24         **MR. ROGERS:**  Understood.  Okay.

25         **MR. WILSON:**  You guys want to take a look at this?

1      **MR. ROGERS:**  Yes, sure.  I've seen one of those.

2      **MR. WILSON:**  Just wanted to clarify.  That was

3  another thing I didn't want to have happen.

4      **THE COURT:**  Excellent.

5      **MR. ROGERS:**  Will there be any other demonstratives?

6      **MR. WILSON:**  There's going to be some -- there'll be

7  some needles that the doctor will have to kind of indicate

8  this is where I put this, this is where I put that.

9      **MR. ROGERS:**  I object to the needles.

10      **MR. WILSON:**  I can get them for you to look at if

11  you'd like.

12      **THE COURT:**  Yeah, is it Dr. Leon who's going to be

13  doing this.

14      **MR. WILSON:**  Yes, ma'am.

15      **THE COURT:**  Okay.  Is he in the hallway?

16      **MR. WILSON:**  I will find out.  Apparently he is.

17      **THE COURT:**  Yeah, yeah.  Go get him and you guys can

18  talk about that do we know if all the jury is here.

19      **COURTROOM ADMINISTRATOR:**  I'm going to go check,

20  Your Honor.

21      **THE COURT:**  Don't bring them in yet, just check.

22  Thank you, Ms. Danielle.

23      *(Pause in proceedings.)*

24      **MR. WILSON:**  He doesn't have them.

25      **THE COURT:**  So a pen will be the answer, won't it?

```
 1              MR. WILSON:  Do you have an issue with that?
 2              MR. ROGERS:  No.  And, Your Honor, sorry, I keep
 3     peeling my mask off.  My nose is -- my allergies have just
 4     kicked in.
 5              THE COURT:  Oh, goodness.
 6              MR. ROGERS:  I'm -- so I'm double vaccinated so we're
 7     clear on that.  I'm just allergic.
 8              THE COURT:  We're almost to the end I think of -- of
 9     the mandatory masks but we are in this courthouse it's still
10     going on so.
11              MR. WILSON:  I believe with that we're -- we're
12     ready, Your Honor.
13              THE COURT:  All right.  So yeah I've typically seen
14     doctors use a pen to point sort of in the areas and I'm
15     guessing that because the marshals don't let people in here
16     with needles.
17              MR. WILSON:  I would assume as much, Your Honor.  I
18     think they're pretty long.  I think that's the issue.  They're
19     small but they're fairly long.
20              THE COURT:  Yeah.  Got it.
21              MR. WILSON:  Other than that --
22              THE COURT:  So the marshals have solved that issue.
23              MR. ROGERS:  Okay.
24              THE COURT:  All right.  Then we'll just pause here
25     for a bit while we find out if we have the jury.
```

```
1        (Pause in proceedings.)
2            COURTROOM ADMINISTRATOR:  All rise.
3        (Jury in at 9:21 a.m.)
4            THE COURT:  Good morning.  And welcome back.  Will
5    the parties stipulate to the presence of the jury?
6            MR. WILSON:  Yes.
7            MS. TEMPLE:  Yes, Your Honor.
8            THE COURT:  All right.  Thank you.  Let's call the
9    next witness.  Have a seat, everyone.  We have some witnesses
10   actually in person today.
11           MR. WILSON:  Plaintiff calls Dr. Raimundo Leon.
12           THE COURT:  Good morning, sir.  You're going to head
13   right over here to Danielle.
14           COURTROOM ADMINISTRATOR:  Please watch your step, and
15   then there's two more steps over here.
16           THE WITNESS:  Great.  Thank you.
17           COURTROOM ADMINISTRATOR:  Please raise your right
18   hand.
19       (The witness is sworn.)
20           THE WITNESS:  I do.
21           COURTROOM ADMINISTRATOR:  Thank you.  Please have a
22   seat.
23           THE WITNESS:  Thank you.
24           COURTROOM ADMINISTRATOR:  And will you please state
25   and spell your name for the record.
```

Raimundo Leon, M.D. - Direct

1          **THE WITNESS:**  Yes.  First name is Raimundo,

2    R-a-i-m-u-n-d-o.  Last name is Leon, L-e-o-n.

3          **THE COURT:**  You can inquire.

4                    **DIRECT EXAMINATION**

5    BY MR. WILSON:

6    Q.    Good morning, Dr. Leon.

7    **A.**    Good morning.

8    Q.    Can you please introduce yourself to the jury.

9    **A.**    Yes.  Hi.  My name is Raimundo Leon.  I'm an

10   interventional pain specialist residing and practicing here in

11   Las Vegas.

12   Q.    And Dr. Leon, you've been retained in this case as an

13   expert witness in the area of interventional pain management.

14   Is that your understanding?

15   **A.**    That's my understanding, yes.

16   Q.    Can you tell us a little bit more about your area of

17   specialty.

18   **A.**    Yes.  As an anesthesiologist that specializes in pain

19   management, I deal with all sorts of injuries, more

20   specifically to the neck and back area.  So things like

21   traumatic events, changes after, like, sports injuries, for

22   example, and then also dealing with joint dysfunctions.  For

23   example, shoulder joints, hip joints, knee joints.  So

24   anything basically in the body that can produce pain we can

25   address.

Raimundo Leon, M.D. - Direct

```
1    Q.    And is that limited to instances of traumatic injury?
2    A.    No.  No.  I mean, it's -- you know, patients sometimes --
3    well, I guess when you say traumatic injuries, for example, we
4    picked up a box and had some muscle injuries, for example, or
5    sometimes natural occurring processes, certain disease
6    processes, for example, can produce pain as well, and those
7    things are addressed as well.
8    Q.    So it's fair to say that your -- your expertise enables
9    you to opine and discuss pain from a broad spectrum of
10   originators?
11   A.    I believe I do, yes.
12   Q.    Okay.  And what made you want to go into that specialty?
13   A.    Well, I -- I was really fascinating by anesthesia when I
14   was in medical school.  And once I entered my anesthesia
15   residency during my senior year as a chief resident, I really
16   enjoyed the -- what we called had was the pain clinic, and I
17   was really fascinated with the ability to take somebody who's
18   in severe discomfort or severe pain and bring them -- and be
19   able to return their quality of life.  And that's how --
20   that's how I transitioned into -- after spending six months of
21   my senior year, for example, just doing pain management, I
22   then decided to go on and get further training in -- in that
23   specialty.
24   Q.    And is that a new area of medicine for a person to
25   specialize in?
```

Raimundo Leon, M.D. - Direct

1    **A.**   I think when you compare us to other specialties, like

2    family practice, for example, or general medicine or surgery,

3    yes.  I think the specialty is probably less than 100 years

4    old compared to other specialties that we may be aware of.

5    Like surgery, that's been around for hundreds of years, for

6    example.  Medicine itself has been around for a long, long

7    time.  But the actual specialty of dealing with pain is fairly

8    new compared to our other specialties that exist in medicine.

9    Q.   Okay.  And you'll have to forgive me for some of my

10   question because I'm, you know, relatively new to discussing

11   this sort of thing.  But is the -- is kind of the genesis of

12   your specialty got something to do with the advances in

13   medicine in the last 100 years, to use the time frame that you

14   suggested?

15   **A.**   Sure.  But more specifically probably in the last 50

16   years.  I mean, to be -- you know, as we know, technology does

17   advance.  And probably over even closer than that, the last 30

18   years, some of the techniques and some of the technology

19   instruments that we use, some of the medications that we use,

20   for example, all these different things have been fairly new

21   from a time frame perspective when you compare us to, for

22   example, surgery, when somebody takes the appendix out, for

23   example.  So the techniques -- so when you compare our

24   specialty to other specialties as far as time frame and

25   development, for us probably over the last 30 years we've had

Raimundo Leon, M.D. - Direct

1    the most significant leaps and bounds of processes that allow
2    us to take care of patients in pain.
3    Q.   Okay.  And in the process that you're utilizing to take
4    care of patients in pain, what are some of the interesting
5    things that you get to deal with in that specialty?
6    A.   Well, you know, the one thing is that medicine is
7    fascinating.  So I think every patient that walks in the door
8    to seek help has a different story, has a different process.
9    So just that aspect of it, of trying to isolate that symptom,
10   isolate that -- that pain source, and try to help them, I
11   think that's the most fascinating.  That happens every day in
12   my office.
13   Q.   Okay.  And I want to kind of change gears a little bit
14   because we've sort of talked about your specialty some.  I
15   want to kind of get the background of -- of your educational
16   foundation.
17        So can you tell us where you went to college.
18   A.   I went to school locally.  I went to UN -- I graduated
19   here from University of Nevada, Las Vegas, or UNLV.
20   Q.   Okay.  And then medical school?
21   A.   Medical school, I went to Ross University.
22   Q.   Where is that located?
23   A.   Ross University is a Caribbean medical school.
24   Q.   Okay.
25   A.   And then I spent my third and fourth year through that

Raimundo Leon, M.D. - Direct

1    organization at the University of Colorado School of Medicine.

2    Q.    All right.  And is that post-doc training?

3    **A.**    No.  That's during training.

4    Q.    Okay.  Did you do any post-doc training?

5    **A.**    I did.

6    Q.    And where was that at?

7    **A.**    I did my what's known as internship and residency, which

8    is when you pick your specialty, at the University of New

9    Mexico in Albuquerque.

10   Q.    Okay.  And you mentioned earlier, I believe, about your

11   specialty, some -- some advanced training in that.  Do you

12   have anything beyond your post-doc in your specialty?

13   **A.**    Yes.

14   Q.    And what is that?

15   **A.**    Well, once -- once you complete a specialty -- in my --

16   in my case, I completed anesthesia.  And as I mentioned, I was

17   fascinated about the -- the process of pain and pain

18   management that I -- I proceeded to what's called a

19   fellowship.  And a fellowship is specialized training in that

20   area for a year after you complete it or two depending on your

21   primary specialty.  For example, a general surgeon may be --

22   may do a fellowship or extra training in plastic surgery.  An

23   internist may do fellowship training in cardiology, for

24   example.  So there's a number of, you know -- a fellowship, in

25   quotations, is extra training beyond the completion of a

1    specific specialty.

2    Q.   Okay.  And that sort of training, that's your fellowship.

3    So you sort of anticipated one of the next things I was going

4    to ask.  I was going to ask if there are different

5    fellowships.  But within your fellowship, when you get

6    trained, is the training that you receive, is that -- is that

7    medicine as applicable in one place as it is in another?

8    A.   Absolutely.  I mean, and that's -- well, similar to the

9    residency programs, you know, there's certain processes in

10   order for the completion of that fellowship.  So there's --

11   there's things that fall within that umbrella that, regardless

12   of the state or the city that you do a fellowship, for

13   example -- because there's different programs.  It's not just

14   one single program.  From a pain perspective, at last count,

15   there's about 23 pain fellowships.  Within anesthesia, there

16   are also other fellowships that one can do.  For example, if

17   you want to specialize in doing cardiac anesthesia and that's

18   all you want to do, there's a fellowship for that.  Obstetrics

19   and gynecology anesthesia, so if you wanted to assist in those

20   types of surgeries, there are fellowships for that.  And then,

21   of course, if you want to specialize in pediatrics, for

22   example, there's extra training where you can focus, and

23   that's all the concentration during that window of time that

24   exists.

25   Q.   Okay.  So even within fellowships there's further

Raimundo Leon, M.D. - Direct

1   specialty?

2   **A.**   There can be, correct.

3   Q.   Okay.  And what fellowship would apply to the situation

4   that my client, Donald Humes, is facing?

5   **A.**   That would be the pain management fellowship.

6   Q.   Okay.  And that's the one that you attended; correct?

7   **A.**   Correct.

8   Q.   Why is fellowship training in -- in your area of

9   specialty important?

10  **A.**   Well, I think there's several reasons.  Number 1 is the

11  ability to focus within that year to a specific area, right,

12  or a specific discipline, if we say.  Allows for complete

13  focus within that area.  Allows for development of studies.

14  Allows for access to have a better understanding as opposed to

15  a general understanding.  So it's much more specific in that

16  area.  And during that year we are focusing on

17  procedural-based processes for the identification of pain.

18        We are -- we are trained in reference to the

19  management of medications.  As we know, you know, medications

20  are like going to the store to buy bread.  There's 30

21  different kinds of breads, for example.  They're all breads,

22  but they look different, they taste different.  Well,

23  medications are similar where there's a number of different

24  medications that can be used for the management of pain but to

25  have a better understanding of why one pain medication may be

Raimundo Leon, M.D. - Direct

1    better served for the patient than the other.  Similar to the

2    procedures, why one procedure may be -- may be better for

3    identification of the problem or the resolution of the

4    problem, and that all occurs during that window of time.

5    Q.   Okay.  And utilizing your -- your specialty, right, and

6    your fellowship training, in this case, since you're an

7    expert, do you use that -- that knowledge that you -- you

8    bring from your education background into your analysis of the

9    medical bills, medical records, and the treatment that a

10   person might receive?

11   **A.**   Yes.

12   Q.   Okay.  And in doing that in this case, did you look at

13   all the medical bills and records that were incurred by my

14   client?

15   **A.**   I did.

16   Q.   All right.  And when you were looking at those, did you

17   happen to review any of the other treating doctors that were

18   responsible for the treatment in various locations?

19   **A.**   I did.

20   Q.   And were any of them also fellowship trained?

21   **A.**   Yes.

22   Q.   Who?

23   **A.**   Dr. Anderson, a pain management physician out of

24   South Dakota, he was also fellowship trained.

25   Q.   And did he provide any treatment to my -- my client,

Raimundo Leon, M.D. - Direct

1    Donald?

2    **A.**    He provided most of the treatment to your -- to

3    Mr. Humes.

4    Q.    Okay.  And are any of the -- the doctors that are

5    involved in this case not fellowship trained?

6    **A.**    Yes.

7    Q.    And who is that?

8    **A.**    Defense expert Dr. Schifini.

9    Q.    Okay.  After you complete your fellowship training, is

10   there any sort of specialized certification process that you

11   go through to kind of utilize that fellowship training?

12   **A.**    Sure.  Fellowship training allows you then to receive a

13   special certificate that then allows you to sit for specific

14   boards in reference to the management of pain.

15   Q.    Okay.  And when you say boards, what do you mean?

16   **A.**    Well, board certification is a process.  I mentioned

17   earlier that there are different programs throughout the

18   nation.  So a process of board certification is to basically

19   set a certain standard of the educational process regardless

20   of where you may have trained.  For example, if you trained in

21   California as opposed to training in Florida or if you trained

22   in New York, for example, because of the exposure and the

23   experience that one may experience in different locales, one

24   way to identify that a physician has met a certain standard is

25   a process of certification.  That includes examination both

Raimundo Leon, M.D. - Direct

1    written and oral on there.

2          So when you have certain training, it allows you to

3    sit for those -- those types of certifications to allow you to

4    say that -- or to show that you've met a certain qualification

5    not only for the patients but the administration of the

6    hospital, surgery centers, et cetera.

7    Q.   So in order to sit for these boards, do you have to

8    participate in a -- the one-year-long fellowship?

9    A.   Well, for the -- for the pain management, yes.

10   Q.   Okay.  And you are board certified; correct?

11   A.   Yes.

12   Q.   And does that board have a name?

13   A.   Well, the American -- I'm boarded by the -- what's known

14   as the American Board of Anesthesiology, which is my primary

15   certification.  And then, because of the fellowship training,

16   there's the extra certificate, a certification that comes with

17   that.

18   Q.   Okay.  And that deals with pain management?

19   A.   Correct.

20   Q.   So you mentioned that there were -- there were tests.  Is

21   there anything else that's required to be board certified?

22   A.   Well, for each board -- yes, there's -- besides the test

23   is the -- the exposure and treatment of patients throughout

24   your training process.  So the number of cases that you would

25   have had to have evaluated, the number of cases you would have

Raimundo Leon, M.D. - Direct

1    had to have done, those kind of things, all lead to the

2    ability for you to sit for the particular certification of

3    that specialty.

4    Q.   Okay.  So it's not just educational training.  It's also

5    practical training as well?

6    **A.**   Correct.  Right.  Exposure to the processes of different

7    aspects of medicine within that specialty.

8    Q.   Okay.  And is that sort of practical, hands-on training

9    that results in board certification important in your

10   specialty?

11   **A.**   Well, I think it's extremely important, again, because it

12   allows for your patients, it allows for other colleagues, it

13   allows for institutions to say that you've met a certain

14   standard.

15   Q.   So in line with that board certification, does that allow

16   you to deal with medical issues that come from -- from a

17   localized region or -- or is that a national standard?

18   **A.**   Well, I think in reference to the certification process,

19   I think you're -- you know, it's the exposure for the

20   treatment of the patients; right?  The actual certificate just

21   denotes the process that you've completed, and whoever is

22   observing that recognizes that that process occurred.  Not

23   being board certified does not prevent you from practicing

24   medicine, but it does set -- it does give the ability to set

25   physicians apart.

Raimundo Leon, M.D. - Direct

1    Q.    Okay.  And would that same ability to set physicians

2    apart apply equally to different states in the area of pain

3    management?

4    A.    It may.

5    Q.    Okay.  Is there a difference between being board

6    certified and being board eligible?

7    A.    Board eligible is that process that -- is that you've met

8    the requirement to do it.  So -- so that's the definition of

9    board eligible.  And that holds true for every specialty.  It

10   means you've met a criteria that meets the eligibility.  And

11   then once the extra steps of examinations, et cetera, then

12   that's how one becomes board certified.  But the eligibility

13   is basically, as the terms means, that you're allowed to --

14   you're eligible -- you have met the requirements of that set

15   board -- I mean, they're all the same in reference -- in

16   reference to this medical -- board of medical specialties to

17   sit for that particular board.

18   Q.    Okay.  And so aside from, you know, your fellowship

19   training and your board certification, you have to have an

20   actual license to practice medicine as well; correct?

21   A.    That's correct.

22   Q.    And what states are you licensed in?

23   A.    I'm currently licensed in the state of Nevada, the state

24   of New Mexico, the state of Arizona, the state of Utah, the

25   state of Florida, and most recently in the last six months the

Raimundo Leon, M.D. - Direct

1    state of Colorado.

2    Q.    Okay.  But you currently primarily practice in the

3    Las Vegas area; is that correct?

4    **A.**    That's correct.

5    Q.    Can you tell us about your medical practice?

6    **A.**    Yes.  My medical practice is really focused on, as I

7    mentioned a little bit ago, in reference to pain ailments,

8    specifically of the spine.  And when we talk about the spine,

9    there's generally three components.  That would be the neck,

10   mid, and low back.  That's the majority of my focus in dealing

11   in my general practice with patients that may have an ailment

12   from that particular area.

13         A smaller percent of my practice is dealing with

14   other types of extremity pains, such as shoulders, knees,

15   hips.  That's a small portion.

16         And then lastly, just the basic management.  We had

17   talked a little bit about that certain disease process can

18   produce pain, for example, and sometimes our internal medicine

19   colleagues or family practice colleagues don't feel

20   comfortable prescribing certain medications to deal with that

21   ailment.  So, therefore, from a medical perspective we will

22   see those patients and try to adjust or introduce different

23   types of medical management that our colleagues at the primary

24   care level are not -- are not comfortable with, for example.

25   Q.    And how long have you been practicing here?

Raimundo Leon, M.D. - Direct

1    **A.**    I started in Las Vegas in July of 2002.

2    Q.    And did you practice anywhere before that?

3    **A.**    Yes.  During my fellowship training, as well as my

4    residency training, I worked in Albuquerque.  For a window of

5    time I worked as a general physician at an urgent care center.

6    Once I graduated from anesthesia and was in the middle of my

7    fellowship, I actually practiced as an anesthesiologist at a

8    local hospital.  And lastly, one of the things I did during

9    that window of time, I was also part of what was known as the

10   New Mexico Athletic Commission, and what that does is deals

11   with athletes in professional settings.  So boxing, mixed

12   martial arts, those kind of things.  So I was a ringside

13   physician during that window of time as well.

14   Q.    Okay.  And throughout your -- your history of practice,

15   have you been providing expert services the way you are in

16   this case?

17   **A.**    Yes.

18   Q.    And how long have you been doing that?

19   **A.**    I'm sorry.  You're talking in reference to?

20   Q.    Like, just generally, how long have you been -- been

21   doing -- giving expert testimony, providing expert opinions

22   for people?  Sorry.

23   **A.**    Since early or late 2002, 2003.  So it's been a long

24   time.

25   Q.    Has that taken you to kind of a localized area, or do you

Raimundo Leon, M.D. - Direct

1    go all over the country?  How does that's work?

2    **A.**   I've -- it's mostly local.  Occasionally there are cases

3    where I've been involved with that are in different states,

4    such as Arizona, for example.  I've testified a number of

5    times there as well.  But the vast majority of the expert

6    testimony or expert evaluations, for example, are in Las Vegas

7    or from Nevada I should say.

8    Q.   Okay.  And when you're providing expert services, is one

9    of the things that you have to do an analysis of various

10   medical records and bills from other providers with respect to

11   their appropriateness, the level of care, and things of that

12   nature?

13   **A.**   That's correct.

14   Q.   And does providing that analysis when you provide expert

15   opinions, does that require you to look at, let's say, medical

16   records from different places and bills from different places?

17   **A.**   Correct.

18   Q.   What sorts of places?

19   **A.**   Well, again, it depends on where -- like I mentioned, the

20   vast majority is in Las Vegas.  But, you know, in -- well, in

21   cases where the patient may -- may have been treated here

22   initially and subsequently treated elsewhere, for example,

23   that's the most common process that I've been involved with,

24   where the patient would have sought, for whatever reason,

25   treatment elsewhere, they moved, et cetera, on there.

Raimundo Leon, M.D. - Direct

1           I've been involved in cases where I've just simply

2      been an expert, not seeing the patient, but yet treatment has

3      occurred in other locations.  Other states, for example.

4           So, yeah, it's just the nature of the practice and

5      pain management that it's not uncommon to see records or deal

6      with records and/or billing or handle prescriptions from a

7      different state.  That's not an uncommon process.  It does

8      occur, especially in Las Vegas that is somewhat transient;

9      right?  I mean, I've been here a long time and, you know,

10     we've grown a lot.  And not a lot of people are from Vegas;

11     right?  Most of -- most of -- most of our patients are

12     implants from somewhere else.  So it's not uncommon to see

13     records -- whether from an expert perspective or just from a

14     treating perspective, to see records from other communities

15     associated with that, other billings, et cetera.

16     Q.   And does your experience and training enable you to view

17     those records and provide analysis on them to a reasonable

18     degree of medical certainty?

19     **A.**   I believe it does.

20     Q.   And what about with respect to the billing?

21     **A.**   Similar.  I mean, as far as billing is concerned, you

22     know, I've taken it upon myself in my own practice to -- I've

23     attended a number of different billing conferences throughout

24     my career from a continuing medical education perspective.

25     The fact of being an expert, we have access to several

Raimundo Leon, M.D. - Direct

1     web-based processes, such as fairhealthconsumer.com, that

2     looks at global charges, for example, and at times talks about

3     reimbursement.  So there's a number of -- Optum Fee Analyzer,

4     for example, is another.  So those are -- those are tools that

5     are used when you're asked to be an expert to -- to analyze

6     the billing aspect in different communities on there to say --

7     and you can actually compare them to local communities as well

8     and say, well, this is -- this is reasonable within that --

9     within that community.

10           You know, unfortunately, there's -- it's proprietary

11    processes of how an institution decides on a particular bill,

12    for example.  We can't call up and say, you know, those are --

13    because everybody's processes on developing a charge, for

14    example, is going to vary among practitioners.  It's going to

15    vary among -- it's going to vary among institutions, et

16    cetera.  So there's a lot of different components that -- that

17    come into play in reference to determining whether a bill

18    is -- is reasonable.  And it's also -- there's a lot of

19    understanding the anatomy and understanding the processes that

20    may have done, whether or not that procedure that would have

21    been performed that generated that bill was reasonable and

22    necessary as it relates to that particular patient.

23           I think that process is -- is, you know, as -- as a

24    physician comes into -- is part of the process, and then more

25    so as an expert that's -- you hone in on those aspects because

Raimundo Leon, M.D. - Direct

1    those are the things that are asked of you.

2           **MR. WILSON:**  Okay.  At this time I move to have

3    Dr. Leon recognized as an expert in the area of interventional

4    pain management.

5           **MR. ROGERS:**  No objection on the medicine, but the

6    defense maintains the objection under *Daubert* on the charges

7    for other jurisdictions.

8           **THE COURT:**  All right.  With respect to the request

9    to have him qualified as a pain management medicine expert,

10   I'm -- I do find that the plaintiff has established that he is

11   qualified and that his testimony has a reliable basis in the

12   knowledge and experience of the pain management medicine

13   discipline.  We are definitely not there yet on whether he is

14   qualified to give an opinion as to South Dakota billing

15   practices reasonableness.

16          So my ruling and the qualification at this point only

17   relates to diagnosis and the practice of medicine aspect of

18   it, not the billing aspect of it for South Dakota.

19          **MR. WILSON:**  Yes, Your Honor.

20   **BY MR. WILSON:**

21   Q.   So can you tell us a little bit more about your area of

22   specialty, interventional pain management?  What type of

23   patients do you take care of on a day-to-day basis?

24   **A.**   The majority of my practice, again, deals with patients

25   that have ailments from the neck, mid, and low back.  That's

Raimundo Leon, M.D. - Direct

1  the vast majority.  And within those -- within that area

2  there's different structures within the neck, mid, and low

3  back that can -- that can produce pain.

4          Identifying the distribution of pain, for example,

5  from those areas, the characteristic of that pain are slightly

6  different in those areas.  There is some overlap, for example.

7  And understanding that pathway and being able to discern and

8  then assist and provide diagnostic information as well as

9  provide treatment for that patient, that's the vast majority

10  of my practice.

11  Q.   And something I actually forgot to ask you earlier.  I

12  probably should have when we were talking about your

13  education.  Why did you decide to get into medicine?

14  **A.**   I'm sorry, Counselor?

15  Q.   Oh.  I asked why did you decide to get into medicine?

16  **A.**   Oh.  I've been a -- I've been a biology junkie my entire

17  life, and when I was in college I was a biology major.  And at

18  the same time I worked in a local emergency room and was

19  fascinated with the ability to take this knowledge of the --

20  of biology, if you will, and chemistry and -- and see it in

21  motion.

22          So based on that, I followed -- I followed my dream

23  of being able to put those two together, of taking the basic

24  sciences that we hear about, the basic science that we know

25  about, and actually put them in a situation where you're

Raimundo Leon, M.D. - Direct

1   making decisions and assisting the patient at the end of the
2   day for a better quality of life.
3           THE COURT:  Hang on one second.
4           Doctor, if you're more comfortable taking your mask
5   off to testify, you certainly can do so.  You are surrounded
6   by --
7           THE WITNESS:  Okay.
8           THE COURT:  -- Plexiglas, and you are far distanced
9   from anyone in this courtroom.  So you're welcome to do so.
10          THE WITNESS:  Okay.  As long as -- it may be better
11  -- you can hear me better.  That's fine.
12          THE COURT:  Yes.  Thank you.
13          THE WITNESS:  Thank you.
14  BY MR. WILSON:
15  Q.  Part of your practice today deals with personal injury
16  cases; is that correct?
17  A.  That's correct.
18  Q.  Why is that?
19  A.  Well, I think the nature of the specialty of pain
20  management, it is not unusual to be involved at some level
21  with personal injury.  And personal injury being, you know, a
22  cause of injury by, you know, the fault of someone else, for
23  example.  So it's just I think the nature of the practice.
24          I think the majority of us in this community, at some
25  point if you do pain management and more specifically in a

Raimundo Leon, M.D. - Direct

1    interventional pain management, you're going to inquire or

2    you're going to be involved in a patient that would have been

3    involved in or is involved in a personal injury case.  So I

4    think it's the nature of the business or the nature of the

5    practice I should say.

6    Q.    When dealing with that at your practice, is it like any

7    other doctor's office -- I would imagine anyway -- where, you

8    know, someone comes to you and they say, hey, this is my

9    situation, I would like to receive treatment from you?

10   **A.**    Correct.  We -- we don't -- in our practice we don't

11   separate or give treatment in different ways, for example,

12   whether you came in from an injury at a soccer field versus

13   coming in with an injury from a motor vehicle accident.  It's

14   not our standard of practice to do that.  Our standard of

15   practice is to take care of patients.  So regardless of the

16   initial reasoning or whether, you know, the spectrum of why

17   somebody would see a pain management physician, we see them.

18   And we treat and, therefore, the flip side of that is

19   everybody's treated exactly the same.

20   Q.    Are there ever cases that -- that come to you that you

21   don't take?

22   **A.**    Occasionally there are.  And a good example of those

23   would be patients that unfortunately, with the narcotic and

24   opioid crisis that we're unfortunately experiencing, sometimes

25   those are the types of cases we don't take because either the

Raimundo Leon, M.D. - Direct

1    patient doesn't want to get helped or there are issues that --
2    that to establish a patient-doctor relationship would be
3    difficult.  So, yeah, there's at times cases we don't take.
4    Q.   So it's fair to say a person has to have some legitimacy
5    to an injury in order to get treatment?
6    **A.**   In my practice, that's correct.
7          **MR. ROGERS:**  Objection, Your Honor.  And if we should
8    approach, just say so.  There was a ruling about secondary
9    gain, and it sounds like we're getting close to vouching.
10          **MR. WILSON:**  That's not what I was doing, Your Honor.
11    I'm merely establishing that not every person who walks
12    through the door receives treatment at this clinic.
13          **THE COURT:**  I think we're not there yet, so thank
14    you.
15          **MR. ROGERS:**  Okay.
16          **THE COURT:**  Overruled.
17    **BY MR. WILSON:**
18    Q.   Why did you agree to be an expert in this case?
19    **A.**   Well, similarly that -- that I mentioned earlier, it's
20    part of the all-encompassing of being a pain management
21    physician.  First and foremost, I'm a patient advocate.  So
22    understanding that, the patients that are involved in personal
23    injury at some point may lead into a situation that we are
24    today.  That's part of the practice, and I understood that.
25    So I look at it as part of the practice.  You do things for

Raimundo Leon, M.D. - Direct

1    your patients to assist them in any way you can, and when you

2    deal in the personal injury arena or you treat patients in the

3    personal injury arena, there's going to arise situations where

4    you have to provide expert testimony at times just related to

5    the treatment and at times, like I'd been asked today, to

6    comment in reference to the totality of treatment by other

7    physicians.

8            So I -- it's -- I agreed because it's just part of

9    the all-encompassing part of my practice.

10   Q.   Okay.  And at some point -- to kind of shift focus into a

11   more applicable set of questioning, at some point you met my

12   client, Mr. Donald Humes; isn't that correct?

13   A.   I did, yes.

14   Q.   And how did you come to meet him?

15   A.   He presented to my office specifically on April 10th of

16   2013.

17   Q.   Okay.  So I noticed you looked at your -- at your records

18   there and referenced a date that's several years old.

19   A.   Correct.

20   Q.   How many people would you estimate you have treated since

21   that day?

22   A.   Wow.  On average, I -- I see 125 to 150 people a week.

23   Not a great mathematician, so I would say it's a significant

24   number.  I've seen thousands and thousands of patients after

25   Mr. Humes.

Raimundo Leon, M.D. - Direct

1    Q.   Okay.  And despite the fact that you're fellowship

2    trained and board certified, you're just like the rest of us.

3    When presented with that much information, it's probably

4    difficult to recall specifics from that so long -- that long

5    ago; is that correct?

6    A.   That's correct.  I mean, generalities, that's easy to do.

7    I think we can all do that.  But in this type of setting, a

8    lot of questions that are asked are very specific.  So, yeah,

9    refreshing my memory and looking at records to say, oh, yes,

10   that's -- that's -- I think that's reasonable.

11   Q.   Okay.  And so on that first meeting, what capacity did

12   you first see him in?

13   A.   My initial encounter with Mr. Humes was as a treating

14   physician.  A gentleman presented with certain complaints

15   after being involved in a motor vehicle accident.  That was my

16   initial process of dealing with Mr. Humes.  And that's --

17   that's how we treated him.  He came in, he provided

18   information to us, and we provided options in reference to

19   dealing with the ailments that he reported that had initiated

20   after a motor vehicle accident.

21   Q.   Okay.  Do you know how Donald ended up -- ended up under

22   your care?

23   A.   I -- I know that the referral listing in my -- and this

24   is something that's done by my administrative staff -- said

25   self-referral.  Since then we've gotten a lot better in

Raimundo Leon, M.D. - Direct

1    breaking down what that exactly means, but at the time that
2    Mr. Humes came -- and self-referral could include a number of
3    different things.  It could be himself finding us through
4    Yellow Pages, web, et cetera, being referred by a friend,
5    potentially being referred by an attorney.  We didn't
6    separate, you know, the exact referral source.
7         One of the usual -- one of the customary reasons for
8    identifying where the patient's coming from is to be able to
9    provide information; right?  If -- you know, it's always
10   important; that is, for example, a primary care physician or
11   some other medical professional, it would be nice to inform
12   them that we had the opportunity to see his or her client or
13   his or her patient.  If it's referred from a friend -- like I
14   said, back in the initial time we -- we did not break it down
15   to exactly where the source came in.
16        And the reason for that is because at the end of --
17   in my opinion, the -- the patient's there for a particular
18   reason.  The referral source, to me, is indifferent, and
19   that's because we treat everybody the same.  You asked a
20   question earlier in reference to, you know, personal injury
21   or -- or other traumatic events, and it's -- as a physician,
22   I'm indifferent about that process and taking care of that
23   patient.  My idea is to take care of that patient and provide
24   the best medical care I can, you know, regardless of what
25   source the patient comes from.

Raimundo Leon, M.D. - Direct

1    Q.   As a medical provider, do you have a special relationship

2    with --

3              **MR. ROGERS:**   Your Honor, I'm going to object as

4    nonresponsive.   The question was who referred the patient to

5    you.   And the doctor mentioned that his note of a

6    self-referral was incorrect, but then no answer was given.

7              **MR. WILSON:**   I believe I actually asked how he ended

8    up being treated by him.

9              **THE COURT:**   The question is:   Do you know how Donald

10   ended up under your care?

11             So I think it was sufficiently responsive.   You can

12   explore it on cross-ex.

13             Overruled.   You can continue.

14   **BY MR. WILSON:**

15   Q.   Do you have a special relationship with the law firm that

16   I work for?

17   **A.**   I do not.

18   Q.   Okay.   How long have you been treating patients that are

19   involved in car collisions here in the Las Vegas area?

20   **A.**   Essentially since I started practice.   By the end of my

21   initial year, which was July of 2002, to the best of my

22   recollection by the end of that year, possibly beginning of

23   2003, we were starting to receive -- as my practice grew, we

24   started to receive patients that would have been involved or

25   had been involved in a motor vehicle accident.

Raimundo Leon, M.D. - Direct

1    Q.   Okay.  And so when you're treating a patient that's

2    involved in a motor vehicle accident, are they always

3    represented by counsel?

4    A.   No.

5    Q.   Okay.  And if they are represented by counsel, do you

6    have any requirements to interact with their attorney?

7    A.   Not at all, no.

8    Q.   Your office, does it -- does your office generally

9    interact with the attorney's office?

10   A.   Generally, yes.  So if an attorney is involved, there may

11   be requests for records, for example, and things like that.

12   Yeah, that's usually done through the administrative office

13   employees, yes.  So there -- when there is an attorney

14   involved in a particular -- with a particular patient, it's

15   not unusual for the offices to communicate.

16   Q.   And did anything occur in this case that's outside the

17   norm of your practice?

18   A.   Not that I'm aware of, no.

19   Q.   So now I kind of want to get into your treatment of

20   Donald in this case.

21   A.   Okay.

22   Q.   When was the last time that you personally saw him?

23   A.   I saw him in 2019.

24   Q.   When was that?

25   A.   April -- let's see here.  Sorry, Counselor.  We're

Raimundo Leon, M.D. - Direct

1    computerized.  So my computer, I couldn't get it to --

2    password to go directly to the records.  But the last time I

3    saw Mr. Humes was April 23rd.  Actually, I want to say...

4           The records that you have here was April 23rd, 2014.

5    Q.   Okay.

6    A.   But I believe I saw him after that.

7    Q.   Okay.  Do you know when his initial collision occurred?

8    A.   Yes.  It's my understanding that the initial collision

9    occurred April 6th of 2013.

10   Q.   Okay.  So going off of that April 23rd, 2014, date, that

11   would have meant roughly a year of -- of actually being

12   involved in his care physically; is that correct?

13   A.   Initially.  That would be correct, yes.

14   Q.   In addition to providing treatment to Donald in this

15   case, were you provided records to review that occurred before

16   the collision that brings us here today?

17   A.   Yes.

18        MR. ROGERS:  Objection, Your Honor.  Could we

19   approach on this one?

20        THE COURT:  All right.  Sidebar.

21     (At sidebar on the record.)

22        MR. ROGERS:  There's been no disclosure of his review

23   of pre-accident records.

24        MR. WILSON:  All the records that were provided in

25   this case have been disclosed.  They were disclosed to our

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914          *Page 49*

Raimundo Leon, M.D. - Direct

1    experts.  And he actually has discussed in his reports the --
2    specifically, right, the treatment from Dr. Crisman that
3    occurred in 2011.
4              **MR. ROGERS:**  He didn't.
5              **MR. WILSON:**  I'm sorry?
6              **MR. ROGERS:**  He didn't.
7              **MR. WILSON:**  I'm 99 percent certain that he did.  I
8    think I have those reports at my desk.
9              **MR. ROGERS:**  I do and he didn't.
10             **THE COURT:**  All right.  Let's -- let me -- let me see
11   the report.
12             **MR. WILSON:**  All right.  Give me a second.
13             **MR. ROGERS:**  Yeah.  Wait here?
14             **THE COURT:**  We'll wait here.
15        *(Pause in proceedings.)*
16             **MR. WILSON:**  Apologies for the delay.
17             So in the August 9th -- or sorry, October 9th, 2018,
18   disclosure, the Alternative Health Care and billing records.
19   Although he doesn't reference the x-ray explicitly, he
20   generally says based on a review of these records --
21             **MR. ROGERS:**  Do we need to be quieter?
22             **THE COURT:**  We're fine.  We're fine.
23             **MR. WILSON:**  And based on our review of these
24   records, that's the one where he was -- the first one where he
25   was provided the x-ray from 2011 that was done from

Raimundo Leon, M.D. - Direct

1    Alternative Health Care during the chiropractic treatment, and

2    that was just the first one I found.  And that's why I came

3    back.

4           **MR. ROGERS:**  Yeah.  So there's no mention of 2011

5    care in it or the 2011 x-ray.  The trick here, Your Honor, is

6    that this is the chiropractic -- sorry, chiropractic clinic

7    where he treated after the accident, and --

8           **MR. WILSON:**  And before --

9           **MR. ROGERS:**  -- and we obtained the records from

10   before when we went out there to do the chiropractor's

11   deposition, which was much later in the case.  So if that's an

12   initial production, nobody even had the priors.

13          But more to the point, the reports from Leon never

14   once mention any of the pre-accident treatment, and that's the

15   basis of the objection.  Yes, it's the same provider, but no

16   discussion about the pre-accident records.

17          **MR. WILSON:**  In addition to being provided with that

18   record, he was also provided with all of the testimony in this

19   case, specifically Dr. Crisman, and everything that occurred

20   after that fact.  And in his reports he maintains that,

21   despite what he knew, what he was shown through the records

22   and testimony, his determination for causation in this case is

23   the same.  So he necessarily included that in that conclusion

24   and opinion.

25          **MR. ROGERS:**  Right.  My response is that to offer an

Raimundo Leon, M.D. - Direct

1   opinion you have to disclose it in your reports if you're a

2   specially retained expert.  Dr. Schifini won't be allowed to

3   talk about things he didn't report on.  And --

4          **THE COURT:**  Let me ask that question.  What's the

5   scope of his expert opinion in his report?  Because this is

6   true, both sides are going to be limited to what is disclosed

7   as opinions in their report.  What does he say in his -- does

8   he say anywhere in his report or does it reflect anywhere in

9   his report an opinion based on a review of prior meds?

10         **MR. WILSON:**  And right here is says based on a review

11  of these records, it appears a portion of the records are

12  previously noted -- and he continues to go.

13         Just there, before getting into the rest of his

14  conclusions, he reviewed the records, and one of the records

15  that we're talking about with this particular disclosure is

16  that 2011 x-ray.

17         **MR. ROGERS:**  Where does it mention that?  I don't see

18  that.

19         **MR. WILSON:**  Alternative Health Care -- I'm sorry, I

20  didn't know that this was the touchscreen kind -- medical

21  records.  Right there.

22         **MR. ROGERS:**  Right.  It doesn't say anything about

23  2011.  He never once said, I have seen the pre-accident

24  treatment, and this is my opinion about whether those

25  pre-accident conditions are a contributing factor.  He never

Raimundo Leon, M.D. - Direct

1   even talks about pre-accident.  It's -- I mean, you can see

2   right below he just gets into 2018.

3        **MR. WILSON:**  That's actually above where I was

4   talking about.  This is where I was talking about.  Based on a

5   review of these records is below the 2018 stuff.

6        **THE COURT:**  Can I see it?

7        **MR. WILSON:**  Yes, Your Honor.

8        **THE COURT:**  So Alternative Health Care billing and

9   medical records contain -- what is that -- what is that?

10       **MR. WILSON:**  That's the chiropractic clinic.

11       **MR. ROGERS:**  That's the place he treated before and

12  after that was discussed.

13       **THE COURT:**  So based on a -- so this is a October

14  7th, 2018, letter that says he's in receipt of Alternative

15  Health Care billing and medical records.  It doesn't state

16  what date it is, but it doesn't exclude any dates also.

17       All right.  And so your objection is that -- that

18  Alternative Health Care billing and medical records wouldn't

19  include the earlier stuff?

20       **MR. ROGERS:**  It didn't.  That's what I meant when I

21  said we didn't get those records until --

22       **THE COURT:**  After 2018?

23       **MR. ROGERS:**  Yeah, until -- I think it was -- I don't

24  remember the exact date of -- of the chiropractor's

25  deposition.

Raimundo Leon, M.D. - Direct

1          **MR. WILSON:**  I can tell you right now.  Hold on.

2          **THE COURT:**  Okay.

3          **MR. WILSON:**  And I'll submit that he's right on a

4   portion of that, that the big -- the actual notes from the

5   chiropractor from the 2011 care were not disclosed until

6   his -- his deposition, and it looks like here the deposition

7   would have been on -- sometime in 2019.  Oh.  Actually,

8   September 11th, 2018.  Apologies.  Which was also something

9   that he did review, our expert.

10          **THE COURT:**  So that chiropractor depo happened before

11  this letter, which is October 2018?

12          **MR. WILSON:**  Yeah, September -- which one was it?  I

13  got so much stuff pulled up here.  Now I'm going back to a

14  PDF.  I don't know which... this letter, October 7th, 2018,

15  that's correct.  And the deposition was September of 2018.

16          **THE COURT:**  September 11th?

17          **MR. WILSON:**  Yeah.

18          **THE COURT:**  So this letter is almost a month after

19  that chiropractor depo?

20          **MR. WILSON:**  Correct.

21          **THE COURT:**  So when -- when this letter says, I have

22  reviewed -- sorry, what was the name of it again?

23          **MR. WILSON:**  Alternative Health Care billing and

24  medical records.

25          **MR. ROGERS:**  Just AHC is what I --

Raimundo Leon, M.D. - Direct

1          **THE COURT:**  AHC records.  Then, if it's a month

2    later, did we have -- did these prior records for AHC, would

3    they have been included in that?

4          **MR. WILSON:**  At least part of them.  I don't believe

5    all of them were.

6          **MR. ROGERS:**  And, you know, our concern is I'm not

7    sure that any of them were.  I'm not even sure we had the

8    transcript back, but it's the -- he doesn't express any

9    opinions addressing the pre-accident treatment expressly.

10         **THE COURT:**  True.  But he does say in this letter

11   that those records don't change his opinion.

12         So I'm going to allow this testimony, but it's going

13   to have to be very narrow.  And you get to come up and

14   cross-examine with respect to what did you have and -- and you

15   didn't express an opinion.

16         So the opinion is -- it's almost more of an

17   impeachment issue than it is --

18         **MR. WILSON:**  Right.

19         **THE COURT:**  -- an opinion issue.  So --

20         **MR. WILSON:**  Right.

21         **THE COURT:**  -- he's not going to be able to -- I

22   think you need to present it from a what are your opinions and

23   then did you later review these records and did they change

24   your opinion.

25         **MR. WILSON:**  Okay.

Raimundo Leon, M.D. - Direct

1          **THE COURT:**  It has to be that narrow.

2          **MR. WILSON:**  Yes, Your Honor.  I'll keep it general.

3          **MR. ROGERS:**  Okay.  Understood.

4          One more note is that Dr. Leon has said a couple of

5    times that he believes he has seen the plaintiff since the

6    last date of treatment that we're aware of.

7          **MR. WILSON:**  He corrected himself.

8          **MR. ROGERS:**  He said I believe I've seen him since

9    then.  He did correct himself, you're right.  At first he said

10   last in 2019, and then he looked at his bills and they showed

11   the last treatment was in 2014.

12         **MR. WILSON:**  Records.

13         **MR. ROGERS:**  And then he said but I'm pretty sure

14   I've seen him since then.  And so I'm sort of on the edge of

15   my seat going, wait, I don't know about any of -- any

16   treatment after 2014.

17         **MR. WILSON:**  I don't either.  So I'll represent to

18   you that I think the doctor might be confusing this client or

19   this patient with another patient.

20         **THE COURT:**  That he saw yours later.

21         **MR. WILSON:**  Because my note was August 24th, 2014, I

22   believe is what it was.  It was sometime in early 2014.  So I

23   agree with him.  I think he's just -- was off a little bit.

24         **THE COURT:**  You're welcome to explore that or not

25   based on -- you can elaborate on his credibility, his -- his

Raimundo Leon, M.D. - Direct

1   memory about whether he's -- when he saw this person, but --

2          **MR. ROGERS:**  Yeah.  My concern is just, oh, no, am I

3   going to get opinions about a more recent visit that haven't

4   been disclosed?

5          **MR. WILSON:**  I'm not going there because I don't know

6   of any recent visit that hasn't been disclosed.

7          **THE COURT:**  There we go.

8          **MR. WILSON:**  I was just as shocked and probably less

9   happy when he said that than you were, if we're being honest.

10         **THE COURT:**  Thank you.

11     *(End of discussion at sidebar.)*

12         **THE COURT:**  All right.  Thanks for your patience,

13  everyone.  I appreciate it.

14         And you can continue.  I'm just letting you know

15  we're going to go about 10-ish more minutes, and then we're

16  going to take a morning break, so...

17         **MR. WILSON:**  Yes, Your Honor.

18  **BY MR. WILSON:**

19  Q.   Did you ultimately provide opinions about the cause of

20  Donald's injuries in this case?

21  **A.**   I did.

22  Q.   And in providing those opinions, what sort of things do

23  you look at to -- to provide that opinion?

24  **A.**    In reference to the opinion, initially the evaluation of

25  Mr. Humes, the description of what happened, the physical

Raimundo Leon, M.D. - Direct

1    examination that I performed, the subsequent imaging studies

2    that were taken, the reports from other physicians such as

3    Dr. Anderson and Dr. Crisman, who's a chiropractor, and

4    subsequently the physicians that he saw in Florida, in Tampa,

5    and again my reevaluations and my procedures.  So I took all

6    that information that was provided and -- and made an opinion

7    in reference to the cause.

8    Q.   And when you're provided information, does that -- does

9    that happen all at once or does it sometimes happen

10   incrementally?

11   **A.**   It's generally incrementally.  Generally it's a moving

12   process.  You -- you get information in, and as information

13   arrives, you make determination, you evaluate the new

14   information, having an understanding what you've previously

15   stated and what you previously knew on there to make a

16   decision of whether or not something is still related.  For

17   example, whether the treatment that he's receiving is related,

18   those kind of things.  So it's a moving process.  It's

19   never -- it's never stagnant.  At least that's been my

20   experience.

21   Q.   Okay.  And in this case did it happen that way where you

22   were provided with some information and you came to a

23   determination and then you were provided with more information

24   and had to reassess your determination?

25   **A.**   That's correct.  That's exactly what happened, and those

Raimundo Leon, M.D. - Direct

1    were so stated.

2    Q.   And throughout that process, were you provided with

3    medical records of Donald that happened before the collision?

4    A.   At some point, yes.

5    Q.   And in your review of those records, did that change any

6    of the opinions that you had come to?

7    A.   It did -- it did not.

8    Q.   Okay.  What is the last date of treatment that you

9    reviewed?

10   A.   It looks like the last record that I had where he

11   received treatment was May of 2020, May 14th.

12   Q.   And whose record is that?

13   A.   He received injection therapy.  I believe it's

14   Dr. Anderson's record.

15   Q.   Okay.  And when you're doing your analysis, do you also

16   review deposition transcripts?

17   A.   I do.

18   Q.   And what depositions did you review in this case?

19   A.   In this case I reviewed my own deposition.  I reviewed

20   mister -- Donald's -- Mr. Humes' deposition.  I also reviewed

21   Dr. Anderson's as well as Dr. Crisman's deposition.

22   Q.   And so we know who you are, and we know who Donald is.

23   Can you -- can you explain who Dr. Crisman and Dr. Anderson

24   are, please?

25   A.   Yeah.  Dr. Anderson is a pain management physician that

Raimundo Leon, M.D. - Direct

1    performed -- performed evaluations and multiple treatments to

2    Mr. Humes out of South Dakota.  And Dr. Crisman is a

3    chiropractor from also South Dakota where he initiated

4    treatment after this accident, and that's where we also

5    identified that he had prior treatment with Dr. Crisman prior

6    to this accident.

7    Q.   Were there reports done in this case?

8    A.   Yes.

9    Q.   Who did reports in this case?

10   A.   I did a number of reports.  And defense expert,

11   Dr. Schifini, has a number of reports in this case.

12   Q.   Did you review Dr. Schifini's reports?

13   A.   I did.

14   Q.   And you were provided a list of exhibits that would

15   potentially be used in this trial, were you not?

16   A.   Yes.

17   Q.   And did you go through all of those?

18   A.   Yes, I did.

19        **MR. WILSON:**  Brief indulgence, Your Honor.

20   **BY MR. WILSON:**

21   Q.   And those exhibits that you were provided, were those

22   representative of the medical bills and medical records that

23   relate to this case?

24   A.   It encompassed all the above, sir, yes.

25   Q.   Okay.  Have we covered everything that you reviewed in

Raimundo Leon, M.D. - Direct

1   this case?

2   **A.**   I believe we have, yes.

3   Q.   Okay.  So I want to change focus a little bit here and

4   discuss Donald's prior medical history.

5         To your knowledge, did Donald have any complaints or

6   injuries to his neck before this collision?

7               **THE COURT:**  Hold on.  Hold on a second, Doctor.

8               **MR. ROGERS:**  I believe this broaches the discussion

9   we just had.

10              **MR. WILSON:**  It's -- it's not the same, Your Honor.

11  And it was actually -- if we're looking --

12              **THE COURT:**  All right.  Here's what we're going to

13  do.  We're going to take our break now.  We'll take about a

14  15-minute break.

15              Ladies and gentlemen, please, when you take this

16  break, don't talk about this case among yourselves or with

17  anybody else.  Please don't review or conduct any research

18  about this case.  And don't come to any final conclusions

19  until you have seen all of the evidence and heard my

20  instructions of law.

21              We'll see you in about 15 minutes.

22              **COURTROOM ADMINISTRATOR:**  All rise.

23        *(Jury out at 10:26 a.m.)*

24              **THE COURT:**  All right.  Why is this not the same?

25              **MR. WILSON:**  The issues that I was about to get into

Raimundo Leon, M.D. - Direct

1    deal with the -- the fusion that Donald explained to -- to

2    Dr. Leon during his initial examination.  Also, he explained

3    to the emergency room physicians and staff there that he had a

4    fusion in his neck, and that's where I was going with this

5    one, Your Honor.  So this is actually not related.  And if

6    you'd like, I can kind of bullet point the different priors

7    that I was going to discuss and --

8         **THE COURT:**  So this wouldn't be based on a review of

9    the AHC records?

10        **MR. WILSON:**  Negative.

11        **THE COURT:**  Okay.

12        **MR. ROGERS:**  And I believe that's what we just

13   discussed, where counsel was limited to generalities because

14   the doctor didn't express any opinions in his written reports

15   that have been disclosed.

16        Also, I want to add that the doctor has just

17   testified that he reviewed deposition transcripts of

18   Drs. Anderson and Crisman.  We touched on the timing of

19   Dr. Crisman's deposition in September 2018, and that report

20   that you looked at from October, the following month, that

21   October report doesn't mention reviewing Dr. Crisman's

22   deposition and neither do any of the later reports.  And

23   Dr. Anderson's deposition isn't mentioned either.

24        **THE COURT:**  All right.  So the question is going to

25   be -- and I don't know what his expert opinions are.  So I'm

Raimundo Leon, M.D. - Direct

 1     operating in a void here.

 2              **MR. WILSON:**  Yes, Your Honor.

 3              **THE COURT:**  Are his opinions going -- the opinions

 4     that have been disclosed, do those opinions include opinions

 5     that relate to this alleged injury versus a prior alleged

 6     injury?

 7              **MR. WILSON:**  Well, necessarily they do, Your Honor.

 8     As I've just explained, using the C6-7 fusion, as I believe

 9     they'll probably point out at some point, when Donald

10     initially reported that, he reported it as a C3-4 fusion.  But

11     that's actually in Dr. Leon's initial intake forms.  So using

12     this as the example, he knew that Donald had a fusion from the

13     late '90s.  He provided an opinion, and his opinion was that

14     the causation was not from that.  It was from the collision.

15              Now, did he expressly say this is what -- this is

16     what caused this?  This is what didn't?  I don't believe so

17     explicitly like that, but he --

18              **THE COURT:**  Is there any discussion in his -- or

19     reference in his report to a prior injury?

20              **MR. WILSON:**  Did he discuss it in his reports?

21              **THE COURT:**  Yes.

22              **MR. WILSON:**  I -- again, I believe so, but I don't

23     want to misquote.  There were five different reports.  I don't

24     have them memorized.  If you want take a break for a moment

25     and give me a minute, I'll take a look and get back to you?

Raimundo Leon, M.D. - Direct

1          **THE COURT:**  Yeah.  That's -- that's the question.  I

2   mean, I'm starting -- it would be -- let me ask this.  At

3   deposition, was he asked about anything with respect to his

4   conclusions about whether it was a prior or this accident?

5   Was there any discussion of that at a depo?

6          Mr. Rogers.

7          **MR. WILSON:**  I wasn't present for that one, and I

8   don't --

9          **MR. ROGERS:**  Yes, yes.  Good.  So we're conflating

10  two different issues here.

11         **THE COURT:**  Okay.

12         **MR. ROGERS:**  Just to give you a clear arc of the

13  treatment, the plaintiff underwent a cervical fusion 14 years

14  before the accident.  You've heard them talking about the

15  1990s.  It was in 1999 is the closest to an exact date we've

16  got.  We don't have the records on it.  And Dr. Leon knew

17  about the prior fusion.  Yes, there was some confusion about

18  the level, but he was aware that there's a prior surgery.

19         The focus, though, is that that was 14 years before

20  the accident.  The treatment that we were discussing at

21  sidebar was a year and a half before the accident, and that is

22  what Dr. Leon never expressed an opinion about in reports or

23  at his deposition.

24         So the question isn't, well, did he have a prior

25  fusion and a prior problem?  Yeah, everybody understands that.

Raimundo Leon, M.D. - Direct

1    What nobody knew is that there was this treatment a year and a

2    half before the accident.

3              **THE COURT:**   Okay.  So he's able to get into the 1999.

4              **MR. ROGERS:**   Yes, that was discussed.

5              **THE COURT:**   Okay.  So the questions were --

6              **MR. WILSON:**   There were -- while we're on this topic,

7    there are a couple other general ones that they mentioned in

8    their opening that I was going to address here.  Specifically

9    the TIA stroke.  They mentioned gout.  And those were all

10   disclosed.  And we're in the initial examination, and I

11   believe that's it aside from the -- aside from the AHC.  I

12   don't think there's any other priors that you guys talked

13   about that we're discussing right now.

14             **MR. ROGERS:**   Yeah.  The focus of this objection is

15   the pre-accident AHC records.  That's why I gave you that

16   clarification about the timing of the surgery and the prior

17   chiro.  Because that is the topic that was never addressed by

18   Dr. Leon before today.

19             **THE COURT:**   Okay.  So the question that was asked was

20   much more broad:  To your knowledge, did Donald have any

21   complaints or injuries to his neck before this collision?

22             **MR. WILSON:**   And I'll submit to you that the five

23   chiropractic treatments -- or six.  Five or six, one of those

24   numbers, primarily focused on the lumbar spine and that when

25   Dr. Crisman was asked about it in his deposition, I believe he

 1   explained that the reason the cervical spine got included in

 2   that was basically like a full -- full back crack.  It wasn't

 3   that the treatment was for the cervical spine.  It was that it

 4   was for the lumbar spine.

 5         **MS. TEMPLE:**  I took the depo, Your Honor, and that's

 6   not what he said.  I specifically asked him under oath if he

 7   would have treated Mr. Humes' neck if he hadn't had neck pain

 8   complaints, and he said he would not have.  I can pull the

 9   page.

10         **THE COURT:**  Okay.  So I think what we're talking

11   about now -- so the question --

12         **MR. WILSON:**  That's --

13         **THE COURT:**  -- Mr. Wilson, that you were asking --

14         **MR. WILSON:**  Yes, Your Honor.

15         **THE COURT:**  -- just now, what was it seeking to

16   elicit information about?

17         **MR. WILSON:**  The -- the -- the fusion.

18         **THE COURT:**  So the 1999 situation?

19         **MR. WILSON:**  Yes, Your Honor.

20         **THE COURT:**  Not these year-and-a-half earlier AHC

21   records?

22         **MR. WILSON:**  Negative.  I was eventually going to get

23   to that, and that's why I brought up the others because I

24   wanted to just go ahead -- so we don't have a string of

25   objections, I wanted to go ahead and point out the various

Raimundo Leon, M.D. - Direct

1    prior records or ailments that I was going to discuss in the

2    next page and a half of my -- my notes here.

3              THE COURT:  All right.  So then you're going to talk

4    about the TIA stroke and the gout?

5              MR. WILSON:  Correct, which were both also on the

6    intake form at Dr. Leon's office.

7              THE COURT:  Okay.  But we're not going to be talking

8    about his knowledge or understanding of the treatment at AHC a

9    year and a half before?

10             MR. WILSON:  Well, I definitely want to get into

11   that, Your Honor.

12             THE COURT:  So he hasn't rendered an opinion, though,

13   about that except to say that, based on records he reviewed,

14   AHC records he reviewed, it didn't change his opinion.  That

15   is the scope of his opinion about that information?

16             MR. WILSON:  I believe so.

17             MR. ROGERS:  Should we attach an exhibit, Your Honor,

18   of that October report since that's --

19             THE COURT:  No, not right now.

20             MR. WILSON:  Also, Dr. Leon was asked about the 2011

21   treatment in the form of a hypothetical during his deposition,

22   page 31, lines 1 through 22.

23             THE COURT:  What is it?

24             MR. WILSON:  Can I have my co-counsel --

25             THE COURT:  Sure.  She can address it.

Raimundo Leon, M.D. - Direct

1          **MS. XIDIS:**  It begins:

2          "Q   If you were to learn that he was experiencing back

3     pain in the year prior to the accident, would that change

4     your opinion on causation?

5          "A   Well, again, it -- it -- you know, as -- unfortunate,

6     as Americans, we always, again, experience back pain.  The

7     question is there's a -- different types of back pain one

8     can have.  The patient says his back pain but it could

9     be -- but could it be discogenic?  Could be facet

10    mediated, could be muscular in nature.  Again, we'd have

11    to take a look at what was done, the distribution of

12    symptoms, those kind of things.

13         "Q   Let me ask you this.  Could it change your causation

14    opinion if you were to learn that he experienced back pain

15    and underwent treatment for lumbar spine pain prior to the

16    accident?

17         "A   Again, the importance would be what type of -- of

18    treatment that he underwent and what was the resolution of

19    that treatment.

20         "Q   So it's possible?

21         "A   Anything is possible, yes."

22         **THE COURT:**  Okay.  So it sounds, to me, like nobody

23    can identify for me an opinion that is based on a review of

24    these chiropractic records.

25         **MR. WILSON:**  Explicitly I reviewed this record, it

Raimundo Leon, M.D. - Direct

1    doesn't change my opinion, I don't believe so.  Generally,

2    these records have been reviewed.  It was after this

3    deposition.  Once the transcript was procured, it was provided

4    to him.  My opinions haven't changed, yes, if that makes

5    sense.

6            THE COURT:  All right.  So you just -- you're not

7    going to be able to say did you -- because no one can identify

8    for me what records he reviewed.  There's still confusion

9    about what AHC records were reviewed at this point.  And

10   there's nothing in his disclosed opinions that says -- that

11   tackles in any specific way any information contained in the

12   AHC chiropractic records from a year and a half before.

13   There's just not fair notice on this issue for -- for --

14           MR. WILSON:  There's not what?  I'm sorry.

15           THE COURT:  Fair notice --

16           MR. WILSON:  Yes, Your Honor.

17           THE COURT:  -- that he has an opinion about the

18   treatment provided by that chiropractor.  The only thing he

19   can say is that he reviewed some -- some of these records and

20   it didn't change his opinion.  So that's going to be the

21   limitation of how you can get into it.

22           MR. WILSON:  Okay.  Yes, Your Honor.  With respect to

23   the rest of the prior, the gout, the TIA, the fusion --

24           THE COURT:  Is there any question that he was aware

25   of that information, the TIA, the gout, the fusion?

Raimundo Leon, M.D. - Direct

1        **MR. ROGERS:**  No.  No, that -- counsel's correct, that
2    was disclosed.  That wasn't discussed at length in any of the
3    reporting, but that isn't as important a lack of notice issue
4    as the 2011 records that we're discussing.
5        **THE COURT:**  Yeah.  And so we're done with the 2011
6    issue.  He doesn't get to get into them specifically.  He can
7    say he reviewed some and it didn't change his opinion, but
8    that's the best you can do at this point because there wasn't
9    an opinion about it disclosed.
10        **MR. WILSON:**  Yes, Your Honor.
11        **THE COURT:**  All right.  So it sounds like we're not
12    going to have an objection on the fusion, the TIA stroke, and
13    the gout.
14        **MR. WILSON:**  Yes, Your Honor.
15        **THE COURT:**  All right.  So take five minutes, and
16    then we'll bring the jury back.
17        *(Recess at 10:38 a.m., until 10:49 a.m.)*
18        **THE COURT:**  All right.  Are we ready to bring them
19    back?
20        **MR. WILSON:**  Plaintiff's ready, Your Honor.
21        **MR. ROGERS:**  Yes, Your Honor.
22        **THE COURT:**  Okay.  Danielle, let's do it.
23        Mr. Wilson, how much longer do you think you have
24    with this witness?
25        **MR. WILSON:**  I'm sorry?

Raimundo Leon, M.D. - Direct

1        **THE COURT:**  How much longer do you think you have

2  with this witness?

3        **MR. WILSON:**  You know, if you'd asked me that at 9:00

4  o'clock, I probably wouldn't have said until now.  So I -- I'm

5  going to try my hardest to speed it up because we are rapidly

6  getting behind schedule.

7        **THE COURT:**  Great.

8        **MR. WILSON:**  So I'm going to do the next three things

9  all at once, just so that you know:  The stroke, the gout, the

10  fusion.

11        **MR. ROGERS:**  Got it.

12     *(Reporter instruction.)*

13        **MR. WILSON:**  I said I'm going to talk about those

14  three things, the gout, the fusion, and the stroke, and then

15  I'll talk about the other records generally and then we'll

16  move on so you know what I'm doing so that you don't need to

17  object.

18        **MS. TEMPLE:**  Other records generally, I think you

19  already asked him about that.

20        **MR. WILSON:**  Jesus Christ.

21        **COURTROOM ADMINISTRATOR:**  All rise.

22     *(Jury in at 10:50 a.m.)*

23        **THE COURT:**  Welcome back.  Do the parties stipulate

24  the presence of the jury?

25        **MR. WILSON:**  Plaintiff stipulates.

Raimundo Leon, M.D. - Direct

1          **THE COURT:**  Stipulate to the presence of the jury?

2          **MR. ROGERS:**  Yes, Your Honor.

3          **MS. TEMPLE:**  Oh yes.  I'm sorry.

4          **THE COURT:**  Thank you.  All right.  Have a seat.

5          Please continue your questioning, Mr. Wilson.

6   **BY MR. WILSON:**

7   Q.   Before the break, I was about to ask you if you -- you

8   knew about some -- some prior medical treatment that Donald

9   had had.  And so what I'm going to do is I'm going to list a

10  few things, and then we'll discuss those.  Okay?

11  **A.**   Okay.

12  Q.   So in 1999 Donald had a C6-7 fusion surgery.  He also,

13  when he presented to your office, explained that he had a TIA

14  stroke 30 years before and that he had a history of gout.

15  Were you aware of those things?

16  **A.**   Yes.

17  Q.   And do any of those impact your opinions about the cause

18  of Donald's injuries as he sits here today?

19  **A.**   They do not.

20  Q.   Can you briefly explain why that is?

21  **A.**   Yes.  Based on the -- I can take them one at a time.  For

22  example, gout.  Gout is an arthritic change that generally

23  affects the small joints.  The most common place is the foot.

24  Next to most common is probably the -- the -- the knees.  So

25  that has nothing to do with any of the symptoms that -- in

Raimundo Leon, M.D. - Direct

1    reference to the cervical spine that we had discussed.

2            In reference to the TIA stroke, that describes two

3    different things.  A TIA is called a trans ischemic attack,

4    which means that there's a -- a spasming of the vessel that

5    can cause some sort of neuro deficit.  Tingling in the hands,

6    for example.  Some sort of -- some sort of problem later on.

7    Similar with a stroke.  And the stroke is meaning that there's

8    been a decreased blood supply to a portion of the brain that

9    may or may not resolve in any -- in any symptoms, usually the

10   symptoms of the extremities.  Again, not related to the

11   symptoms that -- or the pain that he presented to in my office

12   on there, so...

13           And then lastly, the fusion, the fusion itself is in

14   reference to a disk pain in there.  And, again, my -- my

15   interpretation at the initial consultation and distribution of

16   subsequently all the records, that was not the issue that

17   Mr. Humes had suffered from.

18           So I don't believe any of those were related.

19   Q.   And then after the April 6th collision, was there any

20   imaging done in this case?

21   **A.**   Yes, there was multiple imagings.

22   Q.   Okay.  Were there MRIs done?

23   **A.**   Yes.

24   Q.   What areas of Donald's body did he have MRIed?

25   **A.**   The initial areas were the neck area, the mid back area,

Raimundo Leon, M.D. - Direct

1   and the low-back area.

2   Q.   And what, if anything, were the results of those MRIs?

3   **A.**   As a general statement, each of those results showed

4   what -- what's termed degenerative changes or what I like to

5   call age-related changes.  There were some small changes

6   within some of the disk structures at the different levels of

7   both the cervical, thoracic, and lumbar spine.

8         So the MRI changes that we see were consistent, for

9   example, of somebody of Mr. Humes' age.

10  Q.   And with respect to any other findings, were there any

11  other findings on the MRIs other than degenerative changes?

12  **A.**   Well, there was some changes, for example, in the lumbar

13  spine when you talk about like essential -- a small central

14  disk protrusion; right?  That is a process that could have

15  been traumatically induced, could have been there prior to the

16  accident.  It's hard to say just with the image itself.

17        The image is a type of procedure that is a moment in

18  time, and it talks about the anatomy.  It does not relate

19  whether something is painful or not painful as a result of an

20  MRI.  So there are changes in there that we can't state

21  without having someone take an MRI every day of their life to

22  see this is what it was yesterday and this is what it is today

23  after a traumatic event.

24        So as a physician we make general assessments of

25  those changes.  There's some changes that are clearly

Raimundo Leon, M.D. - Direct

1   age-related, meaning they've been there a long, long time.

2   But just because there's those changes, it doesn't mean that

3   patients are going to have pain.  Again, this is a moment in

4   time, and it's -- and it's a tool.  It's a tool that's used to

5   identify the person's pain.  It's not a -- it's not an

6   absolute.  In other words, if an MRI said something, that the

7   pain is going to come from there only, that's not the way --

8   that's not the intent of an MRI.  The MRI is a tool that is

9   used -- that a physician uses to identify the source in

10  combination with other things.

11  Q.   And when you're looking at the results of an MRI, how do

12  those come to you?

13  **A.**   Generally they -- depending on where they're coming from,

14  generally in this community we do get them not only by report

15  but now, with all the computer systems, they come by computer.

16  At times they come by CDs or DVDs.

17  Q.   And the report that you just mentioned, is that from

18  another medical provider?

19  **A.**   Yes, sir.

20  Q.   And what kind of medical provider would that be?

21  **A.**   That would be a radiologist.  That's a specialty that

22  addresses -- responsibility for looking at x-rays, MRIs, and

23  other imaging studies that assist a physician in the treatment

24  of a patient.

25  Q.   And do you utilize the radiologist report to -- to

Raimundo Leon, M.D. - Direct

1   determine what the findings were?

2   **A.**   Correct.  Just like a person -- you know, a radiologist

3   is -- like we talked earlier in reference to education, that's

4   what he's done.  After medical school, he's done a specialty

5   in that area where he's looking at the different types of

6   imaging studies to note any change that may have occurred.

7   With those changes, one, as a physician takes in having seen

8   the patient, having spoken to the patient in reference to his

9   or her pain or the distribution of pain, then we use that MRI

10  and see do they or do they not correlate and help us

11  determining this is the area of pain to move forward.

12  Q.   And when you're looking at the -- at the reports, does it

13  have a section on there that kind of lists the significant

14  findings for each MRI?

15  **A.**   They do, yes.

16  Q.   And with these MRIs that were done for the cervical,

17  thoracic -- so the mid spine and the low spine -- did any of

18  them list facetogenic, degenerative changes as a significant

19  finding?

20  **A.**   I believe the MRI of the lumbar spine mentioned the term

21  mild facet arthropathy, and that's a term that's used to -- to

22  denote that there are degenerative changes and what I like to

23  call age-related changes within that structure.

24  Q.   And so to kind of break down what we're talking about

25  generally right now, when we say facet for facetogenic, what

Raimundo Leon, M.D. - Direct

1    does that mean?

2    **A.**    So facet denotes -- so there're -- back up a little bit.

3    There are a number of different structures in the spine

4    itself.  So if we're concentrating for a second, just for

5    simplicity's sake the cervical spine or the neck, there are

6    seven bones that make up the neck, what you and I call the

7    neck structure.  Within those bones, what allows them to stack

8    up like LEGOs, are -- is what's known as a disk.  And what

9    allows that spine to look side to side and up and down are

10   what are known as joints, specifically are called facet

11   joints.  So these three structures and, lastly, a nerve at

12   that particular level, these four structures are noted in the

13   cervical spine.

14          Any one of those structures can be injured.  Any one

15   of those structures can have degenerative changes or

16   age-related changes on there.  Doesn't necessarily have to be

17   an acute -- in other words, a fracture.  That would be an

18   acute finding.  But there could be just changes that have

19   occurred over time that are normal findings that don't

20   necessarily ever produce any type of symptoms.

21          So that's what a radiology reports and reviewing

22   radiology imaging studies, is to allow us to say, okay, this

23   is what we know what the anatomy looks like, this is what the

24   patient is complaining about, this is what the physical

25   examination has shown, this is what the patient is saying that

Raimundo Leon, M.D. - Direct

1    his pain starts and ends.  All those clues, all that as a

2    whole is taken to say the patient may have facetogenic, as you

3    described it, which means pain from that joint versus pain

4    from a disk, for example, or pain from a nerve.  Or what

5    sometimes happens, it's multifactorial, meaning that each of

6    those structures at each different level may also produce pain

7    specifically after a traumatic event.

8    Q.   Speaking on degenerative changes generally, if a person

9    gets an MRI done and they can see that there are degenerative

10   changes, does that necessarily mean that that person will have

11   pain?

12   **A.**   Not at all.  Degenerative changes are -- and, again, I

13   relate them to age-related changes as I speak with -- with my

14   patients and colleagues and medical students is because these

15   are a natural occurring process.  In other words, if we were

16   to take an x-ray of all of us here, we would have changes that

17   are noted to be degenerative because we're over the age of 18.

18   That's an expectation.  It's an expectation that the

19   structures are going to change as we get older.

20        There's no literature that I'm aware of -- and then,

21   along with my clinical experience -- that just because someone

22   has a degenerative change or an age-related change, that

23   somehow they're going to for sure at some point in their life

24   have pain associated with that change.  That -- to this date,

25   I welcome any studies that show that.  I'm not aware of any

Raimundo Leon, M.D. - Direct

1    studies or in my clinical practice that said every person in

2    this room will be in a pain management specialist's office

3    because of degenerative changes.

4    Q.   Okay.  So we've been discussing things that existed

5    before the collision, but I want to change gears and talk

6    about what happened to Donald after the --

7    A.   Sure.

8    Q.   -- collision.  Okay?

9         Whenever you spoke to Donald initially, did he

10   discuss with you what occurred in the crash?

11   A.   He did.

12   Q.   And after Donald spoke to you, did you look at any

13   records that were also taken at the same time of the

14   collision?

15   A.   Yes.  I had had the opportunity to subsequently review

16   the records from the Clark County Fire Department, MedWest

17   Ambulance, Sunrise Hospital.  Those are some of the records

18   that predate him seeing me.

19   Q.   Did you also look at a report generated by the Las Vegas

20   Metropolitan Police Department?

21   A.   If you're referring to the traffic accident report, the

22   answer's yes.

23   Q.   Okay.  And did any of those records have an explanation

24   of what Donald viewed happened in the collision?

25   A.   Well, it confirmed that Donald's explanation in my office

Raimundo Leon, M.D. - Direct

```
 1   about the initiation of pain which started after a motor

 2   vehicle incident confirmed that.  Those records show that he

 3   was involved in a motor vehicle accident.  Those records show

 4   he had similar complaints in reference to the cervical or neck

 5   and mid back area initially prior to seeing me, and that he's

 6   continued along other complaints by the time he saw me.  So it

 7   just confirmed that -- that Donald's history and complaints

 8   were -- were consistent.

 9   Q.   And when you first saw him, what were his chief

10   complaints?

11   A.   When -- when I first saw his -- he had several

12   complaints, and it's -- he related that -- complaints of a

13   headache, neck, mid and low-back pain, bilateral hands, and

14   bilateral knees were the initial pain complaints that he had

15   with me.

16   Q.   And can you explain what bilateral means?

17   A.   Oh.  I'm sorry.  Bilateral just means on both sides.  So

18   he had symptoms that he related to on both sides of the hands

19   and both sides of the knees.

20   Q.   Okay.  So in your capacity as an expert, we discussed

21   earlier how you review medical records.  So instead of

22   bringing everyone who's seen Donald for the last eight years

23   here into court, we asked you to summarize the medical records

24   since the collision and outline not only your treatment but

25   everyone else's.
```

Raimundo Leon, M.D. - Direct

1          Are you prepared to go through that today?

2   **A.**   Yes, sir.

3   Q.   So before he saw you, we discussed just a moment ago that

4   he went to an emergency room; is that correct?

5   **A.**   He did, that's correct.

6   Q.   And he was transported by ambulance; is that right?

7   **A.**   That's correct.

8   Q.   Okay.  And you said the fire department was also there?

9   **A.**   Yes.  There was a report by the Clark County Fire

10  Department.  They were present.

11  Q.   Okay.  And once you began treating Donald, how long after

12  the collision was that?

13  **A.**   His collision occurred on the 6th of April, and I saw

14  Donald for the first time on April 10th.  So four days after

15  the incident.

16  Q.   Okay.  And when Donald came into your office, was he

17  getting billed for your treatment?

18  **A.**   Yes.

19  Q.   Now, during their opening statement, Acuity told the jury

20  your treatment was on a lien; is that correct?

21  **A.**   That's correct.

22  Q.   She also said that your bill hasn't been paid yet; is

23  that correct?

24  **A.**   That's incorrect.

25  Q.   What do you mean by that?

Raimundo Leon, M.D. - Direct

1    **A.**    Our bill has been paid.

2    Q.    Okay.  Can you briefly explain what a lien is to us?

3    **A.**    Yeah.  A lien -- and as it's explained to our patients of

4    those who choose to use a lien, that it's a contract between

5    the patient, ourselves -- and ourselves, as well as the

6    attorney, that we are -- we'll perform treatment or treat the

7    patient and defer payment to some later date.  A lien does not

8    say it's a forgiveness of payment.  It's just simply a

9    deferment of payment for such time that he does have a lien

10   present.

11   Q.    And does that mean that that person will necessarily be

12   responsible for that bill regardless of the outcome of the

13   case?

14   **A.**    The person is responsible regardless of the outcome of

15   the case, yes.

16   Q.    And when you initially saw Donald, did he provide you

17   with a medical history?

18   **A.**    He did.

19   Q.    Okay.  Now, hypothetically, if someone had a complaint of

20   pain before a collision when they come into your office, what

21   would you be looking for to see if the two injuries are the

22   same?

23   **A.**    First and foremost is the character of the pain, location

24   of the pain, duration of the pain, and specifically asking the

25   patient how is that pain different.  Those are the -- the

Raimundo Leon, M.D. - Direct

1    major questions.  Follow-up questions may be, prior to the

2    onset of the new pain, what have you done before?  How has

3    that helped?  Et cetera.  Those are general questions that we

4    ask to try to differentiate if something is similar or is it

5    different, which leads to if something was just simply

6    aggravated.  In other words, that was there before and now

7    made worse, or is this something new?  That's the most

8    simplistic way of explaining it.

9    Q.   Are you aware of anything in Donald's past medical

10   history that would make you believe the complaints of pain

11   that he had when he visited would you after the crash are not

12   related to the April 16th [sic], 2013, crash?

13   **A.**   No.  Based on his description of pain and the onset of

14   pain and the distribution of pain, it -- there was nothing in

15   his past medical history that he provided that would have me

16   concerned that it was coming or emanating from the same area.

17   Q.   Now, we mentioned earlier that there were other medical

18   providers in various locations.

19   **A.**   Yes.

20   Q.   So Donald was receiving treatment from multiple providers

21   at one time; is that correct?

22   **A.**   That's correct.

23   Q.   So they sort of overlapped?

24   **A.**   At times they did, yes.

25   Q.   Okay.  Is it unusual for that to occur?

Raimundo Leon, M.D. - Direct

1    **A.**   Well, unusual in the sense that -- well, let me phrase it

2    this way.  Not unusual for somebody who travels.  For example,

3    we live in a city that, for example, in the winter we have a

4    larger population than we do in the summer because of the

5    heat.  So it's not uncommon to see patients who have -- have

6    treatment elsewhere, continue treatment here, and vice versa.

7    Q.   Okay.  And when you first saw Donald -- so you would have

8    been the first provider after the emergency services --

9    **A.**   That's correct.

10   Q.   -- what did -- did you indicate that he ought to do as

11   far as continued treatment?

12   **A.**   Sure.  Well, initially, after performing a physical

13   exam -- taking a history, performing a physical examination,

14   we discussed what I believe were the pain coming from the

15   potential processes that are producing these pain.  And I

16   recommended at that point to be very conservative.  What I

17   mean by that is I don't believe he was an injection candidate

18   at that moment.  I believe that part of this may be muscular

19   in nature, and the treatment for that is a course of therapy

20   and medication and time.  Those are the three things that, if

21   an injury is related to the muscle, example, that's what --

22   that's what needs to occur.

23         Whether there's injuries to other structures, we

24   treat them initially the same because we know statistically

25   speaking that, even if there's an injury to the joint, even if

Raimundo Leon, M.D. - Direct

1    there's an injury to the disk, the nerve, that conservative

2    management in a significant portion of patients -- probably

3    higher than 60 to 80 percent -- get better with just

4    conservative management, and that was my recommendation to

5    Mr. Humes at that time.

6    Q.    And did he follow your recommendation?

7    **A.**    He did.

8    Q.    Where did he go to do that?

9    **A.**    He returned back to South Dakota.

10   Q.    And did he seek chiropractic care at a place called

11   Alternative Health Care Center?

12   **A.**    He did.

13   Q.    And did Donald continue to treat with them in a way that

14   is reasonable and normal?

15   **A.**    Yes.  He had multiple treatment sessions and, again,

16   which were well within the realm of expectation to -- to treat

17   someone conservatively.

18   Q.    Okay.  And while getting treatment with the chiropractic

19   place, is that when the imaging was done?

20   **A.**    Correct.  During that time, yes.

21   Q.    And is that the time that a patient would normally go to

22   get imaging done after a collision?

23   **A.**    Time frame -- the exact time -- timing of when an MRI or

24   any type of further imaging besides an x-ray is ordered is

25   really physician dependent, physician experience, and, of

Raimundo Leon, M.D. - Direct

1    course, more importantly, the patient's complaint patterns.

2    If there are improvements with a resolution, there's no need

3    for those types of imaging studies.  But if there's minimal

4    improvement or stagnant improvement or no improvement, then to

5    assist a physician they're very commonly ordered.  Time frame,

6    as a general statement, somewhere between four to six weeks is

7    not uncommon for imaging studies to be ordered in order to

8    assist the patient improve quicker.  So it falls well within

9    my expectation of when an MRI should be ordered.

10   Q.    Okay.  And after you initially saw Donald and then he

11   went back to South Dakota to start this conservative care, is

12   there a time when you actually saw him in person?

13   A.    Yes.  He returned back to Las Vegas on July 10th of 2013.

14   Q.    And did you recommend any treatment to assist Donald with

15   the pain that he was experiencing at that point?

16   A.    Yes.  Based on the lack of resolution of conservative

17   management and the fact that he now had imaging studies, so

18   forth, we discussed other options, and those options were

19   specifically injection therapies that are intended to provide

20   two -- two things.  Number 1 is to try to establish an answer

21   of where this pain is coming from.  Knowing where the

22   structure or structures where the pain may be coming from, we

23   can set a treatment course for Mr. Humes with the intent of

24   resolution.  I think every pain physician or any physician,

25   for that matter, is to get the patient to a status of

Raimundo Leon, M.D. - Direct

1    resolution.

2          Secondly, these -- these injection therapies that are

3    performed are exactly what the term says:  It's a therapy to

4    resolve those symptoms.  So identification of the problem and

5    resolution of the problem are the reasoning for these

6    injection therapy, and that's what I -- based on what -- how

7    much improvement or lack thereof he received, based on the

8    imaging study, that was my next recommendation for Mr. Humes.

9    Q.    Did you also suggest that Donald seek physical therapy?

10   **A.**    We talked about therapy.  You know, there's -- there's

11   different types of therapy; correct?  There's chiropractic

12   therapy.  There's physical therapy.  Although there's a lot of

13   overlap, at times the physical therapy has different

14   modalities that the chiropractic therapy does not perform and

15   vice versa.  So it's not uncommon specifically, if you're

16   trying to improve your pain, if you're trying to avoid these

17   injections, these injections are not benign by any means.

18   They're small surgical procedures.  So for that reason it

19   would not be unusual to try a different type of modality to

20   improve his pain.

21   Q.    And did -- did Donald go through with that suggestion and

22   seek physical therapy before injection therapy?

23   **A.**    He did.

24   Q.    And does physical therapy and chiropractic sort of work

25   in a way where you're going to continue to go to the same

Raimundo Leon, M.D. - Direct

1    provider over and over?

2    **A.**    Correct.  Yes.

3    Q.    So correct me if I'm wrong, it seems like you'll --

4    you'll go to this provider, and your development or the

5    effectiveness of this treatment will have will be over a

6    longer period of time than something as -- than some medical

7    treatment that's just one appointment?

8    **A.**    For the most part, yes.  I mean, the process of physical

9    therapy is a -- is a window of time.  The process of

10   chiropractic therapy is similar; it's a window of time.  It's

11   a number of sessions.  Again -- but it relates to what is the

12   cause of the pain.  If there are -- there are certain

13   structures that therapy may at some point just be palliative,

14   meaning that it only helps for that small window of time.  It

15   doesn't provide resolution, but it's well within the standard

16   of -- before invasive procedures to try to minimize or improve

17   the symptoms to avoid invasive procedures.

18   Q.    And so aside from physical therapy, getting your

19   diagnostic imaging done -- MRIs in this case -- and receiving

20   chiropractic care, is there any other sort of conservative

21   treatment that could be done that wasn't done in this case?

22   **A.**    No.  The other conservative management was effective

23   medication and then time itself.  We do know that in certain

24   instances just the fact that you've given something a chance

25   to heal also helps.  But other than those, time, medications,

Raimundo Leon, M.D. - Direct

1   the two types of therapy received, there's no other things

2   that falls into what you described as a conservative approach.

3   Q.   Now, medication is -- is it a situation where you take a

4   pill and you just stop hurting?

5   **A.**   That would be nice.  That's not -- that's not reality.

6   You know, we, as a pain management specialist -- and we deal

7   with this every day -- you know, we want to give that patient

8   a -- it would be great if we gave that patient a pill or any

9   medication that they take and then it's like turning off the

10   light switch.  It's not -- that's not the way medications

11   work.

12        And, you know, when we -- it's about expectations.

13   When we talk about medications, it's that the medications are

14   intended to improve the symptoms.  Occasionally we do get

15   resolution, but in the majority of the times, because the

16   different entities of pain, what one particular medication

17   does is not all-encompassing.  And then we get into the issue

18   of, well, if we give the medication to make it

19   all-encompassing, then we're dealing with side effects and so

20   forth.

21        So medication is an option, and as with everything in

22   medicine, it does provide a portion of relief.  But, again,

23   that comes at a cost as well in reference to side effects and

24   things like that.

25   Q.   These -- these medications you're talking about, I'm

Raimundo Leon, M.D. - Direct

1    imagining they're pretty -- pretty strong; right?

2    **A.**    You know, again, it's -- strong is a relative word.

3    Because for -- it all depends on the milligram dose that you

4    gave -- you give and how you give it and how often you give it

5    plays a role in that.  But, yeah, they're not benign.  That's

6    the way I'll describe it.  Even your over-the-counter

7    medications that we can go to the store and buy, even those

8    are not benign under the wrong guidance or the amount.  They

9    can get into issues.

10   Q.    Okay.  And so after this conservative care that we've

11   talked about -- and you mentioned earlier that you -- you

12   prescribed continuing on with more invasive injection therapy,

13   did Donald do that?

14   **A.**    He then eventually did, yes.

15   Q.    And was that with Dr. Anderson at The Rehab Doctors in

16   South Dakota?

17   **A.**    Yes, that's correct.

18   Q.    Do you know, in looking at your report there, what the --

19   the first date and injection type was?

20   **A.**    Yes.  The first date that he -- he received a procedure

21   was August 14th of 2013, and the procedure that was -- that

22   was undertaken was a C7-T1 intralaminar epidural steroid

23   injection.

24   Q.    Okay.  So that was a lot there.  Let's -- let's break

25   this down into two sections.

Raimundo Leon, M.D. - Direct

1    **A.**    Sure.

2    Q.    When you say C7-T1, what do you mean?

3    **A.**    All right.  Remember we -- on basic anatomy -- and to be

4    able to communicate with physicians and even patients when

5    you're looking at an MRI, there's a number system that we use.

6    Understanding that in the neck area there's seven bones, in

7    the mid back area there's 12, and low back there's five, the

8    description of the numbers are based on the procedure that's

9    done.

10          So in this particular case, C6-7, meaning that

11   between the level of the sixth -- the bone number six and bone

12   number seven, that space, there was a needle placed in there,

13   and through a specific technique that needle is placed into

14   the epidural space, similar space that we -- when women

15   undergo epidurals for labor, for example, it's a space where

16   we, as physicians, can put medication to address pain.  And

17   that's what was performed.

18   Q.    Okay.  And now, can you kind of explain to all of us what

19   that injection actually is?

20   **A.**    Okay.  So the injection is -- is a procedure whereby the

21   area where you're going to put it is treated like a surgical

22   procedure.  The area's cleaned to avoid any infection.

23   There's local anesthetic usually placed in the -- in the skin,

24   and through there a needle -- a special type needle for an

25   epidural called a two-way needle is placed and a technique

Raimundo Leon, M.D. - Direct

1    known as loss of resistance technique is placed to put this

2    needle into the space that we talked about to inject the

3    medication.

4         What medication can you inject in there?  The most

5    common medication and the one that we're looking for from a

6    long-term perspective is a steroid spaced medication.  Steroid

7    is not the kind the athletes take to bulk up but the one that

8    helps to break up any inflammatory processes that may be in

9    there, and that's -- and that's the reasoning and the process

10   of that -- of putting that medication into that space.

11   Q.   Okay.  And so when we're talking about this particular

12   injection, you mentioned joints and disks earlier.  This is

13   the disk area; right?

14   A.   Well, as an epidural, you know, there's -- it's not

15   targeting a specific area.  It's not what we term a

16   site-specific injection.  This particular injection is to -- a

17   physician may choose to do this because of the generalization

18   of the pain and potentially assist at multiple levels, right,

19   or multiple structures, be that of the disk, be that of the

20   joint, be that of the nerve.

21        So it's not uncommon for a -- a pain physician to

22   say, I want to do something just to help the patient.  It is

23   not diagnostic, meaning that once you finish that procedure,

24   it's not going to give you information about where that pain

25   is coming from.  The intent is to resolve his symptoms

Raimundo Leon, M.D. - Direct

1    regardless of what the entity is causing the pain.

2    Q.    Now, Dr. Anderson was the doctor that we discussed

3    earlier that also was pain management fellowship trained;

4    correct?

5    A.    That's correct.

6    Q.    And when he did this injection, did he do it exactly the

7    same way you do it?

8    A.    In reference to the procedure of an epidural, of a --

9    Q.    Yes.

10   A.    Yes.  Yes.

11   Q.    Was there anything different that he did about this

12   injection than -- than what you would do?

13   A.    No.

14   Q.    Okay.  After this injection, did Donald follow up with

15   any other injections?

16   A.    He did.

17   Q.    And what was the next one?

18   A.    Let's see here.  The next injection was performed on

19   September 13th of 2013, and Dr. Anderson now performed

20   bilateral C4-5 and bilateral C5-6 facet joint injections.

21   That's a different type of procedure that he performed the

22   second time.

23   Q.    Okay.  So C4-5 and 6, with what you just talked about

24   earlier, those are also areas of the neck; right?

25   A.    Correct.  Those numbers represent the levels of the small

Raimundo Leon, M.D. - Direct

1    joints that allow -- again, that allow the patient to turn

2    side to side and up and down.  So it's a very specific level

3    that he's looking at, and he's going to base on that on the

4    distribution of pain, you're going to base on that any imaging

5    studies that may counteract that or say that you shouldn't go

6    there.  And of course, you know, on the base on the

7    distribution, and that's why he specifically chose those

8    areas.  And it would have been on Donald's complaints and

9    physical examination that he received, along with the imaging

10   study, and his expertise.  And lastly, the fact that the first

11   injection failed to resolve his symptoms.

12          So all those things would have come into play to --

13   to make that decision of doing that specific area with that

14   specific injection.

15   Q.   And is the point of doing it there to determine whether

16   or not the pain generator comes from a facet joint?

17   **A.**   Correct.  Now, this particular injection now is a -- what

18   we term a site-specific injection.  That -- that is now

19   determined to say this is or this isn't an area of pain.

20   Q.   And so in doing that procedure did -- does a doctor have

21   to know that this is where he thinks the pain's coming from or

22   she?

23   **A.**   Correct.  The doctor believes, as I mentioned, based on

24   the lack of resolution with everything prior, based on the

25   distribution of the complaints of the pain, the physical

Raimundo Leon, M.D. - Direct

1    examination, and, again, the use of an MRI to rule out or say,

2    I'm convinced it's a joint versus something -- so, yeah, all

3    of those things come into play and -- and to say it's -- I

4    want to go at this site for that -- for those particular

5    reasons.

6    Q.   And did you also determine that you thought Donald's pain

7    was facet mediated?

8    A.   Yes.  Prior to that, I believe that he suffered from

9    facet-mediated syndrome, yes.

10   Q.   And so you and Dr. Anderson came to the same conclusion

11   in different places; correct?

12   A.   That's correct.

13   Q.   Did either of you discuss your findings or opinions with

14   each other prior to reaching those conclusions?

15   A.   No.

16   Q.   Okay.  And so I'm going to kind of generally go through

17   this.

18        After that facet injection with Dr. Anderson in

19   South Dakota, did Donald get medical treatment in Florida?

20   A.   He did.

21   Q.   And was that more conservative care?

22   A.   Correct.  Physical therapy I believe it was, yes.

23   Q.   Okay.  A couple of physical therapy places down there?

24   A.   Yes.

25   Q.   And then is -- so going back into what we talked about

Raimundo Leon, M.D. - Direct

1    earlier about, you know, conservative care overlapping with

2    more invasive treatments, is this still normal?

3    **A.**    It's not unusual, no.

4    Q.    Okay.  And then subsequent to going down to Florida and

5    getting this conservative care after those injections, did --

6    did there come a time when Donald came back to see you in

7    early 2014?

8    **A.**    Yes.

9    Q.    And what happened then?

10   **A.**    So he returned to Las Vegas, and I saw him on January 8th

11   of 2014.  At that time we had discussed the injections that he

12   had previously received and the -- the lack of complete

13   resolution.  There was improvement but no resolution on that.

14   So we discussed what the next step would be, and that is to --

15   once again, a site-specific injection now, furthermore, to

16   isolate whether or not that level is the -- is the -- the --

17   the culprit to his problem.

18        So he underwent a facet joint injection, which is

19   site-specific, and then I recommended to be even slightly more

20   specific is -- is what's called a medial branch block, and

21   what a medial branch block is, is the small nerve that go to

22   the same joint that Dr. Anderson would have put medication in

23   to see if, A, is it a nerve issue to the joint, for example,

24   causing the pain?

25        Because there's two ways to identify a joint problem.

Raimundo Leon, M.D. - Direct

1    One way is to do what's called a facet joint injection, which
2    is putting medication directly into the small joint.  The
3    second identification process is to do what's called a medial
4    branch block, which is put -- put the medication on the nerve
5    that goes directly to that joint, and you're isolating that
6    joint.  That gives us, again, a different option for
7    improvement of pain, but it also leads us to other things if
8    there's fail or resolution.
9    Q.    Now, I have a demonstrative here that is of the spine.
10   Obviously this is not Donald's spine because he's still
11   sitting in that chair, but this is, for all intents and
12   purposes, what his spine would look like if it was out and in
13   this fashion; is that correct?
14   **A.**    That's correct.
15        *(Reporter instruction.)*
16        **MR. WILSON:**  Sorry.  Your Honor, may the witness
17   approach the demonstrative to demonstrate his procedure?
18        **THE COURT:**  Or you can give that to him to use up
19   there.
20        **MR. WILSON:**  Okay.  Either way.  Whichever.
21        **THE COURT:**  Yeah, that works.
22        **MR. WILSON:**  May I approach?
23        **THE COURT:**  Yes, of course.
24        **MR. WILSON:**  There's not a lot of room at this.
25        **THE COURT:**  I know.  You can put it -- closer to him,

Raimundo Leon, M.D. - Direct

1    if he wants, or right there.  Whatever is comfortable for you,

2    Doctor.

3         **THE WITNESS:**  Okay.  That's fine.

4    **BY MR. WILSON:**

5    Q.   All right.  So I understand we don't have the utensils

6    that you would have used for the actual injections.  So let's

7    create a fiction today, and we'll utilize a pen to pretend

8    that that is the needle you would use.

9    **A.**   Okay.

10   Q.   Can you demonstrate and kind of explain while you're

11   demonstrating exactly how that -- that injection would have

12   worked?

13   **A.**   Sure.

14        **THE WITNESS:**  May I stand up, Your Honor?

15        **THE COURT:**  Of course.  Just keep your voice up,

16   though, because you'll be farther from the microphone.

17        **THE WITNESS:**  Okay.  Can you hear me?  Is this good

18   enough?

19        **THE COURT:**  Amber, can you hear him?

20        **THE COURT REPORTER:**  Yes, Your Honor.

21        **THE WITNESS:**  Okay.  So we concentrate our

22   conversation in reference to the cervical spine, and when we

23   talked earlier, there are seven little bones that make up that

24   cervical spine.

25        So if we turn the spine this way (indicating), we

Raimundo Leon, M.D. - Direct

1    talked earlier about a disk, and where Mr. Humes had his

2    surgery previously, he had a fusion in here (indicating).  And

3    this is the area that is mentioned.  This is the C6-7 area on

4    there.

5            So these little clear things represent a disk.  The

6    disk is spongy-like material that is in the bone and supposed

7    to help the function when you look down, when you look up,

8    when you -- and support the weight of your head.

9            If we turn the spine this way (indicating), we see

10   these bones here.  Those actual bones you can feel.  Those are

11   called spinous processes, and if -- I'm going to take these

12   off for a second.

13           If we twist the spine, you can see there's empty

14   spaces in there.  If we do it over here, which is bigger, you

15   see how those spaces come out.  And those spaces, that's the

16   joint.  The joint is comprised of a bone from the bone

17   structure below and the bone from the bone structure above,

18   and there exists -- exists a capsule.  Those joints are very

19   similar to your knee joint, your hip joint, and they have

20   nerve fibers that go to them on there.

21           So in an incident that can occur is there -- the

22   question is, well, why would these get hurt, is the process of

23   the impact, for example, where your head is thrown forward and

24   thrown backward.  That process can cause injury to a number of

25   different structures.  The most common structure to be injured

Raimundo Leon, M.D. - Direct

1    in that scenario are the small joints.

2            So what I did and what doctor -- so to give you a

3    difference of what Dr. Anderson did initially, he did a

4    translaminar epidural.  So he went in here (indicating)

5    through the back and said, I'm going to put medication and I

6    hope to bathe all the areas where pain may be originating

7    from.  Dr. Anderson went -- that failed to resolve his

8    symptoms.  He then put the same type of needle or a different

9    type of needle into those small spaces that we discussed, and

10   that's called a facet injection.

11           What I did was, instead of putting medication within

12   the joint itself, the little nerve which is not represented

13   here, I put medication directly onto that small nerve with the

14   intent of isolating the same two joints that Dr. Anderson did.

15   And in this -- in this case, it did, it resolved his symptoms

16   on that day.

17   **BY MR. WILSON:**

18   Q.   Okay.  I'll go ahead and get that out of your way real

19   quick.

20           And so once that resolved those symptoms, what, if

21   anything, did that tell you?

22   **A.**   It confirmed -- in my opinion, it confirmed the

23   diagnosis, and the diagnosis being facet-mediated pain,

24   meaning that those joints in there are the cause of his

25   symptoms and that was based on the initiation onset of pain,

Raimundo Leon, M.D. - Direct

1    the distribution of where his pain was going, the failure of

2    conservative management, physical therapy, chiropractic

3    therapy not resolving his symptoms, a failure of a general

4    injection to say I want to fix it all, and then more

5    importantly, two site-specific injections that resulted in the

6    same thing:  Improvement.  And that's -- based on all those,

7    that's where I believe that this -- Mr. Humes' pain is facet

8    oriented.

9    Q.    And now to kind of get back to your capacity as an expert

10   in this case, you end up reviewing these records at some

11   point; correct?

12   **A.**    That's correct.

13   Q.    Which includes the three injections we've already talked

14   about as well as the billing that goes along with that --

15   **A.**    Yes.

16   Q.    -- is that right?

17          And are you familiar with the reasonable and

18   customary charges for medical bills in our community and in

19   others?

20   **A.**    Yes.

21   Q.    And how do you know about other communities?

22   **A.**    Well, several reasons.  One is the number of continuing

23   medical education courses that one takes throughout his

24   career.  Specifically through billings in -- they're discussed

25   in generalities not just in the local community where these

Raimundo Leon, M.D. - Direct

1    conferences are held but in other communities.

2           The nature of being an expert and a number of --

3    being an expert since 2003, the opportunity to see bills from

4    a number of different entities, not only my own specialty but

5    other specialties and from other parts of this -- other parts

6    of the country.  And lastly, as an expert, the process of --

7    there are organizations and there are information that you can

8    obtain to generalize or to get general ideas of what may be

9    billed in a different city or in a different state.

10          So all of those things as an expert, that's what I

11   used to determine the usual and customary in this area and can

12   opine in reference to -- to other areas as well.

13   Q.    And did you utilize that same process in this case?

14   **A.**    Correct.  It's the same process I've always used.

15          **MR. WILSON:**  Your Honor, at this point I move to

16   qualify Dr. Leon as an expert --

17          **THE COURT:**  I think we need more information -- are

18   we talking about the South Dakota bills at this point?

19          **MR. WILSON:**  Yes, Your Honor.

20          **THE COURT:**  Is that what you're going to inquire

21   about?

22          **MR. WILSON:**  Brief indulgence.  I'll ask a couple

23   more questions --

24          **THE COURT:**  Okay.  And then.

25          **MR. WILSON:**  -- and then I can come right back to

Raimundo Leon, M.D. - Direct

1    this.

2          **THE COURT:**  Yeah.  Let's try that.

3    **BY MR. WILSON:**

4    Q.   So when we're talking about viewing the bills -- and I'm

5    going to kind of expand because we've already discussed

6    Florida a little bit.  So there's other treatment that we

7    haven't discussed in this case, right, other providers?

8    A.   That's correct.

9    Q.   And did you also review their bills and records?

10   A.   Yes.

11   Q.   And were those -- those providers were located primarily

12   in Florida, South Dakota, and Nevada; is that correct?

13   A.   That's correct.

14   Q.   And with this process that you utilized, you're looking

15   at their records and their billing; correct?

16   A.   Correct.

17   Q.   And that can be from the chiropractic care or the more

18   invasive injection therapy; correct?

19   A.   That's correct.

20   Q.   Okay.  And so the process that you described earlier

21   about how you determine the reasonable and customary nature of

22   billing in various locations, you would -- did you utilize

23   that with respect to Florida and South Dakota and Nevada?

24   A.   That's correct.

25   Q.   Okay.  And were you able to come to conclusions based on

Raimundo Leon, M.D. - Direct

1    that process?

2    **A.**    Yes.

3    Q.    In your capacity as an expert?

4    **A.**    Correct.

5    Q.    To a reasonable degree of medical probability?

6    **A.**    Yes.

7         **MR. WILSON:**  At this point I move to admit him as an

8    expert in the area of billing for the locations of Florida,

9    South Dakota, and Nevada.

10        **THE COURT:**  With respect to amounts of bills, that's

11   all we're talking about, correct, not billing practices?

12        **MR. WILSON:**  Yes, the amount.  Sorry, sorry.  I

13   should have been more clear, Your Honor.

14        **THE COURT:**  Okay.  Response?

15        **MR. ROGERS:**  Yeah.  It's the same objection,

16   Your Honor.  There's been no disclosure of any database that

17   the doctor earlier mentioned applied to other geographic areas

18   to assess the usual and customary charge there, whether it's

19   Optum, American Hospital Directory, any of them.  That just

20   hasn't been disclosed.  So it's the same objection that

21   we've -- we've already made.

22        **THE COURT:**  When you tell me, it's that the databases

23   have not been disclosed or the fact that he would render an

24   opinion on this area?

25        **MR. ROGERS:**  Both.

Raimundo Leon, M.D. - Direct

1          **MR. WILSON:**  Brief indulgence, Your Honor.

2          **THE COURT:**  Yes.

3          **MR. WILSON:**  April 6th of 2021 we had a disclosure

4    where Dr. Leon actually references two databases that he would

5    have utilized to address the bills, and so necessarily in that

6    he also would have addressed the bills.

7          **THE COURT:**  Okay.  So... has -- did his expert report

8    contain an opinion about the reasonableness of bills?

9          **MR. WILSON:**  The April 6th, 2021, report.

10         **THE COURT:**  Okay.  Can I see what we're talking

11   about, please?  And then sidebar.

12         **MR. WILSON:**  Yes, Your Honor.

13         **THE COURT:**  Actually, maybe I don't need a sidebar,

14   but if you can hand that up from --

15         **MR. WILSON:**  Yeah.  So if Your Honor would look at

16   the bottom of page 2, the last paragraph and the top of

17   page 3, that is the most recent.

18         **THE COURT:**  Okay.  So this is the April 2021 we're

19   talking about?

20         **MR. WILSON:**  April 6th, 2021, Your Honor.  And that's

21   just the most recent one we looked at.

22         **THE COURT:**  All right.  It does contain an opinion on

23   that.  Your response, Mr. Rogers?  I'm going to hang on to

24   this for a second.

25         **MR. ROGERS:**  Did you want to --

Raimundo Leon, M.D. - Direct

1      **THE COURT:**  All right.  Let's go ahead and sidebar

2   then.

3      **MR. ROGERS:**  Yes.

4      *(At sidebar on the record.)*

5      **MR. ROGERS:**  Yeah.  So the -- I just was shown that,

6   this April report, that there was a mention of a -- it says

7   I've also looked at this database or I have access to the

8   database is the way he put it.  To assess the reasonableness

9   of charges, the foundation is that this is the range of

10  reasonable in a given community.  Dr. Leon will testify that

11  he charges at the 75th percentile, that he knows that range,

12  and that it falls within usual and customary.

13      What he did in this report was, after having already

14  opined repeatedly over I think four previous reports that all

15  the charges were reasonable and customary, in this one he says

16  I also have access to databases.  There's no reference to

17  which one would have given him the insight that's needed for

18  this foundational opinion.  And, Your Honor, this one isn't

19  really that tricky because the next witness is Dr. Anderson.

20  He's from there.

21      **THE COURT:**  Yeah, I know Anderson is going to be able

22  to testify, right, about the reasonableness?

23      **MR. WILSON:**  Yes, Your Honor.

24      **THE COURT:**  So -- but your -- so why do we even need

25  this witness as to reasonableness?

Raimundo Leon, M.D. - Direct

1          **MR. WILSON:**  Because this witness has a 10,000-foot

2     viewpoint.  He can testify to the reasonableness of the

3     various areas of care that were received.  And additionally,

4     in the other reports he did discuss those bills, the various

5     billing that was -- that was acquired throughout the process.

6          **THE COURT:**  Okay.  I think that he -- it's

7     sufficiently disclosed.  Now, y'all have a stipulation that

8     says that they're only going to testify about things in their

9     reports and at their depositions, and it -- but, again, I --

10    I'm -- I'm operating a bit in a black box because I don't have

11    their expert reports in front of me to be able to make these

12    decisions.  Those have not been presented to me.  I am looking

13    at a letter dated April 6th, 2021, that I understand to be

14    essentially a supplemental report.

15         **MR. WILSON:**  Yes, Your Honor.

16         **THE COURT:**  And it says:  I believe the medical bills

17    reviewed within this report continue to fall within the usual

18    and customary.  This is based on my experience as an expert in

19    this community for over 18 years having access to web-based

20    data in reference to billing, in parentheses, such as Optum,

21    O-p-t-u-m, Fee, F-e-e, Analyzer and fairhealthconsumer.org,

22    end parentheses and, lastly, based on the number of continuing

23    medication -- medical education courses I have taken

24    throughout my career in reference to billing.

25         I think it's sufficiently disclosed based on what

Raimundo Leon, M.D. - Direct

1    I've been presented with, based on his testimony, and it's

2    going to be a vigorous cross-examination that I think is going

3    to be the appropriate remedy for this testimony.

4         But I would say it doesn't make sense for you to go

5    into any kind of detail on his South Dakota reasonableness

6    when you have Dr. Anderson coming in.  So you can certainly

7    ask about it, but I would limit those questions.

8         **MR. WILSON:**  I intend on limiting it to a degree,

9    Your Honor.  It's just that in comparing the three areas,

10   right, especially for the cost letter -- and I can anticipate

11   that this is going to happen again -- our expert has an

12   opinion about future care; right?

13        **THE COURT:**  Yes.

14        **MR. WILSON:**  And in looking at those three areas, he

15   has determined that his is not the highest area; right?  That

16   you've got a reasonable amount of Florida, a reasonable amount

17   for South Dakota, and a reasonable amount for Nevada.  The

18   reason it's important that he's able to discuss this is so

19   that there's a frame of reference for how he got to that --

20   that number --

21        **COURTROOM ADMINISTRATOR:**  Can you lower your voice?

22        **MR. WILSON:**  Apologies.

23        How he got to that number with respect to his future

24   care.

25        **THE COURT:**  Okay.  So we've dealt with it as -- the

Raimundo Leon, M.D. - Direct

1    question here was prior.  That was the question, was the

2    billings, so far, reasonableness; right?  So that's what he's

3    been establishing so far.

4         **MR. WILSON:**  Correct.

5         **THE COURT:**  And this that you've just showed me, this

6    April letter, talks about the billings that have occurred and

7    the reasonableness of those.

8         **MR. WILSON:**  Yes.

9         **THE COURT:**  I don't know anything about and haven't

10   seen any expert discussion about futures.  So is there --

11        **MR. WILSON:**  I'm aware of that, Your Honor.  I'm just

12   trying to preface for what's coming.

13        **THE COURT:**  And I'm asking is there a problem with

14   that?  Has he -- is that part of his opinion?  Has he

15   disclosed opinions about the reasonableness of future --

16        **MR. WILSON:**  There was actually a cost letter that

17   was disclosed I believe April 21st -- 24th of 2013.  That's

18   one of the first things.

19        **THE COURT:**  Okay.

20        **MR. WILSON:**  So it's been on the table for quite some

21   time.

22        **MR. ROGERS:**  Okay.  And that's a long bridge from the

23   issue that you're hearing right now, which is can he offer an

24   opinion that the charges from the providers in Florida and

25   South Dakota are usual and customary?  Let's leave that where

Raimundo Leon, M.D. - Direct

1    it is.

2            The next question about this cost estimate, there's

3    never been any suggestion disclosed in any expert reports that

4    there was a comparative analysis of the charges from Las Vegas

5    versus South Dakota and Florida.  Dr. Leon simply wrote a

6    letter that we can show you that says, my charge for this

7    treatment is X, $21,000.  And that's the one that we've been

8    talking to you about when we've said, look, they haven't given

9    us a computation about their futures, and they've said, well,

10   it's just math.  It's Leon's projected number times the number

11   of years left under the life table.

12           And all Leon said was, this is my number.  So for him

13   to get up and do a comparison analysis now would be improper

14   because it's -- that's never been disclosed.

15           **THE COURT:**  This cost letter has the cost of his

16   treatment as of 2013 -- or, sorry, his projected cost of

17   future treatments as of 2013?

18           **MR. WILSON:**  I believe that that's correct.  I'll

19   take counsel's assertion as true.

20           **THE COURT:**  Okay.  So to the extent he intends to

21   testify about how that would compare to other areas, if that

22   hasn't been part of his disclosed opinions, we're not -- we

23   can't go there.

24           **MR. WILSON:**  Okay.

25           **THE COURT:**  All right.

Raimundo Leon, M.D. - Direct

1          **MR. ROGERS:**  Very good.

2          **MR. WILSON:**  All right.  So -- and forgive me because

3    we just went to another area.

4          **THE COURT:**  We did.

5          **MR. WILSON:**  Let's make sure that I understand this.

6    He can talk about the bills?

7          **THE COURT:**  Prior bills.

8          **MR. WILSON:**  Prior bills.

9          **THE COURT:**  Yeah.

10         **MR. WILSON:**  Right.  Up to the --

11         **THE COURT:**  Incurred, not futures.

12         **MR. WILSON:**  Right.  Up to the end of treatment,

13   which would be -- yes.  All right.

14         **THE COURT:**  We think 2014; right?  I'm sorry.

15         **MR. WILSON:**  No, no.  The end of treatment is 2020.

16         **THE COURT:**  Oh.  I see.  Okay.  I was thinking of --

17         **MR. WILSON:**  His treatment was 2014.

18         **THE COURT:**  I understand.

19         So his review of -- I think this letter of last month

20   suggests that he had reviewed bills up till then.

21         **MR. WILSON:**  Yep.

22         **THE COURT:**  So he can talk about that.

23         **MR. WILSON:**  Okay.

24         **THE COURT:**  And then he can talk about what his

25   projection was in his cost letter because that has been

Raimundo Leon, M.D. - Direct

1    disclosed.

2           **MR. WILSON:**  Can he discuss, you know, mine are in

3    this percentile here, the same cost over there would be in

4    that percentile, the same cost in Florida would be that

5    percentile?  Can he say this is different?

6           **MR. ROGERS:**  Yeah, that's -- that is different, and

7    it's never been disclosed in a report.

8           **MR. WILSON:**  That's just math.

9           **MR. ROGERS:**  He's never done an analysis like that.

10          **THE COURT:**  All right.  So if there hasn't been

11   disclosure that he would be doing a cost comparison, the

12   answer is no.

13          **MR. WILSON:**  Got it.

14          **THE COURT:**  Okay.

15          **MR. WILSON:**  Thank you.

16          **THE COURT:**  Thank you.

17      *(End of discussion at sidebar.)*

18          **THE COURT:**  And about 15 minutes left before lunch.

19          **MR. WILSON:**  I'm trying to hurry.

20          **THE COURT:**  I understand.  I'm just giving you a

21   timeline.

22          **MR. WILSON:**  Thank you, Your Honor.

23          **THE COURT:**  I wasn't trying to rush you.

24          **MR. WILSON:**  No, I understand.  I'm not feeling

25   rushed.

Raimundo Leon, M.D. - Direct

1    **BY MR. WILSON:**

2    Q.   Okay.  So before we had our discussion, we were talking

3    about the -- the various billings that you reviewed with

4    respect to the injections that we've already talked about.  Do

5    you remember that?

6    **A.**   I do.

7    Q.   And with respect to the -- the various costs that you've

8    reviewed up to this point -- and I'll just say generally

9    speaking for the rest of care for the -- for the care of

10   Donald that you've reviewed, were those bills that were

11   incurred in the various locations, Florida, South Dakota, and

12   Nevada, reasonable and customary for the services rendered?

13   **A.**   I believe they were, yes.

14   Q.   Okay.  And you know that based on what you talked about

15   is your process right before we went on the little discussion;

16   correct?

17   **A.**   That's correct.

18   Q.   Okay.  Where were the overwhelming majority of the

19   medical procedures performed in this case?

20   **A.**   In South Dakota.

21   Q.   Okay.  How many injections did you actually perform?

22   **A.**   I just performed one injection, which was the medial

23   branch block.

24   Q.   Okay.  So Donald followed up with you after that third

25   facet injection that he got in South Dakota in -- on

Raimundo Leon, M.D. - Direct

1    April 23rd, 2014; is that correct?

2    **A.**   That's correct.

3    Q.   And at that time, once you reviewed the additional

4    injection therapy, what was your recommendation?

5    **A.**   Are you talking April 23rd, 2014, Counselor?

6    Q.   Yes.  Yes, sir.

7    **A.**   Let me go to that.

8         At that point we discussed several options for him.

9    One option was to simply -- medications, exercise program, and

10   simply watch what he can and cannot do.  So limit himself to

11   the activities that may aggravate those symptoms.

12        The second opinion was the -- consider an ablation

13   therapy, which is to destroy -- a procedure that destroys the

14   little nerve that was just performed in the medial branch to

15   provide longer than just a few days or few weeks worth of

16   improvement, prolonged improvement.

17        And lastly, again, not as common but is talked about,

18   about surgically trying to do something at those levels for

19   those joints.

20        Those are the three options that are given to a

21   patient who has a known facet or joint dysfunction as far as

22   what he can do with them.

23   Q.   And what did Donald ultimately decide with the advice of

24   his medical providers?

25   **A.**   He decided on ablation therapies.

Raimundo Leon, M.D. - Direct

1    Q.    And can you explain to us briefly what that is?

2    **A.**    Sure.  An ablation therapy is very similar to the

3    procedure that I performed except two things.  Number 1 is the

4    type of needle that's used.  This procedure is a destructive

5    procedure with the intent of stopping the transmission from

6    those joints to your brain to tell you that you have pain from

7    those joints.  It doesn't prevent from hurting yourself.  It

8    just simply minimizes, you know, the -- if there's any --

9    going to be any transmission for the improvement of pain.

10           So that's the biggest -- that's -- so the type of

11   needle and then the procedure itself instead of placing

12   medication with the intent of identifying -- it's intended

13   to -- to -- I'm going to use it in quotation, destruction,

14   again, to stop that transmission of pain.

15           The destructive term is kind of misleading because

16   one would expect, if you destroy something or you stop

17   something, that it goes away 100 percent and never comes back.

18   And that's not true.  That is not true.  Nothing in medicine,

19   except for birth and death, is 100 percent.  Everything else

20   is a percentage of on here.

21           So when these procedures are performed, the intent is

22   to provide significant, noticeable improvement to avoid the

23   need for other things like medications or just a poor quality

24   of life.  So that's the biggest difference between these --

25   these procedures.

Raimundo Leon, M.D. - Direct

1    Q.    When did he get his first ablation?

2    **A.**    Oh.  Sorry, Counselor.  Let's see.  He received -- I'm

3    sorry, Counselor.  My records -- everything's on computer, so

4    I try to print stuff out so I can be quicker about this.

5    Q.    If I represent to you that it was May 19th --

6    **A.**    It's -- I'm sorry.  Yes, that's correct.

7    Q.    Okay.  And that was with Dr. Anderson?

8    **A.**    Correct.

9    Q.    And was that --

10        **THE COURT:**  What year was that?

11        **MR. WILSON:**  2014.  Sorry.

12        **THE COURT:**  Thank you.

13   **BY MR. WILSON:**

14   Q.    And was that procedure successful in diminishing Donald's

15   pain?

16   **A.**    It improved his pain, yes.

17   Q.    Did he continue with physical therapy at that point?

18   **A.**    He did.

19   Q.    Okay.  And during this time was -- did Donald have any

20   neurological complaints with any of his providers?

21   **A.**    He did.

22   Q.    And what briefly were those?

23   **A.**    Well, originally he did complain of some headaches.  He

24   did complain of concentration issues.  Those were the kind of

25   complaints that were noted in the record.

Raimundo Leon, M.D. - Direct

1   Q.   Did he eventually see a neuropsychologist for that?

2   A.   He did.

3   Q.   And what, if anything, did the neuropsychologist

4   conclude?

5   A.   That there was some -- he performed an evaluation and

6   specifically noted that there were some changes from his

7   cognitive perspective on there based on the pain that he was

8   suffering from.

9   Q.   So does that mean that pain can -- can cause issues with

10  someone's mind?

11  A.   Well, I think once -- when you start talking about pain

12  in the chronic sense as opposed to acute sense -- and chronic

13  described as the continuation of a symptom for greater than

14  six months.  There's clear evidence that patients who have

15  that can have issues from a mentation, forgetfulness,

16  depression, anxiety.  All these things can occur in a chronic

17  pain patient.

18         From a neuropsychology perspective, you know,

19  obviously those gentlemen are experts in identifying those by

20  certain examinations, et cetera.  So it's not uncommon for a

21  chronic pain patient to suffer from some of those issues I

22  just described.

23  Q.   And so where we're at now, somewhere after May of 2014,

24  we're well past a year; correct?

25  A.   Correct.

Raimundo Leon, M.D. - Direct

1    Q.    So would that qualify Donald as having chronic pain?

2    A.    Yes, it would.

3    Q.    Okay.  Now, October 6th, 2014, Donald met with

4    Dr. Anderson to discuss his ablation, and Donald stated that

5    he felt like it was wearing off.  Do you recall that record?

6    A.    Yes.

7    Q.    What, if anything, is the significance of that record?

8    A.    Well, the fact that it's -- and that's expected; right?

9    We talked a little bit about processes only lasting a window

10   of time.  We know from anatomy and the literature that, when I

11   say the word destructive, it's not permanent.  It does --

12   there's certain nerves in our system that regenerate over a

13   window of time, and everybody's regenerative power to return

14   to a state of pain is different for everyone.  So the simple

15   fact that the patient has noticed that symptoms are returning,

16   that would be reasonable.  That would make sense.  That makes

17   anatomical sense to a pain physician why that would happen.

18   Q.    Is that return of symptoms gradual or is it like a light

19   switch?

20   A.    That's a great question, and the majority of the time

21   it's a gradual process.  You know, occasionally a patient

22   might say that they were doing fine and they woke up and it

23   was returned.  But the majority of the cases, it's a gradual

24   process.  As that nerve regenerates and heals itself from

25   being destroyed, it could be a window of time.

Raimundo Leon, M.D. - Direct

1    Q.   So fair to say that, if it was reported October 6th,

2    2014, that it was beginning to come back, it could be an

3    indeterminate amount of time in the future when it would

4    actually come back to complete -- the way it was completely

5    before the ablation; is that correct?

6    **A.**   That's correct.  Absolutely.

7    Q.   And now, after that ablation and after that note with

8    Dr. Anderson, Donald was still going to PT, wasn't he,

9    physical therapy?

10   **A.**   Yes.

11   Q.   Okay.  And then after all of that there was a gap in care

12   where Donald didn't see Dr. Anderson until May -- May 5th of

13   2016 for another ablation.  Is that problematic?

14   **A.**   Well, I guess I'm a little confused with the problematic.

15   I mean, in reference to the pain distribution, it's not

16   problematic.  We know where the problem is.  The description

17   and subsequent -- we know as from -- as pain management

18   physicians that this is going to return.  So it's problematic

19   in the sense that the patient may have been suffering for a

20   window of time with this pain, but problematic in the sense

21   that we're concerned that there's other issues or a new

22   incident or a new -- a new area of pain, no, that's not the --

23   that's not problematic.

24   Q.   Was the pain at that point in May of 2016 the same as it

25   had been in October of 2014?

Raimundo Leon, M.D. - Direct

1   **A.**   Based on the fact that Dr. Anderson performed the exact

2   same procedure, yes, it was the exact same pain.

3   Q.   And did that -- that gap in treatment make Donald's

4   condition worse?

5   **A.**   Unless -- the only thing that would have made it worse

6   would be ensuing incidents, right, a new traumatic event,

7   those kind of things.  The pain symptom, however, may be

8   worse.  The interpretation of the pain by Donald may have been

9   worse because of the lack of treatment or exercise, et cetera.

10  But as far as worse in the sense that unless there's some

11  other traumatic event that would give pause for considering

12  other entities, no.

13  Q.   Is there any indication in the records that there was

14  another one?

15  **A.**   There was none, no.

16  Q.   Okay.  So after that second ablation with Dr. Anderson,

17  Donald continued his treatment in Florida with Dr. Bhalani I

18  believe is how you pronounce that, spelled B-h-a-l-a-n-i.

19  Does that sound accurate?

20  **A.**   Yes.

21  Q.   And when Dr. Bhalani reviewed Donald, what was his

22  determination?

23  **A.**   Based on his examination and distribution of symptoms, it

24  appeared that he believed that Mr. Humes had a facet-mediated

25  problem or continued to have a facet-mediated problem.

Raimundo Leon, M.D. - Direct

1    Q.   So this is the third doctor that's come to the same

2    conclusion?

3    **A.**   Correct.

4    Q.   And just like between you and Dr. Anderson, did any of

5    y'all talk to each other?

6    **A.**   I did not speak to any physician, no.

7    Q.   Okay.  And on December 14th, 2016 -- or sorry.

8    Dr. Bhalani, did he -- he performed an ablation; is that

9    correct?

10   **A.**   He did, yes.

11   Q.   And then on December 14th, 2016, when Donald presented to

12   Dr. Bhalani, did he indicate what amount of relief he got from

13   that ablation?

14   **A.**   Yes.  I believe he got significant improvement.  I don't

15   recall the exact, but it was 80 percent I believe, something

16   to that effect, yeah.  It was significant improvement.

17   Q.   So when Donald was going back and forth to care at this

18   point between Dr. Anderson and Dr. Bhalani, he was focused on

19   his neck and the ablations; is that correct?

20   **A.**   That's correct.

21   Q.   Is that significant?

22   **A.**   It's significant in the sense that he has continued

23   symptoms, and it is -- it stands to reason that he's receiving

24   therapies for a diagnosis that has been present for a large

25   window of time and nothing essentially has changed in

Raimundo Leon, M.D. - Direct

1   reference to these treatments or providing relief; therefore,

2   it's significant that he's not -- it's still helping, it's

3   still providing relief.

4   Q.   So he's been getting care for his -- for his neck for

5   pretty much the whole time after April 10th of 2013; is that

6   correct?

7   A.   That's correct.

8   Q.   And at some point in here, when he's going back and forth

9   to Dr. Anderson and Dr. Bhalani, it sounded like he got quite

10  a bit more relief from that -- that ablation from the

11  appointment in December of 2016; correct?

12  A.   It would appear so, yes.

13  Q.   All right.  And then was there a shift in focus for where

14  the care was -- was at on Donald's back?

15  A.   Yeah.  Once the -- it appeared that the shift was focused

16  to the low back and mid back area.

17  Q.   And is that referenced with the September 1st, 2017,

18  joint injections in the thoracic spine?

19  A.   That's correct.

20  Q.   And --

21       THE COURT:  Mr. Wilson, is this a pretty good

22  stopping point, or do you have a couple more questions to --

23  is this a good stopping point?

24       MR. WILSON:  This is fine.

25       THE COURT:  This is good?

Raimundo Leon, M.D. - Direct

1          **MR. WILSON:**  Yep.

2          **THE COURT:**  All right.  All right, everybody.  We're

3     going to take our bunch break now.  I'm going to ask you to

4     come back and be prepared to come back at 1:00 o'clock.

5          While we are on this break, please remember don't

6     talk about the case among yourselves or with anybody else,

7     don't conduct any of your own investigation, don't read or

8     view anything about the case, and please don't formulate your

9     final opinions until you've heard all of the evidence and my

10    instructions of law.

11         Have a good lunch.  We'll see you in an hour.

12         **COURTROOM ADMINISTRATOR:**  All rise.

13      *(Jury out at 12:02 p.m.)*

14         **THE COURT:**  All right.  Doctor, you can step down and

15    take a lunch break.  We'll see you back here at 1:00.

16         **THE WITNESS:**  Thank you, Your Honor.

17         **THE COURT:**  Mr. Wilson, no stress, just what -- how

18    much longer do you think you have?

19         **MR. WILSON:**  Let me take a look at this.  That

20    wasn't -- that wasn't at you; that was at me.  I apologize.

21         I think that the next few pages will be very fast.

22    That will be quick.  That will be much faster now.  I don't

23    know, 20, 35 minutes hopefully?

24         **THE COURT:**  Mr. Rogers, how long do you think you

25    have?

Raimundo Leon, M.D. - Direct

1          **MR. ROGERS:**  Well, it -- it got a little bit longer

2    over the direct.  I would ballpark it out at about 40 minutes.

3          **THE COURT:**  Okay.  If you-all anticipate issues

4    coming up, perhaps you can have a chat over the lunch break

5    and maybe resolve them so that we don't have lengthy sidebars

6    anymore and we can get through this witness.

7          **MR. WILSON:**  Got it.

8       *(Lunch recess at 12:03 p.m., until 1:05 p.m.)*

9          **THE COURT:**  All right.  Do we need to resolve

10   anything before the jury comes back?

11         **MR. ROGERS:**  Yes.

12         **MS. TEMPLE:**  Oh.  She said do you need to resolve

13   anything.

14         **MR. ROGERS:**  Oh.  I'm sorry.  I don't believe so.

15         **THE COURT:**  Okay.  Don't need to resolve anything;

16   correct?

17         **MR. ROGERS:**  Nothing.

18         **THE COURT:**  All right.  Let's bring them back.

19      *(Pause in proceedings.)*

20      *(Jury in at 1:08 p.m.)*

21         **THE COURT:**  Welcome back, everyone.

22         Will the parties stipulate to the presence of the

23   jury?

24         **MR. WILSON:**  The plaintiff stipulates.

25         **MS. TEMPLE:**  Yes, Your Honor.

Raimundo Leon, M.D. - Direct

1           **THE COURT:**  Have a seat, everyone.  You can continue,
2      Mr. Wilson.
3      **BY MR. WILSON:**
4      Q.   All right.  So before the lunch break we had discussed
5      the September 3rd -- September 1st, 2017, injection.  And I
6      don't believe I asked you to sort of describe briefly what
7      that one was.  Can you explain the difference with that one?
8      **A.**   Yes.  The -- excuse me.  The September 1st, 2017,
9      injection was known as a lumbar facet injection.  It's similar
10     to the first injection -- the second injection that
11     Dr. Anderson performed in the cervical spine except this time
12     it's in the low-back area.  Same concept, however; the concept
13     of putting medication within the specific joint to identify
14     and improve symptoms as it relates to that area of pain.
15     Q.   So while this is going on -- and we've kind of migrated
16     to the lower back -- was there any indication about whether or
17     not Donald was still dealing with neck pain?
18     **A.**   Throughout the records it shows that, yeah, he was
19     still -- there was improvement but there was no -- at no point
20     that I can recall was there resolution of the symptoms.  So
21     they were still present, but they were -- they were improved.
22     Q.   And is that normal with as many ablations as he had?
23     **A.**   Yeah.  Unfortunately, ablation is not a -- a process
24     where it actually completely severs a nerve or deadens a nerve
25     forever.  The physiology of the nerve itself is over time to

Raimundo Leon, M.D. - Direct

1    regenerate, to heal itself.

2           It's kind of similar to when we talk about a

3    paraplegic, for example.  A person may gain sensation back,

4    but he won't get motor function back.  Where he gets sensation

5    back, that's a sensory nerve.  And sensory nerves have the

6    ability to regenerate themselves, and if their process is to

7    inform the patient of pain, that's what it generally does.

8    Q.   Okay.  And now, there's a few more injections, and I'm

9    only going to go through one more of them by itself because I

10   think it's different than the rest of them, but then we'll go

11   through the others kind of generally speaking.

12          On August 30th, 2019, I show that there was an

13   injection done by Dr. Anderson.  Is that your understanding?

14   **A.**   Yes.

15   Q.   And what was that one?

16   **A.**   On August 30th, 2019, was injections in the mid back area

17   at the facet levels, at the 2-3, 3-4, and 4-5.

18   Q.   And that's the -- roughly the same as the one that we

19   just talked about; correct?

20   **A.**   Correct, just in a different area addressing the symptoms

21   that Dr. Anderson believed he -- he had from in those areas,

22   yes.

23   Q.   Okay.  So a facet injection, whether it be in the

24   cervical/neck, thoracic/mid, or lumbar/low spine, they're

25   essentially, for all intents and purposes, the same; correct?

Raimundo Leon, M.D. - Direct

1    A.    In the sense of identification and resolution of symptoms

2    or improvements of symptoms, yes.

3    Q.    And how you would do it, it would be in the facet joint

4    just in a different part of the spine?

5    A.    Correct, correct.  So the technique, you know, at each

6    level is slightly different.  The size of the needle may be

7    slightly different.  But the -- the necessity and the

8    reasoning for doing it remains the same, whether it's in the

9    neck, mid, or low back.

10   Q.    And are you aware of a -- an ablation that was done in

11   October of 2019, October 28th, 2019?

12   A.    Yes.  That was in relationship to the cervical spine.

13   Q.    Okay.  So that's kind of going back to the -- the prior

14   ablations that we've already discussed in the same area, just

15   further in time; correct?

16   A.    Correct.

17   Q.    Okay.  And everything that we've discussed about the

18   prior ablations is the exact same thing, it's just a different

19   date?

20   A.    Just a different date, correct.

21   Q.    All right.  And then there's two more facet injections it

22   looked like -- it looks like April 30th of 2020 and May 14th

23   of 2020; is that your understanding?

24   A.    That's correct.  That's what the record revealed, yes.

25   Q.    And are those the -- the last facet injections that

Raimundo Leon, M.D. - Direct

1    Donald has received up to this point?

2    A.    The last injection, yes, November 25th of 2020.

3    Q.    Okay.

4    A.    In the mid back area, yes.

5    Q.    And do the records indicate whether or not Donald was

6    receiving benefit from those facet injections?

7    A.    Again, in the records there's description of improvement

8    but, again, never -- never resolution of the symptoms.

9    Q.    So I guess the -- the million-dollar question:  Is it

10   normal to continue to have to get that number of injections in

11   one location or one area?

12   A.    Sure.  When it relates to the facets and the treatment of

13   facets, that is one of the -- the most minimally invasive

14   treatment for those -- that type of pain is to repeat

15   injections for the duration of the patient's symptoms.

16   There's no set number.  You know, unfortunately, the

17   literature itself doesn't say -- we don't have the types of

18   study that say this person, based on X results, is only going

19   to require 1 or 100.  We don't have that.

20         We have some studies that show that over -- the

21   studies went over a window of time, anywhere between three to

22   six years, which show consistency of injections based on

23   improvement.  You know, because the question becomes then

24   what's the alternative, and the alternative for that is to

25   learn to live with the pain and have to deal with it in other

Raimundo Leon, M.D. - Direct

1    means, such as narcotic medications, anti-inflammatories,

2    change in lifestyle, and all the other things that we do to

3    minimize or improve our symptoms when we don't want to or

4    can't get those procedures.

5    Q.    And is what we've discussed today been the majority of

6    the significant treatment that Donald received for the

7    April 6th, 2013, collision?

8    A.    I believe it is, yes.

9    Q.    Now, obviously we didn't go through every single

10   appointment here, did we?

11   A.    We did not.

12   Q.    And if we had done that, it would have taken much longer

13   than it already did; isn't that correct?

14   A.    Yes, that's correct.

15   Q.    Okay.  And so the expert opinions that you came to in

16   this case, did they incorporate all the medical records,

17   whether we spoke about them or not?

18   A.    That's correct.  In reference to the opinions, however, I

19   took all the medical records that I reviewed, which --

20   including some of -- a number of them that we didn't discuss

21   in developing my opinions in reference to the symptomatology

22   and the causes of symptomatology, yes.

23   Q.    Okay.  And did you come up with any diagnoses as a result

24   of that -- those reviews of the records?

25   A.    Yes.

Raimundo Leon, M.D. - Direct

1    Q.   And what were those?

2    **A.**   Well, we start from the top working our way down.  In the

3    cervical spine he's got a facet-mediated symptomatology in the

4    cervical spine.  Based on the distribution and injections that

5    they performed in the -- in the mid back area, it appears he

6    has some facet-mediated pain in the mid back.  And lastly,

7    he's got facet -- he has facet-mediated pain in the low back.

8    So he has the same type of problem and, unfortunately, in

9    three areas of his spine.

10   Q.   And in evaluating this case with respect to Donald, were

11   you ever called upon to offer an opinion about any future

12   medical care that Donald might need?

13   **A.**   I was.

14   Q.   And how does that work?  What do you do when it comes to

15   that?

16   **A.**   What I'm asked is, you know, based on a given disease

17   process or based on a diagnosis that is -- that has been known

18   on there, understanding what we term in medicine the path of

19   physiology or how that pain relates, then I'm asked to opine

20   in reference to those symptoms and -- that were initiated as a

21   result of this trauma, how or what can that patient expect in

22   the future in reference to the necessity for medical

23   treatment.

24        And in my opinions, he was a candidate initially for

25   facet injections and then, from a long-term perspective,

Raimundo Leon, M.D. - Direct

1    medial branch radiofrequency rhizotomy or the destruction of

2    the small, little nerves.

3    Q.   And after you offered that opinion, is that what took

4    place?

5    A.   That's correct.  That's exactly what took place.

6    Q.   Is that what's up to the most recent past and continuing

7    to take place?

8    A.   Correct.  It's continuing to take place, yes.

9    Q.   And did you associate a cost with those items?

10   A.   I did.

11   Q.   And what was that?

12   A.   In reference to the cervical spine?

13   Q.   Yes.

14   A.   Based on the information when I -- when I was given the

15   information -- and this was in 2014 -- I estimated that the

16   cost would run in the -- in the neighborhood of $20,700.  And

17   within those costs, that includes the physician fee, the

18   facility fee, and as well as the anesthesia fee associated

19   with these procedures.

20   Q.   And is that something that happens once, or does that

21   happen over time?

22   A.   Well, again, if we're talking about the rhizotomy aspect

23   of it, that is continued; right?  We -- as we've seen in

24   Mr. Humes himself, they have been repeated because of the

25   symptomatology.  So the expectation, at least in trying to

Raimundo Leon, M.D. - Direct

1    determine future cost, we're asked to make decisions based on

2    information on this particular day.  We're making information

3    based on -- up to that point.  And it appeared to me, and now

4    as shown, that he continues to get benefit from these

5    injection therapies, and from a future perspective, a letter

6    that I wrote back in 2014 is holding true; that he will

7    continue to require these.  And, again, I cannot give a

8    specific number because we simply don't know.  As long as he

9    continues to have the symptoms, he is a candidate.

10            Now, based on experience, this is not unusual.  Based

11   on my experience, it's not unusual for a patient to get

12   multiple ablation therapies as a treatment option for these

13   types of ailments.

14   Q.   And will that continue for the remainder of his life?

15   **A.**   Yes.

16   Q.   And whenever you come up with these opinions, do you

17   utilize any sort of charts or databases to kind of determine

18   what the estimate for a person's lifetime might be?

19   **A.**   Well, you base the opinion on the available literature as

20   it relates to that particular procedure.  In this case, the --

21   the ablation therapy.  You base it on your clinical

22   experience.  You base it on some of the experience of your

23   colleagues, for example.  And then you base it on -- as far as

24   you use things like life expectancy charts, for example, of

25   how long somebody's expected to live, and those are -- there's

Raimundo Leon, M.D. - Direct

1    several influences on how we can determine or state that the

2    patient's going to require a particular procedure -- in this

3    case, a rhizotomy -- in the future.

4    Q.    And do you know what Donald's expected -- or life

5    expectancy is as he sits here today?

6    **A.**    Based on the chart that I reviewed and based on the

7    initiation, about 21 years is his life expectancy.

8    Q.    Okay.  And so what's your opinion as to how it relates

9    that he'll need this treatment for these accident-related

10   injuries in that future?

11   **A.**    I believe he's going to continue to require them.  He's

12   actually shown this already.  You know, if we look at the

13   medical records in totality -- not one specific instance

14   versus another, but if we look at the medical records, which

15   is, as an expert, what we should do, is look at them in

16   totality, recognizing that he has received benefit from these

17   procedures and there's -- there's been no documentation of

18   resolution.  So, therefore, just based between the initiation

19   of rhizotomy in 2014 through, now, 2019, there continues to be

20   the need for these injection therapies and, therefore, there's

21   nothing in the medical records or nothing in my experience

22   that -- that says otherwise, that he will not require them.

23   Q.    And do you have an opinion as to whether these diagnoses

24   that we've all just talked -- or that we just talked about

25   were caused by the crash in April of 2013?

Raimundo Leon, M.D. - Direct

1    **A.**    I do.

2    Q.    And what is that?

3    **A.**    My -- my opinion is that the diagnoses that we discussed

4    over the last several hours are causally related to the motor

5    vehicle accident of April 6th of 2013.

6    Q.    And did you ever provide that opinion in a -- a prior

7    proceeding under oath?

8    **A.**    Yes, I believe that in -- in my records, my expert

9    reports that I provided, and I believe in my deposition I

10   stated that it was causally related.

11   Q.    Okay.  So you reviewed not just the -- the records but

12   also the bills; is that correct?

13   **A.**    I did.

14          **MR. WILSON:**    Your Honor, may I grab an exhibit and

15   approach?

16          **THE COURT:**    Sure.

17          **MR. WILSON:**    Thank you.

18          **THE COURT:**    What exhibit are you going to be

19   referring to, Counsel?

20          **MR. WILSON:**    31, Your Honor.

21   **BY MR. WILSON:**

22   Q.    I've just handed you what's been premarked for

23   identifying as Exhibit 31.  What is that document?

24   **A.**    This document provides a list of the treatment and

25   entities or the entities where he received treatment starting

Raimundo Leon, M.D. - Direct

1  with Med West, which is the ambulance company, leading through

2  procedures he received at Black Hills Urgent Care -- or, I'm

3  sorry -- yeah.  So it appears that all the different

4  treatments that he received during his care as it relates to

5  these injuries that we spoke with.

6  Q.   That document is -- was not generated by those providers,

7  was it?

8  **A.**   It was not.

9  Q.   Nevertheless, each of the providers listed, do they have

10  a -- a number for the total value of the care that was

11  rendered at that location?

12  **A.**   Yes.  It appears that the -- each provider, you've listed

13  what is in the medical records as their own billing.  You

14  summarized them here in -- in this chart.  So, yes, these are

15  the actual bills that I reviewed when I was reviewing the

16  medical records.

17  Q.   And does that summary accurately reflect the total amount

18  of bills that are associated with each of the various

19  providers despite not being in the original condition?

20  **A.**   Yes.

21  Q.   Okay.

22       **MR. WILSON:**   Your Honor, at this point I move to

23  admit into evidence what has been premarked for identification

24  as Exhibit 31.

25       *(Exhibit No. 31, offered.)*

Raimundo Leon, M.D. - Direct

1          **MR. ROGERS:**  It's been stipulated, Your Honor.

2          **THE COURT:**  All right.

3          **MR. WILSON:**  Apologies.

4          **THE COURT:**  Thank you.  Thirty-one will come in.

5     *(Exhibit No. 31, received.)*

6          **THE COURT:**  Do you want to do something with that?

7          **MR. WILSON:**  I'd like to publish it to the jury.

8          **THE COURT:**  Great.

9     *(Exhibit No. 31, published.)*

10         **THE COURT:**  So you just pop that up.

11         **MR. WILSON:**  Do you know the orientation?

12         **THE COURT:**  We never know until we start.  That

13    looks -- that looks right.

14         **MR. WILSON:**  Okay.

15         **THE COURT:**  Or it was a moment ago.

16         **MS. TEMPLE:**  There we go.

17         **MR. WILSON:**  So despite my age, I'm severely

18    technologically challenged.

19         **THE COURT:**  There we go.

20    **BY MR. WILSON:**

21    Q.   And so this is the document that we were just discussing;

22    is that correct?

23    **A.**   Yes, sir.

24    Q.   So you started that top there at MedicWest, and then

25    there's a number right next to that, $950.02?

Raimundo Leon, M.D. - Direct

1    **A.**   Yes.

2    Q.   And so that would be the -- the total bill that was

3    incurred at that location?

4    **A.**   Correct.

5    Q.   Okay.  And the total there, $160,397.03 represents the

6    total of all the care we discussed here today?

7    **A.**   That's correct.

8    Q.   Okay.  Have we gone over all of the care that Donald has

9    and is currently receiving for the collision-related

10   diagnoses?

11   **A.**   I believe we have, sir, yes.

12   Q.   And were those treatments reasonable, necessary, and

13   related to that collision --

14   **A.**   Yes, they were.

15   Q.   -- of April 6th, 2013?

16   **A.**   Yes.

17   Q.   Are you aware of another expert who was hired by Acuity

18   in this case?

19   **A.**   Yes.

20   Q.   What, if anything, is his function here?

21   **A.**   He's an expert witness for the defense in reference to

22   the medical records he reviewed.

23   Q.   Did you review all of his reports?

24   **A.**   I did.

25   Q.   I'd like to discuss a couple of things from those

Raimundo Leon, M.D. - Direct

1   reports, if you don't mind.

2   **A.**   Sure.

3   Q.   In his initial report he mentioned the Glasgow -- GSC.

4   And I forget the acronym.

5   **A.**   Glasgow Coma Scale.

6   Q.   Glasgow Coma Scale.  Yeah, there we go.  I got it

7   backwards.  That's what it was.

8            -- that Donald received while in the hospital.  Can

9   you briefly explain what that is?

10  **A.**   Yeah.  Glasgow Coma Scale is a -- is a scale that's used

11  in an acute trauma to assess the patient's alertness and

12  concentration and mentality.  It's the ability to function.

13           So there's three components to it.  There's a verbal

14  component to it.  There's a motor component to it.  And all

15  these three components will lead to a score, and that score

16  gives the doctor some indication of any potential acute

17  trauma.  That's what it relates to, an acute trauma to the

18  brain itself.

19           And it's used in trauma centers.  I mean, it's a very

20  common -- by emergency medical personnel, that gives

21  information to the hospital, for example, if they're

22  communicating that this person is alert and oriented and is

23  following commands and there's not a concern of a neurological

24  process that may cause a problem, so...

25  Q.   And does that have any significance when related to the

Raimundo Leon, M.D. - Direct

1    complaints that Donald was having for cognitive issues?

2    **A.**    No.   The Glasgow Coma Scale is -- is in reference to an

3    acute problem, not things down the -- down the road.   There is

4    some suggestion that, if your Glasgow Coma Scale is low or

5    there's a number of things there, that there might be some

6    cognitive issues in the future from that perspective if the

7    numbers are low.   But his was normal.   So there's no

8    indication that on that day there was going to be any sort of

9    cognitive issues.

10   Q.   And in line with things from that first day of the

11   incident that appeared normal, Dr. Schifini also noted that

12   the x-rays at the emergency room appeared normal.   Do you

13   recall reading that?

14   **A.**    Yes.

15   Q.   Does that have any significance or change any opinions

16   that you previously discussed?

17   **A.**    No.   What it tells me is that he has no fractures.

18   There's -- there's nothing acute that needs to be addressed

19   from a surgical perspective, for example, immediately.   That's

20   what it tells me.

21          Remember, we spoke earlier that x-rays and MRIs are a

22   picture of a moment in time, and it's used in the assistance

23   of determining injuries and doesn't determine whether or not

24   something will happen after.   It's simply a moment in time.

25          And I would agree with Dr. Schifini there was no

Raimundo Leon, M.D. - Direct

1   fractures or -- I think he used the word normal in there.

2   That would be not unusual.

3   Q.   Okay.   Doctor -- and I know I'm jumping around on this,

4   but I don't intend on going through everything here with it,

5   with respect to his reports.   But he also discussed the first

6   injection that occurred on August 14th, 2013, and the lack of

7   an analogue pain scale after the injection.   Can you describe

8   what that means?

9   **A.**   What he was referring to is that there was no

10  documentation from a first score -- from the first procedure

11  of any particular type of improvement the day of the

12  procedure.   And from the type of procedure that was performed,

13  it's not unusual.   You know, we all have different ways of

14  practicing and in being able to communicate with patients

15  the -- a success or lack thereof after a procedure.   And he

16  was correct, I did not see that -- on that particular day that

17  he was asked specifically in reference to what's called a VAS,

18  or a visual -- visual analogue pain scale score, and that's a

19  person -- that's the patient's interpretation of how bad his

20  symptoms are.

21       The general explanation is zero is obviously no pain.

22  And the way I explain it to my patients, ten being the worst

23  pain you've ever had in your life that you have to be

24  hospitalized, just to kind of give a patient an indication.

25       And what we're trying to do with that is gauge

Raimundo Leon, M.D. - Direct

1    improvement, gauge, you know, success of a particular therapy
2    or typical modality.
3    Q.   So depending upon how a particular physician practices,
4    not asking that question, does that render that treatment
5    insignificant or not available for diagnostic purposes?
6    **A.**   Well, it we're specifically talking about that first
7    procedure, you know, an epidural, which was a C7-T1 if I'm
8    correct, that, in general, is not diagnostic in nature.  It's
9    not going to tell you where the pain comes from.  It's simply
10   going to tell you whether there's inflammation and it helps.
11          So for that reason, you know, I think I -- at times I
12   may not ask the patient during an epidural a pain scale score
13   just because whether there's improvement there at the moment
14   it's not -- it's not helping me in the diagnostic perspective
15   but it's helping me in the therapeutic perspective.
16          So the fact that there was no pain scale score does
17   not make the procedure irrelevant.  It still was warranted and
18   was reasonable as based on the description and examination
19   that Dr. Trevor performed.
20   Q.   Okay.  Another thing that Dr. Schifini specifically
21   mentioned in some of his reports was the discussion about
22   sedation --
23   **A.**   Yes.
24   Q.   -- in your -- in your injection, specifically with the
25   uses of propofol and Versed.  Do you recall that --

Raimundo Leon, M.D. - Direct

1    **A.**    Yes.

2    Q.    -- analysis?

3    **A.**    I do.

4    Q.    Can you please discuss that?

5    **A.**    Sure.  Dr. Schifini, in his reports, he -- he does not

6    like the use of certain sedations.  It's not like he doesn't

7    like sedation because my understanding, as a practicing

8    physician here, he does use sedation.  But we tend to use

9    different types of sedations, and he is uncomfortable or does

10   not approve of, in his practice, propofol.  In my practice and

11   in the practice of a lot of fellowship trained physicians do

12   use it as a -- as a sedative property.

13         When you perform sedation, the idea is to make the

14   patient comfortable and not asleep.  During these -- during

15   these procedures the patient -- we have many different

16   monitors that we use, but the best monitor that a physician

17   has while performing these procedures is the patient.  So the

18   patient -- the use of sedation is to make the patient

19   comfortable but still awake, following commands, listening to

20   us.  Because if that needle goes to a place that it shouldn't

21   go or that injectate that we put in goes into the spinal cord,

22   the vertebral artery that goes to your brain, all these

23   different places that can cause problems, you're going to want

24   to know that and prevent that.  And the way you prevent that

25   is by having the patient to be comfortable and alert and

Raimundo Leon, M.D. - Direct

```
 1   talking to you.
 2            So we would disagree on the types of sedation that we
 3   use, but at the end of the day the majority of pain physicians
 4   use some sort of type of sedation, and it's -- it's patient --
 5   it's physician choice.  It's physician comfortability in what
 6   you're trying to use.
 7            For example, some of our colleagues use IV narcotics
 8   as part of their sedation.  I don't tend to use that because I
 9   believe IV narcotics can cause resolution and take away some
10   of the diagnostic value, for example.  But, again, that's just
11   my opinion on there.
12            So it is a physician choice.  And ultimately what we
13   want to do is make sure that the patient is taken care of and
14   is safe.  So whatever sedation or medication used for your
15   sedation, the physician that's providing that service needs to
16   be comfortable with.
17   Q.   And while you were performing your injection, was Donald
18   awake and aware and able to discuss, you know, what was going
19   on with you to do what you just said, to make sure nothing
20   wrong happened?
21   A.   That's correct.  There is no better monitor than that of
22   the patient.
23            Now, that being said, what's sometimes -- because of
24   the sedation that we do use, the patient may not recall.  And
25   non-recollection doesn't mean you were asleep.  Many times a
```

Raimundo Leon, M.D. - Direct

1   patient does not recall but, yet, I will mention a

2   conversation we may have had in reference to a topic and, oh,

3   I said that?  Yes.

4           Yeah.  By far I -- I think Dr. Schifini makes a point

5   that these procedures should not be done under a general

6   anesthetic, and I agree with that.  I think that the patient

7   is the most important monitor here.

8           So, again, it goes back to doctor choice, doctor

9   comfortability, and what you're trying to accomplish when

10  you're doing these procedures.

11          I can tell you that if Mr. Humes at any point wasn't

12  conscious or wasn't able to communicate with me, the procedure

13  would have been stopped immediately because, again, that's my

14  best monitor.

15  Q.   And how much propofol did you use?

16  **A.**   I believe the anesthesiologist used 20 to 30 milligrams.

17  So if we talk about amounts -- again, sedation is -- is

18  relative also to the amount given.  That is a very small

19  amount, generally less than 10 percent of what Mr. Humes would

20  require if he were to go general anesthetic.  For example, if

21  he was going to have his gallbladder taken out, the chances of

22  him -- the amount of medication that he would require to

23  render him asleep to do the things that we need to do would be

24  ten times that, eight times that.

25          So as you can see, it's a miniscule amount that we

Raimundo Leon, M.D. - Direct

1   use compared to -- to other sedations.  And I use in

2   combination of the medication called Versed.  Now, Versed is

3   a -- is a similar drug to that of Valium.  It just works much

4   quicker and lasts much shorter on there.  So with the

5   combination of the two, it allows me to maintain or decrease

6   the amount of each that I can do.  By using the combination,

7   we can -- we can decrease any potential side effects of using

8   any sedation.

9   Q.   Almost done here.

10         Generally speaking, he discussed how sometimes Donald

11  would get a procedure done and then relatively close to it he

12  would report, you know, symptoms coming back or haven't had as

13  much relief.  The specific reference was -- was a physical

14  therapy appointment where six days after an injection with

15  Dr. Anderson he went to the physical therapist and he said

16  I've still got pain.

17         Is that sort of reporting when it happened and the

18  way that Dr. Schifini referenced it concerning at all?

19  A.   Well, I think specifically that injection was a steroid

20  injection, and you have to give some of these procedures from

21  a medication perspective time.  Anti-inflammatory medication

22  that's injectate can vary in the onset of time.  The average,

23  once you put anti-inflammatories in any particular area, it

24  can take -- it can be -- it can start working as immediate as

25  the next day to as long as ten days.  So if it's in

Raimundo Leon, M.D. - Direct

1    relationship to the choroidal effect for somebody at six days

2    out to say there's no improvement, that would not be unusual.

3    Q.    Okay.   Dr. Schifini also mentions the fact that after

4    Donald was in the collision here in Las Vegas he had to drive

5    back to South Dakota.   Do you recall that discussion?

6    **A.**    Yes.

7    Q.    Doctor, do you ever tell your patients they can't go on

8    long drives after a collision like this?

9    **A.**    No.

10   Q.    All right.   So a trip from here to South Dakota, which is

11   a considerable distance, is that medically impossible after

12   sustaining injuries the way that Donald did in this collision?

13   **A.**    Not the type of injuries that he sustained, no.

14   Q.    Okay.   And is it anything that would have been

15   aggravating to his condition?

16   **A.**    Again, what play as role in that, the way he was sitting,

17   the amount of stops he had.   I mean, there's -- there's

18   differing components of could it -- could that driving

19   aggravate or make -- sure, it can.   But to say that he cannot

20   do it, you know, based on the injury, that's incorrect.

21   Q.    And is making an -- is taking that drive and using it to

22   say that there wasn't an injury, is that medically sound?

23   **A.**    Not at all.   I think that we're comparing apples and

24   oranges.   I mean, I think it's based on -- again, when we take

25   records in totality, you know, when you look at the complaints

Raimundo Leon, M.D. - Direct

1    the patient had, the physical examination that were done prior

2    to that drive clearly showed he had issues at multiple levels.

3    He had symptoms in multiple levels.  But at no point, in my

4    opinion, that those symptoms would prevent him from driving or

5    being in a vehicle being driven.

6    Q.   Okay.  Do you know what an activator is?

7    **A.**   An activator?  Yes.

8    Q.   What is it?

9    **A.**   An activator is a device that chiropractors and at times

10   physical therapists -- bless you -- use to release any muscle

11   tension that may exist.  And generally it's a -- the way it's

12   performed is that the chiropractor can feel the muscular

13   structures and is using this device to essentially release any

14   type of tightness or swelling or something to that effect that

15   may be occurring in a particular muscular structure.

16   Q.   Where is that usually performed at?

17   **A.**   Well, generally the general practice for these -- for the

18   chiropractors is you start low and work your way up.  So in

19   other words, you start in the low-back area and kind of just

20   go up depending on what he or she is feeling along with any

21   patient complaints.

22        So usually, my experience with -- with the activator

23   system that's used with our local physicians is that they

24   normally start in the place that bothers them the most; right?

25   So the patient comes in says, Doc, my low back is tender, et

Raimundo Leon, M.D. - Direct

1    cetera, they may use that device and start at the area of --
2    of biggest complaint and move elsewhere.
3    Q.    Okay.  And then, finally, Dr. Schifini stated in his
4    reports that Donald would have reached a maximum medical
5    improvement by June of 2013.  What does that mean?
6    A.    Well, that would mean that Mr. Humes only had a muscular
7    injury and that other things that were to be done up -- that
8    were done up to that point should have resolved.  The simple
9    fact that it didn't, the simple fact that you have multiple
10   physicians documenting continued symptomatology, I would
11   disagree with that opinion that it was just a sprain/strain or
12   that the treatment would have resolved his symptoms by that
13   window of time.  I think the records speak for themselves.
14   Q.    Okay.  But at a basic level, Dr. Schifini, in stating
15   that, is acknowledging that Donald was injured in this
16   collision; is that correct?
17   A.    He acknowledged that there's something, right, but the
18   something that he acknowledged, in my opinion, is incorrect.
19   He acknowledged that at best it was a muscle-type injury or
20   what's -- what's known in the medical arena as sprain/strain
21   and there would have been no problems anywhere else but the
22   muscles.  And we know that to be incorrect simply by the
23   procedures that he received.  The procedures that he received
24   are very specific, and they were not for a sprain/strain.
25   They were not for the muscular structure.  They were for the

Raimundo Leon, M.D. - Direct

1    structure of the spine itself.

2    Q.   And then, finally, the procedures that Donald received,

3    specifically the ablations, are those comfortable?

4    **A.**   No.  They're -- that's one of the few procedures, at

5    least in my practice and in most practices, you actually give

6    the patient IV narcotics during the procedure or shortly

7    thereafter.  And the reason for that is because, again, what

8    that -- we didn't talk real specifically about the procedure,

9    but what it is, it's a needle that's placed in the direction

10   or onto that nerve and that needle is connected to a device

11   called a radiofrequency machine that generates heat.  And that

12   amount of heat is 80 degrees Celsius.  Depending on what

13   you're burning, that's significantly hot.

14        And, again, there are other sensory nerves that

15   may -- may be present, and that's why the patient is

16   uncomfortable and that's why the full effect of that procedure

17   is not instant.  Discussion of success of that type of

18   procedure sometimes is delayed several weeks because of the

19   aggravation or the -- what's known as a neuritis because

20   you're actually -- the idea is to irritate and remove, if you

21   will, the top layer so there's no communication with the brain

22   that you have pain from that area.

23   Q.   Okay.

24        **MR. WILSON:**  No further questions.

25        **THE COURT:**  Thank you.  Cross.

Raimundo Leon, M.D. - Cross

1          **MR. ROGERS:**  Thank you, Your Honor.

2                        **CROSS-EXAMINATION**

3     **BY MR. ROGERS:**

4     Q.    All right, Doc.

5     **A.**    Good afternoon, sir.

6     Q.    Yes.  Now, you and I have met many times before in

7     depositions and at trials so I'll begin where we typically

8     start and that is your medical training first.  As you

9     mentioned, you went to Ross Medical School?

10    **A.**    That's correct.

11    Q.    And you went to undergrad at UNLV before going to Ross?

12    **A.**    I did.

13    Q.    And while you were at UNLV, you actually knew

14    Dr. Schifini --

15    **A.**    Yes.

16    Q.    -- before either of you went to school, medical school?

17    **A.**    That's correct.

18    Q.    Okay.  And you go to school in Dominica in the Caribbean.

19    Is -- is that the same as the Dominican Republic?

20    **A.**    No.  It's a separate island.  It's its own island.  It's

21    in the West Indies.

22    Q.    Okay.  Now, you're aware that your résumé represents that

23    Ross Medical School is in New Jersey?

24    **A.**    At the time the main office, for letter purposes and

25    transcription purposes, is in the United States.  So it's a

Raimundo Leon, M.D. - Cross

1   mailing address.  But the campus, as I -- as it is, is in the

2   Caribbean.  And most recently the campus now is in Barbados.

3   Q.   Okay.  Now, did you apply to U.S. medical schools?

4   **A.**   I applied to two U.S. medical schools.  One I received an

5   alternate position, and the other I was -- I was denied.  And

6   I chose, had the opportunity, to go down to that school, and I

7   went.

8   Q.   Okay.  So were you accepted into any U.S. medical

9   schools?

10   **A.**   No, I was not.

11   Q.   Okay.  Then after completing medical school in Dominica,

12   you came to the U.S. where you got the residency you spoke of?

13   **A.**   Right.  Well, let's kind of back up a little bit a

14   second.  That school, there are a number or several medical

15   schools in the Caribbean that you spend the first two years of

16   your academic settings in the island, and then you spend your

17   third and fourth years rotating through -- through -- through

18   clerkships through U.S. medical schools here in the U.S.  And

19   that's what I did.  So I spent my third and fourth year

20   rotating through the clerkships at the University of Colorado,

21   but my graduating -- I graduated from Ross University.

22   Q.   Got it.

23        Now, you said you did your pain management

24   fellowship.  Do you know what year pain management fellowships

25   were initiated?

Raimundo Leon, M.D. - Cross

1    **A.**   It's my understanding in 1992 to '94 where the

2    understanding -- where -- actually, there was a certification

3    process.  Prior to those years, there was -- they weren't --

4    they weren't structured fellowships until such time.

5    Q.   Okay.  Now, you were asked if the other doctors in this

6    case attended a fellowship program.  You didn't mention

7    Dr. Bhalani who, just for the jury's sake, is the pain

8    management physician in Florida.  Was he fellowship trained?

9    **A.**   You know, Counselor, I don't recall.  I think they asked

10   me about -- I thought the question was in reference to

11   Dr. Trevor.  I don't know.

12   Q.   Okay.  Now, just so that the jury, many of whom are not

13   involved in -- in litigation or have little experience there,

14   just so that they get it, when you are called as an expert in

15   a case, there are a few documents that you produce.  One is

16   the résumé that we've just discussed.  Another is your

17   testimony history.  And in the testimony history that you've

18   produced it reflects that I think around 2019 you had

19   testified somewhere around 400 times.  Does that sound

20   correct?

21   **A.**   If -- are we saying in trial or depositions or?

22   Q.   That's just all the testimony that you listed in your

23   chart.

24   **A.**   That -- if that's -- I don't know exactly the number, but

25   that would sound about correct, yes.

Raimundo Leon, M.D. - Cross

1  Q.   Okay.  Now, every time you've testified in court, as

2  you're doing here today, you've done so on behalf of a

3  plaintiff involved in a personal injury lawsuit, never for a

4  defendant; correct?

5  **A.**   In reference to actual court testimony, that's correct.

6  Q.   And in your practice, your intake sheets contain a

7  section that inquires about the attorney's identity.  Is it

8  fair to say that your medical practice has forms in place for

9  personal injury claims?

10 **A.**   The fact that we do accept those patients, yes, those

11 forms are in place, yes.

12 Q.   You mentioned earlier that you see about 150 patients a

13 week.  On a percentage basis, how many of your patients are

14 involved in personal injury claims?

15 **A.**   And it varies between day by week by month, but I think

16 if we take it on a monthly basis, anywhere between 25 to

17 45 percent of my practice would have involved patients that

18 in -- are in litigation or pre-litigation or, in other words,

19 represented by an attorney.  That would not be uncommon.

20 Q.   Other times on a monthly basis that it's greater than

21 50 percent?

22 **A.**   On an individual basis, I've never looked at it.  But,

23 yes, that would not -- that -- that would be -- that could --

24 that could occur, yes.

25 Q.   Okay.

Raimundo Leon, M.D. - Cross

1    **A.**    And then there are other times where there are none.

2    Q.    Now, you've described your practice as a pain management

3    physician.  Do you currently have privileges at a hospital?

4    **A.**    I do.

5    Q.    Do you do OR work?

6    **A.**    I do not.

7    Q.    Okay.  And by that I mean operating room.

8          Where do you have privileges?

9          I'm just going to get my water.

10   **A.**    Sure.

11   Q.    Go ahead.

12   **A.**    So currently I have privileges at Valley Hospital, UMC,

13   and Desert Springs, if I'm not mistaken.

14   Q.    Okay.  When did you last do anesthesia in an operating

15   room?

16   **A.**    In a hospital?

17   Q.    Yes.

18   **A.**    It's been a number of years.  Probably '04/'05.

19   Q.    Okay.  How many times have you testified for plaintiffs

20   who are represented by the attorneys who represent Mr. Humes?

21   **A.**    You know, Counselor, I don't have an exact number.  But,

22   I mean, I would venture to guess somewhere 10 to 12 percent of

23   my overall testimony may have been in relationship to

24   counselor's law firm.

25   Q.    Okay.  There are -- I don't mean just their current law

Raimundo Leon, M.D. - Cross

1    firm but also the previous incarnation, Ganz & Hauf.

2    **A.**   I just -- I took it upon myself to assume that you

3    would -- yes, that's the same answer.

4    Q.   Okay.  And by that percentage, you're talking about of

5    the 400 some-odd cases back in 2018?

6    **A.**   That would be correct, yes.

7    Q.   What was the percentage again?

8    **A.**   About 10 to 12 percent.

9    Q.   Okay.  And you've -- you've been friends or had a

10   relationship with the partners at that law firm for a couple

11   decades or more; right?

12   **A.**   Counselor, you need to be more specific.  What do you

13   mean relationship?

14   Q.   Well, for example, when Mr. Ganz ran for state court

15   judge, you hosted a campaign fundraiser for him?

16   **A.**   I was one of the people, yes, that assisted with that,

17   yes.

18   Q.   Okay.  You and your wife and your son contributed

19   thousands of dollars to his campaign?

20   **A.**   His campaign and many other campaigns as well, other

21   judges.  He was not the only judge that we contributed to.

22        **THE COURT:**  Can you stop for just a second?  I just

23   saw some new folks came in.  I just want to make sure we don't

24   have any witnesses in the gallery.

25        **UNIDENTIFIED SPEAKER:**  No, ma'am.

Raimundo Leon, M.D. - Cross

1          **THE COURT:**  Okay.  Thank you.  You can continue,

2     Mr. Rogers.

3          **MR. ROGERS:**  Thank you.

4     **BY MR. ROGERS:**

5     Q.   And if someone in your family had posted on social media

6     that you have been friends with Mr. Ganz for 20-plus years,

7     would that be an accurate statement?

8     **A.**   Again, Counselor, I don't have social media, so I'm not

9     sure what you're referring to.  To know that I've known

10    Mr. Ganz a long time, the answer is yes.  Have I been to

11    social events that Mr. Ganz has been at?  Yes.  If that -- if

12    that -- that relationship is considered friendly or

13    friendship, I would say yes.

14    Q.   All right.  Now, you said during direct -- which is the

15    questioning from opposing counsel -- that you consider

16    yourself first and foremost a patient advocate.

17          Now, of all the times that you've come to court and

18    testified for a plaintiff involved in a car accident lawsuit,

19    have you ever testified that none of the conditions that you

20    diagnosed were related to the car accident?

21    **A.**   Well, two -- I'll answer it to two ways, Counselor.

22    First of all, the question that -- that was asked of me was in

23    reference to my practice and the reasoning for doing personal

24    injury as opposed to other types of practices, not necessarily

25    the coming-to-court aspect of it.

Raimundo Leon, M.D. - Cross

1              Secondly, I -- I can't remember, as you mentioned

2    400-some times, what exactly I testified to in the past.  But

3    I can make this statement.  As a physician and/or as an

4    expert, if something is not related, I've stated so, whether

5    it is in a deposition or whether it is in a courtroom or

6    whether it's in the medical records.  If I believe that a

7    particular process is not related, it would be stated as such.

8    Q.   Okay.  Now, that -- that answer didn't exactly answer the

9    question, though, which is:  Have you ever come to court and

10   testified that none of the conditions with which you diagnosed

11   the patient -- or plaintiff in the car accident lawsuit --

12   were related to the car accident?

13   **A.**   Well, again, Counselor, you're asking me to remember

14   every diagnoses that I would have made.  If I would have

15   diagnosed a patient, for example, with migraine headaches,

16   right, which would be a diagnosis for the patient, and if that

17   headache was not related, it would have been -- and if I would

18   have been asked, it would have been stated as such.

19              So the answer is:  Every time, to the best of my

20   recollection, that I've testified in court or in deposition,

21   if I feel that the injury or if I feel that the diagnosis that

22   was given is related to the incident, it would be stated as

23   such.  If a diagnosis of a patient -- and I use migraines as

24   somewhat of a common one -- that is not related to that and

25   I've been asked, I would not relate it.

Raimundo Leon, M.D. - Cross

1    Q.   Okay.  That -- that's actually the same answer, though,
2    as before.  The question is:  Have you ever testified in court
3    that none of your diagnoses were related to the car accident?
4    A.   I can't imagine that none would be an answer where I
5    would have not had -- the reason for being there would be that
6    I believed that a diagnosis would have been related to.  So to
7    say that I've never -- that none would -- I don't believe
8    that.  You're asking me to remember over 400 processes.  I
9    don't recall a moment where I said absolutely none of the
10   diagnoses that I provided in a situation that were given that
11   were not related.  No, I don't recall that.
12   Q.   Okay.  How much are you charging to be here today?
13   A.   We charge $5,000 for half a day.
14   Q.   So it will be more than that for today?
15   A.   That's correct.  It was more than half of a day.
16   Q.   Did you meet with plaintiff counsel to prepare?
17   A.   I did not.  I communicated with their office in reference
18   to timing and location.  We were initially supposed to be here
19   on Monday and that changed.  So there's -- there has been some
20   communication with their office mostly through my office
21   staff, but that's a -- that's a communication that we've most
22   recently had.
23   Q.   Did you assist in preparation of any of the questions
24   that you answered today?
25   A.   Absolutely not.

Raimundo Leon, M.D. - Cross

1    Q.   Who was it at plaintiff counsel's office who you spoke

2    with?

3    **A.**   I believe Brigette is her name.

4    Q.   Okay.

5    **A.**   That's one of the paralegals, if I'm not mistaken.

6    Again, this communication was done through my office staff.

7    Q.   So your testimony is you didn't speak with any of the

8    attorneys before coming here for trial today?

9    **A.**   That is my testimony, yes.

10   Q.   Did you speak with them before preparing that cost letter

11   that you discussed during the direct examination in which you

12   projected future costs for rhizotomies?

13   **A.**   I don't know if I -- I can't say I didn't.  I would

14   imagine at some point during -- once becoming an expert, I may

15   have talked to counsel, but I don't recall any specifics.

16         And to your specific question, I do not recall

17   speaking to any counsel in reference to the future cost.  I

18   believe that came over, if I'm not mistaken, in reference to

19   through an e-mail or -- and/or hand delivery request for that

20   cost letter.

21   Q.   Now, you've -- you've discussed some about your review of

22   Dr. Anderson's records.  Dr. Anderson is the South Dakota pain

23   management physician.  His records contain entries that the

24   plaintiff was asking him to speak with plaintiff counsel.  Did

25   he ever ask you to do that?

Raimundo Leon, M.D. - Cross

1    **A.**   I don't recall if he did or didn't, and I would have

2    done -- similar, I would have documented that if that was a

3    request.  But as I sit here today, I don't recall if Mr. Humes

4    specifically asked me to speak with plaintiff counsel.

5    Q.   Okay.  You had your deposition taken in this case.  What

6    did you charge for that?

7    **A.**   $1,500.

8    Q.   Per hour?

9    **A.**   That's correct.

10   Q.   So in addition to the roughly $10,000 for today is the

11   $1,500 per hour for your deposition?

12   **A.**   That's correct.

13   Q.   And you were asked about your lien.  Before I get into

14   your testimony about it, a significant portion of your patient

15   base is personal injury.  Of those patients, how many treat on

16   a lien?

17   **A.**   Again, Counselor, that's not how we -- we -- we denote

18   it.  But there is a -- a portion -- a percent -- a certain

19   percentage -- and I don't know that percentage as I sit here

20   today -- but a certain percentage of those patients involved

21   in personal injury are through a lien as opposed to other

22   forms of payment.

23   Q.   Does 90 percent sound correct?

24   **A.**   I -- again, Counselor, I don't know how high it is.

25   Q.   Okay.  You said that the lien was paid.  Now, Acuity, my

Raimundo Leon, M.D. - Cross

1    client, had medical payments coverage.  All of it has been

2    paid.  Did Acuity pay your bill?

3    **A.**    No.

4    Q.    Who did you submit your bill to?

5    **A.**    The person was on a lien, so we submit it to the law

6    firm.

7    Q.    The law firm paid your lien?

8    **A.**    The lien was paid.  Exactly how -- portion was it, I

9    don't know.  All I know is that our lien was paid.  You're

10   asking specifically.  I don't know if Acuity had any portion

11   to my bill.  I don't know that.

12   Q.    Okay.  Well, do you know whether the law firm paid it?

13   **A.**    I believe -- well, the bill was to Mr. Humes.  So exactly

14   who paid it, when they paid, I don't know that.  I don't have

15   that information.  That's not something that I keep track of.

16   That's administrative issues.  I wasn't aware that the lien

17   was paid until I was reviewing to come here today.

18   Q.    Okay.  Has it all been paid?

19   **A.**    Yes.

20   Q.    Now, you have two billing entities involved in this case;

21   that's you and the surgery center that you're an owner of.

22   Does this lien we're discussing that's been paid include the

23   surgery center?

24   **A.**    Well, first off, Counselor, I'm a percentage owner, and

25   there's -- there's four other owners within that facility.

Raimundo Leon, M.D. - Cross

1     It's not just my facility.

2              Secondly, every facility is in and of itself.  I do

3     not manage the liens for Box Canyon Surgery Center.  That is a

4     separate entity, and I don't know if that lien has been paid.

5     Q.   All right.  You were asked earlier about your opinion of

6     the charges from other states, from the medical providers.

7     **A.**   That's correct.

8     Q.   You've been practicing really your entire career in

9     Las Vegas; right?

10    **A.**   Correct.

11    Q.   And I understand that you're familiar with the charges in

12    the town where you work.

13             Had you ever practiced in South Dakota?

14    **A.**   I have not.

15    Q.   Okay.  You were asked if the charges from various

16    providers there were usual and customary.  I think your

17    testimony was that you had access to, well, fee databases.

18    **A.**   Correct.

19    Q.   Did you actually use them?

20    **A.**   Yes.  That's why I stated in my last report where that

21    information was obtained.  I failed to mention it in the first

22    report, but that's my standard of practice.  As an expert,

23    when I'm asked or tasked to identify charges, right, one fair

24    way to look at it is by organizations that do the legwork in

25    reference to communities, states, regions, et cetera, and

Raimundo Leon, M.D. - Cross

1    that's -- that's what I use.  On top of which having attended

2    multiple conferences since 2002 that are relationship to

3    billing on there and having opportunities to listen to other

4    physicians and in some cases different specialties of their

5    charges for procedures.

6           So it's a wealth of data that -- that -- that comes

7    in.  On top of that, when you take a look at the regional --

8    what I believe to be reasonable in both of those states when

9    you compare them to the -- Las Vegas for some of those

10   procedures, they're similar.

11          So from that perspective, yes, I believe I was

12   qualified and I believe that, based on that information, that

13   I can state that the charges that were present would be

14   considered usual and customary for that individual location.

15   Q.   Well, what was your charge for the one injection that you

16   did in this case, the medial branch block?

17   **A.**   Counselor, I don't have the exact bill.  I want to -- let

18   me see here.  I don't have my bill in front of me, but I

19   believe it was $7,200.

20   Q.   Okay.  Do you know what Dr. Anderson's charge was for his

21   facet block?

22   **A.**   I believe it was just under $3,000.

23   Q.   Is it less than $2,000 maybe?

24   **A.**   Maybe it was less than $2,000, correct.  $1,980 something

25   if I remember correctly.  I mean, we can look at the bill

Raimundo Leon, M.D. - Cross

1    itself to see if we're going to be accurate, but yes.

2    Q.   Okay.  Which of these databases did you use for the

3    South Dakota charges?

4    **A.**   Again, both of those databases, specifically

5    fairhealthorganization.com, by placing in the specific codes

6    of the procedures and in how they bill them, that would give

7    you information about that community or that state or that

8    region.

9    Q.   And why didn't you provide that analysis, that disclosure

10   to the defense, to us?

11   **A.**   I thought in the report I mentioned that, that that's

12   what I did.  That's the analysis that I used.

13   Q.   You didn't mention anything about, for example, which

14   percentile any of the South Dakota providers were -- were

15   within the usual and customary.

16   **A.**   Well, understanding what usual and customary is, right, I

17   did not say specifically what percentile.  No, that I did not.

18   I looked at it from a global perspective of ranges for the

19   procedures that are done, and that's how I determine whether

20   something would be usual and customary.

21        But to say that I broke it down to the 20 percentile

22   versus the 70 percentile, that I did not do, no.

23   Q.   Okay.  And I'm not, you know, being so exacting as to

24   require a specific number, but you didn't even provide a

25   range.

Raimundo Leon, M.D. - Cross

1    **A.**    What I provided was the usual -- a statement of usual and

2    customary, and that was a -- that's what I testified to.

3    Q.    Okay.  Now, you did not provide a cost estimate for

4    future rhizotomies from South Dakota where the plaintiff got

5    all of his done.

6    **A.**    Correct.  But if we -- to be fair, that cost estimate was

7    done in March of 2014, and it was -- the conversation that the

8    procedures were going to be done here.  I had -- at that point

9    we did not know that Mr. Humes would be getting treatment or

10   if we were even leading to rhizotomies at that point and where

11   they would be done.  So when I wrote my letter, it was in

12   reference to the cost here.

13   Q.    Right, right.  And then the four or five reports that

14   you've submitted since writing that cost estimate back in

15   2014, you've never addressed this issue about what the cost

16   would be, where the plaintiff was getting them done.

17   **A.**    That's correct.  There's no report that specifically

18   states the cost associated with if he were to have them done

19   in South Dakota or if he had them done in Florida.  Now that

20   being said, we know now, we have numbers, right, and if he

21   chooses to do -- that's -- we know the expectation in the

22   region that he is at.

23   Q.    Okay.  I want to turn to your initial consult, and then

24   I -- I want to walk the jury a little bit into the difference

25   between these injections.  You and I know the terms because

Raimundo Leon, M.D. - Cross

 1    we've discussed them before in these cases, but it's new to a

 2    lot of the people here.

 3             So, to begin with, we go to this initial consult.

 4    And the plaintiff was involved in the car accident on

 5    April 6th, 2013, now eight years ago.  And within a couple

 6    days -- actually, four days he -- he's at your office; right?

 7    A.    That's correct.

 8    Q.    And it -- it is an attorney referral to you; correct?

 9    A.    Again, I answered it that at that point I did not know

10    what type of referral it was.  In the documentation it simply

11    said self-referral.

12    Q.    Right.  I understand that's what your office wrote, but

13    it also mentions plaintiff counsel's name in the intake.

14    A.    That's what he was -- he told the staff that he was

15    represented by counsel, yes.

16    Q.    Well, he's not from here.  He wouldn't know your name

17    because you don't have television ads or anything, do you?

18    A.    I do not.

19             MR. WILSON:  I'm going to object at this point,

20    Your Honor.  Calls for speculation.

21             THE COURT:  Response?

22             MR. ROGERS:  I guess the question really was just:

23    Are you commonly out there by advertising?

24             MR. WILSON:  Again, that's not what he asked, Your

25    Honor.

1          **THE COURT:**  Okay.  So sustain the objection.  Re-ask

2     the question.

3          **MR. ROGERS:**  Okay.

4     **BY MR. ROGERS:**

5     Q.   Are you out in the community with advertising of any

6     sort, billboards, television, things like that?

7     **A.**   We don't have any advertising from billboards or

8     television, no.

9     Q.   Okay.  And, now, having worked with plaintiff counsel in

10    this case for several years -- I mean, not those -- all those

11    eight years but since they filed and -- and you've

12    communicated with them, do you say you don't know whether they

13    referred the plaintiff to you?

14    **A.**   That's correct, Counsel.  The question was -- I did not

15    ask Mr. Humes if he was referred by the law firm.  I did not

16    call the law firm to see if he was referred.  The law firm did

17    not call me.  The question was specifically what was my

18    knowledge, and I based it on my record that said the referral

19    was self-referred.

20          Now, that being said, are they -- and specifically

21    you're talking about in that intake sheet they have an

22    attorney.  This patient -- for example, if the patient

23    hypothetically was sent by Dr. Smith, the referral source

24    would be Dr. Smith but, yet, the patient still represented by

25    counsel and that's a question.

Raimundo Leon, M.D. - Cross

1          I was not aware if the law firm referred the patient.
2  And from a physician perspective and from a treating
3  perspective, to me, it's irrelevant if the attorney sent him
4  or whether he found me in -- in a phone book or whether he
5  found me on the Internet or he was referred by a friend.  The
6  treatment this gentleman received and would receive would be
7  the same regardless of the referral source.
8  Q.   Now, the plaintiff had just been to the emergency room
9  and ends up in your office.  Pain management is typically
10 considered a tertiary provider.  Why not start with a primary
11 care provider?
12 **A.**   First of all, Counselor, I disagree with your statement
13 that we're tertiary.  That's not true.
14 Q.   Okay.
15 **A.**   My mode of practice, I have dealt -- I deal with patients
16 that had an injury in the morning, and I can deal with
17 patients that have had an injury ten years earlier.  So to --
18 to -- to say that pain management, as the term implies, is
19 only tertiary would be incorrect.
20          As a pain management physician, I can do everything
21 from a traumatic event that a primary care guy can do or, like
22 you said, if the person shows up at a primary care's office,
23 the general workup is a history, a physical examination, plus
24 or minus x-rays, plus or minus medication use, and then the
25 recommendation of conservative management in such that could

Raimundo Leon, M.D. - Cross

1    include physical therapy or -- or chiropractic care.

2    Q.    Okay.  Now, evidently none of the records have been

3    submitted or admitted, but I will refer you to your chart.

4    Page 89 is a letter that's dated two days before the plaintiff

5    comes to your office.  It's on your letterhead.  "Attention:

6    Plaintiff counsel."  And it reads, "As a courtesy to you, this

7    is to inform you that your client has been scheduled for a new

8    patient consult."

9    A.    Yes.

10   Q.    And that the treatment would be billed under a lien.

11   A.    That's what it says, yes.

12   Q.    So you're aware that you were treating the patient who

13   was being represented by plaintiff counsel?

14   A.    Counselor, first of all, these are administrative

15   processes; okay?  The question is when did I -- when was I

16   informed; okay?  And I would not have been informed prior to.

17   This is an administrative process that the appointment was

18   made by administrative staff.  It was identified that this

19   patient will be coming in under a lien.  It was identified

20   that the referral source that was identified was self, okay,

21   did not specify whether it was attorney driven -- attorney --

22   referred by the attorney, referred by a friend.  So all these

23   things are administrative processes that I was not involved in

24   until such time that I saw the patient.

25           So your specific question in this line of questioning

Raimundo Leon, M.D. - Cross

```
 1    was in reference to the referral source, and I've tried to
 2    explain the best I can I wasn't aware of what referral source
 3    it was.  But clearly we know that the client, once the patient
 4    was seen, is represented by the law firm.
 5    Q.   Okay.  Now, when you first met Mr. Humes, the plaintiff,
 6    you didn't have the records from the ER or the paramedics who
 7    saw him four days earlier; right?
 8    A.   That's correct.
 9    Q.   The plaintiff told you that he'd been involved in a car
10    accident?
11    A.   Correct.
12    Q.   He told you that he had been extricated from the car?
13    A.   Correct.
14    Q.   You assume the truth of what your patient is telling you?
15    A.   Correct.
16    Q.   And the only source of information you have about the
17    accident is what the plaintiff tells you?
18    A.   At this point, that's correct.
19    Q.   Did you ever see the vehicle photos?
20    A.   Yes.  I believe there are -- in one of my reports there
21    were 31 pictures of the vehicle.
22    Q.   Okay.  The plaintiff told you that his windshield was
23    starred.  Did you see, in your review of those photos, that
24    there is no damage to the windshield?
25    A.   Counselor, as I sit here, I don't recall whether there
```

Raimundo Leon, M.D. - Cross

1    was or wasn't to the windshield.

2    Q.    When he came to see you, at that time you didn't know

3    about the paramedic or the ER doctor's findings?

4    A.    Correct.  I just knew that he was evaluated by the

5    paramedics and he was taken to the hospital and he was

6    evaluated in the emergency room.  That was the extent of what

7    I knew at that time, correct.

8    Q.    Okay.  And you had a -- a brief discussion with plaintiff

9    counsel about the normal Glascow Coma score -- scale?

10   A.    Correct.

11   Q.    And you later learned, as you collected the records, that

12   the plaintiff testified that he lost consciousness; correct?

13   A.    Correct.

14   Q.    A normal Glasgow Coma Scale would suggest that that isn't

15   so?

16   A.    That's not necessarily true, Counselor.  If it is a

17   momentary or what he described as a loss of consciousness,

18   within seconds you can continue to have a normal Glasgow Coma

19   Scale.  It's referenced to a moment in time.  The Glasgow Coma

20   Scale was once the paramedics arrived.

21   Q.    Do you know how much time elapsed --

22   A.    I do not know.

23   Q.    -- between the accident and then?

24   A.    I do not know.  But my point is, to your suggestion that

25   if there was loss of consciousness, that somehow the Glasgow

Raimundo Leon, M.D. - Cross

1    Coma Scale would be different.  If it was witnessed, then that
2    would be the case.  But the fact that a time passed -- and
3    you're correct, I do not know that time passed.  But the
4    evaluation was such that the Glasgow Coma Scale, as noted by
5    the paramedics, was normal.
6    Q.   And as noted by the ER physicians as well?
7    A.   Correct, correct.
8    Q.   Okay.  Now, did you see any physical exam findings of
9    trauma to Mr. Humes' face or head?
10   A.   There were no specific trauma markings, no.  Bruising or
11   cuts, no.
12   Q.   Okay.  The only diagnosis at the emergency room by the ER
13   physician was cervical strain?
14   A.   That's correct.
15   Q.   There was no diagnosis of a low-back injury?
16   A.   That's also correct.
17   Q.   At your office when the plaintiff first presented, you
18   had him fill out the forms that we've been discussing, and one
19   of those forms included a pain diagram where they make -- the
20   patients make marks on the parts of the body where they're
21   feeling symptoms; right?
22   A.   That's correct.
23   Q.   On the pain diagram at his initial visit with you, he
24   didn't note any low-back pain?
25   A.   Let me get to that, Counselor.  I don't recall what he

Raimundo Leon, M.D. - Cross

1    noted, but --

2    Q.   It's page 3 --

3    A.   Page --

4    Q.   -- of the binder.

5    A.   Okay.  Yes.  The notations that he drew was head, neck,

6    and mid back pain as well as both hands and bilateral knees.

7    Q.   Okay.  Now, the plaintiff gave you a typed out piece of

8    paper with a list of his symptoms.  This was discussed at your

9    deposition.  This is page 4, the next page.

10   A.   Yes.

11   Q.   You didn't ask him to prepare this; right?

12   A.   I did not, no.

13   Q.   Do you know if plaintiff counsel did?

14   A.   I don't know that either.

15   Q.   And that list, if you'll read through it, you'll notice

16   again that he doesn't complain of low-back pain.  We're now --

17   just so the jury's aware of the chronology of it, we're four

18   days after the accident.

19   A.   Correct, Counselor.  What's fair here, I don't know when

20   this was done and when his onset of back pain compared to when

21   he wrote this.  I don't know.  I would agree with you there's

22   no definite -- there's no description of back pain, that's

23   correct.

24   Q.   Okay.  Now, while he submits that list to you with a past

25   medical history and no mention of low-back pain and he gives

Raimundo Leon, M.D. - Cross

1   you that pain diagram that doesn't mention low-back pain, your

2   diagnoses included low-back symptoms?

3   **A.**   Well, Counselor, in the initial consultation he complains

4   of low-back pain.

5   Q.   Okay.

6   **A.**   So when he first sees me, his complaints were

7   specifically constant aching sensation throughout the head,

8   neck, and low back, as well as bilateral hands and bilateral

9   knees.  So at least on this particular visit he's complaining

10  of low-back pain and he was -- and it was addressed.  It

11  was -- a physical examination was performed, and based on the

12  complaint, based on the physical examination, he was diagnosed

13  with a low-back problem.

14  Q.   Okay.  I understand that's what's typed in your report,

15  but on the forms that he prepared there is no mention of it.

16  **A.**   Again, Counselor, these forms are a guide; right?  And we

17  use them, and I'm also asking questions in reference to this,

18  in reference to the symptomatology in those areas.  So based

19  on that, these are -- these are notes that are taken and

20  what's dictated is what he referred -- what he told me.

21  Q.   Okay.

22  **A.**   So the fact that he did not circle low-back pain but told

23  me there's low-back pain, that's why it's in the initial

24  consultation.

25  Q.   Now -- pardon me.  I just -- my pen gave out on me.

Raimundo Leon, M.D. - Cross

1              Part of this initial consult is you're taking a past

2    medical history.  So the patient comes in to see you, they

3    give you their list of complaints, you inquire about past

4    medical history, and then you conduct a physical exam, and

5    then after the exam you reach your diagnoses; correct?

6    **A.**   The impression, correct.

7    Q.   Okay.  So he comes in with these complaints, and you ask

8    him about his past medical history.  And that basically is do

9    you have any history of neck, mid, low back, or extremity

10   pain, which means the arms and the legs; right?

11   **A.**   Correct.  Well, specifically as noted there, he was asked

12   in -- medical history, when we talk about medical history, are

13   any medical problems that may mimmick, for example, the

14   symptoms of which he is presenting for, any disease processes.

15   Along the same line of questioning, there is questions in

16   reference to traumatic issues that may be similar as well.

17   And, yes, specifically questions in reference to any of the

18   symptoms that he is -- currently has present prior to this

19   motor vehicle accident.  So that's the -- that's the past

20   medical history conversation that's had.

21   Q.   So he tells you about the neck surgery that he'd had 14

22   years earlier?

23   **A.**   Correct.

24   Q.   And that is the cervical fusion?

25   **A.**   Correct.

Raimundo Leon, M.D. - Cross

1   Q.   He did not disclose to you that he had neck or back pain

2   since that surgery?

3   **A.**   That's correct.

4   Q.   Now, you asked if he had work-related injuries?

5   **A.**   Yes.

6   Q.   And he, again, denied that?

7   **A.**   Correct.

8   Q.   Now, he didn't tell you about a fall that he had while

9   working as a -- as a semi driver?

10  **A.**   No.  Not on that day, no.

11  Q.   Now, he told you that he'd had x-rays at Sunrise?

12  **A.**   Correct.

13  Q.   At that time you -- you didn't order them; you just wrote

14  no imaging studies available?

15  **A.**   And that's in reference to that dictation; correct?

16  Q.   Right.

17        And in this visit with him you didn't order any

18  additional films, like x-rays or MRIs?

19  **A.**   Not at this time, no, I did not.

20  Q.   Now, at this initial evaluation four days after the

21  accident, he rated his pain at 3 of 10; correct?

22  **A.**   Correct.

23  Q.   Now, since he didn't tell you about any prior neck or

24  back pain, you didn't know whether he had previously treated

25  for pain that he rated 3 of 10 or greater?

Raimundo Leon, M.D. - Cross

1    **A.**   Correct.

2    Q.   He told you that he had completely recovered from the

3    neck surgery and had no problems for 14 years?

4    **A.**   Correct.

5    Q.   And he told you he has no history of low-back pain?

6    **A.**   That's what he said, correct.

7    Q.   At that time you weren't aware of low-back x-rays that

8    were taken before this accident?

9    **A.**   That's correct.

10   Q.   Did you ask him what condition caused the need for that

11   neck surgery that he'd had 14 years earlier?

12   **A.**   As I review my records, I did not specifically get into

13   that specifically when he mentioned that there's been no

14   issues since then, since his surgery.

15   Q.   Did you ask him whether it was a trauma or a degenerative

16   process?

17   **A.**   I did not, Counselor.  It would be unfair.  I don't

18   recall specifically diving into the -- the reasoning for the

19   fusion, so I...

20   Q.   Okay.  You -- you gave the jury a brief tutorial on the

21   spine.

22   **A.**   Yes.

23   Q.   And the next question sort of goes back to that anatomy,

24   and that is:  Do you know whether the plaintiff had facet

25   conditions when he had that neck surgery, or was it just disk?

Raimundo Leon, M.D. - Cross

1    **A.**   More likely than not, based on a single-level fusion, it

2    would be just disk.  But, then, I don't know.  Generally

3    joints or facets work in combination.  It's usually not a

4    single-level issue, and that's just based on the anatomy and

5    the functionality of the anatomy.  So the fact that it's a

6    single-level, more likely than not it was a disk issue.

7    Q.   And the fact that it's a single level, does that suggest

8    to you that more likely than not it was traumatic?

9    **A.**   That I can't say.

10   Q.   Okay.  Usually, when we've had this discussion before, it

11   is that single-level trauma is more indicative of a traumatic

12   insult whereas diffuse conditions suggest more of a

13   degenerative process, a general breakdown.

14        Do you agree with that proposition generally?

15   **A.**   I really can't, Counselor, because there's so many

16   components to that to say that single level is strictly

17   traumatically induced --

18   Q.   I'm not saying -- I'm not saying strictly.  We're not

19   saying 100 percent of the time.  You're talking in

20   probabilities because you've said you don't know what the

21   cause was --

22   **A.**   Correct.

23   Q.   -- or the pathology was for which he had that neck

24   surgery.  So now we're talking in probabilities.

25   **A.**   Okay.

Raimundo Leon, M.D. - Cross

1    Q.   I get that.

2            So do you agree with that proposition, that if it's

3    just a single-level disk problem, if we're talking about

4    probabilities, it's likely a traumatic thing?

5    **A.**   Again, Counselor, that's kind of unfair because we know

6    it's a single-level surgery; okay?  But whether it was a

7    single-level surgery for the fact of being a single-level

8    surgery or there's -- could be more than one level but, yet,

9    it was chosen to be a single, I don't have that information to

10   say one way or the other.

11           But to assume that because it's single level it's

12   only traumatic would be incorrect.  We would need to get the

13   history of what -- what occurred prior to and what things were

14   done prior to that led to that single-level surgery.  But what

15   we do know, according to Mr. Humes, that once that surgery

16   occurred, there was no other issues in his cervical spine.

17   Q.   Now, because you didn't have any of the pre-accident

18   records at this initial visit with the plaintiff, you didn't

19   know whether he'd previously been assessed with facet

20   syndrome, the very condition you relate to the accident?

21   **A.**   There was no -- Mr. Humes gave no indication that he had

22   any issues with his cervical spine outside of the fusion that

23   occurred 14 years earlier.  So, no, I had no indication that

24   he had facet issues or facet pain prior to this accident.

25   Q.   Yeah.  And my question isn't limited to the cervical

Raimundo Leon, M.D. - Cross

1    spine.  It's the low back as well.

2    **A.**    Sure.

3    Q.    You don't know whether he was previously assessed with

4    lumbar or low-back facet syndrome?

5    **A.**    At the time of the evaluation, I had no records to

6    suggest nor the patient's reporting that there was issues in

7    the cervical or lumbar spine and, more specifically, facet

8    mediated, no.

9    Q.    Okay.  Now, we've had a discussion now about the past

10   medical history.  I want to move to the next part of your

11   initial consult, and that's the physical exam.

12   **A.**    Okay.

13   Q.    You note that the plaintiff was 6 feet tall, 253 pounds;

14   correct?

15   **A.**    Correct.

16   Q.    Did he have normal posture?

17   **A.**    I didn't mention whether it was -- my tendency, if there

18   was an abnormal posture, I would have -- I would have noted.

19   I did not note the posture either way.

20   Q.    Okay.  Did he have a normal gait?  I'm sure you asked him

21   to walk.

22   **A.**    Correct.  And the fact that there was nothing noted

23   there, the gait would have been considered normal.

24   Q.    Okay.  Did he exhibit any difficulties standing from a

25   seated position?

Raimundo Leon, M.D. - Cross

1   **A.**   Not that -- not that was noted, no.

2   Q.   Now, your initial consult doesn't mention anything about

3   a leg length discrepancy.  At that time you weren't aware that

4   he'd previously been assessed with that condition; correct?

5   **A.**   That's correct.

6   Q.   And when one leg is shorter than the other -- in this

7   case, a half to three-quarters of an inch -- that can cause

8   misalignments in the spine; correct?

9   **A.**   It can, yes.

10  Q.   And a difference in leg lengths can result in chronic

11  leg, knee, hip, and back pain?

12  **A.**   It has a potential for causing problems.  Will it or

13  won't it, that's unknown.

14  Q.   On this physical exam that you did, did the plaintiff

15  have any positive neurological findings?

16  **A.**   No.  Neurologically he was intact, meaning that there

17  were no neuro -- no neurological deficits noted.  Except for

18  in the upper extremity he had decreased sensation over the --

19  what's know as a hypothenar area on the right.  So it's the --

20  the area between the thumb and the first digit.  When we

21  compared the sensation, one felt less than the other.

22  Q.   Yeah.  And because there were no symptoms going down the

23  arm to that area in the hand, you probably didn't consider

24  that to be related to the neck?

25  **A.**   Correct.  And specifically the examination of the

1  cervical spine that would give you that identification, if

2  there's a nerve compression, for example, or some sort of

3  nerve abnormality which we describe as radiculopathy, he did

4  not have that.  So that's sensation in that area, it would be

5  a local phenomenon.

6  Q.   Okay.  Now, you were asked about the plaintiff's prior

7  stroke.

8  A.   I'm sorry.  Prior what, Counselor?

9  Q.   TIA.

10  A.   Okay.

11  Q.   Do you know whether these symptoms that he had in his

12  hand were related to that?

13  A.   There was some discussion that he had sensation in the

14  tips of his hands on the opposite side, but since the accident

15  he noted -- he described tingling sensations on both hands and

16  fingers in the hands.

17  Q.   So is it your opinion it's not related to the stroke?

18  A.   Again, it looks -- the -- according to what he had

19  mentioned is that the stroke symptoms that he was -- had, he

20  had them in both hands.  But to the extent that if it was

21  the -- what we term the snuffbox, which is what that's called,

22  I don't think -- I can say I believe that was related.  I

23  couldn't make a relationship at that moment to that, no.

24  Q.   Okay.  Can diabetes cause neuropathy in the hands?

25  A.   Diabetes can cause neuropathy, yes.

Raimundo Leon, M.D. - Cross

1    Q.    Okay.  Do you know if that was related to diabetes?

2    A.    I had no information at that time to say whether it's

3    diabetic related or not, no.

4    Q.    Okay.  Your treatment plan after you conducted this exam,

5    as we've walked the jury through this, it is -- you take the

6    complaints, you do the past medical history, you do this

7    physical exam, and then you assess the -- the patient and you

8    come up with a treatment plan; right?

9    A.    That's correct.

10   Q.    Your plan was physical therapy and follow up in four

11   weeks?

12   A.    Along with the use of medications, yes.

13   Q.    Okay.  Now, you didn't find in the exam that he was

14   disabled; right?

15   A.    No.

16   Q.    Did you ever find him to be disabled?

17   A.    No.

18   Q.    Did you ever take him off work?

19   A.    I did not.

20   Q.    Were you aware that he reported two weeks after seeing

21   you in the Oswestry Index that -- those forms, that he was

22   severely disabled?

23   A.    I saw that he -- yes, I had seen those.  Yes.  This is a

24   person -- this is a self-evaluation how the patient feels in

25   reference to those -- the disability.  It's the patient's

Raimundo Leon, M.D. - Cross

1    interpretation of his or her disability, yes.

2    Q.   Okay.  Now, if a patient presented to you that way,

3    wouldn't you counsel them against driving an RV 1,200 miles?

4    **A.**   Well, I think there would be more information, right,

5    because this is a person -- this is a patient's interpretation

6    of these -- of these forms.  But, again, it doesn't prevent a

7    person from being active, for example, or driving.  That --

8    the two are not to mutually exclusive, no.

9    Q.   Okay.  Now, he returns those 1,200 miles to South Dakota.

10   **A.**   Yes.

11   Q.   And you've looked at the records from the folks there.

12   You said you've looked at Dr. Anderson, the pain management

13   physician's records, and that he performs the injections like

14   you do.  But there is a big distinction here, and that is the

15   pre and post pain scores that he never kept.  You discussed it

16   in relation to the epidural.  I want to discuss it in relation

17   to the facets and the medial branches.  And -- doggonit.

18   Well, I'll just be as quick as I can instead of pulling that

19   model up.

20          **THE COURT:**  Can you get back to the microphone?

21          **MR. ROGERS:**  Yes.  Yes.

22   **BY MR. ROGERS:**

23   Q.   So if my fist were the vertebrae, the facets would be

24   where the bones meet on the sides, and the disk would be that

25   cushion that goes in between them; right?

Raimundo Leon, M.D. - Cross

1    **A.**    That's incorrect.

2    Q.    Oh.

3    **A.**    So if we're going to use our fist as an example, we can

4    say the fist is the bone of the spine, and they're all the

5    same in reference to what they look like, what their

6    differences are, the size, and their functionality depending

7    on whether it's the neck, mid, or low back.  So if we say the

8    fist is a bony structure, above that sits the disk, above that

9    sits another bone, and my fingers would represent the joints.

10   Q.    Okay.  Fair enough.

11         All right.  So that epidural is directed to that

12   cushion or that disk that sits between the vertebrae; right?

13   **A.**    Well, first of all, the epidural -- again, it's just not

14   that simplistic, Counselor.

15         So if that's the anatomy, right, where we have a

16   disk -- we have a bone disk joint, behind that would be the

17   spinal cord, right, and all the nerves as they come out.  And

18   behind that, that ligament there is a ligament that's

19   protecting the spinal cord.  Then there's an empty space.

20   That empty space, okay, and then there's another ligament that

21   makes -- that gives you the spinous process.  So that empty

22   space is the epidural space.  And where that epidural was

23   performed at that level, it bathes and it has the ability

24   potentially to affect different structures, not just the disk.

25   Q.    You agree, though, that that injection is directed to the

Raimundo Leon, M.D. - Cross

1    disk, that's the reason Dr. Anderson ordered it?

2    **A.**   Again, Counselor, I disagree with you.  It can be used

3    for the disk, but unfortunately, because it's not specific to

4    the disk, okay, that there could be other components that may

5    be affected, including the nerve roots.

6    Q.   Okay.  Well, we'll -- we'll address that with

7    Dr. Anderson.  He's next.

8    **A.**   Fair enough.

9    Q.   And after Dr. Anderson -- that's the first injection he

10   does?

11   **A.**   Correct.

12   Q.   He recognizes that the plaintiff had that fusion before

13   and that there could be a problem at the adjacent level;

14   correct?

15   **A.**   That's possible, yes.

16   Q.   And so he does that epidural injection.  Then he shifts

17   to the facet joints, and that is these pinkies that you've

18   talked about.

19        Now, let's talk about those pre and post pain score

20   entries that you make that Dr. Anderson does not.

21   **A.**   Correct.

22   Q.   With every facet block and every medial branch block that

23   you do, correct, you don't do them without the pain scores?

24   **A.**   That's my standard practice, that's correct.

25   Q.   Now, the reason that you do them is so that you can

Raimundo Leon, M.D. - Cross

1    determine if, when an anesthetic is dropped at that spot, if

2    it actually provides immediate pain relief?

3    **A.**    That's correct.  The reason I obtain those scores is for

4    that specific reason, that's correct.

5    Q.    And that's what makes that diagnostic, is the pre and

6    post pain scores that you keep?

7    **A.**    That's part of the diagnostic process, yes.

8    Q.    Now, Dr. Anderson did not do that?

9    **A.**    That's correct.

10   Q.    Okay.  So when you're looking at his injections, you

11   can't interpret them in the same way that you can yours

12   because you don't have that information?

13   **A.**    You're reliant at that point, that's -- the short answer

14   is yes, but you're reliant on the resolution at that point.

15   So there's two diagnostic components that occur when placing

16   medication into a facet joint.

17          The first diagnostic component is analyzing the

18   process or what the local anesthetic did; correct?  And the

19   second diagnostic portion or potential diagnostic process is

20   identification that you are confident that you put the

21   medication in the right spot and that they receive some sort

22   of improvement which would be related to the anti-inflammatory

23   medication that would have been injected.

24   Q.    Okay.  Now, Dr. Anderson is of the opinion that with an

25   injection to the facet joint -- to the bone, not the disk --

Raimundo Leon, M.D. - Cross

1    that the desired relief so that you can determine whether this

2    injection is actually successful is around 75 to 80 percent.

3    Do you agree with him?

4    **A.**   From an -- you mean from an anti -- anti-inflammatory

5    response sense?  Is that what we're speaking about?

6    **Q.**   That's the only measure that he would have because he

7    doesn't keep the pre and post pain scores?

8    **A.**   Correct.  Again, every --

9    **Q.**   And let me -- let me just clarify that for the -- for the

10   jury.  I'll ask you this; you tell me if this is right.

11          The anesthetic tells you immediately whether it

12   relieves symptoms.  The anti-inflammatory or steroid tells you

13   a little further down the road whether it's providing relief?

14   **A.**   (Nods head up and down).

15   **Q.**   So since --

16   **A.**   Yes.

17   **Q.**   -- he's not recording the scores, he doesn't know whether

18   there's an anesthetic diagnostic value to this injection.

19   **A.**   (Nods head up and down).

20   **Q.**   Now, let me get back to his --

21   **A.**   Sure.

22   **Q.**   -- opinion.

23          If the injection provides 75 to 80 percent relief,

24   then, in his opinion, it's successful.  Do you agree?

25   **A.**   That would be reasonable, yes.

Raimundo Leon, M.D. - Cross

1    Q.   Okay.  Now, because you don't have pain scores from

2    Dr. Anderson, you can't gauge whether the injections he's done

3    provided the desired relief so that you can make other

4    diagnostic decisions?

5    A.   Well, there was documentation of -- of improvement for

6    windows of time.

7    Q.   Right.  But he reported improvement with chiropractic

8    treatment, with physical therapy.  You don't know whether he

9    got the same improvement from those as he got from the facet

10   blocks that Dr. Anderson did?

11   A.   Well, there's no documentation of percentage, I would

12   agree with that.  But to say that there was improvement, yes,

13   that's correct.

14        And, again, if we look at him as an individual basis,

15   it would be difficult to say because those -- those -- those

16   scores were not obtained.  But if you take the records that --

17   in totality and the description of improvement, right, you

18   would say, yes, there was improvement with those procedures.

19   And, again, it's Dr. Anderson's practice or standard of

20   practice that he felt -- and he would have to explain how

21   comfortable he feels with responding of the patient, you know,

22   as opposed to obtaining specific scores.

23   Q.   Okay.

24   A.   So as an expert what I do is I'm looking at the totality

25   of the records and the totality of the processes, and that's

Raimundo Leon, M.D. - Cross

1    my determination that I would concur with Dr. Anderson that
2    that area of which -- where he placed his injections were
3    symptomatic.
4    Q.   Okay.  I'm -- my allergies are killing me.  I'm going to
5    reload here.
6             MS. TEMPLE:  You can take this off.  Ask the judge.
7             MR. ROGERS:  I'll wait.  Okay.
8             THE WITNESS:  I can share with you, Counsel.  I have
9    one.
10            THE COURT:  And, Mr. Rogers, just so you know, we're
11   about ten minutes to 3:00, and we're going to take our
12   afternoon break at 3:00 o'clock.
13            MR. ROGERS:  Yes.  Okay.  Well, I'm going to move
14   then.  I'm going to move along here.
15   BY MR. ROGERS:
16   Q.   So you get these sort of unquantified comments about
17   improvement from all the different kinds of care that the
18   plaintiff is getting when he returns to San Diego [sic].  And
19   you were asked earlier did you ever speak with Dr. Anderson,
20   and you said you didn't.
21   A.   That's correct.
22   Q.   Did you speak with anybody in San Diego [sic] for
23   clarification on what was going on with the treatment there?
24   A.   I did not, no.
25   Q.   Okay.  Then he returns to see you in July 2013.  Now,

Raimundo Leon, M.D. - Cross

1    this is four months after the accident.  Basically four months

2    since he's seen you.  And at that visit you didn't have any of

3    the records from his treating doctors in South Dakota; right?

4    A.   That's correct.

5    Q.   You didn't see the MRIs that he'd gotten in South Dakota;

6    you saw the reports?

7    A.   That's correct.

8    Q.   Now -- and just so the jury's clear on this, the MRI

9    actually is a film or a series of films, and a radiologist

10   reads it and types out or dictates a report, and you just

11   didn't see the films; right?

12   A.   Correct.

13   Q.   Now, the reports that are in your chart -- and this is

14   page 24 for you -- the cervical MRI shows spondylosis which

15   someone handwrote on there translates to degenerative

16   osteoarthritis; correct?

17   A.   Correct.

18   Q.   Now, someone with degenerative osteoarthritis might well

19   have a degenerative condition in the facet joints as part of

20   the bone?

21   A.   They may, yes.

22   Q.   Okay.  Now since you didn't see the film, you didn't get

23   any further explanation on that; right?

24   A.   What do you mean, Counselor?

25   Q.   On -- on how bad the osteoarthritis is affecting the

Raimundo Leon, M.D. - Cross

1    facet joints.

2    **A.**   No, I didn't get the chance to measure it.  If that's

3    what you're implying, no, I did not.

4    Q.   Okay.  And you did see --

5    **A.**   I can simply say it was there.  It was present, yes.

6    Q.   Yeah.  Well, and you did see in the top paragraph, the

7    narrative before the impressions, that there was an

8    affirmative finding of C4-5 facet issues.  C4-5 is one of the

9    levels that were being injected?

10   **A.**   Okay, Counselor.  The -- an MRI does not explain whether

11   something is symptomatic or not.  It simply says that --

12   whether there's -- there's a change at that level.  That's all

13   we can say about this particular MRI or any MRI for that

14   reason.

15   Q.   And you've said that.  I understand that.

16   **A.**   Okay.

17   Q.   But just so --

18   **A.**   Well, you imply that there's a change, that somehow

19   there's -- that the C4-5 is symptomatic because the MRI said

20   so, and that's incorrect.  And if I -- I misinterpreted you, I

21   apologize.  But the -- I would -- there's no question that

22   there are changes in this MRI that are consistent with someone

23   of his age.  That's --

24   Q.   And someone having a degenerative process there?

25   **A.**   Correct.  But we can't say that a degenerative process,

Raimundo Leon, M.D. - Cross

1    okay, is going to equal pain.  That just --

2    Q.    Let --

3    **A.**    I'm sorry.  Go ahead.

4    Q.    Again, let's -- let's fine-tune this question, though.

5    **A.**    Sure.

6    Q.    Because you talked about the seven bones in the neck, C1

7    through C7, and the two levels that you did your one injection

8    at were C4-5, C5-6.

9    **A.**    Right.  And the reason for that level -- so for

10    clarification -- is based on examination, based on the

11    distribution of pain that are consistent with what's -- what's

12    known as the demographics of distribution of pain when a pain

13    comes from a joint, for example, as opposed to a disk or a

14    nerve.

15    Q.    Okay.  And that -- one of those levels that you injected

16    is one that the radiologist said, yeah, there's facet issues

17    there and degenerative osteoarthritis.

18    **A.**    Again, Counselor, you -- I guess my -- my interpretation

19    of issues is that somehow that implies that there's symptoms

20    from there.

21          What I would agree with you is that the radiologist

22    notes and specifically he states facet arthropathy; okay?

23    What arthropathy means is -- is degeneration.  I don't know

24    degeneration equals issue is my -- what I'm trying to explain.

25          The radiologist did not say C4-5 facet issues.

Raimundo Leon, M.D. - Cross

1    That's not what it reads here.  What it reads here is C4-5

2    facet arthropathy and vertebral body spondylosis.  Again,

3    those words, that terminology, spondylosis, arthropathy, that

4    is descriptions of basic related age changes.

5    Q.   Okay.  And osteoarthritis.

6         Now, that's just the cervical spine.  In the lumbar,

7    which is just a few pages later, on page 30 for you, it,

8    again --

9    A.   Well, Counselor, I'm sorry.  I don't mean to interrupt,

10   but when you talk about osteoarthritis, the notation that you

11   were talking about, it was in reference to the disk itself.

12   They were talking about spondylosis, and that is an

13   osteoarthritic change within the disk level.

14   Q.   Right.

15   A.   Okay.

16   Q.   And then in the lumbar spine you have, again, facet

17   arthropathy?

18   A.   Yes.

19   Q.   And facet conditions is the very condition that you've

20   addressed, you've diagnosed the plaintiff with?

21   A.   Correct.

22   Q.   Okay.  And this suggests that there were degenerative

23   processes contributing to that.

24   A.   I would -- I would agree that there are degenerative

25   processes in there, but there's no indication how long this

Raimundo Leon, M.D. - Cross

```
 1    arthropathy has been there.  There's no indication in any
 2    record that I had the opportunity to review that these
 3    changes -- which I -- again, I refer them to age-related
 4    changes -- were symptomatic.  And that's what we're dealing
 5    with.  We're dealing with the pain associated with this
 6    incident, not whether or not this incident caused the
 7    generation.  That's obviously not true.  This has been a
 8    long-standing issue.
 9            But what I mentioned earlier is just because somebody
10    has a degenerative change or spondylosis or osteoarthritis,
11    does that -- going to mean that the patient will have
12    symptoms, and that's why those questions were asked.
13    Q.   Okay.  Now, I think, Doc, we may be close to a break now.
14            THE COURT:  Five minutes.
15            MR. ROGERS:  Oh good.  Let's keep going then.
16        (Reporter instruction.)
17            MR. ROGERS:  Okay.  I'll stand here.
18    BY MR. ROGERS:
19    Q.   You next saw the plaintiff six months later.  So what we
20    have is April 2013 and July 2013 and now we're in
21    January 2014.
22    A.   That's correct.
23    Q.   And at this visit you recommended a confirming neck
24    injection to the facet joints, and I want to focus on that
25    word "confirming."  We discussed how, without the pain scores
```

Raimundo Leon, M.D. - Cross

1    from Dr. Anderson, you don't really know whether they

2    confirmed a facet condition.  Fair?

3    **A.**    Well, what I -- the term "confirming" is that my intent

4    is to confirm that that's where the area of pain is.  There is

5    if you want to call it a suggestion based on is, that that's

6    where the symptoms are coming from.  And, again, based on --

7    and this is something that Dr. Anderson can answer, but it

8    would appear that he was convinced that the pain was emanating

9    from those joints.  Now, if his style does not use numbers or

10   et cetera, that's a question for -- for Dr. Anderson.

11          From -- my perspective is even from the original time

12   I saw him before any injections were done I believed that that

13   area of pain, that those joints were symptomatic.  So the fact

14   that just my intuition, my knowledge, my expertise and my

15   evaluation of the patient, that those areas were -- the fact

16   that he got medication put into them, the patient noted

17   improvement, okay, for all those reasons I believe that it

18   needed to be confirmed.  And one way to confirm it is exactly

19   what was discussed.

20   Q.   Okay.  But you can't determine from the records that you

21   have without speaking with Dr. Anderson whether his injection

22   was diagnostic?

23   **A.**    Again, the fact that the patient received and Mr. Humes

24   stated himself that he received benefit, that in and of itself

25   has a diagnostic value.  Would we like more diagnostic value?

Raimundo Leon, M.D. - Cross

1   We want -- yes.  But to say -- to simply say that it was

2   not -- it provided no information, I would disagree.

3   Q.   Well, later you read the plaintiff's deposition in which

4   he testified that, unlike his report to your office, none of

5   the injections provided even 30 percent relief and at that for

6   less than a month.

7   **A.**   Okay.

8   Q.   Now, if the plaintiff's testimony is true, then these

9   injections were not diagnostic.

10  **A.**   I disagree.  The diagnostic value has been shown

11  specifically with my injection where he provided --

12  Q.   He didn't exclude your injection.

13  **A.**   I'm sorry?

14  Q.   He did not exclude your injection.

15  **A.**   I understand.  Right.  But you're asking they're not

16  diagnostic.  That's contrary to what the records show.  Again,

17  I didn't -- I don't -- I didn't memorize his deposition, how

18  he was asked, et cetera.  But, again, from a totality of the

19  medical records, there's clear evidence that there's been

20  improvement sometimes more better than others, but to say that

21  there was no improvement at no point in time, it contradicts

22  what the actual records show.

23  Q.   Well, I mean, one of the records you touched on with

24  plaintiff counsel reflects that two weeks after an injection

25  by Dr. Anderson he told his physical therapist it didn't do

Raimundo Leon, M.D. - Cross

1    any good.

2    **A.**    I'm sorry --

3    Q.    And if that's true -- the suggestion to you was that it

4    was six days after.  It wasn't.  It was two weeks.  You said

5    that, well, you know, if it's six days, maybe the

6    anti-inflammatory hadn't kicked in.  If it's two weeks, it

7    has.  And if the plaintiff says it's not working, that's not

8    diagnostic; correct?

9    **A.**    Again, Counselor, we'd have you -- you'd have to show me

10   the record.  I -- I was mistaken.  I thought it was -- the

11   therapist was prior to that.

12           **THE COURT:**  Sorry.  I didn't mean to cut you off,

13   Doctor.

14           **MR. ROGERS:**  We can wait.

15           **THE COURT:**  All right.  We'll take our break.

16           Ladies and gentlemen, please remember the rules.

17   Don't talk about the case among yourselves or with anybody

18   else.  Don't conduct any of your own research.  Don't read or

19   view anything about the case, and wait to formulate your final

20   opinions until you've heard all of the evidence and my

21   instructions of law.

22           We'll see you in ten minutes.

23           **COURTROOM ADMINISTRATOR:**  All rise.

24       *(Jury out at 3:01 p.m.)*

25           **THE COURT:**  Mr. Rogers, you've been going for an hour

Raimundo Leon, M.D. - Cross

1    and 20.

2          **MS. TEMPLE:**  I wanted to point out, I said Friday

3    overly optimistic.

4          **MR. ROGERS:**  Okay.  Let me -- hold on.  Let me just

5    take a look so -- so -- I know you want an accounting.  So I

6    am on page 9, and all I have is up through 11.  So we're very

7    near to done.

8          **THE COURT:**  All right.  Let's speed up the pace --

9          **MR. ROGERS:**  Okay.

10         **THE COURT:**  -- of those questions.

11         Thank you.  Ten minutes.  You can step down, Doctor.

12         **THE WITNESS:**  Thank you.

13         **THE COURT:**  When you return, you'll still be under

14   oath.

15         **THE WITNESS:**  Thank you.

16      *(Recess at 3:02 p.m., until 3:11 p.m.)*

17         **THE COURT:**  Ready to bring the jury back?

18         **MR. ROGERS:**  Yes.

19         **THE COURT:**  Okay.  Danielle, you want to go grab

20   them?

21      *(Pause in proceedings.)*

22         **MR. ROGERS:**  Hey, Doc and Your Honor, just -- I don't

23   mean to interrupt, but just so that we can speed this up, that

24   PT visit I was talking about earlier that's two weeks -- it's

25   a little over two weeks after one of the rhizotomies is

Raimundo Leon, M.D. - Cross

1    Exhibit 18.  Do you have the exhibit binder in front of you or

2    just your chart?

3              **THE COURT:**  It's over on the side.

4              **MR. WILSON:**  It's the top right.

5              **THE WITNESS:**  What's that?

6              **MS. TEMPLE:**  All the binders are right there

7    (indicating).

8              **THE WITNESS:**  Okay.

9              **MR. WILSON:**  Top right.

10             **THE WITNESS:**  Top right?

11             **MR. WILSON:**  Yep, that's where 18 is.

12             **THE COURT:**  The jury's about to come through that

13   door, so you guys might want to move the binder up.

14             **MR. ROGERS:**  Should I just put this up on his --

15             **THE COURT:**  Sure.

16             **MS. XIDIS:**  What page of that exhibit, Steve?

17             **MR. ROGERS:**  18-56.

18             **COURTROOM ADMINISTRATOR:**  All rise.

19        *(Jury in at 3:13 p.m.)*

20             **THE COURT:**  Will the parties stipulate to the

21   presence of the jury?

22             **MR. ROGERS:**  Yes, Your Honor.

23             **MR. WILSON:**  The plaintiff stipulates.

24             **THE COURT:**  All right.  Everyone, have a seat.

25             You can continue your inquiry, Mr. Rogers.

Raimundo Leon, M.D. - Cross

1          MR. ROGERS:  Okay.  Thank you.

2     BY MR. ROGERS:

3     Q.   All right.  Where we left off was the physical therapy

4     visit that came a couple weeks after one of the rhizotomies

5     where the plaintiff told his therapist that it actually made

6     his pain worse so far.

7          Do you see that, Doc?

8     A.   Which -- I'm sorry, Counselor.  Can you repeat the -- the

9     number, the --

10    Q.   Sure.

11         MR. ROGERS:  May I approach, Your Honor, and just

12    show this to him?

13         THE COURT:  Sure.

14         MR. ROGERS:  Okay.

15    BY MR. ROGERS:

16    Q.   And you can read off this as well.

17    A.   Sure.

18    Q.   So if you go down near the bottom, maybe two or three

19    lines up from the bottom, he says that --

20         THE COURT:  All right.  And you are not by a

21    microphone, Mr. Rogers, so if you want to return to your

22    microphone.

23         MR. ROGERS:  Sure.

24         THE COURT:  Thanks.

25    ///

Raimundo Leon, M.D. - Cross

1    **BY MR. ROGERS:**

2    Q.    Okay.  There he had the injections actually more than two

3    weeks before this report, and he tells the physical therapist

4    that it hasn't improved it at all, it's made it worse?

5    **A.**    Right.  Well, two things, Counselor.  Number 1 is the --

6    what we were speaking before in reference to the direct

7    examination wasn't this procedure.  It was a steroid procedure

8    on there.

9            This according -- to the timing of this, this is

10   after a rhizotomy treatment; correct?

11   Q.    Sure.

12   **A.**    Yeah.  That's -- that's my understanding.  Like I said,

13   it was different than the question you asked earlier.  I

14   was -- if I remember correctly, the -- when we were talking

15   about the six days was in reference to a steroid injection and

16   not a rhizotomy.  The fact that a rhizotomy, as we mentioned

17   earlier, right, that can increase symptomatology and not see

18   the full effect for a number of weeks would not be unusual.

19   So what he's telling the physical therapist after a rhizotomy

20   would not be unusual.  And if this is -- if what we're talking

21   about, he would have had a rhizotomy on or about the 19th of

22   May.  So two and a half weeks or so later, three weeks.

23   Q.    That's not a successful block; correct?

24   **A.**    Well --

25   Q.    Or a successful rhizotomy?

Raimundo Leon, M.D. - Cross

1    **A.**    Well, we talked about earlier that the expectations --

2    and I don't want to get, you know, confusions here.  From a

3    steroidal perspective -- there's three things here that we

4    should clear up a little bit.

5          The effect of the local anesthetic should be instant.

6    Information should be obtained within a very short window of

7    time, call it less than an hour.  The effect of the steroid

8    itself to see the -- and, again, these are averages -- could

9    be up to ten days, and what we were speaking about earlier in

10   reference to physical therapist, I believe it was six days.

11   From -- a rhizotomy treatment is not instant either.  As a

12   matter of fact, my standard of practice after a rhizotomy is

13   to bring a patient back three to four weeks later because that

14   could take that long, and depending on what literature you

15   read, theoretically it could take up to six weeks to see the

16   full effect.  But, again, as an individual at this day, I

17   would agree with you that it did not help.

18   Q.    Okay.  So you have injections that have not been

19   diagnostic.  You have rhizotomies --

20       *(Reporter instruction.)*

21   **BY MR. ROGERS:**

22   Q.    Yes.

23          You have rhizotomies that certainly, according to

24   this note and the plaintiff's deposition testimony, have not

25   been entirely successful.

Raimundo Leon, M.D. - Cross

1    A.    Well, Counselor, you're saying -- you know, you can't say

2    that about all the injections.  I think the injection that I

3    performed, if we're using the criteria that we went over,

4    would be diagnostic.

5    Q.    Okay.  Let's -- let's talk about your injection.

6    A.    Okay.

7    Q.    You'll recognize, when you go through all of the

8    injections done, that yours stands alone as the only one that

9    any doctor ever reported provided complete relief.

10   A.    Correct.  And that is specifically because the way I

11   perform these injections is that I obtain a pain scale score.

12   So, therefore, we can't say one way or the other, for the

13   procedure that Dr. Anderson did, if -- if it was -- if it was

14   complete resolution at that time.  Again, that's a question

15   for him.  But it would stand to reason that there was

16   improvement and why he proceeded forward with rhizotomies.

17   Q.    It's not just Dr. Anderson, though.  That includes

18   Dr. Bhalani.

19   A.    But Dr. Bhalani, first of all, is doing rhizotomy

20   treatment.  He's not doing diagnostic blocks.

21   Q.    And again, he doesn't report complete relief at any

22   point.

23   A.    From the injection?  From --

24   Q.    The rhizotomy.

25   A.    Well, there's improvement, and I believe it was 80 to

Raimundo Leon, M.D. - Cross

1   90 percent or something to that effect.

2   Q.   Right.  But just so that we're not mincing words, there's

3   a difference between improvement and complete relief --

4   **A.**   Well, and that would -- I'm sorry.

5   Q.   Yeah.  Your record stands alone.  You're the only one who

6   says that ever occurred.

7   **A.**   Correct.  But we're comparing apples and oranges here.

8   Okay?  You are -- the records such as Dr. Bhalani's in Tampa

9   of the 80 to 90 percent improvement -- which, by the way, that

10   is a successful block.  To imply that a treatment -- any

11   medical treatment is going to provide 100 percent relief is

12   incorrect.  So -- let me finish for a second.  So, therefore,

13   the simple fact -- and you even stated earlier that

14   Dr. Anderson believes that a 75 percent improvement is

15   success.  On that criteria alone, Dr. Bhalani's injection

16   falls well within that aspect of it.

17        And, again, we're comparing diagnostic medial branch

18   blocks to rhizotomies.  How we got to rhizotomy was based on

19   the injection of the facet joints, the medial branch blocks

20   that were performed, okay, and that's how we ended up on a

21   track of rhizotomies to be -- to be performed.

22        Now, did they vary in improvement?  Yes.  But to say

23   that the expectation -- and of course, as a doctor, we want

24   complete resolution.  That's not the reality.  The reality is

25   in 20 years of practice I can't remember a patient that said I

Raimundo Leon, M.D. - Cross

1   received 100 percent.  The closest I may have gotten is 95,

2   98.  But on a consistent basis from a rhizotomy perspective.

3   From a medial branch perspective and a diagnostic perspective,

4   that's the expectation.

5   Q.   Now, something else unique that you do was brought up

6   during the direct exam, and that is that you administer

7   propofol.  You said that others do that as well.

8        You're aware that Dr. Anderson, the South Dakota pain

9   management physician, said he doesn't?

10  **A.**   Correct.

11  Q.   And he thinks it might confuse the diagnostic value of

12  that injection.  You're aware of that?

13  **A.**   I'm not aware of that, but I can state to the fact that

14  propofol has --

15  Q.   Let's just do this.  Do you disagree with Dr. Anderson on

16  that?

17  **A.**   I disagree in the -- in the process of the use of

18  propofol, and I would also state that any sedation -- okay, we

19  can't single out propofol here because it's not fair.  Because

20  any sedation that's given in the inappropriate doses or

21  inappropriately monitored will provide issues with the

22  diagnostic value.  Moreover, there are no analgesic

23  properties.  And again -- and this is where we differ.  I'm an

24  anesthesiologist, and my understanding is he's a physiatrist.

25  So our training leading up to our fellowship are slightly

Raimundo Leon, M.D. - Cross

1    different.

2            As an anesthesiologist, in understanding the process

3    of propofol, the administration of propofol in the right

4    setting, it will not interfere with the -- with the pain

5    aspect.  Moreover, is when does that sedation wear off?  And

6    within that window that we've talked about -- and we've talked

7    about in my deposition of when do we ask these patients, when

8    do we reevaluate the patients, when do we do this exam again,

9    it's well within the time that the effect of propofol would

10   have dissipated, would have been gone.

11   Q.    Okay.  It sounds like you're persuaded by it but that

12   Dr. Anderson and Dr. Schifini disagree with you.

13   **A.**    That's correct.  But then we have 75 percent of the other

14   pain physicians here in Las Vegas who clearly use propofol as

15   a sedation of choice.  Dr. Schifini is clearly in the minority

16   in this community.

17   Q.    Dr. Bhalani, the only other doctor involved in this case?

18   **A.**    He was doing -- he -- well, what he gave was actually --

19   if I'm not mistaken, he gave a narcotic during his process

20   because he's not anticipating any diagnostic value.  He knows

21   the problem.

22   Q.    He didn't use propofol?

23   **A.**    He did not use propofol, that's correct.

24   Q.    Now, based on your reported complete relief and your

25   impression that that first injection that was done by

Raimundo Leon, M.D. - Cross

1    Dr. Anderson was diagnostic, you wrote a cost letter back in
2    March 2014 for future rhizotomies?
3    **A.**    That's correct.
4    Q.    And at that point the plaintiff hadn't undergone any?
5    **A.**    That's correct.
6    Q.    And if the plaintiff's testimony is true, that none of
7    these injections provided the relief that you reported, then
8    that projection would be unfounded because the injections
9    weren't diagnostic?
10   **A.**    Again, Counselor, you keep going back to diagnostic, and
11   I'm saying that the injection was diagnostic in the sense
12   of --
13   Q.    I'm saying, if the plaintiff's testimony is accurate -- I
14   get it.  You're saying off your report it's diagnostic.  But
15   if the plaintiff's testimony that, yeah, no, it didn't provide
16   that kind of relief, that's correct, your projection of future
17   rhizotomies is unjustified?
18   **A.**    Well, let's go back and look through the records; okay?
19   The records show that Mr. Humes underwent continuous
20   rhizotomies.
21   Q.    We're talking about your cost projection letter from
22   2014.
23   **A.**    I'm a little confused then, Counselor.  I don't
24   understand what you're asking then.
25   Q.    Okay.  So what happens is the plaintiff has had two

Raimundo Leon, M.D. - Cross

1    injections to the facet joint?

2    **A.**   Correct.

3    Q.   And one of them was done by you?

4    **A.**   Correct.

5    Q.   And you write a projection for future rhizotomies?

6    **A.**   Correct.

7    Q.   If the plaintiff's testimony describing his relief from

8    the injections is taken as true, then that recommendation for

9    rhizotomies is unjustified?

10   **A.**   If you take it in that context, that would be true then.

11   That would be true.  However, when we look at the whole of the

12   records and he received -- he continued to receive these

13   rhizotomies, and I'm -- and Dr. Anderson, you can ask him as

14   well.  I would imagine that the decision for continuing

15   rhizotomy is offering some sort of improvement or significant

16   improvement to justify repeat rhizotomies not only in the

17   cervical spine but in other areas as well.

18   Q.   Now, the last time you saw the plaintiff was actually

19   before any rhizotomies were done.  The last time you saw him

20   was in April 2014.  The rhizotomies didn't begin until May.

21   **A.**   Correct.  I think I stated earlier -- and it's not --

22   that there was a visit in 2019.  But in reference to what

23   you're talking about, yes, April 23rd, 2014.

24   Q.   Now, you didn't write any pain scores in this visit.

25   **A.**   It is my standard of practice.  So I'll have to find

Raimundo Leon, M.D. - Cross

1    the -- the patient is instructed to fill out a -- a -- what's

2    called a patient follow-up form, and for April 23rd of 2014

3    his pain is a 3 to 4 out of 10.  So it was not transcribed.

4    And I would agree with you, but he did fill out a pain scale

5    score for me.  And I do note there that these dictations are

6    dictated but not edited.  That's why we have the handwritten

7    backup here, and clearly he -- he did give us a pain score.

8    It was a 3 to 4 out of 10.

9    Q.   Okay.  Now, this brings us up to near the time of this

10   gap in treatment, and I'll be closing with this.

11   A.   Okay.

12   Q.   The plaintiff has the rhizotomy the month after he sees

13   you, and it's followed by an 18 or 19-month period where

14   there's no records from anyone.

15        Now, in your reports that you've done that you've

16   written after you've reviewed everything, you never mention

17   cancer.

18   A.   I'm sorry?

19   Q.   You never mention cancer; correct?

20   A.   I don't believe I did, no.

21   Q.   The plaintiff never told you about that?

22   A.   No.

23   Q.   You didn't see any records reflecting cancer somehow

24   disrupting ongoing care?

25   A.   Yeah.  Counselor, as I sit here, I don't recall there's

Raimundo Leon, M.D. - Cross

 1    any.  I know there was some discussion about prostate, but

 2    I -- I'm not sure.

 3    Q.   Okay.  He didn't tell you about his wife's illnesses or

 4    treatment interfering with treatment?

 5    **A.**   We did not have any of those conversations, no.

 6    Q.   You didn't see any records from anyone else suggesting

 7    that the plaintiff was unable to treat because of conditions

 8    his wife was suffering?

 9    **A.**   That's correct.

10    Q.   Did you see any mention of medical issues with anyone in

11    his family in all the medical records you reviewed?

12    **A.**   I did not.

13    Q.   Now, what you did see is that shortly before that year

14    and a half off treatment, the rhizotomy he reported was

15    wearing off?

16    **A.**   That's correct.

17    Q.   And by that entry, just before that year and a half off

18    of treatment begins, it would suggest that that rhizotomy

19    didn't give him complete relief for a year and a half, that's

20    not the reason for him stopping treatment?

21    **A.**   Again, Counselor, the description of wearing off doesn't

22    denote stoppage.  So I can't -- you know, I can't assume that

23    it completely wore off or it didn't.  I don't know.  I just

24    can say what he said.

25    Q.   Okay.  When a patient gives you inaccurate medical

Raimundo Leon, M.D. - Redirect

1    history or accounts of his treatment, does it raise any

2    questions in your mind about patient reliability?

3    **A.**   It can, yes.

4    Q.   Okay.  That's all I have.  Thank you.

5             **MR. ROGERS:**  And, Your Honor, I left a -- a document

6    up there.  Is it okay --

7             **THE COURT:**  You can retrieve it.

8             Brief redirect?

9             **MR. WILSON:**  Yes, Your Honor.  I'll try to be quick.

10                    **REDIRECT EXAMINATION**

11   **BY MR. WILSON:**

12   Q.   Mr. Rogers asked you about your relationship with

13   Mr. Ganz?

14   **A.**   Yes.

15   Q.   Is he an attorney that you dealt with on this case?

16   **A.**   No.

17   Q.   In fact, Mr. Ganz is currently retired; isn't that

18   correct?

19   **A.**   It's my understanding, yes.

20   Q.   Do you work with a lot of attorneys in town?

21   **A.**   I do.

22   Q.   Including Mr. Rogers co-counsel, Ms. Temple's husband;

23   correct?

24   **A.**   That's correct.

25   Q.   Has he ever questioned your abilities as a pain

Raimundo Leon, M.D. - Redirect

1   management doctor?

2   **A.**   He has not.

3   Q.   And with respect to the questions that Mr. Rogers asked

4   you about campaign events, did you attend campaign events with

5   numerous attorneys in this community?

6   **A.**   Yes, I did.

7   Q.   And was one of those events including Rebecca Mastrangelo

8   who is Mr. Rogers' law partner?

9   **A.**   Yes.

10  Q.   So I just want to cut right to it.  Would you ever

11  consider making treatment decisions based on the attorneys

12  representing your patients?

13  **A.**   No, not at all.

14  Q.   Okay.  What about an insurance company like Acuity, would

15  you let them dictate how you treat a patient?

16  **A.**   Absolutely not.  And that goes back to this whole

17  referral process.  I'm blinded to how or when -- how they show

18  up.  They're going to be treated exactly the same regardless

19  of the source.

20  Q.   There was some questions about whether or not you've ever

21  testified in court or at a deposition where you found that

22  none of the -- the treatment was related to the collision.  Is

23  that -- do you remember that?

24  **A.**   I do.

25  Q.   Okay.  If you were to state that a condition was

Raimundo Leon, M.D. - Redirect

 1   completely unrelated to a crash, would that even go to court?

 2   A.   I would imagine it wouldn't, no.

 3   Q.   What would typically happen if you did that?

 4   A.   I would imagine it would settle way before that or

 5   something -- or the case would be dropped.  I don't know.  I'm

 6   not an attorney, so I don't know what the process is for that.

 7   Q.   That certainly would eliminate any evidence or reason to

 8   push forward; correct?

 9   A.   I would agree with that, yes.

10        MR. ROGERS:  He seems to be asking the doctor a legal

11   question.  Preclusion of evidence.

12        THE COURT:  How about you try to rephrase that?

13   BY MR. WILSON:

14   Q.   Have you ever seen a treatment plan in a case that goes

15   before a jury or to a deposition where there was no physician

16   indicating that the individual was injured in the collision

17   that brought them to that proceeding or trial?

18   A.   That's correct.  That was my intent.  There's been other

19   diagnoses that may be included in there that are -- were not

20   related and, of course, if they're not related, at such time

21   they were said to be not related.

22   Q.   Okay.  Do most people over 40 have degenerative changes

23   in their spine?

24   A.   Yes.  And it can start as early as 18.

25   Q.   Have you ever seen an MRI of someone over 60 without

Raimundo Leon, M.D. - Redirect

1  degenerative changes in their spine?

2  **A.**   I don't think I've ever seen that.  Even at the most

3  minimal aspect of it, there is some sort of change in that

4  spine.

5  Q.   Is every person with degenerative changes walking around

6  with pain?

7  **A.**   No.  And if that were true, I think we would need a lot

8  more pain physicians than what we have because it means that

9  everybody that has a spine, that has bony structures within

10  them -- which is all of us -- would succumb to pain, and

11  there's absolutely no indication of that in my clinical

12  experience nor in the literature that would suggest that.

13  Q.   Do degenerative changes in a person's spine make them

14  more suspectable to injury when they are in a traumatic event

15  like a car crash?

16  **A.**   No.  That's -- yes, that would be -- it's more likely to

17  have because the structure's not normal in a particular area.

18  So it would stand to reason that it was most likely to be

19  injured as opposed to not.

20  Q.   I'm kind of bouncing around here because I was taking

21  notes as he was asking you questions.

22  **A.**   Okay.

23  Q.   In order for trauma to exist on the inside or injury,

24  does trauma have to be visible on the outside of a person?

25  **A.**   No.

Raimundo Leon, M.D. - Redirect

1    Q.    Mr. Rogers asked you questions about whether or not you
2    saw the emergency room records or the fire department or EMS
3    records when you first saw Donald.  Did you end up -- did you
4    end up seeing them later?
5    A.    I did.
6    Q.    Before or after you initially filed your first report?
7    A.    It would have been just shortly before that, yes.
8    Q.    So you had those records when you came to your
9    conclusions?
10   A.    Yes.
11   Q.    With respect to the questions about the MRI that
12   Mr. Rogers asked you, did the MRI report of facet arthropathy
13   make it into the finding section of the MRI report?
14   A.    It did not.
15   Q.    And what, if anything, does that mean to you?
16   A.    It doesn't mean one way or the other in reference to
17   that.  It's obviously something that's noted there, which was
18   there and it -- in my opinion, it's really insignificant one
19   way or the other.
20   Q.    Do you know where Don will have his future RFAs?
21   A.    It's my understanding it appears, per the records, that
22   he's based out of South Dakota.
23   Q.    Is it possible that it could be in any of the states that
24   he frequents, such as Nevada, South Dakota, Florida, Texas, or
25   Arizona?

Raimundo Leon, M.D. - Redirect

1   A.    Again, it's -- he could and, sure, it could be possible
2   if he chooses to.  This is a patient choice at this point.  We
3   have a clear diagnosis.  We have a treatment option.  It's
4   obviously up to the patient if and when and where he would
5   like to proceed with that option.
6   Q.    And just judging it based off his -- off the records that
7   we have in front of us, it appears that he gets the treatment
8   where he's at at the time; is that correct?
9   A.    That's what it appears so, yes.
10  Q.    When he initially reported to you that he had neck and
11  back pain, which was his primary complaint?  What was
12  bothering him the most at that time?
13  A.    Initially the majority of the pain was in the cervical
14  spine.
15  Q.    Which is the neck; correct?
16  A.    The neck, that's correct.
17  Q.    Don's deposition occurred in 2018; correct?
18  A.    Yes.
19  Q.    What is more likely, that Donald's reports of pain relief
20  in the recommend -- or in the records taken shortly after the
21  procedures is correct or his memory from five years later?
22  A.    It would stand to reason that what's in the records taken
23  by these physicians would be more correct.
24  Q.    Okay.  Barbara Humes, who is Donald's wife, testified on
25  Monday -- and Donald also testified in his deposition -- that

Raimundo Leon, M.D. - Redirect

1    he woke up one day with pain in his arm and ended up needing

2    surgery and hasn't had any problems with it since.

3         Is that more consistent with a disk injury or a facet

4    injury?

5    **A.**   That would be more consistent with a disk injury than

6    that of a facet.

7    Q.   Okay.  Will Donald require future medical treatment --

8    sorry.  Will Donald require the future medical treatment you

9    described to a reasonable degree of medical probability?

10   **A.**   Yes.

11   Q.   In other words, is it more likely than not that he will

12   require this treatment for the rest of his life?

13   **A.**   It's more likely than not that he will continue to

14   require these treatments for the rest of his life.

15   Q.   Are all of the opinions that you've shared with us today

16   here to a reasonable degree of medical probability?

17   **A.**   They are.

18        **MR. WILSON:**  No further questions.

19        **THE COURT:**  Anything?

20        **MR. ROGERS:**  No, Your Honor.  Thank you.

21        **THE COURT:**  All right.  May I excuse this witness?

22        **MR. WILSON:**  You may, Your Honor.

23        **THE COURT:**  Mr. Rogers, may I excuse this witness?

24        **MR. ROGERS:**  Yes, Your Honor.

25        **THE COURT:**  All right.  Thank you, Doctor.

1          **THE WITNESS:**  Thank you.  Appreciate it.

2          **THE COURT:**  You can step down.

3          Next witness.

4          **MR. WILSON:**  We are getting him in -- into the

5     waiting room I believe is what it's called.

6          **THE COURT:**  Oh.  It's video?

7          **MR. WILSON:**  Yes.

8          And if you don't mind, Your Honor, I'm going to

9     retrieve the demonstrative and move it away.

10          **THE COURT:**  The what?  Oh, the spine?

11          **MR. WILSON:**  Yes.

12          **THE COURT:**  Sure.  All right.

13        *(Pause in the proceedings.)*

14          **COURTROOM ADMINISTRATOR:**  I just admitted him from

15     the waiting room.

16          **THE COURT:**  What did you say?

17          **COURTROOM ADMINISTRATOR:**  The witness, I just

18     admitted him from the waiting room.

19          **THE COURT:**  Oh.  There we go.  Hi, there.  Can you

20     see and hear us?

21          **THE WITNESS:**  Yes, I can.

22          **THE COURT:**  All right.  Fantastic.  All right.  Can

23     you tell us your name?

24          **THE WITNESS:**  Trevor Anderson.

25          **THE COURT:**  All right.  So Danielle is going to swear

Trevor Anderson, M.D. - Direct

1    you in, if you could raise your right hand.

2         *(The witness is sworn.)*

3              **THE WITNESS:**  I do.

4              **COURTROOM ADMINISTRATOR:**  Thank you.

5              And will you please state your name for the record.

6              **THE WITNESS:**  Trevor Anderson.

7              **COURTROOM ADMINISTRATOR:**  Thank you.

8              **THE COURT:**  We're going to get some questions to you

9    in just a second.  We're going to switch the camera so you can

10   see counsel.

11             **THE WITNESS:**  Thank you.

12             **THE COURT:**  So it's that camera right over there.

13             **MR. WILSON:**  Okay.  It's strange.

14             **THE COURT:**  Yeah, I know.  Maybe you want to put that

15   video up -- or, sorry, the screen up?

16             **COURTROOM ADMINISTRATOR:**  You can put that monitor up

17   and see him.

18             **MR. WILSON:**  Okay.  That will be a little better.

19             **THE COURT:**  Yeah.

20                            **DIRECT EXAMINATION**

21   BY MR. WILSON:

22   Q.   Good evening, Dr. Anderson.

23   **A.**   Hi.

24   Q.   Can you tell us where you work?

25   **A.**   I work at The Rehab Doctors in Rapid City, South Dakota.

Trevor Anderson, M.D. - Direct

1    Q.    And what kind of practice is that?

2    **A.**    I do primarily pain management.

3    Q.    Okay.  And is -- and we've -- we've heard a lot about

4    that today, about how it's a specialty.  Do you have any

5    advanced training beyond medical school that goes along with

6    that specialty?

7    **A.**    Yeah.  I did a residency in physical medicine and

8    rehabilitation at the University of Minnesota, and then I did

9    a one-year fellowship in pain medicine at the University of

10   Minnesota as well.

11   Q.    And after that fellowship, did you sit for any boards or

12   anything?

13   **A.**    Yeah.  I sat for and passed my boards both in physical

14   medicine and rehabilitation and in pain medicine.

15   Q.    Can you tell us why you decided to get into medicine?

16   **A.**    I suppose the simple answer is that my father is a

17   physician.

18   Q.    Sort of kind of a family affair, is it?

19   **A.**    Yeah.  Yeah.  I would -- he would run into his patients

20   out in the public, and they just really seemed to admire him

21   and think he was a -- just seemed to help a lot of people, and

22   I liked that so I wanted that, too.

23   Q.    What sort of doctor is he?

24   **A.**    He originally started as a family practice physician, and

25   then he later got board-certified in occupational medicine.

Trevor Anderson, M.D. - Direct

1    Q.   Okay.  So part of your practice deals with personal

2    injury; is that correct?

3    **A.**   Yes.

4    Q.   Why is that?

5    **A.**   It's just the nature of the business.  When somebody's

6    injured, they frequently have pain, and that's what I treat.

7    Q.   And do you treat all of your patients the same?

8    **A.**   Well, I mean, for whatever diagnosis they have, yes, I

9    would treat them same for whatever --

10   Q.   That's fair.

11   **A.**   -- diagnosis that I believe --

12   Q.   That was a -- that was a poorly worded question.

13        What I meant by that is, regardless of where they

14   come from or how they -- how they get to your office, once you

15   get a patient, is there any kind of differentiation based on,

16   you know, if it's a personal injury or if let's say it was a

17   sport accident or a boating accident or something like that?

18   **A.**   No.

19   Q.   Okay.  How did you come to meet Donald?

20   **A.**   He came to my office for a new evaluation.

21   Q.   And so --

22   **A.**   In 2013.

23   Q.   I'm sorry?

24   **A.**   In 2013.

25   Q.   Okay.  And when you first saw him, was that in the

Trevor Anderson, M.D. - Direct

1    capacity of just a treating physician?

2    A.    Yes.

3    Q.    All right.  And are you still treating him?

4    A.    Yes.

5    Q.    When was the last time that you saw him personally?

6    A.    Looks like December 21st of 2020.

7    Q.    So I see that you looked down at your records there, and

8    I want to kind of talk about that for a second.  How many

9    patients would you say that you see on a monthly basis?

10   A.    Oh, on a monthly basis, probably around 500.

11   Q.    All right.  So fair to say you probably don't remember

12   all of their records verbatim?

13   A.    No.  No.

14   Q.    Okay.  Do you have any follow-up appointments scheduled

15   with Donald?

16   A.    I don't think there's any scheduled follow-ups at this

17   point.  The -- when he starts to have pain again and needs his

18   injections repeated, then that's usually when he'll give me a

19   call and we'll get him set up.

20   Q.    So I want to kind of break down our discussion here, and

21   I want to talk about what you knew about Donald's medical

22   history before the collision, whenever he began treatment with

23   you; okay?

24   A.    Okay.

25   Q.    Were you aware of a fusion that occurred at the C6-C7

Trevor Anderson, M.D. - Direct

1    level in his spine roughly 14 years before the collision?

2    A.    Yes, I was aware of that.

3    Q.    And to your knowledge, at the time of this collision was

4    he symptomatic or did he have any issues related to that?

5    A.    Just prior to that collision?

6    Q.    Correct.

7    A.    No, not to my knowledge.

8    Q.    Okay.  Were you aware of any complaints or injuries to

9    Donald's low back before this collision?

10   A.    I was not.

11   Q.    Okay.  Were you aware of what's called a TIA that Donald

12   had 30 years before the collision?

13   A.    I was not.

14   Q.    Would you have been aware of that at the time you first

15   saw him if it was in your records?

16   A.    Potentially.  I -- I don't believe I was, but I may have

17   been --

18   Q.    Okay.

19   A.    -- at that time.

20   Q.    Can you explain what a TIA is?

21   A.    It stands for transient ischemic attack.  It's basically

22   a stroke or it's an event that causes -- usually by way of a

23   clot -- restriction of the blood flow to a part of your brain.

24   But it resolves quick enough that there's no residual

25   long-term effects from it.  Because, if there were, then it

Trevor Anderson, M.D. - Direct

1    would be a stroke.

2    Q.    Okay.  So 30 years later you wouldn't be seeing any

3    effects from that; correct?

4    A.    Correct.

5    Q.    Okay.  And what about gout?  Is that the kind of

6    condition that causes issues with someone's spine?

7    A.    I've never seen that.  That would be a very rare thing.

8    Q.    Where is it typically located, the issues with gout?

9    A.    The most common form of gout typically affects the large

10   toe.

11   Q.    Okay.  So moving forward a little bit, in this case

12   before you treated him, he had -- Donald had a couple of other

13   treaters related to this collision.  Did you review the

14   imaging that was done before he treated with you?

15   A.    Probably as I was seeing him that first time.

16   Q.    Okay.  As you sit here today, do you have an independent

17   recollection of any of that?

18   A.    You mean of what I -- what was seen on those -- that

19   imaging?

20   Q.    Yes, Doctor.

21   A.    No.  I mean, I've been -- of course, in preparation for

22   this, I've been reviewing some of the records.  So I looked

23   over them earlier today.

24   Q.    Okay.  And what, if anything, was remarkable on them?

25   A.    There was the evidence of the fusion at C6-7 in his neck,

Trevor Anderson, M.D. - Direct

 1    and then he had some degenerative changes, mild degenerative
 2    changes in his spine as well.  In his thoracic spine he had
 3    some disk herniations I believe it was.
 4    Q.    What does facet arthropathy mean?
 5    A.    So facet arthropathy is a loss of the cartilage that
 6    cushions the joint in the facet joints.  Facet joints are
 7    stabilizer joints that are on either side throughout your
 8    entire spine.
 9    Q.    And if somebody has facet arthropathy, does that
10    necessarily mean that they're experiencing pain?
11    A.    No.
12    Q.    So as I'm standing here right now, if I submit to you
13    that I don't have pain, could I potentially have facet
14    arthropathy and just not know it?
15    A.    Definitely.
16    Q.    Okay.  So getting to when you actually started to see
17    Donald, do you recall what the first -- sorry.  Strike that.
18          Do you recall when the first time you saw him was?
19    A.    Yes.  It was on August 8th of 2013.
20    Q.    And do you know how he came to be in your office?
21    A.    It says in my notes self-referred.  So all that means is
22    that he was not referred by another doctor to me.
23    Q.    Okay.  What were his chief complaints?
24    A.    Headache, neck pain, and back pain.
25    Q.    Did he have any symptoms between his neck and arm?

Trevor Anderson, M.D. - Direct

1   **A.**   You mean did he have symptoms in both his neck and arm?

2   Q.   No.  What I mean by that is did he have symptomatology

3   that indicated that there was a discogenic pain generator?

4   **A.**   Oh, that I felt was -- the symptoms in his arm were

5   related to his neck?

6   Q.   Correct.

7   **A.**   Yes, he did have symptoms that made me believe that.

8   Q.   Okay.  What part of his neck did you believe the -- the

9   symptoms were originating from?

10  **A.**   Probably the -- about the C5-6, C6-7 levels.

11  Q.   Any particular areas of those levels?

12  **A.**   Well, the canal where the -- the nerves of the spinal

13  cord runs and the foramina where the spinal nerves exit the

14  spine.

15  Q.   And did you perform any sort of diagnostic procedures to

16  determine, you know, where the pain generator was for Donald?

17  **A.**   You mean in terms of physical exam or an injection?

18  Q.   Both.  Just walk me through your process.  Tell me --

19  tell me sort of what you did.

20  **A.**   Yeah.  He -- I would have done a physical exam where I

21  had him do range of motion of his neck and where I palpated

22  his neck and have him identify for me where he felt the pain

23  there.  I would also do, you know, a neurologic exam of his

24  arm, and then we did eventually end up doing a cervical

25  epidural, which would be a steroid injection to his neck into

Trevor Anderson, M.D. - Direct

1   the epidural space.

2   Q.   Okay.  So I want to unpack -- oh.  Apologies.  I didn't

3   mean to interrupt.

4   A.   No, it's okay.

5        It would have both diagnostic and therapeutic

6   effects.

7   Q.   Okay.  I want to kind of unpack some of what you just

8   said.  You used the word "palpate."  Can you explain to all of

9   us what that means?

10  A.   Sure.  That's -- that's just touching with your fingers.

11  Q.   And what, if anything, are you looking for when you do

12  that?

13  A.   Primarily, in this case, would be looking for tenderness.

14  If I'm -- if I'm pressing with a -- a medium to hard pressure,

15  that if that's causing him increased pain.

16  Q.   And what would that -- what would that tell you?

17  A.   That that was an area where he probably had some form of

18  inflammation and was potentially a source for his pain.

19  Q.   And is that how you were able to kind of narrow down what

20  level you thought that the issues were coming from?

21  A.   Yeah.  It's a little bit difficult to delineate that

22  exactly because I don't have x-ray vision, but it can give you

23  an idea --

24  Q.   Okay.

25  A.   -- [indiscernible].

Trevor Anderson, M.D. - Direct

1    Q.    You also mentioned you were looking for neurologic

2    issues.  What does that mean?

3    **A.**    Oh.  So nerve signs such as decreased sensation or

4    decreased strength in his arm.

5    Q.    And what, if anything, would that have indicated to you?

6    **A.**    It could indicate if there's a presence of a nerve injury

7    and how severe it might be.

8    Q.    And did you find one?

9    **A.**    I don't believe he had any abnormalities in the

10   neurologic exam.  He had symptoms that were consistent with

11   approximately a C6-C7 distribution in terms of his pain, but

12   he did not exhibit loss of sensation or weakness in his hand.

13   Q.    Okay.  And so now I want to get back to that -- that

14   steroid injection you said.  That was August 14th of 2013; is

15   that correct?

16   **A.**    I believe that's correct, yes.

17   Q.    And that injection occurred after a fair amount of

18   treatment had already taken place for Donald; is that -- is

19   that also accurate?

20   **A.**    I believe so, yes.

21   Q.    When you are talking to a patient, at least

22   contemporaneously, are you aware of, say, some conservative

23   treatment that they're doing?  Like, if Donald would have been

24   in chiropractic care, is that something you would have asked

25   him?

Trevor Anderson, M.D. - Direct

1    **A.**    Typically I will, yeah.

2    Q.    All right.  And so basically what I'm getting at here, do

3    you just jump straight into injections in your practice, or do

4    you have, you know, some steps you go through before you get

5    to that point?

6    **A.**    Well, it would depend on what the -- what the diagnosis

7    is.  There are some things that the injection is the gold

8    standard first treatment, but there's lots of things where

9    medications, time, physical therapy, heat, ice, chiropractic,

10   all which might be part of the treatment process prior to

11   considering injections.

12   Q.    And I'm assuming that Donald was in the latter; is that

13   correct?

14   **A.**    By the time he got to me, he had done quite a few things,

15   yes.  He had tried several different types of medications.  It

16   looks like he had been to chiropractic.  Yeah, because he had

17   been -- I was aware at that time that he'd been seeing someone

18   in Las Vegas, and they were recommending medial branch blocks

19   at that time.  So he'd been through the more conservative

20   treatment by the time that he came to see me.

21   Q.    Okay.  And so at this point where we're talking about

22   this injection, that's an epidural steroid injection.  We've

23   already heard a little bit about that today.  Can you kind of

24   briefly describe what that is?

25   **A.**    Sure.  So an epidural steroid injection for this

Trevor Anderson, M.D. - Direct

1    particular one -- there's several different approaches -- but

2    this one would be an interlaminar, meaning it would come

3    almost [indiscernible] back of the spine, and the needle would

4    be advanced down to the posterior epidural space.  And once I

5    got there, I would inject contrast to confirm it was in the

6    epidural space that I could see under an x-ray machine that

7    I'm using at this time actively.  And once that was confirmed

8    to be in the correct location, then I would inject the

9    steroid.  And by steroid I mean a corticosteroid, which is an

10   anti-inflammatory agent that's an analogue of cortisol,

11   something our bodies make.

12   Q.   And what are you hoping to learn from that?

13   A.   Well, in terms of diagnostic utility is that if you have

14   improvement of symptoms, then you have identified the source

15   of the symptoms.

16   Q.   And if you don't have improvement?

17   A.   Well, then you probably didn't put it in the right spot

18   or -- I mean, not that the injection wasn't done correctly but

19   that the -- that your choice of where to inject maybe was not

20   correct.

21   Q.   And what was the result of this injection?

22   A.   He had improvement of his arm symptoms and some minor

23   improvement of his neck symptoms, but he had continued neck

24   pain.

25   Q.   What, if anything, did that indicate to you?

Trevor Anderson, M.D. - Direct

1    **A.**    That he probably had two sources of his symptoms, both in

2    the spine and then maybe -- and then some other potential

3    source in his neck or it could indicate that the injection

4    just wasn't powerful enough to have gotten rid of his pain

5    completely.

6    Q.    Speaking of getting rid of the pain for these injections,

7    what sort of numbing agent do you use when you perform this

8    procedure?

9    **A.**    I don't use any numbing agent in the cervical spine in

10   the epidural space because I don't want to inject Lidocaine

11   directly over the spinal cord.  I mean, you can do that, but I

12   just choose not to because sometimes you could end up with

13   somebody who has paralysis temporarily in the body and people

14   don't really like that.

15          But what I do do is I will put some Lidocaine just

16   under the skin because the needle is somewhat large that

17   you're using for this injection and so to reduce the pain of

18   inserting that needle through the skin.

19   Q.    So --

20   **A.**    I do put some there.

21   Q.    -- like the needle that they give me a shot in my arm, is

22   the one that you're using bigger than that?

23   **A.**    Yes.  For like a vaccine?  Definitely.

24   Q.    Yeah.  What about like my pen here?  You can't really see

25   it, but just a standard pen.  Is it smaller around than that?

Trevor Anderson, M.D. - Direct

1    A.    A standard pen would -- the pen would be larger than the

2    needle.  The needle is probably a couple millimeters in

3    diameter.

4    Q.    Okay.  And other than using Lidocaine, are there any

5    other acceptable methods for providing pain relief during the

6    procedure?

7    A.    Yeah.  I mean, sometimes you'll use sedation.

8    Q.    When people use sedation, do they typically -- or sorry.

9    When physicians use sedation in these procedures, do they

10   typically use full sedation or partial?

11   A.    Typically partial.

12   Q.    Why is that?

13   A.    Well, because the risk is increased with full sedation,

14   and it's usually unnecessary.

15   Q.    Does that also minimize the -- the diagnostic effects if

16   they're under full sedation?

17   A.    It depends on the injection.  For this one, no.  Because

18   for this particular injection, like a cervical epidural, by

19   the time you're seeing the positive results, your sedation

20   will have been completely over.

21   Q.    Okay.

22   A.    You will have completely recovered from the sedation.

23   Q.    And following this injection you had an appointment on

24   September 10th of 2013; is that correct?

25   A.    Let me look here.  I think it's easier for me to look

Trevor Anderson, M.D. - Direct

1    through my paper record.  I've got it on the computer, but --

2    you said September 10th?

3    Q.   Yes, sir.

4    **A.**   Yes, I did.  I followed up with him on September 10th.

5    Q.   And at that appointment what, if anything -- what

6    conclusions were you able to come to in speaking with Donald

7    about how the injection worked?

8    **A.**   Well, he was still having neck pain at that time.  His

9    neck pain was about 50 percent better, but he was still having

10   neck pain particularly with rotation of his neck.

11   Q.   Did that indicate anything to you?

12   **A.**   Well, that made me suspicious that he maybe had

13   facetogenic pain.

14   Q.   And once you determined that someone might have

15   facetogenic pain -- and correct me if I'm wrong, but that

16   means pain coming from the facet joint, which we've all heard

17   about a little today so I'm not going to bore everybody in

18   here with rediscussing that, but is that what you're talking

19   about?

20   **A.**   Yes, it is.

21   Q.   Okay.  And when you came to that conclusion, had you

22   discussed this treatment with Donald -- or, sorry, the

23   treatment of Donald and any of the prior treatment with any

24   other physicians?

25   **A.**   No.

Trevor Anderson, M.D. - Direct

1    Q.    Okay.  So in your note you stated that you wanted to
2    schedule a C4-5, C6 facet joint injection; is that correct?
3    **A.**    Correct.
4    Q.    All right.  And was that to determine whether or not the
5    pain was generating in the facet joints?
6    **A.**    Well, it was primarily to try to help him with his pain,
7    to reduce his pain.  But, yes, it would have some diagnostic
8    utility as well.
9    Q.    Okay.  In looking at your records, between the
10   September -- or, sorry, right before the September 10th note
11   there's a -- scratch that.  Sorry.  Strike that.
12          Let's jump to that September 13, 2013, facet
13   injection.  We've already heard roughly what that is, so if
14   you could briefly just kind of describe how you do that
15   procedure.
16   **A.**    Yep.  So that's a -- that -- for bilateral C4-5, C5-6
17   that means that would be four total spots we'd be injecting,
18   two on each side.  I would inject some numbing on the skin.
19   Then I would insert -- for this one, a lot of times you can do
20   all four of them at the same time.  So I would do the four
21   numbing spots and then insert the four needles using x-ray
22   guidance again and direct them down to what looks to be the --
23   kind of the middle part of the posterior facet joint to each
24   of those levels.  Then I'll take a lateral view just to make
25   sure I'm at the right spot depth wise and inferior wise.  And

Trevor Anderson, M.D. - Direct

1    once that looks good, then I'll inject some contrast to

2    confirm I'm not in a blood vessel.  And then I'll inject the

3    medication, which would be a mixture of a numbing medication

4    and a corticosteroid again.

5    Q.    And what sort of numbing medication do you use?

6    A.    Lidocaine.

7    Q.    And are there different schools of thought on which one

8    to use there?

9    A.    Maybe.  I would -- I assume most people use lidocaine,

10   but there's -- I use bupivacaine for some injections.  There's

11   several other types of local anesthetics that can be used.

12   Q.    So if the purpose is to -- to numb the area but keep the

13   patient lucid so that they can talk to you; is that correct?

14   A.    Well, not for the facet injections.  That would be --

15   well, okay.  There are some things that can be major

16   complications that I think can be avoided by having the

17   patient awake enough to be able to tell you what they're

18   feeling.  So they could say, well, boy, that really hurts, or

19   I'm feeling that down my arm, or something that might indicate

20   that you're doing something that could be potentially harming

21   them.  So that would be why I would prefer my patients for

22   most of my procedures to be awake enough where they can

23   communicate with me.

24   Q.    Okay.  How long does it take for the -- the numbing agent

25   and anti-inflammatory to take effect for the injection to

Trevor Anderson, M.D. - Direct

1   where the person will feel relief?

2   **A.**    The numbing agent can be within seconds.  Lidocaine kicks

3   in pretty fast, but it only lasts for a few hours typically.

4   The steroid is usually about three to five days for these.  It

5   can be as fast as one day or take as long as two weeks.

6   Q.   So if I represent to you that in the medical records on

7   September 19th of 2013 Donald went to a physical therapy

8   appointment and reported that the injections hadn't changed

9   his complaints much, does that mean the injections was not

10  successful for diagnostic purposes?

11  **A.**    No.

12  Q.   And why is that?

13  **A.**    Well, because it was six days afterwards.  That would be

14  after the numbing would have worn off and could be before the

15  steroid could have kicked in.  So that could be in that fairly

16  common period between those two where the pain is essentially

17  the same as it was before.

18  Q.   Can the amount of time that it takes for the steroid to

19  kick in and start working, can that be longer than a week or

20  two?

21  **A.**    Occasionally, but it's -- most of the time by two weeks

22  it will have kicked in and started working.

23  Q.   Okay.  And at some point while you were treating Donald,

24  were you made aware of treatment that was going on

25  contemporaneously that was similar to yours, pain management?

Trevor Anderson, M.D. - Direct

1   **A.**   You know, maybe.  I don't -- I don't recall off the top

2   of my head at this time --

3   Q.   Specifically --

4   **A.**   -- if I -- if I [indiscernible] --

5        *(Simultaneous crosstalk.)*

6   Q.   I'll kind of direct you a little bit.

7        On January 9th of 2014, Donald received a -- an

8   injection here in Las Vegas from Dr. Leon that was a bilateral

9   C4-5/6 medial branch block.

10  **A.**   Yep.

11  Q.   Were you made aware of that?

12  **A.**   I'm looking at my record from May 5th, 2014, and it looks

13  like he did inform me of that.

14  Q.   And when you say "he," who do you mean?

15  **A.**   Don.

16  Q.   Okay.  And did Donald also indicate how they worked for

17  him?

18  **A.**   Yeah.  It said in my record here that he had good results

19  for almost a month.

20  Q.   And what, if anything, does that indicate to you?

21  **A.**   Well, it's a little unusual to have that long of relief

22  from medial branch blocks, but I've seen that before myself.

23  It just indicates that it was a procedure that was the correct

24  procedure at the correct levels to help him with his neck

25  pain.

Trevor Anderson, M.D. - Direct

1   Q.   Did that dictate what the next sort of treatment should

2   be?

3   **A.**   Yes.  Because if you have good results from medial branch

4   blocks but those are never going to last long enough to be

5   good enough on their own, so then you're always progressing to

6   a radiofrequency ablation if you have positive results from

7   medial blanch blocks.

8   Q.   And so with -- with those sorts of injections in mind,

9   are you able to conclude to a reasonable degree of medical

10  probability that the RFAs -- the ablation is the direction

11  that you should go in?

12  **A.**   Yes.

13  Q.   Okay.  And when did you first perform an RFA on Donald?

14  **A.**   It was on May -- I'm sorry, May 19th of 2014.

15  Q.   And so we've talked about those a little bit today, but

16  can you kind of walk us through what exactly that is?

17  **A.**   Sure.

18  Q.   Ablation.

19  **A.**   So the ablation -- so, again, we're talking about four

20  facet joints.  When we did the injections into the joints,

21  there was only four spots.  For the radiofrequency ablation

22  we're targeting the nerves that provide sensory information

23  from those joints to your brain.  And so for that there's

24  actually six spots.  There is the nerve, the medial branch

25  right in between the two facet joints and then the medial

Trevor Anderson, M.D. - Direct

```
 1   branch above and below and then there's those on either side.
 2   So we're talking about six different nerves that we're
 3   targeting.
 4          And what you'll do is there's a special type of
 5   needle that has -- it's insulated down to the tip, and then
 6   there's a 5-millimeter tip that you insert and direct, again,
 7   by x-ray guidance and put it in the grove on the side of the
 8   cervical spine with that nerve runs.  And once you have it in
 9   good placement, then you put some stimulation through it to
10   confirm that you're getting stimulation in the area that's
11   desirable to indicate that you're next to the nerve.
12          Once that's confirmed, you give them a bunch of
13   lidocaine to help numb it and make it nice and numb.  And I
14   give it a few minutes to let it kick in so it doesn't hurt
15   them too bad.  And then you burn that -- those nerves.  And
16   the tip then heats up to 80 degrees Celsius, which is like
17   136, I think, Fahrenheit.  And -- and you do that for 90
18   seconds at each of those spots.
19          And your goal is to basically obliterate a section of
20   that nerve so that you're cutting off as much sensory
21   communication from the facet joints to your brain as possible.
22   Q.   And you mentioned making the needle move in some way to
23   indicate that you're in the right spot.  What happens when you
24   do that?
25   A.   Oh.  What -- how do we confirm that?
```

Trevor Anderson, M.D. - Direct

1    Q.   Yes.

2    **A.**   Yeah.  So we'll -- I'll put sensory -- I'll put sensory

3    stimulation through the -- at the tip, that exposed metal tip

4    right next to the nerve, and then I'll ask the patient where

5    they're feeling that.  And if they indicate -- you know,

6    depending on what level, kind of the area in the back of their

7    neck essentially, and as long as they're not feeling it go

8    down into their shoulder and arm, then we know that we're at

9    the right location and not too deep and not in any great

10   danger of burning a structure we don't want to.

11   Q.   And is this process comfortable for the person receiving

12   it?

13   **A.**   No, not at all.  It's very painful.  I mean, I try to do

14   my best.  I'll never get a patient again if they hear that.

15   But it's -- it's -- no, there's a lot of pain involved in it.

16   The burning part is usually not too bad because we give all

17   that numbing, but the process of getting these fairly large

18   needles into the spot we need to is painful.

19   Q.   And you had to do --

20   **A.**   I actually don't even like doing the procedure that much

21   because I don't like seeing people in pain, but it does help

22   enough eventually that I -- I still do it.

23   Q.   And so many needles did you have to use on Donald this

24   time, like how many spots?  Six?

25   **A.**   For that RFA would be six of those RF cannulas they're

Trevor Anderson, M.D. - Direct

1    called.

2    Q.    Okay.  And so each one of those would feel kind of the

3    way you've just described, pretty painful?

4    A.    Yes.

5    Q.    All right.

6    A.    Yeah.  In the process of putting them in, it would be

7    painful.

8    Q.    Are these treatments that we've been discussing, are they

9    kind of in line with what you learned in your fellowship?

10   A.    Oh absolutely.

11   Q.    Did you actually perform ablations in your fellowship?

12   A.    Definitely.  Many times.

13   Q.    How long do ablations usually last on a person?

14   A.    Cervical ablations would last about a year.  They can

15   last anywhere -- I suppose the 90 -- the 90 percent range on

16   the bell Curve, probably from six months to two years.

17   Q.    Did this ablation help Donald at all?

18   A.    I believe it did.

19   Q.    Did you see him on August 25th of 2014 to discuss this?

20   A.    You said August 25th of 2014?

21   Q.    Yes, Doctor.

22   A.    Let me find that.  Sorry.  This still back from when we

23   had paper records.  It's a little bit slower to dig through.

24         Yes, I did have a follow up with him on August 25th,

25   2014.

Trevor Anderson, M.D. - Direct

1    Q.    Did he indicate whether or not the ablation was

2    successful?

3    **A.**    He said that it was.

4    Q.    And that would have been pretty close to when it was

5    actually performed; correct?

6    **A.**    Well, what was the date?  So, I mean, we're talking three

7    months later.

8    Q.    Okay.  If -- if I represent to you that in your records

9    on October 6th of 2014 you saw Donald and he indicated that

10   the ablation was wearing off, does that cause you any concern

11   with respect to the effectiveness of the ablation?

12   **A.**    What was the date of that?

13   Q.    October 6th of 2014.

14   **A.**    Yeah, that would be somewhat concerning to me because

15   that would potentially indicate that he's not getting as long

16   duration of action as he should out of it, but it's also

17   possible that it's a different cause of pain or that he's --

18   just was having a rough time at that particular time.  That

19   sometimes can be seen.

20   Q.    So there's -- there's numerous causes that could cause

21   someone who had an ablation that close in time to come to you

22   and say, hey, Doc, I'm not feeling great today?

23   **A.**    Sure.

24   Q.    All right.  That doesn't necessarily mean that it wasn't

25   effective or that it wasn't the right procedure, does it?

Trevor Anderson, M.D. - Direct

1    A.    Correct.

2    Q.    Okay.  Do you ever perform procedures like these on

3    people that you don't think need them?

4    A.    No.

5    Q.    And during this time while he was getting this treatment,

6    do you know if Donald was doing physical therapy or anything

7    like that, more conservative care to kind of go with the

8    invasive treatment?

9    A.    Yes, he was doing physical therapy at that time.

10   Q.    Is that normal?

11   A.    Yeah, that's really common for people to be engaged in

12   physical therapy at the same time as getting injections.

13   Q.    Okay.  And now, the next time that you saw Donald was May

14   5th of 2016; is that correct?

15   A.    Now we're getting to where I do have the medical records

16   electronically.

17         Yes, he was.

18   Q.    And was that for another ablation?

19   A.    It was.

20   Q.    And between that ablation and the one before, that's a --

21   it's a decent gap, isn't it?

22   A.    Yeah.

23   Q.    Does that indicate to you anything about Donald's pain

24   generators or whether or not the ablation was medically

25   necessary?

Trevor Anderson, M.D. - Direct

1    A.   Well, all it tells me is that he -- it's possible that he

2    was -- just had good enough results for that long where he

3    didn't need it up until then.   It's also possible he was --

4    had other things going on that stopped him -- prevented him --

5    even if his pain did come back, prevented him from coming back

6    to see me again.

7    Q.   And that ablation would have been --

8    A.   That's not --

9    Q.   Oh.  Sorry.  Go ahead.

10   A.   That's not an unusual gap at all for it to go between for

11   my radiofrequency patients.

12   Q.   And this ablation would have been the exact same as the

13   one we just talked about a little bit earlier in detail; is

14   that correct?

15   A.   Correct.

16   Q.   So you followed up after the May 15, 2016, ablation on

17   June 24th, 2016, to -- to discuss that; is that correct?

18   A.   Yes.

19   Q.   And what, if anything, happened at that follow up

20   concerning the ablation that was remarkable?

21   A.   Well, he said that it hasn't helped much with his neck

22   pain.

23   Q.   Does that -- is that concerning from a treatment

24   perspective?

25   A.   Well, this is something that I've debated whether I

Trevor Anderson, M.D. - Direct

1    should change the follow up distance after my radiofrequency

2    ablations.  I typically do them six weeks afterwards, and I

3    would say 80 percent of my patients do not feel like the

4    ablation is helping them significantly at that time.  By two

5    months afterwards, probably 95 percent of them it is helping

6    them significantly.  There's structures that are burned

7    between the nerve and the lining of the bone that are very

8    slow to heal, and it's just fairly common to not reap the full

9    benefits of radiofrequency ablation until two months after

10   you've had it.

11   Q.   So what you're -- what you're basically saying is that

12   Donald's situation sounds like it's the same as a lot of your

13   patients with respect to --

14   **A.**   Correct.

15   Q.   -- to his interpretation of his pain level?

16   **A.**   At that time -- related to that amount of time after the

17   RF, yes.

18   Q.   Okay.  So the next time that you saw Donald was April 3rd

19   of 2017, and this is after other treatment that he had

20   received down in Florida.

21   **A.**   Yes.

22   Q.   What, if anything, did he indicate to you about his most

23   recent medical care?

24   **A.**   He told me that he had another radiofrequency ablation in

25   Florida around October of 2016 but that his primary issue at

Trevor Anderson, M.D. - Direct

1    that time was pain in his thoracic spine around his ribs and
2    his mid back.
3    Q.   Is that normal?
4    **A.**   Well, it would be a normal thing if you have a primary
5    pain generator and something helps you with that and then
6    secondary pain generators become the primary issue.  Yeah,
7    that's common.
8    Q.   And do you believe that's what occurred here?
9    **A.**   It would appear that way to me, yes.
10   Q.   And what did you do as a result -- or what treatment did
11   you provide as a result of this analysis and discovery?
12   **A.**   It looks like I got him set up for massage therapy,
13   physical therapy, and costovertebral joint injections.
14   Q.   And so looking through here it appears that you -- you
15   sort of changed focus from your primary focus being on the
16   cervical spine and going into the thoracic and lumbar spine;
17   is that correct?
18   **A.**   Correct.
19   Q.   And I'm not going to, you know, bore everybody with the
20   details of all of this because we've already gone through it a
21   little bit, but you did diagnostic injections and then
22   ultimately facet injections in those other levels, sort of
23   following the same trajectory that you did with the cervical
24   spine; is that correct?
25   **A.**   Yeah, to a degree.  The difference is the first shots

Trevor Anderson, M.D. - Direct

1    that I gave him -- let me confirm that, see what I actually

2    ended up doing.

3           Yeah, the first shots I actually gave him were

4    costovertebral joint injections, which is the joints where the

5    ribs come into the spine, where they -- the ribs articulate

6    with the spine.  That's the most common injections I do for

7    the thoracic spine.  I find I typically have better results

8    with those for thoracic related pain than I do with the facet

9    joints in the thorax.  So that's what I first did for him

10   there, which there are no costovertebral joints in the neck so

11   I would have never have done those there because you don't

12   have ribs in your neck, obviously.

13   Q.   Right.

14          And how did you ultimately come to perform facet

15   injections at this point at the lower level of the spine?

16   What sort of led up to that?

17   **A.**   Let me see if I can figure that out...

18   Q.   I'll direct you to September 1st of 2017.

19   **A.**   Well, I think actually it was May 16th, 2018, was the

20   visit where I -- where I decided to do thoracic facet

21   injections.  Or are you talking about lumbar?

22   Q.   I'm talking about lumbar.

23   **A.**   Okay.  Lumbar.

24   Q.   I was sort of following chronologically trying to go

25   from, you know, day 1 to day 10,000 or whatever we're at right

Trevor Anderson, M.D. - Direct

1    now.

2    **A.**    So what was the date you wanted me to look at again?

3    August 23rd, 2017, maybe?

4    Q.    September 1, 2017.

5    **A.**    Okay.  Yeah, that was the actual day I did the

6    injections, but the decision to do those was made on

7    August 23rd, 2017.

8    Q.    And what led to that?

9    **A.**    He was -- at this point he was having good enough results

10   from the RF in his neck and the costovertebral joints in his

11   thoracic spine to where now the lumbar spine was the primary

12   issue.  It had always been an issue.  I mean, he complained of

13   pain there from the first time I saw him, but that, at this

14   point, was his primary problem.  So that's when I signed him

15   up for the facet joint injections there.

16   Q.    And did those facet injections provide more relief than

17   the cervical spine injections?

18   **A.**    They did help with his lumbar spine pain, yes.  I have

19   here that he felt 70 percent better when he had his follow up

20   on October 5th, 2017.

21   Q.    Sort of in comparing the facet injections in the lumbar

22   to the cervical, it seems like the -- the lumbar facet

23   injections did more from a pain reduction standpoint; is that

24   accurate?

25   **A.**    Correct, yes.

Trevor Anderson, M.D. - Direct

1    Q.   Is there any indication as to why that is?

2    **A.**   No.  That's just the way it goes sometimes.

3    Q.   It's not abnormal or concerning in any way?

4    **A.**   No.

5    Q.   Okay.  And you did another set of facet injections on

6    August 30th of 2019; is that correct?

7    **A.**   Yes, in his thoracic spine.

8    Q.   And then you also did a -- another ablation, which is the

9    same C4-5/6, October 28th of 2019; is that correct?

10   **A.**   Correct.

11   Q.   And then on April 30th of 2020 more facet injections in

12   the mid back?

13   **A.**   Correct.

14   Q.   And then finally, May 14th, 2020, facet injections in the

15   lower back?

16   **A.**   Correct.

17   Q.   And -- and each of these sets of injections in this --

18   these kind of --

19       *(Reporter instruction.)*

20          **MR. WILSON:**   Oh.  Sorry.

21   **BY MR. WILSON:**

22   Q.   Each of these sets of injections and sort of the

23   divergences in -- in the focus, were those all medically

24   necessary according to your interpretation and diagnosis?

25   **A.**   Yeah.  He was -- he had had sufficiently good results

Trevor Anderson, M.D. - Direct

1   with the previous injections for a long enough time where it
2   was worth repeating them when he needed them.
3   Q.   Do you have any opinions as to whether or not the
4   diagnoses that you made and the treatment that you provided to
5   Donald were caused by the April 6th, 2013, collision?
6   **A.**   Yeah, I would say that the -- the pain he was
7   experiencing in those areas and, therefore, the treatment for
8   such were related to that accident.
9   Q.   Okay.  And did you ever testify to that?
10  **A.**   I believe I did, yes.
11  Q.   And if I submitted to you that it was September 11th of
12  2018, does that sound accurate?
13  **A.**   Was that the date of my deposition?
14  Q.   It was.
15  **A.**   Yes, that sounds accurate.
16  Q.   Okay.  I now want to talk very briefly about your
17  billing.
18  **A.**   Okay.
19  Q.   When you get a new patient, does it matter for the --
20  from the perspective of treatment what form of payment they'll
21  be using?
22  **A.**   No.
23  Q.   So do you treat all your patients the same?
24  **A.**   I do.
25  Q.   Do you know how Donald is paying for his care from you?

Trevor Anderson, M.D. - Direct

1    **A.**    I believe we have a lien with him.

2    Q.    Okay.  And so is that a bill that exists no matter what

3    happens in his case?

4    **A.**    Correct.

5    Q.    And with respect to your billing, have you ever analyzed

6    how your bills relate to other providers in your area?

7    **A.**    No.  I mean, I'm sure I bill similar to what my other

8    partners do.  I am -- I tend to be pretty cautious about not

9    over billing.  I would prefer to under bill rather than over

10   bill.

11   Q.    Do you actually control the charges and the billing, or

12   does somebody in your staff do that?

13   **A.**    I actually put in the -- the charges.  I put in the code

14   of what I like to do, what I want to charge.

15   Q.    So just taking one of these ablations, for example, after

16   the procedure you go in and say, you know, one of these, two

17   of these --

18   **A.**    Yeah.

19   Q.    -- and so on?

20   **A.**    Correct.

21   Q.    Okay.

22   **A.**    Like, for the cervical it's 4633, and that's -- I just

23   have that memorized because I do it often enough.  And I would

24   put in that code, and then that goes to my billing department

25   and then they bill it out.  I don't know exactly what that

Trevor Anderson, M.D. - Direct

1  bill amount is for that, but I do put in the code for the
2  procedure that I did.
3  Q.   And then with respect to -- to Donald's treatment, to a
4  reasonable degree of medical probability, do you believe he's
5  going to need future injections and ablations to continue to
6  try to manage his pain?
7  **A.**   I do.
8  Q.   And would it follow the same course, at least as far as
9  the levels and areas, as the ablations and injections that
10  we've been discussing for the last 15 or 20 minutes?
11  **A.**   I would think so, yes.
12  Q.   Okay.
13  **A.**   I feel like we've established a set of procedures that
14  give him good pain relief.
15       **MR. WILSON:**  Brief indulgence, Your Honor.
16  **BY MR. WILSON:**
17  Q.   One last question, Doctor.  Are all of the opinions that
18  you've shared with us today to a reasonable degree of medical
19  probability?
20  **A.**   Yes.
21  Q.   Thank you.
22       **MR. WILSON:**  No further questions.
23       **MR. ROGERS:**  May I stay here just to have this
24  information or --
25       **THE COURT:**  Sure.

Trevor Anderson, M.D. - Cross

1          **MR. ROGERS:**  Thank you.  Thank you, Your Honor.

2          **THE COURT:**  Can we put the camera that way?  Let's

3   see if we can get -- unfortunately, the camera's not real

4   close, but we'll see what we can do here.

5          **MR. ROGERS:**  I'll move to speed it up.

6          **THE COURT:**  No, you're good.  You're good.  And we

7   have half an hour.  Let's see if we can get done with this

8   witness.

9          **MR. ROGERS:**  You bet.

10                      **CROSS-EXAMINATION**

11  **BY MR. WILSON:**

12  Q.   Okay.  Doc, my name is Steve Rogers.  Thank you for

13  showing.

14          Now --

15  **A.**   [Indiscernible].

16  Q.   That's right.  I didn't know that until I was probably

17  20, but yes.

18          So let's -- let's pick up where you left off and that

19  is the bills.  I see that your charge for the initial

20  evaluation was $257.  Dr. Leon's initial consultation charge

21  was $1,200, a factor of five times what you charge.

22          Have you ever charged $1,200 for an initial

23  consult -- or, pardon me, $1,200?

24  **A.**   I don't believe so.  I think -- I think probably what we

25  charge for the highest level of initial consult is around

Trevor Anderson, M.D. - Cross

1   $500, and I've maybe billed that twice in my nine-year career

2   here.  So I don't bill -- like I said, I tend to be pretty

3   cautious about not over billing.  I probably under bill but,

4   you know, I'm doing all right.

5   Q.   Okay.  Now, for the facet blocks that you did, your

6   charges were roughly $1,970 whereas Dr. Leon's was $9,500.

7   Have you ever charged that much for facet or medial branch

8   blocks?

9   **A.**   You know, I honestly have ideas of estimates of how much

10  I charge for things, but I don't know the exact amounts that

11  we charge.  And it changes to a degree --

12  Q.   Okay.

13  **A.**   -- over time.

14  Q.   What's your charge to be here today?

15  **A.**   I think it's around $8,000.

16  Q.   Okay.

17  **A.**   This is my first time testifying in court, so...

18  Q.   Well, welcome.

19  **A.**   Thank you.

20  Q.   All right.  Now, what percentage -- since this is your

21  first time, what percentage of your practice involves personal

22  injury patients?

23  **A.**   Not a whole lot.  Maybe 10 to 15 percent I would

24  estimate.

25  Q.   Okay.

Trevor Anderson, M.D. - Cross

1    **A.**   Most of my patients are Medicare, VA, you know, just the

2    more typical Blue Cross Blue Shield, typical insurances.

3    Q.   Okay.  Got it.

4         Now, as I understand it, you haven't seen the other

5    physicians' records, Dr. Leon, the folks -- the other folks

6    here in Las Vegas, the doctors down in Florida, and so forth?

7    **A.**   I believe one exception to that might be early on I

8    probably saw the records for the medial branch blocks that

9    were done and, thus, that led to that first radiofrequency

10   abrasion that I did.

11   Q.   Well, you mentioned that your patient, Mr. Humes, the

12   plaintiff in this case, told you about it, but I didn't see

13   that record from Dr. Leon's office in your chart.

14   **A.**   And I may not have seen it.

15   Q.   Okay.  Now, at that first visit you had with the

16   plaintiff -- and just so everyone's clear on the chronology,

17   the accident happens in April 2013.  Your first visit is

18   August.  So four months later; right?

19   **A.**   Right.  Yes.

20   Q.   Okay.  So when you first saw him, you asked him about his

21   presenting complaints and about his past medical history;

22   right?

23   **A.**   Yes.

24   Q.   Okay.  Now, you would agree that accurate information

25   from your patient is important for you to reach the correct

Trevor Anderson, M.D. - Cross

1    clinical judgments?

2    **A.**    Yes.

3    Q.    And patient reliability is essential to that?

4    **A.**    Yes.

5    Q.    Okay.  The plaintiff didn't disclose to you any past neck

6    or back treatment other than a fusion that he'd had 14 years

7    earlier?

8    **A.**    Yeah, I don't believe he did.

9    Q.    Okay.  And it's fair to say that knowing the past medical

10   history is important to determining causation; is that fair?

11   **A.**    It can be, yes.

12   Q.    Now, with regard to causation, the plaintiff told you

13   that he'd been involved in a car accident, he told you that he

14   was rear-ended in Las Vegas, but he didn't provide any further

15   description; right?

16   **A.**    I don't believe so, no.

17   Q.    And you haven't seen vehicle photos?

18   **A.**    I -- I believe I did at one time around the -- the time

19   of the deposition.

20   Q.    Okay.

21   **A.**    But not more recently.

22   Q.    I don't believe we have a record of that, but let me --

23   let me march on.

24         Did the plaintiff's head or body strike anything

25   inside the car?

Trevor Anderson, M.D. - Cross

1   A.   I don't know that.  I know that he had some headache

2   problems.  So -- but I don't know if that indicates whether he

3   struck his head or not.  I don't -- it doesn't look like that

4   was reported to me at the time.

5   Q.   Okay.  He didn't have any cuts or bruises or abrasions

6   when he saw you.  Granted, that's four months after the

7   accident.  But he didn't have any marks on him anywhere;

8   right?

9   A.   No, not at that time.

10  Q.   Okay.  Now, you would agree with the general proposition

11  that the likelihood of injury from a trauma is proportionate

12  to the forces involved in it?

13  A.   Thus, that the -- the higher the force is, the more

14  likely you'd be injured?

15  Q.   You got it.

16  A.   In general, yeah, that would hold up.

17  Q.   Okay.  So we discussed his presenting complaints and his

18  history.  You do your exam after you collect that information,

19  and -- let me -- let me pull that up.  It -- it appears that

20  the plaintiff has a normal gait.  Let me see what else I saw

21  there.

22          And just for your information, this is that physical

23  exam portion of that 8/8/13 visit.  His -- he was able to walk

24  on toes and heels without difficulty?

25  A.   Yep.

Trevor Anderson, M.D. - Cross

1   Q.   Okay.  The strength testing of all the fingers, hands,

2   extremities was normal?

3   **A.**   Yes, it appears so.

4   Q.   And no loss of sensation anywhere?

5   **A.**   Correct.

6   Q.   The deep tendon reflexes were all normal?

7   **A.**   Correct.

8   Q.   Okay.  Okay.  Now, I understand he had the complaints of

9   pain in the neck and back, though; right?

10  **A.**   Yes.

11  Q.   Okay.  Now, that's your exam.  And then did you look at

12  any of the diagnostics, the films?  You mentioned earlier the

13  MRIs.  Did you see the films or just the reports?

14  **A.**   I would have just read the reports.

15  Q.   Okay.  Now, it looks here like you actually saw the films

16  taken at the emergency room.  You mentioned in your deposition

17  reviewing the cervical x-ray taken at the ER; correct?

18  **A.**   I may have or I may have just looked at a report for

19  that, too.  I don't recall.

20  Q.   Okay.  Now, you left off with plaintiff counsel with a

21  discussion about treatment for the low back.  You noticed that

22  in the emergency room there were no lumbar x-rays.  Were you

23  aware of that?

24  **A.**   At his initial emergency room visit?

25  Q.   Yes.

Trevor Anderson, M.D. - Cross

1    **A.**    I believe you, if that's the case.

2    Q.    Okay.

3    **A.**    Yeah, I don't recall one way or the other.

4    Q.    Were you aware that the only diagnosis at the emergency

5    room was cervical strain?  In other words, neck, whiplash.

6    **A.**    Okay.

7    Q.    Okay.

8    **A.**    I have seen emergency room records in the past, not

9    recently, but -- so I would have at one time been aware of

10   that.

11   Q.    Okay.  Now, with regard to the MRIs, you looked those

12   over and you saw that they depict degenerative processes going

13   on; correct?

14   **A.**    Yes.

15   Q.    Are there any findings on those MRIs that can be caused

16   only by trauma, you know, a single traumatic event like a car

17   accident?

18   **A.**    No, all the findings -- some of the findings could be due

19   to trauma, but they could all be explained by degenerative

20   findings.

21   Q.    Okay.  Now, because the plaintiff denied any prior neck

22   or back problems to you, you didn't see any pre-accident

23   x-rays; correct?

24   **A.**    I did not.

25   Q.    Did you see any pre-accident medical records?

Trevor Anderson, M.D. - Cross

1    **A.**   I don't remember, but I don't think so.

2    Q.   Did you ever find out what the pathology was in his neck

3    for which he had that cervical fusion 14 years before the

4    accident?

5    **A.**   No, I did not find out the specifics of why he had that

6    surgery.

7    Q.   Okay.  Now, you've discussed your first injection.  You

8    see him four months after the accident, and a few days later

9    after you first see him you do this epidural.  And you did

10   that because you thought, well, maybe there's a disk issue

11   related to that prior fusion; correct?

12   **A.**   No.  I was thinking that he's having neuropathic pain and

13   discogenic pain related to the accident.

14   Q.   Right.  But this was sort of an adjacent segment problem.

15   You were just going right around where the fusion was; right?

16   **A.**   Well, for the cervical epidurals you inject almost always

17   at the C7-T1 level because studies show that the

18   effectiveness, no matter what the level of the problem is, is

19   similar and the safety is highest at that level.  So the level

20   where you inject is just where I do 95 percent of the time

21   when I do cervical epidurals.

22   Q.   Okay.

23   **A.**   So I wasn't choosing this based on where I thought the

24   problem was other than my thought it was in his neck.

25   Q.   Got it.

Trevor Anderson, M.D. - Cross

1          Now, when you elected to go ahead with that epidural,
2   you'd already heard from the plaintiff that the Las Vegas
3   doctor, Dr. Leon, was suggesting medial branch blocks, but at
4   that initial visit you disagreed with that.  You went a
5   different route; right?
6   **A.**   Well, I thought it was possible that he needed medial
7   branch blocks.  The facets could be a possible source of pain.
8   But, I mean, I even said in my initial note likely facetogenic
9   pain in the cervical pine.
10          The reason I chose to do the epidural is the
11   epidural -- he was having arm and hand symptoms as well, and
12   the epidural can have a chance to help him with both arm
13   symptoms and neck symptoms and headache, whereas the facet
14   joint injections at those levels, the medial branch blocks
15   would pretty much be specifically to help treat neck pain.  So
16   my hope was to hopefully treat a larger number of his problems
17   with one shot.
18   Q.   Okay.  Now, we had a discussion with Dr. Leon about your
19   procedure, which is different from his.  You don't report pre
20   and post-injection pain scores, at least not in the
21   plaintiff's records, whereas he does.  Do you know why
22   there -- that difference exists?
23   **A.**   Well, we have that for everybody, but that is somewhat up
24   to patient responsibility.  And so it's not in the records.
25   It's just possible that Don didn't return that to me.  Because

Trevor Anderson, M.D. - Cross

1    we -- we have a sheet --

2    Q.    Don is --

3    **A.**    -- on everyone --

4    Q.    -- Mr. Humes?  I'm just --

5    **A.**    Mr. Humes.

6    Q.    I didn't mean to interrupt you.  Go ahead.

7    **A.**    Yes, Mr. Humes.

8            So for everyone we record -- the nurse records a

9    pre-procedure pain level on every single person I give an

10   injection to at the Black Hills Imaging Center.  Then that

11   pain record -- and then, when the patient comes back from the

12   procedure, the nurse again records the post-procedure pain

13   score.  And then that sheet is given to the patient to fill

14   out with every hour for the first six hours pain scores and

15   then every day for the first 14 days pain scores.  And then

16   it's the patient -- patient's responsibility to return that to

17   us later.

18           Some people put more into that than I do.  I

19   personally find it more helpful just to talk to the patient

20   and see how they're doing at their follow up than -- so they

21   get too much information from those pain scores because

22   they're so subjective anyways.

23   Q.    Okay.  So the plaintiff never turned in these pre and

24   post-pain scores?

25   **A.**    That's -- that's a possible reason why I don't have them.

1   Also, that was -- at that time, those initial early
2   procedures, we didn't yet have electronic medical records.
3   And so it's possible that that was somewhere in his paper
4   chart, and just when we eventually got the electronic medical
5   records, that wasn't one of the priority things to be scanned
6   in so it just is no longer available.  Because if somebody has
7   had a ton of injections, I mean, those could kind of clog up a
8   paper chart, and -- and they're not always that useful because
9   usually we try to document that to a sufficient degree in
10  their follow-up notes.
11  Q.   Okay.  Well, it's fair to say that that first injection
12  you did, the epidural, was not diagnostic; is that correct?
13  A.   Well, he did get 50 percent improvement in his neck pain,
14  and he was no longer complaining of his arm pain.  That's --
15  the arm symptoms.  That's a common thing I have happen when
16  somebody has two sources of problems.  I'll give them, like,
17  an epidural steroid injection and it's primarily for the nerve
18  pain or nerve symptoms in their leg, say, and they'll come
19  back and I will ask them how's it going and they said, oh, it
20  didn't work.  I said, oh, so you still have the leg pain?  And
21  they'll say, oh, no, that's all gone, but I still have pain in
22  my back.
23        So the epidural worked for the nerve symptoms, but
24  they still have inflammatory problems in other structures that
25  the epidural won't help with, such as in this case I would

Trevor Anderson, M.D. - Cross

1    assume in the facet joints that we went on to treat later.

2    Q.   Okay.  Well, you're -- you're aware from the deposition

3    that the plaintiff was reporting a little bit of a different

4    response to the injections to others than he was to you.  For

5    example, after the facet block he told his physical therapist

6    that the neck injection didn't change his complaints much.

7    A.   And that was the one that was six days after the facet

8    injections?

9    Q.   Let's see.  That's correct.

10   A.   Yeah, and that's what we talked about a little bit ago

11   where that's in that window where it's fairly common for the

12   numbing medication to have worn off and the steroid to not

13   have kicked in yet.

14        It's also possible that he just -- the injection

15   wasn't powerful enough, and that's exactly the reason why we

16   end up going on to the radiofrequency ablation.  Because if

17   someone is getting short-term improvement, like, from the

18   numbing for a facet injection, then they need to go on to the

19   medial branch blocks and radiofrequency ablation to try to get

20   more long-term improvement.

21   Q.   Okay.  Well, you didn't follow up with him after that

22   facet injection for -- when was the next visit?

23   A.   Let me look.

24        THE COURT:  While he's looking, Mr. Rogers, we are at

25   10 to 5:00 right now.  How much longer do you think you have

Trevor Anderson, M.D. - Cross

1   with this witness?

2           **MR. ROGERS:**  I will be done at 5:00.

3           **THE COURT:**  Okay.  All right.  Well, let's try to

4   finish with this witness then.

5           **MR. ROGERS:**  I've committed myself.  That stinks but

6   there it is.

7           **THE WITNESS:**  I'm sorry I'm taking up your time here.

8           It looks like -- he got the injection on 9/13/13.

9   Yeah, it was quite awhile until I saw him again.

10  **BY MR. ROGERS:**

11  Q.   Yeah, it was --

12       (Simultaneous crosstalk.)

13  **A.**   I think that's --

14  Q.   -- months later; right?

15  **A.**   What was that?

16  Q.   It was in May?

17  **A.**   It was May of 2014 it looks like was the next time --

18       (Simultaneous crosstalk.)

19  Q.   Right.  So you -- you don't know whether there was a

20  diagnostic value to that injection because you didn't have the

21  follow up for eight months.

22  **A.**   I would agree with that.

23  Q.   Okay.  So fair to say you weren't able to tell whether

24  the block was successful?

25  **A.**   Yeah.  Whether with the facet injections were successful,

Trevor Anderson, M.D. - Cross

1    correct.

2    Q.   And for you, success means 75 to 80 percent relief?

3    **A.**   For the medial branch blocks, yes.  That's what we're

4    hoping for.

5    Q.   Okay.

6    **A.**   I will note that on my May -- or my May 5th, 2014, note I

7    did say assessment Number 4 that he had good but short-term

8    results with intra-articular injections.

9              So that must have been indicated to me from him at

10   that time or sometime that the facet injections helped with

11   his pain but didn't last very long.

12   Q.   Okay.  Well, that's a good segue into the next topic,

13   which is the relief isn't simply the amount of improvement --

14   75 to 80 percent -- but when we get to rhizotomies, the focus

15   is the duration of the relief; right?

16   **A.**   Correct.

17   Q.   Okay.  And you've suggested -- or discussed already about

18   this short relief that the plaintiff is reporting or short

19   reduction in his complaints, that that's a little too short;

20   right?

21   **A.**   For the -- for the facet joints and the medial branch

22   blocks, yes, he had short term.

23   Q.   That was with respect to the rhizotomy as well; correct?

24   **A.**   Oh.  Are you talking about the time when he said that he

25   felt like it was wearing off but it -- he said it was still

Trevor Anderson, M.D. - Cross

1   helping but he felt like it was wearing off to a degree --

2   Q.   Yeah, he does --

3   A.   -- and that was about five months after?

4   Q.   Yeah.  You do the rhizotomy in May, and then at the

5   August follow up three months later he reports he continues to

6   be frustrated.  And then you go to October, and he'd -- he'd

7   already reported that he was doing worse, it was wearing off.

8        That's not a successful rhizotomy; correct?

9   A.   Well, it said he feels like the injection -- and that's

10   the radiofrequency ablation -- is wearing off some, but it is

11   still helping.

12       So he was still getting improvement, but he felt that

13   maybe his neck pain was returning to a degree at five months,

14   which is -- is a less-an-ideal outcome.  I mean, we'd like

15   them to last at least six months and have him get real good

16   improvement.

17   Q.   Okay.  Now, in this note it's mentioned that the

18   plaintiff's attorney will call for a phone meeting.  What was

19   that about?

20   A.   He probably mentioned that to me, my attorney would like

21   to talk to you or set up a meeting to talk.  I have attorney

22   meetings with my patients' attorneys on a semi regular basis

23   in these types of situations.

24   Q.   Okay.  Is the phone call with plaintiff's counsel what

25   prompted you to write that letter that you wrote just a couple

Trevor Anderson, M.D. - Cross

1    weeks later recommending future treatment for a period of two
2    years?
3    **A.**    Let me look here.  Probably.
4          What was the date of that letter again?
5    Q.    October 31.  That's Halloween.
6    **A.**    And I apologize.  I am not seeing that letter.  But
7    probably, yeah.
8    Q.    Okay.  Now, what happens at this point in time is you've
9    done this injection.  It's had this sort of mixed result.  It
10   is reportedly wearing off.  You write a letter for plaintiff
11   counsel that suggests future treatment for a period of two
12   years.  So that -- that would carry you up until 2016.
13         And what follows is basically a year-and-a-half gap
14   in treatment.  The treatment just ends.  You're aware of that;
15   right?
16   **A.**    Correct.  Yep.
17   Q.    Okay.  Now, you're aware that the case against the driver
18   involved in this accident settled right at this time, or did
19   you know that?
20   **A.**    I'm not aware of that, no.  I wasn't aware of that.
21   Q.    Now, you've said that there could be explanations for the
22   plaintiff's ongoing complaints other than the facet joints,
23   that that could explain some of these mixed results from the
24   injections; correct?
25   **A.**    Yes.

Trevor Anderson, M.D. - Cross

1    Q.   Are there potential non-anatomic issues going on?  In

2    other words, that you can't explain physically what accounts

3    for these ongoing complaints?

4    A.   What do you mean?  Like, what's...

5    Q.   In other words, it's not the facet, it's not the disk.

6    And since there's a question about diagnostics on it, that

7    there might be a non-anatomic explanation for it?

8    A.   I mean, do you mean like he's making it up or he's

9    malingering?

10   Q.   It's -- do you do work comp?

11   A.   Yes.

12   Q.   Okay.  Well, consider all the variables that you do in

13   that arena.

14   A.   Yeah, I --

15   Q.   Could there be a non-anatomic explanation for it with

16   these kind of mixed results?

17   A.   And it makes me angry when people try to fake me out and

18   overexaggerate and misrepresent what's going on, but I never

19   got that impression with Mr. Humes.

20   Q.   Do you have an explanation for why there was no treatment

21   for a year and a half?

22   A.   Yeah, I would say it's probably one of two things.

23   Either -- because I've seen that many times with other

24   patients, too, even ones who were just -- weren't in motor

25   vehicle accidents.  Either he was doing better for that period

Trevor Anderson, M.D. - Cross

1    of time, and that could certainly be from the ablation.  Even

2    though he was feeling like it was wearing off to a degree at

3    that one point, that could have been he was having a bad week.

4    That happens sometimes.

5              I have back pain myself.  Sometimes I have a bad week

6    and it resolves.

7              It could have been that other life things were

8    happening that took precedence over him seeking out treatment

9    for his neck.  There were bigger issues going on that were

10   taking precedence, and he just didn't have the time to make to

11   seek out that treatment.

12             Those would be the two most common things that I see

13   with my patients when I don't see them for a long time.

14   Q.   Okay.  You didn't report on any such bigger things,

15   anything going on in his life that might interfere with

16   treatment.  That's nowhere in the records --

17   **A.**   No.

18   Q.   -- correct?

19   **A.**   No.  Oh that -- it wasn't reported to me, and it

20   frequently isn't.

21   Q.   Okay.

22   **A.**   I just got a phone call from him that he needed the

23   ablation done again, that his neck pain was coming back, and

24   we got him set up and did it.

25   Q.   Okay.  Now, he comes back to you after this hiatus, and

Trevor Anderson, M.D. - Redirect

1    he tells you that he's coming back because of the agreement

2    that he'd entered into with your office to have rhizotomies

3    every two years.  There really was no such agreement; correct?

4    **A.**   No.  That sounds like a misunderstanding.

5    Q.   Okay.

6    **A.**   I'm sure that I told him, like I do everybody else, that

7    rhizotomies last typically six months to two years, and that

8    when it wears off, when nerves grow back and it wears off and

9    his pain comes back, then he needs to give me a call and we do

10   it again.

11   Q.   Okay.  Now, final question -- I know it's 5:00.

12          So you do work comp.  You do disability ratings.  Did

13   you ever do one on the plaintiff?

14   **A.**   I don't believe I have.

15   Q.   Okay.  Thank you.

16          **THE COURT:**  Brief redirect?

17          **MR. WILSON:**  Very brief.

18                       **REDIRECT EXAMINATION**

19   **BY MR. WILSON:**

20   Q.   I'm going to start where he ended and sort of work

21   backwards.

22          Do patients always discuss the life events that cause

23   them to have the gaps you-all were just discussing with you?

24   **A.**   Sometimes but not always, no.

25   Q.   Okay.  When a patient goes to an emergency room, does all

Trevor Anderson, M.D. - Redirect

1    the pain appear immediately all at once?

2    **A.**   No, not always.

3    Q.   If a patient is involved in a case, is it normal for you

4    to write letters to their counsel informing them of future

5    costs and procedures that might be necessary?

6    **A.**   Very normal.  Almost every single person I have in that

7    situation I do that, yes.

8    Q.   Okay.  Hypothetically, if Don had an episode of low-back

9    pain a couple of years before the collision for which he had

10   about six chiropractic visits and the pain resolved within a

11   month, would that change any of your opinions that you have

12   shared with us today?

13   **A.**   No.

14   Q.   Why not?

15   **A.**   Because it's far enough in the past and it had resolved

16   that -- in that period of time where it -- the amount that

17   that would be contributing to his symptoms that I was seeing

18   him for would be extremely minimal.

19   Q.   Okay.  Last question.  Mr. Rogers asked you about the

20   improvement Don received from the various individual

21   procedures.  When you consider the big picture, Don's response

22   to the various procedures, is that -- or, sorry, is it clear

23   to you that Don was benefiting from the injections and the

24   radiofrequency ablations?

25   **A.**   Yes, that was my impression.

Trevor Anderson, M.D. - Recross

1    Q.   And would you continue to recommend these treatments for
2    Don?
3    **A.**   Yes.  If his pain returns and it's the same type of pain
4    that was helped previously by the injections, then I would
5    recommend repeating them to help him again.
6              **MR. WILSON:**  No further questions.
7              **THE COURT:**  Anything else, Mr. Rogers?
8              **MR. ROGERS:**  Just -- just this one.
9                        **RECROSS-EXAMINATION**
10   **BY MR. ROGERS:**
11   Q.   But you have no follow-up appointment you've testified,
12   nothing scheduled now?
13   **A.**   There's nothing scheduled currently, no.
14   Q.   Good.
15             **MR. ROGERS:**  Okay.  Thank you.
16             **THE COURT:**  All right.  May I excuse this witness?
17             **MR. WILSON:**  He's free.
18             **THE COURT:**  All right, Dr. Anderson.  Thank you so
19   much.  You are excused.
20             **THE WITNESS:**  Yep.
21             **MR. WILSON:**  Thanks, Doc.
22             **THE WITNESS:**  Thanks, Justin.  You guys have a good
23   night.
24             **THE COURT:**  You, too.
25             **THE WITNESS:**  Thank you, everyone.  Bye.

Trevor Anderson, M.D. - Recross

1          **THE COURT:**  All right.  Ladies and gentlemen, that is

2    all for this evening, and we will return tomorrow morning at

3    9:00.

4          Michelle, I know you were supposed to pick up your

5    mom.  Is that going to give you enough time?

6          **A JUROR:**  Sure.

7          **THE COURT:**  If something happens, do you have

8    Danielle's number so you can get in touch with her?

9          **A JUROR:**  I do.

10          **THE COURT:**  Okay.  All right.  So we'll see everyone

11    back here at 9:00, and we will resume.

12          Please remember the rules.  Don't talk about the case

13    among yourselves or with anybody else.  Please don't review or

14    read or research anything about the case, and don't formulate

15    your final conclusions until you have heard all of the

16    evidence and heard my instructions of law.

17          Thank you for your patience and your attention today.

18    We'll see you tomorrow morning.

19          **COURTROOM ADMINISTRATOR:**  All rise.

20       *(Jury out at 5:03 p.m.)*

21          **THE COURT:**  Look at that.  We got through two doctors

22    today.

23          **MS. TEMPLE:**  I'm impressed.

24          **THE COURT:**  All right.  So tomorrow morning are we

25    going to go out of order, is that our plan, or are we starting

Trevor Anderson, M.D. - Recross

 1    with Mr. Humes tomorrow morning?  Or no, we're doing afternoon
 2    with your --
 3            **MS. TEMPLE:**  He's coming afternoon.
 4            **THE COURT:**  Schifini.
 5            **MS. TEMPLE:**  Um-hum.  We had changed it.
 6            **THE COURT:**  Okay.
 7            **MS. TEMPLE:**  Yep.
 8            **THE COURT:**  So we got Mr. Humes tomorrow.  Let's try
 9    to streamline his testimony so that we can get him done and
10    moved to Dr. Schifini.
11            **MS. XIDIS:**  Yes.  And we have one very brief witness
12    after Mr. Humes, but it will be a ten-minute witness.
13            **THE COURT:**  Okay.  And have we decided to not do some
14    witnesses?
15            **MR. WILSON:**  We did.
16            **MS. XIDIS:**  Yes.
17            **THE COURT:**  All right.  You want to let us -- you
18    want to --
19            **MR. WILSON:**  Linda Humes.
20            **MS. XIDIS:**  And Tony Lesko.
21            **MR. WILSON:**  And then there was another, Chris I
22    believe Noel that we were --
23            **THE COURT:**  So sorry, we're not doing Larry?  Is that
24    what you said?  I'm sorry.  Who did you say we're not doing?
25            **MR. WILSON:**  Linda.

Trevor Anderson, M.D. - Recross

1          **THE COURT:**  Linda.  Sorry.  I missed -- I didn't

2     hear.  So no Linda.  No Tony.

3          **MR. WILSON:**  And no Noel.

4          **THE COURT:**  And no Noel.  So the short one is Joe?

5          **MR. WILSON:**  Yes, Your Honor.

6          **THE COURT:**  Gotcha.

7          **MR. ROGERS:**  So, Your Honor, just -- it sounds like

8     two witnesses tomorrow.  Then the plaintiff closes.  The

9     defendant calls one witness and closes?

10          **MS. XIDIS:**  Yeah.

11          **MR. ROGERS:**  Is that the --

12          **MR. WILSON:**  That's my understanding.

13          **MS. TEMPLE:**  Perfect.

14          **THE COURT:**  We have draft -- discussion drafts of the

15     jury instructions.  Based -- we revised them after we got the

16     stipulation this morning and streamlined some things.

17          Did we do the verdict form yet?

18          **MR. ALDERMAN:**  No.

19          **THE COURT:**  We would love a plaintiff's proposed

20     verdict form.  It would be really helpful for us.

21          We have the defense's proposed verdict form.  I don't

22     think I have a proposed plaintiff's.

23          **MS. XIDIS:**  I can send it over.  It should have been

24     at the very end of our proposed jury instructions, but it's

25     possible.  Accidents happen.

Trevor Anderson, M.D. - Recross

1          **THE COURT:**  Okay.

2          **MS. XIDIS:**  I think it's very similar to the -- it's

3     just a straight up these are the damages.

4          **THE COURT:**  Okay.  Great.  Yeah, if you could send it

5     over, that would be helpful.

6          **MS. XIDIS:**  Do you want me to e-file it, or would you

7     like it just e-mailed to Danielle?

8          **THE COURT:**  E-file would be -- would be great.  That

9     would be the best for us to keep track of it.

10         **MS. XIDIS:**  We'll get that --

11         **THE COURT:**  In the meantime, we have the discussion

12    draft.  We'll go over it at some point tomorrow probably.

13    There's no specific time that we plan to do this, but if you

14    could take a look at it tonight.  So it contains most of the

15    stipulated agreed upon ones, but we've swapped out Eighth

16    Circuit for Ninth Circuit.  Because based on *Erie* we're in --

17    those jury instructions are procedural.  We are in the

18    Ninth Circuit.  So I swapped out Eighth for the Ninth Circuit

19    versions.

20         **MR. ROGERS:**  They were arguing because they had that

21    very argument.

22         **MS. TEMPLE:**  We agreed.

23         **MR. WILSON:**  We actually had done that before we met

24    with you and then you said --

25         **MS. TEMPLE:**  We thought we were saying we need to --

Trevor Anderson, M.D. - Recross

1    so we switched it all back.

2         **MS. XIDIS:**  Just a confusion.

3         **THE COURT:**  I meant you needed South Dakota --

4         **MS. TEMPLE:**  Substantive.

5         **THE COURT:**  -- substantive law because that's what

6    applies but not -- okay.  So good.  Good.  Well, then, maybe

7    we all are on the same page.

8         So we swapped them out for Ninth Circuit model

9    instructions and some of the others that I give.  Typically,

10   like, I combine a few of the ones about what evidence can come

11   in, what evidence doesn't come in just to make it so it reads

12   easier.

13        And then the ones that two of you had disagreed on we

14   made some -- we made some choices, and so this packet -- this

15   discussion draft packet has the ones that survived our

16   analysis and will now come in.  And also our -- I think we

17   also think are most consistent now with the stipulated issues.

18        I think we'll also probably need to consider whether

19   we need another jury instruction -- this just struck me --

20   about what, if any, facts have been stipulated to that the

21   jury needs to know about.  So we just -- I hadn't thought

22   about that until just now.

23        So, anyway, Max is going to pass out two per side so

24   that you can each take them home, and these are the discussion

25   drafts.  Hopefully we can mostly agree on them, especially

Trevor Anderson, M.D. - Recross

1  because of the streamline version as a result of the

2  stipulation this morning.

3          **MR. ROGERS:**  Great.

4          **THE COURT:**  All right.  So it looks like we are now

5  back on track.

6          **MS. TEMPLE:**  Yes.

7          **MR. WILSON:**  I don't know if you can tell on that

8  second witness, but there was a fire lit underneath me to get

9  that done.

10          **THE COURT:**  I saw it.  I loved it.  On both of you.

11  There was a fire under both of you.  So let's keep that fire

12  burning as we go into these next witnesses.

13          *(Proceedings adjourned at 5:09 p.m.)*

14                          --o0o--

15                  COURT REPORTER'S CERTIFICATE

16

17      I, AMBER M. McCLANE, Official Court Reporter, United

18  States District Court, District of Nevada, Las Vegas, Nevada,

19  do hereby certify that pursuant to 28 U.S.C. § 753 the

20  foregoing is a true, complete, and correct transcript of the

21  proceedings had in connection with the above-entitled matter.

22  DATED:  8/16/2021

23

24  /s/_____*Amber M. McClane*_____
                    AMBER McCLANE, RPR, CRR, CCR #914

25